UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

ELETSON HOLDINGS, INC. and ELETSON
CORPORATION,

                              Petitioners,

                   -v-

LEVONA HOLDINGS LTD.,

                        Respondent.

--------------------------------------------------------------------X

23-cv-7331 (LJL)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/09/2024

LEWIS J. LIMAN, United States District Judge:

Petitioners Eletson Holdings Inc. ("Holdings") and Eletson Corporation ("Corp" and, together with Holdings, "Eletson" or "Petitioners"), apply for an Order confirming a final arbitration award (the "Award") issued by the Honorable Ariel Belen of the Judicial Arbitration and Mediation Services, Inc. ("JAMS") on September 29, 2023. Dkt. No. 62. Respondent and Cross-Petitioner Levona Holdings, Ltd. ("Levona" or "Respondent"), moves: (1) for an Order, pursuant to Federal Rule of Civil Procedure 12(b)(1), dismissing the petition to confirm the Award; (2) for an Order, pursuant to 9 U.S.C. § 10, vacating the corrected interim award dated August 15, 2023 (the "Corrected Interim Award") and the Award; and (3) for an Order, pursuant to 9 U.S.C. § 9, 9 U.S.C. § 207, and/or Article V of the New York Convention, denying the petition to confirm the Award. Dkt. No. 49.

## BACKGROUND

The following facts are drawn from the Amended and Supplemental Petition to Recognize and Enforce the Arbitral Award ("Amended Petition"), Dkt. No. 62, the Award, Dkt.

No. 67-58, and the parties' statements of material fact pursuant to Federal Rule of Civil

Procedure 56.1, Dkt. Nos. 65, 66.  The facts are undisputed except as otherwise stated.

## I.      The Relevant Parties

This dispute relates to corporate control over non-party Eletson Gas LLC ("Eletson Gas"

or the "Company").  Eletson Gas, formed in 2013 under the laws of the Republic of the Marshall

Islands, is a limited liability company that specializes in liquified petroleum gas ("LPG")

shipping.  Dkt. No. 67-58 at 5; Dkt. No. 62 ¶ 2.  The present dispute centers on whether

Respondent Levona violated its agreements with and obligations to Petitioners Holdings and

Corp, a question which turns in part on whether an option to purchase the preferred shares of

Eletson Gas was effectively exercised by Holdings.

Eletson—both Petitioners Holdings and Corp—is an international shipping group owned

by three principal families: the families of non-parties Laskarina Karastamati, Vassilis

Kertsikoff, and Vasilis Hadjieleftheriadis.  Dkt. No. 67-58 at 5.  Both Holdings, the parent

company, as well as its subsidiary, Corp, are corporations formed under the laws of Liberia.

Dkt. No. 62 ¶ 2.  Holdings owns the common shares of the Company.  *Id.*  Corp provides

management services for vessels owned directly or indirectly by Eletson Gas in exchange for a

management fee.

Respondent Levona is a special purpose entity formed under the laws of the British

Virgin Islands on October 20, 2021.  *Id.* ¶ 3.  Levona is a subsidiary of two hedge funds, Nomis

Bay and BPY, that have both engaged the same alternative management company Murchinson

Ltd. ("Murchinson") to act as their investment sub-advisor.  *Id.*; Dkt. No. 50 at 7 n.2.

## II.     The Joint Venture

As noted, this case arises from a dispute over the ownership of the preferred shares in the

Company, and thereby the control over the Company's decision making and assets.  The

2

Company has historically owned a large fleet of medium and long-range product tankers and has been a leader in the transportation of oil products and gas cargoes.  Dkt. No. 67-58 at 6.  At the time that the events giving rise to this case occurred, the Company owned and operated fourteen LPG vessels, making its fleet the second largest on the market, second only to Unigas, the Company's primary competitor.  *Id.*

The Company was formed in 2013 as a joint venture by Holdings and funds managed by Blackstone Tactical Opportunities ("Blackstone").  *Id.* at 5.  At the outset of the joint venture, Holdings, which contributed equity interests in five medium-sized LPG vessels to the enterprise,[1] held (and still retains at present) the common stock in the Company, while the Blackstone funds, which contributed capital, held the preferred shares.  *Id.*; Dkt. No. 67-50 ¶¶ 91–92.  Over the following few years, the Company was plagued by financial problems, defaulting on several loans.  Eventually, in November 2021, Blackstone sold its interest in the Company to Levona, making Levona the owner of the preferred shares previously held by Blackstone.  Dkt. No. 67-58 at 7.

Several agreements are relevant to this dispute.  The first is the Third Amended and Restated LLC Agreement ("LLCA"), which became effective August 16, 2019, and governs the relationship among the holders of membership interests in the Company and contains the arbitration provision that Eletson invoked in the arbitration at issue here.  *Id.* at 6.  The original parties to the LLCA were the Company, Holdings (the common shareholder of the Company), Corp (the manager of the fleet of the Company's ships), and Blackstone (which held the preferred shares in the Company through a number of different funds it managed, all of which

---

[1] The vessels were the Anafi, the Nisyros, the Symi II ("Symi"), the Telendos II ("Telendos"), and the Tilos.  Dkt. No. 31-1 at 84.  Eletson later contributed capital to the venture as well.

were parties to the LLCA).  Dkt. No. 67-2 at 1–2.  When Blackstone sold its interest in the preferred shares (the "Preferred Interests") to Levona in November 2021, Levona replaced Blackstone as party to the LLCA, and signed a Joinder Agreement to that effect, agreeing to be fully bound by and subject to the provisions of the LLCA.  *See* Dkt. No. 67-4.

The LLCA confers on the parties certain rights and obligations.  As relevant to this dispute, the LLCA gave the holder of the Preferred Interests the power to designate three of five members of the Company's Board of Directors.  Dkt. No. 67-2 § 3.3.  Because the Board of Directors had "the sole right to manage and control the business, operations and affairs of the Company and to do any and all acts on behalf of the Company that are necessary, advisable or convenient to the discharge of its duties," *id.* § 3.1, the LLCA affords the holder of the Preferred Interests managerial control over the Company.  Even so, ownership of the Preferred Interests did not guarantee total control over the Company; the LLCA requires the approval of four Directors—one more Director than the holder of the Preferred Interests has the power to select— to undertake any "Fundamental Action," including the acquisition or disposition of any vessels or any assets worth more than $1,000,000.  *Id.* § 3.2; *id.* Schedule VI.  The LLCA also gives the holder of the Preferred Interests the right to the vast majority of the profits of the Company. When Levona purchased the preferred stock from Blackstone in November 2021, it inherited these rights.

The LLCA also contained a mandatory arbitration provision.  Section 12.14(a) provides as follows:

> Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (including the determination of the scope or applicability of this agreement to arbitrate) shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator.  The arbitrator shall be selected by agreement of the parties.  If the parties are unable to agree on an

arbitrator within 15 days after the demand for arbitration is made, JAMS shall
designated the arbitrator.  The arbitration shall be administered by JAMS pursuant
to its Comprehensive Arbitration Rules and Procedures.  The Federal Arbitration
Act shall govern the interpretation and enforcement of such arbitration proceeding.
The arbitrator shall apply the Law of the State of Delaware and the Republic of the
Marshall Islands, as the case may be, in accordance with Section 12.13.[2]

Dkt. No. 67-2 § 12.14(a).  Arbitration was designated as the "exclusive and binding method" for

resolving any such dispute.  *Id.* § 12.14(b).  But the Company's financial problems continued

despite the LLCA and the Company's new management.  By early 2022, five of the Company's

ships—over a third of its fleet—had been arrested by various creditors for non-payment of the

Company's liabilities.  Dkt. No. 67-58 at 54.  Multiple arrested ships were scheduled to be sold

at auction to compensate creditors.

Three days before the auction was set to proceed, however, Holdings, Corp, the

Company, and a wholly-owned subsidiary of the Company, entered into the second agreement

with Levona that is relevant to this dispute—the Binding Offer Letter ("BOL")—on February 22,

2022, which, through a desperately-needed infusion of cash in the form of a loan from Levona,

enabled the Company to avoid losing most of its fleet.  Dkt. No. 67-10.  Pursuant to the BOL, the

Company agreed to transfer two of its ships to Levona, in exchange for Levona lending up to

$10,000,000 to the Company, and granting the Company a limited option to buy Levona out of

the Preferred Interests, which would have the effect of terminating Levona's ownership and

control of the Company.  *Id.*  Because it has some relevance to the dispute, the Court describes

the terms of the BOL in some detail.  The BOL sets forth the terms and conditions pursuant to

---

[2] Section 12.13 provides that "[t]o the fullest extent permitted under the laws of the Republic of
the Marshall Islands, [the LLCA] and the rights and obligations of the parties [t]hereunder shall
be governed and construed and enforced in accordance with the laws of the state of Delaware for
agreements made and to be performed wholly within that jurisdiction."  Dkt. No. 67-2 § 12.13.
To the extent that the laws of the Marshall Islands did not permit application of Delaware law,
Section 12.13 provides that the law of the Marshall Islands governs.  *Id.*

which Levona was "willing to (A) buy the shares and/or membership interests of" two of the
Company's vessels, the Symi and Telendos, "from [the Company] in consideration of advancing
a purchase option to [the Company] and Eletson Holdings . . . ; [and] (B) advance a
US$10,000,000 senior loan to [the Company] . . . ." *Id.* With respect to the purchase of the
Symi and the Telendos, the BOL states that "Levona shall buy all of the Shares in the Companies
held by [the Company] . . . in consideration of the grant to [the Company] and [Corp] of the
purchase option set out in Clause 2" of the BOL. *Id.* § 1.1.

The BOL then goes on to provide the terms and conditions of both the loan and the
option to purchase the Preferred Interests from Levona (the "Purchase Option"). Clause Four,
which addresses the loan and Assignment, provides that "[c]oncurrently with the Transfer [of the
Company's interests in the Symi and the Telendos to Levona], Levona shall enter into a loan
agreement . . . for the advance of a loan facility to [the Company] of an amount of
US$10,000,000" to be "used as mutually agreed upon between Levona and [the Company] for
various refinancing and sources and uses." *Id.* § 4.1. This loan, the BOL provided, was senior to
all liabilities of the Company "save for such secured debts of [the Company] as Levona may
agree in their sole discretion may remain senior to the loan." *Id.* And, concurrent with the
transfer of the interests in the vessels and entry into the loan agreement, the parties agreed that
Corp and the Company's subsidiary would assign any claims they had against the Company to
Levona until the full amount of the loan was paid back. *Id.* §§ 4.3, 4.4. The BOL further states
that the loan terms are to also include: (1) a maturity date of two years from the date of the first
drawdown; (2) an interest rate of 10% per annum compounded monthly; and (3) priority on any
excess cash flow. *Id.* § 4.2.

Clauses Two and Three of the BOL address the Purchase Option and the consideration for the Purchase Option ("Purchase Option Consideration"), respectively.  Clause Two outlines the parameters under which the Company could buy out the Preferred Interests.  It states that, "[s]ubject to and in consideration of the Transfer [of shares in the Symi and the Telendos] occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to [the Company] . . . the option, exercisable by written notice to Levona . . . , for either [the Company] or its nominee to purchase all of the membership interests held by Levona in [the Company] . . . for a consideration equal to the Purchase Option Consideration" detailed in Clause Three.  *Id.* § 2.1.  However, the BOL sets conditions upon how and when this Purchase Option could be exercised.  Clause 2.2 states that the Company "shall only be entitled to serve an Option Notice after either: (a) the Loan and any Interest accrued thereon is fully repaid; or (b) adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona)."  *Id.* § 2.2.  Clause 2.3 limits the amount of time the relevant parties had to exercise the purchase option.  "[A]n Option Notice may only be served within 30 days from the date of [the BOL] ('the Purchase Option Period')."  *Id.* § 2.3.  The Purchase Option Period could be extended, but only if the loan was at least partially repaid.  *Id.* §§ 2.4, 2.5.  Under Clause 2.3, "[i]f no Option Notice is validly served by the expiry of such Purchase Option Period, . . . the purchase option shall lapse."  *Id.* § 2.3.

Clause Three of the BOL sets forth the formula and methodology for calculating the Purchase Option Consideration.  The Purchase Option Consideration is stated to be an amount equal to "$1 plus an amount equal to US$23,000,000 less the Net Value," where the "Net Value" is equivalent to the value of the Symi and the Telendos as determined by an independent valuation.  *Id.* §§ 3.2, 3.3.  In essence, if the value of the two vessels is less than $23,000,000, the

Company—to exercise the option to buy out Levona's Preferred Interests—must true up the difference to Levona so that the total value of consideration paid to Levona (including the value of the vessels) equals $23,000,000.  If the "Net Value" exceeds $23,000,000 (*i.e.*, if the value of the vessels is greater than $23,000,000), then the excess benefits the Company and is applied to reduce the amount outstanding on Levona's loan to the Company.

The BOL also conditioned the loan on an agreement from the Company, Corp, and Holdings that from the last date of the period during which the Purchase Option could be exercised, they would cooperate and vote in favor of any Fundamental Action proposed by Levona.  *Id.* § 4.2(d).

Importantly, the BOL links the loan and the Purchase Option.  The Company could only exercise the Purchase Option if Levona was repaid the loan and interest in full, or if Levona received, in its sole discretion, "adequate security and/or collateral . . . for the Loan."  *Id.* § 2.2(b).  If the Company repaid the loan and interest or provided such adequate security and/or collateral, it was entitled to exercise the Purchase Option and buy the Preferred Interests from Levona, subject only to truing up the value of the ships (the Symi and the Telendos) to $23,000,000.  But if the Company could not repay the loan and interest or provide such adequate security, then it did not have the option of buying the Preferred Interests from Levona.  In that situation, Levona, as consideration for the unexercised option, would retain the Preferred Interests and the attendant control over the Company, as well as its interests in the Symi and the Telendos.

Like the LLCA, the BOL contained a provision stipulating to the applicable law that would be used to adjudicate disputes, as well as a mandatory arbitration provision.  But the law to be applied, as well as the terms of where and how any arbitration would occur, were different

from those set forth in the LLCA.  Arbitration to resolve disputes arising from the BOL was to proceed as follows:

> This Letter and the negotiations between the parties in connection with the contents hereof, including but not limited to the proposed purchase of the Shares, grant of the Purchase Option and advance of the Loan and any disputes and claims arising out of or in connection with them and their formation (including non-contractual claims and disputes), shall be governed by and construed in accordance with English law and shall finally be resolved by arbitration in accordance with the rules of arbitration of the London International Centre for Arbitration applicable at the time of conclusion of this letter (the "Rules") by one arbitrator to be appointed in accordance with the Rules.  The seat of the arbitration shall be London, United Kingdom.  The language to be used in the arbitral proceedings shall be the English language.

*Id.* § 10.  The mandatory arbitration provision in the BOL did not supersede the mandatory arbitration provision in the LLCA.

In short, the BOL provided that Levona would be provided $23,000,000 (partially in the form of the two ships), in exchange for a loan of $10,000,000 and, if that loan and any interest accrued on it was repaid, or if adequate security or collateral was provided to Levona, the Company could exercise an option to buy out Levona's stake in the Company by acquiring the Preferred Interests.

On March 11, 2022, Levona and the Company executed a series of contracts to give effect to the terms outlined in the BOL (the "Transaction Documents").  Pursuant to the agreement contemplated in the BOL to transfer two Company vessels to Levona, the parties executed the Share Transfer Agreement ("STA").  Dkt. No. 67-12.  The STA provided that the Company would sell its interests in the Symi and the Telendos vessels and that "[t]he consideration for the sale and purchase of the Shares [in the vessels] shall be as set out in the [BOL]."  *Id.* § 3.1.  It contained an integration clause providing that the STA "together with the [BOL] constitutes the entire agreement between the Parties regarding the sale and purchase of the Shares [in the vessels] and related matters."  *Id.* § 7.1.

The same day, the parties also executed several other agreements to effectuate the terms contemplated by the BOL.  The parties entered into an Intra-Group Loan Agreement, pursuant to which Levona provided to the Company a loan facility of up to $10,000,000 for a term of up to two years.  Dkt. No. 67-58 at 8.  The parties agreed, through a Fundamental Action Letter, that while the loan was outstanding, Eletson would "[c]o-operate with any Fundamental Action . . . proposed by Levona."  Dkt. No. 55-4 at 15.  Before the parties entered into the Fundamental Action Letter, "Fundamental Actions" as defined in the LLCA—including the Company's acquisition and disposition of vessels and other assets worth more than $1,000,000— were the only acts over which Levona could not already exercise complete control as the holder of the Preferred Interests.  By providing that Eletson would cooperate with "Fundamental Actions" that Levona wanted to take, the Fundamental Action Letter transferred virtually unfettered control over the Company's affairs to Levona.  The parties also entered into an Assignment of Claims agreement, as contemplated by the BOL, pursuant to which Corp assigned to Levona all of its claims against the Company and any of its vessels.  Dkt. No. 67-58 at 9. Relatedly, the parties entered into a Deed of Waiver and Release, pursuant to which specified outstanding claims against the Symi and Telendos were released by certain Eletson entities.

On the same day that the parties executed the Transaction Documents, March 11, 2022, the Board of Directors of the Company unanimously approved the STA, the Loan Agreement, and the Fundamental Action Letter in a written memorandum ("Written Consent").  Dkt. No. 67-13.  The Written Consent summarized the terms of the BOL with respect to the sale of two of the Company's vessels to Levona "in consideration of the grant of a purchase option to the Company over the shares held by Levona in the Company," and with respect to the "fixed term unsecured loan facility advanced by Levona to the Company of []$10,000,000."  *Id.*  The Written Consent

ratified the BOL and all of the ancillary contracts, and authorized the Eletson Directors on the board to sign, execute, and deliver the STA and the Loan Agreement on behalf of the Company. *Id.* at 2.

After signing the Transaction Documents, the Company and Levona continued to work in concert to navigate the Company's financial challenges.  Dkt. No. 67-48 at 38.  A March 9, 2022 cash forecast prepared by the CFO of Corp, Peter Kanelos, projected that the Company would be out of cash by April 7, 2022, and again by April 12, 2022.  *Id*.  In light of this projection, the parties amended the loan to increase the amount available to the Company to $14,000,000.  Dkt. No. 67-58 at 9.

The parties dispute the effect of these agreements and specifically whether they constitute an exercise of the Purchase Option, and thus whether the Company bought out Levona's Preferred Interests in the Company.  Holdings and Corp contended in the arbitral proceedings that these contracts satisfied the Purchase Option and effectuated the Company's purchase of the Preferred Interest from Levona, and thus nullified Levona's membership interest in the Company.  Dkt. No. 67-24 at 13–14.  Accordingly, Petitioners argued, Levona's later attempt to sell some of the Company's assets was improper, because Levona, having allegedly sold off the Preferred Interests, no longer had the authority to control the Company or its assets.  *Id.* at 14.  In response, Levona contended that the transfer of the ownership shares of the vessels was consideration for the Purchase Option, but did not itself constitute an exercise of the Purchase Option.  Dkt. No. 67-17 at 8.  If the conditions for exercise of the Purchase Option were not satisfied, Levona would retain the Preferred Interests *and* retain the ownership shares of the vessels.  Pointing to the lack of a written notice to exercise the Purchase Option, and lack of repayment of any portion of the Loan, Levona contended that the Company never exercised the

Purchase Option and thus that Levona properly retained managerial control over the Company. *Id.*

About four months after the Transaction Documents were executed, on July 15, 2022, Levona—purporting to act on behalf of the Company—signed a non-binding Letter of Intent with Unigas (the "Unigas LOI")—the Company's primary competitor—to sell Unigas nine of the Company's twelve remaining vessels for $262,000,000. Dkt. No. 67-58 at 9. The two Eletson representatives on the Company's Board of Directors were not consulted before the Unigas LOI was signed, and were only informed of the agreement when a Levona representative sent the Unigas LOI to the Company's Board of Directors via email and directed them to accept its terms. Dkt. No. 67-24 at 16. Less than one week later, on July 21, 2022, one of the Levona representatives on the Board of Directors circulated notice for a Company Board Meeting to be held on July 26, 2022. *Id.* The Eletson representatives on the Board of Directors responded that the notice of the meeting was deficient for several reasons, such as the fact that the notice of the meeting did not specify the purpose of the meeting. *Id.* at 17. The Levona-appointed representative then circulated a new notice for a meeting of the Board of Directors of the Company to be held on July 28, 2022, and this time included a statement of the purpose of the meeting, which included certain actions to be taken in furtherance of the Unigas LOI. *Id.* After the Eletson Directors again responded that the notice was deficient and that they would not attend the meeting, the Levona directors stated that the meeting would nevertheless proceed, and ultimately held the meeting. *Id.*

## III.    The Commencement of the Arbitration and Jurisdictional Issues

On July 29, 2022, Holdings and Corp submitted a statement of claims and demand for arbitration against Levona in New York pursuant to the mandatory arbitration provision of the LLCA. Dkt. No. 67-16; Dkt. No. 65 ¶ 40; Dkt. No. 66 ¶ 40. Petitioners alleged that Respondent

breached the LLCA "and its express and implied duties thereunder" by, *inter alia*, purporting to act on behalf of the Company and in that capacity "actively trying to strip the Company of substantially all of its assets for less . . . than fair market value and for [Respondent's] selfish and personal gain." Dkt. No. 67-16 at 2. In particular, Petitioners alleged that Respondent granted the Company and Corp the Purchase Option, *id.* ¶ 13, that the Company had exercised the Purchase Option and effectuated the buy-out of the Preferred Interests, *id.,* that Respondent accordingly had no power or authority to act on behalf of the Company, *id.*, and that notwithstanding its absence of authority, and in violation of its duties under the LLCA, Respondent had attempted to effect a sale of nine of the Company's twelve vessels at fire-sale prices, *id.* ¶¶ 18–20. Eletson also included in its statement of claims its allegations that the Eletson-appointed Directors on the Company's Board had refused to sign off on the sale of nine of its twelve vessels, and that Respondent had improperly purported to call a meeting of the Company's Board of Directors to circumvent the Eletson-appointed Directors. *Id.* ¶¶ 21–29. Among other relief, Petitioners sought "[a] declaration that [Petitioners] have complied with all obligations necessary to complete the buyout purchase option and that the option has been executed," and injunctive relief against Respondent continuing to act on behalf of the Company. *Id.* at 8. Petitioners also sought an award of "[c]ompensatory damages for all the harm caused to the Company and/or Claimants by reason of Levona's misconduct," as well as punitive damages. *Id.* at 8–9. On August 16, 2022, pursuant to the LLCA, JAMS appointed Justice Belen to act as sole arbitrator of the dispute. Dkt. No. 62 ¶ 12.

On August 19, 2022, Levona filed its Response to the Statement of Claims and Statement of Counterclaims. *Id.* ¶ 13; Dkt. No. 67-17. Levona contested the jurisdiction of the arbitrator on the ground that the LLCA arbitration provision that Petitioners invoked—which provided for

arbitration in New York under the laws of the Marshall Islands and Delaware—could not control the parties' dispute, which, Levona contended, arose from the BOL. Dkt. No. 67-17 ¶ 1. It contended that the "crux" of the matter—the issue which underpinned all of Eletson's claims— was whether the Company had exercised the Purchase Option as provided for in the BOL, and thus that the dispute could only be resolved by an adjudication of the BOL in London under English law pursuant to the BOL's arbitration provision. *Id.* ¶¶ 1, 2. Levona also asserted counterclaims. It asserted that Eletson (both Holdings and Corp) had mismanaged the Company and failed to take care of its needs in violation of its obligations under the LLCA, the BOL, and the Loan Agreement. *Id.* ¶¶ 24–28. Specifically, Levona alleged that Eletson had breached the provision of the BOL requiring it to agree to Fundamental Actions directed by Levona as long as the loan remained outstanding. *Id.* ¶ 25. It alleged, as an example of Eletson's management failures, that Eletson had prevented the financier responsible for the March 2022 refinancing of selected LPG vessels from placing a mortgage on five of the vessels as desired, resulting in an increase in the interest margin rate and higher interest payments. *Id.* ¶ 28. It also alleged that Eletson had interfered with Levona's sale of the Symi and Telendos vessels, which Levona had acquired pursuant to the STA. *Id.* ¶¶ 29–34. And finally, Levona alleged that, as the sole holder of the Preferred Interests and pursuant to the LLCA and the Fundamental Action Letter, it had the right to sign the Unigas LOI and that Eletson had interfered with Levona's efforts to make the sale on behalf of the Company. *Id.* ¶¶ 35–41. Levona sought an order requiring Eletson agents to vacate the Symi and Telendos, declaratory judgment that the Purchase Option was not exercised, declaratory judgment that it retained the Preferred Interests, declaratory judgment that it was authorized to execute the Unigas LOI, and "[c]ompensatory damages for all the harm

caused and continuing to be caused to the Company and Levona by way of [Petitioners']
mismanagement, breach of contracts, and tortious behavior."  Dkt. No. 67-17 ¶ 48.

On September 12, 2022, Levona moved to strike Eletson's claims, asserting that the
claims were not within the jurisdiction of JAMS as it had in its initial response.  Dkt. No. 67-18
at 3.  On September 30, 2022, Justice Belen issued an order denying Levona's motion, holding
that "the arbitration provision in the [LLCA] is broad, encompasses the claims asserted, and the
parties agree that this arbitration provision was not replaced or superseded by the arbitration
[provision] in the Transaction Documents."  *Id.* at 12.  Justice Belen also found that Levona had
waived its jurisdictional challenges when it availed itself of the JAMS forum by filing
counterclaims.  *Id.*

On October 10, 2022, Justice Belen issued a temporary restraining order ("TRO")
providing that, during its pendency, "the parties hereto shall maintain the status quo and shall
not, among other things: (1) engage in the transfer or sale of any assets of [the
Company] . . . absent the joint written consent of the parties"; or "(2) notice or conduct of any
board meetings for the purposes of proposing or considering transfer or sale of any assets of the
Company."  Dkt. No. 67-58 at 13–14.[3]  On November 7, 2022, Justice Belen issued an order
rejecting Levona's argument that the TRO did not apply to "the sale of the Symi and Telendos"
because those vessels were no longer assets of the Company, having been transferred to Levona
pursuant to the STA.  The arbitrator held that "[a]ny attempt to sell or otherwise transfer the
Symi and Telendos vessels will be deemed to be in violation of the TRO."  *Id.* at 14.

---

[3] The LLCA empowers the arbitrator to grant injunctive relief.  It states, in relevant part, that
"[t]he parties agree that the arbitrator shall have authority to grant injunctive or other forms of
equitable relief (including, without limitation, a temporary restraining order or preliminary
injunction) to any party . . . to preserve such party's rights pending a final resolution on the
merits."  Dkt. No. 67-2 § 12.14(c).

