UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/06/2024

------------------------------------------------------------------X
                                                :

ELETSON HOLDINGS, INC. and ELETSON      :
CORPORATION,
                                               :

                  Petitioners,      :        23-cv-7331 (LJL)
                                               :

        -v-                          :       OPINION AND ORDER
                                               :

LEVONA HOLDINGS LTD.,                   :
                                               :

                 Respondent.      :
                                             X
------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

Respondent and Cross-Petitioner Levona Holdings, Ltd. ("Levona" or "Respondent"),

moves for leave to file an amended answer to the operative petition of Eletson Holdings Inc.

("Holdings") and Eletson Corporation ("Corp" and, together with Holdings, "Eletson" or

"Petitioners") to confirm the final arbitration award (the "Award") issued by the Honorable Ariel

Belen of the Judicial Arbitration and Mediation Services, Inc. ("JAMS") on September 29, 2023,

and an amended cross-petition to vacate the Award.  Dkt. No. 123.  Eletson has opposed the

motion.  Dkt. No. 147.

For the following reasons, Levona's motion is granted.

**BACKGROUND**

The Court has detailed the factual allegations underlying this matter at length in its prior

Amended Opinion and Order, dated April 19, 2024.  Dkt. No. 104.  The Court recounts here only

a brief background and those facts pertinent to the current motion.[1]

---

[1] In discussing the facts in this Opinion, the Court draws inferences in favor of Levona.  It does
not engage in ultimate factfinding.

## I.    Background of the Parties and Dispute

The underlying dispute in this case relates to control over a joint venture, non-party Eletson Gas LLC ("Eletson Gas" or the "Company").  Eletson Gas, formed in 2013 under the laws of the Republic of the Marshall Islands, is a limited liability company that specializes in liquified petroleum gas ("LPG") shipping.  Dkt. No. 67-58 ("Final Award") at 6; Dkt. No. 62 ¶ 2.[2]  Eletson Gas has historically owned a large fleet of medium and long-range product tankers and has been a leader in the transportation of oil products and gas cargoes.  Final Award at 7.  At the time that the events giving rise to this case occurred, the Company owned and operated fourteen LPG vessels, making its fleet the second largest on the market.  *Id.*

Eletson is an international shipping group.  Final Award at 6.  Holdings owns the common shares of the Company while Corp provides management services in exchange for a management fee.  Dkt. No. 62.  Levona is a special purpose entity formed under the laws of the British Virgin Islands on October 20, 2021.  *Id.*  Levona is a subsidiary of two hedge funds, Nomis Bay and BPY, that have both engaged the same alternative management company Murchinson Ltd. ("Murchinson") to act as their investment sub-advisor.  *Id.*; Dkt. No. 50 at 7 n.2.

Eletson and Levona were parties to a Third Amended and Restated LLC Agreement ("LLCA"), effective on August 16, 2019, that governs the relationship among the holders of the membership interests in the Company.  Final Award at 7.  Under the LLCA, Holdings was to own the common stock in the Company while Levona was to hold the preferred shares (the "Preferred Interests").  *Id.* at 6–7; Dkt. No. 67-50 ¶¶ 91–92.  The LLCA affords holders of Preferred Interests managerial control over the Company.  Dkt. No. 67-2 §§ 3.1, 3.3.

---

[2] All page numbers refer to the ECF pagination unless otherwise noted.

The Company was plagued with financial problems, and by early 2022 five of the Company's ships—over a third of its fleet—had been arrested by various creditors for non-payment of the Company's liabilities.  Final Award at 55.  Multiple arrested ships were scheduled to be sold at auction to compensate creditors, but before the auction, Eletson and Levona entered into a Binding Offer Letter ("BOL") and related agreements through which Levona provided much-needed cash in the form of a loan to avoid the Company's loss of most of its fleet.  Dkt. No. 67-10.  As part of those agreements, Levona granted the Company an option to buy out Levona's Preferred Interests in the Company.  *Id.*

Several months later, Levona—purporting to act on behalf of the Company—signed a non-binding Letter of Intent to sell nine of the Company's twelve remaining vessels to its primary competitor, Unigas.  Final Award at 9.  A dispute arose about whether Levona had the authority to do this, which turned in large part on whether Eletson had in fact exercised the option to buy the Preferred Interests.

## II.    The Issues in the Arbitration

Eletson made a demand for arbitration on July 29, 2022.  Final Award at 4.  It claimed that Levona had breached the LLCA by purporting to act on behalf of the Company and by "strip[ping]" the Company of its assets for less than fair market value.  Dkt. No. 67-16.  Eletson argued that because it had effectuated a buyout of the Preferred Interests, Levona had no power to act on behalf of the Company.  Eletson also included allegations that Levona had improperly purported to call a meeting of the Company's Board of Directors to circumvent the Eletson-appointed directors of the Company.  *Id.*  Levona responded to the claim on August 19, 2022.  It counterclaimed, alleging that Eletson had mismanaged the Company, including by preventing refinancing of certain vessels, in violation of its obligations under the LLCA, BOL and related agreements.  Dkt. No. 67-17.  It also alleged that Eletson had failed to comply with the provision

of the BOL under which it was required to agree to certain "fundamental actions" directed by Levona while the loan remained outstanding. *Id*. Finally, Levona alleged that Eletson interfered with Levona's sale of two of the Company's ships and with Levona's right to sell vessels to Unigas. *Id*.

A pivotal question in the arbitration was whether Eletson had properly exercised the right granted it in the BOL to purchase Levona's Preferred Interests in the Company. Through the BOL and related documents, the Company had transferred two ships to Levona—the Symi and the Telendos. In exchange, it received working capital of up to $10,000,000 (the "Loan") and a limited option to buy Levona out of its Preferred Interests in the Company (the "Purchase Option"). The Purchase Option was exercisable only during a limited time period and under limited circumstances. It expired if not exercised within thirty days of the February 22, 2022 date of the BOL. Dkt. No. 67-10 § 2.3. It could only be exercised if either (a) the Loan and any Interest accrued thereon was fully repaid; or (b) adequate security and/or collateral was provided for the Loan, with the adequacy of the security to be at the sole discretion of Levona. *Id*. § 2.2. To exercise the Purchase Option, Eletson had to pay Levona $23 million, with the value of the two vessels to be credited against this amount. If the value of the vessels exceeded $23 million, the excess would be applied to reduce the amount outstanding on Levona's loan to the Company. *Id*. § 3.2. Under the terms of the BOL, if the Purchase Option was not exercised Levona was entitled to retain the two vessels as consideration for the right to exercise the option.

The parties hotly disputed whether the Purchase Option had been timely and properly exercised. Eletson claimed that the Purchase Option was exercised on March 11, 2022, when it executed a series of documents to sell its interests in the Symi and Telendos to Levona. It further claimed that it need not have either repaid the Loan or provided adequate security for the

repayment of the Loan.  It claimed that it only needed to have provided collateral—which it did when it transferred Corp's claims against the Company to Levona—despite the fact that the BOL, independent of any collateral, required Eletson to transfer Corp's claims against the Company until the Loan was paid off in full and that, in any event, Levona's rights under the Loan were senior to those of Corp.  Levona claimed that the Purchase Option was not exercised. It argued that Eletson never provided adequate security or collateral to Levona, nor did Eletson provide notice of the exercise of the Purchase Option.  Levona's argument was that the transfer of the vessels was consideration for the Purchase Option itself rather than consideration paid for the Preferred Interests in exercise of the Purchase Option.

As the arbitrator recognized in the Award, the question of whether the Purchase Option had been properly and timely exercised was critical.  Final Award at 9.  If the Purchase Option had not been exercised, then Levona's counterclaims against Eletson had force—among other things, it had the right to sell the ships on behalf of the Company and Eletson may have violated its obligations towards Levona by refusing to engage in due diligence relating to that sale.  If, on the other hand, the Purchase Option was properly exercised, then Levona was no longer a member of the Company and had violated Eletson's rights by purporting to sell the ships on behalf of the Company.

The arbitrator ultimately sided with Eletson.  He concluded that the transfer of the two vessels was consideration for the exercise of the Purchase Option and not for the grant of the Purchase Option itself (thus concluding that Eletson paid no additional consideration for the Purchase Option).  Final Award at 35–43.  He further concluded that the transfer of the vessels was adequate consideration because their value exceeded $23 million.  *Id.*  He also found that the assignment of Corp's claims against the Company to Levona constituted collateral and that

Levona had no right to reject the collateral on grounds it was inadequate. *Id.* Finally, notwithstanding that no formal notice was provided to Levona of the exercise of the Purchase Option, he concluded that the notice provision of the BOL was satisfied because Levona was on actual notice of the fact of the Purchase Option's exercise. *Id.*

In support of its position, Levona had presented a July 13, 2022 email from Eletson CFO Peter Kanelos with an attachment entitled "Murchinson Buyout Steps." Dkt. No. 67-14. The email was addressed to Adam Spears of Levona and copied Vassilis Kertsikoff of Eletson, among others. It refers to the interests held by Murchinson through Levona. It attached a buyout proposal which Kanelos stated that Kerstikoff would want to discuss with Spears. *Id.* The attached document had a section entitled "Murchinson exits from Eletson Gas." *Id.* It stated, in pertinent part, "As per the agreement dated February 22, 2022, Murchinson transfers all membership interest to Eletson Gas LLC after: Receipt of $23 million net clear proceeds and, Repayment of $12.85 million Levona W.C facility and any interest outstanding," and contained a proposal for how the "Exit Proceeds" would be funded. On its face, the document appeared to support Levona's position that the Purchase Option had not been exercised in March 2022. It would make little sense for Kertsikoff to want to discuss with Spears in July 2022 the next steps for Eletson to buy out Levona's Preferred Interests if Eletson had already purchased those interests in March 2022.

Eletson fought that interpretation of the email. Eletson submitted a declaration of Kertsikoff that stated that the July 13, 2022 document was not a new offer and plan to buyout Levona's Preferred Interests but simply documents the steps that Eletson previously had put in place "to finalize residual outstanding issues of the buyout effectuated in March 2022" and "to

capture the fundamental elements of the parties' agreement to buy out Levona's interest in the Company pursuant to the BOL and Transaction Documents."  Dkt. No. 127-12 ¶ 14.

