**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELETSON HOLDINGS, INC. and ELETSON CORP.,<br><br>                Petitioners/Cross-Respondents,<br><br>       v.<br><br>LEVONA HOLDINGS, LTD.,<br><br>            Respondent/Cross-Petitioner. | Case No. 1:23-cv-07331-LJL |

**MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL AND FOR EXTENSION OF TIME TO COMPLY WITH TURNOVER ORDER**

Louis M. Solomon
Colin A. Underwood
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel.: (212) 549-0400
Lsolomon@reedsmith.com

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ...............................................................................................................2

I.     THIS COURT SHOULD ISSUE A STAY PENDING APPEAL .........................2

   A.   Likelihood of Success Favors a Stay ......................................................... 3

      1.   Article III Jurisdiction .................................................................... 4

      2.   Turnover ........................................................................................... 7

      3.   Retaining Lien ................................................................................ 10

      4.   Displacement of Reed Smith ........................................................ 11

   B.   Irreparable Harm Exists and Supports a Stay .......................................... 12

   C.   A Stay Will Not Substantially Injure Reorganized Holdings ................... 14

   D.   The Public Interest Favors a Stay ............................................................ 15

   E.   No Bond Should Be Required .................................................................... 16

II.    AS ALTERNATIVE RELIEF, THE COURT SHOULD GRANT A TEMPORARY STAY TO SEEK STAY RELIEF FROM THE SECOND CIRCUIT ................................16

III.   THIS COURT SHOULD EXTEND THE DEADLINES IN THE ORDER PENDING DETERMINATION OF A STAY ..................................................................17

   A.   Current Deadlines in the Order and the Need for Further Clarification ........................... 17

   B.   Good Cause Exists to Extend the Deadlines in the Turnover Order .............................. 17

   C.   Reed Smith's Continued Efforts to Date to Comply with the Order ............................... 19

CONCLUSION ...........................................................................................................22

CERTIFICATE OF COMPLIANCE ........................................................................23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Props.*,
    2020 WL 3000382 (S.D.N.Y. June 4, 2020) ............................................................2

*In re Accent Delight Int'l, Ltd.*,
    2018 WL 7473109 (S.D.N.Y. June 27, 2018) ...................................................13, 16

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999).....................................................................................12

*Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*,
    964 F.2d 159 (2d Cir. 1992)......................................................................................13

*Cleveland v. Chamberlain*,
    66 U.S. 419 (1862)..................................................................................................6, 7

*Commodity Futures Trading Com v. Weintraub*,
    471 U.S. 343 (1985)....................................................................................................8

*Cooper v. United States Postal Serv.*,
    246 F.R.D. 415 (D. Conn. 2007)................................................................................3

*Damon J. Baldone, LLC v. Starr Surplus Lines Ins. Co.*,
    2024 WL 4188482 (E.D. La. Sept. 13, 2024)......................................................13, 15

*Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*,
    459 F. Supp. 2d 1294 (S.D. Fla. 2006) ......................................................................5

*Diorinou v. Mezitis*,
    237 F.3d 133 (2d Cir. 2001).......................................................................................16

*Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*,
    18 F. Supp. 3d 375 (S.D.N.Y. 2014)..........................................................................10

*In re Gorsoan Ltd.*,
    2020 WL 4194822 (S.D.N.Y. July 21, 2020) .......................................................15, 16

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024)....................................................................................................10

*In re Hechinger Inv. Co. of Del., Inc.*,
    285 B.R. 601 (D. Del. 2002).....................................................................................8, 9

*Jock v. Sterling Jewelers, Inc.*,
    738 F. Supp. 2d 445 (S.D.N.Y. 2010) ...............................................................9, 12

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)...................................................................................10

*King Spider LLC v. Panda (Hong Kong) Tech. Co.*,
    2025 WL 252655 (S.D.N.Y. Jan. 21, 2025) ..........................................................17

*Law Firm of Ravi Batra, P.C. v Rabinowich*,
    77 A.D.3d 532 (1st Dep't 2010) ............................................................................11

*Lord v. Veazie*,
    49 U.S. 251 (1850)................................................................................................6, 7

*Mohammed v. Reno*,
    309 F.3d 95 (2d Cir. 2002).....................................................................................15

*Nat'l Immigration Project of the Nat'l Lawyers Guild v.
    United States Dep't of Homeland Sec.*,
    842 F. Supp. 2d 720 (S.D.N.Y. 2012)..................................................................9, 12

*NLRB v. Constellium Rolled Prods. Ravenswood, LLC*,
    43 F.4th 395 (4th Cir. 2022) ....................................................................................6

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
    342 B.R. 416 (S.D.N.Y. 2006)................................................................................18

*Polin v. Wisehart & Koch*,
    2002 WL 1033807 (S.D.N.Y. May 22, 2002) ........................................................18

*Regeneron Pharms., Inc. v. United States HHS*,
    510 F. Supp. 3d 29 (S.D.N.Y. 2020).........................................................................3

*Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*,
    91 N.Y.2d 30 (1997) ................................................................................8, 11, 18

*In re Sears Holding Corp.*,
    2024 WL 2751131 (S.D.N.Y. May 29, 2024) ....................................................3, 16

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    657 B.R. 382 (Bankr. S.D.N.Y. 2024)....................................................................14

*Seneca Nation of Indians v. Paterson*,
    2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ..............................................2, 15, 16

*South Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*,
    145 U.S. 300 (1892)...............................................................................................5, 6

