UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:  3/24/2025           │
└─────────────────────────────────┘
```

-----------------------------------------------------------------------X
        :

ELETSON HOLDINGS INC., and ELETSON     :
CORPORATION,
        :

                Plaintiffs,     :          23-cv-7331 (LJL)

        :

        -v-        :      OPINION AND ORDER

        :

LEVONA HOLDINGS LTD.        :

        :

                Defendant.     :

        :

-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Reed Smith, LLP moves, pursuant to Federal Rule of Civil Procedure 62(d) and Federal

Rule of Appellate Procedure 8(a), for a stay of this Court's order of February 14, 2025,

displacing Reed Smith as counsel of record in this action and requiring Reed Smith to turn over

client files for Eletson Holdings Inc. ("Eletson Holdings") and Eletson Corp.  Dkt. No. 273.[1]

The order of February 14, 2025, granted the motion of Eletson Holdings Inc., by and through its

counsel Goulston & Storrs, to displace Reed Smith as counsel for Eletson Holdings and compel

Reed Smith to turn over its client files to Eletson Holdings.  Dkt. No. 269, incorporating oral

ruling at Dkt. No. 270.  The order was issued after extensive briefing and oral argument.  Dkt.

Nos. 243, 252, 257, 258, 270.  On February 24, 2025, Reed Smith filed a Notice of Appeal of

that ruling.  Dkt. No. 272.  Reed Smith moves for a stay of the ruling pending a decision on its

appeal or, in the alternative, a temporary stay so that it may seek a stay from the Second Circuit,

---

[1] Throughout this opinion, docket citations not followed by a case name or number are to the
docket in this case, 23-cv-7331.  Docket citations from other related proceedings are followed by
a case name or number.

or, in the alternative, additional time to turn over the client files pursuant to Federal Rule of Civil Procedure 6(b).  Dkt. No. 273.

For the following reasons, the motion for a stay pending a decision on Reed Smith's appeal is denied.  The motion for additional time to turn over the client files is also denied.  The motion for a temporary stay so that Reed Smith may seek a stay from the Second Circuit is granted.

## I.    Background

The Court assumes familiarity with prior proceedings in this matter and provides only a general outline.

Eletson Holdings and its subsidiary Eletson Corp. are companies organized under the laws of Liberia[2] which are engaged in the shipment of liquified petroleum gas.  Dkt. No. 67-58 ("Award") at 5.  Eletson Holdings and Eletson Corp. were parties to an arbitration with Levona Holdings Ltd. ("Levona"), in which the arbitrator ruled in favor of the Eletson entities.  *Id.* at 94–101.  The arbitrator specifically ordered Levona, as well as non-parties Murchinson and Pach Shemen, which are affiliated with Levona, to pay certain sums to non-party Eletson Gas LLC and to three Cypriot entities related to the families which controlled Eletson Holdings.  *Id.*

This case concerns the petition of Eletson Holdings and Eletson Corp. to confirm the arbitral award and the motion of Levona to vacate that award.  On February 9, 2024, the Court issued an Opinion and Order granting in part and denying in part Eletson's petition to confirm and granting in part and denying in part Levona's cross-petition to vacate the arbitral award

---

[2] During the pendency of this motion, Eletson Holdings submitted papers in a related action stating that as of March 14, 2025, "Holdings has re-domiciled out of Liberia" and is now domiciled in the Republic of the Marshall Islands.  Dkt. No. 13, *In re Eletson Holdings*, 25-cv-1685.  Eletson Holdings stated that its former majority shareholders and others were challenging this action.  *Id.*

("Award").  Dkt. No. 83; *see* Dkt. No. 104.  However, on September 6, 2024, the Court granted

Levona's motion to file an amended answer and amended cross-petition to vacate based on

newly-produced documents tending to show fraud in the arbitration proceeding.  Dkt. No. 162.

In March 2023, while the arbitration was pending, Pach Shemen and two other creditors

(the "Petitioning Creditors") commenced involuntary bankruptcy proceedings (the "Bankruptcy

Proceeding") against Eletson Holdings and two affiliates (the "Debtors").  Dkt. Nos. 67-26, 67-

30; *see In re Eletson Holdings Inc. et al.* (*"Bankruptcy Proceeding"*), No. 23-10322 (Bankr.

S.D.N.Y.).  On September 25, 2023, on motion of the Debtors, the proceeding was converted to a

voluntary bankruptcy under chapter 11.  Dkt. No. 215, *Bankruptcy Proceeding*.  The Debtors and

Petitioning Creditors proposed competing plans of reorganization.  Dkt. No. 1212 at 5–11,

*Bankruptcy Proceeding*.  After five days of evidentiary hearings and significant briefing, the

bankruptcy court held that the Debtors' plan was not confirmable and the Petitioning Creditors'

plan was confirmable.  *Id.*[3]  The bankruptcy court confirmed the petitioning creditors' plan on

November 4, 2025.

The confirmed plan ("Plan") provided that control of Eletson Holdings would pass from

its former equity holders and board to Pach Shemen and a new board representing creditor

interests.  On the effective date of the Plan, the members of the governing body of each Debtor

prior to the Effective Date were "deemed to have resigned or otherwise ceased to be a director or

manager of the applicable Debtor," Dkt. No. 202-3 § 5.10(c), Eletson Holdings was deemed to

---

[3] The bankruptcy court concluded that Debtors' Plan was not confirmable because the
shareholders did not contribute new value or value that was substantial and thus it violated the
absolute priority rule.  *Id.* at 54–67.  The court also noted as an additional problem with the plan
that it presumed equitable subordination of the Petitioning Creditors on the grounds that they had
acted in bad faith, but the court concluded the Petitioning Creditors did not act in bad faith.  *Id.* at
86–89.

be Reorganized Holdings, and the equity of the old Eletson Holdings was vested in its new owners, *id.* § 1.125-126.  Reorganized Holdings was to be managed by a new board consisting of three directors: (i) one director selected by the Plan Proponents, (ii) one selected by the Plan Proponents but subject to the consent of the Creditors' Committee, and (iii) an independent director selected by the Creditors Committee.  *Id.* § 5.10(a), (c).  Decisions related to claims with Levona and its affiliates, including Pach Shemen, would be made by the independent director, with a limited exception.  *Id.* § 5.10(b).  Retention of all professionals by Debtors would terminate on the effective date.  *Id.* § 2.5(a).  The bankruptcy court's confirmation order directed that the Debtors and Petitioning Creditors, including their related parties, "cooperate in good faith to implement and consummate the Plan."  Dkt. No. 1223 at 20, *Bankruptcy Proceeding*.

The effective date of the Plan was defined as the business day when no stay of the confirmation order was in effect, all conditions precedent had been satisfied or waived, and the Plan was declared effective.  Dkt. No. 202-3 § 1.62.  On November 19, 2024, Eletson Holdings waived conditions precedent and the Plan became effective.  Dkt. No. 1258, *Bankruptcy Proceeding*; *see* Dkt. No. 255-1 at 23:17–18 (statement of the bankruptcy court that "[o]n November 19th, 2024, the Chapter 11 plan became effective.").  No stay of the confirmation order was sought or obtained.  Thus, on that date, the board members of the former Debtor were deemed to have resigned, the new board of directors was deemed appointed, the equity interest in the former holders was extinguished, and the equity interest was vested in the new holders.  Dkt. No. 255-1 at 26:5–27:20.  Eletson Holdings' retention of Reed Smith was terminated.  *Id.* at 12:14–20; Dkt. No. 212.

After the effective date, Goulston & Storrs appeared in this case as counsel for Eletson Holdings and Eletson Corp.  Dkt. No. 216–17.  However, Reed Smith declined to turn over any

client files and argued that it continued to represent Eletson Holdings, stating that the Plan had

not been recognized under Liberian law and that a court in Piraeus, Greece, had issued an order

constituting a so-called "provisional" board of directors with authority to act for Eletson

Holdings. Dkt. No. 217; *see* Dkt. No. 238 at 16:13–24:23. On December 23, 2025, the Court

ruled that by order of the bankruptcy court, the former board of Eletson Holdings had been

displaced by the new board stated in the confirmed Plan, and that such new board had authority

to act on behalf of Eletson Holdings with respect to this appeal. Dkt. No. 238 at 31:10–32:5;

Dkt. No. 234.