On October 25, 2022, Eletson moved for a preliminary injunction, extending the TRO through the conclusion of the arbitration proceedings.  Dkt. No. 31-20.  In its application, it complained that Levona was attempting to sell the Symi and Telendos and to continue its efforts to sell the nine vessels to Unigas.  *Id.*  Levona cross-moved for injunctive relief, seeking an order requiring Eletson to comply with any directive provided to Eletson by Levona related to the Symi and Telendos and to cooperate in due diligence with respect to the sale of the nine vessels to Unigas.  On January 12, 2023, the arbitrator issued a decision on the parties' cross-motions for preliminary injunctions and entered a preliminary injunction ("Status Quo Injunction") extending the TRO's prohibition on actions altering the status quo until further notice.  Dkt. No. 67-58 at 14.  The preliminary injunction stated that:

> The parties hereto shall maintain the status quo and shall not, among other things: (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any assets of [the Company] . . . or assets in dispute in this arbitration, absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator, or (2) notice or conduct of any board meeting for the purpose of proposing or considering the transfer or sale of any assets of the Company or other assets in dispute in this arbitration.

*Id.*

On December 31, 2022, Eletson filed a Third Amended Statement of Claims and Response to Counterclaims.  Dkt. No. 67-24.  In its claims, Eletson sought a determination that Levona *never* had any lawful interests in the Company, that the assignment of the two entities owning Company vessels to Levona was procured by coercion, fraud, illegal, and other wrongdoing and is null and void, and that Levona not be considered an interest holder of the Company, or, in the alternative, specific performance of the Company's buy-out of Levona's Preferred Interests.  *Id.* at 4.  Eletson also sought compensatory and punitive damages and attorneys' fees.  *Id.*; *see also id.* at 22–24.  In particular, Eletson sought "compensatory damages

for all the harm caused to the Company and/or Claimants by reason of Levona's misconduct." *Id.* at 22.[4]

## IV.   The Debt Holder Litigation, Holdings' Bankruptcy and Related Arbitration Developments

On or about January 4, 2023, an affiliate under common ownership with Levona—Pach Shemen—purchased $183,851,546 in bonds of Holdings for $2,000,000, with an agreement that it would pay an additional $500,000 if the arbitration ended to Levona's satisfaction such that it was able to exercise its rights as holder of the Preferred Interests to sell the Company or its vessels. Dkt. No. 67-58 at 60. Thereafter, on January 11, 2023, Pach Shemen instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on the bonds. *Id.* Accordingly, that same day, a complaint was filed in this District by Wilmington Savings Fund Society, FSB against Holdings and two related entities (the "Bondholder Litigation"), alleging that the defendants had failed to make required quarterly interest payments on April 15, 2019 and each quarter thereafter, and had failed to repay principal and accrued interest on the maturity date of the bonds in violation of the terms of the notes and the indenture. *Wilmington Sav. Fund Soc'y, FSB v. Eletson Holdings Inc.*, CM-ECF No. 23-cv-261, Dkt. No. 1. On February 2, 2023, and again on March 8, 2023, the court in that case granted letter motions for an extension of time to answer. *Id.* Dkt. Nos. 18, 23. The case has since been stayed. *Id.* Dkt. No. 23.

On March 7, 2023, while the arbitration was pending and after the Bondholder Litigation had been filed, Pach Shemen and two other creditors of Holdings filed involuntary petitions for relief under Section 303 of Title 11 of the Bankruptcy Code, commencing involuntary Chapter 7

---

[4] On January 27, 2023, Respondent filed a Second Amended Statement of Counterclaims. Dkt. No. 67-25.

proceedings against Holdings and two of its affiliates in the Bankruptcy Court for the Southern District of New York.  Dkt. No. 67-30.  Levona notified the arbitrator of the bankruptcy proceedings that same day.  *Id.*  On March 8, Eletson submitted its own letter to the arbitrator, asserting that the automatic stay generated as a result of the involuntary petition against Holdings did not stay any of Eletson's affirmative claims or any of Levona's counterclaims against Corp, and that Eletson intended to move the bankruptcy court to modify the automatic stay so as to permit Levona's counterclaims against Holdings and the arbitration as a whole to move forward. Dkt. No. 67-32.  Eletson argued that the arbitration should move forward as scheduled for April 24, 2023.  *Id.*  It ended its letter to the arbitrator: "[w]e fully preserve all of Claimants' rights, claims, and defenses.  Levona's bad-faith bankruptcy filing, like its other bad-faith tactics, is causing Claimants serious harm."  *Id.*  On March 10, 2023, Eletson sent a second letter to the arbitrator in response to a suggestion by Levona that the arbitration and certain of Levona's deadlines in connection with the arbitration be delayed.  Dkt. No. 67-33.  Eletson accused Levona's affiliate, Pach Shemen, of procuring the involuntary bankruptcy to disrupt the arbitration and of making false statements to the arbitrator.  *Id.*  It noted that Levona's affiliate was the largest petitioning creditor in the bankruptcy proceeding, that Levona's designees on the Company's Board had signed the involuntary petition, and that Pach Shemen had acknowledged in the bankruptcy petition that one of its affiliates owned the balance of the equity interests in the Company and was engaged in mandatory arbitration concerning the ownership of the equity interests in the Company.  *Id.*  Eletson also asserted that Pach Shemen's purchase of the Holdings bonds constituted a violation of the arbitrator's Status Quo Injunction.  Referring to a dispute the parties had with respect to documents, it stated: "Your Honor should insist on timely production of documents and expert reports. If Levona does not honor Your Honor's orders,

Claimants reserve the right to seek the most severe sanctions." *Id.* at 1. The same day, the arbitrator stayed the arbitration pending further order of the Bankruptcy Court. Dkt. No. 67-34. In his order, the arbitrator stated: "[Petitioners] argue . . . [that] the filing of the involuntary petition is *arguably* a violation of the status quo injunctive order." *Id.* at 2 (emphasis added).

On April 11, 2023, the petitioning creditors and the debtors in the bankruptcy case submitted a stipulation, which was signed by the Bankruptcy Court on April 17, 2023, permitting the existing claims then pending in the Arbitration to proceed (the "Lift Stay Order"). Dkt. No. 67-35. The relevant provisions are in paragraphs 3 and 4 of the Lift Stay Order:

> 3. The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the Arbitrator, including any appeals, with respect to the claims currently pending in the Arbitration . . . . The Arbitration Parties are authorized to provide a copy of this Stipulation and Order to the Arbitrator.

> 4. Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending further order of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award. For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court.

*Id.* at 3–4. The Lift Stay Order recited that the parties to the arbitration were Holdings, Corp, and Levona and defined them as the "Arbitration Parties." *Id.* at 2.

On April 25, 2023, Eletson submitted to the arbitrator what it styled a "Supplemental Notice of Additional Levona Status Quo Injunction Violations." Dkt. No. 67-36. Eletson challenged (1) the filing in this court of the Bondholder Litigation, a claim for breach of contract by the trustee of notes issued by Holdings and two non-party affiliates due to the nonpayment of interest and principal and certain indemnified losses as a bad-faith filing "directed" by the "Levona Parties"; (2) the service of a Notice by that trustee, Wilmington Savings Fund Society,

FSB, terminating a "Restructuring Support Agreement" among the consenting noteholders; and (3) the filing by Pach Shemen and the two other creditors of the involuntary bankruptcy petitions against Holdings and its two non-party affiliates. *Id.* Eletson claimed that the Bondholder Litigation and the related purported termination of the Restructuring Support Agreement, as well as the involuntary bankruptcy petition initiated by Pach Shemen, violated the Status Quo Injunction and caused damages to Eletson generally and the Company specifically. *Id.* at 8–10. Eletson further accused Levona of misleading the arbitrator when it filed a letter to the arbitrator asserting that the arbitration was automatically stayed due to the bankruptcy petition, and that Levona had misled the arbitrator by stating in the letter that "Levona is not responsible for the bankruptcy nor does it own or control any party who filed the involuntary petition." *Id.* at 10. Eletson submitted evidence that Pach Shemen's owners were identical to Levona's owners and that Pach Shemen held itself out as "Levona II," as well as other evidence suggesting a close relationship between the entities. *Id.* at 12. Eletson stated that it intended "to include these violations and seek appropriate relief concerning them in the upcoming pre-hearing submissions and to adduce proof concerning them at the upcoming hearing, seeking such other and further relief as the Arbitrator deems fitting." *Id.* at 2. In the last numbered paragraph of the submission, Eletson took issue with the claim in the bankruptcy proceeding that the Preferred Interests were part of the bankruptcy estate. *Id.* at 16–17 ¶ 47. Eletson stated that:

> [A]s Levona knows, the preferred interests at issue here were, under the BOL, to be transferred to Gas or to a nominee, and, as Levona knows, the preferred interest was transferred at the time of the BOL and the subsequent March 2022 transactions to such nominees. Part of the relief Claimants seek here is confirmation that Levona has no interest in that preferred and that the nominees from Gas do.

*Id.* This statement was the first time that Eletson asserted in the arbitration that the Preferred Interests were transferred to a nominee. Previously, in an October 25, 2022 affidavit submitted in the arbitration, Eletson claimed that Eletson had exercised the Purchase Option and was the

sole unit holder of the Company.  Dkt. No. 67-20 ¶¶ 2, 9.  Eletson made the same claim in memoranda of law submitted to the arbitrator on October 25, 2022, November 8, 2022, and November 18, 2022.  Dkt. No. 67-21 at 10; Dkt. No. 67-22 at 6; Dkt. No. 67-23 at 11.  But Eletson did not, until April 2023, state that the Company had transferred the Preferred Interests to a nominee.

Ultimately, Holdings and the other debtors agreed to convert the bankruptcy case to a voluntary Chapter 11 case, to withdraw a motion they had previously made in the bankruptcy case that the involuntary bankruptcy case had been filed in bad faith, and agreed not to object to the payment of attorneys' fees to the petitioning creditors from the bankruptcy estate in an amount up to $1,500,000.  Dkt. No. 65 ¶¶ 132–134.  On September 25, 2023, the bankruptcy court converted the involuntary bankruptcy proceeding to a Chapter 11 voluntary bankruptcy case.  *Id.* ¶ 135.  On November 13, 2023, the bankruptcy court approved an award of $1,500,000 in attorneys' fees that the petitioning creditors, including Pach Shemen, had incurred in filing and prosecuting the involuntary bankruptcy case.  *Id.* ¶ 174.

## V.   The Arbitration Hearing

The arbitration hearing commenced on May 15, 2023.  Dkt. No. 67-58 at 19.  On May 3, 2023, in advance of the hearing and before the submission of the parties' Pre-Hearing Briefs, the parties stipulated that the schedule for the hearing was "fair and reasonable and waive[d] any objection to the schedule ordered or otherwise determined by the arbitrator."  Dkt. No. 67-39 at 4.  The parties further stipulated "that each has no challenge or objection to the arbitration on fairness grounds or on the basis that it has not been granted enough time to prepare for or present its case."  *Id.*  Procedural Order Number 6 identified the parties to the arbitration as those stated in the caption (*i.e.*, Holdings, Corp, and Levona), and the claims as those set forth in the Demand

for Arbitration and the Statement of Claims as well as those in Levona's Response to the Statement of Claims and Counterclaims.  *Id.* at 1, 4.

In its Pre-Hearing Brief submitted on May 5, 2023, Eletson asserted that the Preferred Interests were not bought out by the Company but were transferred to nominees chosen by Eletson in March 2022.  Dkt. No. 67-38.  It stated: "[t]he preferred interests in this arbitration, from their issuance up until the execution of the BOL and even thereafter, were never owned or controlled, directly or indirectly" by Eletson, the Company or "any other entity directly or indirectly affiliated with any of those entities," *id.* ¶ 100, but that "[f]rom January 2022, at the latest," the owners of Eletson had determined to nominate three Cypriot entities (the "Nominees")—each related to the three families who own Eletson—to hold the Preferred Interests, *id.* ¶ 103.  Eletson asked that the arbitrator confirm that the Nominees held the Preferred Interests in the Company.  *Id.* ¶ 208(ii).  Eletson also made a claim for "rescissory damages relating to the transfer of the Symi and Telendos to Levona, including that the proceeds of any sale of the Symi and Telendos and revenue related thereto paid to Claimants/the Company."  *Id.* ¶ 50.  Further, Eletson sought "punitive and other damages" for Levona's conduct that it alleged violated the Status Quo Injunction.  *Id.* ¶ 51.

On May 10, 2023, Levona moved to strike Eletson's allegations that the Preferred Interests had been transferred to the Nominees, or in the alternative to dismiss Eletson's claims in chief.  Dkt. No. 67-40.  Levona argued that Eletson had improperly alleged that the Preferred Interests had been transferred to the Nominees for the first time on the eve of the hearing, with only specious evidence in support of the allegations, and in complete contradiction of Eletson's

prior assertions about the holders of the Preferred Interests.[5]  *Id.*  Levona suggested that Eletson had contrived the allegation that the Preferred Interests had been transferred to the Nominees to ensure that the Preferred Interests were not considered part of the bankruptcy estate in the bankruptcy litigation and thereby "avoid the consequences of a negative decision in the Bankruptcy Court."  *Id.* at 4.  Put differently, on Levona's account, Eletson only suggested that the Preferred Interests had been transferred to the Nominees at such a late stage because Eletson did not have an incentive to make such an assertion until after the bankruptcy proceeding against Holdings had been initiated.  *Id.*  Prior to the initiation of the bankruptcy proceeding, Holdings could retain the Preferred Interests by winning the arbitration; after the initiation of the bankruptcy proceedings, however, any arbitral award to Holdings would become an asset of the bankruptcy estate, such that if the Preferred Interests were included in the arbitral award, the Preferred Interests would be distributed to Holdings's creditors.  *Id.*  If the Preferred Interests had been transferred to the Nominees, however, they would remain remote to the creditors in the bankruptcy proceeding.  Levona also argued that, if the Cypriot entities were the Nominees, they would be the real parties in interest and would be required to be made parties to the arbitration and that Eletson would not have standing.  The arbitrator did not rule on Levona's motion until after the hearing.  Dkt. No. 67-58 at 30.

During the eight-day hearing beginning on May 15, 2023, Eletson and Levona presented the testimony of their representatives, expert witnesses, and others.  *Id.* ¶ 20.  In his opening statement at the arbitration, counsel for Petitioners stated that he wished to address "how we might structure relief here so that it's effective so that we don't wind up going through all this

---

[5] Levona specifically argued that it would be prejudicial to allow Eletson to introduce documents regarding the transfer without allowing Levona any discovery.  Dkt. No. 67-40 at 5.

and your Honor will come to toil and struggle to come to a decision and then Levona and its affiliates will render it nugatory" and sought to prevent Levona from arguing that "even if [Petitioners] win in this proceeding, [the recovery] goes back into Holdings" because "the bankruptcy allows them to take it."  Dkt. No. 67-42 at 4–5, 6.

The arbitration hearing continued on May 16, 18, 19, 22, 23, and 24, and the arbitrator heard closing arguments on June 13, 2023, at which point he deemed the record closed.  Dkt. No. 65 ¶ 118; Dkt. No. 66 ¶ 118.  At the hearing, representatives of the Nominees submitted written testimony in which they stated that Eletson had told Levona that it intended the Preferred Interests to go to the Nominees of the Company and that "[a]ny conclusion by the Tribunal in this Arbitration" would "bind" them.  Dkt. No. 67-41 at ¶¶ 101, 103; Dkt. No. 67-43 ¶¶ 194, 196; Dkt. No. 67-45 ¶ 104.  At the conclusion of the hearing, the parties consented to a fifteen-day extension of the thirty-day deadline under the JAMS Rules for issuance of an award.  Dkt. No. 62 ¶ 21.

In early June 2023, both sides submitted to the arbitrator their post-hearing briefs, Dkt. No. 67-48; Dkt. No. 67-50; and their proposed arbitral award orders, Dkt. No. 67-47; Dkt. No. 67-49.  In their proposed order, Petitioners requested an award of damages solely and directly to the Nominees and to the Company—non-parties to the arbitration—with no damages paid directly to either Petitioner.  Dkt. No. 67-47.  On July 11, 2023, while awaiting the arbitrator's decision, Levona applied to the arbitrator to order Eletson to produce what Levona claimed was material new information that had been produced by Holdings in the bankruptcy proceedings.  Construing the request as one to reopen the hearing, the arbitrator denied that request as both procedurally and substantively flawed on July 18, 2023.  Dkt. No. 67-52.

## VI.     The Interim Ruling and Final Award

On July 28, 2022, Justice Belen issued an "interim" ruling and award ("Interim Award") in Eletson's favor, and on August 15, 2023, Justice Belen issued the Corrected Interim Award. Dkt. No. 67-55.  On September 29, 2023, Justice Belen issued a Final Award.  Dkt. No. 67-58. The Interim Award and Corrected Interim Award resolved all issues submitted for decision in the arbitration, except those relating to the parties' requests for attorneys' fees, costs, expenses and pre-judgment interest.  Dkt. No. 62 ¶ 23.[6]  The Final Award adopted, incorporated, and republished the Corrected Interim Award in its entirety and integrated the arbitrator's subsequent determinations regarding the parties' requests for attorneys' fees, costs, expenses and interest. *Id.* ¶ 28.

The arbitrator grouped Eletson's claims that Levona breached the LLCA and the implied covenant of good faith and fair dealing into four categories: (1) claims that Murchinson engaged in deceitful and wrongful conducted that voided *ab initio* Levona's acquisition of Blackstone's Preferred Interests by bribing Corp's Chief Financial Officer to induce him to disclose confidential Company information, and by communicating directly with Company financiers and lenders, thus engaging in "industrial sabotage" prior to Levona's acquisition of the Preferred Interests, in violation of the NDA that Levona had entered into with Blackstone; (2) claims that Levona breached the LLCA after its acquisition of the Preferred Interests and before entering into the BOL by attempting to fire Corp as the manager of the Company's vessels and by failing

---

[6] On August 14, 2023, Justice Belen issued a ruling rejecting Levona's argument that the Interim Award was not an award subject to JAMS Rule 24, which governs finality, but granted Levona an extension under the JAMS rules to identify "any computational, typographical or other similar error in the Interim Award."  Dkt. No. 62 ¶¶ 24–25.  Justice Belen found "absolutely no merit to Respondent's argument that the Interim Award was not a final determination with respect to all the issues and arguments raised in this arbitration relating to the merits of the claims and counterclaims."  *Id.* ¶ 25.

to disclose its pre-acquisition misuse of confidential information; (3) claims that Levona and "Levona-related entities"—Pach Shemen and Murchinson—violated the Status Quo Injunction on numerous occasions, including by wrongfully declaring the Company in default of the loan made by Levona to the Company, trying to sell the Symi and Telendos, directing the purchase of a controlling position in debt securities of Holdings for the purpose of commencing litigation against Holdings and the involuntary bankruptcy of Holdings; and (4) claims that Levona breached the LLCA and the covenant of good faith and fair dealing by failing to transfer its Preferred Interests in the Company in accordance with the BOL and continuing to act on behalf of the Company in "complete bad faith" including by entering into a letter of intent with Unigas. Dkt. No. 67-58 at 9–11.

Levona, on the other hand, sought a declaration that it remained the holder of the Preferred Interests, and claimed that Eletson had breached the LLCA and Fundamental Action Letter by failing to attend board meetings (thereby preventing the Company from refinancing debt and engaging in due diligence in connection with the Unigas LOI), had tortiously interfered with the Company's LOI with Unigas, and had engaged in conversion for denying Levona the ability to sell the Symi and Telendos. *Id.* at 11.

The arbitrator recognized that resolution of the majority of the claims and counterclaims turned upon the interpretation of the Transaction Documents and whether the Company exercised the Purchase Option to buy Levona out of the Preferred Interests. *Id.* at 9. If the answer to that question was yes, then at some point Levona was no longer a member of the Company and did not have rights under the LLCA to enter into the Unigas LOI or otherwise act on behalf of the Company. If the answer was no, then Levona would have remained a member

of the joint venture and Eletson may have violated its obligations under the LLCA by refusing to, *inter alia*, engage in due diligence relating to the Unigas LOI. *Id.*

As a preliminary matter, Justice Belen found that Murchinson and Pach Shemen were alter egos of Levona. He found that the evidence demonstrated "conclusively that although technically two separate corporate entities, Murchinson and Levona are not distinct for any purposes relevant to these proceedings," and that while Levona, which was a shell entity, might "be the named party, Murchinson is the real party in interest." *Id.* at 21. He thus concluded that "any ruling . . . in this arbitration extends to Murchinson. Any award in favor of Levona is really in favor of Murchinson, and similarly, any award finding liability and damages against Levona, is owed by Murchinson." *Id.* He reached the same conclusion as to Pach Shemen, which he found had the identical ownership of Levona and was "seemingly created for the sole purpose of purchasing a controlling interest in the outstanding bond debt of Holdings so that three weeks later, it could direct the involuntary bankruptcy filing against Holdings." *Id.*

The arbitrator also denied Levona's motion to strike Eletson's claims that the Purchase Option had been exercised and that the Preferred Interests had been transferred to the Nominees, or alternatively to dismiss the claims. *Id.* at 30. He acknowledged that the lack of earlier written notice to Levona of the contingent transfer of the Preferred Interests to the Nominees had initially "raised concern," but concluded that there was no "bad faith or misconduct" in the failure to give notice as "the Eletson witnesses viewed the Company as a family company," "representatives from each of the Preferred Nominees . . . testified that they are bound by any award in th[e] arbitration," and that "Levona was not prejudiced by the later reference to the

Preferred Nominees." *Id.* at 30–31.[7]  The arbitrator noted that "Eletson witnesses testified that from the outset of the time that the parties began discussing the buyout of Levona's interests, Eletson intended the preferred units to go to nominees of the Company, and that it told Levona of this intention." *Id.* at 27.  The arbitrator stated that Eletson's explanation for why the transfer to the Nominees was not mentioned earlier in the proceedings was credible: "It was only after the Levona-related entities including . . . Pach Shemen made clear in the Holdings bankruptcy that they would attempt to use the bankruptcy proceedings as an end-run around against any adverse award in this arbitration by claiming that the preferred shares were part of the bankruptcy estate of Holdings, that Eletson felt compelled to set the record straight and make clear that . . . Holdings was never intended to directly or indirectly, as owner of the common shares of the Company, own the preferred shares." *Id.* at 31.

Justice Belen next concluded that the Company properly exercised the Purchase Option for the Preferred Interests because it had paid Levona the Purchase Option Consideration and had provided adequate security and/or collateral for the Loan.[8]  *Id.* at 34–42.  He concluded that the Company paid Levona the Purchase Option Consideration when, pursuant to the Share Transfer Agreement, on March 11, 2022, it transferred the ownership shares of the Symi and Telendos to Levona.  *Id.*  Levona had argued that the transfer of vessels was the consideration for the Purchase Option itself, rather than the Purchase Option Consideration payable upon the exercise of Purchase Option.  Justice Belen rejected that argument.  *Id.*  He reasoned that because Section 2.1 of the BOL provided that "consideration equal to the Purchase Option Consideration" would

---

[7] The arbitrator noted that "Levona never sought additional discovery nor requested depositions on the issue of the nominees before or during the arbitration hearing" and "did not conduct any meaningful cross-examination of the three Eletson witnesses who testified about the contingent transfer to the Preferred Nominees or present any contradicting evidence." *Id.* at 31–32.

[8] It was not disputed that the loan remained outstanding and had not been fully repaid. *Id.* at 34.

be paid "on completion of the transfer of the Membership Interests," the BOL contemplated that the Purchase Option Consideration would be paid in exchange for the Preferred Interests and not in exchange for the *option* to purchase the Preferred Interests. *Id.* In his view, that conclusion was consistent with the terms of the LLCA, which prohibits Members (including Levona as the holder of the Preferred Interests) from acquiring or owning any vessels such as the Symi and Telendos. *Id.* at 35. It was only if the Purchase Option was exercised and Levona was no longer a member of the Company that Levona could, consistent with the LLCA, acquire the two vessels.[9] Justice Belen further concluded that the transfer of the Symi and Telendos was adequate consideration because the Net Value of those ships was in excess of $23,000,000, and thus more than the Purchase Option Consideration amount contemplated in the BOL of $23,000,000 less the value of the two ships. *Id.* at 37.

Justice Belen also found that Eletson satisfied the additional conditions for exercising the Purchase Option. Although it was undisputed that Eletson had not repaid the loan to Levona, the arbitrator found that the Company had met the alternative basis outlined in the BOL for exercising the Purchase Option by providing "adequate security and/or collateral." *Id.* at 38–42. He rejected Levona's argument that the Purchase Option could not be exercised without Levona's determination that it had been afforded adequate security or collateral for the Loan, reading the relevant section of the BOL to provide only that the adequacy of the security, not the adequacy of the collateral, would be at Levona's sole discretion. Dkt. No. 67-58 at 39. Justice Belen read the word "adequate" to modify only "security" and not collateral. *Id.* And he concluded that Eletson had provided adequate collateral by assigning Corp's claims against the

_____

[9] The arbitrator also pointed to parol evidence that the parties contemplated that the consideration to be paid to Levona for its interests in the Company was $23,000,000. *Id.* at 36–37.

Company to Levona, despite the fact that the BOL, independent of any collateral, required Eletson to transfer Corp's claims against the Company until the loan was paid off in full and that, in any event, Levona's rights under the loan were senior to the claims by Corp. *Id.* at 38. Justice Belen rejected Levona's contention that it required the assignment of claims not as collateral for the Loan, but as a separate protective measure to prevent Corp from attempting to repay itself before the Company repaid the Loan. *Id.* at 39. He also concluded that the assigned claims constituted adequate collateral because at the time of the assignment their value exceeded $10,000,000. *Id.* at 40.

Justice Belen further found that notice of intent to exercise the Purchase Option was properly provided. Although he found that Eletson did not provide separate formal written notice of exercising the Purchase Option to Levona as required by the BOL, he also found that Levona was on actual notice of the Purchase Option's exercise based on the minutes of a March 10, 2022 Company Board of Directors meeting which contained a reference to an "[u]pdate on Eletson's intention to exercise the purchase option." *Id.* at 42. Based on that language, and the testimony of an Eletson witness that for Eletson, "intention means the actual fact," the Company had, in practice, provided sufficient notice. *Id.* The arbitrator additionally concluded that Eletson had engaged in conduct after March 11, 2022, the date that the Transaction Documents were signed, that was consistent with a buyout by assisting Levona in the sale of the two vessels to third parties, reflagging the vessels from Greece to Liberia, and novating the underlying bareboat charters to Levona's interests. *Id.* at 44. The arbitrator also noted that after that date, Eletson held itself out to be the sole shareholder of the Company and the sole beneficial owner of its remaining twelve vessels, even though the Directors that Levona had named to the Company Board, pursuant to its authority as the holder of the Preferred Interests, remained on the Board

well past March 11.  *Id.*  He concluded that "[a]t best, the absence of a written notice and a payment of $1 dollar [required by the BOL] are formalities that the parties failed to observe."  *Id.* at 45.

Justice Belen concluded that since the conditions for the buyout were met, the Preferred Interests had been transferred to the Company or the Nominees and that, as of March 11, 2022, Levona no longer held the Preferred Interests and ceased to have any ownership interest in the Company.  *Id.* at 46.  The determination that the Purchase Option was properly exercised and that Levona ceased to have any ownership interest in the Company informed a number of the remainder of Justice Belen's conclusions.  Specifically, he concluded that Levona did not have the authority, once it ceased holding the Preferred Interests, to enter into the Unigas LOI, direct the operations of the Company, or otherwise assert control over the assets of the Company.  *Id.* at 47.