In the Final Award, the arbitrator accepted Eletson's interpretation of the evidence.  He discounted the email on the grounds that "it was drafted by Mr. Kanelos who was being bribed by Murchinson and had every incentive to muddy the waters."  Final Award at 45 n. 6   He also found that "at most, this memo is an inaccurate checklist of items needed to complete Levona's exit from the Company pursuant to the terms of the BOL."  *Id.*

## III.  Levona's Efforts to Obtain the Newly-Produced Documents and Roadblocks Created by Eletson

Levona's motion is based on four documents that Eletson was compelled to produce in a bankruptcy proceeding in which Holdings is the debtor and Levona is a creditor.[3]  The documents were produced on March 18, 2024 subject to a protective order, but Levona was given leave to disclose the documents to this Court only on June 18, 2024.  Levona's efforts to obtain these documents began during the arbitration and continued uninterrupted thereafter.  Its demands were repeatedly rebuffed by Eletson.

During the arbitration, Levona asked for, among other things: 1) "Any communications and/or documents related to Eletson's preparation of, negotiations to, and/or related to the final

---

[3] On March 7, 2023, while the arbitration was pending, Pach Shemen and two other creditors of Holdings filed involuntarily petitions for relief under Section 303 of Title 11 of the Bankruptcy Code, commencing involuntary Chapter 7 proceedings against Holdings and two of its affiliates in the Bankruptcy Court for the Southern District of New York.  Dkt. No. 67-30.  Eletson accused Pach Shemen, as an affiliate of Levona, of filing the bankruptcy petition to disrupt the arbitration.  Dkt. No. 67-33.  On April 17, 2023, the bankruptcy court signed a stipulation by the petitioning creditors and the debtors permitting the existing claims then pending in the arbitration to proceed.  Dkt. No. 67-35.  Ultimately, Holdings and the other debtors agreed to convert the bankruptcy to a voluntary Chapter 11 case, which occurred on September 25, 2023. They also agreed to withdraw their allegations that the involuntary bankruptcy had been filed in bad faith and not to object to payment of attorneys' fees to the petitioning creditors, including Pach Shemen, who had prosecuted the involuntary bankruptcy.  Dkt. No. 65.

offer of the 'Murchinson Buyout Steps', attached to Counterclaim as Exhibit E."; 2) "[a]ny and all communications concerning actions undertaken by Eletson to obtain independent investors to purchase an interest in Eletson or [Eletson Gas] from March 11, 2022 through present"; 3) "[a]ny documents . . . as to the determinations of the value of the [Symi and Telendos] in 2022" and 4) "[a]ny communications related to any attempt to refinance any debt of [Eletson Gas] and secure new debt/credit for [Eletson Gas] from January 1, 2022 through present."  Dkt. No. 136 at 10–11; Dkt. No. 127-10; Dkt. No. 127-11.  JAMS, which oversaw the arbitration, requires parties to "cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information (including electronically stored information ('ESI')) relevant to the dispute or claim immediately after commencement of the Arbitration."  JAMS Rule 17(a).

Shortly after testimony concluded in the arbitration in June 2023 and before the arbitrator had issued any award, Levona learned of the existence of a document that Eletson purportedly had produced to the petitioning creditors in Eletson's bankruptcy case, *see* Case No. 23-cv-10322, United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Proceeding"), and that allegedly contradicted Eletson's position during the arbitration that it had exercised the Purchase Option.  Dkt. No. 136 at 12–13.  Levona did not receive the document itself and was not told what it said.  At the time, Levona had not filed a claim in the Bankruptcy Proceeding and it had no right of access to the document.  Levona learned of the document's existence through non-confidential information shared with it by an individual who is both a representative of a petitioning creditor in the Bankruptcy Proceeding and a representative of Levona and who informed Levona about the document's existence.  *Id.* at 13 n.6.  The petitioning creditor had no right or ability to share the document or its contents with Levona. The document was a subject of a protective order (the "Protective Order") in place in the

Bankruptcy Proceeding that Eletson vigorously enforced and that required documents designated as confidential to be used "solely for the purposes of the Contested Bankruptcy Proceedings, the Chapter 11 Cases or any related Disputes, and not for any other purpose." Dkt. No. 127-34 ¶ 10.[4] Notably, despite the request made by Levona for documents in the arbitration, the document was not produced during the arbitration.

In July 2023, before the award was issued, Levona's counsel reached out to Eletson's counsel about this document. Dkt. No. 148-6. Eletson's counsel responded with accusations. Counsel stated that, "[a]pparently you and others have been violating the Protective Order entered in the Bankruptcy Court. After the fuss you made about confidentiality and the respect for confidentiality orders, your violation is doubly unpardonable." *Id*. Eletson's counsel also made threats. It stated that Eletson "do[es] not consent to your reviewing whatever document you identified. Indeed, we strenuously object, and we intend to seek all available remedies if you, once again, try to delay or derail the arbitration process . . . In the meantime, it is time for you to tell your client that you want no more part in its illegal schemes." *Id*.

Levona proceeded to ask the arbitrator to order Eletson to produce the document. *Id.*; Dkt. No. 67-52. In its request, Levona noted that once Levona's counsel reviewed the document, it would determine whether it was appropriate to seek reopening of the arbitration based on that new evidence. *Id*. In opposition, Eletson noted that the document was within the scope of the Protective Order, and Eletson's counsel again made accusations against Levona. Counsel wrote that "Levona has never really understood that there needs to be an end to argument – unless

---

[4] Disclosure of material subject to the Protective Order not in accordance with the Protective Order's terms subjects the disclosing person to the potential for sanctions or other remedies the bankruptcy court may deem appropriate. *Id*. ¶ 22. The Protective Order also requires parties to take reasonable steps to destroy or return confidential material at the conclusion of the bankruptcy and remains in force after final resolution of the bankruptcy. *Id*. ¶¶ 27–28.

one's goal is to delay – and that Levona does not always have to get <u>both</u> the first <u>and</u> last word," and complained that Levona only knew that the document existed because its client was willfully and repeatedly violating the Protective Order.  Dkt. No. 67-52 (emphasis in original).  The arbitrator denied the request and later denied reconsideration.  *Id.*; Dkt. No. 67-54.  The arbitrator stated that Levona had not proffered any legal basis supporting the notion that the arbitrator had the authority to order Eletson to violate the Protective Order.  The arbitrator also relied on the fact that Levona was not able to proffer the contents of the document.  He stated that  the conclusory assertions by "interested agents" of Levona that these documents were relevant did not amount to good cause to bypass the Protective Order.  Dkt. No. 67-52.

Levona continued to pursue the document.  Even though it was not a creditor but a mere third party, it wrote a letter to the bankruptcy court on July 26, 2023 identifying itself as the respondent in a pending arbitration in which the hearing had concluded but no decision had been issued.  It stated that a representative of Pach Shemen had advised Levona that Eletson produced a document in the Bankruptcy Proceeding that was material to and should have been produced in the arbitration, that Levona had tried to resolve the issue without the court's intervention by asking Eletson to produce the document, and that Justice Belen had also refused Levona's request in the arbitration to order Eletson to produce the document at issue.  It accordingly requested that the bankruptcy court grant relief under the Protective Order to allow counsel for Levona to view the document to potentially reopen the arbitration.  *See* Bankruptcy Proceeding Dkt. No. 144.  Eletson never responded.  Dkt. No. 147 at 15.  The issue was not adjudicated by the bankruptcy court because the arbitrator issued an interim award two days later, on July 28, 2023, in favor of Eletson.  A corrected interim award was issued on August 15, 2023, Dkt. No. 67-55, and the Final Award on September 29, 2023.  Dkt. No. 67-58.

Levona continued to pursue the evidence notwithstanding that the arbitration had concluded.  In October 2023, Levona moved the bankruptcy court to modify its Protective Order to allow Levona to access what, by that point, Levona thought were four documents produced in the Bankruptcy Proceeding that should have been produced in the arbitration proceeding, which Levona still had not seen.  Dkt. Nos. 127-14; 127-15.  Eletson once again resisted Levona's requests.  In opposition, Eletson argued that Levona was not entitled to the documents because it was not a party in the Bankruptcy Proceeding.  It also argued that Levona was impermissibly seeking to attack the Award and that the arbitrator had already rejected Levona's attempt to reopen the evidentiary record.  Notably, Eletson was silent about the fact that Levona had a right to attack the Award or to seek in this Court to make the argument that the record was impermissibly restricted.  Dkt. No. 127-30.  Taking advantage of the fact that it alone knew what the documents said, Eletson further represented that there was no "cognizable argument as to why the Documents can or should have any relevance whatsoever to the issue whether that Award should be confirmed" in part because there is "no provision for discovery" in the district court.  *Id*. at 3.  Eletson also relied on the Protective Order, arguing that it was improper for Levona to seek modification of the Protective Order for the purpose of using the documents in an entirely separate proceeding that had nothing to do with the Bankruptcy Proceeding and that granting such a request would be render the Protective Order meaningless.  *Id*. at 7.  Eletson also again made the accusation that a representative of Pach Shemen had apparently "improperly disclosed to Levona's counsel information concerning a document covered by the Protective Order."  *Id*. at 9.  Finally, Eletson submitted an affidavit of Eletson principal Vassilis Kertsikoff stating that Levona's understanding of the documents was incorrect and the documents were "of a piece with, and the same subject matter as, the corrupt doings of Levona and Peter Kanelos"

because they were created "by or for that bribed former employee." *Id.* at 10; *see also* Dkt. No. 127-31.

Levona responded accurately that the district court was, in fact, empowered to decide whether the Award was procured by fraud and that Levona could still press additional grounds for vacatur. Dkt. No. 127-15 at 3–4. Levona also pointed out that neither it, nor its counsel, nor the district court could test Eletson's assertions about what the documents say without seeing them. *Id.* at 4.

On November 8, the bankruptcy court held a hearing on the motion. At the hearing, counsel for Levona explained that it wanted the bankruptcy court to modify the Protective Order so that Levona could review the four documents, which it believed were relevant to this Court's consideration of the pending petition to confirm the arbitral award and cross-petition to vacate the arbitral award, which were then *sub judice*. Dkt. No. 127-16 at 35. Levona stated to the bankruptcy court that it believed there was misconduct in the arbitration because the documents were not produced there. *Id.*

Eletson vigorously opposed the motion. It once again asserted that Levona's efforts were simply a "fishing expedition" and an effort to "misuse the offices of this Court." *Id.* at 39. Eletson stated that the document Levona had previously presented to the arbitrator was not responsive to any arbitration discovery request and that the arbitrator had decided not to consider the document because it was allegedly dated after the last relevant event in the arbitration in March 2022, not because it was subject to the Protective Order. *Id.* at 40. It did not explain why the documents could not be relevant if they were dated after March 2022. Reading this Court's jurisdiction narrowly, Eletson went on to tell the bankruptcy court that the issue in this Court was not whether the documents were responsive in or relevant to the arbitration, but only the limited

question of whether the arbitrator had erred under a very narrow set of standards. *Id*. at 41. Eletson stated that there is no discovery in this Court, that Levona never sought discovery in this Court, and that Levona had not moved to vacate in this Court based on omitted evidence or fraud. *Id*. at 41–42. Eletson also argued that there would be no protective order in District Court. *Id*. at 42. The bankruptcy court denied the motion to modify the Protective Order. *Id*. at 51.