*Tekni-Plex Inc. v. Meyner & Landis*,
    89 N.Y.2d 123 (1996) .................................................................................8, 9

*Thapa v. Gonzales*,
    460 F.3d 323 (2d Cir. 2006)...................................................................2, 3, 15

*U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*,
    2012 WL 2033548 (S.D.N.Y. June 5, 2012) .........................................16

*United States SEC v. Citigroup Global Mkts., Inc.*,
    673 F.3d 158 (2d Cir. 2012)....................................................................2

*United States v. Johnson*,
    319 U.S. 302 (1943)...............................................................................4

*United States v. Windsor*,
    570 U.S. 744 (2013) ..............................................................................6

*Veritas Vincit, LLC v. Brown*,
    2024 WL 3543414 (E.D. Tex. July 25, 2024) ....................................5, 6

**Statutes**

11 U.S.C. § 524(e) .......................................................................................10

**Rules**

Fed. R. Civ. P. 6(b) ......................................................................................17

Fed. R. Civ. P. 62(d) ....................................................................................16

**Other Authorities**

13 Wright, Miller & Cooper, Federal Practice & Procedure § 3530 (3d ed.)................................7

Reed Smith LLP ("Reed Smith") respectfully submits this brief in support of its motion or a stay pending appeal of this Court's February 14, 2025 Order displacing Reed Smith as counsel of record in this action and ordering the turnover of Reed Smith's Eletson client file as described in this Court's February 14, 2025 oral ruling (ECF 269, incorporating transcript of oral ruling (ECF 270, "2/14/25 Tr."), collectively the "Order"), and, in the alternative, for the issuance of a temporary stay permitting Reed Smith to seek a stay from the Second Circuit; and for an extension of the deadlines in the Court's Order absent a stay.

## PRELIMINARY STATEMENT

The Order requires Reed Smith to disclose privileged documents directly related to ongoing, adversarial actions against Levona directly to Levona's principals (who are also the principals of Reorganized Holdings). Should the Order be reversed, the manifest irreparable harm from having made such disclosure could never be undone. Movant respectfully submits that the strength of this showing of irreparable harm is sufficient to grant a stay pending appeal, particularly in light of the strong showing on the merits and the significant issues at stake.

The appeal from the Order presents serious and novel questions directly touching on substantial matters, including the inability of federal courts to issue orders in matters in which there is no case or controversy, including where one party controls both sides of the litigation before the Court; the attorney-client privilege; the scope of a bankruptcy discharge; the right to counsel; and other matters. A stay is warranted pending appeal so that the irreparable harm of disclosing privileged information directly to the principals of Reed Smith's client's adversary, among other harms, can be avoided pending review by the Second Circuit. (For purposes of clarity and not reargument, Reed Smith's "client" is the Greek/Liberian entity directed by the Board of Directors provisionally appointed by the Greek Court on November 12, 2024 and the management appointed by that Board.)

- 1 -

Alternatively, Reed Smith seeks a temporary stay so that it can make a stay application directly to the Second Circuit. In the absence of a stay, Reed Smith also seeks an extension of the deadlines set forth in the Order, as the universe of material at issue makes compliance with the Order's deadlines impossible.

## ARGUMENT

## I.    THIS COURT SHOULD ISSUE A STAY PENDING APPEAL

Reed Smith shows below that it satisfies the standard for a stay pending appeal.

To obtain a stay pending appeal, the Court must consider the following four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *United States SEC v. Citigroup Global Mkts., Inc*., 673 F.3d 158, 162 (2d Cir. 2012).

The Second Circuit has "treated these criteria somewhat like a sliding scale, citing approvingly other circuits' formulation that '[t]he necessary "level" or "degree" of possibility of success will vary according to the court's assessment of the other stay factors' and explaining that '[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other.'" *Thapa v. Gonzales*, 460 F.3d 323, 334-35 (2d Cir. 2006) (granting stay where party "demonstrated some possibility of success and the balance of hardships tips decidedly in his favor"); *see In re 650 Fifth Ave. & Related Props.*, 2020 WL 3000382, *2 (S.D.N.Y. June 4, 2020) (to obtain a stay, "'the movant need only present a substantial case on the merits when a ***serious legal question*** is involved and show that the balance of the equities weighs heavily in favor of granting the stay'") (emphasis added); *see also Seneca Nation of*

- 2 -

*Indians v. Paterson*, 2010 WL 4027795, *3 (W.D.N.Y. Oct. 14, 2010) (although movant "failed to demonstrate a substantial possibility of success on appeal," stay granted because movant raised "serious legal questions going to the merits of their claims" as "some aspects of the new tax amendments are unprecedented" and thus "there is some possibility of success on appeal"); *Cooper v. United States Postal Serv.*, 246 F.R.D. 415, 418 (D. Conn. 2007) ("the court believes that the balance of hardships favors the [movant], which in turn means that their burden for the first factor (i.e., likelihood of success) is lower") (granting stay pending appeal).

Thus, in considering whether to grant the stay, the Court engages in a balancing of the relevant considerations – the Court need not find that each factor weighs in favor of the request for the stay. Here, however, each factor does weigh in favor of a stay.