On January 7, 2025, Eletson Holdings and Eletson Corp. moved for an order displacing

Reed Smith as counsel of record in this matter and compelling the immediate turnover of the

Reed Smith's Eletson client file as related to the arbitration[4] to Goulston & Storrs. Dkt. Nos.

242–245. Reed Smith opposed the motion. Dkt. Nos. 251–252. Reed Smith continued to argue

that the provisional board of Eletson Holdings appointed by the Greek court, not the new board

pursuant to the confirmed Plan in the United States bankruptcy court, had capacity to act for

Eletson Holdings in this proceeding. Dkt. No. 252 at 3–7, 10–12. Reed Smith also argued in the

alternative that if the new board were the proper representative of Eletson, there would be no

case or controversy before the Court, and therefore no jurisdiction, because the new board and

Levona are both controlled by Murchinson. *Id.* at 13–15. Finally, Reed Smith argued that it

---

[4] Specifically, the Eletson client file was defined for purposes of this motion as: "1. The entire client file maintained by Reed Smith in any matter wherein it represented Eletson Corp. or Eletson Holdings, Inc. in relation to the Arbitration Award, the enforcement thereof or the monetization of it and the disputes underlying the Arbitration. 2. All communications between Eletson Corp., Eletson Holdings, Inc. and/or any agents thereof, including Reed Smith, and any third party relating to the Arbitration. 3. Unredacted time sheets through the current date, including internal work in progress accounting time entries, relating to the Arbitration." Dkt. No. 243 at 9.

could not be compelled to turn over client files to an adverse party pursuant to *Tekni-Plex, Inc. v. Meyner & Landis*, 89 N.Y.2d 123 (1996). *Id.* at 17–19.

After oral argument, the Court granted the motion in part, displacing Reed Smith as counsel of record and ordering Reed Smith to turn over the client file. Dkt. No. 269; *see* Dkt. No. 270 at 83:11–116:1. It stated that by order of the bankruptcy court, "reorganized Eletson Holdings is the only Eletson Holdings Inc." *Id.* at 96:21–22 (quoting Dkt. No. 257-1 at 26 (transcript of bankruptcy court hearing of January 24, 2025)). The Court reasoned that recognition of the order of the bankruptcy court in this proceeding is "not contingent upon the recognition of the order in Greece and Liberia," and that a party cannot countermand the order of a United States court simply because it is not yet recognized in a foreign jurisdiction. *Id.* at 99:11–12, 101:13–15. It additionally held that the exception to file turnover in *Tekni-Plex* is not applicable, *id.* at 108–09, and that jurisdiction is present because the existence of the arbitration award is a real injury to Levona for which vacatur would provide relief, *id.* at 109–111.[5]

Reed Smith then filed a notice of appeal and moved to stay enforcement of such order pending appeal. Dkt. Nos. 272–274.

## II.    Discussion

The Court considers the following four factors in deciding whether to grant a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the

---

[5] At the same conference, the Court ruled on several pending motions in the related proceeding involving Eletson Holdings' appeal of the confirmation order in the bankruptcy proceeding. *See* Dkt. No. 66, *In re Eletson Holdings Inc.*, No. 24-cv-8672 (S.D.N.Y. February 14, 2025); Dkt. No. 270 at 95:8–106:9. The effect of these rulings was similarly that reorganized Eletson Holdings, not the former board of Eletson Holdings, had authority to act on behalf of Eletson Holdings in that appeal. *See id.* at 105:24–106:9 ("The only party before the Court as appellant is the entity that converted the proceeding in the Bankruptcy Court to a voluntary petition, Eletson Holdings, which, as the confirmed plan indicates, is run by a new board.").

stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *S.E.C. v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 162 (2d Cir. 2012) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Reed Smith seeks a stay of the Court's order 1) displacing Reed Smith as counsel of record and 2) requiring the turnover of Reed Smith's Eletson client file.  Dkt. No. 272.  Reed Smith has not established a basis to stay either part of this order pending appeal.

Notwithstanding Reed Smith's attempts to complicate the issues, they are relatively straightforward.  Reed Smith's desire to remain counsel for Eletson Holdings does not create irreparable injury or provide grounds for a backdoor appeal of the Plan ordered by the bankruptcy court.  It is moreover straightforward that when counsel is replaced, former counsel must turn over the client file.  Reed Smith's argument reduces to the quotidian: it claims it is still owed fees by Eletson Corp. and that it should be entitled to withhold the file from its client Eletson Holdings to secure its right to those fees.  The claim appears to lack merit, does not give rise to irreparable harm, and is hardly the type of issue that could give rise to a stay pending appeal.

### A.    Likelihood of Success on the Merits

Reed Smith identifies the following as serious questions going to the merits: (1) whether the Court continues to have Article III jurisdiction over this action to confirm or, in the alternative to vacate, the arbitral award, Dkt. No. 274 at 4–7; (2) whether the Court's turnover order violates the New York Court of Appeal's decision in *Tekni-Plex Inc. v. Meyner & Landis*, 89 N.Y.2d 123 (1996), *id.* at 7–9; (3) whether Reed Smith continues to have a retaining lien against Eletson Corp. following Plan confirmation which would preclude a turnover order, *id.* at 10–11; and (4) whether the Court's order displacing Reed Smith violates principles of international comity and deprives Eletson Holdings and Eletson Corp. of their right to counsel,

*id.* at 11–12. Eletson Holdings argues that Reed Smith is not likely to succeed on the merits because the Court's order is not appealable, Dkt. No. 277 at 2–4, and that even assuming the order was appealable, Reed Smith's arguments lack merit, *id.* at 4–15.

Given the number of legal issues raised, is useful to clarify what would need to occur for Reed Smith to succeed in reversing the Court's order displacing Reed Smith as counsel of record and requiring the turnover of Reed Smith's Eletson client file. First, the Court of Appeals would need to hold that it has jurisdiction over the appeal. If the Court of Appeals has jurisdiction over the appeal, the court would need to hold either that this Court lacked jurisdiction to enter the order appealed, *id.* at 4–7, or that, assuming it had jurisdiction, that the order should be reversed on the merits, Dkt. No. 274 at 7–12. Reed Smith's merits argument as to its displacement as counsel is that the displacement violates principles of international comity and the right to counsel. Dkt. No. 274 at 11–12. Reed Smith's merits argument as to the turnover of the file is that the file is subject to a retaining lien and its turnover would violate *Tekni-Plex*. *Id.* at 7–11. The Court considers each of these issues in turn.

### 1.    Whether Interlocutory Appeal is Permitted

Eletson Holdings argues that Reed Smith's application is unlikely to succeed for the threshold reason that this Court's order is not appealable. Dkt. No. 277 at 2–4. Eletson Holdings also questions whether Reed Smith, as counsel, has standing to pursue an appeal. Dkt. No. 277 at 4 n.2. Reed Smith responds that the Court's turnover order is akin to a mandatory injunction, which is immediately appealable. Dkt. No. 280 at 2. It also argues that the Court's order is immediately appealable under the *Forgay-Conrad* doctrine. *Id.* at 3; *see HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632 n.4 (2d Cir. 1995) ("Under the *Forgay* doctrine, an order is treated as final if it directs the immediate delivery of property and subjects the losing party to irreparable harm if appellate review is delayed." (*quoting In re Martin–Trigona* (*Schlehan v. Olympic*

*Worldwide Communications, Inc.*), 763 F.2d 135, 138 (2d Cir.1985))).  The Court finds that

Reed Smith's appeal is likely permissible only as to the portion of the order directing turnover of

the client file.

"[A] party must ordinarily raise all claims of error in a single appeal following final

judgment on the merits."  *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981).  An

exception exists for collateral orders which "finally determine claims of right separable from,

and collateral to, rights asserted in the action, [and are] too important to be denied review and too

independent of the cause itself to require that appellate consideration be deferred until the whole

case is adjudicated."  *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949).

However, the collateral order doctrine has been applied narrowly.  In *Mohawk Indus., Inc. v.