Having reached the determination that Eletson properly exercised the Purchase Option and that therefore Levona no longer held preferred interests in the Company, the arbitrator turned to the substantive claims.  With respect to Eletson's pre-BOL claims, Justice Belen concluded that: (1) he had no jurisdiction over any claims related to conduct before November 2, 2021, when Levona and the Levona-related entities were not parties to the LLCA, and that such entities also could not have breached the terms of the LLCA or the covenant of good faith and fair dealing implied in it for pre-November 2, 2021 conduct, *id.* at 49; and (2) although there was "sufficient evidence" that Murchinson engaged in underhanded tactics and dishonest dealings to acquire Blackstone's interests in the Company, Eletson was not entitled to have Levona's acquisition of those interests voided *ab initio*, *id.*  The arbitrator thus rejected Eletson's pre-BOL claims against Levona and the Levona-related entities.

Moving to Eletson's claims regarding Levona's conduct after becoming a signatory to the LLCA, but before entering into the BOL, Justice Belen ruled for Eletson.  He found that in the time period after Levona acquired the Preferred Interests and became a member of the Company pursuant to the LLCA in November 2021, and before the BOL was entered into in February 2022, Murchinson bribed Peter Kanelos, the CFO of Corp and a representative of the Company, breached the terms of its NDA with Blackstone, and disclosed confidential Company information in violation of the LLCA and the covenant of good faith and fair dealing.  *Id.* at 51.  Levona and Murchinson had executed what was called a "Services Agreement" with Kanelos in December 2021 pursuant to which Murchinson wired $100,000 to Kanelos.  *Id.*  The arbitrator concluded that Kanelos was an officer of the Company, and not just Corp, and that, as a result, Levona and Murchinson's conduct violated a provision of the LLCA that barred Levona from entering into any agreement with an officer or member of senior management of the Company.  *Id.*  The arbitrator found that Kanelos had clandestine communications with Murchinson before and after Levona's acquisition of the Preferred Interests, contrary to his duties as an officer of Eletson and of the Company, and that he and Murchinson actively concealed their communications.  *Id.* at 23–24.  Justice Belen also found that Murchinson breached its NDA with Blackstone by communicating directly with the Company's financiers and lenders.  *Id.* at 51.  Justice Belen further found "Murchinson/Levona continued to disclose confidential information in breach of the LLCA, without Eletson's and the Company's knowledge, and without NDAs, after Levona purported to join the Company."  *Id.* at 53–54.  Justice Belen found that "Levona breached the covenant of good faith and fair dealing by causing the Company's lenders to arrest five vessels and failing to disclose this conduct after it became a member of the Company."  *Id.* at 54.  He determined: "Murchinson's improper dealings with the Company's banks and

financiers pre-acquisition of Blackstone's interests caused the arrests of the vessels and that its failure to disclose these actions to Eletson once it became a member in the Company was a breach of the covenant of good faith and fair dealing." *Id.* at 56.  And, the arbitrator found that Levona breached the LLCA by attempting to terminate the Company's management agreement with Corp and by attempting to replace the boards of directors of the Company's subsidiaries with Levona's preferred representatives.  *Id.* at 58.

Next, Justice Belen found that "Levona-related entities," namely Pach Shemen, had violated the Status Quo Injunction by purchasing a controlling interest in outstanding bonds issued by Holdings, directing the trustee to commence litigation against Holdings, and then directing the commencement of an involuntary bankruptcy petition against Holdings.  *Id.* at 59–62.  Justice Belen found that, in those ways, Pach Shemen intended to disrupt the status quo and ensure that it would retain the Preferred Interests and be able to use them to control and profit from the sale of the vessels; either the involuntary bankruptcy would strip the arbitrator of jurisdiction or, if not, it would operate as a hedge against a potential loss in the arbitration.  *Id.* at 61.  On the assumption (which Justice Belen elsewhere found to be faulty) that the Preferred Interests would pass to Holdings in the event of an arbitral ruling in its favor, Pach Shemen as a creditor of Holdings would nonetheless be able to use the bankruptcy proceeding to obtain the Preferred Interests.  *Id.* at 61.  Finally, Justice Belen rejected Levona's counterclaims based on his finding that Eletson exercised the Purchase Option and bought out the Preferred Interests as of March 11, 2022.  *Id.* at 62.

Justice Belen awarded compensatory damages against Levona, and against Murchinson and Pach Shemen as Levona's alter egos, jointly and severally, to the Nominees in the amount of $19,677,743.71 and to the Company in the amount of $23,777,378.50.  *Id.* at 100.  The damages

included $19,677,743.71 for the loss of the two vessels that Levona caused to be improperly transferred.  *Id.* at 63–64.  The arbitrator concluded that those damages should be paid directly to the Nominees "as they flow directly from Levona's refusal to relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the preferred interests."  *Id.* at 64.  He also awarded $21,777,378.50 to the Company for losses arising from Levona's conduct that led to the vessel arrests.  *Id.* at 64.  He awarded another $2,000,000 to the Company for the (1) reduced bargaining position of the Company with business-sensitive information available to other parties, including those negotiating with the Company; (2) reputational harm to the Company and Eletson from the actions of Levona and its affiliates with financiers and banks but also with customers, employees, and vendors; (3) lost business opportunities, both with existing customers and with new customers, as a result of the reputational harm; (4) Eletson's loss of access to both existing and new sources of capital; and (5) permanent harm from the "indelible record created by Levona and its affiliates."  *Id.* at 65–67.[10]  The arbitrator further awarded Eletson reimbursement of the attorney's fees and costs incurred in connection with the trustee litigation in the Southern District of New York and the involuntary bankruptcy proceeding in the amount of $3,007,266.20 "to be paid to the entity or individuals who paid those costs and fees."  *Id.* at 67, 75.  Justice Belen also awarded $43,455,122.21 in punitive damages to be paid to the same entities awarded the underlying compensatory damages.  *Id.* at 73.

In addition to the compensatory and punitive damages, Justice Belen awarded Eletson attorneys' fees, expenses and costs for the arbitration of $9,590,222.99.  *Id.* at 86.  The attorneys' fees and costs awarded included fees and costs incurred in connection with the arbitration, a

---

[10] Justice Belen awarded the Petitioners prejudgment interest at a contractual rate of ten percent per annum.  *Id.* at 73.

success fee owed by Eletson to counsel for Eletson, and fees and costs in connection with the

bankruptcy and bondholder litigation, but did not include costs incurred in connection with a

state court action that Eletson commenced against Murchinson. *Id.* at 75–76, 84. The arbitrator

rejected Levona's argument that Eletson was not the prevailing party because relief was payable

only to the Company and to the Nominees, on the theory that it had been clear "throughout the[]

proceedings that Eletson would turn over any damages" to the Company and that accordingly it

was "Eletson that substantially prevailed on its claims in this arbitration." *Id.* at 88. The

arbitrator also rejected Levona's argument that fees should not be awarded for the bankruptcy

and bondholder litigation based on JAMS Rule 29, which provides that the "Arbitrator may order

appropriate sanctions for failure of a Party to comply with its obligations under any of these

Rules or with an order of the Arbitrator." *Id.* at 91. "In other words, the award of attorneys' fees

was as damages to compensate for the intentional violations by Levona, through its alter ego,

Pach Shemen, of the Status Quo Injunction Order—not a finding of a prevailing party's

entitlement to fees or a finding under a fee-shifting provision." *Id.*

## PROCEDURAL HISTORY

On August 18, 2023, Petitioners filed the instant Petition, which was ordered unsealed on

September 13, 2023. Dkt. Nos. 1, 11, 14. On September 22, 2023, Respondent moved to

dismiss the Petition and cross-petitioned to vacate the Award. Dkt. Nos. 28–31.[11] About one

---

[11] On October 14, 2023, Respondent filed a statement of relatedness asking the Court to refer the
Petition to the Bankruptcy Court handling the bankruptcy litigation of Holdings. Dkt. No. 32.
Petitioners opposed that request. Dkt. No. 33. On October 6, 2023, Respondent filed a motion
to refer the matter to the Bankruptcy Court, Dkt. No. 34, and, on October 10, 2023, Petitioners
opposed that motion, Dkt. No. 35. The Court denied the motion to refer the Petition to the
Bankruptcy Court on October 10, 2023. Dkt. No. 36. The Court reasoned that, as the tribunal
with original jurisdiction of the Petition under the New York Convention and the Federal
Arbitration Act, it was the proper entity to decide whether to confirm or vacate the Award. *Id.*
Respondent asked the Court to reconsider that order, Dkt. No. 38, but the Court denied that

month later, on October 19, 2023, with leave from the Court, Petitioners filed their Supplemental Amended Petition.  Dkt. Nos. 46–47.  The Supplemental Amended Petition amended the Petition to reflect that the arbitrator had rendered a Final Award.  *Id.*  Respondent amended its response and moved to dismiss the Amended Petition on October 24.  Dkt. Nos. 48–51.  One week later, Petitioners filed their reply in support of the Amended Petition and further opposition to Respondent's cross-petition to vacate.  Dkt. Nos. 54–55.  Respondent filed its own reply in support of its motion to dismiss the Amended Petition on November 14, 2023.  Dkt. Nos. 59–60.

On November 15, the Court held a conference, at which it instructed the parties to each submit statements of undisputed fact pursuant to Federal Rule of Civil Procedure 56.1.  That same day, Petitioners filed a Corrected Amended and Supplemental Petition to Confirm the Arbitral Award, reflecting that Petitioners sought only confirmation and not enforcement of the Award.  Dkt. No. 62.  Petitioners and Respondent filed their respective statements and corresponding exhibits over the following forty-five days.  Dkt. Nos. 65–68.  On January 2, 2024, the Court held oral argument on the Petition.[12]

## DISCUSSION

Petitioners petition for an order confirming the Award and to have judgment entered thereon pursuant to Section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207.  Dkt. No. 62.  Respondent moves to dismiss the petition and cross-petitions the Court to vacate the

---

request, noting that confirmation was intended to be conducted on a summary and speedy basis and that it was prepared to consider the pending motions on the timetable submitted by the parties, Dkt. No. 39.

[12] The Court received supplemental letter briefs on January 5, 2024.  Dkt. Nos. 73, 74.  By letter motion on January 11, 2024, Respondent moved to amend its motion to vacate the Award and for discovery.  Dkt. No. 75.  After hearing oral argument, the Court denied that motion by memorandum and order dated January 23, 2024. Dkt. No. 80.

Award.[13]  Dkt. No. 49.  Petitioners brought this action under the New York Convention, more formally known as the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38.  "Recognition and enforcement seek to give effect to an arbitral award, while vacatur challenges the validity of the award and seeks to have it declared null and void."  *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 882 (11th Cir. 2023).  "The party opposing enforcement of an arbitral award has the burden to prove that one of the . . . defenses under the New York Convention applies."  *Encylopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005).

There is a "strong federal policy favoring arbitration, the enforcement of arbitration agreements and the confirmation of arbitration awards."  *Pike v. Freeman*, 266 F.3d 78, 89 (2d Cir. 2001). "[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."  *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).  As a summary proceeding, the decision of whether to confirm an arbitral award "is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to

---

[13] The Court has jurisdiction over this matter.  Although review of domestic awards requires an "independent jurisdictional basis" apart from the FAA, confirmation or vacatur of nondomestic or international awards under the New York Convention does not.  *F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 324 (S.D.N.Y. 2010).  The FAA expressly provides federal courts with subject matter jurisdiction over an "action or proceeding falling under the [New York] Convention."  9 U.S.C. § 203.  The New York Convention applies to arbitral awards relating to commercial matters where either (1) at least one party is not a citizen of the United States; or (2) all parties are United States citizens but there is some reasonable relationship with one of more foreign states.  9 U.S.C. § 202; *see Dumitru v. Princess Cruise Lines, Ltd.*, 732 F. Supp. 2d 328, 335 (S.D.N.Y. 2010).  It is not disputed here that no party is domiciled or has its principal place of business in the United States, and that the Award concerns a commercial matter.

confirm." *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007).  The review of arbitration awards

is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling

disputes efficiently and avoiding long and expensive litigation."  *Folkways Music Publishers,*

*Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993).  Thus, although the FAA empowers a court to

"confirm and/or vacate the award, either in whole or in part . . . a petition brought under the FAA

is not an occasion for *de novo* review of an arbitral award," *Scandnavian Reinsurance Co. v.*

*Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012), nor an occasion for the court

to conduct a "reassessment of the evidentiary record," *Wallace v. Buttar*, 378 F.3d 182, 193 (2d

Cir. 2004).

     The FAA provides several grounds upon which a court can refuse to confirm an arbitral

award.  At the outset, it states that a court must confirm an arbitral award falling under the New

York Convention "unless it finds one of the grounds for refusal or deferral of recognition or

enforcement of the award specified in said Convention."[14]  9 U.S.C. § 207.  Article V of the New

York Convention specifies seven grounds upon which courts may refuse to recognize an award.

*Encyclopaedia Universalis*, 403 F.3d at 90.  "[R]ecognition and enforcement of the award may

be refused" only if the party against whom the award is invoked "furnishes . . . proof" that: (1)

the parties to the arbitration agreement were "under some incapacity" or the agreement "is not

valid" under the law designated by the parties, or, in the event they have not designated any, the

law of the country where the award was made; (2) "the party against whom the award is invoked

was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings

or was otherwise unable to present his case;" (3) "[t]he award deals with a difference not

---

[14]  Some courts in this District have found that, by its express terms, the New York Convention
does not permit *vacatur* of arbitral award; it only permits a court to refuse to confirm.  *See, e.g.*,
*Kondot S.A. v. Duron LLC*, 586 F. Supp. 3d 246, 255 (S.D.N.Y. 2022).

contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration," although any "part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced;" (4) "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place;" or (5) "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  New York Convention, art. V.  Additionally, "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that" (6) "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country" or (7) "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."  *Id.*

In addition to the bases for refusing to confirm an arbitral award provided in the New York Convention, and recognized by reference in the FAA, the FAA itself contains several further statutory bases upon which an arbitral award may be vacated.  Such statutory bases are authorized by the New York Convention, which instructs "a court in the country under whose law the Arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award."  *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997).  Thus, where an "[a]rbitration was entered into in the United States . . . the domestic provisions of the FAA also apply, as permitted by Articles V(1)(e) and (V)(2) of the New York Convention."  *Scandinavian Reinsurance Co.*, 668 F.3d at 71; *see also Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 589 (2d Cir. 2016) ("The

award in this case having been rendered in the United States, available grounds for vacatur include all the express grounds for vacating an award under the FAA."); *Temsa Ulasim Araclari Sanayi ve Ticaret A.S. v. CH Bus Sales, LLC*, 2022 WL 3974437 (S.D.N.Y. Sept. 1, 2022) (explaining that where "'the arbitration took place in the United States,' the award also is 'subject to the FAA provisions governing domestic arbitration awards.'" (quoting *Zeiler*, 500 F.3d at 164). Because the arbitration here was conducted in the United States, the Court also considers the grounds for vacatur outlined in the FAA. *See, e.g.*, *Branco Bradesco S.A. v. Steadfast Ins. Co.*, 2018 WL 4284315, at \*10 (S.D.N.Y. Sept. 7, 2018).

Section 10(a) of the FAA provides four statutory bases upon which an arbitral award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; and

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them so that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Next, Section 11(b) of the FAA states that that the Court may *modify* the award under certain circumstances, including when "the arbitrators have awarded upon a matter not submitted to them." *Id.* § 11(b); *see also Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 474 (S.D.N.Y. 2016). Still, courts have cabined the applicability of the FAA's statutory bases for vacating, modifying, or correcting an award: "[t]he statutory provisions [of the FAA], 9 U.S.C. §§ 10, 11, in expressly stating certain grounds for either vacating an award or modifying or correcting it, do not authorize its setting aside on the grounds of erroneous finding

of fact or of misinterpretation of law." *Amaicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir. 1960); *see also Squarepoint Ops LLC v. Sesum*, 2020 WL 996760, at *3 (S.D.N.Y. Mar. 2, 2020) ("Even a 'serious error' in the law or facts is alone insufficient to warrant vacatur." (quoting *KT Corp. v. ABS Holdings, Ltd.*, 784 F. App'x 21, 24 (2d Cir. 2019) (summary order))).

Finally, and in addition to the bases specified in the New York Convention and the FAA, the Second Circuit "has 'held that the court may set aside an arbitration award if it was rendered in manifest disregard of the law.'"[15] *Zurich Am. Ins. Co.*, 811 F.3d at 589 (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011)). Under these standards, "vacatur of arbitral awards is extremely rare." *Salus Cap. Partners, LLC v. Moser*, 289 F. Supp. 3d 468, 476 (S.D.N.Y. 2018) (quoting *Hamerslough v. Hipple*, 2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012)).

Respondent argues that (1) the Petition should be dismissed at least in part because the Award was not in favor of Petitioners and Petitioners therefore lack standing, Dkt. No. 50 at 14–16; (2) the arbitrator exceeded his powers, *id.* at 16–31; and (3) the arbitrator manifestly disregarded the law, *id.* at 32–35. There is no argument that the award was procured by corruption, fraud, or undue means, that there was evident partiality or corruption in the arbitrator, or that the arbitrator was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy.

The Court takes each argument in turn.

---

[15] The Second Circuit has expressly rejected the more permissive approach by other Circuits to vacatur of arbitral awards on other non-statutory bases, such as when the awards are "completely irrational," "arbitrary and capricious," or "contrary to an explicit public policy." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).

41

## I.     Petitioners Have Standing

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'  For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); *see also Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019).  "To have standing, a plaintiff must 'present an injury that is concrete, particularized and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "If a plaintiff fails to satisfy any of those elements, a federal court lacks subject-matter jurisdiction to hear the case and it must be dismissed." *Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 89 (S.D.N.Y. 2022) (quoting *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015)).  "Article III's case-or-controversy requirement applies to actions governed by the FAA." *Stafford v. Int'l Bus. Machines Corp.*, 78 F.4th 62, 68 (2d Cir. 2023); *Badgerow v. Walters*, 142 S. Ct. 1310, 1316 (2022).

Respondent argues that Petitioners lack Article III standing—specifically, injury in fact—to confirm the Award because the arbitrator did not award Petitioners any financial relief.  Dkt. No. 50 at 14–16; Dkt. No. 59 at 2-6.  Respondent notes that the compensatory damages awarded by the arbitrator are to be paid to persons other than Petitioners, including the Company, the Nominees, and those who advanced the fees and costs expended in the arbitration.  Dkt. No. 59 at 4.  Respondent also argues that the Award's declaratory relief was purely backward-looking. *Id.*  Finally, Respondent argues that its vacatur petition cannot give Petitioners standing to confirm the award because standing addresses whether a party may bring suit in the first place. *Id.* at 5.  Respondent bases its argument in large part on language from the Supreme Court's decision in *Town of Chester v. Laroe Estates*, 581 U.S. 433 (2017), that "a plaintiff must

demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* at 439 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  Relying on the second clause of that sentence, Respondent asserts that the Court must examine each item of relief awarded by the arbitrator to determine whether it provides a financial or other benefit to Respondents and, if it does not, then the Court must refuse to confirm the arbitral award or at least those portions of it that do not benefit Respondents.

Respondent's argument is built on a faulty foundation.  Respondent reasons from *Town of Chester* that because portions of the award do not provide financial relief directly to Petitioners, Petitioners do not have a concrete interest in enforcement of those portions and the remedy awarded by the arbitrator will not redress their grievances.  Respondent's premise is mistaken.  A party to a contract need not have suffered direct financial loss to have a stake in its enforcement or to have suffered a concrete injury when it is breached.  "Intangible harms," in addition to physical or monetary injuries, "can also be concrete."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *Id.*  Rights arising from the law of contracts are no less legal rights than those arising from the laws of property and tort.  *See Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137 (1939).  A contract right itself is a protectible interest, the breach of which gives rise to a concrete injury.  *See Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) (private rights that confer Article III standing include contract rights); *Tech-Sonic, Inc. v. Sonics & Materials, Inc.*, 2015 WL 4715329, at *6 (D. Conn. Aug. 7, 2015).

A division has emerged among sister circuits regarding whether a breach of contract itself constitutes a legally cognizable injury in fact, and thus satisfies the first element of the *Lujan* test

for standing.  *See, e.g.*, *Dinerstein v. Google, LLC*, 73 F.4th 502, 522 (7th Cir. 2023) ("A breach

of contract alone—without any actual harm—is purely an injury in law, not an injury in fact.

And it therefore falls short of the Article III requirements for a suit in federal court."); *Denning*

*v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) ("[A] breach of contract is a sufficient

injury for standing purposes.").

      In the Court's view, the Fifth Circuit has the better of the arguments.  The Seventh

Circuit based its view that an alleged breach of contract did not create a cognizable injury giving

rise to standing in federal court on its reading of *Spokeo, Inc. v. Robins*, 578 U.S. 330,

*TransUnion LLV v. Ramirez*, 594 U.S. 413, and on a law review article.  *Dinerstein*, 73 F.4th at

519.  In *Spokeo*, the Supreme Court held that a plaintiff asserting a "bare procedural violation" of

the Fair Credit Reporting Act ("FCRA"), "divorced from any concrete harm," did not have

standing to sue in federal court.  578 U.S. at 341.  Congress did not have the power to "authorize

that person to sue to vindicate that right."  *Id.*  In *TransUnion*, the Supreme Court held that the

courts lacked the power under Article III of the Constitution to adjudicate claims that a credit

reporting agency violated the FCRA by failing to use reasonable procedures to ensure the

accuracy of credit files in the absence of evidence that the misleading credit files were provide to

any potential creditors, concluding that the misleading information in the internal credit files did

not itself constitute a concrete harm.  594 U.S. at 433, 435.  The Seventh Circuit, citing *Spokeo*

and *TransUnion*, reasoned that breach of a contract created a mere "legal infraction" and was

insufficient to create standing in the absence of some additional "factual harm suffered" to the

plaintiff as a result of the breach. *Dinerstein*, 73 F.4th at 519 (quoting F. Andrew Hessick,

*Standing and Contracts*, 89 Geo. Wash. L. Rev. 298, 313 (2021)).[16]

The holdings of *Spokeo* and *TransUnion* do not compel that result, and the decisions of

the Second Circuit do not support it. Both *Spokeo* and *TransUnion* involved alleged statutory

violations. At bottom, the question before the Court was whether Congress could expand the

power of the federal courts under Article III by "elevat[ing] to the status of legally cognizable

injuries, *de facto* injuries that were previously inadequate in law." *Spokeo*, 578 U.S. at 341

(quoting *Lujan*, 504 U.S. at 578); *see TransUnion*, 594 U.S. at 425. Those cases did not involve,

as here, pre-existing common law rights historically enforceable in both federal and state court.

*See, e.g.*, *Ogden v. Saunders*, 25 U.S. 213, 259 (1827). The *TransUnion* Court held that

Congress "may not simply enact an injury into existence, using its lawmaking power to

transform something that is not remotely harmful into something that is." 594 U.S. at 426

(quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

The Court's methodology in *Spokeo* and *TransUnion* support the existence of Article III

standing here. The Supreme Court instructed courts to look to "constitutional text, history, and

precedent" to mark the limits of Congress's power to create an actionable legal injury sufficient

to support Article III standing. *Id.* at 428; *see also id.* at 424 ("[H]istory and tradition offer a

meaningful guide to the types of cases that Article III empowers federal courts to consider."

(quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008))); *Spokeo*, 578

---

[16] Ironically, the Hessick article cited in *Dinerstein* recognizes that applying *Spokeo* to require a showing of some additional concrete harm to the plaintiff before a breach of contract claim could be brought in federal court "would significantly affect the enforceability of contracts in federal courts" and would have "undesirable consequences," but argues that "the inability to square *Spokeo* with contracts provides a compelling argument that *Spokeo* was wrongly decided." F. Andrew Hessick, *Standing and Contracts*, 89 Geo. Wash. L. Rev. 298, 300–02 (2021). The more logical and compelling inference is that *Spokeo* does not apply to contract claims.

U.S. at 340–41 (standing inquiry derives from case-or-controversy requirement which "is grounded in historical practice").  The Supreme Court did not hold that the plaintiff was required to show financial or physical injury to have Article III standing.  Rather, it specifically embraced that "[v]arious intangible harms . . . can also be concrete."  *TransUnion*, 594 U.S. at 425; *id.* at 427 (asking whether the plaintiff has alleged "any physical, monetary, or cognizable intangible harm,"); *Spokeo*, 578 U.S. at 340 ("[W]e have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete").  The Court also did not hold that the plaintiff personally need have suffered some additional factual harm in order to have standing.  The *Spokeo* Court stated that in some circumstances, those similar to instances at common law, the violation of a legal right can give rise to standing without any showing of additional harm.  578 U.S. at 342; *see also* Erwin Chemerinsky, *Federal Jurisdiction* 74 (8th ed. 2020) ("Injury to rights recognized at common law—property, contracts, and torts, are sufficient for standing purposes.").  The *TransUnion* Court then relied upon and cited favorably to *Sprint Communications*, in which (as discussed further *infra*) the Court recognized that a person did not have had to suffer harm individually in order to have standing to bring suit for harm caused to another.  *Sprint Commc'ns Co.*, 554 U.S. at 287–88.

Eletson's standing here fits comfortably within constitutional text, history, and precedent.  Eletson's injury is breach of a contractual right for Levona to honor the arbitral award.  History and precedent support that a person whose contractual rights have been violated has standing to sue the breaching party, regardless of whether the non-breaching party has suffered additional harm.  The right of a party to sue for breach of contract, regardless of harm done, has deep and roots in the law.  *See* Restatement (First) of Contracts § 328 & cmt. a (1932) ("A breach of contract always creates a right of action; but a breach sometimes occurs without causing any

harm."); Lon L. Fuller & William R. Perdue, *The Reliance Interest in Contract Damages: 1*, 46 Yale L.J. 52, 59 (1936) ("In a society in which credit has become a significant and pervasive institution, it is inevitable that the expectancy created by an enforceable promise should be regarded as a kind of property, and breach of the promise as an injury to that property . . . . That the promisee had not "used" the property which the promise represents (had not relied on the promise) is as immaterial as the question whether the plaintiff in trespass *quare clausum fregit* was using his property at the time it was encroached upon."). For two centuries, courts have recognized that a party who suffers only nominal damages from a material breach may still seek relief in court against the breaching party. *See Marzetti v. Williams*, 109 Eng. Rep. 842, 846 (K.B. 1830) ("[W]herever there is a breach of contract, or any injury to the right arising out of that contract, nominal damages are recoverable."); *Wilcox v. Executors of Plummer*, 4 Pet. 172, 181–182 (1830) (holding that breach of "a contract to act diligently and skil[l]fully" provides a "ground[] of action" in federal court); *see also Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (reversing district court's grant of dismissal of breach of contract claim for failure to adequately plead damages because plaintiff "would have plausible claims for nominal damages"). Courts also have long recognized that a promisee has the same right to enforce a contractual provision benefitting a third-party beneficiary as a contractual provision benefitting the promissee itself. *See* Restatement (First) of Contracts § 345 & cmt. a (1932) ("This Section is an application of the general rules of damages to contracts for the breach of which a beneficiary as well as the promisee can maintain suit."); Restatement (Second) of Contracts § 305 (1981) ("The promisee of a promise for the benefit of a beneficiary has the same right to performance as any other promise, whether the promise is binding because part of a bargain, because of his reliance, or because of its formal

characteristics."); *see also* Restatement (Second) of Contracts § 305 ("A promise in a contract creates a duty in the promisor to the promise to perform the promise even though he also has a similar duty to an intended beneficiary."); 9 Corbin on Contracts § 46.2 (2023) ("Currently, there is no longer any doubt that a promisee has the same right to performance in a contract for the benefit of a third party as any other contract promise.").  It is sufficient that a plaintiff be "'in privity of contract with the defendant *or* is a third party beneficiary of the contract.'"  *Tang Cap. Partners, LP. v. BRC Inc.*, 2023 WL 2396635, at *16–17 (S.D.N.Y. Mar. 8, 2023) (quoting *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 49 (2d Cir. 2014))).