Levona persisted in its efforts and Eletson persisted in its steadfast opposition. In December 2023, Levona filed a proof of claim in the Bankruptcy Proceeding, but Eletson objected. Dkt. No. 127-17. In its objection, Eletson argued that Levona's claim was essentially duplicative of what it had argued in arbitration and that the bankruptcy court should give the Award preclusive effect. Dkt. No. 127-17 at 10–12.[5] Eletson continued to seek to delay in the Bankruptcy Proceeding, arguing that the bankruptcy court should stay the adjudication of Levona's claim until the Award was confirmed by the district court. *Id*.

On February 8, 2024, Levona served discovery requests on Eletson related to its proof of claim, including for documents regarding "(a) any interest Eletson Holdings or others ever held in the [Preferred Interests]; and (b) Eletson Holdings' knowledge as to whether Eletson Gas exercised the [Purchase Option]." Dkt. No. 136 at 14. On February 22, 2024, Eletson objected and did not produce any documents.[6] Dkt. No. 136 at 14; Dkt. No. 127-20.

---

[5] As the Court stated in its prior Opinion and Order, the Court does not confirm factual findings of an arbitrator. Dkt. No. 104 at 82; *cf. id.* at 87–88 (noting limits of claim preclusive effect of arbitration awards).

[6] In May 2024, in connection with Levona's proof of claim, Levona also served subpoenas on third parties to obtain documents regarding "(a) potential financing or re-financing of Eletson or related entities; (b) purchase of Levona's preferred shares in Eletson Gas by any entity; and (c) transfer of preferred interests in Eletson Gas to the Cypriot nominees or related entities," but Eletson had obtained a stay of discovery from the bankruptcy court and Levona has not received any third-party discovery. Dkt. No. 136 at 14; *see also* Bankruptcy Dkt. No. 811 (noting at a

Separately from the discovery it sought related to its proof of claim, on February 15, 2024, Levona wrote to the bankruptcy court "regarding [Eletson's] baseless effort to obstruct Levona from viewing documents" that had already been produced in the Bankruptcy Proceeding notwithstanding the fact that Levona had now signed the Protective Order.  Dkt. No. 127-21. Eletson was objecting to Levona's viewing of documents on the basis that Levona was "not a party to the [P]rotective [O]rder," including because Levona's claims were precluded by the arbitration and it was therefore not a creditor.  *Id*.  However, in its previously filed objection, Eletson had acknowledged that some of Levona's claims were "distinguishable" from the claims in the arbitration.  Dkt. No. 127-17 at 7, 12–13.  Levona prevailed at a hearing on the issue, when the bankruptcy court held that Levona was entitled to view certain documents filed under seal. Dkt. No. 127-22 at 11–12.  Eletson thereafter continued to complain that it had no evidence that Levona had signed the Protective Order, even though under the Protective Order it was not entitled to such evidence.  *Id*. at 12–13.  Following the bankruptcy court's order, Levona was able to review some documents that had previously been under seal for the first time on March 18, 2024.  *Id*.  However, those documents remained under the Protective Order.

In April 2024, Levona asked the bankruptcy court for another discovery conference regarding Eletson's continued refusal to produce the additional discovery that Levona requested regarding its proof of claim.  Dkt. No. 136 at 15; Dkt. Nos. 127-23, 127-24.  Levona was permitted to and did move to compel production of that additional evidence in May 2024.  Dkt. No. 136 at 15; *see also* 127-26 (noting that "many months after Levona issued the discovery,

---

hearing on May 31, 2024, that discovery regarding the Levona claim is stayed and the evidentiary hearing on the claim objection is adjourned to a date to be determined).

[Eletson] [has] refused to produce any documents or witnesses" and describing the willful withholding of certain material documents from the arbitrator).

Eletson again sought to delay in the Bankruptcy Proceeding, requesting a stay of discovery.  Dkt. Nos. 127-28, 127-27; Bankruptcy Proceeding Dkt. No. 715.  In opposing Levona's motion to compel, Eletson argued that Levona was impermissibly seeking to collaterally attack the Award "as subsequently confirmed by Judge Liman" and that Levona's "'new' alleged claims are even more obvious collateral attacks on Judge Liman."  Dkt. No. 127-27 at 2.  It made those statements even though this Court did not confirm any of the findings of the arbitrator, but concluded only that the Award was not in manifest disregard of the law and was within the scope of the arbitration agreement.  *Id*.  The Court did not address any of the issues that Levona now raises.  Eletson further argued that Levona's discovery efforts were irrelevant and a waste of resources because arguments for vacatur under 10(a) of the FAA needed to be raised with the district court and in any event had been waived by Levona.  *Id*. at 3.

The bankruptcy court held a hearing on June 18 regarding the discovery issues and . "why [the bankruptcy court] should not modify [its] [P]rotective [O]rder to allow the district court to see [the newly-discovered evidence]."  Dkt. No. 136 at 15.  Eletson again resisted production.  It argued that Levona was seeking to improperly collaterally attack the Award as confirmed by Judge Liman.  Bankruptcy Proceeding Dkt. No. 779.  Eletson described Levona as having "been blustering about these Documents for nearly a full year, repeatedly claiming they show fraud in the Arbitration."  *Id*. ¶ 3.  Eletson took issue with the fact that Levona was seeking to modify the Protective Order when it had never raised its fraud claim with the district court, all the while taking the position that Levona was not entitled to the documents necessary to raise the issue of fraud with this Court.  *Id*.  Eletson's position was that before asking the bankruptcy court

for discovery that it might use in the district court, Levona needed to have the district court first reopen its confirmation proceedings.  *Id*. ¶ 4.

The bankruptcy court ruled in Levona's favor and modified its Protective Order for the limited purpose of allowing Levona to use the documents in this Court, finding that "extraordinary circumstances" and "compelling need" existed to justify the modification.  *Id*; *see also* Dkt. No. 128-1.  And on July 11, 2024, a London-based arbitrator presiding over a separate arbitration between the parties permitted Levona to disclose another email both in this Court and in the Bankruptcy Proceedings.  *Id*. at 16.

## IV.    The Newly-Produced Documents

Crediting the inferences for which Levona argues, the newly-produced documents put the lie to Eletson's suggestion that these documents would be irrelevant.  The documents are highly relevant both to the arbitration and to the proceedings before this Court.  They tend to show fraud in the arbitration proceeding.  As it turns out, Levona was not just blustering.

The newly-produced documents include a July 25, 2022 email from Marina Orfanoudaki, Corp's Group Financial Controller, to Kanelos concerning the "Buyout of Murchinson."  Dkt. No. 127-4.  The communication addresses the financing necessary to fund the repayment of the loan and to purchase the Murchinson partnership share.  *Id.*  The email reflects that Eletson was considering purchasing the Preferred Interests of Levona for $36.2 million—far in excess of the amount under the BOL if the Purchase Option had been exercised in March 2022.  *Id.*  The documents also include (1) a second July 25, 2022 email also from the Group Financial Controller describing the procedures for a Murchinson buyout and containing an updated cashflow model, Dkt. No. 127-5; (2) an August 12, 2022 email from Kanelos to Kertsikoff with the subject line "Investor Model for Murchinson Buyout" that contemplated an additional $12.5 million to be used "in negotiations with Murchinson for acquisition of preferred shares," in

addition to $23 million net sale proceeds from the sale of the vessels "to be applied towards Murchinson," Dkt. No. 127-8; (3) an August 18, 2022 email from Corp's Treasury and Corporate Finance Manager to Kanelos containing a "revised model" that contemplated that Eletson would repay the working capital facility and provide $23 million from the sale of the two vessels and a residual $2.2 million from other funding for the Murchinson's Exit Payment, Dkt. No. 127-9; and (4) a detailed model sent by Eletson's CFO, and copying Kertsikoff, to financial advisory firm Castalia Partners and to an individual at private equity firm Austen Grove Capital, for a minority investment in Eletson Gas that contains an entry for "Murchinson's Exit Payment" that contemplates repayment of the working capital, $23 million from the sale of the vessels and a residual amount of $2.2 million, Dkt. No. 137-1 at 7.  The documents also refer to an August 13 engagement letter between Kertsikoff and Castalia Partners "in regards to capital raising for Eletson Gas."  Dkt. No. 137-1 at 5.

The story that Eletson told, which was accepted by the arbitrator, was that by March 2022, Eletson had already bought out Murchinson's Preferred Interests and all that remained was the repayment of the working capital.  In that version of events, there would have been no need after March 2022 for Eletson to raise money for the purchase of the Preferred Interests or for Eletson to have sold the vessels.  Eletson already had the Preferred Interests and Levona had the right to the vessels, which it obtained in exchange for the Preferred Interests.

According to the documents which Eletson was compelled to produce during the bankruptcy proceeding, the story told by Eletson to the arbitrator was untrue.  As late as August 2022, after Eletson had filed the arbitration, Eletson was trying to raise funds in order to purchase the Preferred Interests and was contemplating that it would have to pay more for those interests than contemplated under the Purchase Option.  And unlike the email the arbitrator

considered during the arbitration, not all of these emails were written by the bribed Kanelos. It is easy to imagine that an arbitrator, confronted with these documents, would have reached a contrary decision to that reached by the arbitrator here and would have ruled for Levona on its counterclaims rather than for Eletson on its claims.

## PROCEDURAL HISTORY

On July 28, 2023, the arbitrator issued an interim award, and on August 15, 2023, the arbitrator issued a corrected interim award. Dkt. Nos. 67-55, 67-58.

On August 18, 2023, Eletson filed its petition to confirm what was then an interim arbitral award, which was ordered unsealed on September 13, 2023. Dkt. Nos. 1, 11, 14. On September 22, 2023, Levona moved to dismiss the Petition and cross-petitioned to vacate the arbitral award. Dkt. Nos. 28–31.

On October 6, 2023, Levona requested that this Court refer the confirmation/vacatur proceeding regarding the arbitral award to the bankruptcy court as related. Dkt. No. 34. Eletson objected to the motion. Dkt. No. 35.[7] The Court denied the motion and reconsideration, reasoning that, as the body with original jurisdiction of the Petition under the New York Convention and the Federal Arbitration Act, it was the proper entity to decide whether to confirm or vacate the arbitral award. Dkt. No. 136 at 13; *see also* Dkt. Nos. 36, 39.