### A.    Likelihood of Success Favors a Stay

This Court has issued its ruling, which Reed Smith acknowledges. However, the issues addressed in the Order are ones where there are substantial grounds for difference of opinion, and the Second Circuit may see things differently. To find that this factor favors a stay, this Court need not reconsider its ruling – it need only acknowledge that there are sufficiently serious questions going to the merits. *See In re Sears Holding Corp.*, 2024 WL 2751131, *2 (S.D.N.Y. May 29, 2024) ("And while I think I reached the right result, I cannot and will not pretend that there is not an argument of substance on the other side. So while I could not in good conscience find that MOAC is *likely* to succeed on appeal . . . there are sufficiently serious questions going to the merits") (emphasis in original).

Here, multiple issues present serious questions going to the merits. This factor, however, favors a stay when *only one* issue presents sufficiently serious questions going to the merits. *See*, *e.g.*, *Thapa*, 460 F.3d at 335 (party "raised a substantial enough question to pass this first threshold" only on second of two arguments; stay granted); *see also Regeneron Pharms., Inc. v.*

*United States HHS*, 510 F. Supp. 3d 29, 41 (S.D.N.Y. 2020) (granting preliminary injunction after finding likelihood of success on one claim, and "tak[ing] no position on Plaintiff's probability of success on its other claims").  Accordingly, Reed Smith discusses the main issues below (without waiving any other arguments), but need only demonstrate the requisite showing as to one.

        1.    <u>Article III Jurisdiction</u>

Respectfully, this Court's ruling that it continues to have jurisdiction when it has determined that the only parties before it are Reorganized Holdings (purportedly controlling Corp) and Levona is not supported by the relevant case law.  This Court's decision is the only case of which we are aware that has allowed parties under common control on opposite sides of the "v" to continue litigating against each other (and only each other).  This Court accepted Reorganized Holdings' argument concerning the identity of the Petitioners – over Reed Smith's arguments to the contrary – and the result that flows from that ruling is that there is no case or controversy before this Court.

None of the cases identified by this Court involved parties under common control. Neither Reorganized Holdings nor Levona disputed that Murchinson controlled both of them; that Adam Spears and Mark Lichtenstein represent both Reorganized Holdings and Levona (and Pach Shemen); or that Murchinson/Pach Shemen is paying for Reorganized Holdings to sue its affiliate Levona (*see* ECF 252 at 7-9, 13-16 (citing evidence); ECF 265 at 2).  The Supreme Court has been clear that "in a litigation where only private rights are involved, the judgment will not be allowed to stand where one of the parties has dominated the conduct of the suit by payment of the fees of both."  *United States v. Johnson*, 319 U.S. 302, 304 (1943).

This Court noted that "Eletson Holdings and Levona are separate corporations," and have some differences in their "investors" and "creditors" (2/14/25 Tr. at 111:19-22).  There is no case

that permits separate corporations that are in fact affiliates to litigate against each other in federal court, even when they have different investors. The Supreme Court long ago ruled that "the litigation has ceased to be between adverse parties" when "'control of both the corporations, parties to this suit, had come into the hands of the same persons, but that there was a minority of stockholders in [one of the parties] who retained the interest that they had at the time the decision was rendered.'" *South Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*, 145 U.S. 300, 301-02 (1892). This rule is applied to this day. *See, e.g.*, *Veritas Vincit, LLC v. Brown*, 2024 WL 3543414, *7 & n.7 (E.D. Tex. July 25, 2024) (no jurisdiction when "Plaintiffs, acting through an entity who they control (Fiduciario), acquired Defendant Reticulum"); *Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1304 (S.D. Fla. 2006) (no jurisdiction where one person was the only member of one party, and the "majority shareholder" of the other).

No case considering common control looks at creditors – any time a corporation sets up two subsidiaries, they are likely to have different creditors, but that has no bearing on whether the corporations are under common control and can sue each other in federal court.

This Court also cited the bare statement in the Spears Declaration that Eletson Holdings "has board members who have no duties to or any role in Levona, Murchinson, or Pach Shemen" (2/14/25 Tr. at 111:23-25). That Declaration pointed to no document that supported that statement. Levona – another party that Spears represents – had earlier admitted that Reorganized Holdings had "an independent director whose fiduciary duties run to the new shareholders – *i.e.*, to Pach Shemen and its designee" (ECF 202, Levona 10/28/24 Letter, at 1-2). In fact, as we showed in our papers (ECF 252 at 14-16), all directors owe duties to their shareholders – in this case, Pach Shemen. Moreover, the "independent director[s]" – and we are aware of only one,

- 5 -

despite Spears' use of the plural (*accord* 2/14/25 Tr. at 89:19-25) – is subject to direction by the minority shareholder, who has no restrictions on its actions, and can agree with Murchinson to take positions that benefit Levona.

No case has held that the lack of adversity inherent in the common control between two parties is a matter of prudential concern rather than core Article III jurisdiction. The Supreme Court has repeatedly referred to the issue of common control as representing a lack of "controversy" – the exact terminology set forth in Article III. *See, e.g., South Spring Hill Gold Mining Co.*, 145 U.S. at 301 ("the controversy is not a real one"); *Cleveland v. Chamberlain*, 66 U.S. 419, 426 (1862) ("no controversy"); *Lord v. Veazie*, 49 U.S. 251, 255 (1850) ("there must be an actual controversy," not "a feigned controversy"); *see also Veritas Vincit*, 2024 WL 3543414, *6 ("The Court finds that Plaintiffs do in fact control Defendant Reticulum and that no case or controversy exists between Plaintiffs and Reticulum").