Carpenter*, the Supreme Court held that a discovery order requiring a party in a case to produce

otherwise privileged documents, like any other pretrial discovery order, was not immediately

appealable under the collateral order doctrine.  558 U.S. 100, 108 (2009).  The Court held that

postjudgment appeals "generally suffice[d] to protect the rights of litigants and ensure the vitality

of the attorney-client privilege."  *Id.* at 109.[6]  Similarly, in *Richardson-Merrell, Inc. v. Koller*,

the Supreme Court held that orders disqualifying counsel in civil cases "are not collateral orders

---

[6] The Supreme Court noted that if the court erred in requiring disclosure of privileged
information, an appellate court could remedy the erroneous ruling "in the same way they remedy
a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding
for a new trial in which the protected material and its fruits [were] excluded from evidence."  *Id.*
An aggrieved party could also ask the district court to certify, and the court of appeals to accept,
an interlocutory appeal from the order.  *Id.* at 110–111.  The aggrieved party also could petition
for a writ of mandamus or defy the order and, if contempt sanctions were imposed, take an
appeal.  *Id.* at 111.  The Court recognized that such actions would not remedy the "right not to
disclose the privileged information in the first place," but held that such right was not of
sufficient weight to permit an interlocutory appeal.  *Id.* at 109.  The Second Circuit has since
applied *Mohawk Industries* to other claims of privilege asserted by a party to a litigation and
where the disclosure order is directed at a third party.  *See Rosner v. United States*, 958 F.3d 163,
166 (2d Cir. 2020) (psychotherapist-patient privilege).

subject to appeal as 'final judgments' within the meaning of 28 U.S.C. § 1291." 472 U.S. 424, 440 (1985). The Supreme Court held that despite the "significant hardship" loss of preferred counsel may impose on litigants, such orders are properly reviewed on appeal of a final judgment. *Id.* at 440.

On the other hand, the Second Circuit and other Circuits have held that an order directing an attorney to turn over a client file which is purportedly security for an attorney's lien is an appealable collateral order, because it is "directed to non-parties" and effectively unreviewable on appeal from the final judgment. *Pomerantz v. Schandler*, 704 F.2d 681, 682 (2d Cir. 1983); *see Kaibel v. Mun. Bldg. Comm'n*, 742 F.3d 1065, 1067 (8th Cir. 2014) (collecting authority).

These principles are instructive here. Although Reed Smith initially stated a stay was needed due to "the irreparable harm of disclosing privileged information directly to the principals of Reed Smith's client's adversary," Dkt. No. 274 at 1, Reed Smith is not the privilege holder—the privilege holder is its client. And its client is Eletson Holdings. Moreover, even assuming the privilege was held not by the board of Eletson Holdings appointed pursuant to the Plan but rather by "the Greek/Liberian entity provisionally appointed by the Greek Court," as Reed Smith claims, Dkt. No. 274 at 1, such party has not appeared in this action. If the allegedly competing board of Eletson Holdings wanted to assert the privilege, it could always have filed a motion to intervene—a step it has steadfastly refused to take despite invitation. *See* Dkt. No. 207 ("[T]he Court modifies the stay to permit (but not require) motions by interested parties, including Eletson Gas and the Preferred Nominees, to intervene in this action."). The privilege is assuredly not held by Reed Smith and cannot be asserted by Reed Smith.

Under *Richardson-Koller*, Reed Smith's displacement as counsel also does not provide grounds for Reed Smith to take an interlocutory appeal. Although the appellant in *Richardson-*

*Koller* was a litigant who had lost her preferred counsel, the Supreme Court specifically noted that "the disqualified attorney's personal desire for vindication," does not present independent grounds for an interlocutory appeal, given that "the decision to appeal should turn entirely on the client's interest." 472 U.S. at 434.

*Mohawk Industries* and *Richardson-Koller* thus appear to be dispositive to the extent that Reed Smith argues that the Court's order intrudes into the attorney-client privilege or undermines Eletson Holding's right to counsel. The alternative board of Eletson Holdings has not appeared in this case, nor has any party who could claim to be a privilege holder (despite the Court's invitation), and, under *Mohawk Industries* and *Richardson-Keller*, those parties can take an appeal from a final order if they do appear and if they believe that this Court erred. By absenting themselves, they cannot convert an otherwise unappealable interlocutory order into an appealable order.

By contrast, Reed Smith does have an independent proprietary interest in its client file that is distinct from the interests of its client and from the underlying action. Reed Smith asserts that the file is security for a $2 million retaining lien owed by Eletson Corp. Dkt. No. 272 at 10. Under *Pomerantz*, Reed Smith may properly take an interlocutory appeal to protect this interest. 704 F.2d at 682; *see also Sutton v. New York City Transit Auth*., 462 F.3d 157 (2d Cir. 2006) ("[O]rders adjudicating attorney's fees are normally considered sufficiently distinct from the main litigation to be appealable as collateral orders.").

Therefore, Reed Smith is likely to succeed in obtaining review of its claims regarding its retaining lien in the client file. However, Reed Smith is unlikely to succeed in obtaining review of its claims regarding its displacement as counsel. *See Oneida Indian Nation of Wisconsin v. State of N.Y.*, 732 F.2d 259, 261 (2d Cir. 1984) (considering an order disqualifying counsel and

denying turnover of documents, and suggesting that jurisdiction could be present over the latter and not the former).[7]

## 2.   Jurisdiction to Enter the Order

Assuming the order is appealable, Reed Smith's primary argument on appeal is that this Court lacked jurisdiction to enter the turnover order. Reed Smith argues that because Eletson Holdings and Levona are now "under common control," there is no case or controversy supporting Article III jurisdiction. Dkt. No. 274 at 4–5. There are two flaws in the argument.

First, the Court's order here is rooted in the Court's inherent power to administer proceedings before it and to regulate the conduct of counsel appearing before it, not in the Court's Article III jurisdiction to adjudicate the underlying dispute between Eletson Holdings and Levona. "It is well established that a federal court may consider collateral issues after an action is no longer pending," including "after an action is dismissed for want of jurisdiction." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). For example, a Court may order costs, attorney's fees, contempt sanctions, and Rule 11 sanctions. *Id.* at 395–96; *see Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999). "Such an order implicates no constitutional concern because it 'does not signify a district court's assessment of the legal merits

---

[7] Reed Smith's contention that the Court's order is effectively a mandatory injunction and invocation of the "practical finality" doctrine, Dkt. No. 280 at 2, do not affect this conclusion. "An order has the practical effect of granting injunctive relief within the meaning of section 1292(a)(1) if it is 'directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint.'" *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 632 (2d Cir. 1995) (quoting *Abish v. Northwestern National Insurance Co.*, 924 F.2d 448, 453 (2d Cir.1991)). The Court's order is directed towards counsel and is independent from the substantive issues in the proceeding. It is not an injunction within the meaning of section 1292(a)(1). Essentially all court orders require a party or that party's counsel to do something—this does not make them all appealable injunctions. As to practical finality, the source cited by Reed Smith describes such doctrine as applying to "a decision that leaves only ministerial or unrelated matters to be resolved." 19 Moore's Federal Practice—Civil § 202.08 (2024). The decision to displace Reed Smith as counsel and order turnover leaves every substantive issue in this case unresolved. The practical finality doctrine therefore does not apply.

of the complaint.'" *Willy v. Coastal Corp.*, 503 U.S. 131, 138 (1992) (quoting *Cooter & Gell*, 496 U.S. at 396). "It therefore does not raise the issue of a district court adjudicating the merits of a 'case or controversy' over which it lacks jurisdiction." *Id.* Rather, such orders are related to a Court's inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases" and "discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)). Similarly, "[t]he authority of federal courts to disqualify attorneys derives from their inherent power." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, at 132 (2d Cir. 2005). Courts in this Circuit have also held that the power to compel an attorney to turn over a client file stems from "[t]he power to control the actions of attorneys as officers of the court." *Kleiman v. O'Neill*, 2008 WL 5582453, at *4 (E.D.N.Y. Dec. 30, 2008); *see United States v. Kaplan*, 2023 WL 5718901, at *3 (E.D.N.Y. Sept. 5, 2023).