The Court in *Spokeo* recognized that a plaintiff would have standing to bring a claim for slander *per se*, notwithstanding that damages might be difficult to prove, 578 U.S. at 341–42, and the Court in *TransUnion* recognized that harms such as "reputational harms, disclosure of private information, and intrusion upon seclusion" could give rise to Article III standing, 594 U.S. at 425.  The tort of invasion of privacy, however, was recognized only late in our constitutional history.  *See* Restatement (Second) of Torts § 652A & cmt. a ("Prior to 1890 no English or American court had ever expressly recognized the existence of the right [to privacy] . . . .").  There is no reason to believe that the common law claim of breach of contract, which is of at least equal if not greater historical provenance, should be accorded lesser recognition.

The recognition of standing is also supported by constitutional text.  While Respondent's challenge to Petitioners' standing arises in the immediate and specific context of a motion to confirm an arbitral award, Respondent's argument cannot be so limited.  If accepted, it would deny any party to a contract the right to seek relief in federal court for a material breach in the absence of a showing of some additional harm to itself.  But claims for breach of contract arise routinely in both state and federal court, and—not infrequently in those actions—the non-

breaching party has not suffered additional harm separate from the breach itself.  It occasionally

will bargain for and seek to enforce benefits that will accrue to a third party.  The Constitution

itself recognizes that when such suits arise between citizens of different States the federal courts

are not deprived of power to hear them.  Article III of the Constitution provides that the judicial

power of the United States extends "to Controversies between two or more States."  U.S. Const.

Art. III sec. 2, cl. 1.  Indeed, the provenance of diversity jurisdiction dates back to the very first

Congress.  Judiciary Act of 1789, 1 Stat. 73.  If the non-breaching party has a claim against the

party in breach, the non-breaching party has the right to have that case adjudicated in federal

court (assuming that the statutory prerequisites for diversity jurisdiction are satisfied).  And if the

breaching party is sued in the courts of a foreign state by a citizen of that state, it has the right to

remove the matter to federal court (again, assuming the statutory prerequisites are satisfied). In

that manner, the Constitution itself guarantees all citizens a fair and impartial tribunal for the

adjudication of disputes.  *See, e.g.*, *Bank of United States v. Deveaux*, 5 Cranch 61, 87 (1809)

(Marshall, C.J.) ("The judicial department was introduced into the American constitution under

impressions, and with views, which are too apparent not to be perceived by all. However, true

the fact may be, that the tribunals of the states will administer justice as impartially as those of

the nation, to parties of every description, it is not less true that the constitution itself either

entertains apprehensions on this subject, or views with such indulgence the possible fears and

apprehensions of suitors, that it has established national tribunals for the decision of

controversies between aliens and a citizen, or between citizens of different states."), *overruled on

other grounds by Louisville, C. & C.R. Co. v. Letson*, 43 U.S. 497 (1844); The Federalist No. 80

(Alexander Hamilton) (stating that suits between citizens of different states "should be

committed to that tribunal which, having no local attachments, will be likely to be impartial

between the different States and their citizens, and which, owing its official existence to the Union, will never be likely to feel any bias inauspicious to the principles on which it is founded"). But the Seventh Circuit's view would have the effect of stripping the federal courts of power to hear certain of those cases in which, at the founding, the Framers and the First Congress thought the exercise of federal court power would be most important—where the presumed parochialism and prejudices of state courts would not give a foreigner a fair and independent tribunal. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 74 (1938) ("Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the state."). Under its view, an out-of-state plaintiff who contracted for a benefit to be provided to a third party and whose right to that performance was breached would be relegated in a suit for performance to the courts of the breaching party, except if the plaintiff could show some additional harm to itself. The court would have the general language of "case" or "controversy" negate the more specific language creating diversity jurisdiction in a vast swath of cases.

Finally, the Fifth Circuit's approach is closer to the Second Circuit's reading of *TransUnion*. In the aftermath of *TransUnion*, the Second Circuit has held that a person who was neither a party to a contract nor its third-party beneficiary but was a mere non-party lacked standing to enforce an agreement. *Ryansko v. N.Y. Univ.*, 63 F.4th 186, 193–94 (2d Cir. 2023). Implicit in *Rynasko* was the notion that if the plaintiff—the parent—was a party to the contract, she would have had standing. The Second Circuit has also held a property-based injury, even one rooted in federal statute, is sufficient to give rise to standing in the absence of any other additional harm. *Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 114 (2d Cir. 2023). If one's right to dominion and control over chattels is seriously

interfered with, she has standing to sue.  *Id.*  The Second Circuit has held, post-*TransUnion*, that a plaintiff whose private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm.  *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 285–86 (2d Cir. 2023).  Indeed, the Second Circuit has never suggested that *TransUnion* or *Spokeo* denied a person who had standing to bring a common law contract, tort, or property claim in state court lacked the standing to bring the same claim in federal court.

The conclusion that Petitioners have standing to seek confirmation of the Award readily follows.  Petitioners and Respondent are all parties to the LLCA.  Dkt. No. 67-2 at 1–2; Dkt No. 67-4 at 2; *cf. Ryansko*, 63 F.4th at 193 (holding that a party lacked standing to bring breach of contract claim because she was "neither a party to the contract . . . nor an intended third-party beneficiary of that agreement, nor an assignee of [a party to the contract]'s claims").  The LLCA contains a mandatory arbitration provision, which states that "[a]ny dispute, claim, or controversy arising out of or relating to this Agreement . . . shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator."  Dkt. No. 67-2 at 69.  It also designated arbitration as the "exclusive and *binding* method" of resolving such disputes.  *Id.* (emphasis added).  It was pursuant to that provision of the LLCA that Holdings and Corp commenced an arbitration proceeding against Respondent in July 2022.  Dkt. No. 65 ¶ 40; Dkt. No. 66 ¶ 40.  Holdings and Corp bargained and gave consideration for the contractual right for all disputes regarding LLCA to be resolved through arbitration.  Respondent agreed to be bound to that method of resolution.  Yet, Respondent has not satisfied the award.  It has denied that the arbitrator has the power to resolve its dispute with Petitioners and has refused to honor the arbitrator's determination of that dispute.

"An unconfirmed award is a contract right that may be used as the basis for a cause of action[,]" *Florasynth, Inc.*, 750 F.2d at 176, and contract rights are a type of private right recognized as conferring Article III standing. *See Spokeo*, 578 U.S. at 344 (Thomas, J., concurring); *see also Culwick v. Wood*, 384 F. Supp. 3d 328, 339 (E.D.N.Y. 2019). Holdings and Corp have suffered a concrete injury in the breach of their right to have the dispute determined by the arbitrator and have standing to vindicate their contractual right, even if the benefit of the award were to flow entirely to a third-party. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Cookson Am., Inc.*, 710 F.3d 470, 475 (2d Cir. 2013) (per curiam) (concluding that a union had Article III standing to enforce an agreement with an employer to provide benefits to retirees, because "[t]hat this benefit accrues to third parties . . . does not change the fact that the [plaintiff] has negotiated for the benefit and has incurred obligations in order to secure it"); *see also Frontier Commc'ns of N.Y., Inc. v. Int'l Bhd. of Elec. Workers*, 2008 WL 1991096, at *3 (S.D.N.Y. May 6, 2008) (Lynch, J.) ("It is 'axiomatic' that a party to an agreement has standing to sue a counter-party who breaches that agreement, even where some or all of the benefits of that contract accrue to a third party.").

It also is not fatal to the "redressability" element of the standing inquiry that the financial relief to be awarded by a court will be payable to a third-party and not to the plaintiff directly. "[F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their warder; receivers bring suit to benefit their receiverships' assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suits to benefit testator estates; and so forth." *Sprint Commc'ns Co.*, 554 U.S. at 287–88; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (holding that plaintiff had Article III

standing to assert claim for civil penalty to be paid to the Government).  "[C]onfirmation arms the winning party of an arbitration 'with a court order . . . [and] a variety of remedies available to enforce the judgment.'"  *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 253 (3d Cir. 2020) (quoting *Florasynth*, 750 F.2d at 176).  If the behavior of the defendant giving rise to a concrete injury is the failure to provide a benefit to a third-party as promised, then an order requiring the provision of that benefit will redress the injury no less than the penalty paid to the federal government redressed the injury of the private plaintiff in *Laidlaw*.

Thus, even though it is true that an arbitration award is divisible for purposes of confirmation, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (court "can confirm . . . the award either in whole or in part" in FAA case), the Court need not parse through the arbitral award and determine whether Petitioners have standing to seek the Court's confirmation of each element of the award.  Instead, as long as the award remains unsatisfied in any respect, Petitioners—as parties to the LLCA and parties to the arbitration—have standing to seek redress.  "A party, successful in arbitration, seeks confirmation by a court generally because he fears the losing party will not abide by the award.  Armed with a court order the winning party has a variety of remedies available to enforce the judgment."  *Florasynth, Inc.*, 750 F.2d at 176. Petitioners bargained for, and gave consideration pursuant to, a contract—the LLCA—that bound Petitioners and Respondent to resolve disputes relating to the contract through arbitration. Respondent has failed to satisfy that award.  Confirmation of the award would reduce the arbitrator's contractually-enforceable order into a judicially-enforceable judgment, thus providing redress for Petitioners' grievance that the award has not been satisfied.  *Cf. Stafford*, 78 F.4th at 67 ("Confirmation is a 'mechanism[] for enforcing arbitration awards.'" (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008))); *D.H. Blair & Co.*, 462 F.3d at

104 ("The request [to confirm an arbitral award] simply [seeks] to give effect to the arbitration award."); *Footchrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 516 (2d Cir. 1975) ("The award itself is inchoate until enforced by judgment.").  Respondent has not demonstrated that anything more is necessary.

The few cases upon which Respondent relies are not to the contrary.  *Town of Chester* does not require a plaintiff—in order to have Article III standing—to show that the requested relief will benefit himself or herself financially.  The plaintiff need only show for each claim asserted and for each form of relief claimed, a concrete and particularized injury traceable to the defendant that can be redressed through judicial relief requested.  The plaintiff who has suffered damages in the past does not thereby have standing to assert a claim for injunctive relief, preventing the defendant from engaging in misconduct in the future; he also needs to allege a real and immediate risk of future injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *accord Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 47 (2d Cir. 2023) (en banc) (separately analyzing whether plaintiffs' injury was redressable "by monetary damages and by the specific injunctive relief sought").  Likewise, a plaintiff who has standing to complain about a municipal property tax exemption does not thereby have standing to challenge a state franchise tax credit.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  It does not follow from *Town of Chester* that a person who has suffered a concrete non-speculative harm is denied a federal forum simply because the relief that will redress that harm will also accrue to the benefit of a third party.

In *Stafford v. IBM*, 78 F.4th 62, the Second Circuit held that a motion to seek confirmation of an arbitral award was moot and thus the courts did not have Article III standing

to hear it.[17]  The court did not review the underlying relief awarded by the arbitrator or base its decision on any issue regarding the persons whom that relief benefitted.  Rather, the court concluded that the case was moot because respondent had satisfied its obligations under an arbitration award "in full"; regardless of whom the award benefitted, there was nothing a judgment could remedy.  The respondent did not owe the petitioner any further relief.  *Id.* at 65, 68.  There was "no longer any issue over payment or ongoing compliance with a prospective award."  *Id.* at 68.  The petitioner's alleged injury had been fully redressed, and its contractual right to resolution by arbitration had been fully vindicated.  In this case, by contrast, Petitioners do not base standing solely on the "statutory right to seek confirmation under the FAA."  *Id.* at 69.  Respondent breached its contract with Petitioners and have yet to remedy that breach.[18]  The Award provides relief intended to redress that breach.  The dispute is not moot.  A judgment is necessary for Petitioners to obtain the relief that the arbitrator determined would redress the contract rights of Petitioners that the arbitrator determined were violated.

Put differently, *Stafford* does not hold that a party to arbitration must have something financial to gain from enforcement of the award, in order to have Article III standing to seek its confirmation.  Further support for this conclusion can be found in the *Stafford* court's favorable

---

[17] The Court notes that other Circuits would hold that, even if an arbitral award is fully satisfied, that a party could still have standing to apply for the award's confirmation.  *See Teamsters Loc. 177*, 966 F.3d at 251–52 (holding that "[u]nder the FAA a party's injuries are only fully remedied by the entry of a confirmation order," and that "the dispute the parties went to arbitration to resolve is 'live' until the arbitration award is confirmed and the parties have an enforceable judgment in hand").

[18] Although the Court is dubious of the proposition that a pledge to comply with an arbitration award would defeat standing, it need not address that issue except to note that such a proposition, if accepted, could undermine the right conferred by the FAA and the New York Convention to confirmation of an award.  *See Teamsters Loc. 177*, 966 F.3d at 253 & n.3.  A respondent seeking to avoid payment under the award could simply pledge that it would satisfy the award, only to renege after the time period for confirmation had run.

mention of a Seventh Circuit case, *Unite Here Local 1 v. Hyatt Corp.*, in which that court found

the petitioner had Article III standing to confirm an arbitral award.  862 F.3d 588 (7th Cir. 2017).

In that case, the petitioner sought confirmation of two arbitral awards, one of which granted

relief only in the form of an order for respondent to cease and desist certain conduct prohibited

by the collective bargaining agreement between the parties, and the other of which granted

monetary relief in the form of backpay, along with an order for respondent to cease and desist

conduct prohibited by the collective bargaining agreement.  *Id.* at 590–94.  The court then found

that there was "plainly a live dispute about whether [the respondent was] in fact acting in

compliance with the awards," because "41 pending alleged violations of the award" created "an

ongoing controversy."  *Id.* at 598–99.  Summarizing that and other cases, the *Stafford* court

stated that a petitioner lacked standing to confirm an arbitral award "when there is no longer any

issue over payment or ongoing compliance with a prospective award."  78 F.4th at 68.  Finally,

the court concluded its standing analysis by stating that "[t]he FAA's process for confirming an

arbitration award still requires Article III injury, and § 9 of the FAA does not itself confer

standing."  *Id.* at 69.

     *Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed'n*, is also far afield.

2008 WL 3833257, at *6 (S.D.N.Y. Aug. 15, 2008), *aff'd*, 350 F. App'x 476 (2d Cir. 2009)

(summary order).  In that case, the court held that a party to an arbitration who had assigned its

claim and the proceeds of an arbitration award to a syndicate of banks lacked standing to bring

suit on that claim and to enforce the arbitral award.  But Respondent's reliance on *Compagnie

Noga* confuses an assignee with a third-party beneficiary.  "An unequivocal and complete

assignment extinguishes the assignor's rights against the obligor and leaves the assignor without

standing to sue the obligor."  *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112,

125 (2d Cir. 1984); *see Valdin Invs. Corp. v. Oxbridge Cap. Mgmt., LLC*, 651 Fed. App'x 5, 7

(2d Cir. 2016) (summary order) ("Valdin's assignment of its rights extinguished its claims

against Oxbridge and deprived it of any interest in this litigation. Valdin therefore lacks

standing."); *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2023 WL 4493542,

at *1 (S.D.N.Y. July 12, 2023) (same); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,

403 F. Supp. 3d 257, 260 (S.D.N.Y. 2019) ("Where a valid assignment has been executed, the

assignee is 'the real party in interest' and 'the right to sue is exclusively' the assignee's."

(quoting *Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404, 409 n.6 (S.D.N.Y. 2018))).  By

contrast, both the parties to the contract and an intended third-party beneficiary have standing to

enforce a contract.  *Wistron Neweb Corp.*, 2023 WL 4493542, at *1.  The petitioner in

*Compagnie Noga* had assigned its interest in the claim in that case.  2008 WL 3833257, at *5.

Accordingly, the holding in *Compagnie Noga* that the petitioner no longer had standing was and

remains unexceptional.  Acceptance of Respondent's argument here, on the other hand, would be

unprecedented.

## II.    Respondent's Arguments that the Arbitrator Exceeded His Powers

Respondent next argues that the arbitrator exceeded his powers in violation of Section

10(a)(4) of the FAA by (1) adjudicating claims for conduct that falls outside the scope of the

arbitration agreement in the LLCA and that is expressly subject to a London-seated arbitral

tribunal; (2) adjudicating the rights and duties of non-parties to the arbitration proceedings and

non-signatories to the LLCA; (3) adjudicating claims barred by the bankruptcy; (4) awarding

fees incurred in the bankruptcy case and the bondholder litigation, in a manner that both violates

the bankruptcy court's exclusive jurisdiction and is outside the scope of the LLCA's arbitration

clause; and (5) awarding fees and costs to non-prevailing parties.

The FAA permits vacatur of an arbitral judgment "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Second Circuit has "consistently accorded the narrowest of readings to section 10(a)(4) permitting vacatur where the arbitrator has exceeded [his] powers." *Jock v. Sterling Jewelers Inc.*, 942 F.3d 617, 622 (2d Cir. 2019) (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009)). The focus of the inquiry is "whether the arbitrator had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrator correctly decided that issue." *Id.* (alterations omitted) (quoting *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011)); *see also Subway Int'l, B.V. v. Subway Russia Franchising Co., LLC*, 2021 WL 5830651, at *4 (S.D.N.Y. Dec. 8, 2021); *LTF Constr. Co., LLC v. Cento Sols. Inc.*, 2020 WL 7211236, at *3 (S.D.N.Y. Dec. 7, 2020). "[A]n arbitrator may exceed her authority by, first considering issues beyond those the parties have submitted for her consideration, or second, reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 942 F.3d at 622. "This is an extremely deferential standard of review." *Id.* "It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

### A.      Adjudication of Claims Subject to a Different Arbitration Agreement

Respondent argues that the arbitrator exceeded his powers under the arbitration clause of the LLCA by improperly adjudicating claims stemming from an alleged breach of the BOL. Dkt. No. 50 at 23–25. In particular, Respondent asserts that the dispute about whether the Company exercised the Purchase Option should have been arbitrated in London before the London Court of International Arbitration ("LCIA") under English law pursuant to the terms of

the BOL, and not in New York pursuant to the terms of the LLCA. *Id.* at 25. Respondent points to portions of the Award in which the arbitrator "concluded that because 'the conditions for the buyout were met . . . pursuant to the BOL, Levona's interests should have been transferred to Eletson Gas, or its nominee[,]" *id.* at 24 (quoting Dkt. No. 67-58 at 47), to posit that the arbitrator acted outside his scope of "authority to decide only those issues 'arising out of or relating to' the LLCA[,]" *id.* (quoting Dkt. No. 67-2 § 12.14). Respondent argues that the arbitrator therefore improperly awarded unjust enrichment damages for events "not governed by the arbitration agreement." *Id.* at 24 (internal citation omitted).

Respondent's arguments mirror those that it made to the arbitrator. *See* Dkt. No. 31-8. Before the arbitrator, Respondent argued that, in the words of the arbitrator, "whether the Option was exercised, or whether performance under the Option or Loan was completed, must be decided by the LCIA, not JAMS." *Id.* at 5. It further asserted, again in the words of the arbitrator, that "the issue of who controls the preferred units is outside of JAMS' jurisdiction because it requires the arbitrator to interpret and enforce the Transaction Documents, which, according to Respondent, provide for arbitration in the London Court of International Arbitration." *Id.*

The arbitrator twice rejected those arguments. In his ruling on the motion to strike, the arbitrator first concluded that, by filing counterclaims, Respondent had availed itself of the arbitral forum, submitted to JAMS, and waived any objection to the arbitrator's assertion of jurisdiction. *Id.* at 12. In the alternative, and independently, the arbitrator rejected Respondent's argument on the merits because the language of the arbitration provision in the LLCA was broad, and "[t]o the extent that the Transaction Documents or events or actions that occurred in connection with those transactions 'relat[e] to [the LLC Agreement] or the breach, termination,

enforcement, interpretation or validity thereof' the broad arbitration provision of the LLC

Agreement governs." *Id.* at 13 (quoting Dkt. No. 67-2 § 12.14(a)) (alterations in original).  The

arbitrator rejected Respondent's proposed construction of the two arbitration provisions which

would "require that the parties arbitrate their disputes in two steps: first, go to London to

adjudicate performance under the Transaction Documents and then second, come to JAMS to

determine breaches under the [LLCA]."  *Id.* at 14.  According to the arbitrator, such an

interpretation "would render impossible the intent of the arbitration provision in the [LLCA],

which contemplates that the parties use best efforts to arbitrate to completion disputes within 150

days from the selection of the arbitrator."  *Id.*  In the Award, the arbitrator reiterated that Levona

itself had sought relief for counterclaims that the arbitrator could only award if he interpreted,

enforced and provided relief pursuant to the Transaction Documents, and had thereby waived

any jurisdictional objections concerning the claims and counterclaims.  Dkt. No. 67-58 at 13.

     At the outset, the parties dispute whether Respondent waived its objection to the

arbitrator's jurisdiction to determine if the Purchase Option was exercised.  It is for the Court to

determine whether Respondent waived its objection.  *Cf. Opals on Ice Lingerie v. Bodylines,*

*Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) ("[I]n this case, Bodylines objected repeatedly to

arbitration, beginning with the statement by its counsel in June 1999 which inspired Opals to file

the instant litigation. Correspondence between the parties throughout the period of the dispute

further supports Bodylines' assertion that it continuously objected to arbitration. These

objections prevent a finding of waiver.").  Further, the question of whether a party has waived its

right to object to the arbitrability of an issue is governed by federal law.  *See, e.g., Woodcrest*

*Nursing Home v. Loc. 144, Hotel, Hospital, Nursing Home and Allied Services Union*, 788 F.2d

894, 899 (2d Cir.1986) (per curiam).  Even where a party participates in arbitral proceedings, it is

not deemed to have waived its objection to arbitrability of an issue if it "consistently and vigorously maintained its objection to the scope of arbitration." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 9 n.10 (1st Cir. 2000). "[T]he fact that a party 'forcefully object[s]' to having an arbitrator decide a dispute . . . suggests an unwillingness to submit to arbitration." *Opals*, 320 F. 3d at 369 (quoting *First Options of Chi. v. Kaplan*, 514 U.S. 938, 946 (1995) (alteration added)). Here, Respondent did not waive its objection. The first argument presented by Respondent in its response to the Petitioners' statement of claims was that the arbitrator lacked jurisdiction to determine whether the Purchase Option was exercised, stating: "the question of this matter is simple: who holds the preferred shares of [the Company] . . . ? As will be shown, this can *only* be resolved by an adjudication on the [BOL] and various other documents signed at the nexus of the transaction in question, all of which demand arbitration in London and are governed by English Law." Dkt. No. 67-17 at 1. Respondent again reiterated its objection to the arbitrator's jurisdiction to resolve the Purchase Option issue in its amended statement of counterclaims, Dkt. No. 67-25 at 1, in its motion to strike Petitioners' allegations regarding the Preferred Interests, Dkt. No. 67-40 at 5, and its post-hearing brief, Dkt. No. 67-48 at 55. Petitioner thus did not waive its objection to the arbitrator's jurisdiction to determine the Purchase Option issue.

Even so, however, Respondent's argument underlying the objection—that the arbitrator exceeded his authority in awarding unjust enrichment damages and in addressing the question of Levona's ownership of the Preferred Interests—is without merit. The Supreme Court and the Second Circuit have repeatedly "held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019); *see also First Options of Chi.*, 514 U.S. at 944–45 ("In this manner the law treats silence or ambiguity about

the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption.") (emphasis in original).  Moreover, when "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delete such issues to an arbitrator."  *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 209 (2d Cir. 2005); *see Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 72302, at *8 (S.D.N.Y. Jan. 6, 2022); *Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *16 (S.D.N.Y. Sept. 16, 2020); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400 (E.D.N.Y. 2014).

   The arbitration agreement in the LLCA is broad.  It provides that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (including the scope or applicability of this agreement to arbitrate) shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator."  Dkt. No. 67-2 § 12.14(a).  The mandatory arbitration provision does not just apply to disputes or controversies arising out of the LLCA but also to any disputes or controversies "relating to" the LLCA.  *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).  The provision also is not limited to claims or controversies relating to breaches of the LLCA but to any dispute, claim or controversy relating to the "termination, enforcement, interpretation, or validity" of the LLCA. *See, e.g.*, *Davitashvili v. Grubhub Inc.*, 2023 WL 2537777 (S.D.N.Y. Mar. 16, 2023); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 65 (2010).

Moreover, and importantly, the parties clearly and unmistakably delegated to the arbitrators the authority to decide the scope and application or the agreement to arbitrate.  The breadth of the authority the parties delegated to the arbitrator is reinforced by their decision that the arbitration would be "administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures."  LLCA at 69.  Rule 11 of the JAMS Rules and Procedures which provides, in relevant part, that jurisdictional disputes, including disputes over the interpretation and scope of the agreement to arbitrate, will be submitted to the arbitrator:

> A.    Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing.  The resolution of the issue by the Arbitrator shall be final.
>
> B.    Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are the proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.[19]

Dkt. No. 55-1 at 9.

"[I]f a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Id.*; *see also Beijing Shougang Mining Inv. Co., Ltd. v. Mongolia*, 11 F.4th 144 (2d Cir. 2021); *Jock*, 942 F.3d at 624 ("[W]hen parties to an agreement explicitly incorporate rules that empower an arbitrator to decide an issue, 'the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" (quoting *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 (2d Cir. 2018)); *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 522–23 (S.D.N.Y. 2017) (finding clear and unmistakable intent based on contract language that

---

[19] The language "as a preliminary matter" conveys that the arbitrator is to decide the scope of the arbitration before addressing the merits and not to limit the scope of the arbitrator's authority. *Cf. Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (summary order); *Parrella v. Orange Rabbit, Inc.*, 2021 WL 4462809, at *8–9 (S.D.N.Y. Sept. 29, 2021).

stated "disputes arising out of or relating to interpretation or application of this Arbitration

Provision shall be decided by an Arbitrator and not by a court or judge"); *Fraternity Fund Ltd. v.*

*Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 575–76 (S.D.N.Y. 2005) (finding clear and

unmistakable intent based on contract language that delegated to an arbitrator disputes involving

"meaning, construction, validity and/or enforceability"). "'[O]nce the parties have agreed that an

arbitrator may decide questions regarding the scope of arbitrable issues in the first instance,'

federal courts are indeed required to afford deference to the arbitral tribunal's decision as to that

scope." *Beijing Shougang*, 11 F.4th at 156 (quoting *Schneider v. Kingdom of Thailand*, 688 F.3d

68, 76 (2d Cir. 2012)). The Second Circuit has instructed that the Court may disturb the

arbitrator's ruling as to jurisdiction only if the ruling did not fall "within his interpretative

authority" and if the arbitrators reasoning did not draw "its essence from the agreement to

arbitrate" but instead effectively "dispensed its own brand of justice." *Beijing Shougang*, 11

F.4th at 161 (internal quotation marks and citations omitted).