On October 19, 2023, with leave from the Court, Eletson filed their Supplemental Amended Petition, which reflected that the arbitrator had rendered a Final Award. Dkt. Nos. 46–47. Levona amended its response and moved to dismiss the Amended Petition on October 24. Dkt. Nos. 48–51. One week later, Petitioners filed their reply in support of the Amended Petition and further opposition to Respondent's cross-petition to vacate. Dkt. Nos. 54–55. Respondent

---

[7] Levona filed a Related Case Statement on October 4, 2023. Dkt. No. 32.

filed its own reply in support of its motion to dismiss the Amended Petition on November 14, 2023. Dkt. Nos. 59–60.[8]

On February 9, 2024, the Court issued an Opinion and Order granting in part and denying in part Eletson's petition to confirm and granting in part and denying in part Levona's cross-petition to vacate the arbitral award. The Court denied confirmation of those parts of the award that purported to provide relief: 1) against Murchinson and Pach Shemen (affiliates of Levona), 2) based upon violations of the status quo injunction issued by the arbitrator, and 3) of attorneys' fees related to the involuntary bankruptcy petition and other related litigation between the parties. Dkt. No. 83 at 123–24. The parties submitted proposed judgments on February 23, 2024. Dkt. Nos. 94, 96. The Court issued an Amended Opinion and Order correcting typographical errors on April 19, 2024. Dkt. Nos. 104–105.

Also on April 19, 2024, the Court issued a Memorandum and Order accepting Eletson's suggestion and remanding the Award to the arbitrator for further clarification regarding the relationship between the arbitrator's punitive damages award and his finding that the status quo injunction was violated. Dkt. No. 106.[9]

---

[8] On November 15, the Court held a conference, at which it instructed the parties to each submit statements of undisputed fact pursuant to Federal Rule of Civil Procedure 56.1. That same day, Petitioners filed a Corrected Amended and Supplemental Petition to Confirm the Arbitral Award, reflecting that Petitioners sought only confirmation and not enforcement of the Award. Dkt. No. 62. Petitioners and Respondent filed their respective statements and corresponding exhibits over the following 45 days. Dkt. Nos. 65–68. On January 2, 2024, the Court held oral argument on the Petition. The Court received supplemental letter briefs on January 5, 2024. Dkt. Nos. 73, 74. By letter motion on January 11, 2024, Respondent moved to amend its motion to vacate the Award and for discovery. Dkt. No. 75. After hearing oral argument, the Court denied that motion by memorandum and order dated January 23, 2024 because Levona could have raised the arguments it made there during the arbitration itself or had otherwise waived them. Dkt. No. 80.
[9] Levona moved for reconsideration of the Court's remand order. Dkt. No. 107. On June 12, 2024, the Court granted in part and denied in part Levona's motion for reconsideration and clarified the question it was remanding to the arbitrator, explaining that the remand was meant to limit the arbitrator to the question of identification of what portion of the lump-sum punitive

On July 3, 2024, Levona filed the current motion for leave to file an amended answer to the operative petition. Dkt. No. 123. Eletson opposed the motion on July 23, 2024. Dkt. No. 147. Levona filed a reply memorandum of law on July 30, 2024. Dkt. No. 149.[10]

No judgment has issued in this case.

The Court announced its decision from the bench on September 3, 2024. This Opinion and Order explains the Court's reasoning.

## DISCUSSION

Eletson opposes Levona's amendment principally on the grounds that it is time-barred. Dkt. No. 147 at 18–24. Section 12 of the FAA provides that "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. The Corrected Interim Award was issued on August 15, 2023, but the Final Award was issued on September 29, 2023. Dkt. Nos. 67-55; 67-58. Accordingly, the three months under the FAA expired on December 29, 2023. Levona responds that the three-month period does not apply because: (1) the time limit does not apply to affirmative defenses under the New York Convention, Dkt. No. 149 at 5; (2) the amendment relates back to the date of the filing of Levona's original motion to vacate on September 22, 2023, under Federal Rule of Civil Procedure 15, *id.* at 5–7, Dkt. No. 138 at 23; and (3) equitable tolling applies in all events, Dkt. No. 149 at 7–9. According to Eletson, neither

---

damages award, if any, was based upon the conduct violating the injunction. Dkt. No. 121.
[10] On August 22, 2024, the Court raised that Levona had argued that amendment was proper under Federal Rule of Civil Procedure 15, but that Eletson had responded that Rule 15 applies only to pleadings, not motions, and vacatur of an arbitration award is available only by motion. Dkt. No. 152. The Court noted that the Second Circuit has found Rule 15 applicable to motions made by a prisoner in federal custody to vacate, set aside or correct his sentence under 28 U.S.C. § 2255, despite the fact that such proceedings are by motion and are not "pleadings," and issued an Order directing the parties to submit letter briefs on this issue. *Id.* Both parties submitted briefs on August 28, 2024. *See* Dkt. Nos. 156, 157.

Federal Rule of Civil Procedure 15 nor equitable tolling are available to extend the three-month time frame for motions to vacate arbitral awards set forth in 9 U.S.C. § 12 or allow Levona to amend its motion after the three-month period has expired.  Eletson further argues that even if equitable tolling or Rule 15 were procedurally available here, Levona has not satisfied the requisite standards to permit its proposed amendment under either framework.[11]

## I.    Equitable Tolling

Levona argues that the time-limit for filing the amended motion was equitably tolled because it acted with diligence in pursuing its claim of fraud and extraordinary circumstances prevented it from filing earlier.  Eletson resists that conclusion on the grounds that (1) equitable tolling is not permissible under the FAA; and (2) Levona has not established a basis for equitable tolling.  Levona has the better of the argument.

### A.    The FAA Does Not Foreclose Equitable Tolling

"Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity."  *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023) (citing *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000)).  It is "a background principle against which Congress drafts limitation periods."  *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 209 (2022).  Congress need not explicitly state that a statutory time limit can be equitably tolled for a court to conclude that the statute is subject to equitable tolling.  *See Holland v. Florida*, 560 U.S. 631, 647 (2010).  The Supreme Court has long presumed that in federal statutes, "nonjurisdictional deadlines can be equitably tolled."  *Boechler*, 596 U.S. at 209;

---

[11] Levona's argument that the FAA's three-month time limit applies only to motions to vacate and not to affirmative defenses under the New York Convention is not fully developed in the parties' briefing.  Because the Court is permitting Levona to amend, the Court does not discuss that argument.  The Court's permission for Levona to amend is without prejudice to Eletson moving to dismiss or otherwise contesting any affirmative defenses.

*see also Holland*, 560 U.S. at 645–46 (2010) ("We have previously made clear that a nonjurisdictional federal statute of limitations is normally subject to a rebuttable presumption in favor of equitable tolling." (internal citation and quotations omitted)); *Young v. United States,* 535 U.S. 43, 49 (2002); *Rotella v. Wood*, 528 U.S. 549, 561 (2000); *John R. Sand & Gravel Co. v. U.S.*, 552 U.S. 130, 133 (2008); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96 (1990). In determining whether a statute is subject to equitable tolling, the court considers whether the statute at issue "(1) set[s] forth its time limitations in unusually emphatic form"; (2) uses "highly detailed" and "technical" language "that, linguistically speaking, cannot easily be read as containing implicit exceptions"; (3) "reiterate[s] its limitations several times in several different ways"; (4) relates to an "underlying subject matter . . . with respect to which the practical consequences of permitting tolling would [be] substantial"; and (5) "would, if tolled, require tolling, not only procedural limitations, but also substantive limitations on the amount of recovery." *Holland*, 560 U.S. at 646–47 (internal citation and quotations omitted).

The Supreme Court has found the presumption of equitable tolling to be rebutted in only few circumstances.  In *United States v. Brockamp*, 519 U.S. 347 (1997), the Court found that "several distinctive features of that statutory deadline," *Boechler*, 596 U.S. at 209, sufficed to rebut the presumption in favor of equitable tolling.  The tax statute there set forth its time limitations in unusually emphatic form, in detailed and technical language, and reiterated those limitations several times. *Brockamp*, 519 U.S. at 350–52.  Moreover, applying equitable tolling would have required tolling substantive limitations on the amount of recovery available.  *Id*. "The 'nature of the underlying subject matter—tax collection—underscore[d] the linguistic point' . . . because of the 'administrative problem' of allowing equitable tolling when the 'IRS processe[d] more than 200 million tax returns' and 'issue[d] more than 90 million refunds' each

year." *Boechler*, 596 U.S. at 209–10 (quoting *Brockamp*, 519 U.S. at 352).  In *United States v. Beggerly*, 524 U.S. 38, 48–49 (1998), the presumption was rebutted because the statute effectively already provided for equitable tolling by stating that the limitations period would not begin to run until the plaintiff knew or should have known about the relevant claim, and because it was already unusually generous in providing twelve years from the point of that knowledge. 524 U.S. at 48–49.

The FAA contains none of the features that the Supreme Court has found sufficient to rebut the presumption in favor of equitable tolling.  The language used to set forth the time period is neither particularly emphatic nor highly technical—Section 12 provides that notice of a motion to vacate "must be served upon the adverse party or his attorney within three months after the award is filed or delivered."  9 U.S.C. § 12.  Save for the use of the word "motion" instead of "complaint," the language is indistinguishable from that customarily used for statutes of limitations.  *See, e.g.*, N.Y. C.P.L.R. § 213 (describing types of actions that "must be commenced within six years"); 5 U.S.C. § 7703 (describing cases that "must be filed within 30 days"); 28 U.S.C. § 2244 ("A 1-year period of limitation shall apply […]").  The word "must" is less emphatic than the language of the Federal Tort Claims Act ("FTCA"), which states that claims are "forever barred" after a certain time period, and yet the Supreme Court has found the FTCA subject to equitable tolling.  *See U.S. v. Wong*, 575 U.S. 402, 420 (2015).

The three-month limitation is not unusually generous.  In *Beggerly*, the court found that the presumption in favor of equitable tolling was rebutted because Congress already provided a twelve-year limitations period for quiet title actions and a further extension of the limitations period "would throw a cloud of uncertainty" over land rights incompatible with the Quiet Title Act.  *Beggerly*, 524 U.S. at 48–49.  The three-month limitations period is one of the shortest, if

not the shortest, in the federal code; there is nothing about it that suggests Congress intended to preclude equitable tolling.  The limitation is also not repeated elsewhere in the FAA.

Finally, allowing tolling in the limited circumstances in which the bar for tolling is met would not have significant practical consequences nor would it require tolling substantive limitations on the amount of recovery.  Eletson hints that equitable tolling is inconsistent with the "expedited and summary" nature of proceedings under the FAA. Dkt.  No. 147 at 1; *see also* Dkt. No. 153 (arguing that confirmation of an award is intended to be expedited).  That argument misunderstands the expedited nature of proceedings under the FAA.