Moreover, to the extent the Order relied on *United States v. Windsor*, 570 U.S. 744 (2013), to rule that a controversy exists, the Second Circuit has not addressed whether the logic of that case extinguished the Article III adversity requirement in the context of common control. And the one Circuit that did discuss the issue stated that where "one party has come to control the litigation on both sides of the 'V,' where one party becomes the *dominus litis* (master of the suit) on both sides[, t]his configuration is evidence that the suit lacks the necessary adverseness." *NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 401 & n.5 (4th Cir. 2022) (citation omitted) ("*Windsor* did not abandon the longstanding principle that Article III requires adverseness. *Windsor* instead reaffirmed that Article III requires 'sufficient adverseness' to confer an 'adequate basis for jurisdiction.'").

Further, Levona admitted that it wants this case to proceed so that it can use this Court's order against third parties. That is precisely what the blackletter law against collusive litigation prohibits (see ECF 265 at 7-8, citing *Cleveland v. Chamberlain*, 66 U.S. at 426 & *Lord v. Veazie*, 49 U.S. at 255). *See also* 13 Wright, Miller & Cooper, Federal Practice & Procedure § 3530 (3d ed.) ("[There must] be adversity in fact. The most fundamental rule is that there actually be parties. *Other rules are nearly as fundamental, as the rule against suits brought by cooperating interests for the purpose of affecting the interests of nonparties*.") (emphasis added).

Finally, once Article III jurisdiction is lost, any authority to issue the turnover order also ends. To the extent that the Court may have "continuing jurisdiction even after [a] case has concluded to require attorneys to turn over their case files to their clients" (2/14/25 Tr. at 112:17-19), no case cited to or by this Court involved a request for a turnover order that was to be made after the Court lost subject matter jurisdiction. As far as we know, there is no case where a Court that lacked subject matter jurisdiction then issued a turnover order. Reed Smith respectfully believe that that conclusion is even more appropriate in a New York Convention case, where federal jurisdiction is by statute narrow to begin with.

For each and all of these reasons, Reed Smith has a strong basis to argue against the Court's ruling that this Court has subject matter jurisdiction to continue with this proceeding or to order turnover.

### 2.  Turnover

Reed Smith has a reasonable likelihood of success on its argument that it should not be ordered to turn over privileged communications to Reorganized Holdings, now controlled by the same people who control Levona, its client's adversary.

Absent waiver or other requisite criteria not present here, there is no case that ordered privileged documents to be disclosed wholesale to a client's *adversary*. The reason is obvious –

the privilege exists precisely to stop adversaries from obtaining attorney-client privileged documents. But that is precisely the result of the turnover order. Adam Spears represents Levona, and is also CEO of Reorganized Holdings, and so Levona will see the documents when they are turned over to Reorganized Holdings. Additionally, Levona is actively litigating actions involving the Arbitration against parties other than Eletson Holdings and Eletson Corp, and the turnover order may provide Levona with access to privileged documents they would never otherwise be able to obtain.

By ruling that "Sage Realty applies here" (2/14/25 Tr. at 108:11-12), this Court correctly acknowledged that the turnover ordered is pursuant to New York law, as the turnover notice of motion itself acknowledged (ECF 242). The Tekni-Plex case, *Tekni-Plex Inc. v. Meyner & Landis*, 89 N.Y.2d 123 (1996), is an integral part of New York law on turnover.

The Delaware case cited by the Court – *In re Hechinger Inv. Co. of Del., Inc*., 285 B.R. 601 (D. Del. 2002) – was in fact an adversary proceeding under the Bankruptcy Code, and thus disregarded New York law, including *Tekni-Plex*. *In re Hechinger*, 285 B.R. at 604, 611. Moreover, the underlying transaction for which disclosure was sought was "a business transaction and not litigation." *Id*. at 607.

This New York Convention proceeding is not brought under the bankruptcy code. Moreover, whether new management of Reorganized Holdings controls the privilege in general is not presented in this case. The issue is whether privileged materials related to an ongoing, hotly contested litigation must be turned over to the principals of the very adversary in that litigation. No court prior to this one has made such an order. Even in the bankruptcy context, the parties to whom privileged documents were disclosed were neutral trustees not connected with any adversary. *See, e.g.*, *Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343, 346

(1985) (owner of privilege was trustee appointed by bankruptcy court under Chapter 7); *Hechinger*, 285 B.R. at 603-04 (requester was liquidating trust of debtor).

*Tekni-Plex*, while set in a merger scenario, is applicable here. We believe *Tekni-Plex* stands for the general rule that privileged documents need not be turned over to new management regarding a transaction where new management had been adverse to the prior management. *See Tekni-Plex*, 89 N.Y.2d at 138. That is all the more pertinent here, where the adversity occurred in litigation, and the litigation at issue – as well as related proceedings – are ongoing. The Order did not grapple with the fact that the owners/principals of Reorganized Holdings are in fact the same as the owners/principals of Levona.

Relatedly, the Court did not address the limitations inherent in presiding over a New York Convention summary proceeding, or even limit the disclosure to this proceeding.

At the very least, the question of whether the principals of an active adversary who were never represented by Reed Smith can obtain Reed Smith's core privileged communications directly concerning that adversity is a matter of first impression. Given that, the threshold is more easily met, because "where the district court has had to address issues as to which the appellate courts have provided little direct guidance, the likelihood that an appellate court will take a different approach increases." *Nat'l Immigration Project of the Nat'l Lawyers Guild v. United States Dep't of Homeland Sec*., 842 F. Supp. 2d 720, 733 (S.D.N.Y. 2012)); *Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (granting a stay pending appeal where "[the] appeal presents an issue of first impression," even though "the Court remain[ed] confident in the soundness of [its] reasons"). Reed Smith thus has a strong basis to argue that turnover should not have been ordered.