Whether or not the Court has Article III jurisdiction, the Court has the power to relieve or displace the counsel appearing before it. Goulston & Storrs, as counsel appearing for Eletson Holdings, argues that the Court has Article III jurisdiction to resolve the dispute between it and Levona. Reed Smith argues that the Court does not have Article III jurisdiction. Regardless how the Court resolves that question, Eletson Holdings has the right to have the issues presented by a counsel devoted to it. And the Court has an independent interest in assuring that the lawyer speaking to it, purportedly on behalf of a client, has the authority to speak on behalf of that client. *Cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."). The Court's displacement order falls squarely within its powers regardless whether the Court finds it has jurisdiction to entertain Eletson Holdings' motion to confirm the

arbitration award and Levona's motion to vacate it. For similar reasons, the Court retains the authority to order Reed Smith—if Reed Smith in fact is an interloper with no continuing right to the client file—to turn over that client file to its client so that the client can make decisions in this case in an informed manner. The Court may properly regulate Reed Smith's conduct in this manner because Reed Smith is appearing before it and its conduct is relevant to Eletson Holdings' ability to represent itself in this case. *See Kaplan,* 2023 WL 5718901, at *3; *Love & Madness, Inc. v. Claire's Holdings, LLC*, 2021 WL 4554058, at *3 (S.D.N.Y. Oct. 4, 2021) (ordering turnover of client file to facilitate ongoing litigation).

The second flaw in Reed Smith's jurisdictional argument is that this Court does in fact have Article III jurisdiction over the underlying controversy between Eletson and Levona. When this case was begun through the motion to confirm filed by Eletson Holdings, Levona and Eletson were not under common control. Prior to the takeover, Levona argued that the Court lacked Article III jurisdiction because the relief awarded by the arbitrator ran in favor of persons other than Eletson Holdings who were not parties to the Arbitration. Dkt. No. 50 at 14–16. Eletson Holdings responded that "[a] party to an arbitration who 'is entitled to confirmation of an award' satisfies the Article III case and controversy requirement." Dkt. No. 54 at 6 (citing *Nat'l Cas. Co. v. Resolute Reinsurance Co*., 2016 WL 1178779, at *3 (S.D.N.Y. Mar. 24, 2016) ("Because a party to an arbitration is entitled to confirmation of an award, until it receives that confirmation an ongoing case and controversy exists.")). The Court accepted that argument. Dkt. No. 83 at 46–55. The same logic follows now that the shoe is on the other foot. The Court has jurisdiction both with respect to the ongoing motion to confirm, as to which the Court has not reached a final decision, and with respect to Levona's motion to vacate the award.

A court has Article III jurisdiction if the plaintiff can show she has (1) suffered an actual or imminent injury in fact that (2) is fairly traceable to the conduct of the defendant and that (3) would be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Standing limitations ensure that the plaintiff has a "personal stake" in the case, as "a federal court may resolve only 'a real controversy with real impact on real persons.'" *Id.* (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring)).

All three elements have been established here. First, Levona has suffered an injury in fact. An award has been entered against it by an arbitrator sitting in New York. The award runs in favor of Eletson Holdings and Eletson Corp., but also in favor of the so-called Preferred Nominees and Eletson Gas. Under the New York Convention, that award can be enforced anywhere in the world, without being reduced to a judgment. *See CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 73 (2d Cir. 2017) (holding that the New York Convention did away with the "double *exequatur*" requirement that the court in the rendering state recognize an award before it could be taken and enforced abroad). At any time, the Preferred Nominees and others may attempt to enforce the award against Levona. Moreover, the injury is actual and imminent: the risk of enforcement proceedings is not merely hypothetical. Enforcement proceedings already have been commenced against Levona in several jurisdictions. Those proceedings could lead to substantial financial damages. *See* Dkt. No. 248-1 at 23 (England); Dkt. No. 276-1 (Greece); *see also* Dkt. No. 275 at 2.[8] There is a causal connection between the

---

[8] Reed Smith recently filed an action in England on behalf of Eletson Gas to recognize and enforce the Award against Levona. Dkt. No. 248-1 at 23. The alleged Cypriot nominees issued formal board resolutions and corporate records in February 2024, in reliance on the Court's February 9, 2024, confirmation/vacatur decision, purporting to change the share registry and

injury and the conduct complained of:  The Award is the product of the arbitration, and the Court has already found that there is evidence to suggest that the Award was procured by the fraud of Eletson Holdings and certain of its representatives during the arbitration.  Dkt. No. 162 at 15–16, 34, 47.  And, finally, the injury can be redressed by a favorable decision.  If the Court vacates the award, Levona will be relieved of the threat of enforcement of the award.  There will no longer be an award to enforce.

Reed Smith resists that conclusion by adding a fourth element to the Article III test for standing.  It claims that Article III contains an "adversity requirement," at least "in the context of common control."  Dkt. No. 274 at 6.  It relies on the line of cases that hold that courts lacks authority "to act in friendly or feigned proceedings."  *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 71 (1997) (citing *United States v. Johnson,* 319 U.S. 302, 304 (1943)).  In *United States v. Johnson*, for example, the Court declined to resolve an appeal when the plaintiff filed his lawsuit under a fictitious name at the request of the defendant who sought a friendly lawsuit and where the plaintiff did not employ or even meet his attorney, did not pay any legal expenses, did not read the complaint filed in his name, and had no knowledge of the relief being sought.  319 U.S. 302 (1943).  The cases on their facts speak to circumstances in which the plaintiff has not suffered an actual or imminent injury in fact, and a court decision is not necessary to provide redress.  If the plaintiff and defendant are not truly adverse and the defendant has the ability and

---

board of directors of Eletson Gas to reflect the relief they believe they obtained through the Award and to authorize themselves to enforce it.  Dkt. No. 248.  In March 2024, Eletson Corp. and Eletson Gas obtained an ex parte injunction in the British Virgin Islands precluding Levona from dissipating certain asserts based on the Court's confirmation/vacatur decision.  Reed Smith and others have been asserting that the Award has been "confirmed" and runs against Levona. *Id.*  The creditors have argued in the bankruptcy court that the efforts of the purported Preferred Nominees and Reed Smith violate the terms of that Court's Stay Relief Order, which prohibited any efforts to enforce or effectuate the arbitration award absent further order of that court. *Id.*

the interest to provide to the plaintiff all the relief that the plaintiff would be seeking through a lawsuit, then it is easy to view the lawsuit as a contrivance to obtain an opinion that a court would be prohibited from giving in the absence of a real case and controversy. *See Muskrat v. United States*, 219 U.S. 346, 361 (1911).

The existence of a party-defendant who is willing and able to present adverse arguments, however, is not necessary to Article III jurisdiction. The Supreme Court has squarely held that the existence of "concrete adverseness which sharpens the presentation of issues" goes to the prudential question whether the Court should exercise jurisdiction, not to the constitutional question whether the Court may exercise jurisdiction. *See United States v. Windsor*, 570 U.S. 744, 759–60 (2013). The Court in *Windsor* distinguished between "the jurisdictional requirements of Article III and the prudential limits on its exercise." *Id.* at 756. The constitutional requirements are those set forth in *Lujan* and *TransUnion*. *Id.* at 757. Those principles require that a favorable decision will have "'real meaning'" for the party invoking the court's jurisdiction and that the party retains "a stake" in the matter. *Id.* at 758 (quoting *INS v. Chadha*, 462 U.S. 919, 940 (1983)). Even if the Court has Article III jurisdiction, prudential factors may counsel against the Court hearing the case depending on, for example, whether the Court would benefit from the "adversarial presentation of the issues." *Id.* at 760.