 Respondent has not satisfied its burden to show that the arbitrator exceeded his

interpretative authority in awarding unjust enrichment damages and in deciding issues regarding

Levona's ownership of the Preferred Interests. *See Smarter Tools Inc. v. Chongqing SENCI*

*Import & Export Trade Co., Ltd.*, 57 F.4th 372, 378 (2d Cir. 2023) (burden is on party seeking to

vacate the award to show that arbitrator exceeded his authority). The Third Amended Statement

of Claims and Response to Counterclaims submitted by Petitioners asserted that Levona had

engaged in "egregious and ongoing breaches" of the LLCA. Dkt. No. 31-35 ¶ 1. In the Award,

the arbitrator found that Levona breached its obligations arising out of the LLCA, including by

bribing an employee of Corp and causing him to disclose confidential information, violating

confidentiality obligations itself, influencing Gas's financiers to turn against Petitioners by

causing the arrest of Gas's vessels and doing so without notifying Petitioners, failing to acknowledge that Eletson had fully complied with the terms of the BOL Purchase Option, improperly purporting to act on behalf of the Company in its business dealings with third parties, improperly threatening Eletson and its affiliated officers and directors, improperly purporting to seize control of the Company's board of directors post-March 11, 2022, improperly purporting to assert control over the assets of the Company post March 11, 2022, improperly purporting to call and hold meetings of the Board of Directors post March 11, 2022, and breaching its obligations under the LLCA. Dkt. No. 67-58 at 96–98. The arbitrator did not purport to award damages for breach of the BOL. He awarded damages of $19,677,743,71 for the lost services of the Symi and Telendos without the reciprocal transfer of the Preferred Interests. The damages were based on an estimate of what the Company would have made from the two vessels had it not transferred them and was awarded to the Nominees because they flowed from Levona's refusal to relinquish the Preferred Interests and the Nominees hold all title and interest in the Preferred Interests. *Id.* at 64–65. The arbitrator also awarded $21,777,378.50 as directly calculable losses arising from Levona's conduct that led to the vessel arrests, including lost revenues and fixed costs incurred due to the arrests, payable to the Company as compensatory damages. *Id.* at 65. Finally, the arbitrator awarded $2,000,000 to be paid to the Company from a number of other wrongful acts of Levona including the loss of access to capital, management distraction, and reputational harm. *Id.* at 66.

The arbitrator based his conclusion that he had authority to make these determinations on the language of the arbitration provision in the LLCA, and did not dispense his own brand of industrial justice. The Court need not conclude that it would have reached the same decision as the arbitrator to conclude that he acted within the authority granted him by the parties to

determine his own jurisdiction.  *See Beijing Shougang*, 11 F.4th at 158, 161.  The dispute—and

the arbitrator's ultimate determination of wrongful conduct—arose out of the LLCA and the

relationship between the parties formed as a result of the LLCA, and related not just to breaches

of the LLCA but also to its termination, enforcement and interpretation.  Levona is in error when

it asserts that the award of unjust enrichment damages related to events "not governed" by the

LLCA.[20]  It is precisely as a result of Levona's conduct that the arbitrator determined that the

Company and the Nominees suffered the damages the arbitrator found that they had suffered.

With respect to the unjust enrichment damages in particular, the arbitrator concluded that it was

because Levona had taken unilateral acts—without authority to do so under the LLCA—that the

Company had suffered foregone profits.

Levona is mistaken in its argument that the arbitrator was required as a matter of law to

forego determination of Petitioners' claims because the arbitrator could not conclude whether

Levona had engaged in wrongful conduct arising out of or relating to the LLCA without first

making an antecedent determination as to whether Eletson had properly exercised the Purchase

Option.  Eletson's claim for damages turned upon conduct engaged in by Levona both before and

after the exercise of the Purchase Option, and the arbitrator did not award damages for Levona's

failure to honor the Purchase Option.  Thus, to a large extent, the question of whether Eletson

---

[20] Thus, Levona's reliance on the dictum from *Smarter Tools* that "vacatur was necessary where, for example, the arbitrators exceeded their powers [by awarding damages] for events not governed by the arbitration agreement," 57 F.4th at 382, is not availing.  *Smarter Tools* cited *In re Arbitration Between Melun Indus., Inc. & Strange*, 898 F. Supp. 990, 994–95 (S.D.N.Y. 1990), but the distance between the facts of this case and those of *Melun Industries* demonstrate the weakness of Respondent's argument.  In *Melun Industries*, the arbitration provision at issue limited the arbitrator to resolving disputes over a post-closing adjustment and thus the arbitrator exceeded his authority by resolving issues regarding the accuracy of an opening balance sheet. The case bears no resemblance to this one in which the arbitration clause is broad and delegates issues regarding arbitrability to the arbitrator.

had properly exercised the Purchase Option was in the nature of an affirmative defense or an "anticipatory repudiation"—if Eletson had not exercised the option and if Levona had maintained its Preferred Interests, then arguably Levona would not have breached the LLCA and its conduct would not have violated any implied covenant of good faith and fair dealing.

The antecedent determination that the arbitrator was required to make here bears similarity to the antecedent determinations that courts are required to make when analyzing a claim for tortious interference, which only lies if the plaintiff had a business relationship with a third party that the defendant injured, and which may be overcome by a showing by the defendant that interference arose through the exercise of its equal or superior right in the breaching party's business.  *See, e.g.*, *Lesnik v. Lincoln Financial Advisors Corp.*, 2020 WL 3057456, at *3 (S.D.N.Y. June 9, 2020) ("Under New York law, a claim for tortious interference with prospective economic advantage comprises four elements: (a) business relations with a third party; (b) that defendant knew of the relationship and interfered with it; (c) defendant acted with the sole purpose of harming the plaintiff or solely out of malice or used wrongful means; and (d) injury to that business relationship."); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 791 (S.D.N.Y. 2019) ("It is imperative that, in bringing a tortious interference claim, a plaintiff identify the relevant terms of the contract that existed that were breached by defendant.") (internal quotation marks omitted); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013) (noting the requirement that a plaintiff "identify the potential customers at issue when asserting a cause of action for interference with prospective economic advantage"); *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 835 N.Y.S.2d 530, 532 (2007) ("In response to such a claim, a defendant may raise the economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business.").  In other words,

67

judicial bodies are called upon to make antecedent determinations about rights and obligations arising out of contracts even where the judicial body would not have jurisdiction to decide a dispute arising out of those contracts.

Further, once the arbitrator had properly seized jurisdiction of the dispute, it was not outside the scope of his remedial authority to determine that the Preferred Interests should be transferred to the Nominees.  As the arbitrator reasoned, because Eletson asserted breaches of the LLCA, the parties were not required to "arbitrate their disputes in two steps: first, go to London to adjudicate performance under the Transaction Documents and then second, come to JAMS to determine breaches under the [LLCA]."  *Id.* at 14.

## B.     Adjudication of the Rights and Duties of Non-Parties to the Arbitration and Non-Signatories to the Arbitration Agreement

Respondent argues that the arbitrator improperly adjudicated the rights and duties of non-parties to the arbitration proceedings and non-signatories to the LLCA.  Dkt. No. 50 at 17–22. Specifically, Respondent complains that the arbitrator could not have awarded damages to the Company, as a non-party to the arbitration proceedings, or to the Nominees, as non-parties to the arbitration proceedings and non-signatories to the LLCA.  *Id.* at 19.  It also takes issue with the arbitrator's award of damages against Murchinson and Pach Shemen as Levona's alter egos because Murchison and Pach Shemen were not parties to the arbitration proceedings and are not signatories to the LLCA.  *Id.* at 22–23.

### 1.     The Award of Relief to Non-Signatories and Non-Parties

Respondent argues that the arbitrator erred and exceeded his powers under the arbitration agreement by adjudicating the rights and obligations of the Company and the Nominees.  Dkt. No. 50 at 19–22; Dkt. No. 59 at 6.  Respondent argues that the arbitrator was without power to award damages to the Nominees because they were neither signatories to the LLCA nor parties

to the arbitration proceedings, Dkt. No. 50 at 19, and that he lacked power to award damages to Gas because, although it was a signatory to the LLCA, it was not a party to the arbitration, *id.* at 19–20.  The argument is without merit.

The arbitration agreement in the LLCA is broad.  It commits to the arbitrator the resolution of "[a]ny dispute, claim or controversy arising out of or relating to th[e LLCA] or the breach, termination, enforcement, interpretation or validity thereof (including the determination of the scope or applicability of this agreement to arbitrate) . . . ."  Dkt. No. 67-2 at 69; *see Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 652 (S.D.N.Y. 2011) ("An arbitration clause covering '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is 'the paradigm of a broad clause.'" (quoting *Collins & Aikman Prods. Co.*, 58 F.3d at 20)); *see also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35–36 (2d Cir. 2002); *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 (2d Cir. 1987).  It also provides "[t]he arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures."  Dkt. No. 67-2 at 69.

"Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate."  *ReliaStar Life Ins. Co. of N.Y.*, 564 F.3d at 86.  "It is not the role of the courts to undermine the comprehensive grant of authority to arbitrators by prohibiting an arbitral security award that ensures a meaningful final award."  *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 262 (2d Cir. 2003); *see also Forschner Grp., Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 406 (2d Cir. 1997).  Indeed, "arbitrators are generally afforded greater flexibility in fashioning remedies than are courts."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 902 (2d Cir. 2015); *see Shasha v. Malkin*, 2021 WL 11960275, at *7 (S.D.N.Y. Mar. 24, 2021) ("Arbitrators 'may grant equitable relief that a Court

could not.'" (quoting *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 532 F. Supp. 901, 905 (S.D.N.Y. 1982), *aff'd*, 689 F.2d 301 (2d Cir. 1982))); *see also* 1 M. Domke, Domke on Commercial Arbitration § 35:1 (3d ed. 2003) (hereinafter "Domke on Commercial Arbitration") ("Limited only by the broad concepts of equity and justice, an arbitrator has a plethora of remedies, both legal and equitable, to choose from in structuring a remedy.").  "Additionally, the parties to the arbitration agreement can broaden the remedies available to them under the arbitration agreement by incorporating the rules of an arbitration administering agency."  Domke on Commercial Arbitration § 35:2.  Here, JAMS Rule 24 provides: "The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy."  Dkt. No. 67-3.

The award to the Nominees and the Company here fell within the broad authority the parties delegated to the arbitrator.  An arbitrator under a broad arbitration provision has even greater power than a court to award relief in favor of Gas and/or the Nominees as third-party beneficiaries of the LLCA.  *Benihana, Inc*., 784 F.3d at 902; *Sperry Int'l Trade*, 689 F.2d at 306 ("Under New York law arbitrators have power to fashion relief that a court might not properly grant.").  The arbitrator concluded that Respondent wrongfully denied the Nominees the Preferred Interests to which they were entitled and that, by depriving them of the Preferred Interests while retaining the two vessels, Levona was unjustly enriched at the Nominees' expense.  The arbitrator reasoned that the damages "flow[ed] directly from Levona's refusal to relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the preferred interests."  Dkt. No. 47-5 at 64.  The arbitrator had the authority to hold that the Preferred Interests were transferred to the Nominees and award the Nominees damages.  The

Court need not agree with that reasoning to conclude that it was within the arbitrator's power to determine that Levona's breach of its obligations to Petitioners could be most readily and effectively redressed by giving the party most directly injured the benefit the arbitrator found that Respondent unjustly enjoyed.  As to the Company, the arbitrator determined that they too were directly injured by the conduct that the arbitrator found violated the LLCA—Levona caused the arrests of the Company's vessels and committed other breaches of contract.  If it was within the power of the arbitrator to determine whether Levona breached the LLCA, it follows that it would be within the power of the arbitrator to grant the relief that the arbitrator believed was most effective to redress that breach.

Respondent's arguments to the contrary are without merit.  Respondent contends that a non-party to the arbitration agreement that did not participate in the arbitration is not bound by the award rendered in the arbitration.  *See, e.g.*, *Ali A. Tamini v. M/V Jewon*, 808 F.2d 978, 981 (2d Cir. 1987); *Dist. Council No. 9 v. APC Painting, Inc.*, 272 F. Supp. 2d 229, 240 (S.D.N.Y. 2003).  Respondent's point that the Nominees and the Company were non-parties and that they did not participate in the arbitration has force.  Neither the Nominees nor the Company were named as parties.  Although representatives of each testified, they did so in their capacity as witnesses, and not in their capacity as parties.  The Court has reviewed the arbitration filings and agrees with Respondent that it was not until the pre-hearing brief, months after the arbitration had commenced, that Petitioners asserted that the Preferred Interests should be transferred to the Nominees and not until after the hearing and in its proposed order that Petitioners asked that damages be awarded to Gas and to the Nominees and not to itself.

But that point gets Respondent only so far.  Unlike the arbitrator's decision to award relief as against non-parties to the arbitration discussed below, the arbitrator's decision to award

damages to non-parties did *not* "bind nonparties to the arbitration." *Soleimani v. Andonian*, 2022 WL 748246, at *5 (S.D.N.Y. Mar. 10, 2022). It bound Levona, a party to both the arbitration and the underlying contract, to pay damages to non-parties. Accordingly, the award "do[es] not bind the[] non-parties in the sense proscribed by decisional law." *Matter of Arb. Between Cole Pub. Co., Inc. v. John Wiley & Sons, Inc.*, 1994 WL 532898, at *4 (S.D.N.Y. Sept. 29, 1994). Nor does the award "unnecessarily determine the rights of non-parties," as in cases where petitioners sought to confirm awards that benefitted nonparties *without resolving the parties' dispute*. *See, e.g.*, *Techcapital Corp. v. Amoco Corp.*, 2001 WL 267010, at *16 (S.D.N.Y. Mar. 19, 2001).

Respondent also relies upon the Sixth Circuit decisions in *NCR Corp. v. Sac-Co, Inc.*, 43 F.3d 1076 (6th Cir. 1995), *Nationwide Mutual Insurance Co. v. Home Insurance Co.*, 330 F.3d 843, 849 (6th Cir. 2003), and *Armco Employees Independent Federation, Inc. v. AK Steel Corp.*, 149 F. App'x 347 (6th Cir. 2005). None is apposite. In *NCR Corp.*, all parties agreed that the arbitrator exceeded his powers by awarding "class action type relief in a case that was not a class action." 43 F.3d at 1080. One of NCR's authorized dealers asserted a claim in arbitration of unfair competition; the arbitrator not only awarded that dealer punitive damages but also awarded "punitive damages to all of NCR's United States nonservicing dealers even though only one nonservicing dealer . . . was a party to the action before the arbitrator." *Id.* at 1078. In *Nationwide*, the reviewing court had previously determined that the third-party eventually awarded relief could not be a party to the arbitration given its contractual relationship with the parties to the arbitration, and that the only relief available in the arbitration was to the parties before the arbitrator. 330 F.3d at 847 ("In *Nationwide I*, we held that Nationwide could not bring suit directly against CIGNA, or compel CIGNA to submit to arbitration, because of a third-party

disclaimer provision in the assumption contract between Home and CIGNA. We construed this disclaimer provision as a limitation on the obligations CIGNA undertook in its assumption contract with Home. Therefore, Nationwide's only recourse was against Home, and CIGNA and its affiliates were not parties to the arbitration."). The court concluded that the award was in manifest disregard of the law and the Circuit's prior opinion because it purported to adjudicate and create rights that were not the subject of the arbitration. *Id.* Put differently, the court in *Nationwide* held that relief could not be awarded to a third-party because the relevant contracts did not provide for it. *Id.* at 848 ("Thus, the arbitration award unambiguously exceeds the terms of the Nationwide-Home contractual dispute."). Notably, the court did not contest the proposition proffered by the appellee that, if the award was construed, simply to direct relief by which the appellant could discharge its legal obligations, it could be confirmed. *Id.* Finally, in *Armco*, the Sixth Circuit held that the labor arbitrator exceeded his powers by awarding relief in an arbitration brought by the defendant's apprentices who complied with the collective bargaining agreement's grievance procedures also to those apprentices who did not comply with those grievance procedures. *Armco*, 149 F. App'x at 350–52. The court concluded, "[l]imiting relief to those apprentices who properly complied with the group grievance procedure is consistent with the terms of the CBA" and that the arbitrator's award to all apprentices, including those who did not comply with the grievance procedure demonstrated a "clear infidelity" to the collective bargaining agreement because it conflicted not only with the terms of the collective bargaining agreement, but also with "the parties' intent in entering into an agreement that sets forth such detailed provisions for filing grievances." *Id.* at 351–52.

The cases offered by Respondent thus do not stand for the universal proposition that an arbitrator determining a dispute under a broad arbitration agreement lacks authority to grant

monetary relief directly to third parties.  In those cases, the arbitrator's award either depended on the determination of the rights of persons who were not parties to the arbitration, or granted relief to parties that a court had previously held could not be awarded relief in the arbitration.  In this case, by contrast, the Award did not rest upon a determination that a wrong was committed as against the Company or the Nominees independent of the wrongs committed to Petitioners.  It rested upon a determination the rights of Corp and Holdings—including the right to exercise the Purchase Option—were violated and that the payment of monies to the third parties was the most effective means of providing relief.  The Award does direct a remedy by which Respondent will "discharge its legal obligations" to Petitioners.  *Nationwide*, 330 F.3d at 847.  The Award thus cannot be disturbed on the basis that because relief was directed to persons other than the Petitioners the arbitrator exceeded his authority under the arbitration agreement.

### 2.    The Award of Relief Against Non-Parties

Respondent next argues that because Murchinson and Pach Shemen were not parties to the arbitration, the arbitrator could not award relief against them and in favor of Petitioners.  Dkt. No. 50 at 22-23; Dkt. No. 59 at 8.  For their part, Petitioners assert that they seek *confirmation* of the award only as against Levona, and not against Murchinson or Pach Shemen.  Dkt. No. 54 at 13.  Petitioners argue that—with respect to the liability of Murchinson and Pach Shemen—the Court should merely confirm the *factual findings* of the arbitrator regarding the roles and actions of Murchison and Pach Shemen, as the issues of the relationship among Levona, Murchinson, and Pach Shemen were before the arbitrator and the arbitrator's findings cannot be revisited by a court on a petition to confirm an award.  Dkt. No. 54 at 13.  Specifically, the arbitrator based his award of relief against Murchison and Pach Shemen on his conclusion that "Levona, Murchinson, and Pach Shemen, are each alter egos of the other concerning every fact proven in

this matter and every item of relief awarded herein." Dkt. No. 67-58 at 96. As a result, "and for
the avoidance of any doubt, any judgments against Levona are also against each alter ego." *Id.*

Respondent's argument has merit. "[A] gateway dispute about whether the parties are
bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide."
*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *see Schneider v. Kingdom of
Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) ("The question whether the parties have submitted a
particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial
determination unless the parties clearly and unmistakably provide otherwise." (quoting *Howsam*,
537 U.S. at 83)). "[A]rbitration is simply a matter of contract between the parties; it is a way to
resolve those disputes—but only those disputes—that the parties have agreed to submit to
arbitration." *First Options of Chi.*, 514 U.S. at 943. Thus, "a decision whether parties other than
those formally signatories to an arbitration clause may have their rights and obligations
determined by an arbitrator when that issue has not been submitted to him is not within the
province of the arbitrator himself but only of the court." *Orion Shipping & Trading Co. v. E.
States Petroleum Corp. of Panama, S.A.*, 312 F.2d 299, 301 (2d Cir.), *cert. denied*, 373 U.S. 949
(1963). "[W]here the petitioners contend that they are not 'bound to [the] arbitration agreement,
the issue of arbitrability is for the Court in the first instance.'" *Kwatin v. Mason*, 356 F. Supp. 3d
343, 348 (S.D.N.Y. 2018) (quoting *Boroditskiy v. European Specialties LLC*, 314 F. Supp. 3d
487, 493 (S.D.N.Y. 2018)); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Stucco Sys., LLC*,
289 F. Supp. 3d 457, 466 (S.D.N.Y. 2018) (stating that "whether [the non-signatory] is to be a
party to the [arbitration agreement] is an issue for judicial determination first"); *Boroditskiy*, 314
F. Supp. 3d at 493 (noting that "in cases where a party disputes whether it is bound to an
arbitration agreement, the issue of arbitrability is for the Court in the first instance" (quotation

marks omitted)); *Herman Miller, Inc. v. Worth Cap., Inc.*, 173 F.3d 844, (2d Cir. 1999)

(summary order) ("The question of 'whether a person is a party to [an] arbitration agreement' is

a threshold question to be determined by the court, and not by an arbitrator." (quoting *Interbras*

*Cayman Co. v. Orient Victory Shipping Co.*, 663 F.2d 4, 7 (2d Cir.1981) (per curiam))).

Although parties may delegate questions of arbitrability to the arbitrator "so long as the parties'

agreement does so by 'clear and unmistakable' evidence," "before referring a dispute to an

arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein,*

*Inc.*, 139 S. Ct. at 530 (quoting *First Options of Chi.*, 514 U.S. at 944); *see Pacelli v. Augustus*

*Intel., Inc.*, 459 F. Supp. 3d 597, 605 (S.D.N.Y. 2020).  These principles stem from the fact that

arbitration is "a creature of contract."  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir.

2019); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).  "[A]rbitration 'is a

matter of consent, not coercion.'"  *Stolt-Nielsen*, 559 U.S. at 681 (quoting *Volt Info. Scis., Inc. v.*

*Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).  Accordingly, "the FAA

does not require parties to arbitrate when they have not agreed to do so."  *Volt*, 489 U.S. at 478

(quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)); *see*

*also Stolt-Nielsen*, 559 U.S. at 683 (holding that "parties may specify *with whom* they choose to

arbitrate their disputes").

There are limited circumstances in which a person who is not party to an arbitration

agreement will be bound by an arbitral award.  A court upon motion may *compel* a non-signatory

to an arbitration agreement to participate in an arbitration.  The Second Circuit has recognized

five theories for requiring non-signatories to arbitrate: "1) incorporation by reference; 2)

assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel."  *Thomson-CSF, S.A. v. Am.*

*Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995); *see also Oriental Com. & Shipping Co. v. Rosseel,*

*N.V.*, 609 F. Supp. 75, 78 (S.D.N.Y. 1985) ("It is within the province of this Court to determine whether Oriental S.A., although not formally a party to the arbitration agreement, should be made a party to the arbitration proceeding in addition to Rosseel and Oriental U.K.").  District courts are instructed to "narrowly construe these five theories, each of which is governed by ordinary principles of contract and agency law." *Boroditskiy*, 314 F. Supp. 3d at 493.  As such, an "agreement to arbitrate does not bind an agent acting on behalf of a disclosed principal 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" *Veera v. Janssen*, 2005 WL 1606054, at *3 (S.D.N.Y. July 5, 2005) (quoting *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991)).

In addition, a person who is not a party to an arbitration agreement may nonetheless become bound by the arbitrator's award if that person initiates the arbitration or participates, without objection, in the arbitration proceedings.  *Cf. Cole Publishing Co.*, 1994 WL 532898, *4 ("[I]t has long been recognized that an arbitration award cannot be enforced against a non-party to the arbitration clause who did not participate in arbitration proceedings.").  Although "arbitrators do not have the power to bind a corporation which is not a party to the arbitration or a voluntary participant in the arbitration proceeding," *Am. Renaissance Lines, Inc. v. Saxis S.S. Co.*, 502 F.2d 674, 677 (2d Cir. 1974), they do have the authority to bind a voluntary participant in the arbitration proceeding, *see LGC Cap. Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 473 (S.D.N.Y. 2017) (holding that individual non-signatories to an arbitration agreement "waived any right to object to the imposition of personal liability" by participating voluntarily in the proceeding, including by listing themselves in their personal capacity as respondents in the proceeding); *Halley Optical Corp. v. Jagar Int'l Mktg. Corp.*, 752 F. Supp.

638, 639–40 (S.D.N.Y. 1990) (finding waiver of objection to the imposition of personal liability where an individual participated in arbitration in order to ensure a party does not "participate in an arbitration, with the assurance that if it loses it may later challenge whether it had ever agreed to arbitration").

Finally, an alter ego to a participant in an arbitration or a party to an arbitration agreement can also be required to satisfy an arbitral award in the absence of an order compelling a party to arbitrate, or of actual participation in the arbitral proceedings. *See, e.g.*, *Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.*, 722 F.3d 488 (2d Cir. 2013). However, in that circumstance, the proper vehicle is not an application under the FAA or the New York Convention to confirm the award issued in connection with a proceeding in which the third party did not participate and was not compelled to participate. An award against a person who is not a party to an arbitration agreement or who has not participated either voluntarily or by compulsion in an arbitration proceeding cannot be confirmed. The award may be confirmed only to the extent that it orders relief against a party or a participant. If the prevailing party seeks to hold the alter ego responsible for the relief awarded by the arbitrator, it must do so through a separate action in court to pierce the corporate veil. *See GE Transp. (Shenyang) Co. v. A-Power Energy Generation Sys., Ltd.*, 2016 WL 3525358, at *6 (S.D.N.Y. June 22, 2016); *APC Painting, Inc.*, 272 F. Supp. 2d at 240 ("[C]ase law is clear that in the commercial arbitration context the corporate veil cannot be pierced as part of a motion to confirm the arbitration award." (citing *Productos Mercantiles E Endustriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46–47 (2d Cir. 1994))); *see also Orion Shipping & Trading Co.*, 312 F.2d at 301 ("It may well be . . . that Eastern Panama is thoroughly dominated by Signal, and that Signal is properly accountable on an 'alter ego' theory. But we hold that an action for confirmation is not the proper time for a

District Court to 'pierce the corporate veil.'").  "[T]he question of whether a third party not named in an arbitral award may have that award enforced against it under a theory of alter-ego liability . . . is one left to the law of the enforcing jurisdiction, here the Southern District of New York, under the terms of Article III of the New York Convention," *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 74 (2d Cir.), *cert. denied*, 583 U.S. 1039 (2017), in which the Court applies the federal common law of veil piercing, *see, e.g.*, *Global Gaming Philippines, LLC v. Razon*, 2023 WL 5935640 (S.D.N.Y. Sept. 12, 2023).[21]

The arbitrator thus exceeded his authority when he ruled that Pach Shemen and Murchinson were required to pay damages to Levona.  *See Orion Shipping & Trading Co.*, 312 F.2d at 300 (concluding that the district court "held, properly we think, the arbitrator exceeded his powers in determining the obligations of a corporation which was clearly not a party to the arbitration proceeding, and that Signal's motion to vacate the award against it should be granted"); *Porzig*, 497 F.3d at 140–41 (vacating arbitral award of relief against a non-party to the arbitration after stating that "[t]he authority of the arbitral panel is established only through the contract between the parties who have subjected themselves to arbitration, and a panel may not exceed the power granted to it by the parties in the contract").  Here, only Levona—not Murchinson or Pach Shemen—was party to the LLCA, which contained the arbitration provision that Petitioners invoked.  There is no dispute that Murchinson and Pach Shemen did not agree to the LLCA, were not signatories to the LLCA, were not parties to the LLCA, and were not bound

---

[21] "An alter ego relationship is not easy to establish," and exists "only where the instrumentality is so extensively controlled that a relationship of principal and agent is created or where affording the entity separate juridical status would work fraud or injustice."  *Esso Expl. & Prod'n Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 59 (2d Cir. 2022); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021) (same).  Common ownership and control is not enough.  *See, e.g.*, *Thomson-CSF*, 64 F.3d at 788.

by the LLCA.  Murchinson and Pach Shemen were thus also not bound by the arbitration

provision in the LLCA.  There also is no evidence or argument that Levona had the authority to

bind Murchinson or Pach Shemen to the LLCA.  The arbitrator had no authority to make

Murchinson or Pach Shemen parties to the arbitration and, even if he did, he did not exercise that

authority.  Petitioners did not seek an order from a court compelling non-signatories Murchinson

or Pach Shemen to participate in the arbitration under the LLCA.  Petitioners never claimed that

Murchinson or Pach Shemen were required to participate in the arbitration under a theory of

incorporation by reference, assumption, agency, veil-piercing, or estoppel.  The JAMS

Comprehensive Arbitration Rules and Procedures, pursuant to which Eletson and Levona agreed

to arbitrate in the LLCA, Dkt. No. 67-2 § 12.14(a), requires each party to serve on the other a

Notice of Claims, "afford[ing] all other Parties reasonable and timely notice of its claims," Dkt.