The requirement that applications to vacate an arbitration award be made by motion is "important, for the nature of the proceeding affects the burdens of the various parties as well as the rule of decision to be applied by the district court." *O.R. Sec., Inc. v. Pro. Plan. Assocs., Inc.*, 857 F.2d 742, 745 (11th Cir. 1988).  If "the application to vacate the award may be brought in the form of a complaint, then the burden of dismissing the complaint would be on the party defending the arbitration award [and] [t]he defending party would be forced to show that the movant could not prove any facts that would entitle him to relief from the arbitration award." *Id.* "If the defending party did not prevail on its motion to dismiss, the proceeding to vacate the arbitration award would develop into full scale litigation, with the attendant discovery, motions, and perhaps trial." *Id.*  The fact that the action is initiated by way of motion ensures that it will be adjudicated in a more summary fashion.

However, the provision that the FAA makes for confirmation of an award and the summary nature of that proceeding is what suffices to protect settled expectations and to do so on a summary basis.  It is black letter law that until an arbitration award is confirmed, the prevailing party has a mere contract right.  *See Trustees of N.Y. State Nurses Assoc. Pension Plan v. White*

*Oak Global Advisors, LLC*, 102 F.4th 572, 595–96 (2d Cir. 2024) ("[A]n award has legal force only because the parties have elsewhere promised to be bound by it."); *Stafford v. Int'l Business Machines Corp.*, 78 F.4th 62, 68 (2d Cir. 2023) ("An unconfirmed award is a contract right . . . "). The losing party may disregard the award subject only to a claim for breach of contract. In an action for breach of contract, it would have available to it the full range of contract defenses. An innovation of the FAA is that a party may bring an action to confirm the award under Section 9 even if the other side has not yet failed to comply, allowing the party to convert its arbitration award into a judgment in an expedited and summary manner. *See LiveWire Ergogenics, Inc. v. JS Barkats PLLC*, 645 F. Supp. 3d 290, 297 (S.D.N.Y. 2002) ("'[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'") (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)); *cf. Fotochrome, Inc. v. Copal Co.*, Ltd., 517 F.2d 512, 516 ("The [arbitration] award itself is inchoate until enforced by judgment.").

Thus, the expedited and summary nature of FAA proceedings is not inconsistent with, but rather is consistent with, applying equitable tolling to motions to vacate. A party wishing to avoid a plenary action for breach of contract, and wishing to avoid the risk of the application of equitable tolling to a claim that an award was procured by fraud, may do so, but it must do so through an application to confirm. In that way, the award, now reduced to a judgment, may be upset, only—and if at all—by a Rule 60 motion for relief from the judgment. *But see Arrowood Indem. Co. v. Equitas Ins. Ltd.*, 2015 WL 2258260, at *3–4 (S.D.N.Y. May 14, 2015) (holding that a Rule 60(b)(3) motion seeking relief from a final judgment confirming an arbitration award was an improper means to address alleged fraud that had occurred during the arbitration itself).[12]

---

[12] Rule 60's time limits have been interpreted strictly and the Circuit Courts that have considered

The Court need not read into the Section 12 right to move to vacate a limitation against the application of equitable estoppel.  The work is done by the effect of a successful motion to confirm. To the extent Eletson argues that recognition of equitable tolling disturbs settled expectations and exposes the prevailing party to the risk that an award could be upset for an indeterminate time into the future, it expresses an understandable concern but it offers the wrong answer.  The answer is not that the person who is a victim of a fraud on the arbitrator and then confronted with exceptional circumstances that prevent it from discovering that fraud must remain silent in the face of efforts to enforce the award.  The answer is that the party who wishes to cut off the right to equitable tolling can do so through a successful application to confirm.

As the Ninth Circuit has observed, despite the FAA's interest in swift and limited judicial review of arbitral awards, "the arbitral process will not be disrupted if parties are permitted to satisfy the high bar of equitable tolling in limited circumstances."  *See Move, Inc. v. Citigroup Global Markets, Inc.*, 840 F.3d 1152, 1155 (9th Cir. 2016).

Eletson additionally argues that equitable tolling does not apply because the FAA's limitations period is "jurisdictional."  *See* Dkt. No. 147 at 19.  However, the courts "treat a procedural requirement as jurisdictional only if Congress 'clearly states' that it is."  *Boechler*, 596 U.S. at 203 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006)).  Although Congress need not "incant magic words," *Auburn*, 568 U.S. at 153, the "traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences," *id.* at 203–04 (quoting *Wong*, 575 U.S. at 410).  It is not sufficient that a time bar

---

the issue have generally found that Rule 60 does not itself allow for equitable tolling.  *See, e.g.*, *United States v. Williams*, 56 F.4th 366, 368 (4th Cir. 2023); *In re Cook Med., Inc.*, 27 F.4th 539, 543 (7th Cir. 2022); *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1277 (10th Cir. 2019); *see also Warren v. Garvin*, 219 F.3d at 114 (describing Rule 60(b)'s time limit as "absolute"); *Beggerly*, 524 U.S. at 46 (describing Rule 60(b)'s time limitation as "strict").

is mandatory and emphatic. *Wong*, 575 U.S. at 411; *see also Harrow v. Dep't of Def.*, 601 U.S. 480, 485 (2024). And "most time bars are nonjurisdictional." *Wong*, 575 U.S. at 410. The Supreme Court has clarified that "what matters . . . is whether a time bar speaks to a court's authority to hear a case." *Harrow*, 601 U.S. at 485. Here, as in *Harrow*, Section 12 of the FAA makes no mention of the court's authority to hear the case nor is it a statute the Supreme Court has previously defined as jurisdictional. *Compare John R. Sand & Gravel*, 552 U.S. at 132, 137. Nor does the FAA fall under the "exception" to the general presumption of the availability of equitable tolling for statutes that involve an appeal from one Article III court to another. *Id*. at 489 (citing *Bowles v. Russell*, 551 U.S. 205 (2007)). And as described above, there is nothing in the text, structure, or purpose of the FAA that would indicate Congress intended the time limit not to be subject to equitable tolling.

Eletson also suggests that the Second Circuit in *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, has foreclosed the Court from applying principles of equitable tolling. Eletson relies on the language from *Florasynth* that:

> [T]here is no common law exception to the three month limitations period on the motion to vacate . . . The action to enforce an arbitration award is a creature of statute and was unknown in the common law [and] [i]t is settled that where by statute a right of action is given which did not exist by the common law, and the statute giving the right fixes the time period within which the right may be enforced, the time so fixed becomes a limitation on that right.

*Florasynth*, 750 F.2d at 175; *see* Dkt. No. 147 at 18–19. Several courts in this District have held based on *Florasynth* that equitable tolling is not permissible under the FAA. *See Milberg LLP v. HWB*, 2020 WL 3833829, *4 (S.D.N.Y. July 8, 2020), *aff'd sub nom. Milberg, LLP v. Drawrah Ltd.*, 844 F. App'x 397 (2d Cir. 2021); *Marshak v. Original Drifters, Inc.*, 2020 WL 1151564, *6 (S.D.N.Y. Mar. 9, 2020); *Triomphe Partners, Inc. v. Realogy Corp.*, 2011 WL 3586161, *3 (S.D.N.Y. Aug. 15, 2011).

The Court respectfully disagrees.  The Second Circuit has not itself understood *Florasynth* as deciding the question whether equitable tolling is permissible under the FAA.  In *Milberg*, in 2021, the Second Circuit explicitly left open the question "whether there are any exceptions to the rule of strict compliance with the FAA's three-month deadline," 844 F. App'x at 400, a statement that would be incomprehensible if *Florasynth* had already decided the question for the court.  In fact, the question in *Florasynth* was far different from that presented here.  *Florasynth* addressed the question of whether, notwithstanding the explicit three-month time period in the FAA, a motion to vacate an arbitral award could be brought as an affirmative defense to an application to confirm an arbitral award brought within the one-year period for such actions.  750 F.2d at 175.  The court held that the longer limitations period did not apply.  The Circuit considered Congress's decision to impose a three-month period for motions to vacate an award and a one-year period for an application to confirm an award.  "When the three month limitation period has run without vacation of the arbitration award, the successful party has a right to assume the award is valid and untainted, and to obtain its confirmation in a summary proceeding."  *Id.* at 177.  That right, and "the mechanism for speedy dispute resolution" that is carried with it, would be frustrated if, after a party with grounds to move to vacate an award sits on its right to do so, it suddenly invokes the basis for vacatur only after an application to confirm is made.  *Florasynth*, 750 F.2d at 176.  Indeed, the cases cited by the Circuit in support of the proposition that "there is no common law exception to the three month limitations period on the motion to vacate," *Id.* at 175 (citing *Chauffers Local 364 v. Ruan Transportation Corp.*, 473 F. Supp. 298, 302 (N.D. Ind. 1979) and *Chauffers Local 135 v. Jefferson Trucking Co.*, 628 F.2d 1023, 1027 (7th Cir. 1980)), both addressed the question whether a motion to vacate could be brought as an affirmative defense to an application to confirm after the three-month time period

for motions to vacate had expired.  The court in *Florasynth* said nothing about whether the assumption of validity that would apply to an award if no motion to vacate is made within three months could be overcome if, notwithstanding the efforts made by the losing party in an arbitration to challenge the award, some extraordinary circumstance stood in its way.  *See Bartlett v. Baasiri*, 81 F.4th 28, 35 (2d Cir. 2023) ("[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.").