3.    <u>Retaining Lien</u>

Reed Smith is owed approximately $2 million by Eletson Corp – which includes amounts that have already been approved by the Bankruptcy Court for payment by Eletson Corp (not by Holdings), but not yet paid by Eletson Corp (due at least in part to Levona/Murchinson's ongoing interference in Corp's business) (2/14/25 Tr. at 69:7-16; *see* Bankr. ECF 1325 at 4 n.2 & 6 n.9.).  The Court held that this debt, and other amounts owed to Reed Smith by Corp, did not give rise to a retaining lien against Eletson Corp because it accepted the argument made by one of Reorganized Holdings attorneys that "as of the effective date, any liens against subsidiaries, including Corp., were extinguished" (2/14/25 Tr. at 114:25-115:1; *id*. 72:16-18; *but see id*. 22:5-10 (Reorganized Holdings' bankruptcy counsel stating, "I don't believe [Corp's obligations to pay Reed Smith] have been discharged under the plan")).  This Court's Order effectively extinguished these debts, including debt that Judge Mastando recognized and approved.

Reed Smith has a strong basis to argue against the Court's ruling on this issue.  The Plan cannot be read to discharge Eletson Corp's debts to Reed Smith, because the Supreme Court recently held that non-debtor third parties' debts cannot be released by a bankruptcy plan absent consent by the affected creditor (here, Reed Smith).  *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024) ("the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants"); 11 U.S.C. § 524(e) ("discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 n.4 (2d Cir. 1988) (non-debtor subsidiaries "may not lawfully be protected from creditors' claims if they are separate, viable entities in which [debtor] can shield its assets"); *Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 380-81 (S.D.N.Y. 2014) (discussing related proceeding where Mexican

discharge of nondebtor subsidiaries, whose creditors could not vote on reorganization plan, was not recognized in U.S.). In the bankruptcy proceeding, only Holdings' creditors were given notice and solicited for their votes. As is standard practice, Corp's creditors were not even disclosed, let alone permitted to vote. Reed Smith was never solicited for a vote, never informed that any debts due to it from Eletson Corp would be discharged, and never had an opportunity to consent or object. Thus, there was no consent, and no discharge.

Because a retaining lien precludes a turnover order, *see, e.g.*, *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 91 N.Y.2d 30, 34 (1997) (presumption of turnover only "where no claim for unpaid legal fees is outstanding"); *Law Firm of Ravi Batra, P.C. v Rabinowich*, 77 A.D.3d 532, 533 (1st Dep't 2010) ("It is only where there is no outstanding claim for unpaid legal fees that a client 'presumptively' has access to its file"), Reed Smith has a strong basis to argue that turnover should not have been ordered.

### 4.    Displacement of Reed Smith

This Court's determination, that Reed Smith's client was not a party to this proceeding and thus not entitled to counsel, raises serious issues, not least concerning international comity, and the right to counsel. Even this Court recognized that it "may well be true in Liberia and in Greece" that "'Provisional Holdings . . . remains a distinct entity until Liberia and Greece recognize and accept the effects of the confirmation order,'" and that "[i]t may be correct that the new board and new shareholders will not be recognized in [Liberia and Greece] until there is a recognition proceeding" (2/14/25 Tr. at 103:2-9), but declined to permit that entity to be heard in this Court and ruled that the issue of comity was not presented here.

This issue is one of first impression – no case has reached the issue of whether a comity analysis has no role in the consideration of whether the proponent of a plan of reorganization for a foreign entity can replace that entity (and deprive it of counsel) without first receiving

recognition and complying with the corporate law of the countries of incorporation and principal place of business. The issue is extremely important – the court's ruling essentially deprives entities recognized outside of the United States from the ability to participate in proceedings in the United States, and requires, in the circumstances here where Reorganized Holdings and Levona have overlapping principals, that their privileged and confidential material be provided to their adversary in litigation. Particularly here, where the Plan and Confirmation Order indicate that integral actions under the Plan and Order can proceed only if in accordance with all applicable law including non-U.S. law, and where the existence of that entity in Greece and Liberia is still recognized, Reed Smith has raised serious questions concerning the Court's ruling on this issue. *See, e.g.*, *Nat'l Immigration Project*, 842 F. Supp. 2d at 733; *Jock*, 738 F. Supp. 2d at 447.

## B.     Irreparable Harm Exists and Supports a Stay

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999) (upholding preliminary injunction). The irreparable harm analysis assumes the possibility that this Court's ruling(s) may be reversed. *Nat'l Immigration Project*, 842 F. Supp. 2d at 733. With that in mind, the Order will cause irreparable harm.

The disclosure of files protected by the attorney-client privilege cannot be undone by any subsequent order or appellate victory. Here, "failure to stay the disclosure required by the Order would cause the [party] irreparable injury if the ruling was erroneous." *Nat'l Immigration Project*, 842 F. Supp. 2d at 733. The disclosure of privileged communications to Levona's principals – which is the direct effect of the Order, as the principals of Reorganized Holdings are the same as the principals of Levona – will result in irreparable harm, particularly because the

documents relate to ongoing litigation not only in this Court but also in other tribunals.  "Indeed, if Defendants were required to produce privileged and/or protected communications or documents, they risk suffering immediate, irreparable harm.  Once information subject to the attorney-client privilege or work product doctrine is disclosed, the right of nondisclosure cannot be restored."  *Damon J. Baldone, LLC v. Starr Surplus Lines Ins. Co*., 2024 WL 4188482, \*2 (E.D. La. Sept. 13, 2024) (granting stay); *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 165 (2d Cir. 1992) (even where only opposing counsel would see privileged documents, "[i]f opposing counsel is allowed access to information arguably protected by the privilege before an adjudication as to whether the privilege applies, a pertinent aspect of confidentiality will be lost…  [A]ttorneys cannot unlearn what has been disclosed to them.").