Courts not infrequently exercise Article III subject-matter jurisdiction when there is not adversity. It is common, for example, for the courts to enter a default judgment on a complaint that has not been tested by the appearance of an adversary. *See, e.g.*, *Broach v. Metro. Exposition Servs., Inc.*, 2020 WL 3892509, at *4–5 (S.D.N.Y. July 10, 2020); *Gavel v. WOW Payments LLC*, 2020 WL 7890660, at *1 (S.D.N.Y. Oct. 15, 2020). It is sufficient that "[p]rior to entering a default judgment, the Court . . . ascertain that subject matter jurisdiction exists over

plaintiff's claims" based on Article III and federal statutes. *DeVito Verdi, Inc. v. Legal Sea Foods, Inc.*, 2021 WL 1600088, at *1–2 (S.D.N.Y. Apr. 23, 2021) (collecting cases).[9] Likewise, the courts frequently entertain an undisputed motion to confirm or vacate an arbitration award. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 112 (2d Cir. 2006) ("Because the Broker's motion to confirm was unopposed, confirmation of the entire arbitral award is appropriate."); *New York Hotel & Gaming Trades Council, AFL-CIO v. CSC Hudson*, 2025 WL 80228, at *4 (S.D.N.Y. Jan. 13, 2025) (discussing the standard for granting an unopposed motion for confirmation of an arbitral award). It is enough that an arbitrator has entered an award which would benefit or hurt the party bringing the lawsuit. The Court does not pause to inquire why the seemingly adverse party is not opposing the motion—whether it is because it is now under common control with the petitioner or whether for some other reason it is in its interest not to oppose the relief being sought. It is a truism that the Court must have Article III jurisdiction at all times. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."). Yet, if one or the other party chooses not to answer a motion for summary judgment, the Court need not dismiss the case for lack of subject-matter jurisdiction. It can grant the motion if the moving party "has met its burden of demonstrating that no material issue of fact remains for trial." *Entsorgafin S.P.A. v. Entsorga W. Virginia, LLC*, 2023 WL 6465316, at *1 (S.D.N.Y. Oct. 4, 2023) (quoting *D.H. Blair*, 462 F.3d at 110). Finally, parties who have settled can ask a court to vacate an adverse ruling or judgment. *See U.S.*

---

[9] Indeed, a court may even enter a default judgment without having determined that it can exercise personal jurisdiction over the defendant. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133–36 (2d Cir. 2011).

*Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21–22 (1994); *U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Toney*, 2019 WL 3779876, at *2–3 (E.D.N.Y. Aug. 12, 2019). The fact that the parties are no longer adverse does not prevent the Court from acting. *See U.S. Bancorp*, 513 U.S. at 21 ("Article III does not prescribe such paralysis."). In all of these circumstances, it is irrelevant why the person who was at one time on the other side of the "v" has decided not to oppose the relief sought by the moving party. What matters is that the Plaintiff has (1) suffered an actual or imminent injury in fact that (2) is fairly traceable to the conduct of the defendant and that (3) would be redressed by a favorable decision of the court. *Lujan*, 504 U.S. at 560.

Both at its inception and in its current posture, this proceeding is anything but feigned. The relief sought by Levona has "real meaning," and Levona has a "stake" in the matter, as does Eletson. *Windsor*, 570 U.S. at 757–58 (quoting *Chadha*, 462 U.S. at 939). An Award in the amount of over $85 million has been entered against Levona. Dkt. No. 67-58. Under the New York Convention, there is no need for the Award to be confirmed in the United States before it can be enforced in other countries. *See CBF Industria de Gusa*, 850 F.3d at 72–73 (noting that "[t]his, in fact, was the entire purpose of the New York Convention"). In those other countries, which are not the site in which the Award was rendered, the grounds for avoiding an arbitration award are "strictly limited." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997). Under Article V of the Convention, such grounds include only that:

>  (a) The parties to the agreement . . . were . . . under some incapacity, or the said agreement is not valid under the law . . . ; or

>  (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings . . . ; or

>  (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . . ; or

19

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 ("New York Convention"), art. V(1).  Enforcement may also be refused if "[t]he subject matter of the difference is not capable of settlement by arbitration," or if "recognition or enforcement of the award would be contrary to the public policy" of the country in which enforcement or recognition is sought.  *Id.* art. V(2).  "These seven grounds are the only grounds explicitly provided under the Convention." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 19. Fraud before the arbitrator is not grounds for avoiding enforcement in a secondary jurisdiction. This Court, however, has primary jurisdiction and, under the New York Convention and the Federal Arbitration Act, is therefore "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *CBF Industria de Gusa*, 850 F.3d at 73 (quoting *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 ((citing N.Y. Convention, art. V(1)(e))).  Those grounds include that "the award was procured by corruption, fraud, or undue means," and that "there was evident partiality or corruption in the arbitrators, or either of them."  9 U.S.C. § 10(1), (2).

In other words, Levona has a concrete, immediate stake in whether the arbitration award is set aside here or rather can continue to be used around the world to force Levona to pay tens of millions of dollars to the Preferred Nominees and Eletson Gas.  Such is true no matter whether an adverse party contests Levona's position that the award should be set aside.  And even in the absence of adversity, there is no guarantee that the Court would vacate the award.  Levona would have to convince the Court that there is sufficient evidence to support a conclusion that there was

fraud in the arbitration.  *See D.H. Blair*, 462 F.3d at 109; *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

Finally, there is no reason to doubt that the Court will be aided in its decision by adversarial briefing.  Although Reed Smith claims that Eletson Holdings and Levona cannot be adverse because they are both controlled by Murchinson, Eletson Holdings and Levona are distinct corporations and the Plan explicitly provides that decisions related to claims concerning Levona and its affiliates, including Pach Shemen, would be made by an independent director appointed by the Creditors' Committee and controlled by shareholders other than Pach Shemen. *Id.* § 5.10(b).  The apparent purpose of this provision is to ensure that Eletson Holdings' decisions in this litigation are *not* controlled by Pach Shemen or Levona, but rather are made independently in the best interests of the shareholders of Eletson Holdings who are unaffiliated with Pach Shemen.  More important, the Preferred Nominees—who are the principal beneficiaries of the Award—have a direct interest in whether the Award is confirmed, suspended, or vacated.  As noted, those parties have already started to try to enforce the Award outside the United States, and Reed Smith has indicated that such parties would seek to intervene to defend the award.  Dkt. No. 204 at 2.  More recently, one of the nominees has filed a motion to file an amicus curiae brief, in which it asserts that it is considering filing a motion to intervene. Dkt. No. 291.  The Preferred Nominees have every reason to do so.  They have the most direct stake in the Court's decision.  The only apparent reason that they have not done so to date is a gambit that, if they do not do so, the Court may do their work for them and allow the Award to stand, not because of any decision as to whether it should be vacated or not but based on the judgment that their absence alone deprives the Court of jurisdiction to address that question.

Reed Smith's argument thus is appropriately seen for what it is—an attempt to utilize an enforceable award while avoiding any scrutiny by any court anywhere as to whether the recipient obtained that award by defrauding the arbitrator. So viewed, it is evident that Levona has "a personal stake in the outcome of the controversy" and that only this Court can grant it the relief that it seeks. *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Reed Smith is accordingly unlikely to succeed in its argument that this Court lacked jurisdiction to enter the order appealed.

### 3.    Displacement as Counsel of Record

Reed Smith is also unlikely to succeed in reversing this Court's order displacing it as counsel on the merits.

Reed Smith's argument regarding its displacement as counsel of record is that the Court violated principles of comity by favoring the counsel chosen by Eletson Holdings pursuant to the order of the United States bankruptcy court over the counsel chosen by the provisional board appointed by a court in Piraeus, Greece. Dkt. No. 274 at 11–12. It also argues that this decision deprives Eletson Holdings of its right to counsel. *Id.* Similarly, it suggests that this appeal presents the issue whether "the proponent of a plan of reorganization for a foreign entity can replace that entity (and deprive it of counsel) without first receiving recognition and complying with the corporate law of the countries of incorporation and principal place of business." *Id.*

This argument is phrased as an argument about choice of counsel in this arbitration proceeding, but it is fundamentally a backdoor attempt to undo the bankruptcy court's reorganization of Eletson Holdings. Although Reed Smith brings this appeal in its own name, the relief Reed Smith seeks is, in effect, a stay of the Effective Date of the Plan, on behalf of the former or provisional board of Eletson Holdings. Reed Smith represented the Debtors in the

Bankruptcy Proceeding, in which the bankruptcy court rejected the Debtors' proposed plan and instead confirmed the Petitioning Creditor's Plan, which provided that the existing equity holders would lose their equity and Levona's affiliate Pach Shemen, which agreed to contribute $53.5 million in new value to Eletson Holdings to pay off Eletson Holding's pre-existing debts, would gain control of the company. Dkt. No. 1212 at 40, *Bankruptcy Proceeding*. It was entirely clear that on the Effective Date of the Plan, the current members of the governing body of Eletson Holdings would be "deemed to have resigned or otherwise ceased to be a director or manager" of Eletson Holdings, and that control would pass to a new board appointed by the plan proponents and other creditors. *See* Dkt. No. 202-3 § 5.10(a), (c). Moreover, any professionals retained by the Debtors would not be considered employed by the reorganized entity absent execution of a new engagement letter for services rendered after that date. *Id.* § 10.6. This change of control is the reason the bankruptcy proceeding was so hotly contested.