No. 67-3 § 9.  None of Eletson's Notice of Claims name Murchinson or Pach Shemen or seek

relief against Murchinson or Pach Shemen; Eletson does not claim here that it served

Murchinson or Pach Shemen with its Notice of Claims.  Indeed, the Third Amended Statement

of Claims and Response to Counterclaims which was the basis of Eletson's claims in the

arbitration names only Levona; it does not name Pach Shemen or Murchinson, seek to compel

them to participate in the arbitration, or seek relief against them.  Dkt. No. 31-35.  Among other

things, Petitioners sought as relief "the damages that they have suffered because of Levona's

unlawful conduct together with punitive damages and attorneys' fees and costs."  *Id.* ¶ 6(e).

Indeed, it was not until after the hearing had concluded that Petitioners asked the arbitrator to

award any relief against Pach Shemen and Murchinson and even then it did not do so by serving

Murchinson or Pach Shemen with papers or seeking to bring them in to the arbitration.  Snuck

into the second page of Petitioners' post-hearing proposed order was the request that Murchinson

and Pach Shemen (along with hedge funds Nomis Bay and BPY) should be found to be alter

egos of Levona and responsible for "every item of relief awarded herein."  Dkt. No. 67-47 at 2.

Tellingly, even then, the proposed order asked only that Levona pay damages.[22]  *Id.* at 6–7.  But,

by that point the hearing was over.  Pach Shemen and Murchinson had no notice prior to the

hearing that they may ultimately be deemed liable in the proceedings, no opportunity to be heard,

and no opportunity to defend themselves.  Their rights were adjudicated without affording them

any opportunity to be heard.

The Court therefore vacates the portions of the Award that purport to find Murchinson

and Pach Shemen liable, or that require them to pay damages to Petitioners, the Company, or the

Nominees.  Section 11 of the FAA gives the court the power to modify or correct an award on

the ground that "the arbitrators have awarded upon a matter not submitted to them, unless it is a

matter not affecting the merits of the decision upon the matters submitted."  9 U.S.C. § 11.  The

power is discretionary, and not mandatory.  *See Sociedad Armadora Aristomenis Panama, S.A. v.

Tri-Coast S.S. Co.*, 184 F. Supp. 738, 741 (S.D.N.Y. 1960); *see also Cortez Byrd Chips, Inc. v.

Bill Harbert Constr. Co.*, 529 U.S. 193, 197–98 (2000).  In the alternative, the FAA gives the

Court the power to vacate an award on the grounds that the arbitrator exceeded his power.  9

U.S.C. § 10(a)(4); *see Smarter Tools*, 57 F.4th at 381–82.  In this case, it is an appropriate

exercise of discretion to modify the Award and not to vacate it in its entirety.  The questions of

whether Levona was liable to Eletson and whether Levona could be held responsible under the

LLCA for the conduct of Murchinson and Pach Shemen were before the arbitrator.  That the

arbitrator exceeded his powers in ordering relief directly against Murchinson and Pach

---

[22] The Award, which recites that Levona, Murchinson, and Pach Shemen, pay compensatory and punitive damages and attorney's fees, costs, expenses, and interest, as alter egos, jointly and severally, Dkt. No. 67-58 at 99-100, exceed the relief requested by Eletson.

Shemen—because they were not signatories to the LLCA and were not parties to the arbitration—does not alone relieve Levona from liability for its role in the conduct of those entities.

Petitioners do not dispute that Pach Shemen and Murchinson cannot be bound as parties to the Award. They respond only that the Court should confirm "the factual findings involving the rules and actions of Murchinson and Pach Shemen, as these issues were arbitrated and submitted to Justice Belen for adjudication." Dkt. No. 54 at 13. That argument, however, is a non-sequitur. Under the New York Convention and the FAA, the Court does not confirm "factual findings." As Eletson itself emphasizes, the Court "cannot revisit or question the fact finding . . . that produced a challenged arbitration award." Dkt. No. 54 at 14 (citing *PDV Sweeny, Inc. v. Conocophillips Co.*, 670 F. App'x 23, 24 (2d Cir. 2016) (summary order)). It confirms an arbitral award. *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980). A portion of the Award here, if confirmed in its entirety, would direct Murchinson and Pach Shemen to pay damages. And whether Pach Shemen and Murchinson are liable to pay damages was not a question submitted to Justice Belen for decision. Thus, it is no answer to say that Pach Shemen and Murchinson can raise their arguments in an action by Petitioners for enforcement. Petitioners have not demonstrated that they are entitled to an Award confirmed against Murchinson and Pach Shemen and Respondent has shown that that portion of the Award must be vacated. It may be that Petitioners could have obtained an order compelling Murchison and Pach Shemen to participate in the arbitration even though they were not signatories to the LLCA. Eletson may yet have the opportunity to seek to hold Murchinson and Pach Shemen responsible for Levona's obligations under the Award. But, not having sought to make Murchinson or Pach Shemen a party to the arbitration, they must do so through a separate action

for veil-piercing.  They may not do so through findings and an award as to which Murchinson and Pach Shemen had no opportunity to be heard.

### C.     Arbitration of Claims Barred by the Bankruptcy Stay

Respondent argues that the arbitrator violated the Lift Stay Order and the bankruptcy stay by determining that the Preferred Interests had been assigned to the Nominees and by awarding damages based on the alleged bad faith bankruptcy filing.  Dkt. No. 50 at 25–27.  Petitioners respond that the arbitrator acted within his authority under the Lift Stay Order and that Respondent has waived any claim based on the arbitrator's failure to operate within the confines of that order by not raising any issue until after the arbitration record closed and then only with respect to the fee award.  Petitioners suggest that the claim for violation of the Status Quo Injunction was pending before April 17, 2023 because the issue of the bankruptcy filing having been made in bad faith was the subject of correspondence and motion practice before the arbitrator in March 2023, and because the arbitrator himself stated that the filing of the involuntary petition may have been a violation of the Status Quo Injunction.  Thus, Petitioners argue that the violation of the Status Quo Injunction was not a new claim but an issue relating to a preexisting order of the Tribunal.  Dkt. No. 54 at 19.

The arbitrator's exercise of authority did not violate the automatic stay or the Lift Stay Order.  The automatic stay itself did not prohibit Eletson from litigating its claims against Levona or from asking the arbitrator to find that the Preferred Interests had been transferred to the Nominees.  "Section 362 of the Bankruptcy Code provides that the filing of a bankruptcy petition creates an automatic stay against 'the commencement or continuation . . . of a judicial, administrative, or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case.'"  *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994) (quoting 11 U.S.C. § 362(a)(1)).  "The general purpose" underlying

the provision "is to grant complete, immediate, albeit temporary relief to the debtor from

creditors, and to prevent dissipation of the debtor's assets before orderly distribution to creditors

can be effected." *S.E.C. v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (quoting *Penn Terra Ltd. v.

Dep't of Envtl. Res.*, 733 F.3d 267, 271 (3d Cir. 1984)).  For this reason, "any proceedings or

actions described in section 362(a)(1) are void and without vitality if they occur after the

automatic stay takes effect." *Rexnord Holdings*, 21 F.3d at 527.  However, "the automatic stay is

inapplicable to suits *by* the bankrupt 'debtor,' as he is now called." *Martin-Trigona v. Champion

Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *see also Koolik v. Markowitz*, 40

F.3d 567, 568 (2d Cir. 1994) (per curiam) ("[T]he automatic stay is applicable only to

proceedings 'against' the debtor."); *In re Berry Ests., Inc.*, 812 F.2d 67, 71 (2d Cir. 1987)

(holding that the automatic stay did not apply to state court actions brought by the debtor);

*Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)

("Section 362 by its terms only stays proceedings against the debtor.").  Even if it would have an

adverse impact on the property of the bankruptcy estate, an action against a third party is not

subject to the automatic stay unless it is "legally certain[] to impact estate property." *Picard v.

Fairfield Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014).[23]

---

[23] The automatic stay does not "implicate mere ministerial acts performed by the clerk following
the completion of the judicial function," but does prevent the court from making any "judicial
decisions . . . after the filing of petitions in bankruptcy." *Rexnord Holdings*, 21 F.3d at 528; *see
In re Fogarty*, 39 F.4th 62, 77 (2d Cir. 2022) ("The 'ministerial act' exception represents an
exceedingly narrow category of actions that avoid the automatic stay.").  Petitioner does not
argue that the act of confirmation under the New York Convention and the FAA is merely
ministerial.

Neither Eletson's claims nor the Award violated the automatic stay.[24]  Through the arbitration, Eletson sought a declaration and determination that it had complied with all of the obligations necessary to complete the option and that the option was exercised and completed on March 11, 2022, Dkt. No. 31-35 at 23, and that Levona be ordered to transfer any preferred shares it was found to have to Eletson, *id.* at 24.  Eletson did not assert claims against Holdings. Moreover, although Eletson's claims included "factual allegations" regarding the election of the Nominees that might overlap in any fraudulent conveyance action that the Trustee in the Holdings' bankruptcy case or another party would choose to bring in the future to recover assets of the estate, the "legal bases" for Eletson's claim in the arbitration is "independent" of any such claim and do not "depend in substance" on the question whether Eletson or Holdings may have wrongfully transferred its interest in the option to the Nominees.  *Picard*, 762 F.3d at 209.  Thus, Levona cannot use the automatic stay—a statutory safeguard "intended to protect the debtor and to assure equal distribution among creditors"—as "a weapon against the estate."  *Winters ex rel. McMahon v. George Mason Bank*, 94 F.3d 130, 135 (4th Cir. 1996) (quoting *In re Globe Inv. & Loan Co.*, 867 F.2d 556, 560 (9th Cir. 1989)); *see also Leeber Realty LLC v. Trustco Bank*, 2019 WL 498253, at *11 (S.D.N.Y. Feb. 8, 2019) ("Because the automatic stay's primary purpose is to preserve a bankrupt's estate for the benefit of all creditors, courts consistently hold that actions

---

[24] Eletson argues that Levona waived its rights to complain that the arbitrator exceeded his authority because it raised the issue about which it complains with the bankruptcy court in May 2023, but then did not file additional motions for relief.  Dkt. No. 54 at 20.  That argument is without merit.  Levona moved to strike Eletson's allegations that the Preferred Interests had been transferred to the Nominees or, in the alternative, to dismiss Eletson's claims.  Dkt. No. 31-37.

brought *by* a debtor are not subject to the automatic stay."), *aff'd*, 798 F. App'x 682 (2d Cir. 2019) (summary order).[25]

While Eletson sought an order compelling Levona to transfer to Eletson any preferred shares it was found to have, Dkt. No. 67-24 at 23, that request is more accurately understood as a demand that the arbitrator order Levona to turn over the Preferred Interests to the Company or whomever, under the BOL, the Company elected as its nominees.  As Eletson has argued, the question regarding the identity of the recipient of the preferred shares would be a matter of indifference to Levona in its capacities as contractual counterpart under the LLCA and the BOL. If the Company did in fact exercise its option to buy Levona's preferred shares as the arbitrator found, the Company had the sole authority, without any input by Levona, to determine who should receive the preferred shares.  Levona, which, pursuant to the arbitrator's findings, no longer had control over the Company, had no interest in the matter.

For all of those reasons, Levona is mistaken in its argument that the arbitrator improperly usurped the powers of the bankruptcy court by determining that Eletson had properly exercised the option and that, as a result, the Nominees were entitled to the Preferred Interests.  Nor will this Court have violated the Automatic Stay by confirming the Award.  The Award, by its terms, only declares that "Eletson effectively exercised the buyout option granted in the Binding Offer Letter," that "as of March 11, 2022, . . . Levona had no membership interest in" the Company, that the Company "exercised its rights under *the BOL* to nominate three entities—Fentalon, Apargo, and Desimusco, (the Preferred Nominees)—affiliated with the principals of Claimants,

---

[25] Levona's counterclaims against Eletson arguably did constitute an action against the debtor. *See Koolik*, 40 F.3d at 568 (holding that "a counterclaim against a plaintiff who becomes a bankruptcy debtor is an 'action or proceeding against the debtor' within the meaning of § 362(a)(1), notwithstanding the fact that the plaintiff initiated the lawsuit").  However, the bankruptcy court permitted those claims to go forward.

as the parties to receive the preferred interests in the Company," and that "[t]he preferred interests in the Company were transferred to the Preferred Nominees, effective as of March 11, 2022, and the Preferred Nominees are permitted transferees *under the LLCA*." Dkt. No. 47-5 at 96–97 (emphasis added). In short, the arbitrator adjudicated claims only as between Eletson and Levona and only under the BOL and LLCA. The arbitrator did not purport to address the questions—now raised by Levona—whether the Company or Holdings improperly elected the Nominees or whether the transfer to the Nominees of the Company's right to the Preferred Interests effected a fraud on the creditors of Holdings and the arbitrator's findings can have no collateral estoppel effect on those questions. *See* Restatement (Second) of Judgments § 84 cmt. c (1982) ("Giving claim preclusive effect to an arbitration award does not necessarily imply that such an award should also be given issue preclusive effects. It is coherent to treat an arbitration proceeding as wholly self-contained, conclusive as to the claims represented in the award but inoperative beyond them."). It therefore did not intrude on the authority of "the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999), *cert. denied*, 529 U.S. 1038 (2000). The arbitrator's actions did not "dissipate estate assets or interfere with the trustee's orderly administration of the estate." *In re Fogarty*, 39 F.4th at 71 (quoting *Picard*, 762 F.3d at 207). The arbitrator did not "decide whether claims belonging to a debtor are property of the bankruptcy estate." Dkt. No. 38 at 2. The issues the bankruptcy court will have to decide were not before the arbitral proceedings nor was it necessary for the arbitrator to decide whether the election by Eletson that the Preferred Shares go to the Nominees rather than to the Company effected a fraud on the creditors of Holdings. Those issues therefore remain open for the bankruptcy court to decide.

*See Global Gaming Phillipines*, 2023 WL 5935640, at *3–4 (stating standards for application of issue preclusion to arbitral findings); *see also* Restatement (Second) of Judgments §§ 27, 84 (1982).

Thus, by confirming the arbitral award, the Court also will not intrude on the bankruptcy court's exclusive authority to decide what is property of the estate.  *See Universal Well Servs., Inc. v. Avoco Nat. Gas Storage*, 222 B.R. 26, 30 (W.D.N.Y. 1998) ("[T]he decision as to what is and is not 'property of the estate' lies within the exclusive jurisdiction of the bankruptcy court."). As Eletson itself has emphasized, the Court's role on a petition to confirm an arbitral award is "very limited."  Dkt. No. 54 at 5 (quoting *LiveWire Ergogenics, Inc. v. JS Barkats PLLC*, 645 F. Supp. 3d 290, 297 (S.D.N.Y. 2022)).  The confirmation of an arbitration award "ordinarily is 'a summary proceedings that merely makes what is already a final arbitration award a judgment of the court.'"  *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 132 (2d Cir. 2015) (quoting *D.H. Blair & Co.*, 462 F.3d at 110); Jay E. Grenig, Int'l Com. Arb. § 13:1 (Hilary Shroyer ed., 2023) ("Once a court has confirmed an award and reduced it to a judgment, a party may then seek a court in any Convention country with jurisdiction over the assets of the losing party that can be executed on to satisfy a money judgment.  Finding such a court, the prevailing party may take the award that has been confirmed and reduced to a judgment, and petition the new court for recognition and enforcement.").  The Court does not review the merits of the dispute and must "confirm an arbitration award unless it concludes that one of the enumerated grounds for refusing to enforce the award is present."  *Citigroup*, 776 F.3d at 132 n.4 (internal citations and quotation marks omitted).  Eletson has stated that it "intends to return to the Bankruptcy Court following this Court's ruling on confirmation and will prove then that the Arbitral Award does not even arguably involve property belonging to Holdings's estate."  Dkt. No. 33 at 3; *see also*

Dkt. No. 35 at 3 ("Eletson intends to return to the Bankruptcy Court following this Court's confirmation ruling, to address enforcement issues.").  It is in that forum, in the first instance, that the Court can address the timing of the election by Eletson that the Preferred Interests should go to the Nominees and whether the Preferred Interests should be considered to be property of the estate or should be clawed back or avoided.[26]  *See Stone Container Corp. v. Tradeway Int'l Corp.*, 1994 WL 184661, at *3 (S.D.N.Y. May 12, 1994) ("[T]he issue of preferential transfers is properly an issue for the Bankruptcy Court to consider.  Therefore, the Court [will not] rule on the alleged transfers.").

    For similar reasons, the prosecution of the violation of the Status Quo Injunction also did not violate the automatic stay.  That claim was leveled by Eletson against Levona.  *See Koch v. Preuss*, 2020 WL 1304084, at *3 (S.D.N.Y. Mar. 18, 2020).  It did not intrude upon the assets of the bankruptcy estate.  *See Martin-Trigona*, 892 F.2d at 577.  It could be argued that Eletson—by asking at the last minute that damages be paid to the Company and not to itself—transferred a claim that belonged to the estate or an entity owned by the estate to a non-debtor and that the damages awarded to the Company should instead be for the benefit of the creditors of Holdings, but the Court need not now address that issue (if it ever needs to be addressed).  The arbitrator had before him no issue with respect to the rights as between Holdings and the Company, and no order this Court will issue confirming the award thus could affect the rights as between Holdings and the Company.

---

[26] *Marquis Yachets v. Allied Marine Grp., Inc. (North)*, 2010 WL 1380137 (D. Minn. Mar. 31, 2010), upon which Levona relies, is distinguishable.  In that case, the court held that an arbitration panel exceeded its powers by deciding rather than staying claims in an arbitration brought against the debtor, not by the debtor, but nonetheless declined to modify the arbitration award because the panel was acting within its powers by continuing the arbitration award on claims to which the stay did not apply.

Finally, the Award of the Preferred Interests to the Nominees and damages to the Company for violation of the Status Quo Injunction does not violate the Lift Stay Order or the automatic stay. First, with respect to the Lift Stay Order, that order, by its terms, does not purport to "expand the scope" of the automatic stay. *Picard*, 762 F.3d at 207. Its language is permissive, not restrictive. The Bankruptcy Court stated:

> The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the arbitrator, including any appeals, with respect to the claims currently pending in the Arbitration.

Dkt. No. 67-35 at 4. The Lift Stay Order does not restrict Eletson from pursuing any action beyond the ambit of the automatic stay. In any event, the word "claims" is capacious. It refers to "[a] demand for money, property, or a legal remedy to which one asserts a right." *Claim*, Black's Law Dictionary (10th ed. 2014); *see In re Bridge Const. Servs. of Fla., Inc.*, 140 F. Supp. 3d 324, 334 n.5 (S.D.N.Y. 2015) (same); *Am. Ins. Ass'n v. Del. Dep't of Ins.*, 2008 WL 44322, at *4 (Del. Sup. Ct. Jan. 2, 2008) (same); *see also Goldstein v. N.J. Tr. Co.*, 39 F.R.D. 363, 366 (S.D.N.Y. 1966) (defining the word "claim" as it appears in Federal Rule of Civil Procedure 12(b)(6) to mean "the aggregate of operative facts which give rise to aa right enforceable in courts").

In sum, neither the arbitration nor the present proceeding infringed upon the automatic stay or Lift Stay Order.

### D.   Award of Fees Incurred in the Bankruptcy Case and the Bondholder Litigation

Next, Respondent challenges the arbitrator's award of damages for violations of the Status Quo Injunction. Dkt. No. 50 at 27–31. The arbitrator identified what he characterized as three intentional violations of the Status Quo Injunction that collectively caused quantifiable

harm: (1) Pach Shemen's purchase of a controlling interest of the outstanding bonds issued by Holdings—amounting to $183,851,546 in face value—for $2,000,000 on January 4, 2023; (2) Pach Shemen's directing of the trustee to commence litigation against Holdings on January 11, 2023, after Pach Shemen purchased the bonds; and (3) Pach Shemen's directing of the commencement of the involuntary bankruptcy petition against Holdings on March 7, 2023, again after purchasing the bonds.  Dkt. No. 67-58 at 60; *see also id.* at 98–99 (finding that Levona violated the Status Quo Injunction by "[d]irecting and/or causing Levona's affiliates to purchase a controlling position in securities of . . . Holdings in January 2023 for the purpose of wrongfully commencing and then actually causing the commencement of litigation against . . . Holdings and the filing an involuntary bankruptcy petition against . . . Holdings").  The arbitrator did not find that the acquisition of the bonds by Pach Shemen alone would have violated the Status Quo Injunction, nor is the basis for any such finding apparent from the record.  Rather, the arbitrator concluded that through these actions together, "the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration."  *Id.* at 61.[27]  The arbitrator recognized that Pach Shemen's actions "technically" did not effect a transfer or attempted transfer or sale of the assets of the Company or of the assets in dispute in the arbitration, but he concluded that the "overall strategy was intended to disrupt the status quo and find another path to obtain the 'assets of [the Company] . . . or assets in dispute in this arbitration.'"  *Id.*  He also recognized that Pach Shemen was not bound by the Status Quo Injunction but he found that "Pach Shemen is the alter ego of Levona" and certain of the

---

[27] The arbitrator did not identify what would be wrongful about Levona hedging against a potential loss in the arbitration.  Nor did the arbitrator award any compensatory damages arising out of the purchase of the bonds themselves—the compensatory award for breach of the Status Quo Injunction was based on fees and costs incurred during the bondholder litigation and the involuntary bankruptcy proceeding.

individuals who acted on behalf of Pach Shemen also were bound by the Status Quo Injunction. *Id.*

Consequently, the arbitrator awarded Petitioners $3,007,266.20 in fees and costs incurred by Petitioners in connection with the bondholder litigation against Holdings and the involuntary bankruptcy of Holdings that the arbitrator concluded Pach Shemen directed to be commenced in violation of the Status Quo Injunction, to be paid jointly and severally by Levona, Murchinson, and Pach Shemen to the entities or individuals who paid those costs and fees.  Dkt. No. 67-58 at 91, 100.  The arbitrator concluded that the attorneys' fees were damages "to compensate for the intentional violations by Levona, through its alter ego, Pach Shemen, of the Status Quo Injunction . . . ."  *Id.* at 92.  The arbitrator also based his award of punitive damages in the amount of $43,455,122.21, equal to the amount of compensatory damages, in part on what he concluded were violations of the Status Quo Injunction.  *Id.* at 74.

The arbitrator lacked the power to enjoin Pach Shemen from filing the involuntary bankruptcy petition and the bondholder litigation or Levona from assisting in filing those actions and his award of damages for those actions thus exceeded his authority under the LLCA and under the law.  *See Jock*, 942 F.3d at 622 (an arbitrator exceeds her authority by "considering issues beyond those the parties have submitted for her consideration [or] reaching issues clearly prohibited by law or by the terms of the parties' agreement").  The arbitration clause at issue, though broad, was not unlimited.  It bound only the parties to the LLCA and applied only to disputes, claims or controversies "arising out of or relating to [the LLCA] or the breach, termination, enforcement, interpretation or validity thereof."  Dkt. No. 67-2 § 12.14(b).  It empowered the arbitrator to grant injunctive or other forms of equitable relief but only "(i) to preserve such party's rights pending a final resolution on the merits or (ii) that prevails in any

such arbitration." *Id.* § 12.14(c).  Rule 24(e) of the JAMS Rules, to which the parties consented, gives the arbitrator the authority to grant "whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods."  Dkt. No. 67-3 at 15.  The JAMS Comprehensive Arbitration Rules and Procedures, in Rule 29, give the arbitrator the power to "order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator."  *Id.* at 17.[28]  As long as it is consistent with the arbitral agreement. an arbitrator has the authority to grant "interim relief in order to maintain the status quo."  Domke on Commercial Arbitration § 35:4 (citing *Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67 (1st Cir. 2010); *Charles Constr. Co. v. Derderian*, 586 N.E.2d 992 (Mass. 1992)).  An arbitrator also "possesses the inherent authority to preserve the integrity of the arbitration process to which the parties have agreed."  *On Time Staffing, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 784 F. Supp. 2d 450, 455 (S.D.N.Y. 2011).

The arbitrator's powers to issue injunctions, however, also are not unlimited.  As a general matter, only under limited circumstances may even a court prevent a party from litigating a dispute in another court and thus intrude upon the second court's jurisdiction.  "[T]he Supreme Court has recognized that '[t]he right of access to the courts is . . . one aspect of the right to petition' the government for a redress of grievances secured by the First Amendment to the Constitution."  *Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *5 (S.D.N.Y. Aug. 31, 2020) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).  Accordingly, federal courts themselves have circumscribed power to enjoin a party from availing

---

[28] Those sanctions may include assessment of any "costs occasioned by the actionable conduct, including reasonable attorneys' fees."  Dkt. No. 67-3 at 17.

itself of its right to seek judicial relief.  In particular, a federal court has the power to "protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitious, and baseless litigation," by enjoining a litigant's right to file actions in federal court.  *Abdullah v. Gatto*, 773 F.2d 487, 488 (2d Cir. 1985) (per curiam); *see In re Martin-Trigona*, 737 F.2d 1254, 1262–63 (2d Cir. 1984) (affirming injunction against filings in the District of Connecticut and requiring that Martin-Trigona inform other federal courts of the injunction and obtain leave of court but vacating injunction to the extent that it prevented Martin-Trigona from filing actions in state court).  In addition, under the first-filed rule, "a district court 'may enjoin the suitor in [a] more recently commenced case from taking any further action in the prosecution of that case' if the claims presented in the second action should have been interposed as compulsory counterclaims to the claims in the suit pending before it."  *Comput. Assocs. Int'l., Inc. v. Altai, Inc.*, 893 F.2d 26, 28–29 (2d Cir. 1990) (quoting *Nat'l Equip. Rental, Ltd. v. Fowler*, 287 F.2d 43, 45 (2d Cir. 1961)); *see Tropic Techs., Inc. v. Vendr, Inc.*, 2023 WL 2535215, at *5 (S.D.N.Y. Mar. 15, 2023).