Finally, the only two Circuits to have considered whether the FAA permits equitable tolling in a published opinion after *Holland* have concluded that it does.  *See Move, Inc.*, 840 F.3d at 1155; *Nuvasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 877 (11th Cir. 2023).[13]  In *Move, Inc.*, the Ninth Circuit concluded that none of the *Holland* factors weighed in favor of foreclosing equitable tolling under the FAA and that equitable tolling would not undermine the FAA's purposes.  *Move*, 840 F.3d at 1157.  The Ninth Circuit explained that the FAA's text did not foreclose equitable tolling under *Holland* because the three-month limitation period was not unusually generous or unusually emphatic, nor was it detailed, technical, or reiterated elsewhere in the statute.  *Id.*  Further, the Ninth Circuit noted that the FAA was enacted to "make valid and enforceable written provisions or agreements for arbitration of disputes," and "reflects the national policy favoring arbitration with just the limited review necessary to maintain finality in

---

[13] The Fifth Circuit has held in an unpublished opinion that there is no equitable tolling available with respect to the three-month time limit in Section 12 of the FAA.  *See Cigna Ins. Co. v. Huddleston*, 1993 WL 58742, at *11 (5th Cir. Feb. 16, 1993).  The Fourth Circuit has assumed for the sake of argument that a tolling exception might be applicable to the FAA's three-month bar, although it has observed that the assumption is "questionable."  *See Choice Hotels*, 491 F.3d 171, 177 n.6 (4th Cir. 2007) (citing *Taylor v. Nelson*, 788 F.2d 220, 225 (4th Cir. 1986)).  Both cases predated *Holland*.

arbitral proceedings," but explained that the "general pro-arbitration policy relies on the assumption that the forum is fair" and the limited grounds for review are still designed to serve due process.  *Id*. at 1157–58.  Thus, the Ninth Circuit concluded that the FAA would not be undermined by balancing the needs for finality and due process by allowing parties to satisfy the high bar of equitable tolling in limited circumstances, which will "enhance the accuracy and fairness of arbitral outcomes."  *Id*. at 1158.  The Eleventh Circuit adopted the same reasoning as the Ninth Circuit, and added that there was no indication that the limitations period in the FAA was jurisdictional because there was no clear intent from Congress to make it jurisdictional.  *Nuvasive*, 71 F.4th at 874–75.

This Court agrees.

### B.    Application of Equitable Tolling

Eletson further argues that the conditions for equitable tolling have not been satisfied.  Levona argues that it diligently pursued its rights and was unable to present the evidence of Eletson's fraud to the Court only because Eletson concealed that fraud, failed to produce relevant, responsive documents to Levona or the arbitral tribunal, and then repeatedly imposed roadblocks to Levona's ability to access the documents when they were produced in the Bankruptcy Proceedings.

A statute of limitations is equitably tolled only when the party seeking to avoid its effect shows that it has been pursuing its rights diligently and some extraordinary circumstance stood in his way to prevent timely filing.  *Holland*, 560 U.S. at 649; *see also A.Q.C. ex rel. Castillo v. U.S.*, 656 F.3d 135, 144 (2d Cir. 2011) (equitable tolling is a drastic remedy applicable only in rare and exceptional circumstances).  "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period."  *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011).  The term

"extraordinary circumstances" thus is not easily defined or limited.  A wide variety of circumstances can be "extraordinary" and where the plaintiff has exercised due diligence, can excuse timely filing, ranging from "medical conditions," *Harper*, 648 F.3d at 137, to the state court's prolonged delay in notifying the petitioner of the facts triggering the right to seek federal relief, *see Favourite v. Colvin*, 758 Fed. App'x 68, 70 (2d Cir. 2018), to the concealment by the defendant of the plaintiff's cause of action, *see State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083–85 (2d Cir. 1988); *Sykes v. Mel Harris and Assocs., LLC*, 757 F. Supp. 2d 413, 422 (S.D.N.Y. 2010).

With respect to diligence, a party must act "as diligently as reasonably could have been expected *under the circumstances*" and "*throughout the period he seeks to toll*."  *Harper*, 648 F.3d at 139 (internal citations omitted) (emphases in original).  For instance, reasonable diligence means that a party did not inexplicably wait to investigate.  *See, e.g.*, *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (no equitable tolling where plaintiff could have begun investigation sooner).  Equitable tolling means that a time bar is suspended and then begins to run again upon a later event and the time remaining is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped.  *Harper*, 648 F.3d at 139–40.

To withstand a motion to dismiss based on a statute of limitations where the lapse of the limitations period is apparent on its face, a plaintiff need only plead facts plausibly suggesting equitable tolling should apply.  *Roeder v. JP Morgan Chase*, 523 F. Supp. 3d 601, 618 (S.D.N.Y. 2021); *Edner v. NYCTA-MTA*, 134 F. Supp. 3d 657, 666 (E.D.N.Y. 2015); *cf. Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015).  "Equitable tolling often raises fact-specific issues premature for resolution" on the pleadings.  *Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023).  Where the district court is "the ultimate factfinder on the issue of equitable tolling," it is

appropriate for the court to hold an evidentiary hearing after discovery to "weig[h] competing inferences or resolv[e] contested factual issues." *Id.* at 95–96.[14]

Establishing "extraordinary circumstances" to warrant equitable tolling under the FAA is not a low bar. To establish a basis to vacate an award on grounds that it was "procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), the movant must show "that (1) respondent engaged in fraudulent activity; (2) even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the fraud materially related to an issue in the arbitration." *Odeon Cap. Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017). Thus, it is not sufficient to invoke equitable tolling that the respondent engaged in fraudulent activity that materially affected the award. That showing would be necessary in every case in which a movant seeks relief under Section 10(a)(1), making the three-month time limit for motions based on Section 10(a)(1) largely illusory. On the other hand, one of the purposes of equitable tolling is not to reward a party who intentionally frustrates the ability of its adversary to timely make a claim. *See Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir. 1990) ("The doctrine [of equitable tolling] was developed to address situations in which fraudulent or other conduct concealed the existence of a claim."); *see also Hendrickson Bros.*, 840 F.2d at 1083 ("The doctrine of fraudulent concealment was designed to prevent a party from concealing a fraud, or  committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it."

---

[14] Courts have permitted discovery before determining whether equitable tolling might apply. *See, e.g.*, *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 483 (E.D.N.Y. 2011) (declining to rule on equitable tolling because it was too earlier to make factual findings about the defendant's conduct or whether plaintiff had enough information earlier to commence its lawsuit); see also *Barrett v. U.S.*, 689 F.2d 324, 330 (2d Cir. 1982) (summary judgment on the basis of a statute of limitations was precluded where factual issues existed as to the extent of the defendant's concealment and the diligence exercised by the plaintiff).

(internal citations omitted)).  It would undermine a central and historical function of equitable tolling if the doctrine did not apply where the defendant engaged in efforts to conceal its own wrongdoing frustrating its adversary's right to bring a timely claim.

Levona has identified sufficient facts to establish at this stage both an extraordinary circumstance and due diligence.  Levona argues that Eletson committed fraud during the arbitral proceeding when it withheld critical evidence on the pivotal issue in that proceeding, that its principal lied under oath about the facts to which that evidence related, and that it then constructed extraordinary barriers to prevent Levona from uncovering the evidence of that fraud until after the limitations period for moving to vacate had expired.  Dkt. No. 136 at 20, 26; Dkt. No. 149 at 13–14.  In particular, during the arbitration, when Levona presented evidence that the Purchase Option had not been exercised in the form of a July 13 email where Eletson CFO Kanelos sent a "buyout proposal," Eletson lied about it.  Dkt. No. 136 at 7; *see also* Dkt. No 67-58 at 40, 45–46 n.6.  Eletson claimed that this email related to the Murchinson exit in terms of the loan repayment and did not suggest that the Purchase Option had not been exercised.  *See* Dkt. No. 147 at 10–13.  Eletson also withheld the documents necessary to establish that the Purchase Option had not been exercised and that Eletson principal and witness Vassily Kertsikoff had lied.  Eletson did this even though it was meant to engage in "voluntary and informal exchange of all non-privileged documents and other information . . . relevant to the dispute or claim," JAMS Rule 17(a), and it had agreed to produce all documents responsive to Levona's request for  "[a]ny communications and/or documents related to Eletson's preparation of, negotiations to, and/or related to the final offer of the 'Murchinson Buyout Steps,'" Dkt. No. 136 at 10–11.

Eletson constructed extraordinary obstacles to prevent Levona from uncovering its fraud. Levona time and again asked for the documents that might show that Eletson had withheld material evidence from the arbitrator. And Eletson time and again engaged in efforts to frustrate Levona from obtaining that evidence. It initially argued that Levona was not entitled to the documents because it was not a party to the Bankruptcy Proceedings. When Levona submitted a claim in the Bankruptcy Proceeding and signed the Protective Order, which would enable it to receive the documents that had been produced in that matter, Eletson then raised an objection to Levona's right to participate as a creditor. It objected to Levona viewing the documents and objected to the production of additional documents. It objected to Levona presenting the documents to this Court. Throughout the proceedings, it made threats that Levona was in breach of the Protective Order and that it would be in further breach of that order (and subject to sanctions) if it revealed the contents of the documents to this Court. *See* Dkt. No. 67-52; Dkt. No. 127-16 at 41. Throughout, it also made meritless and arguably frivolous arguments that the documents were not relevant to these proceedings. While Eletson was urging this Court to speed its efforts to confirm the arbitral award, it engaged in a process of stalling and delay in the Bankruptcy Court, repeatedly frustrating Levona's attempts to view the additional documents and objecting at every turn both before and after the Award was issued and before and after Levona filed a claim in the Bankruptcy Proceeding.

Eletson suggests that Levona did not need the ultimately six withheld documents that Levona now raises to bring a claim to vacate the award based on fraud. Dkt. No. 147 at 14, 25–26. According to Eletson, Levona was aware of the possibility that the award was infected by fraud but negligently failed to bring a claim of fraud until after the Court had ruled on its initial motion to vacate. But that suggestion is fatuous. The evidence supports that Levona did not

bring a claim for fraud because based on Eletson's actions it was prevented from doing so. From July 2023—when Levona first learned that there was at least one document produced in the bankruptcy court that was relevant and responsive in the arbitration but had not been produced in the arbitration—until March 2024, Levona fought to get access to the documents. During this time, Levona only had its affiliate's view that the documents were relevant and critical to the arbitration, not access to the documents or their content or the right to see or use them. From March 2024 until June 2024, Levona—now armed with knowledge of what was in the documents—fought for relief from the Protective Order so that they could present the documents to this Court. Absent such relief, it arguably would have been in contempt for disclosing the documents to the Court. Dkt. No. 127-34 ¶ 22. By the terms of the Protective Order, Levona would have been required to destroy the documents upon the conclusion of the bankruptcy. *Id.* ¶¶ 27-28. Eletson fought tooth and nail to prevent Levona from obtaining relief from the Protective Order.