To paraphrase a court faced with an analogous issue, given "the potential burdens on [Reed Smith] in complying with the Court's Opinion and Order, and the fact that the proverbial bell cannot be unrung once [Reed Smith] discloses the information at issue, the Court concludes that a stay is warranted to maintain the status quo while [Reed Smith] seeks a definitive ruling on that issue from the Second Circuit.'" *In re Accent Delight Int'l, Ltd.*, 2018 WL 7473109, \*1 (S.D.N.Y. June 27, 2018) (granting partial stay), *complete stay pending appeal granted*, *In re Accent Delight Int'l, Ltd. v. Sothebys*, No. 18-1755, ECF 85 (2d Cir. Sept. 4, 2018).

Independently, irreparable harm also exists to Reed Smith's client from the Order's conclusion that Reorganized Holdings (purportedly controlling Corp), are the only petitioners in this matter.  The Second Circuit should weigh in before Reed Smith and its client are displaced from this proceeding.  At the least, a stay should be entered pending "the appeal that you have got in the bankruptcy confirmation matter" (2/14/25 Tr. 120:14-15), since, as this Court recognized, some of the central issues here are presented there.  However, given the procedural

posture of that case, there is a possibility that it may be disposed of without the Second Circuit

reaching the merits.  Because of that possibility – and also because the displacement issue does

not address the irreparable harm from the turnover Order and related jurisdictional issues

discussed above – any stay should be entered pending the appeal of this Order.  The Second

Circuit should be permitted to weigh in before a litigant is stripped of its rights to representation

– the most drastic action to be imposed on a litigant, one whom this Court recognized may

"remain[] a distinct entity," even if in other countries (2/14/25 Tr. at 103:2-7).  *See Sec. Investor*

*Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 657 B.R. 382, 392-93 (Bankr. S.D.N.Y. 2024)

(finding prejudice and denying leave to withdraw where entity without counsel would be unable

to participate in legal proceedings).

### C.    A Stay Will Not Substantially Injure Reorganized Holdings

Even assuming there is jurisdiction sufficient for this case to continue, Reorganized

Holdings will not be harmed by a stay pending appeal.

In its motion seeking turnover, Reorganized Holdings stated that it "is entitled to review

its own documents, to, among other things, help it evaluate the claims in this matter" (ECF 243

at 1).  Reorganized Holdings then immediately clarified that "[n]othing in this Motion is a

concession that this information is required by EHI/Corp. to make an independent determination

on course of action" (*id*. n.2).  If the files at issue are admittedly not "required" by Reorganized

Holdings, it cannot suffer cognizable injury from any delay in receipt of those files.

Moreover, Reed Smith is unlikely to have in its Arbitration files significant documents

that fall into what Reorganized Holdings characterized as the "far more time sensitive" bucket of

unproduced "corporate documents that relate to like the corporate day-to-day operations of

Eletson Holdings that Reed Smith may have that relate – that would help us in the

implementation of the Plan" (2/14/25 Tr. at 119:18-22).

- 14 -

Further, there is no schedule in place that will be delayed by a stay, and this case is currently under a stay order issued by this Court.

Any injury to Reorganized Holdings – and we are aware of none – pales in comparison to the irreparable injury faced by Reed Smith, discussed above. "As to the question of irreparable harm, 'this Circuit has granted a stay pending appeal where the likelihood of success is not high but the balance of hardships favors the applicant.'" *Thapa*, 460 F.3d at 336 (quoting *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002)).

### D.    The Public Interest Favors a Stay

A stay of the Order to disclose privileged communications to Levona's principals – the inevitable result of any turnover – is in the public interest. "As the 'oldest of the privileges for confidential communications, the attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice.' As a long-protected form of communication, the Court finds this protection is paramount to the public interest." *Damon J. Baldone, LLC.*, 2024 WL 4188482, *2 (finding the public interest weighed in favor of granting a stay).

There is also a public interest in conserving judicial resources. *In re Gorsoan Ltd.*, 2020 WL 4194822, *8 (S.D.N.Y. July 21, 2020) (granting motion to stay pending appeal and finding "that the public interest factor militates in favor of a stay" based on, *inter alia*, "the public interest in . . . preserving judicial resources by avoiding unnecessary proceedings while the appeal in this action is pending"). A stay would serve to avoid the waste of judicial resources from proceeding with an action over which it may be determined that this Court lacks jurisdiction, warranting dismissal.

There is also a public interest in preserving the status quo pending appeal. *Seneca Nation*, 2010 WL 4027795, *3 ("the Court finds that granting a stay pending appeal is in the

- 15 -

public interest because it will simply preserve the status quo while a higher court considers the merits of the plaintiffs' claims").   Because of the current posture of this matter, the public interest is not undermined – and if anything is furthered – by preserving the status quo.

In light of all the factors, this Court should issue a stay pending appeal.