Nevertheless, Reed Smith and its clients did not seek a stay of the effective date of the Plan. Nor did they raise any of the arguments they raise now, namely that the Plan was required to be recognized in Eletson Holdings' country of incorporation (Liberia) and its purported principal place of business (Greece) before it could become effective. In fact, Reed Smith benefitted from the Plan by obtaining a distribution of the funds that Pach Shemen contributed. Dkt. No. 1520 at 21, *Bankruptcy Proceeding*. Now, however, after the Plan has gone into effect, Reed Smith seeks in this separate arbitration confirmation proceeding a ruling that Reed Smith is still counsel for Eletson, because the new Board lacks authority to act on behalf of Eletson—essentially, a ruling that despite the bankruptcy court's reorganization of Eletson which transferred control to Pach Shemen, control of Eletson remains with its former shareholders and board. It is well-recognized in the bankruptcy context that "the ability to achieve finality is

23

essential to the fashioning of effective remedies," and that "completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed." *In re Chateaugay Corp*. (*"Chateaugay I"*), 988 F.2d 322, 325 (2d Cir.1993). A litigant seeking to undo a bankruptcy reorganization plan is therefore expected to "pursue with diligence all available remedies to obtain a stay of execution of the objectionable order." *In re Chateaugay Corp*., 10 F.3d 944, 953 (2d Cir. 1993) (quoting *In re Roberts Farms, Inc*., 652 F.2d 793, 798 (9th Cir. 1981)). At this point, pursuant to the Plan, Eletson has been reorganized and the new board has possessed broad authority to act on behalf of Eletson for the last four months. Dkt. No. 202-3 § 5.2. Depriving the new board of its ability to control this litigation, which was explicitly mentioned in the Plan, *id*. § 5.10(b), would place the effectiveness of the Plan in doubt and "knock the props out from under the authorization for every transaction that has taken place," *Chateaugay Corp*., 10 F.3d at 953 (quoting *Roberts Farms*, 652 F.3d at 797). If the former shareholders sought to contest the Plan, they should have done so through the bankruptcy proceeding and related appeals. Counsel's resistance to displacement is not a proper vehicle to collaterally attack the orders of the bankruptcy court.

Moreover, even assuming Reed Smith is the proper party to bring arguments that the transfer of power in the Plan should be effectively stayed and that this appeal is the proper vehicle to bring those arguments, those arguments are weak on the merits. The argument that the Plan's non-recognition in Greece or Liberia should prevent it from being recognized in the United States is contrary to the language and purpose of the Plan and to basic principles of international law.

When the matter was before the Court on Eletson Holdings' motion for turnover of the client file, Reed Smith argued that its displacement was inconsistent with the terms of an order of a single-member court of first instance in Greece, which Eletson Holdings' former shareholders obtained on an *ex parte* basis on November 12, 2024, and which appointed an interim board on a provisional basis comprised of members of the family that formerly held Eletson Holdings.  *See* Dkt. Nos. 49-2, 50, 24-cv-8672; Dkt. No. 255-1, 23-cv-7331.  The order, among other things, authorized the "interim board" to appoint attorneys to act on behalf of Eletson Holdings to challenge the confirmation order of the bankruptcy court.  Dkt. No. 49-2.  Reed Smith offered expert testimony that (1) the Confirmation Order and Plan are not automatically recognized in Greece and not currently recognized and effective in Greece, (2) the Greek court order is still valid and effective in Greece, (3) the provisional board members appointed by the Greek court are recognized in Greece as the current board members of Eletson Holdings, (4) an entity referred to as Provisional Eletson Holdings exists in Greece, and (5) the provisional directors are not permitted to effectuate the Confirmation Order and Plan in Greece prior to their recognition by a Greek court.  Dkt. No. 50 ¶ 11.  The Court held that such order by the Greek court, on its own, did not give the purported interim board the authority to appoint counsel to represent Eletson Holdings in a United States court when an unstayed order of a United States court provided that Eletson Holdings was to be governed by a board appointed by the creditors whose plan of confirmation was accepted by the bankruptcy court.

The Court's ruling followed from elementary principles of international law.  A United States court is generally required, subject to certain exceptions, to give recognition to "a final, conclusive, and enforceable judgment of a court of a foreign state granting or denying recovery of a sum of money, or determining a legal controversy."  Restatement (Fourth) of Foreign

Relations Law § 481 (2018). But even such a foreign order is not self-enforcing. In order for the order to be enforced in the United States, it must be recognized and, in order for the foreign judgment to be recognized, the person seeking recognition "must either initiate a civil proceeding for that purpose in a court of competent jurisdiction or properly raise the issue in an existing proceeding." *Id.* § 482. The burden is on the party seeking recognition of the foreign judgment to prove "that the foreign judgment is final, conclusive, and enforceable under the law of the country in which it was rendered; and that the foreign judgment is not for taxes, fines, or other penalties." *Id.* § 485(1). Those same principles apply to a foreign judgment providing injunctive or other nonmonetary relief. *Id.* § 488. In the absence of recognition, the foreign court may exercise jurisdiction to enforce its order in its own territory, but it may not do so in the territory of another country. *Id.* § 432.

The so-called provisional board of Eletson Holdings never sought recognition in this country of the order of the Greek court, nor apparently could it have. Leaving aside all other potential defects, the order was entered on an *ex parte* basis and, by its own terms, does not purport to be final and conclusive. Dkt. No. 244-1. As this Court noted, the interim board of Eletson Holdings could have sought to have the Greek order recognized in the United States by filing an action in the United States and subjecting itself to United States jurisdiction, but it did not do so. As it stands, the Greek order is, at most, effective in Greece. A Greek court does not have the jurisdiction to determine who speaks for Eletson Holdings in the United States. The bankruptcy court has done so via the Plan, which is currently effective and cannot simply be disregarded by a United States court.

Similarly, whether the Plan is recognized in Liberia does not control whether it is recognized in the United States. The order of confirmation provides, in accordance with the

Bankruptcy Code, that the Debtors and Petitioning Creditors, including their related parties, "cooperate in good faith to implement and consummate the Plan." Dkt. No. 1223 at 20, *Bankruptcy Proceeding*. That order is binding on the former shareholders that participated in the bankruptcy process and on their counsel. Dkt. No. 255-1 at 27:13–28:16 (citing relevant provisions of the Bankruptcy Code). Thus, to the extent the Plan has not yet been recognized in Liberia, the former shareholder and their counsel should simply be helping to effectuate that recognition. *Id.* at 43:21–44:3 (stating that Eletson Holdings' former shareholders, officers, directors, and counsel must "take all steps reasonably necessary as requested by the board of Reorganized Eletson Holdings Inc. or its agent to assist in amending the AOR and updating the corporate governance documents" in Liberia); Dkt. No. 1495, *Bankruptcy Proceeding* (sanctioning the former majority shareholders and provisional board for failure to update corporate documents as directed by Reorganized Eletson Holdings). The new board's current lack of recognition in Liberia does not allow Eletson's former shareholders, or their counsel, to continue to control the actions of the company in the United States, in violation of the orders of a United States court transferring control of such company.

Reed Smith has not shown that it is likely to succeed in reversing its displacement as counsel.

### 4.    Turnover of Client File

Reed Smith is also not likely to succeed in reversing the Court's order that it turn over the Eletson client file. Reed Smith makes two arguments on this point. First, it argues that pursuant to *Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663 (N.Y. 1996), it cannot be compelled to turn over privileged communications to Eletson Holdings because it is "now controlled by the same people who control Levona, its client's adversary." Dkt. No. 274 at 7. Second, it argues

that it has a retaining lien in place on Eletson Corp. that prevents the Court from ordering the documents to be turned over to Eletson Holdings.  Dkt. No. 274 at 10–11.