But while courts do have the authority "to enjoin foreign suits by persons subject to their jurisdiction," that authority may only "be used sparingly and . . . only with care and great restraint."  *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35–36 (2d Cir. 1987) (internal citations and quotation marks omitted).  It may only be used when (1) the parties are the same in both matters, and (2) resolution of the case before the enjoining court is dispositive of the matter to be enjoined.  *Id.*; *see LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 199 (2d Cir. 2004); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004).  Even then, a court may not enjoin a party from seeking relief from another court without also weighing "(1) the threat to the enjoining court's jurisdiction posed by

the foreign action; (2) the potential frustration of strong public policies in the enjoining forum; (3) the vexatiousness of the foreign litigation; (4) the possibility of delay, inconvenience, expense, inconsistency, or a race to judgment; and (5) other equitable considerations." *Eastman Kodak Co. v. Asia Optical Co., Inc.*, 118 F. Supp. 3d 581, 586 (S.D.N.Y. 2015); *see also China Trade*, 837 F.2d at 35. If the foreign proceeding poses no threat to the enjoining court's jurisdiction and will not frustrate the strong public policies of the enjoining forum or otherwise undermine the integrity of proceeding before the enjoining forum, no injunction is appropriate. "[O]ur legal system generally relies on principles of *stare decisis* and comity among courts to mitigate the sometimes substantial costs of similar litigation" involving different parties. *Smith v. Bayer Corp.*, 564 U.S. 299, 317 (2011).[29]

Of particular relevance here, a court has the authority to enjoin a party to an international arbitration agreement from initiating or maintaining litigation before another court only if the arbitration agreement is enforceable, the party being enjoined is bound by the arbitration agreement, the claims to be enjoined are within the scope of the arbitration agreement, and issuance of the injunction is appropriate upon consideration of a number of factors, including which court has the greater interest in ruling on the enforceability of the arbitration agreement. Restatement (Third) of the U.S. Law of Int'l Com. Arb. § 2.29 (Am. L. Inst., Tentative Draft No. 2, 2012); *cf. Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd*, 2010 WL 1050988 (S.D.N.Y. Mar. 23, 2010) (weighing *China Trade* factors to determine whether to award an anti-suit injunction against litigation in India in favor of arbitration); *Paramedics Electromedicina Comercial, Ltda.*, 369 F.3d at 680–81 (weighing *China Trade* factors in reviewing district court's anti-suit

---

[29] *Smith v. Bayer* itself involved suits by different plaintiffs, each members of a putative (non-certified) class. The proposition it relied upon, however, is generally applicable to suits involving different parties or different sets of issues, and not just different plaintiffs.

injunction against litigation in Brazil in aid of arbitration); *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, 2013 WL 6409476, at \*4 (S.D.N.Y. 2013) (weighing *China Trade* factors and enjoining respondents and their officers and representatives from bringing action in Israel that would interfere with New York arbitral proceedings); *Stolt Tankers BV v. Allianz Seguros, S.A.*, 2011 WL 2436662, at \*5 (S.D.N.Y. June 16, 2011) (weighing *China Trade* factors and enjoining respondents from pursuing action in Brazil in light of agreement to arbitrate in New York). *But see Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 363–64 (S.D.N.Y. 2007) (Lynch, J.), *aff'd on other grounds*, 584 F.3d 396 (2d Cir. 2009) (holding that where an arbitral body itself enters an anti-suit injunction "the proper inquiry is whether the parties agreed to give the arbitrators the power to enter such an injunction" and that when the parties give broad authority to the arbitrator "the applicable test for arbitral jurisdiction is not whether the preconditions of *China Trade* are satisfied, but whether the arbitral award 'touch[es] matters' within the contract" (quoting *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 26–28 (2d Cir. 2002))).

Petitioners request, however, that this Court hold that they could obtain relief from a private arbitrator—in aid of the arbitration—would far exceed the limited relief that a court would be authorized to grant Petitioners. On Petitioners' argument, the arbitrator had the authority to enjoin the filing of lawsuits by persons who were not parties to the arbitration, to vindicate rights that were not subject to the arbitration, in proceedings that would not adjudicate issues presented in the arbitration, and that would in no way interfere with the integrity of the arbitration or prevent the arbitrator from issuing his award. The Court concludes that the arbitrator had no such authority.

Starting with the involuntary bankruptcy petition, the arbitrator's powers did not extend to enjoining the filing of an involuntary petition even by Levona, much less by Pach Shemen, a party who was not before the arbitral panel.  Under the Bankruptcy Code, both the debtor and a creditor have a near absolute right to file a petition for relief.  *United States v. Royal Bus. Funds Corp.*, 724 F.2d 12, 15 (2d Cir. 1983) (citing the general rule "that a debtor may not agree to waive the right to file a bankruptcy petition"); *In re Project Restore, LLC*, 2022 WL 6233552, at *6 (Bankr. M.D. Tenn. Oct. 7, 2022) ("From the Court's standpoint, a creditor cannot contract away its right as a petitioner in an involuntary case any more than a debtor can contract away its right to file a voluntary bankruptcy.").  The reasons why a debtor cannot be understood, in a bilateral agreement, to have contracted away its right to file a voluntary bankruptcy petition are self-evident and readily understood.  The right to file a bankruptcy petition exists not purely to protect the personal interests of the debtor but also to protect the interests of the community of all of the creditors and the economy generally against the destructive race to the courthouse that would ensue if a single forum were not permitted to adjudicate, all at once, the interests of all with a claim against the debtor.  *See Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203–04 (9th Cir. 2005) ("This is a unique contribution of the Bankruptcy Code that makes bankruptcy different from a collection of actions by individual creditors.  In a world of individual actions, each creditor knows that if he waits too long, the debtor's assets will have been exhausted by the demands of the quicker creditors and he will recover nothing.  The creditors race to the courthouse, all demanding immediate payment of their entire debt.  Like piranhas, they make short work of the debtor, who might have survived to pay off more of his debts with a little bit of reorganization—or at least might have more equitably fed the slower piranhas."); *Israel-British Bank (London) v. Fed. Deposit Ins. Corp.*, 536 F.2d 509, 513 (2d Cir.), *cert.*

*denied*, 429 U.S. 978 (1976) ("The theme of the Bankruptcy Act is equality of distribution of assets among creditors, and correlatively avoidance of preference to some.  The road to equity is not a race course for the swiftest." (internal citations omitted)).  For those reasons, the Second Circuit has held, as discussed further below, that the right to file a bankruptcy petition may be waived only in limited circumstances, generally in those circumstances where—as in the case of a receivership—an alternative forum exists that would "accomplish[] what a bankruptcy would[:]" the settlement of all of the claims against a putative debtor.  *See S.E.C. v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010); *see also Royal Bus. Funds Corp.*, 724 F.2d at 12 (applying the same rule in context of a consensual court-supervised federal receivership).

The same principles apply in the case of an involuntary petition.  The Code gives every creditor the right to file an involuntary bankruptcy petition under Chapter 7 or 11 so long as it is the holder of a claim "that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount," and so long as it is either joined by two other creditors meeting the same criteria and all together holding at least $18,600 in claims or, if there are fewer than twelve creditors, so long as it holds more than $18,600 in claims.  11 U.S.C. § 303(b).  The provision ensures that creditors—as well as the debtor—can prevent the destructive race to the courthouse and ensure the orderly disposition of the debtor's assets.  "Involuntary bankruptcy petitions help ensure the orderly and fair distribution of an estate by giving creditors an alternative to watching nervously as assets are depleted, either by the debtor or by rival creditors who beat them to the courthouse."  *In re Murray*, 900 F.3d 53, 59 (2d Cir. 2018); *see also In re Miles*, 294 B.R. 756, 760 (B.A.P. 9th Cir. 2003) ("A key justification for involuntary cases is as a creditors' remedy that enables creditors who lack the muscle or the luck to extract preferences or unequal transfers from distressed debtors to achieve equitable treatment by invoking the protections inherent in the

98

trustee's avoiding powers consistent with the principle of ratable recovery for creditors.").[30] Although the Code recognizes that a vexatious creditor or a creditor unknowledgeable about the debtor's financial condition could interfere with the debtor's operations, it balances that risk against the risk that the debtor will not place itself into bankruptcy, creating such balance by permitting the debtor to operate until the court orders otherwise, by allowing the court to require the petitioner to file a bond to indemnify the debtor for costs should the petition be dismissed, and by providing for costs and damages in the event that the petition is dismissed.  As Judge Lifland once put it, "[w]hile no doubt an improvidently filed involuntary petition (i.e.: by one without a valid claim) can wreak havoc on an innocent debtor, this potential harm must be juxtaposed with the need to ensure that earnest creditors promptly receive all of the rights and protections afforded by the bankruptcy laws, lest the assets of the estate be squandered and secreted away by a financially troubled or dishonest debtor."  *Matter of B.D. Int'l Disc. Corp.*, 15 B.R. 755, 759 (Bankr. S.D.N.Y. 1981).  Section 303(i) authorizes the court—if an involuntary petition is dismissed—to grant the debtor judgment against the petitioners for costs or a reasonable attorneys' fees and, if the petition has been filed in bad faith, for compensatory or punitive damages.  11 U.S.C. § 303(i); *see also In re TPG Troy, LLC*, 793 F.3d 228, 235 (2d Cir. 2015) ("When an involuntary petition is dismissed, 'there is a presumption that costs and attorney's fees will be awarded to the alleged debtor.'" (quoting *In re Mountain Diaries*, 372

---

[30] Originally, under United States law, only creditors, and not the debtor, could file a bankruptcy petition.  *See In re Marshall*, 721 F.3d 1032, 1058–59 (9th Cir. 2013) ("Historically, bankruptcy laws have not been conceived in the United States or England for the protection of debtors, whether honest or dishonest. Bankruptcy laws were enacted principally for the benefit of trade and for the protection of creditors, to give them more powers acting in concert to collect debts than they possessed individually. . . . The 1841 Act was the first United States law to authorize a debtor to file a voluntary bankruptcy petition. Neither the 1800 Act nor the English predecessors permitted a voluntary bankruptcy filing.").

B.R. 623, 637 (Bankr. S.D.N.Y. 2007))).  "[B]ad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)."  *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 105 (2d Cir.2000).  The cost and damages provisions thus provide a potent deterrent against anyone who would file a possibly frivolous petition.  *In re John Richards Homes Bldg. Co. L.L.C.*, 439 F.3d 248 (6th Cir. 2006) (affirming award of $4,100,000 in compensatory damages and $2,000,000 in punitive damages).  But if a petition is not dismissed, the debtor has no right to relief under these provisions.  The creditors are exercising a right given to them by Congress.

It follows that two parties cannot—by contract—agree to delegate to an arbitrator the power to decide whether either can file a bankruptcy petition, voluntary or involuntary. Although an arbitrator's powers are vast under the FAA and the New York Convention, they do have limits.  "[T]he Arbitration Act's mandate may be overridden by a contrary congressional command."  *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *see also In re Belton v. GE Cap. Retail Bank*, 961 F.3d 612, 615 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1513 (2021) ("The Arbitration Act requires courts to strictly enforce arbitration agreements. But like any statutory directive, that mandate may be overridden by contrary congressional intent.").  The Second Circuit has recently reiterated that congressional intent to override the FAA's mandate to strictly enforce arbitration agreements "may be deduced from 'the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes.'" *In re Belton*, 961 F.3d at 615 (quoting *McMahon*, 482 U.S. at 227).  "Disputes that involve both the Bankruptcy Code and the [FAA] often present conflicts of 'near polar extremes: bankruptcy policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach toward dispute resolution.'"  *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) (quoting *In re U.S. Lines, Inc.*, 197 F.3d at 640).  The Second Circuit has

stated that "[t]he Arbitration Act as interpreted by the Supreme Court dictates that an arbitration clause should be enforced 'unless [doing so] would seriously jeopardize the objectives of the Code.'" *In re U.S. Lines, Inc.*, 197 F.3d at 640 (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1161 (3d Cir. 1989)).  It follows that when enforcement of an arbitration clause would seriously jeopardize the objectives of the Code an arbitration clause should not be enforced.  "In order to determine whether enforcement of an arbitration agreement would present an inherent conflict with the Bankruptcy Code, we must engage in a

> particularized inquiry into the nature of the claim and the facts of the specific bankruptcy. The objectives of the Bankruptcy Code relevant to this inquiry include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders."

*In re Anderson*, 884 F.3d at 389 (quoting *MBNA Am. Bank, N.A.*, 436 F.3d at 108 (citation and internal quotation marks omitted)).  "If a severe conflict is found, then the court can properly conclude that, with respect to the particular Code provision involved, Congress intended to override the [FAA's] general policy favoring the enforcement of arbitration agreements."  *MBNA Am. Bank, N.A.*, 436 F.3d at 108; *see also In re Project Restore*, 2022 WL 6233552, at *4 (holding that arbitration clause is overridden when Congress intended the FAA to yield to a contrary congressional command, "which may be deduced from (i) the text of the statute, (ii) the statute's legislative history, or (iii) an inherent conflict between arbitration and the statute's underlying purposes"); *In re Patriot Solar Grp., LLC*, 569 B.R. 451 (Bankr. W.D. Mich. 2017) (denying motion for relief from the automatic stay so that a contractual counterparty could pursue arbitral proceeding against debtor pursuant to arbitration provision in the parties' contract).

   Courts have considered the preemptive force of Section 303 of the Bankruptcy Code in two related contexts.  Neither is controlling but both are instructive.  In *Project Restore*, the

question was whether an agreement that the parties arbitrate a dispute as a prerequisite to an involuntary petition could thwart the rights of a creditor to file a petition under Section 303. *In re Project Restore*, 2022 WL 6233552, at *1–2. The petitioning creditor had signed an arbitration agreement that any dispute it had with the debtor would be resolved through arbitration. *Id*. The debtor argued that the involuntary petition should be dismissed because, in determining whether to allow an order for relief, the court would have to decide arbitrable issues. *Id*. at *1. As the court characterized it, the case involved the question whether the creditors' rights to file a bankruptcy petition trumped its obligation under the arbitration agreement, as made enforceable by the FAA, to present the dispute in the first instance to the arbitral tribunal. *Id*. at *4–5. The court held that there was "an inherent conflict between the underlying purposes of the Bankruptcy Code and arbitration, at least to the extent that arbitration would preclude a creditor's right to pursue an involuntary bankruptcy." *Id*. at *4. Thus, in the court's view, the issues presented by the petition were ones given exclusively to the bankruptcy courts by the Bankruptcy Code and over which the arbitrator had no authority. *Id*. at *5. The court highlighted first that bankruptcy courts had "exclusive jurisdiction over bankruptcy cases," second that "the bankruptcy court [was] the sole court with which a petition, whether voluntary or involuntary, [could] be filed to commence a bankruptcy proceeding" and "[a] bankruptcy case could not be commenced by filing a petition for bankruptcy with an arbitrator," and third that only the bankruptcy court and not the arbitrator could determine whether the petition satisfied the requirements of Section 303 and enter an order for relief. *Id*. at *4–5. The court also noted that under the debtor's approach, "a petitioning creditor with a disputed claim subject to an arbitration clause would have to have an arbitration award in order to qualify as a petitioning creditor, regarding of whether the dispute was bona fide." *Id*. at *5. The court concluded that "a

creditor cannot contract away its right as a petitioner in an involuntary case any more than a debtor can contract away its right to file a voluntary bankruptcy." *Id.* at *6. In sum, that court held that "creditors cannot prospectively delegate rights under the Bankruptcy Code to an arbitrator." *Id.*

The question in *In re Miles* was whether state law tort causes of action for damages predicated upon the filing of an involuntary bankruptcy petition were completely preempted by the Bankruptcy Code and whether a claim for damages arising from the filing of such a petition could be prosecuted other than through Section 303 of the Code. *In re Miles*, 430 F.3d 1083 (9th Cir. 2005). The plaintiffs in that case were relatives of the debtors who alleged that several involuntary bankruptcy petitions filed by the creditors-defendants, which were subsequently dismissed, gave rise to causes of action under the state law torts of negligence, defamation, false light, abuse of process, intentional and negligent infliction of emotional distress, and negligent misrepresentation. *Id.* at 1086. The creditors-defendants removed the case which had been filed in state court. *Id.* at 1087. The Bankruptcy Appellate Panel of the Ninth Circuit held that the case was properly removed on grounds that the causes of action asserted by the plaintiffs were completely preempted by the Bankruptcy Code, and that the plaintiffs' claims were without merit because they did not satisfy Section 303. *Id.* at 1087. The Ninth Circuit affirmed. As relevant here, the Ninth Circuit held that "Congress intended 11 U.S.C. § 303(i) to provide the exclusive basis for awarding damages predicated upon the filing of an involuntary bankruptcy petition," *id.* at 1089, and that "[p]ermitting state courts to decide whether the filing of an involuntary bankruptcy petition was appropriate would subvert the exclusive jurisdiction of the federal courts and undermine uniformity in bankruptcy law," *id.* at 1090. The court reasoned that "Congress created involuntary bankruptcy proceedings to enable creditors who are unable to extract

preferences or unequal transfers from distressed debtors to achieve equitable treatment." *Id.*; *see also In re Miles*, 294 B.R. at 760.  The court also noted that Section 303(i)'s remedial scheme was "comprehensive" and "addresse[d] the full range of remedies, from costs and attorneys' fees for dismissed involuntary petitions to compensatory and punitive damages for involuntary petitions filed in bad faith," and that Congress's authorization of certain sanctions for petitions filed in bad faith "suggest[ed] that Congress rejected other penalties." *In re Miles*, 430 F.3d at 1090.  The court further noted that the Constitution itself recognized the importance of uniformity in the administration of the bankruptcy laws, providing that Congress had the power "to establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." *Id.* (quoting U.S. Const. Art. I, § 8, cl. 4).  The court held, based on "[t]he 'highly complex' nature of the Bankruptcy Code and 'the unique, historical, and even constitutional need for uniformity in the administration of bankruptcy laws,'" that Section 303(i) provides the exclusive cause of action for damages predicated upon the filing of an involuntary bankruptcy petition and that state courts had no power to grant such relief.  *Id.* at 1090–91 (quoting *MSR Expl., Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914–15 (9th Cir. 1996) (internal citations omitted)).  "Allowing state court remedies for wrongful filings may well interfere with the filings of involuntary bankruptcy petitions by creditors and with other necessary actions that they, and others, must or might take within the confines of the bankruptcy process." *Id.* at 1090.  The court concluded: "Permitting state courts to decide whether the filing of an involuntary bankruptcy petition was appropriate would subvert the exclusive jurisdiction of the federal courts and undermine uniformity in bankruptcy law by allowing state courts to create their own standards as to when a creditor may properly file an involuntary petition." *Id.*

Outside the arbitration context, the Second Circuit itself has limited the circumstances under which a court may issue an anti-litigation injunction barring bankruptcy filings as part of their broad equitable powers, cautioning that such power is "to be exercised cautiously." *Byers*, 609 F.3d at 91.  In *Byers*, it approved such an injunction in the case of a Securities and Exchange Commission ("SEC") receivership only after concluding that the receivership would "accomplish[d] what a bankruptcy would."[31]  *Id.* at 92.  And, in *Royal Business Funds*, the Second Circuit affirmed an anti-suit injunction where the debtor was subject to a federal receivership (with the Small Business Administration ("SBA") serving as receiver pursuant to federal statute) to which it had consented and which had the authority to address the claims by all of the debtor's creditors.  724 F.2d at 16.  No rights of creditors were impaired.  In that instance, "[t]he bankruptcy petition, which was filed by the debtor rather than by third-party creditors, [would] disrupt the receiver's attempts to improve the company's fortunes."  *Id.*  The court concluded that "no public or private interest [wa]s served by allowing [the company] to repudiate the arrangements it made with the SBA."  *Id.*

*In re Miles*, *Project Restore*, *Byers*, and *Royal Business Funds* strongly suggest that Eletson and Levona could not have—by private agreement to resolve disputes through arbitration—contracted away the rights of Levona, or an affiliate of Levona, to file an

---

[31] "A primary purpose of appointing a receiver is to conserve the existing estate."  *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir.1964).  "Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists where necessary to prevent the dissipation of a defendant's assets pending further action by the court."  *S.E.C. v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987), *cert. denied sub nom.*, 485 U.S. 938 (1988) (internal citation omitted).  The Second Circuit has held that, where the SEC has alleged violations of the Securities Exchange Act, "the appointment of a trustee to help preserve the status quo while the various transactions were unraveled was necessary to obtain an accurate picture of what transpired."  *Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir.1972), *abrogated on other grounds by Liu v. S.E.C.*, 140 S. Ct. 1936 (2020).

involuntary bankruptcy petition, and that the arbitral panel lacked the authority to enjoin Pach Shemen from filing such a petition.  A "severe conflict" would be presented by any such provision.  If, as the court held in *Project Restore*, a "petitioning creditor cannot contract away its right as a petitioner in an involuntary case" and cannot be forced to get an arbitrator's approval before filing an involuntary petition because "creditors cannot prospectively delegate rights under the Bankruptcy Code to an arbitrator," 2022 WL 6233552, at *16, it follows that an arbitrator in a case where the petitioning creditor has not contracted away its rights to file an involuntary petition cannot arrogate to himself the power to determine whether an involuntary petition may be filed or not.  The assumption of such a power by the arbitrator would undermine a core proceeding committed to the exclusive jurisdiction of the bankruptcy court.  And if, as the Ninth Circuit held in *Miles*, the exercise of jurisdiction by a state court to impose financial sanctions upon petitioning creditors based on "their own standards as to when a creditor may properly file an involuntary petition" would first, subvert the exclusive jurisdiction of the federal courts to determine whether a petition was properly filed or not, second, defeat the federal policy that "the potential costs of filing an involuntary bankruptcy petition should not be governed by state law," *In re Miles*, 430 F.3d at 1090, and third, undermine the uniformity of the Bankruptcy Code, so too here the exercise of jurisdiction by an arbitrator to determine *ex ante* whether a bankruptcy petition may be filed, and then to impose *ex post* financial sanctions when he has determined that the petition should not have been filed, would also conflict with the Bankruptcy Code, federal policy, and the uniformity intended to be achieved by the Constitution.  In short, as the court stated in *Miles*, if Eletson felt aggrieved by the filing of the involuntary petition, it had "a comprehensive scheme of remedies available in the federal courts."  *Id*.  It had no right under the arbitration agreement and under the law to obtain relief from the arbitral tribunal.

The arrogation by the arbitrator of the power to determine whether a party could join in an involuntary petition clearly conflicts with the Code and its underlying purposes.  Section 303 contains a carefully designed and balanced structure for the filing of an involuntary petition based on the number, type, and aggregate nominal significance of creditors joining in the petition.  If there are fewer than twelve holders of claims that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount (excluding certain specified insiders), an involuntary petition can be filed by a single holder of at least $18,600 (originally "$10,000," adjusted effective April 1, 2022) of such claims.  11 U.S.C. § 303.  If there are twelve or more such holders (excluding certain specified insiders), the petition must be filed by three or more of such entities.  *Id.*  The Code does so in order to permit creditors, as a class, to preserve their interests from the debtor's dissipation of its assets and to ensure that they have a forum in which the interests of all of the creditors are protected, while at the same time protecting against the risk of a premature or vexatious filing that would injure both the debtor and its creditors.  The arbitrator's exercise of authority, if recognized by this Court, would disrupt that balance and undermine the purposes of Section 303.  If accepted, a canny debtor—intent on defeating an involuntary petition—could undermine the rights of all of the creditors by agreeing with some of them that they would not under any circumstances join in an involuntary petition without first going through the arbitral hoop.  A potential involuntary creditor, in those circumstances, might find no one who could join the petition—not because there were no qualified creditors and not because the debtor was not in distress, but because the other creditors had years earlier signed an arbitration agreement.  In a world where arbitration agreements are prolific, it is not difficult to imagine a circumstance in which a putative debtor could virtually immunize itself from the risk of any involuntary bankruptcy by the mere expedient of signing arbitration agreements with all

or almost all of its creditors.  Indeed, on Eletson's theory, an arbitrator presumably could even prevent a creditor—in either a voluntary or involuntary proceeding—from filing a notice of claim in a bankruptcy proceeding until the arbitration was concluded.  If the filing was part of an "overall strategy . . . intended to disrupt the status quo and find another path to obtain the 'assets of [the Company] . . . or assets in dispute in th[e] arbitration,'" Dkt. No. 67-58 at 61, such an injunction would be within the arbitrator's prerogative.  Such an order might provide an immediate benefit to a party in the arbitration.  However, it would forestall the bankruptcy, delay the debtor's liquidation or emergence from bankruptcy, and thereby would undermine the rights of all of the other creditors, undercut the functioning of the Bankruptcy Code, and intrude on the exclusive jurisdiction of the bankruptcy courts.

The risk is not merely hypothetical.  In this case, Pach Shemen joined a petition filed by just two of Holdings' creditors who sought the assistance of the bankruptcy court in order to protect against the risk of Holdings' dissipation of assets.  As it turns out, their petition was well-founded.  The involuntary bankruptcy was not dismissed.  Holdings ultimately agreed to file a motion converting the bankruptcy proceeding to a voluntary case under Chapter 11 and the interests of the creditors are being protected.  Dkt. No. 65 ¶ 134; Dkt. No. 66 ¶ 134.  In the bankruptcy, Holdings agreed to pay the fees of the involuntary creditors.  There was no finding, nor apparently could there have been one, by the bankruptcy court that the involuntary petitions did not qualify or that the petition was filed in bad faith.  Had Pach Shemen not joined in the relief requested by the other creditors, the bankruptcy court might never have been in the position to accord such relief.  The congressional purpose underlying Section 303 would have been thwarted.  It thus cannot be that the arbitrator had the power to prevent Pach Shemen from

joining the petition or, once Pach Shemen had joined the petition, to impose on it damages not authorized by Section 303 for having done so.