To be sure, Levona was aware as early as July 2023 that evidence might exist that would show that there was a fraud. But the law does not require, and might not even permit, a party to bring a claim for fraud when it has some inkling that there might be a fraud. The allegation must have "evidentiary support" or be one that is likely to have evidentiary support. Fed. R. Civ. P. 11(b)(3). Levona does not merely claim that Eletson concealed information that would have made Levona's case to vacate the arbitral award based on fraud stronger. Levona had no basis to vacate the arbitral award based on fraud until it learned of Eletson's alleged fraud. In this way, Levona is correct to point out that while it may have had a recording that was corroborative of the evidence Levona ultimately uncovered that Eletson allegedly fraudulently withheld during

the arbitration, that has no bearing on whether Levona knew that Eletson committed fraud during the arbitration. *See* Dkt. No. 149 at 13.[15]

Finally, Levona was reasonably diligent. Diligence and extraordinary circumstances are related in that a plaintiff's pursuit of their claims with reasonable diligence establishes the causal link between the extraordinary circumstances and the late filing. *See Li by Musso v. Multicultural Radio Broadcasting, Inc.*, 2023 WL 7902890, at *4 (S.D.N.Y. Nov. 16, 2023) (citing *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)). Unlike cases in which there is an inexplicable delay between the end of the extraordinary circumstances and the late filing, *see, e.g.*, *Hizbullahankhamon v. Walker*, 255 F.3d 65, 76 (2d Cir. 2001), Levona here vigorously and without interruption pursued the newly-produced documents and filed its motion to amend approximately two weeks after the bankruptcy court ruled that the Protective Order was modified to permit Levona to use the documents in this Court. Dkt. No. 136 at 15. As discussed above, Levona fought for a year across multiple tribunals to get access to the documents and permission to use them here. It is not clear what more Levona could have done save move to amend based on evidence it either did not have or could not lawfully use. It was in fact Eletson's efforts to oppose Levona's receipt and use of the documents that prevented Levona from filing any earlier. The extraordinary circumstances caused Levona's late motion and Levona filed its motion as soon as those circumstances lifted.

---

[15] The court in *Montomgery v. West*, 2023 WL 2975723, at *3–4 (D. Nevada Apr. 17, 2023), *aff'd* 2024 WL 2843637 (9th Cir. June 5, 2024) considered a similar argument that a protective order in another case prevented the plaintiff from timely filing. The court rejected that argument because the plaintiff had, in fact, used the information purportedly subject to the "gag order" in other, related civil litigation. However, no similar circumstances are present here to suggest that Levona could have gotten around the Protective Order. To the contrary, Levona engaged in persistent efforts to be able to present the documents to this Court despite Eletson's strenuous objections. Dkt. No. 136 at 12–16.

## II.     Rule 15

Levona argues as an alternative ground that its motion to vacate can be amended pursuant to Federal Rule of Civil Procedure 15.  For its part, Eletson argues that Levona's motion to vacate is not a pleading and therefore Federal Rule of Civil Procedure 15, which applies only to pleadings, is inapplicable, that the amendment does not relate back to the date of the filing of the original motion, and that the conditions for amendment under Rule 15 have not been satisfied.  Dkt. No. 147 at 22–31.  The Court's ruling on equitable tolling makes it unnecessary for the Court to rule definitively on this alternative ground at this stage.  For purposes of completeness, the Court nonetheless addresses the arguments of the parties.

### A.     Applicability of Rule 15 to FAA Motions to Vacate

The Second Circuit has not explicitly addressed whether Rule 15 applies to a motion to vacate an arbitral award under the FAA.  However, a panel of the Second Circuit has expressed "doubt" that "the generous Rule 15(a) standards for amending pleadings" apply to a "motion to vacate the arbitration award, which . . . is not a pleading."  *Loch View LLC v. Seneca Ins. Co. Inc.*, No. 21-1008, 2022 WL 1210664, at *2 (2d Cir. Apr. 25, 2022).

By contrast, the Eleventh Circuit has held that Rule 15 applies to motions to vacate an arbitral award, despite the fact that there are no "pleadings."  *See Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378 (11th Cir. 1988); *see* Dkt. No. 149 at 10–11; *see also* 94 Am. Jur. Trials 211, § 36 ("[I]f a motion for vacatur is timely filed and later amended . . . then that amendment—even though filed after the three month vacatur window has closed—relates back to . . . the original vacatur motion.").  Other courts have come to a contrary conclusion.  *See Chelmowski v. AT & T Mobility*, LLC, 615 Fed. App'x 380, 381 (7th Cir. 2015); *Indep. Lab. Emples. Union, Inc. v. ExxonMobil Research & Eng'g Co.*, 2019 WL 3416897, *7 (D.N.J. July 29, 2019), *aff'd*, 11 F.4th 210 (3d Cir. 2021)).

Although the question is close, the better view appears to be that Rule 15 does not apply to motions to vacate.

The Court interprets the Federal Rules of Civil Procedure and the FAA according to their plain language. *See In re Edelman*, 295 F.3d 171, 177 (2d Cir. 2000) ("When interpreting the meaning of a statute . . . the starting point of inquiry is of course the language of the statute itself.") (internal citations omitted); *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540 (1991) (federal rules of civil procedure are interpreted according to plain language).

The Federal Rules of Civil Procedure explicitly provide that they govern FAA proceedings "to the extent applicable [...] except as [the FAA] provide[s] other procedures." Fed. R. Civ. P. 81(a)(6)(B). The relevant Rule of Civil Procedure here is Rule 15, which provides that "[a] party may amend its pleading once as a matter of course" either within 21 days after serving it or after service of a responsive pleading or a motion under Rules 12(b), (e), or (f). Fed. R. Civ. P. 15. It otherwise provides for amendment with consent or the court's leave, which shall be granted freely "when justice so requires." Fed. R. Civ. P. 15.

By its terms, Rule 15 is limited to "pleadings." Federal Rule of Civil Procedure 7 distinguishes between pleadings and motions. Fed. R. Civ. P. 7. And a proceeding to vacate, modify, or correct an award under the FAA is commenced by motion. 9 U.S.C. § 12 ("Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."). It is not commenced by a pleading. *See Kruse v. Sands Bros. & Co.*, 226 F. Supp. 2d 484, 485 (S.D.N.Y. 2002) (a party seeking to vacate an arbitral award must proceed by motion). Moreover, Section 6 of the FAA

provides: "Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions."  9 U.S.C. § 6.

The Federal Rules of Civil Procedure "draw a clear and consistent distinction between pleadings and motions."  *ISC Holding AG v. Nobel Biocare Finance AG*, 688 F.3d 98, 112 (2d Cir. 2012).  "Rule 7(a) exhaustively enumerates the different 'pleadings' available under the civil rules; motions, not appearing in that enumeration, are discussed in Rule 7(b)."  *Id.*  Thus, the Second Circuit consistently has held that Federal Rules which, by their terms, contemplate a pleading, do not apply to "motions" or "applications" under the FAA.  In *ISC Holding*, the Circuit held that Federal Rule of Civil Procedure 41(a)(1)(A)(i) does not apply to petitions to compel arbitration under 9 U.S.C. §§ 4 and 206 because the federal rule presupposes an "answer," which can be filed only in response to a pleading and not in response to a motion.  *Id.* at 113.  The court cited with approval to its prior decision in *Productos Mercantiles E Industriales S.A. v. Faberge USA*, 23 F.3d 31, 36 (2d Cir. 1994), in which the court held that Rule 12(b)'s pleading requirements did not apply to a petition to modify and then confirm an arbitration award, as well as to the Eleventh Circuit's holding in *O.R. Sec., Inc.*, 857 F.2d 747, in which that court held that Rule 8's notice pleading requirements did not apply in a proceeding to vacate an arbitration award.  *ISC Holding*, 688 F.3d at 113.  In *D.H. Blair & Co. v. Gottdiener*, the court also stated that Federal Rule of Civil Procedure 55 "does not operate well in the context of a motion to confirm or vacate an arbitration award" because such proceeding is a motion "rather than a complaint initiating a plenary action."  462 F.3d 95, 107–08 (2d Cir. 2006).

*ISC Holding* and *Productos Mercantiles* suggest that Rule 15 does not apply to motions to vacate an arbitral award.  If such motions need not satisfy the pleading standards of Rule 8 because they are not pleadings and if they cannot be dismissed under Rule 41 because they do

not permit a responsive pleading, it would seem to follow that they also are not pleadings which can be amended under Rule 15. Thus, even assuming that the FAA did not provide other conflicting procedures for amendment, Rule 15 on its face would not be applicable to a motion to vacate.

Moreover, Rule 15 fits uncomfortably with Section 12 motions to vacate. Rule 15(a) provides that amendments may be made once as a matter of course 21 days after service of a responsive "pleading" or after service of a Rule 12 motion. However, the response to a motion to vacate is not a pleading or a Rule 12 motion. It is an opposition to the motion. More importantly, the notion of granting amendment "freely . . . when justice so requires" and the law under Rule 15(a)(2) sits uneasily with the objective under the FAA that arbitration awards be confirmed or vacated in an expedited manner. Courts routinely grant amendments in non-FAA cases absent a showing by nonmovant of prejudice or bad faith. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am.*, 626 F.3d 699, 725 (2d Cir. 2010) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." (internal quotation omitted)); *Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 28 (2d Cir. 1995) (amendments should normally be permitted). "Denial of leave to amend is disfavored," and a "liberal, pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)(2)." 3 Moore's Federal Practice § 15.14 (3d ed. 2024). Indeed, because the text of Rule 15 "unequivocally requires the court to grant leave to amend liberally, a court faces limits on its ability to deny leave to amend [and] denying leave may amount to an abuse of discretion." *Id*. Courts frequently grant amendment before there has been discovery and substantial resources devoted by the other side. *See, e.g.*, *Champion v. Kirkpatrick*, 2019 WL 4451255, at *3–4 (N.D.N.Y. Sept. 17, 2019) (amendment not unduly delayed or prejudicial

when it occurred early in the litigation before substantial discovery); *Fastiggi v. Waterview Hills Nursing Ctr., Inc.*, 6 F. Supp. 2d 242, 243 (S.D.N.Y. 1998) (same).  The delay caused by adjournment is not enough to show that the party opposing amendment will be prejudiced.  *See Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234–35 (2d Cir. 1995) (delay alone generally does not warrant denial).  If those notions were applied to FAA motions to vacate, amendments would be routine.