### E.    No Bond Should Be Required

Under the circumstances presented here, no bond should be required.  No money is needed to "secure the opposing party's rights."  Fed. R. Civ. P. 62(d).  Here, those rights are secured by Reed Smith's unquestioned obligation to maintain the Covered Material (defined below).

Notably, most of the cases cited herein that granted stays pending appeal did not discuss the need for bonds at all.  *See*, *e.g.*, *In re Accent Delight*, 2018 WL 7473109; *In re Gorsoan*, 2020 WL 4194822; *Seneca Nation*, 2010 WL 4027795.  This is not a case where monetary damages will flow directly from the stay.  *See*, *e.g.*, *In re Sears Holding Corp.*, 2024 WL 2751131, *2 (imposing bond where stay could derail pending offer for lease at issue).

## II.    AS ALTERNATIVE RELIEF, THE COURT SHOULD GRANT A TEMPORARY STAY TO SEEK STAY RELIEF FROM THE SECOND CIRCUIT

In the event the Court does not grant a full stay pending appeal, the Court should grant a temporary stay to allow Reed Smith sufficient time to seek a stay from the Second Circuit.  "[O]ur Court of Appeals has noted this practice favorably."  *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 2012 WL 2033548, *1 (S.D.N.Y. June 5, 2012); *see Diorinou v. Mezitis*, 237 F.3d 133, 138 (2d Cir. 2001) ("The District Court helpfully stayed its order . . .  to permit [party] to seek a stay pending appeal from this Court.").  For this alternative request, Reed Smith asks that the Court order a stay that will expire 14 days from the Court's order granting the temporary stay unless Reed Smith files a motion for a stay pending appeal in the Second Circuit

within that 14-day period, in which case the temporary stay should continue until the Second

Circuit decides the motion to stay pending appeal.  *See, e.g.*, *King Spider LLC v. Panda (Hong*

*Kong) Tech. Co*., 2025 WL 252655, *4 (S.D.N.Y. Jan. 21, 2025) (collecting cases) (issuing 14-

day "stay for the limited purpose of allowing Plaintiffs time to make an application to the Second

Circuit for a stay" pending appeal).

### III.    THIS COURT SHOULD EXTEND THE DEADLINES IN THE ORDER PENDING DETERMINATION OF A STAY

#### A.    Current Deadlines in the Order and the Need for Further Clarification

Pursuant to the Order, Reed Smith is directed to turnover by March 17, 2025:  (1) "all

documents conveyed by Eletson Corp. and Eletson Holdings to counsel in connection with the

arbitration"; (2) "all correspondence between Eletson Holdings and Eletson Corp. and Reed

Smith regarding the arbitration"; and (3) "all correspondence with third parties" relating to the

arbitration (2/14/25 Tr. at 119:21-120:5).  Further, "[a]ny remaining documents" and a privilege

log must be produced by March 31 (*id.* at 120:4-5, 121:21-23).

#### B.    Good Cause Exists to Extend the Deadlines in the Turnover Order

For the reasons discussed below, Reed Smith respectfully requests an extension of at least

60 days to the deadlines in the Order.  Federal Rule of Civil Procedure 6(b) provides that

"[w]hen an act may or must be done within a specified time, the court may, for good cause,

extend the time (a) with or without motion or notice if the court acts, or if the request is made,

before the original time or its extension expires."  Fed. R. Civ. P. 6(b).  Good cause exists to

extend the deadlines in the Order.  Indeed, based on the substantial work that needs to be

conducted and the inherent sensitivities involved in the turnover of Reed Smith's client files

(discussed below), Reed Smith simply cannot reasonably comply with the deadlines set forth by

this Court.

As this Court is aware, Reed Smith's representation of Holdings extended beyond the arbitration to include the bankruptcy proceedings.  Further, Reed Smith also represents Eletson Gas LLC ("Gas") in various arbitration proceedings commenced by or against Levona in London.  The Order does not direct Reed Smith to turn over any files other than those "regarding the arbitration" (including any efforts to "monetize" the award).  "Where counsel represents multiple clients, that counsel cannot be forced to divulge to one client the privileged communications shared with counsel by another client."  *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 426 (S.D.N.Y. 2006) (citing *Sage Realty,* 91 N.Y.2d 30); *see also Polin v. Wisehart & Koch*, 2002 WL 1033807, *3 (S.D.N.Y. May 22, 2002) (discussing *Sage Realty* and explaining that "[a]s for the exceptions, the court exempted materials the disclosure of which 'might violate a duty of nondisclosure owed to a third party or otherwise imposed by law.'").  Accordingly, Reed Smith must take all reasonable and necessary steps to prevent the disclosure of Reed Smith's client files other than those compliant with the Order.  This is especially critical where Levona is actively litigating in London against Gas, asserting substantially the same claims at issue in the arbitration.

A separate consideration that affects Reed Smith's handling of files related to any Eletson entity is the fact that a significant portion of the material and information provided to Reed Smith is subject to GDPR restrictions imposed by the EU, and cannot simply be transferred wholesale into the US (even to Reed Smith's US offices) without review and clearance.  These restrictions have required Reed Smith to maintain some client materials on servers located outside of the US throughout the duration of the Levona arbitration and related proceedings.  Reed Smith does not assert that these restrictions absolutely preclude turning over material otherwise covered by the

Order, but notes that they will require additional procedures and protections before Reed Smith can transfer some of this data to counsel for Reorganized Holdings.