As of November 19, 2024, Reed Smith was terminated as counsel of Eletson Holdings.  Upon termination of the attorney-client relationship, a client has presumptive access to its former attorney's entire client file on a represented matter, absent a substantial showing by the attorneys of good cause and subject to the client paying for assemblage and delivery of the documents to the client.  *See Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P.*, 689 N.E.2d 879, 881–883 (N.Y. 1997).  That presumptive right of access includes communications with the client and draft legal memoranda and notes.  *Id.*  The exceptions are that the law firm is not required to disclose documents which might violate a duty of nondisclosure owed to a third party or otherwise imposed by law, or to disclose documents intended only for internal law office review and use.  *Id.* at 883.  Reed Smith does not dispute those propositions.

By virtue of the bankruptcy, there exist new owners of Eletson Holdings and new management.  They are the owners of the privilege and of the privileged documents.  The Supreme Court has explicitly stated that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well," and that "[d]isplaced managers may not assert the privilege over the wishes of current managers."  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 358 (1985).  The privilege belongs to the corporation and not to the persons who happened to manage or own the corporation at the time the privileged communications took place.  *Id.* at 349.

Reed Smith's argument that Eletson Holdings is adverse to its client is based on the implicit but mistaken premise that its clients were members of the family that formerly owned Eletson Holdings, not Eletson Holdings itself.  It asserts that "the privilege exists precisely to

stop adversaries from obtaining attorney-client privileged documents." Dkt. No. 274 at 8.  It

thus appears to express concern that the privileged documents will be used against the prior

owners of Eletson Holdings (to whom Reed Smith reported) or perhaps against Reed Smith

itself.  But the privilege does not belong to the former owners and directors of Eletson Holdings,

much less to Reed Smith.  Reed Smith reported to and owed a duty of loyalty to Eletson

Holdings, a distressed company whose main creditor was Pach Shemen.  If Eletson Holdings

now wants the privileged documents back, it is entitled to them, even if Eletson Holdings—now

under new ownership and management—chooses to use those documents against its prior

ownership and management.[10]

    **a.**    *Tekni-Plex*

The exception recognized in *Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663 (N.Y.

1996) is not applicable here.

*Tekni-Plex* involved a merger between Tekni-Plex and a purchaser.  The surviving

corporation took on the Tekni-Plex name, continued Tekni-Plex's business and took on "all of

the rights, privileges, liabilities and obligations of old Tekni-Plex." *Id.* at 669.  The New York

Court of Appeals specifically held that "Tekni–Plex is entitled to access to any relevant pre-

merger legal advice rendered to old Tekni–Plex that it might need to defend against these

liabilities or pursue any of these rights," and that "control of the attorney-client privilege with

respect to any confidential communications between [counsel] and corporate actors of old

Tekni–Plex concerning [Tekni-Plex's] operations passed to the management of new Tekni–

---

[10] Reed Smith argues that "Levona is actively litigating actions involving the Arbitration against
parties other than Eletson Holdings and Eletson Corp, and the turnover order may provide
Levona with access to privileged documents they would never otherwise be able to obtain." Dkt.
No. 274 at 8.  That argument fails for the same reason.  It would be a perversion of the attorney-
client privilege to say that the privilege presents Eletson Holdings from—in its own interest—
sharing communications for which it paid with any third party.

Plex." *Id.* This is consistent with the rule recognized by the Supreme Court in *Weintraub*. *See* 471 U.S. at 358. Reorganized Eletson Holdings *is* Eletson Holdings, and the new management of Eletson takes on the right to access prior legal advice and control the attorney-client privilege.

The *Tekni-Plex* court carved out a limited exception for attorney-client communications that the law firm had with its then-client, the target corporation, relating to the merger transaction with its purchasers. Advice regarding the merger transaction is distinct from general legal advice regarding the business because as to the merger transaction, the agreement between the parties contemplated that the rights of the acquired corporation "with regard to disputes arising from the merger transaction remain[ed] independent from—and, indeed, adverse to, the rights of the buyer." *Id.* at 138–39. This is different from the general business operations of Tekni-Plex, a subject in which the former owners and current owners share an interest. The court thus held that control of the client files with respect to the merger did not pass to the acquirer. It reasoned:

> Where the parties to a corporate acquisition agree that in any subsequent dispute arising out of the transaction the interest of the buyer will be pitted against the interests of the sold corporation, corporate actors should not have to worry that their privileged communications with counsel concerning the negotiations might be available to the buyer for use against the sold corporation in any ensuing litigation. Such concern would significantly chill attorney-client communications during the transaction.

*Id.* at 139.

As the Court held, *Tekni-Plex* is inapposite. The Court's order requires Reed Smith to turn over the entire client file as to matters in which Reed Smith represented Eletson Holdings in relation to the arbitration award prior to November 19, 2024. Dkt. No. 270 at 107:1–23. Such representation did not involve a transaction in which the current managers of Eletson Holdings were attempting to purchase the corporation from Reed Smith's clients. Reed Smith's client always was Eletson Holdings. The arbitration and subsequent litigation involves a business dispute between Eletson Holdings and a third party, Levona. It would not have chilled Reed

Smith's vigorous representation of Eletson Holdings in the arbitration and related proceedings for it and Eletson Holdings to have known that the documents Reed Smith generated could be used by Eletson Holdings, regardless who managed that entity. As noted, it is implicit in the corporate attorney-client privilege that the privilege belongs to the corporation and not its managers and thus remains with the corporation, regardless who manages it. There is here no question of the documents generated by Reed Smith in the course of its representation of Eletson Holdings being used to assert claims against the party for whom it generated those documents. Eletson Holdings will not sue Eletson Holdings over the arbitration. It may be that the documents will be used by Eletson Holdings to assert claims against its former managers and equity shareholders, if the documents show some sort of wrongdoing. But that does not distinguish this case from any other in which the equity ceases to have value and ownership passes to the debtholders. In all of those cases, the client corporation which paid for and received the legal advice, and not the persons who were the temporary custodians or beneficiaries of its affairs, is the entity entitled to the protection of the attorney-client privilege and to the documents that fall within that privilege. It also may be that the new managers and new owners of Eletson Holdings will provide the otherwise privileged documents to Levona. If it does so, it could only be because those managers decide that it is in the best interests of *Eletson Holdings* and not Levona to do so. There would be no warrant for the Court to interfere in the exercise of that business judgment. Given that the arbitration was not a merger transaction and there was no expectation or agreement that the attorney-client privilege in communications related to the arbitration would belong to Eletson's individual managers and owners rather than the corporation itself, *Tekni-Plex* does not apply.

### b.    Retaining Lien

Reed Smith also argues that it should not be required to turn over the file because it has a

retaining lien against Eletson Corp. "It is only where there is no outstanding claim for unpaid legal fees that a client 'presumptively' has access to its file." *Law Firm of Ravi Batra, P.C. v. Rabinowich,* 909 N.Y.S.2d 706, 708 (1st Dep't 2010); *see Sage Realty*, 689 N.E.2d at 881 (presumption of turnover only "where no claim for unpaid legal fees is outstanding"). This argument is unlikely to succeed on appeal.

Any lien that Reed Smith had on its client file for Eletson Holdings was expressly discharged under the Plan of Confirmation, pursuant to which it has already submitted a claim to have its attorney's fees paid. Under Section 5.13 of the Plan, all liens against "any property of the Estates were fully released and discharged as of the Effective Date of the Plan." Dkt. No. 202-3 § 5.13. The Estates were defined to mean, "individually, the estate of any of the Debtors and collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code." *Id.* § 1.71. Under § 5.2(c) of the Plan, on the Effective Date, "all property in each Estate, including all Retained Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries and Affiliates shall vest in Reorganized Holdings, free and clear of all Liens." Therefore, as of the Effective Date, any liens against Eletson Holdings were extinguished. Under the Plan, all applications for allowance and payment of professional fee claims for services rendered and reimbursement of expenses incurred prior to the Effective Date were to be filed on or before the Professional Fee Claims Bar Date. If they were not filed, they were deemed to be waived. *Id.* § 2.4(b). Reed Smith in fact submitted a claim for $17.7 million in legal fees and $597,000 in expenses. Dkt. No. 245-8. Therefore, any amount Reed Smith was owed by Eletson Holdings for its fees was expressly accounted for in the bankruptcy proceeding and otherwise extinguished. Importantly, moreover, Reed Smith's fee application included fees

for services provided not only to Eletson Holdings, but also to Eletson Corp. *Id.; see* Dkt. No. 1325, *Bankruptcy Proceeding*.