Of course, here, the Court need not go so far as to hold that two parties could never agree to delegate to an arbitrator the power to determine whether either could file an involuntary bankruptcy petition.  It is clear from the arbitration provision here that the parties did not agree to give that power to this arbitrator, and thus that the arbitrator exceeded his powers either by issuing the injunction he did as applied to the filing of the bankruptcy petition or by ordering damages for the violation of the injunction.  The arbitrator had the power to protect the property and disposable goods that were the subject of the arbitration and to preserve the integrity of the proceedings before him.  Instead, the Status Quo Injunction as interpreted and applied by the arbitrator granted relief of a different nature.  The arbitrator interpreted and applied the Status Quo Injunction to prevent an entity that was not before the arbitral tribunal from availing itself of its rights to relief in judicial fora, pursuant to instruments that were not the subject of the arbitration, and pursuant to rights over which the arbitral tribunal had no jurisdiction.  And it did so by preventing that third party from seeking the relief available to any person—debtor or creditor—available from the bankruptcy courts pursuant to the Bankruptcy Code.  Permitting an arbitrator to enjoin an involuntary bankruptcy petition would fundamentally change the nature of arbitration, effectively forcing into the arbitral tribunal issues that affect the rights of third parties and that are committed by the Bankruptcy Code to the bankruptcy courts.  In *Stolt-Nielsen S.A.*, 559 U.S. at 685, the Supreme Court refused to read an arbitration agreement as authorizing class arbitration where the agreement was silent regarding class arbitration.  The Court recognized that "parties are 'generally free to structure their arbitration agreements as they see fit,'" *id.* at 683 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995))), including by

selecting the "rules under which any arbitration will proceed," *id.* Still, the Court refused to infer from silence agreement to a procedure that would fundamentally change the nature of arbitration. *Id.* Here too, the LLCA's silence with respect to anti-bankruptcy cannot be read as a conferral of such authority of a fundamentally different nature.

The same conclusion follows with respect to the Bondholder Litigation. Although the arbitrator stated that the proceedings were launched to "find another path to obtain the 'assets of [the Company] . . . or assets in dispute in this arbitration,'" Dkt. No. 67-58 at 61, the matters to be addressed in the arbitration proceeding and in the Bondholder Litigation just like those in the bankruptcy proceeding, respectively, were entirely different. The former went to Eletson's rights under the LLCA and whether the Company or the Nominees were entitled to the Preferred Interests; the latter went to the rights of Pach Shemen under the bond indenture to the payment of interest and the repayment of principal for loans that had been extended to Holdings. The arbitrator did not find that the Bondholder Litigation or the bankruptcy proceedings would resolve any of the legal or factual issues in the arbitration. Because both sets of proceedings involved different issues, they could not have done so. He also did not base his finding of a violation on any notion that the Bondholder Litigation interfered with or undermined the integrity of the arbitration. Before it was stayed on March 8, 2023 following the filing of the bankruptcy petition, the only activity on the docket consisted of Holdings' agreement with the Trustee that Holdings would have additional time to respond to the complaint. *Wilmington Sav. Fund Soc'y, FSB*, CM-ECF No. 23-cv-261, Dkt Nos. 17, 22.

As Respondent notes, an arbitration award is divisible for purposes of confirmation. *See D.H. Blair & Co.*, 462 F.3d at 104 (holding that a court "can confirm . . . the award either in whole or in part" in FAA case); *Orion Shipping & Trading Co.*, 312 F.2d 299 (affirming district

court's partial confirmation in FAA case).  The Court chooses to do so here in light of the

"strong federal policy favoring arbitration, the enforcement of arbitration agreements and the

confirmation of arbitration awards."  *Pike*, 266 F.3d at 89; *cf. Smarter Tools Inc.*, 57 F.4th at 383

("An award should be enforced, 'despite a court's disagreement with it on the merits, if there is a

barely colorable justification for the outcome reached.'" (quoting *T.Co Metals, LLC v. Dempsey

Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010))).  The portions of the award that found

Levona, Pach Shemen, and Murchinson liable for violating the Status Quo Injunction and the

damages ordered for those violations thus cannot stand.[32]

### E.       Fee Award to Corp and Holdings

Finally, Respondent argues that the arbitrator exceeded his authority in awarding fees and

costs to Holdings and Corp.  Dkt. No. 50 at 31.  The arbitrator awarded Petitioners $9,590,222 in

attorneys' fees, expenses, and costs for the arbitration, including a success fee in the amount of

$1,794,950.70.  Dkt. No. 67-58 at 86–87.  Respondent argues that the award of attorneys' fees

and costs to Petitioners exceeded the arbitrator's authority because the LLCA empowers the

arbitrator to "award reasonable attorneys' fees and reasonable travel expenses (excluding meals)

to the prevailing party," Dkt. No. 67-2 § 12.14(d), and because Delaware law states that "'the

defendant is the prevailing party' if a plaintiff receives 'zero dollars in damages,'" Dkt. No. 50 at

31 (quoting *Cooke v. Murphy*, 99 A.3d 226 (Del. 2014)).  As Holdings and Corp were not

awarded damages by the arbitrator, Respondent argues that the arbitrator could not permissibly

---

[32] The Court therefore need not consider Respondent's argument that this portion of the Award should be vacated on the theory that the arbitrator was without power to award fees and costs incurred in the bankruptcy case to parties other than the bankrupt debtor—Holdings, Dkt. No. 50 at 28, except to note that the arbitrator did not award fees and costs to third parties but rather to Eletson "*to be paid to the entity or individuals who paid those costs and fees*."  Dkt. No. 67-58 at 67 (emphasis added). Whether Eletson would have had the power to further distribute the compensation to other parties is not before the Court.

interpret the LLCA in a manner that would deem Holdings and Corp prevailing parties eligible for fees.  *Id.*

Petitioners respond that the arbitrator had the authority to determine that Holdings and Corp were prevailing parties and that he therefore also had the authority under the LLCA to award them attorneys' fees and costs.  Dkt. No. 54 at 27–28.  Petitioners dispute Respondents' assertion that Delaware law requires a party to be awarded nonzero dollar damages to be considered the prevailing party, and argue instead that "a prevailing party is one who 'predominated in the litigation.'"  *Id.* at 28 (quoting *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 281 (Del. 2022)).  Petitioners point to a case under Delaware law in which a court granted a party prevailing status and awarded it attorneys' fees and expenses even though its only relief in the underlying action was inspection of certain books and records.  *Id.* (citing *Aloha Power Co., LLC v. Regenesis Power, LLC*, 2017 WL 6550429, at *5 (Del. Ch. Ct. Dec. 22, 2017)).

The arbitrator rejected Respondent's argument as "completely without merit."  Dkt. No. 67-58 at 87.  The arbitrator reasoned that, throughout the arbitration, it had been "clear that, in the event the option was exercised, the preferred interests would transfer to [the Company] or its nominee," *id.* at 88, and that "Eletson would turn over any damages" to the non-party Company, *id*.  He thus ruled "it is Eletson that substantially prevailed on its claims in this arbitration."  *Id.* at 88.

The fee award was well within the scope of the arbitrator's "contractually delegated authority."  *Jock*, 942 F.3d at 622 (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)).  An arbitrator may award attorneys' fees and/or arbitration costs, to the extent they are permitted in the relevant arbitration provision or agreement.  *See, e.g.*, *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir. 1996); *LiveWire Ergogenics*, 645 F. Supp. 3d at 299.  The

LLCA delegated to the arbitrator the authority to interpret its terms and to determine any dispute, claim or controversy arising out of it.  Dkt. No. 67-2 § 12.14(a).  One of those terms is Section 12.14(d) which provides in pertinent part that "the arbitrator shall have discretion to award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party, which fees may be set by the arbitrator of such action . . . and which fees shall be in addition to any other relief that may be awarded."  *Id.* § 12.14(d).  Thus, the arbitrator did not exceed his authority when he addressed the question of the prevailing party in the arbitration and determined that Petitioners were the prevailing party.  *See, e.g.*, *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir.1997), *cert. denied*, 522 U.S. 1049 (1998); *MasTec N. Am., Inc. v. MSE Power Sys., Inc.*, 581 F. Supp. 2d 321, 330–31 (N.D.N.Y 2008); *Ferrand v. Mystique Brands LLC*, 2021 WL 119572, at *8 (S.D.N.Y. Jan. 13, 2021); *Ludgate Ins. Co., Ltd. v. Banco De Seguros Del Estado*, 2003 WL 443584, at *6–7 (S.D.N.Y. Jan. 6, 2003).

Respondent's argument is more properly understood as a challenge to the substance of the arbitrator's decision and whether he acted in manifest disregard of the law in determining that Petitioners were the prevailing party.  So framed, however, the claim is no more successful.  Respondent relies upon the Delaware Supreme Court's decision in *Cooke v. Murphy*, 99 A.3d 226, a motor vehicle accident case in which the court held that a plaintiff who proved the defendant's liability but failed to prove damages was not the prevailing party and was not entitled to an award of costs under Delaware Superior Court Civil Rule 54(d).[33]  Following an earlier decision by a lower court, the Delaware Supreme Court reasoned "that where the

---

[33] Delaware Superior Court Civil Rule 54(d) states: "Except when express provision therefor is made either in a statute or in these Rules or in the Rules of the Supreme Court, costs shall be allowed as of course to the prevailing party upon application to the Court within ten (10) days of the entry of final judgment unless the Court directs otherwise."  Del. Super. Ct. Civ. R. 54(d).

judgment reflects an award of zero dollars, 'it necessarily follows that Plaintiff has obtained no judgment from Defendant and Defendant is indeed the prevailing party for purposes of Rule 54(d).'" *Id.* at *3 (quoting *Streetie v. Progressive Classic Ins. Co.*, 2011 WL 1259809, at *15 (Del. Super. Ct.) *aff'd*, 35 A.3d 419 (Del. 2011)).

The arbitrator did not manifestly disregard any law in determining that Petitioners were the prevailing parties under the LLCA and entitled to an award of fees. *Cooke* neither addressed the question whether a party to a contract who succeeds in enforcing a provision specifically benefitting third parties is a prevailing party, nor did it involve a contractual fee-shifting provision. Here, where there was a contractual fee-shifting provision, the question whether Petitioners were prevailing parties here is purely one of contractual interpretation. *See Bako Pathology LP*, 288 A.3d at 280–81. The term "prevailing party" is a legal "term of art that the parties bargained for in the contract[]." *Id.* at 281. It refers to the party which has "predominated in the litigation" and "who has prevailed on most of [the] claims." *Id.* (internal citations omitted). The prevailing party need not have personally received an award of money damages. *See, e.g.*, *Aloha Power Co.*, 2017 WL 6550429, at *5 (concluding that party who succeeded in books-and-records dispute was the prevailing party); *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) ("A plaintiff receiving . . . injunctive relief may be a prevailing party where she prevailed on the merits." (internal quotation marks omitted)); *Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989) ("Plaintiffs may be considered 'prevailing parties' for attorneys' fee purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit."); *cf. Farrar v. Hobby*, 506 U.S. 103, 113 (1992) ("[T]he *degree* of the plaintiff's success does not affect eligibility for a fee award." (alteration in original)).

114

The arbitrator acted within his discretion in determining that Petitioners were the prevailing parties and in awarding them fees.  In its Third Amended Statement of Claims and Response to Counterclaims, Eletson sought a determination that Levona *never* had any lawful interests in the Company, that the assignment of the two entities owning Company vessels to Levona was procured by coercion, fraud, illegal, and other wrongdoing and is null and void, that Levona not be considered an interest holder of the Company, or, in the alternative, specific performance of the buy-out of Levona's preferred stock, and compensatory and punitive damages and attorneys' fees.  Dkt. No. 31-35.  In its Counterclaims, Levona sought an order requiring any agent of Eletson to vacate the two Company vessels, declaratory judgment that the loan was not repaid and the Purchase Option was not executed, a declaration that Levona remains in control of the preferred shares, a declaration that Levona is authorized to execute a deal with Unigas, and compensatory and punitive damages and attorneys' fees.  Dkt. No. 31-11.

The arbitrator ruled for Petitioners.  He concluded: "Claimants have proven breaches of the LLCA and the covenant of good faith and fair dealing and established that Eletson exercised the purchase option pursuant to the BOL, and are therefore entitled to the declaratory relief, compensatory damages, punitive damages, prejudgment interest, and attorney's fees," and that "Respondent has not proven any of its counterclaims and they are dismissed.  Respondent is entitled to recover nothing from the Claimants."  Dkt. No. 67-58 at 95.  The arbitrator issued declaratory relief finding that Eletson exercised the buyout option in the BOL; that as of March 11, 2022, Levona had no membership interest in the Company; that the Preferred Interests were transferred to the Nominees; that Levona had breached the LLCA and violated the Status Quo Injunction; and that Levona, Murchinson, and Pach Shemen were obligated to pay damages to the Company and to the Nominees.  *Id.* at 95–100.  As a result of the Award, Eletson and the

115

Nominees will be the sole owners of the Company.  It is irrelevant that the Preferred Interests will be transferred to the Nominees and not to Eletson itself.  Under the BOL, the Preferred Interests would never have been transferred to Eletson—Eletson contracted for a buyout option for the Company or the Nominees to receive the Preferred Interests.  But the fact that, as a result of Eletson prevailing on its contract claim, the Company or the Nominees will receive the direct monetary benefit does not make Eletson any less the prevailing party than it would any other contract party who succeeds in enforcing a contract provision that inures to the benefit of a third-party beneficiary.  It does not prevent Eletson from being a prevailing party.  *See, e.g.*, *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98 (2d Cir. 2006); *Christopher P. by Norma P. v. Marcus*, 915 F.2d 794, 804–05 (2d Cir. 1990), *cert. denied*, 498 U.S. 1123 (1991).  *Ferrand*, 2021 WL 119572, at *10 ("Even assuming *arguendo* that Ferrand's application here of the contractual term 'prevailing party' were the more persuasive, this case falls far short of being one of 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent but where none of the provisions of the FAA apply.'" (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003))).

## III.      Whether the Arbitrator Manifestly Disregarded the Law

Lastly, Respondent argues that the arbitrator grossly misinterpreted the BOL and manifestly disregarded the law.  Dkt. No. 50 at 32.  Specifically, Respondent contends that the arbitrator acted in manifest disregard of the law by relieving Eletson of the obligation under the BOL to have provided formal written notice of its intention to exercise the Purchase Option, *id.* at 33–34, and by failing to make any effort to interpret the BOL under English law, *id.* at 34–35.  According to Respondent, these "deviation[s] from the plain contractual language and fundamental canons of contract interpretation [were] so far outside the range of permissible decisions as to warrant vacatur."  *Id.* at 35.

116

Review of an arbitration award for manifest disregard of law is "severely limited." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002) (Sotomayor, J.) (quoting *Gov't of India v. Cargill Inc.*, 867 F.2d 130, 133 (2d Cir. 1989)). To vacate an arbitral award on grounds of manifest disregard, the court "must find 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" *Id.* (quoting *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967)). Vacatur under the manifest disregard standard is limited to "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (quoting *T.Co Metals, LLC*, 592 F.3d at 339). "A court may vacate an arbitral award based on manifest disregard only upon a finding that '(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" *Precision Castparts Corp. v. Schultz Holding GmbH & Co. KG*, 2020 WL 4003578, at *2 (S.D.N.Y. July 15, 2020) (quoting *Zurich Am. Ins. Co.*, 811 F.3d at 589). "The test has sometimes been described in three parts, as requiring a demonstration that (1) 'the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators'; (2) 'the law was in fact improperly applied, leading to an erroneous outcome;' and (3) 'the arbitrator must have known of [the law's] existence, and its applicability to the problem before him.'" *Id.* (quoting *T.Co Metals*, 592 F.3d at 339); *see also LiveWire Ergogenics*, 645 F. Supp. 3d at 296. "A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law." *Wallace*, 378 F.3d at 190. Indeed, "[o]nly a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award," *D.H. Blair & Co.*, 462 F.3d at 110, even if the "court[] disagree[s] with [the

117

arbitrator] on the merits," *Wallace*, 378 F.3d at 190.  "A 'barely colorable justification' exists so long as the arbitrators had reasoning on which they 'could have justifiably rested their decision.'"  *Smarter Tools*, 57 F.4th at 383 (quoting *Willemijn Houstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13–14 (2d Cir. 1997).

### A.  The Notice Requirement

Levona first contends that the arbitrator manifestly disregarded the law by holding that Petitioners had satisfied the notice requirement of the BOL.  Dkt. No. 50 at 34.  The BOL provides that the Purchase Option is "exercisable by written notice to Levona" by the Company "for either [the Company] or its nominee to purchase all of the membership interests held by Levona in [the Company]."  Dkt. No. 67-10 § 2.3.  It further provides that if an Option Notice is not "validly served by the expiry of the Purchase Option Period," the Purchase Option will lapse. *Id*. § 2.5.  The arbitrator found that "there does not seem to be a separate formal written notice provided to Levona by Eletson exercising the option," but concluded that Levona received actual notice and that the evidence established that "the parties acknowledged that Eletson was exercising the option."  Dkt. No. 67-58 at 42.  The arbitrator supported that conclusion by the content of the agenda for the March 10, 2022 Company Board of Directors meeting which contained the language "[u]pdate on Eletson's intention to exercise the purchase option."  *Id.*  As "additional support," he looked to the Unanimous Written Consent which was signed by all directors including Levona directors, but gave only the Eletson directors authority to sign or deliver on behalf of the company notices in connection with the BOL.  *Id.* at 43–44.  Finally, the arbitrator concluded that "both parties acted in a manner consistent with the fact that Levona had been bought out of the Company."  *Id.* at 44.  Thus, the arbitrator concluded "[a]t best, the absence of a written notice and payment of $1 dollar are formalities that the parties failed to

observe."  *Id.*  The arbitrator did not cite English law or Delaware law in those portions of his findings.[34]

Respondent supports its argument that the arbitrator's conclusion on notice satisfied the first two prongs of the manifest disregard test—that the law allegedly ignored was clear and explicitly applicable to the matter before the arbitrator, and that the arbitrator misapplied the law—by citing the general axiom that a contract is to be interpreted to give meaning to its every word, and the Delaware Supreme Court's 1986 decision in *Stoppi v. Wilmington Tr. Co.*, 518 A.2d 82, 86 (Del. 1986), regarding the notice required to be given by a secured party to a debtor prior to the sale or disposition of collateral under the Uniform Commercial Code.  Dkt. No. 50 at 34; *see also* Dkt. No. 59 at 13.[35]  Respondent argues that the third prong of the test was satisfied—that the arbitrator knew of the law's existence and its applicability to the problem before him—because they directed the arbitrator's attention to the proposition that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Dkt. No. 55-4 at 9 (quoting *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 Del. Super. LEXIS 279, at *16 (Del. Super. Ct. June 8, 2017)). The argument that the arbitrator manifestly disregarded the law in excusing Petitioners from the requirement of providing written notice is without merit.  First, the general proposition of

---

[34] "[I]t is axiomatic that arbitrators need not disclose the rationale for their award."  *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991).  So long as the Court can infer a ground for the arbitrator's decision from the facts of the case, the Court must confirm the award. *Standard Microsystems Corp.*, 103 F.3d at 9.

[35] *Stoppi* interpreted the former Section 9-504(3) of the U.C.C.  *Stoppi*, 518 A.2d at 84–86. Article 9 of the U.C.C. was recodified in 2001 and the former Section 9-504(3) is now Section 9-611.  It requires a second party that disposes of collateral under Section 9-610 of the U.C.C. to "send" to the debtor and any secondary obligor a "reasonable authenticated notification of disposition."  U.C.C. §§ 9-611(b), (c).  The *Stoppi* court relied upon a definition of "send" to mean deposition in the mail or delivery for transmission to mean that the notification must be in writing.

contract law that a contract is interpreted according to its plain meaning and so as to give every word meaning provides only limited support to Levona, in the face of the other general proposition that, at least in some circumstances and in some states including Delaware, whether viewed as a covenant or a condition precedent, "[n]otice provisions have generally been interpreted to require substantial compliance," not literal compliance.  Richard A. Lord, 6 Williston on Contracts § 49:88 (4th ed. 2003); *Gower v. Trux, Inc.*, 2022 WL 534204, at *11 (Del. Ch. Ct. Feb. 23, 2022) ("When confronted with less than literal compliance with a notice provision, courts have required that a party substantially comply with the notice provision." (quoting *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *7 (Del. Ch. Ct. June 5, 2006))); *Kelly v. Blum*, 2010 WL 629850, at *8 n.52 (Del. Ch. Ct. Feb. 24, 2010) (same); *cf. James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 405 (Tex. 2022), *reh'g denied* (Sept. 2, 2022); *Bantz v. Bongard*, 864 P.2d 618, 624 (Idaho 1993) ("This Court has long held that only substantial compliance with a contractual notice provision is required."); *Putney Sch., Inc. v. Schaaf*, 599 A.2d 322, 327 (Vt. 1991) ("The rule in Vermont is that substantial compliance with notice requirements will suffice.").  Nor do Respondent's citations to Delaware case law.  The Delaware Superior Court's decision in *Motors Liquidation Co.* involved the question whether insurance policies that were the assets of General Motors's predecessor had been validly assigned to its successor trust, and in the quotations cited by Levona, the court relied upon New York law.  2017 Del. Super. LEXIS 279, at *16 n. 61 (citing *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166 (N.Y. 2002)).  It has no apparent bearing on the notice issues raised here.  *Stoppi v. Wilmington Trust Co.*, 518 A.2d at 86, the case Levona cites before this Court, holds that written notification to the debtor prior to any sale or other disposition on collateral is "the better rule" under the U.C.C, but also recognizes that "other jurisdictions have

split on the issue." It does not demonstrate that the law that was allegedly ignored was "clear, and in fact explicitly applicable to the matter before the arbitrators." *Precision Castparts Corp.*, 2020 WL 4003578, at *2.

Generally, Respondent misstates the law when it argues that it is sufficient that the arbitrator "knew the Delaware legal principles governing contract interpretation" and that those general principles should be interpreted to defeat Eletson's right to exercise the option in the absence of written notice. Dkt. No. 59 at 18. A party who agrees for an arbitrator to determine its disputes does not contract for those disputes to be determined in accordance with law, but only not in manifest disregard of the law. The Second Circuit has stated that "[a] party seeking vacatur bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Duferco Int'l Steel Trading*, 333 F.3d at 389.[36] Moreover, in the absence of "an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator," the only duty of the arbitrator is to be aware of the "governing law identified by the parties to the arbitration." *Id.* Thus, the parties must have made the arbitrator aware not only of the law's existence, but also of "its applicability to the problem before him." *Precision Castparts Corp.*, 2020 WL 4003578, at *2 (quoting *T.Co Metals*, 592 F.3d at 339); *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002); *Aksman v. Greenwich Quantitative Rsch. LP*, 563 F. Supp. 3d 139, 150 (S.D.N.Y. 2021), *aff'd*, 2023 WL 6799770 (2d Cir. Oct. 16, 2023) (summary order). More specifically, although the Delaware Superior Court in 2018 required literal compliance with a notice provision preventing the release of funds from escrow

---

[36] The Third Circuit and the Delaware Supreme Court have both adopted this rule verbatim. *See, e.g.*, *Black Box Corp. v. Markham*, 127 F. App'x 22, 24 (3d Cir. 2005); *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014).

where the contract at issue defined what constituted reasonable notice and required the release of

funds if such notice was not provided, *see, e.g.*, *PR Acquisitions, LLC v. Midland Funding LLC*,

2018 WL 2041521, at *6–7 (Del. Ch. Ct. Apr. 30, 2018) (granting summary judgment for

plaintiff where defendant contracting party "never directly gave notice to [the plaintiff] in any

form before the [contractually specified] date," and did not, in course of litigation, offer any

"reason other than its own error for its failure to comply with the notice provision it negotiated"),

and more recently stated "as a matter of law, where the contract specifies what constitutes notice

thereunder and dictates how to communicate that notice, strict compliance with the notice

provision is necessary," *Aluminum Source, LLC v. LLFlex, LLC*, 2023 WL 2547996, at *19 (Del.

Sup. Ct. Mar. 16, 2023), that rule appears not to be as uniformly applicable or oblivious to

context as Levona suggests.  Following *PR Acquisitions*, the Delaware Chancery Court has

explained that Delaware courts have "at times, accepted substantial compliance with notice

provisions in lieu of actual compliance, when the circumstances so justified." *Vintage Rodeo*

*Parent, LLC v. Rent-A-Center, Inc.*, 2019 WL 1223026, at *15 (Del. Ch. Ct. Mar. 14, 2019).  As

Chancellor Strine explained: "The requirement of substantial compliance is an attempt to avoid

'harsh results . . . where the purpose of these [notice] requirements has been met.' . . . Substantial

performance is 'that which, despite deviations from contract requirements, provides the

important and essential benefits of the contract.'" *Gildor*, 2006 WL 4782348, at *7 (internal

citations omitted).

Critically, Levona did not cite any of these cases or any other cases that could possibly be

relied on to support its position to the arbitrator, and thus did not put him on notice of the

applicable law.  Levona's argument to the arbitrator regarding notice was limited to a single

sentence: "[n]o 'written option notice' was given—this is undisputed."  Dkt. No. 55-4 at 19.  It

cited no law to the effect that the failure to provide written notice would defeat the exercise of the option when both parties actually knew of Eletson's exercise of the option within the Purchase Option Period.  It therefore cannot be said that the arbitrator "knew of a governing legal principle yet refused to apply it or ignored it altogether."  *DiRussa*, 121 F.3d at 824 (quoting *Folkways*, 989 F.2d at 112).  Accordingly, its argument that the arbitrator manifestly disregarded the law in finding that the notice requirement had been satisfied is unavailing.

### B.      Interpretation Under Delaware Law

Levona's argument that the arbitrator manifestly disregarded the law by looking only to Delaware law and not to English law is no more successful.  The BOL has a choice-of-law clause providing that it would be "governed by and construed in accordance with English law."  Dkt. No. 67-10 § 10.  Levona did not cite to the arbitrator any English law but only to Delaware law and to New York law.  Dkt. No. 31-38 at 48–49, 52–55, 66–67.  It can hardly complain that the arbitrator manifestly disregarded a body of law to which it did not direct the arbitrator's attention.  *See, e.g.*, *Wallace*, 378 F.3d at 195; *Westerbeke*, 304 F.3d at 209; *DiRussa*, 121 F.3d at 823; *see also GMS Grp., LLC v. Benderson*, 326 F.3d 75, 77–78 (2d Cir. 2003); *Halligan v. Pipe Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999).

### CONCLUSION

The application to confirm is GRANTED IN PART and DENIED IN PART and the motion to vacate is GRANTED IN PART and DENIED IN PART.

The Court confirms the Award as stated in Dkt. No. 67-58, beginning on page 95, including the award of compensatory and punitive damages and the grant of attorneys' fees, costs, expenses, and pre-judgment interest, with the following exceptions:

- Paragraphs A.7, A.8, A.10(i), and A.10(iii) are vacated.

- All awards of relief against Murchinson and Pach Shemen are vacated.

123

- All awards of relief, including compensatory and punitive damages, based upon violations of the Status Quo Injunction are vacated.

- All awards of attorneys' fees, costs, and expenses relating to the involuntary bankruptcy petition and Bondholder Litigation are vacated.

Parties are directed to each submit a proposed judgment in accordance with this Opinion and Order by February 23, 2024.  The Clerk of Court is respectfully directed to close Dkt. Nos. 28, 49.


SO ORDERED.


Dated: February 9, 2024
     New York, New York                                   LEWIS J. LIMAN
                                                  United States District Judge