The Eleventh Circuit came to the contrary conclusion in *Bonar*.  The court concluded that Rule 15 could apply to motions to vacate a judgment because "although technically called a 'motion,' the papers filed by a party seeking to confirm or vacate an arbitration award function as initial pleadings in post-arbitration proceedings in the district court."  835 F.2d at 1382.  The court also concluded that "[s]ince the Arbitration Act provides only that notice of a motion to vacate, modify or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered, and contains no provisions governing amendments to timely motions, the Federal Rules of Civil Procedure apply to this issue."  *Id.*

*Bonar* has not been followed by any Circuit court.[16]  The court's conclusion in *Bonar* appears to have been driven by the nature of the amended claim in that case—that a witness committed perjury which could not have been detected with reasonable diligence during the arbitration—and by the view that the application of Rule 15 would not be inconsistent with the procedure under the FAA.  But the Eleventh Circuit's ruling in *Bonar*, if adopted here, could not be confined to claims of fraud that could not have been discovered during the arbitration.  It

---

[16] *Bonar* has been found persuasive only by several district courts.  *See, e.g.*, *BBVA Secs. of Puerto Rico v. Cintron*, 2012 WL 2002304, at *2 (D.P.R. June 4, 2012); *Passa v. City of Columbus*, 2008 WL 687168, at *6 (S.D. Ohio Mar. 11, 2008); *Riddle v. Wachovia Secs, LLC*, 2005 WL 8175938, at *2–3 (D. Neb. June 29, 2005).

would also extend to claims that the award should be vacated or amended on other grounds, including that there was evidence of partiality or corruption in any of the arbitrators, that the arbitrators improperly refused to postpone the hearing or to hear evidence pertinent and material to the controversy, or that they exceeded their powers, 9 U.S.C. § 10, or that there was an evident material miscalculation of figures or an evident material mistake in the award, 9 U.S.C. § 11. Under *Bonar*, a party seeking to vacate or correct an arbitral award arguably could add such new grounds to its application well after the three-month period provided for under the FAA so long as it satisfied the generous standards under Rule 15. Moreover, as set forth above, *supra* Section I, a construction of Rule 15 that would make a "motion" into a "pleading" is not necessary to capture those cases in which a party to an arbitration commits a fraud on the arbitrator and then conceals the evidence of the fraud from its adversary. Such cases would be captured by concepts of equitable tolling, so long as the motion is brought before the arbitration award is converted into a judgment through a motion to confirm.

Finally, Levona's concerns regarding judicial administration if a motion could not be amended through Rule 15, Dkt. No. 157 at 2–3, are also readily addressed. While the notice of motion filed within three months must contain all of the grounds upon which a party seeks an award vacating or correcting an award, Fed. R. Civ. Proc. 7(b) ("An application to the court for an order shall be made by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefore, and shall set forth the relief or order sought."), a foot fault will not doom an otherwise meritorious motion. A court has discretion to permit a party to elaborate on its grounds for vacatur, so long as those grounds are fairly encompassed within its timely-filed motion. *See* 2 Moore's Federal Practice §7.03[4][a] (3d ed. 2024) (particularity requirement in Rule 7 is flexible and has been interpreted liberally by

courts); *id*. at § 7.03[4][b] ("Actual notice of the issues raised by a conclusory assertion in a motion may be contained in other litigation papers.  A court may consider other closely filed documents . . . [and] if the other documents, when read in conjunction with the motion, set forth the particular grounds for the motion and relief sought, courts often consider Rule 7(b) met.") *id*. at § 7.03[4][c] ("District judges may also require particularity on an individual basis by ordering briefs or by scheduling oral arguments on pending motions."); *see also Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 761 (1st Cir. 1996) (courts routinely take into consideration other closely filed pleadings to determine whether sufficient notice of the grounds for a motion are given and the opposing party has a fair opportunity to respond).

The Second Circuit has held a motion to vacate or set aside an unconstitutional or unlawful sentence could be amended under Rule 15 at any time while the action was pending. *Ching v. U.S.*, 298 F.3d 174, 180 (2d Cir. 2002) (Sotomayor, J.).  An argument can be made that if Section 2255 motions to vacate can be amended under Rule 15, so too should FAA motions to vacate be amendable through Rule 15.  Section 2255 proceedings are, in some ways, similar to Section 12 proceedings to vacate an arbitration award.  They are commenced by motion rather than by complaint.  In fact, Rule 2 of the Rules Governing Section 2255 Proceedings has similar language to 9 U.S.C. § 6: "The application must be in the form of a motion to vacate, set aside, or correct the sentence."  Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 2 (1977) (amended 2019).  And Rule 12 of the Rules Governing Section 2255 Proceedings provides, in language similar to Rule 81 of the Federal Rules of Civil Procedure, that: "The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."  Rules Governing Section 2255 Proceedings,

Rule 12; *compare* Fed. R. Civ. P. 81(a)(6)(B) (the Federal Rules "to the extent applicable, govern proceedings under [the FAA], except as these laws provide other procedures"). The Second Circuit was not troubled by the fact that the document that initiated the 2255 proceeding was denominated a motion and not a complaint. It presumed that the motion would be treated as a complaint and proceeded to consider whether application of Rule 15 would be inconsistent with the statute at issue (the Antiterrorism and Effective Death Penalty Act ("AEDPA")). It concluded that it would not be because the district court retained tools to "thwart tactics that [we]re dilatory, unfairly prejudicial, or otherwise abusive." *Id.* at 180. The same could be said about the application of Rule 15 to motions to amend. The district court still would retain the authority under Rule 15 to prevent dilatory or unfairly prejudicial amendments. *See, e.g.*, *Trump v. Vance*, 480 F. Supp. 3d 460, 506 (S.D.N.Y. 2020).

However, *Ching* does not control the issue here. As Eletson point outs, Dkt. No. 156 at 2, the Court need not give the same or similar language in two different statutes the same interpretation and application. *Yates v. U.S.*, 574 U.S. 528, 537–38 (2015) ("identical language may convey varying content when used in different statutes") (collecting cases); *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) ("most words have different shades of meaning and consequently may be variously construed" when they occur in different statutes). Context matters. *See Gundy v. United States*, 588 U.S. 128, 140–41 (2019). The court based its conclusion in *Ching* on a view that Section 2255 should be interpreted *in pari materia* with Section 2254 of Title 28, under which (by statute) amendments are permitted, *see* 28 U.S.C. § 2241; *Ching*, 298 F.3d at 177, and on the peculiar history of the AEDPA. Congress intended that persons challenging their sentence have "an opportunity for a full adjudication of their claims." *Id.* at 177. Although Section 2255 motions must be brought soon after a conviction becomes

final, there is no deadline for a conviction to become final, *see Clay v. U.S.*, 537 U.S. 522, 525 (2003) (judgment becomes final when the time expires for filing a petition for certiorari), and there is no dictate that Section 2255 motions be expeditiously considered and either granted or denied. The Second Circuit viewed Congress's concern to be with the abuse of the writ, that the movant would engage in "needless or piecemeal litigation." *Ching*, 298 F.3d at 180. There is no other statute with which to compare the FAA *in pari materia*, as there was with Section 2255. And there is no evidence that the concerns that animated *Ching* and that the court there imputed to Congress—that a person held in custody allegedly in violation of the Constitution have one full chance to assert all possible bases to challenge his sentence—would also apply to a person who voluntarily agreed to arbitration and then complained of the award entered by the arbitrator.

Thus, analyzing all of the relevant case law, the Court concludes that the safety valve that Levona seeks in the FAA's time limits is found by application of the doctrine of equitable tolling, not by reading Rule 15 to apply when on its face it does not.

### B.    Rule 15 Discretionary Factors

Eletson argues that an amendment is not permissible because Levona is guilty of undue delay and has acted in bad faith, that an amendment would be futile, and that Eletson would be prejudiced by an amendment. Were Rule 15 applicable, the Court would reject each of these arguments.

The Court's conclusions with respect to diligence and the materiality of the documents dispose of Eletson's arguments regarding delay and bad faith. Absent a showing of bad faith or undue prejudice, mere delay is insufficient for a court to deny the right to amend. *See Tarr v. ACTO Technologies, Inc.*, 2020 WL 13842913, at *3 (S.D.N.Y. Dec. 29, 2020) (internal citations omitted); *see also Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *3 (S.D.N.Y. Aug. 31, 2020) (no undue delay where defendants spent some time investigating and developing potential

counterclaims to satisfy Rule 11 rather than rushing to file a counterclaim on the first suspicion).

"Few cases deny leave to amend on grounds of bad faith," and cases where this has occurred

involve, for example, drastically changing position after 25 years, waiting to move to amend

until after summary judgment to avoid dismissal on forum selection clause or forum non

conveniens grounds, or waiting to introduce new theories until after summary judgment despite

knowing about them from the commencement of the suit. *ACTO Technologies*, 2020 WL

13842913, at *3; *see also SEC v. Rayat*. 2022 WL 3656314, at *11 ("Bad faith as used with

respect to a motion to amend does not serve as an invitation for the party opposing amendment to

raise every generalized grievance it has with respect to the litigation tactics and style of the

movant. It refers to the objective with which the motion to amend is made, including whether, on

the one hand, based on the motion's timing and content, the movant intended solely to gain a

tactical advantage" (internal citations omitted)).  Eletson should not be heard to complain about

delay.  It frustrated Levona's ability to bring this motion earlier through its persistent and

aggressive arguments in the Bankruptcy Court, which ultimately were rejected, including an

argument that the Court finds to be incredible that the documents were not relevant to the

arbitration proceedings.  Those conclusions also address prejudice—Eletson complains that the

proceedings in this Court will affect the rights of the creditors in the Bankruptcy Proceeding, but

Eletson itself is responsible for the issues raised by Levona not having been addressed by this

Court earlier.

The motion also is not futile.  To establish a basis to vacate an award on grounds that it

was "procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), the movant must

show "that (1) respondent engaged in fraudulent activity; (2) even with the exercise of due

diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the

fraud materially related to an issue in the arbitration." *Odeon*, 864 F.3d at 196.  Levona has presented evidence that, if credited, would show that Eletson engaged in fraudulent activity that Levona could not have discovered and that went to a pivotal issue in the arbitration.

## III.    Discovery

Levona also asks for discovery on its new claims.  Dkt. No. 136 at 27–29.  Eletson resists that request.  Dkt. No. 147 at 32.

The Court will permit discovery on facts relevant to equitable tolling and to whether the award was procured by fraud or undue means.  "[D]iscovery in a post-arbitration judicial proceeding to confirm or vacate is governed by the Federal Rules of Civil Procedure" and  is available "in limited circumstances, where relevant and necessary to the determination of an issue raised by such an application." *Frere v. Orthofix, Inc.*, 2000 WL 1789641, at *4 (S.D.N.Y. Dec. 6, 2000).  Eletson's sole argument against discovery is that "[d]iscovery is unwarranted given the glaring legal deficiencies in this Motion, and particularly into the irrelevant and cumulative matters Levona apparently seeks to explore."  Dkt. No. 147 at 24.  But the Court concludes that the motion does not have legal deficiencies and the matters Levona seeks to explore are highly relevant and not cumulative.  Levona has proffered evidence that would suggest that the four documents at issue may be just the tip of the iceberg and that there may be other relevant documents that would support its claims that extraordinary circumstances prevented it from filing earlier and that fraud was committed in the arbitration.

**CONCLUSION**

The motion to amend is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 123.


SO ORDERED.


Dated: September 6, 2024
       New York, New York

LEWIS J. LIMAN
United States District Judge