There is simply no feasible alternative to mitigate the real risk of disclosures of Reed Smith's client files not subject to the Order other than to review Eletson-related documents and communications prior to any turnover. Indeed, because representatives from various Eletson entities use an "eletson.com" domain, it is impossible for Reed Smith easily to isolate "all correspondence between Eletson Holdings and Eletson Corp. and Reed Smith" and "all correspondence with third parties" regarding the arbitration (2/14/25 Tr. at 119:25-120:1). Reed Smith must, therefore, undertake steps to identify whether documents and communications between Reed Smith and any representatives using an "eletson.com" domain or third parties, in fact, involve Holdings and/or Corp and relate to the arbitration. As discussed in detail below, the amount of work and the volume of material needing to be reviewed makes an extension to the Order's deadline imperative.

### C. Reed Smith's Continued Efforts to Date to Comply with the Order

Immediately following the February 14, 2025 hearing at which the Court issued the Order, on February 14, Reed Smith counsel notified firm management of the Order and began work on a plan to identify, locate, and review all documents potentially subject to the Court's directive. Numerous calls occurred over the weekend, particularly on February 16, with lawyers working on the relevant Eletson matter and firm management (including its General Counsel) to identify sources of documents that would need to be organized for production. Upon receiving the transcript of the Court's ruling on February 17, 2025 (the next business day), Reed Smith reviewed the transcript to ensure that its plans would include all of the files identified by the Court, including identifying all relevant internal databases and file systems used by Reed Smith to store documents and communications relating to the arbitration, identifying all Reed Smith

timekeepers and/or custodians who might possess responsive information, and working to extract and process the data for review and ultimate production.

Reed Smith then provided instructions to Gravity Stack, Reed Smith's in-house technology subsidiary, to handle the data collection, processing, hosting, review, and production. This will include reviewing the Relativity databases storing document collections relating to the arbitration and extracting relevant timekeepers' Outlook accounts to identify documents subject to the Order.

In order to complete the required review, Reed Smith must first locate and identify material that could possibly be covered by the Order ("Covered Material"). For material stored in Reed Smith's document management system, this step entails identifying the client and matter folders that might contain Covered Material. With respect to email communications, this step requires running search terms on the email accounts of all personnel who might possess Covered Material. Over the period since Reed Smith was first contacted about the arbitration, there are at least 100 people who have been involved to at least some extent in working on matters relating to one or more Eletson entities. To ensure that no Covered Material is overlooked, Reed Smith has included all of those people in the list of email accounts to be searched.

As for the search terms to be applied, Reed Smith has come up with a list of terms that, it believes, will be more than broad enough to identify anything that could potentially constitute Covered Material – for example, the search includes all emails and communications with the term "Eletson". Gravity Stack began by running those search terms across the Outlook accounts of five timekeepers, to obtain a sample set of documents upon which to base an estimate of the potential overall volume of relevant communications. Following a manual search of the first timekeeper's Outlook account, which returned approximately 48,000 hits, Gravity Stack

concluded that the manual transfer of files would not be feasible due the number of hits and the volume of the data.  Accordingly, Gravity Stack assigned additional staff to assist with search, collection, and export of relevant email files.  By February 21, 2025, Gravity Stack completed searches across the accounts of the 100 relevant Reed Smith personnel for the potentially relevant Eletson matters, which yielded 791,021 emails, *not including attachments*, for export, processing, and de-duplication.

Gravity Stack is currently in the process of exporting those emails from those personnel, a process that will require between several days and a week to complete.  Once the data are extracted, the emails must be processed into a document management and review system before the emails can be de-duplicated and made available for review.  Based on the nature of the material collected, Reed Smith believes that de-duplication should reduce the number of potentially responsive documents significantly, by as much as 40% or more.  Based on the volume of extracted material, this processing operation alone could take at least 20 days to complete, although Gravity Stack will have a clearer timeframe once this step is in progress.  At that point, but only at that point, the review process can begin.  Assuming a 40% reduction from de-duplication, Gravity Stack estimates that even with 20 attorney reviewers devoted full-time to the task, the estimated time to complete the review would be two months or more.  Given Gravity Stack's estimates, that two-month review period cannot even begin until approximately March 17 (several more days to a week to complete the export followed by twenty days to process the data for review) – the day currently set in the Order for production.

Reed Smith is taking its responsibilities under the Order with the utmost seriousness. The importance of complying with the Order while continuing to protect documents not subject

to the Order compels Reed Smith to request that the Court extend the deadlines in the Order by at least 60 days.

Should the Court grant Reed Smith's request to stay the Order pending appeal, Reed Smith will nevertheless continue to work on the review described above, so that if the appellate court affirms the Order, the production will not be delayed.  Reed Smith assumes that Reorganized Holdings will secure payment for that work, as with all the work being done to comply with the Order.

<u>**CONCLUSION**</u>

The Court should grant the Motion and issue a stay pending appeal, and grant such other relief as the Court deems proper.


DATED:    New York, New York
          February 24, 2025

                            **REED SMITH LLP**

                            */s/ Louis M. Solomon*
                            Louis M. Solomon
                            599 Lexington Avenue
                            New York, NY 10022
                            Telephone: (212) 251-5400
                            Facsimile: (212) 521-5450
                            E-Mail: lsolomon@reedsmith.com

                            *Reed Smith LLP*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of S.D.N.Y. Local Rule 7.1(c), because, excluding the parts of the document exempted by that rule, and relying on the word count of the word-processing program used to prepare this document, this document contains 6957 words.

Dated:  February 24, 2025

<u>/s/ Louis M. Solomon</u>
Louis M. Solomon