Reed Smith appears to concede that Eletson Holdings does not owe it any money. Dkt. No. 274 at 10. However, it argues that it should not be required to turn over its files to Eletson Holdings because "[t]he Plan cannot be read to discharge Eletson Corp's debts to Reed Smith, because . . . non-debtor third parties' debts cannot be released by a bankruptcy plan absent consent by the affected creditor (here, Reed Smith)." *Id.* at 10 (*citing Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024)). Reed Smith's argument is supported by the language of the plan stating that what vests in Reorganized Holdings is "interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries," not the interests of the subsidiaries themselves. Dkt. No. 202-3 § 5.2(c).

However, Reed Smith's reading of the Plan is undermined by the fact that it has already applied to the bankruptcy court to recover the fee it is owed by Eletson Corp. In doing so, Reed Smith appears to have read the Plan's releases to cover the fees owed by Eletson Corp. and accepted the benefit of payment of fees that was being provided in exchange for the release of debts. *See Harrington*, 603 U.S. at 227; *Matter of Specialty Equip. Companies, Inc*., 3 F.3d 1043, 1047 (7th Cir. 1993) ("[C]ourts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code."). Reed Smith would now have it that whatever payment it receives in the bankruptcy is, in effect, a guaranteed minimum, and it can attempt to collect again from Eletson Corp. for the same fees. It has not submitted any authority for that proposition or for the proposition that it can withhold the files from Eletson Holdings, which discharged all of its obligations to Reed Smith, based on the notion that it is still

owed money through Eletson Holdings' subsidiary, Eletson Corp.[11]  The provisions of the Plan are clearly intended to allow Eletson Holdings to use its property, including the client file, free of "[l]iens, Claims, charges, or other encumbrances."  Dkt. No. 202-3 § 5.2(c).  At most, Reed Smith's argument seems to justify "posting of adequate security for payment" by Eletson Corp. *Pomerantz*, 704 F.2d at 682.

Reed Smith is not likely to succeed in preventing the turnover of the Eletson Holdings client file related to the arbitration proceedings.

### B.    Irreparable Injury

Reed Smith argues that it will suffer irreparable harm in the absence of a stay because "[t]he disclosure of files protected by the attorney-client privileged cannot be undone by any subsequent order of appellate victory."  Dkt. No. 274 at 12.  It speculates that the privileged documents will be provided by Eletson Holdings to Levona.  *Id.*  The argument is without merit, because it is Eletson Holdings and not Reed Smith that is entitled to assert the attorney-client privilege.  *See Sage Realty*, 689 N.E.2d at 882.[12]

Reed Smith will not suffer irreparable harm by its displacement as counsel or turnover of the client file.  An attorney has no independent right to continue as counsel in a case and clearly does not suffer irreparable harm from being discharged by a client or otherwise removed.  *See Richardson-Koller*, 472 U.S. at 434.  Reed Smith may have an interest in collecting its fees, and

---

[11] Given that Eletson Holdings is a holding company which is closely intertwined with its wholly-owned subsidiary Eletson Corp., it would make sense for the debts of Eletson Corp. to be addressed in the bankruptcy proceeding, and the proceeding appears to have considered the actions and liabilities of Eletson Corp. to some extent.  *See* Dkt. No. 1212 at 23 n.18, 34 & n.31, 88, *Bankruptcy Proceeding*.

[12] Reed Smith's may not rely on injury to "Greek/Liberian entity directed by the Board of Directors provisionally appointed by the Greek Court on November 12, 2024 and the management appointed by that Board," Dkt. No. 274 at 1, which has not appeared in this case and in any case did not exist at the time the documents and communications sought were created.

therefore it could be harmed by losing the protection of the lien over documents. But if it is owed fees that are not paid, that financial damage is the paradigmatic example of an injury that is not irreparable. *See, e.g.*, *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) ("To establish irreparable harm . . . [t]he injury must be one requiring a remedy of more than mere money damages."). If, as Reed Smith claims, the purported debt is not discharged by the Bankruptcy Order, Reed Smith can sue Eletson Corp. for damages.

### C.     Injury to Other Parties

A stay of this Court's order would cause grave harm to third parties. From the moment that the bankruptcy court authorized the transfer of ownership and management of Eletson Holdings, the Court has acted with appropriate expedition. It has done so because of the ongoing proceedings.

Proceedings attempting to enforce the award against Levona have been initiated in England and Greece. Dkt. No. 248-1 at 23 (England); Dkt. No. 276-1 (Greece). There are ongoing disputes in Greece and Liberia regarding which entity has the capacity to speak for Eletson Holdings in those courts. *See* Dkt. No. 50, *In Re Eletson Holdings*, 24-cv-08672 (describing Greek Proceedings); Dkt. No. 13, *In Re Eletson Holdings*, 25-cv-01685 (describing Liberian Proceedings). These disputes exist despite the orders of the bankruptcy court clearly stating that the new board has authority to act on behalf of Eletson Holdings and that "Reorganized Eletson Holdings Inc.'s former shareholders, officers, directors, counsel, and others, as defined in section 1.124 of the plan, are directed to comply with the plan and the confirmation order to assist in effectuating the Chapter 11 plan." Dkt. No. 255 at 2 (quoting Dkt. No. 257-1 at 43:16–20). This Court's orders have been repeatedly cited (frequently misleadingly) in the foreign proceedings. *See, e.g.*, Dkt. Nos. 244-1, 248, 276-2. Staying this Court's order displacing Reed Smith as counsel for Eletson Holdings would sow further

confusion as to the effectiveness of Eletson's reorganization, which is entirely clear under United States law. Moreover, staying the turnover of the Eletson client file would deprive Eletson Holdings of critical material it needs to make a judgment about how and whether to defend itself in these proceedings. Eletson Holdings has made clear its position that it can adequately participate in discovery in this proceeding only when it has the client file. Dkt. Nos. 283–284. Developments in these proceedings have unfolded rapidly in the past four months, and throughout this period the purported "provisional board" has benefitted from the unfair advantage of having access to privileged communications regarding Eletson Holding's strategy in the arbitration, which Eletson Holdings itself lacks. A stay would allow such entity to continue to benefit from its strategy of delay and obfuscation.

   D.    **Public Interest**

Throughout these proceedings, Reed Smith has emphasized the need for expedition. *E.g.* Dkt. No. 33. Arbitral proceedings are intended to be addressed quickly. This provides certainty, especially for parties seeking to enforce the award in foreign jurisdictions. At present, there are proceedings in two foreign countries that are substantially dependent on this Court's decision in the ongoing confirmation/vacatur proceedings. If the Court determines that Levona's motion to vacate is without merit, the proceedings before this Court would no longer serve as an impediment to those proceedings. If, on the other hand, the Court determines that the award should be vacated or suspended, the courts in England and in Greece would no longer be able to proceed with their actions. Those actions in foreign jurisdictions are ongoing and there is an interest in this Court proceeding quickly on the vacatur application.

*        *        *

The passion and length of Reed Smith's arguments, which the Court has had to address, are not matched by their legal force. In the end, the issues are simple.

Reed Smith may not remain as counsel when it has been discharged by order of the bankruptcy court. A stay of the order displacing Reed Smith as counsel would allow Reed Smith's purported clients to benefit from an impermissible collateral attack on such order. Given that Reed Smith is no longer counsel to Eletson Holdings, and Eletson Holdings owes it no money, it must turn over the Eletson Holdings client file. Reed Smith's argument that it is owed a retaining lien by Eletson Corp. is a routine attorneys-fee dispute that does not establish irreparable harm justifying a stay.

## CONCLUSION

The motion for a stay is DENIED. The Court grants a temporary stay until Thursday, March 27, 2025, for Reed Smith to seek relief from the Second Circuit. If Reed Smith applies for a stay from the Second Circuit by Thursday, March 27, 2025, the temporary stay shall remain in effect until the Second Circuit decides Reed Smith's stay motion.

Absent a stay from the Second Circuit, the client file shall be turned over by two weeks from the date of this Order.

The Clerk of Court is respectfully directed to close Dkt. No. 273.

SO ORDERED.

Dated: March 24, 2025
      New York, New York

                                   LEWIS J. LIMAN
                             United States District Judge