```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:   6/2/2025               │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
             :

ELETSON HOLDINGS INC. and ELETSON       :
CORPORATION,                     :
             :

          Cross-Respondents,    :         23-cv-7331 (LJL)
             :

       -v-                 :          PRELIMINARY
             :       INJUNCTION FINDINGS
LEVONA HOLDINGS LTD.,            :        OF FACT AND
             :    CONCLUSIONS OF LAW
         Cross-Petitioner,     :

        and               :

APARGO LIMITED, FENTALON         :
LIMITED, and DESIMUSCO TRADING     :
LIMITED,                    :
             :
         Intervenors.         :
             :
---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Cross-Petitioner Levona Holdings, Ltd. ("Levona") moves, pursuant to Rule 65(a) of the

Federal Rules of Civil Procedure and the Court's inherent powers, for an antisuit injunction

directing Intervenors Apargo Limited, Fentalon Limited, and Desimusco Trading Limited

("Intervenors" or "Putative Nominees") and any of their agents, including purported Eletson Gas

LLC, to take all steps necessary to dismiss or stay proceedings filed in Greece and the United

Kingdom ("U.K.") to enforce the underlying arbitral award (the "Award"), which was entered in

favor of Eletson Holdings, Inc. ("Holdings"), Eletson Corporation ("Corp." and with Holdings,

"Eletson"), and the Intervenors, until the resolution of this action.  Dkt. No. 361.  Levona further

requests that the Court enter an order that Intervenors be required to inform Levona of any foreign proceedings seeking to confirm and/or enforce the Award. *Id.*[1]

This Opinion and Order sets forth the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For the reasons that follow, the Court grants an injunction as set forth in the separate order accompanying this opinion. *See* Dkt. No. 407.[2]

## FINDINGS OF FACT

Familiarity with the prior proceedings in this matter is presumed. The Court sets forth only those facts relevant to the motion for a preliminary injunction.

## I.    The Petition and the Cross-Petition

This case grows out of a petition to confirm and a cross-petition to vacate an arbitral award entered in New York on September 29, 2023 (the "Award"). Dkt. No. 67-58. The Award directed Levona to pay damages to Eletson Gas LLC ("Gas") in the amount of $23,777,378.50 and to Intervenors in the amount of $19,677,743.71, plus punitive damages in the same amount as the compensatory damages. *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 716 F. Supp. 3d 242, 275 (S.D.N.Y. 2024). As laid out in detail in prior orders, the Arbitrator ruled that Eletson had validly exercised an option to purchase the Preferred Shares of Gas from its creditor,

---

[1] On May 19, 2025, Levona submitted a memorandum in support of its motion to show cause, Dkt. No. 362, accompanied by the declaration of Isaac Nesser, Dkt. No. 363. Intervenors submitted a memorandum in opposition on May 25, 2025, Dkt. No. 392, accompanied by the declaration of Themistoklis Sofos, Dkt. No. 393. Levona submitted a reply memorandum on May 29, 2025. Dkt. No. 397. On May 29, 2025, Eletson filed a joinder in support of Levona's motion. Dkt. No. 402. The Court held oral argument on the motion on May 30, 2025. May 30, 2025 Minute Entry; May 30, 2025 Hearing Tr.

[2] Levona separately has suggested that the Court suspend the award pursuant to Article V(1)(e) of the New York Convention. The Court will address that request in a separate order.

Levona, and that Eletson had transferred those Preferred Shares to its chosen nominees, the Intervenors—three Cypriot entities, Apargo Limited, Fentalon Limited, and Desimusco Trading Limited, each affiliated with one of the principal members of the Greek families who historically owned and controlled Eletson.  Dkt. No. 343 at 2–3.

On August 18, 2023, Eletson filed a petition under the New York Convention and the Federal Arbitration Act (the "FAA") seeking to confirm what was then an interim award.  Dkt. Nos. 1, 11, 14.  On September 22, 2023, Levona moved to dismiss the Petition and cross-petitioned to vacate the Award.  Dkt. Nos. 28-31.  On October 19, 2024, Eletson filed a supplemental amended petition to confirm the Award.  Dkt. No. 46.  On October 24, 2024, Levona filed an Amended Response to the Amended Petition.  Dkt. No. 48.

The Court has devoted substantial time and attention to the case throughout its complex history.  On February 9, 2024, the Court issued a 124-page Opinion and Order which granted in part and denied in part the petition to confirm the Award and granted in part and denied in part the motion to vacate.  Dkt. No. 83.  On April 19, 2024, the Court issued an Amended Opinion and Order that corrected typographical errors in the Opinion and Order.  Dkt. No. 104.

On April 19, 2024, the Court issued a Memorandum and Order remanding to the Arbitrator the question whether the Arbitrator would have awarded any punitive damages but for the finding of a violation of the Status Quo Injunction.  Dkt. No. 106.  The Court provided that the parties could move for entry of judgment after the Arbitrator issued his clarification.  *Id.* at 8.  The Court clarified its instructions to the Arbitrator by Memorandum and Order of June 12, 2024.  Dkt. No. 121.  The Arbitrator issued a Remand Decision, Dkt. No. 150-1, which remains *sub judice* before this Court.

## II.    The Amended Cross-Petition

The case took a turn on July 3, 2024, prior to the entry of judgment, when Levona filed a motion for leave to file an amended answer and an amended cross-petition to vacate identifying substantial evidence that Eletson obtained the Award through fraud.  Dkt. No. 123.  The Court permitted Levona to file an amended answer and an amended cross-petition to vacate by Opinion and Order dated September 6, 2024.  Dkt. No. 162.  The Court found that Levona had presented evidence that tended to show that there was fraud that went to a pivotal issue in the arbitration proceeding and that "Eletson constructed extraordinary obstacles to prevent Levona from uncovering its fraud."  *Id.* at 16, 34, 47.  Eletson responded to the second amended cross-petition on September 27, 2024.  Dkt. No. 170.  Consistent with the Court's decision to permit Levona to file the amended answer and cross-petition, on February 14, 2025, the Court *sua sponte* issued an order amending its April 19, 2024, Amended Opinion and Order to make clear that the confirmation of the Award was subject to the resolution of Levona's pending motion to vacate the Award and its defense based on fraud in the arbitration.  Dkt. No. 268.

## III.    The Plan of Confirmation

The case took yet another turn on November 4, 2024, when the United States Bankruptcy Court for the Southern District of New York confirmed a plan of reorganization of Holdings that vested equity ownership and control of the company in Pach Shemen, an affiliate of Levona, and other creditors of Holdings.  *See In re Eletson Holdings Inc. et al.* ("*Bankruptcy Proceeding*"), No. 23-10322 (Bankr. S.D.N.Y.), Dkt. No. 1212 (the "Confirmation Order") at 5–11.

In March 2023, while the arbitration was pending, Pach Shemen and two other creditors (the "Petitioning Creditors") commenced involuntary bankruptcy proceedings against Holdings and two affiliates (the "Debtors").  Dkt. Nos. 67-26, 67-30.  On September 25, 2023, on motion of the Debtors, the proceeding was converted to a voluntary bankruptcy under chapter 11.

*Bankruptcy Proceeding*, Dkt. No. 215.  The Debtors and Petitioning Creditors proposed competing plans of reorganization.  *Bankruptcy Proceeding*, Dkt. No. 1212 at 5–11.  After five days of evidentiary hearings and significant briefing, the bankruptcy court held that the Debtors' plan was not confirmable and the Petitioning Creditors' plan was confirmable, ultimately confirming the Petitioning Creditors' plan on November 4, 2024.  *Id.*

The confirmed plan of reorganization (the "Plan") provided that control of Eletson would pass from its former equity holders and board[3] to Pach Shemen and a new board representing creditor interests.  On the effective date of the Plan, the members of the governing body of each Debtor prior to the Effective Date were "deemed to have resigned or otherwise ceased to be a director or manager of the applicable Debtor," Dkt. No. 202-3 § 5.10(c), Holdings was deemed to be Reorganized Holdings, and the equity of the old Holdings was vested in its new owners, *id.* § 1.125-126.  Reorganized Holdings was to be managed by a new board consisting of three directors: (i) one director selected by the Plan Proponents, (ii) one selected by the Plan Proponents but subject to the consent of the Creditors' Committee, and (iii) an independent director selected by the Creditors Committee.  *Id.* § 5.10(a), (c).  Decisions related to claims with Levona and its affiliates, including Pach Shemen, would be made by the independent director, with a limited exception.  *Id.* § 5.10(b).  Retention of all professionals by Debtors would terminate on the effective date. *Id.* § 2.5(a).

The former owners of Holdings did not seek a stay of the Confirmation Order, and on November 19, 2024, when Holdings waived conditions precedent, the Plan became effective.

---

[3] Holdings was both majority-owned by and its board made up of members of the Greek families whose representatives, Vasilis Hadjieleftheriadis, Vassilis Kertsikoff, and Laskarina Karastamati, are also principals of the Intervenors.  *See infra* at n.5.

*Bankruptcy Proceeding*, Dkt. No. 1258; *see* Dkt. No. 255-1 at 23:17–18 (statement of the bankruptcy court that "[o]n November 19th, 2024, the Chapter 11 plan became effective.").

## IV.    The Motion for Intervention

New counsel appeared for Holdings and Corp., and on February 14, 2025, the Court displaced Holdings and Corp.'s former counsel, Reed Smith.  Dkt. No. 269.

On April 7, 2025, Apargo Limited, Fentalon Limited, and Desimusco Trading Limited, as beneficiaries of the Award, moved to intervene to seek the confirmation of the Award and to oppose vacatur of the Award.  Dkt. No. 301.  Eletson and Levona opposed intervention.  Dkt. Nos. 318, 319.  On May 9, 2025, after oral argument, the Court allowed those entities to intervene to oppose vacatur of the Award but denied intervention to seek confirmation because the entities lacked standing to do so as nonparties to the original arbitration.  Dkt. No. 343.

The Court is now scheduled to decide whether the Award should be vacated before the end of 2025.  On May 21, 2025, the Court entered a case management plan providing that all discovery would be completed no later than July 30, 2025, that summary judgment motions would be filed by August 13, 2025, and that summary judgment briefing would be complete by September 8, 2025.  Dkt. No. 371.

## V.    The Foreign Lawsuits

The former shareholders of Holdings were not content with the bankruptcy court's decision rejecting their proposed plan of confirmation and confirming that of the Petitioning Creditors.

The former shareholders could have sought a stay of the Confirmation Order, which might have been granted with the filing of a bond.  *See* Fed. R. Civ. P. 62(b); Fed. R. Bankr. P. 7062, 8007(a)(1)(B), (c).  Instead, on November 12, 2024, they turned to the foreign courts and obtained in Greece an *ex parte* order from a single-member court of first instance, which

appointed an interim board of Holdings, comprised of members of the families that formerly owned and controlled Holdings, on a provisional basis.  *See* No. 24-cv-8672, Dkt. Nos. 49-2, 50,; No. 23-cv-7331, Dkt. No. 255-1.  The former board of Eletson included the principals of Intervenors and the Putative Nominees: Vasilis Hadjieleftheriadis, Vassilis Kertsikoff, Laskarina Karastamati, and several others.  Vasilis Hadjieleftheriadis continues to sit on the provisional board.  Dkt. No. 255-1 at 22:9–23:7.  In effect, and notwithstanding the Confirmation Order, the parties who had lost in the bankruptcy court turned to the Greek court in an effort to frustrate the Plan, rather than turning to another federal court with jurisdiction and asking it to overturn the order.

To reiterate, the principals and representatives of the three Intervenors are Laskarina Karastamati, Vassilis Kertsikoff, and Vasilis Hadjieleftheriadis, for Fentalon, Apargo, and Desimusco respectively.  Dkt. No. 67-41 ¶¶ 101, 103 (Karastamati witness statement); Dkt. No. 67-43 ¶¶ 194, 196 (Kertsikoff witness statement); Dkt. No. 67-45 ¶ 104 (Hadjieleftheriadis witness statement).  All three claim to be directors of Gas.  Subject to the ultimate resolution of the conflict that was the subject of the arbitration, Intervenors hold themselves out to be the lawful owners of all Preferred Shares of Gas, which would confer on them both economic rights and corporate governance rights, in the form of the right to appoint four out of six directors of the Gas board.  They contend they are currently entitled to and do enjoy those rights.  May 30, 2025 Hearing Tr. 40:4–7 ("[A]s the holders of a hundred percent of the preferred shares, we have the economic rights, the . . . governance rights in terms of board appointments, that are attendant to those preferred shares."); *id.* at 40:24–41:7 ("THE COURT: [W]ho do you contend are the directors of Eletson Gas right now? . . . [INTERVENOR COUNSEL]: They're nominees. THE COURT: And who are those individuals? [INTERVENOR COUNSEL]: They include the

principals of my three clients . . ."); *id.* at 42:7–8.  Furthermore, Intervenors represent that

Laskarina Karastamati currently serves as the Secretary of Gas and Vassilis Kertsikoff currently

serves as the Chief Executive Officer of Gas.  *Id.* at 43:5–11 ("[R]ight now, there is no

functioning board. The management of the company resides with the two executive officers . . .

Vasilis and Laskarina, who would've been the executive officers since 2013."); *id.* at 43:23–25.

Notwithstanding Intervenors' efforts at obfuscation, it is clear that functional day-to-day control

over Gas is being exercised by Intervenors and/or their principals.[4]

In November and December 2024, Intervenors commenced proceedings in Greece and,

through Gas, in the U.K., to confirm and enforce the Award.

In the Greek Proceeding, the Intervenors and Gas seek to confirm and enforce the entire

Award, including those parts that the Court has vacated.  Dkt. No. 363-2; 393-1.  On November

28, 2024, Intervenors and Gas filed an application with the single member court of first instance

in Piraeus pursuant to Articles 905 § 1 and 906 of the Greek Code of Civil Procedure and the

New York Convention asking that court for recognition and confirmation of the Award and to

declare the Award enforceable.  *Id.*  The Greek court has scheduled a June 3, 2025, hearing on

the issue of confirmation and enforcement, conditioned on service being effectuated on Levona.

Dkt. No. 392 ¶ 11.  Service has not yet been effectuated on Levona.  *Id.*  Intervenors' Greek

counsel accordingly represents that he plans to attend the hearing on June 3 and will there

---

[4] Intervenors and their principals have actively taken this position in litigation before the
Southern District of Texas in recent months.  *See* Dkt. No. 340-1 at 2 (asserting that the
Intervenors "control Eletson Gas"); Dkt. No. 340-2 at 10 (asserting that the preferred shares
"still remain in the hands of the Cypriot Nominees, who continue to control Eletson Gas"), Dkt.
No. 340-3 at 3 (asserting that the Intervenors, "the rightful holders of the Eletson Gas Preferred
Shares since March 2022, have ultimate control over Eletson Gas"); Dkt. No. 340-4 at 6:15–21
(counsel asserting that the "preferred shares . . . were transferred to . . . the Cypriot Nominees . . .
on whose ultimate . . . authority and instructions we have appeared in this case").

"inform the judge that actual service on respondents has not been completed," and will request "an adjournment of the hearing in accordance with the Greek court's schedule," which will likely be adjourned for "six to eight months so that actual service can be completed." *Id.* However, Greek counsel has represented that the hearing, once it occurs, could reach the merits of the confirmation quickly. Dkt. No. 363 ¶ 5.

On March 13, 2025, on motion by Holdings, *Bankruptcy Proceeding*, Dkt. No. 1459, the bankruptcy court held various former Eletson entities, including the former majority shareholders,[5] the purported provisional board of Eletson, and Vasilis Hadjieleftheriadis individually, in contempt for pursuing the Greek proceeding, and required those entities and individuals to affirmatively withdraw it, imposing per diem monetary sanctions of $5,000 per party per day, jointly and severally, until they did so, *Bankruptcy Proceeding*, Dkt. No. 1537 (the "Sanctions Order"). They have not complied. Dkt. No. 363 at ¶ 7. The Intervenor entities are not named specifically in that order, though as stated above, Vasilis Hadjieleftheriadis is a principal and representative of Intervenor Desimusco. The Intervenors maintain that they are not subject to the Sanctions Order. Dkt. No. 392 at 7 ("Indisputably, the Preferred Shareholders have not been sanctioned by the Bankruptcy Court.").

On December 16, 2024, Gas filed a claim before the High Court of Justice, Business & Property Courts of England and Wales Commercial Court, seeking an order permitting it "to enforce the JAMS Award in the same manner as a judgment or order of the Court and to the same effect." Dkt. No. 363-1 at ECF 3. In particular, Gas asked the English court to enter

---

[5] The former majority shareholders of Eletson are defined in Judge Mastando's contempt order as the Lassia Investment Company, Family Unity Trust Company, and Glafkos Trust Company. Dkt. No. 1537 at ECF 3. Those three companies belong to Laskarina Karastamati, Vassilis Kertsikoff, and Vasilis Hadjieleftheriadis, respectively, per their own filings before the Greek court. Dkt. No. 276-1 at ECF 6–7.

judgment, pursuant to section 101(3) of the Arbitration Act of 1996, against Levona in the following amounts: (1) $21,777,378.50 in compensatory damages for the alleged improper arrests of vessels belonging to Gas, (2) prejudgment interest on the principal amount of $21,777,378.50 at a rate of 10% running from January 30, 2023 through the earlier of the date of payment of the award or confirmation of the award in a court of competent jurisdiction, (3) $2,000,000 in compensatory damages arising out of Levona's alleged other breaches of contract, (4) punitive damages of $23,777,378.50, (5) additional prejudgment interest in the amount of $1,319,163.14, and (6) additional prejudgment interest on the compensatory damages from August 31, 2023 until the earlier of the date of payment of the amount due or the date of confirmation of the Award. In support of the claim, Gas submitted a "witness statement" of its counsel Reed Smith. The witness statement asserts that Gas seeks a judgment entered in the amount and terms of the Award. *Id.* ¶ 26.

The witness statement is not a model of candor. It asserts that this Court "substantially confirmed the JAMS Award," *id.* ¶ 30, without adding the important caveat that those portions of the Award that were confirmed were confirmed subject to resolution of the motion to vacate, *see* Dkt. No. 268, and that there is substantial evidence to suggest that the award was the product of fraud, *see* Dkt. No. 162. It recites that this Court granted Levona leave to proceed with its motion to vacate, without including the Court's statements about the apparent strength of Levona's evidence that fraud was committed. It elsewhere states incorrectly that the awards in favor of Gas "have been confirmed by the supervisory court," Dkt. No. 363-1 at ¶ 93, without making it clear that there are active proceedings to set aside the award as fraudulent. They do however commit that "[n]o steps are to be taken . . . to enforce the JAMS Award until" the

conclusion of this action. *Id.* at ECF 3. Levona has not yet been served in the U.K. proceeding. Dkt. No. 363 ¶ 4.

In sum, neither the Greek nor U.K. proceeding have advanced beyond very preliminary stages, but the Greek proceeding may proceed extremely quickly once it commences. *See* May 30, 2025, Hearing Tr. 9:18–10:4.

## VI.    Representations of Intervenors and Gas Regarding the Foreign Proceedings

Intervenors and Gas have equivocated about the timing of the foreign proceedings, claiming on the one hand that there is an urgency to them when it has been in the interest of Intervenors and Gas to make that claim and on the other hand that the foreign proceedings are virtually meaningless and should not cause prejudice to Levona when it has been in their interest to make that claim. *See* Dkt. No. 320-2 at 5 (Intervenor counsel writing in response to Levona's request that the Greek proceeding be withdrawn that "the preferred shareholders by seeking arbitral confirmation in Greece do not present any real prejudice to Levona/Murchinson; on the other hand, forcing the Cypriot entities to wait and only then start all over in Greece down the road is in fact prejudicial to them"); *id.* at 3 (insisting that the "Greek proceedings as currently framed proceed on schedule."); May 6, 2025 Hearing Tr. 17:15–17 ("[I]t's prejudicial without any basis to simply put what we're entitled to do in Greece on hold."); May 21, 2025 Hearing Tr. 35:25–36 (insisting even after filing of motion for antisuit injunction that they "legally are entitled . . . to proceed to confirm [in the Greek proceeding]"). Intervenors have likewise been elusive about their plans for future proceedings in other jurisdictions. May 30, 2025 Hearing Tr. 48:23–49:6.

Intervenors have also been less than forthright in their representations to the Court regarding the purpose of these proceedings. In their briefing, Intervenors urge that "they seek only confirmation of the Final Award and *not* enforcement," Dkt. No. 392 at 3 (emphasis in the

original), insisting that they have already provided a fulsome commitment to both this Court and the bankruptcy court that they will provide notice before any enforcement activity. *See* May 6, 2025 Hearing Tr. 5:8–11 ("[M]y clients in one other proceeding in Greece, are pursuing confirmation . . . but we're not pursuing enforcement."); *id*. at 18:15–17 ("[E]nforcement will not take place without returning to the U.S."); *id*. at 33:17–19 ("[W]e can commit to and what I believe we have is that we will enforce with notice to the courts."); *Bankruptcy Proceeding*, Dkt. No. 1587 ("Preferred Nominees have sought confirmation, not enforcement, of the Final Award."); Dkt. No. 329 at 12 ("Preferred Shareholders have sought confirmation, not enforcement, of the award in Greece"). However, the Intervenors insist that they are not subject to the order of the bankruptcy court enjoining enforcement, *see* May 30, 2025 Hearing Tr. 33:9–33:12, and studiously resisted any commitment to Court to await the Court's permission or even its response before proceeding to enforcement, *id.* 35:4–23. While Intervenors have stated that the purpose of the proceedings is to put them in a position to execute, they have refused to indicate one way or the other whether a second purpose is actually to execute, so as to make the relief sought in this case meaningless.

## VII.    The New York Convention

This case arises under the New York Convention (the "Convention"). Therefore, it is necessary to briefly explain the regime established by that convention.

The New York Convention "mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). The court in which or under the law of which the award is made is considered to have "primary jurisdiction," and it has "supervisory authority over an arbitral award." *Id.* at 22; *see also CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,

850 F.3d 58, 71 (2d Cir. 2017).  It is "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Yusuf Ahmed*, 126 F.3d at 23.  All other states that are signatory to the New York Convention are considered to have "secondary jurisdiction." *CBF Industria de Gusa S/A*, 850 F.3d at 71.  They have the power under the New York Convention to recognize and enforce an award and they "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *Yusuf Ahmed*, 126 F.3d at 23; *see also id.* at 20 ("[I]n an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are the only grounds for setting aside an arbitral award.").  Indeed, "many commentators and foreign courts have concluded that an action to set aside an award can be brought *only* under the domestic law of the arbitral forum, and can never be made under the Convention."  *Id.* at 22.

The grounds upon which a court in a secondary jurisdiction may decline to recognize and enforce an award are "limited."  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 115 n.1 (2d Cir. 2007).  Under Article V(1) of the Convention, the grounds for refusing to recognize or enforce an arbitral award are:

a)  The parties to the agreement . . . were . . . under some incapacity, or the said agreement is not valid under the law . . . ; or

b)  The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings . . . ; or

c)  The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . . ; or

d)  The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ; or

e)  The award has not yet become binding on the parties, or has been set aside or
suspended by a competent authority of the country in which, or under the
law of which, that award was made.

Convention art. V(1).  Enforcement may also be refused if "[t]he subject matter of the difference

is not capable of settlement by arbitration," or if "recognition or enforcement of the award would

be contrary to the public policy" of the country in which enforcement or recognition is sought.

*Id.* art. V(2).  These seven grounds are the only grounds explicitly provided under the

Convention.  A court in the secondary jurisdiction does not have the power to vacate or set aside

or refuse to confirm an award on the grounds of fraud in the arbitration or by the arbitrators.

Significantly, the New York Convention did away with "the so-called requirement of

'double exequatur,'" the requirement that before an award could be enforced abroad it had to be

recognized in the rendering state.  *Yusuf Ahmed*, 126 F.3d at 22.  If an award is not recognized in

the rendering state, a party may still ask a foreign court with secondary jurisdiction to recognize

and enforce it.  *CBF Industria de Gusa S/A*, 850 F.3d at 72.  Accordingly, under the New York

Convention, an award can be enforced anywhere in the world without being reduced to a

judgment in the primary jurisdiction.  *Id.* at 72–73. "Nonetheless, under the Convention, the

power and authority of the local courts of the rendering state remain of paramount importance."

*Yusuf Ahmed*, 126 F.3d at 22.  When faced with a decision by a court in a primary jurisdiction to

annul, set aside, or suspend an award, a court in a secondary jurisdiction generally is required by

principles of comity to honor that decision and, for that reason, to decline to recognize and

enforce the award, notwithstanding the seemingly discretionary language of Article V(1)(e).

"[C]ourts considering whether to enforce an award that has been set aside in the primary

jurisdiction should give effect to a judicial decision of the primary jurisdiction unless

enforcement of that judgment would offend the public policy of the state in which enforcement is

sought."  *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864

14

F.3d 172, 183–84 (2d Cir. 2017).  "If a party whose arbitration award has been vacated at the site of the award can automatically obtain enforcement of the awards under the domestic laws of other nations, a losing party will have every reason to pursue its adversary 'with enforcement actions from country to country until a court is found, if any, which grants the enforcement.'" *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 (2d Cir. 1999) (quoting Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 355 (1981)).

The Award was made in the United States under the laws of the United States.  Dkt. No. 67-2 § 12.14(a); Dkt. No. 67-58.  Accordingly, the Court applies the FAA to Levona's petition to set aside or vacate the arbitral award.  *See Yusuf Ahmed*, 126 F.3d at 21.  Section 10(a) of the FAA provides four statutory bases upon which an arbitral award may be vacated:

a)  where the award was procured by corruption, fraud, or undue means;

b)  where there was evident partiality or corruption in the arbitrators, or either of them;

c)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; and

d)  where the arbitrators exceeded their powers, or so imperfectly executed them so that a mutual, final, and definite award upon the subject matter submitted was not made.

Finally, and in addition to the bases specified in the New York Convention and the FAA, the Second Circuit has held that the court may also "set aside an arbitration award if it was rendered in manifest disregard of the law." *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016) (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011)); *see Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 716 F. Supp. 3d 242, 279 (S.D.N.Y. 2024).

## CONCLUSIONS OF LAW

Having laid out the history of this case, the status of the foreign proceedings, and the terms of the New York Convention, the Court finally turns to the motion for an anti-suit injunction.

"[A] federal court may enjoin a party before it from pursuing litigation in a foreign forum." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004); *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926 (D.C. Cir. 1984) ("It is well settled that English and American courts have power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions"). A court may impose an anti-suit injunction against parallel litigation "only if: (A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Paramedics*, 369 F.3d at 652. "If these two threshold requirements are satisfied, courts are directed to consider a number of additional factors, including whether the parallel litigation would:

> (1) frustrat[e] . . . a policy in the enjoining forum; (2) . . . be vexatious; (3) . . . threat[en] . . . the issuing court's *in rem* or *quasi in rem* jurisdiction; (4) . . . prejudice other equitable considerations; or (5) . . . result in delay, inconvenience, expense, inconsistency, or a race to judgment.

*Karaha Bodas,* 500 F.3d at 119 (internal citations and quotations omitted). The court must consider all of these factors, but two have "'greater significance': whether the foreign action threatens the enjoining forum's jurisdiction or its 'strong public policies.'" *Id.* (quoting *China Trade & Development Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987)). "[A]n anti-foreign-suit injunction should be used sparingly and should be granted only with care and great

restraint." *China Trade*, 837 F.2d at 36.  The Court must show "due regard to the interests of

comity." *Id.*[6]

## I.     Threshold Requirements

### A.     Substantial Similarity

Levona has established the first condition, i.e., that the parties are "the same in both

matters," *Paramedics*, 369 F.3d at 652 (citing *China Trade*, 837 F.2d at 35), with respect to both

the Greek and U.K. proceedings.

The parties to this proceeding and to the proceeding in Greece are the same.  The parties

to this proceeding include Intervenors Apargo Limited, Fentalon Limited, and Desimusco

Trading Limited.  The same entities are parties to the Greek proceeding.  Gas also is a party to

the Greek proceeding, but as described above, the Gas entity that has appeared in Greece is

substantially similar to and/or functionally controlled by the Intervenors and, in any event, the

first condition may be satisfied even if there is an additional party in the foreign action.

*Paramedics*, 369 F.3d at 652 (holding that the presence of an additional defendant in the foreign

action, an affiliate of the other foreign defendant, did not defeat the "same parties" requirement

because the parties were substantially similar); *accord Eastman Kodak Co. v. Asia Optical Co.,

Inc.*, 118 F. Supp. 3d 581,587 (S.D.N.Y. 2015) (parties were "sufficiently similar" for purposes

of anti-foreign-suit injunction where there was an additional plaintiff in Chinese lawsuit).

The parties to this proceeding and to the English proceeding are substantially similar.

*See Telecom Bus. Sol., LLC v. Terra Towers Corp.*, 2025 WL 1194375, at *6 (S.D.N.Y. Apr. 22,

---

[6] Intervenors' argument that a judgment is required before a court may enter an anti-suit injunction is plainly mistaken.  A court may enter an injunction to preserve its own jurisdiction. *See Laker Airways*, 731 F.2d at 927 (injunctions may be entered "before or after a judgment has been entered" but "[t]he policies that guide the exercise of discretion vary slightly in each situation"); *Karaha Bodas*, 500 F.3d at 127 (comity considerations have diminished force when a court has already reached a judgment involving the same issues and parties).

2025) ("To satisfy the first threshold condition, the parties need not be exactly identical; it is enough if they are substantially similar such that their interests are represented by one another.") (internal citations and quotations omitted); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007) ("Where parties to the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met."); *Motorola Credit Corp. v. Uzan*, 2003 WL 56998, at *2 (S.D.N.Y. Jan. 7, 2003) (finding the "same parties" requirement satisfied where parties were not completely identical because "the real parties in interest are the same in both matters"). Intervenors protest that they are not parties to the U.K. proceedings, as only Gas has formally appeared in that proceeding. Dkt. No. 392 at 6. But that is a fiction. The individuals now purporting to act as directors of Gas were appointed by Intervenors. Dkt. No. 363-1 at ECF 30. They include Vasilis Hadjieleftheriadis, Laskarina Karastamati, and Vassilis Kertsikoff, principals and representatives of the Intervenors. In addition, the latter two serve as the officers of Gas, the Secretary and Chief Executive Officer respectively. *Id.*; May 30, 2025 Hearing Tr. 43:5–43:11. As recently as May 2025, Intervenors asserted in court filings in the United States District Court for the Southern District of Texas that they are the holders of the Preferred Shares of Eletson Gas and are exercising control over it. *See* Dkt. No. 340-1 at 2; Dkt. No. 340-2 at 10; Dkt. No. 340-3 at 3; Dkt. No. 340-4 at 6:15-6:21.

The Court need not find that Gas is an alter-ego of Intervenors for the Court to find that Gas is "substantially similar" for the purposes of warranting an anti-suit injunction, so long as the "real parties in interest" are the same. *See Int'l Equity*, 441 F. Supp. 2d at 562 ("Defendants contend that plaintiffs cannot meet the first of the anti-suit injunction requirements because the parties in the Brazilian litigation are not identical to those before this Court . . . But defendants

read this requirement too narrowly.  Where parties to the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met.").  But, if a showing of alter ego is necessary, Levona has made it, at least on a preliminary basis.  The Gas that is appearing in the U.K. is controlled by Intervenors, claims to be owned by Intervenors, and is pursuing the interests of Intervenors.  Intervenors are doing Gas's bidding and Gas is doing Intervenors' bidding.  No evidence has been submitted that they have any existence independent of one another.  *See Storm LLC v. Telenor Mobile Commc'ns AS*, 2006 WL 3735657, at *6 (S.D.N.Y. Dec. 15, 2006) ("[T]he Court agrees that [defendant] will likely succeed in establishing that [plaintiff and unnamed third parties] are alter egos of one another, at least to the extent necessary to warrant the relief [defendant] seeks against them. Even if they are not, however, the parties in the two actions are sufficiently similar to satisfy the threshold requirement for a preliminary anti-suit injunction. The litigation in Ukraine, while nominally between [third party and plaintiff], seeks to influence the arbitration proceedings and has resulted in orders that are directed at [defendant]. . . . The real parties in interest in the Ukrainian lawsuit are essentially the same entities that are involved in the arbitration here.") (Lynch, J.).  The first condition is satisfied as to the English proceeding.[7]

---

[7] Gas informed the U.K. court on December 16, 2024, that Gas intended to intervene in this proceeding.  Dkt. No. 363-1¶ 52 ("[Gas] intends to intervene in the Confirmation Proceedings and will file its motion to intervene as soon as it is able to do so."); *id.* ¶ 92.  As Gas told the U.K. court, Gas would have had the right to seek intervention on same grounds as Intervenors. *Id.* ¶ 49 ("At the status conference on 12 November 2024, Judge Liman then modified the stay sought by Levona to 'permit filings of motions to intervene by Gas and by the other people who are beneficiaries of the [Award].'").  Gas's decision not to move to intervene bespeaks an effort by the Greek families to have it both ways—to resist vacatur through efforts of Intervenors while attempting to render meaningless any decision to vacate the Award through Gas's machinations abroad.

Determining that parties are substantially the same for the purposes of the first threshold requirement for an anti-suit injunction is a different, albeit related, inquiry to determining who may ultimately be bound by an injunction issued by a court pursuant to Rule 65 of the Federal Rules of Civil Procedure.  *See Storm LLC*, 2006 WL 3735657, at *6 ("[T]he Court has no trouble concluding that the parties here and in the Ukraine are 'sufficiently similar' for purposes of an antisuit injunction. The question of whether an injunction can or should issue against a nominal defendant in a foreign action presents a distinct and more difficult issue.").  Rule 65 allows federal court injunctions to bind only properly noticed "parties," "parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation [with the aforementioned]."  Fed. R. Civ. P. 65(d)(2).  The Supreme Court, in the course of examining the origins and impact of Rule 65(d)(2), has stated:

> This [rule] is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control.  In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945).  Put another way, even an entity or individual not named as a party, and not before the court *in personam*, may be held in contempt of court when they have "actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or the defendant's privy in violating the injunction." C. Wright & A. Miller, 11A Federal Practice and Procedure § 2956 (3d ed. 2025).  "[T]he privity concept is restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding."  *Id.*  "When an injunction has issued against a corporation, a subsidiary corporation or an independent corporation acting in active concert also may be bound by the order.  In this vein, when a parent corporation transfers property to a

subsidiary in an attempt to circumvent an injunction or when the subsidiary aids, abets, or acts in concert with the parent, the decree is binding on the subsidiary." *Id.*; *see Walling v. James V. Reuter, Inc.*, 321 U.S. 671, 674 (1944) ("[An injunction is enforceable] in appropriate circumstances, against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons."); *Computer Searching Service Corp. v. Ryan,* 439 F.2d 6, 10 (2d Cir. 1971); *Software Freedom Conservancy, Inc. v. Westinghouse Digital Electronics, LLC*, 812 F. Supp. 2d 483, 487–88 (S.D.N.Y. 2011).

In short, the Court has the power to enjoin Intervenors, their "officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with Intervenors. Fed. R. Civ. P. 65(d)(2). Should contempt proceedings be brought for violations of this injunction, the Court anticipates little difficulty in concluding that Gas, Laskarina Karastamati, Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, Lassia Investment Company, Family Unity Trust Company, and Glafkos Trust Company are sufficiently "in privity" with, in "active concert" with, "aiding," or "abetting" Intervenors to bring them within range of the Court's contempt power. *See Regal Knitwear*, 324 U.S. at 14; *see also NML Cap., Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) ("Every injunction issued by a district court automatically forbids others—who are not directly enjoined but who act 'in active concert or participation' with an enjoined party—from assisting in a violation of the injunction . . . The amended injunctions simply provide notice to payment system participants that they could become liable through Rule 65 if they assist Argentina in violating the district court's orders."); *Washington Metropolitan Area Transit Commission v. Reliable Limousine Service, LLC*, 985 F. Supp. 2d 23, 30–31 (D.D.C. 2013).

B.    **Dispositive Nature of the Action in the Enjoining Court**

The second threshold condition is whether "resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Paramedics*, 369 F.3d at 652. "'Courts in this Circuit have found anti-suit injunctions appropriate even when the claims in the foreign and domestic actions were not precisely identical, but were at least based on the same underlying dispute.'" *Jolen, Inc. v. Kundan Rice Mills Ltd.*, 2019 WL 1559173, at *2 (S.D.N.Y. Apr. 9, 2019) (quoting *AU New Haven, LLC v. YKK Corp.*, 2018 WL 2128373, at *3 (S.D.N.Y. May 8, 2018)). That condition also is satisfied. The "substance" of this case, *Karaha Bodas*, 500 F.3d at 121, as it is presently configured, regards whether the Award may be enforced or whether it was procured through fraud. The U.K. Action and the Greek Action both seek to reduce the Award to a money judgment. Under principles of comity, a decision by this Court that the award should be vacated would be preclusive of any decision by the courts in the U.K. and in Greece to recognize and/or enforce the award. *See Thai-Lao Lignite*, 864 F.3d at 176; *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, 832 F.3d 92, 106 (2d Cir. 2016); *Baker Marine*, 191 F.3d at 197; *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) ("[A] secondary Contracting State normally may not enforce an arbitration award that has been lawfully set aside by a 'competent authority' in the primary Contracting State."); *see also Europcar Italia, S.p.A. v. Maellano Tours, Inc.*, 156 F.3d 310, 318 (2d Cir. 1998) ("[U]nder Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country."). Accordingly, resolution of this case should be dispositive of the cases before the courts in Greece and England. If the Court decides to vacate the Award, those courts should be prevented under principles of comity from recognizing and enforcing the Award. By contrast, if the Court decides not to vacate the Award, there would be little if anything for the courts in England and Greece to do. Levona has not

identified grounds for those courts not to recognize the Award under Article V(1)(a)–(d).  Given the limited grounds upon which confirmation can be resisted in a secondary jurisdiction, confirmation and enforcement is likely to follow as a matter of course.

## II.    Discretionary Factors

The additional discretionary factors for issuing an anti-suit injunction also are satisfied.

### A.    Policy in the Enjoining Forum

This Court has a policy interest in "protecting the regime established by the Convention for enforcement of international arbitral awards," which is sufficient to permit the court, "if necessary, [to] enjoin[] parties from engaging in foreign litigation that would undermine it." *Karaha Bodas*, 500 F.3d at 126.  Permitting the foreign litigations to go forward threatens the regime established by the New York Convention.[8]

It is true that the New York Convention permits parallel proceedings in both the primary jurisdiction and in a secondary jurisdiction to recognize and enforce an arbitral award.  *See Europcar*, 156 F.3d at 316–317; *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 2023 WL 2961739 at *1 (2d Cir. Apr. 17, 2023) (summary order).  There is no categorical rule against the beneficiary of an award pursuing recognition and enforcement of an award simultaneously in every jurisdiction that is a party to the New York Convention.  *See CBF Industria de Gusa S/A*, 850 F.3d at 73.  It

---

[8] In *Karaha Bodas*, the Second Circuit stated that "federal courts should not attempt to protect a party seeking enforcement of an award from all the legal hardships associated with foreign litigation over the award" and that "[f]ederal courts in which enforcement of a foreign arbitral award is sought cannot dictate to other 'secondary' jurisdictions under the New York Convention whether the award should be confirmed or enforced in those jurisdictions."  500 F.3d at 123–24.  But Intervenors strip that language from its context.  The United States District Court in *Karaha Bodas* was exercising secondary jurisdiction.  Parallel proceedings in other jurisdictions thus posed no threat to its own jurisdiction.  The court made clear that a different result would obtain when the exercise of a foreign court's jurisdiction would present a threat to the United States court's own primary jurisdiction.  *See id.* at 124 ("[F]ederal courts do have inherent power to protect *their own* judgments from being undermined or vitiated by vexatious litigation in other jurisdictions.").

does not follow, however, that simply because a proceeding can be brought simultaneously in a primary and a secondary jurisdiction, a proceeding in the secondary jurisdiction can never conflict with the primary jurisdiction and the policies animating the New York Convention regime. "Under the Convention, the power and authority of the local courts of the rendering state remain of paramount importance." *Yusuf Ahmed*, 126 F.3d at 22; *see Thai-Lao Lignite*, 864 F.3d at 186. The primary jurisdiction alone has the power to determine whether an award should be vacated or annulled on grounds that it was procured by corruption, fraud, or undue means, that there was evident partiality or corruption in the arbitrators, that the arbitrators were guilty of misconduct or other misbehavior, 9 U.S.C. § 10(a), and the like. "There is no indication in the Convention of any intention to deprive the rendering state of its supervisory authority over an arbitral award, including its authority to set aside that award under domestic law." *Yusuf Ahmed*, 126 F.3d at 22; *TermoRio.*, 487 F.3d at 937 ("The Convention does not endorse a regime in which secondary States . . . second-guess the judgment of a court in a primary State.").

It necessarily follows that, consistent with the New York Convention, a court in a primary jurisdiction must be able to enjoin proceedings in a court in a secondary jurisdiction when those proceedings in a secondary jurisdiction threaten to undermine the first court's authority to vacate, set aside, or suspend the award. Were the rule otherwise, the power of the court in the rendering jurisdiction to review and set aside or suspend an award would be rendered illusory, as would the corollary power of the court in the secondary jurisdiction to decline to enforce an award that has been set aside or suspended pursuant to provision of Article V(1)(e) of the New York Convention. A party that has procured its award through fraud or corruption could simply avoid any inquiry into that fraud or corruption by racing to a court in a state of secondary jurisdiction and asking that court, without any review for fraud or corruption, to

recognize the award.  As indicated, the review by the court in the secondary jurisdiction is limited and the proceeding is intended to be accelerated.  The court with primary jurisdiction would rarely be able make the factual determinations necessary to fairly adjudicate an accusation of fraud, consistent with the due process rights of the award recipient.  Even if, in theory, the court in the primary jurisdiction could make its determination before the court in the secondary jurisdiction could make its determination, the award recipient would have every incentive to drag out the proceedings in the primary jurisdiction to prevent that result.  There would be open season for fraud in arbitration.  The Court cannot accept Intervenors' position that comity under the New York Convention requires Levona to play global "whack-a-mole" as Intervenors and their affiliates race around the world to find a jurisdiction that will confirm their Award before this Court can adjudicate the underlying question of fraud on the arbitrator.

The New York Convention itself recognizes that there will be circumstances in which a court in a primary jurisdiction will effectively stay proceedings in a secondary jurisdiction and circumstances in which a secondary jurisdiction will stay or adjourn its proceedings in favor of the proceedings in the primary jurisdiction.  Article V(1)(e) expressly recognizes that, aside from setting aside an award, the court in a primary jurisdiction may "suspend" the award.  The same provision indicates that, in such circumstance, the court in the secondary jurisdiction would have at least the authority, if not the right, to refuse recognition and enforcement until the proceedings in the primary jurisdiction are concluded.  *Id.*  The New York Convention thus contemplates that there will be occasions in which resolution of the action in the secondary jurisdiction should wait resolution of the action in the primary jurisdiction.  *See* Convention art. VI; *id.* art.V(1)(e) (codified at 9 U.S.C. § 207); Michael H. Strub, Jr., *Resisting Enforcement of Foreign Arbitral*

*Awards Under Article v(1)(e) and Article VI of the New York Convention: A Proposal for*

*Effective Guidelines*, 68 Tex. L. Rev. 1031, 1047 (1990).[9]

Article VI of the New York Convention provides:

[i]f an application for the setting aside or suspension of the award has been made
to a competent authority [of the country in which, or under the law of which, that
award was made], the authority before which the award is sought to be relied upon
may, if it considers it proper, adjourn the decision on the enforcement of the award

---

[9] "Although it is not entirely clear what the drafters of the Convention meant by the suspension
of an award," leading commentators understand it "to refer to suspension of the enforceability or
enforcement of the award by a court in the country of origin." Albert Jan van den Berg, *New
York Convention of 1958: Refusals of Enforcement*, 18 ICC Int'l Ct. Arb. Bull. No. 2, at 17
(2007); *see* NY Convention Guide, Article V(1)(e), ¶ 31 ("The Convention does not provide
guidance as to the definition of the term "suspended"; nevertheless, with very few exceptions,
the majority of courts agree that this refers to a formal suspension resulting from a court
decision."). The concept of suspension under the New York Convention is best understood as
analogous to a stay within the meaning of the FAA. *See* 9 U.S.C. § 12 ("For the purposes of [a]
motion" to vacate, a district court "may make an order . . . staying the proceedings of the adverse
party to enforce the award."); *cf. Smith v. Spizzirri*, 601 U.S. 472, 472 (2024) ("[T]he long-
established legal meaning of the word 'stay' [i]s a 'temporary suspension' of legal
proceedings."). "Suspension" under the New York Convention therefore contemplates a
temporary pause, not a final adjudication of the question of confirmation of or "setting aside" of
an arbitral award. As noted above, *see supra* at n.2, though the parties have separately briefed
the question of "whether, to preserve its jurisdiction, the Court may suspend the Award," Dkt.
No. 365, this Order does not address or resolve the question of suspension in this matter. An
order of suspension, or a recognition of suspension already ordered pursuant to this Court's
February 14, 2025 Order, *see* Dkt. No. 268 (clarifying that any confirmation of the Award is
"[s]ubject to the resolution of Levona's pending motion to vacate the award and its defense
based on fraud in the arbitration"), would not substitute for the anti-foreign suit injunction
pressed here because (1) such an order would not necessarily prevent a court in the secondary
jurisdiction from recognizing or enforcing the Award and (2) it would not prevent Intervenors
and their affiliates from pressing forward in the U.K. and Greece. Intervenors dispute that they
currently are subject to any court order that would prevent them from going to a foreign court to
recognize or enforce the Award. Thus, while Intervenors dispute that the Court has the authority
to stay the Award, even if it had such authority, the Court would not be required to rely upon the
exercise of discretion in the secondary jurisdiction, particularly under the circumstances here
where Intervenors will not commit to desist from proceeding with the actions in the secondary
jurisdiction. *See Bankruptcy Proceeding*, Dkt. No. 48 (the "Lift Stay Order") ¶¶ 3–4 ("Any
Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending further
order of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration
Award."); *id.* Dkt. No. 1537 at 3–4 (requiring those in control of the Intervenors to withdraw
"filings that oppose or undermine" the Confirmation Order); May 30, 2025 Hearing Tr. 33:9–12;
Dkt. No. 392 at 7 ("[T]he Preferred Shareholders are not subject to the Lift Stay Order.").

and may also on the application of the party claiming enforcement of the award, order the other party to give suitable security.

Convention art. VI.  The factors set out by the Second Circuit for a United States court acting as a secondary jurisdiction to consider in determining whether to adjourn in favor of proceedings in the primary jurisdiction are illuminating.  Though presenting the inverse of the scenario here, they also necessarily provide guidance with respect to the factors that this Court should consider in determining whether an injunction is consistent with, or antithetical to, the policies of the New York Convention.  "[A] district court faced with a decision whether to adjourn arbitral enforcement proceedings to await the outcome of foreign proceedings must take into account the inherent tension between competing concerns.  On the one hand, the adjournment of enforcement proceedings impedes the goal of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation. . . . A stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration.  On the other hand, . . . where a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside, a district court may be acting improvidently by enforcing the award prior to the completion of the foreign proceeding." *Europcar*, 156 F.3d at 317.  The Second Circuit has held that the court in the secondary jurisdiction must consider the following factors, among others:

(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

(2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;

(3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;

(4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of

international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive "suitable security" and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country; and

(6) any other circumstance that could tend to shift the balance in favor of or against adjournment.

*Id.* at 317–18.  The first two factors are the most important.  *Id.* at 318.

The Second Circuit analysis in *Europcar* is rooted in the Court's interpretation of the New York Convention and the objectives of that treaty.  There is no reason to believe that the principles the Circuit laid out are not universally applicable to all states parties to the New York Convention.  *Cf. United States v. Phillips*, 2024 WL 1300269, at *12 (S.D.N.Y. Mar. 27, 2024) (discussing the principle of comity that the United States should not do to other countries what it would not want other countries to do to it).

Applying those principles then, an injunction that would have the effect of staying enforcement proceedings in the U.K. and in Greece would further the policies of the New York Convention.  Only the first factor arguably weighs slightly in favor of Intervenors.  An anti-foreign-suit injunction undoubtedly will delay to some extent Intervenors' ability to get relief in the U.K. and in Greece.  That factor is of limited relevance here.  Intervenors showed no interest in pursuing a foreign action to recognize and enforce a judgment until Levona developed evidence in this case that the Award was procured by fraud.  Intervenors' interest is best understood as being to prevent Levona from trying to further develop evidence of fraud, rather than to recover on a lawfully confirmed Award.  Every other *Europcar* factor weighs strongly in favor of a stay.

28

The Court has set a timetable for this case to be resolved by the end of the year. Dkt. No. 371. Any delay is properly laid at the feet of the Intervenors who in Greece seek enforcement. They moved to intervene in this case only at the last minute, on April 7, 2025. Dkt. No. 301.[10] They could have moved to intervene earlier; there was no obstacle to them doing so. Months earlier on October 30, 2024, shortly after the Court had permitted Levona to amend its cross-petition to add allegations of fraud and on the eve of Intervenors losing control of Eletson, then-counsel for Eletson represented that counsel had been authorized to move to intervene on behalf of Gas and Intervenors. Dkt. No. 204 at 1. On November 12, 2024, the Court lifted the stay in this case to permit a motion for intervention to be made. *See* Dkt. No. 208 at 18:15–17; Nov. 12, 2024 Minute Entry. In the witness statement submitted to the U.K. court on December 16, 2024, Gas represented that it intended "to intervene in the Confirmation Proceedings and will file its motion to intervene as soon as it is able to do so," Dkt. No. 363-1 ¶ 52, and also represented that the Putative Nominees intended to apply to intervene, *id.* ¶ 92. They thus had the intent to intervene as early as late October or November. By mid-November if not earlier, Intervenors had an incentive to intervene. The bankruptcy court had confirmed the plan, giving control to Pach Shemen and the Petitioning Creditors and, according to Intervenors, depriving them of an entity who could be trusted to represent their interests in these proceedings. As the Court previously ruled, Intervenors' delay is not attributable to a change in circumstances. It can best be ascribed to an unsuccessful procedural ploy to try to convince the Court that it lacked Article III jurisdiction in Intervenors' absence, and thus could not vacate the Award, while preserving for themselves the option to intervene to protect the Award if the Court rejected that argument.

---

[10] The Court set April 7, 2025, as the deadline for Intervenors to move for intervention. *See* Dkt. No. 297.

*See* Dkt. No. 295 at 21 (the Court observing that Putative Nominees appeared to have declined to intervene up to that point so "the Court may do their work for them and allow the Award to stand, not because of any decision as to whether it should be vacated or not but based upon the judgment that their absence alone deprives the Court of jurisdiction to address that question"); Dkt. No. 343 at 21.  It was only after the Court rejected the argument regarding Article III jurisdiction on March 24, 2025, that a motion to intervene was filed.  To be sure, Intervenors were permitted to have Eletson under its prior management represent their interests and were not required to move to intervene.  But had they intervened earlier, there would have been no reason for discovery not to go forward.  Thus if, as a result of their delay in moving to intervene, discovery in this case is not as far progressed as could have been hoped, Intervenors have only themselves to blame.  They can hardly be heard to complain.

The Award will receive greater scrutiny in this Court than it will receive in the U.K. or in Greece.  In this Court, Levona will have a full and fair opportunity to try to prove their claims of fraud in the arbitration and Intervenors will have the right to respond to that argument.[11]  Levona will have no such opportunity in the U.K. or Greece or in any other court of a secondary jurisdiction.  "The grounds for refusing to enforce an award are limited to the specific defenses enumerated in Article V of the Convention."  *Europcar*, 156 F.3d at 316.  Even if the award were procured by fraud, Intervenors would be able to enjoy its fruits.

The relative characteristics of this proceeding and the U.K. and Greek proceedings further indicate that it would cause no offense to the New York Convention for those

---

[11] In fact, Intervenors have already issued extensive foreign discovery requests.  *See, e.g.,* Dkt. Nos. 377, 380, 383, 386, 388.  Further, document productions from Eletson's former counsel, Reed Smith, remain outstanding, and counsel and Eletson's former owners resist turning over records to its current owners.  *See, e.g.,* Dkt. No. 403.

proceedings to be stayed while this case proceeds to conclusion.  This proceeding was brought initially by Eletson as the award recipient to confirm the Award; the claim of fraud was brought as a response to the petition to confirm.  "[W]here . . . it is the plaintiff who first sought to enforce his award in the originating country, the argument for enforcement by the plaintiff in the district court [in the secondary jurisdiction] loses force because the possibility of conflicting results and the consequent offense to international comity can be laid at the plaintiff's door." *Europcar*, 156 F.3d at 317.  The fact that it was Eletson, under its prior management, and not Levona that initiated this proceeding further goes to mitigate any concerns regarding comity.  *Id.* Indeed, as noted, it was only after the Court permitted Levona to go forward on its claim of fraud in the arbitration that Intervenors commenced the proceedings abroad.

There is no evidence that the petition to vacate on grounds of fraud was initiated under circumstances indicating an intent to hinder or delay resolution of the dispute outside the United States.  At the time Levona brought its claims of fraud, there were no foreign proceedings with which Levona could interfere.  To the contrary, there is every reason to believe that the initiation of the foreign proceedings constitutes an "abusive tacti[c] by the party," Intervenors, who are at risk, if this proceeding turns out adversely to them, of losing their ability to confirm and enforce the award.  *Id.* at 317.

Finally, in this case, the balance of hardships weighs decidedly in favor of Levona. Unlike in *Iraq Telecom*, the moving party here has offered evidence that, if accepted, would lead to vacatur of the award.  2023 WL 2961739, at *2; *see Europcar*, 156 F.3d at 318 ("[U]nder Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country.").  This is not a case where Levona "is simply seeking to delay the inevitable confirmation."  *Iraq Telecom*, 2023 WL 2961739, at *2.  If deprived of the

31

opportunity to challenge the award, Levona will lose something of real value. By contrast, Intervenors will lose nothing. If it turns out that Levona is not able to prove its case and the award was not procured by fraud, Intervenors will then at that point have what should be a smooth and secure path by which to enforce and enjoy the award.

The policy of the New York Convention supports an injunction.

## B.    Vexatiousness

The U.K. and Greek Proceedings fit the very definition of vexatious proceedings. "[V]exatiousness is 'likely to be present whenever parallel actions are proceeding concurrently.'" *Karaha Bodas*, 500 F.3d at 126 (quoting *China Trade*, 837 F.2d at 36). Of course, "vexatiousness" in this sense is insufficient alone to permit a court to order an injunction. *See Laker Airways*, 731 F.2d at 226; *China Trade*, 837 F.2d at 36 ("[S]ince these two factors [of vexatiousness and race to judgment] are likely to be present whenever parallel actions are proceeding concurrently, an anti-suit injunction grounded on these additional factors alone would tend to undermine the policy that allows parallel proceedings to continue and disfavors anti-suit injunctions."). In the ordinary case, the interest in avoiding duplicative litigation is achieved through the application of principles of *res judicata* or is "more properly considered in a motion for dismissal for *forum non conveniens.*" *Laker Airways*, 731 F.2d at 226. There is no offense to the court asked to enjoin a proceeding because the parties in the first court before it will have a full and fair opportunity to litigate all of their issues in the second court. However, if the issues sought to be raised in the first court could not have been raised in the second court, then the second court proceeding will not result in *res judicata* or claim preclusion. *See, e.g. Allen v. McCurry*, 449 U.S. 90, 93 (1980) ("Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privileges from relitigating issues that were or could have been raised in that action."); Restatement (Second) of Judgments § 19 (1982) ("A valid and final

personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim."); *id.* § 26(1)(c) cmt. (noting that the general rule of claim preclusion "assum[es] that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law," and stating further that "[w]hen such formal barriers in fact exist[ ] and [are] operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first"); Restatement (Second) of Conflict of Laws § 98 (1971) ("A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying cause of action are concerned."); *Hilton v. Guyot*, 159 U.S. 113, 202–03 (1895) ("[W]e are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, . . . the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.").  Those principles offer the Court little comfort here. Here, a judgment by a court in a secondary jurisdiction would not be entitled to *res judicata* or claim preclusive effect on the questions of fraud in the arbitration because those questions cannot be litigated in a court of secondary jurisdiction.  And, for the same reasons, the questions regarding fraud cannot be transferred to the courts in Greece and the U.K. or raised there through consolidated proceedings. The effect would be to functionally strip this Court of its jurisdiction and to deprive Levona of its right to a hearing.  While a hearing could go forward, it would be meaningless.  Intervenors

would at that point have their judgment and the right to execute on Levona's assets that comes with a judgment.

### C.    The Court's *In Rem* or *Quasi In Rem* Jurisdiction

"A long-standing exception to the usual rule tolerating concurrent proceedings has been recognized for proceedings *in rem* or *quasi in rem,* because of the threat a second action poses to the first court's basis for jurisdiction." *China Trade*, 837 F.2d at 36.  As noted, ordinarily, when two courts have concurrent *in personam* jurisdiction and the suits are to determine the parties' rights, both may proceed with the litigation because the laws of *res judicata* ordinarily will protect the interests of the first court.  There is no need for the first court to issue an injunction because "*res judicata* alone will . . . protect the jurisdiction of the first court." *Id.* at 36.  "On the other hand, if the two suits are *in rem*, or *quasi in rem*, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other." *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). Absent an injunction, the proceedings in the second court will threaten to deprive the first court of its jurisdiction.  "Even in *in personam* proceedings, if a foreign court is not merely proceeding in parallel but is attempting to carve out exclusive jurisdiction over the action, an injunction may also be necessary to protect the enjoining court's jurisdiction." *China Trade*, 837 F.2d at 36.

The D.C. Circuit's decision in *Laker Airways*, 731 F.2d 909, cited with approval in *China Trade*, 837 F.2d at 36, is illustrative.  The question there was the propriety of an injunction issued by the D.C. District Court enjoining foreign defendants before it from instituting an action in the U.K. which would have restrained the plaintiff from pursuing the United States action. *See Laker Airways*, 731 F.2d at 915 ("If these defendants had been permitted to file foreign injunctive actions, the United States District Court would have been effectively stripped of

control over the claims—based on United States law—which it was in the process of adjudicating."). The two proceedings were *in personam*. After restating the default rule permitting parallel proceedings in concurrent *in personam* actions, *id.* at 928, the D.C. Circuit held that an anti-foreign-suit injunction was appropriate "when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court.," *id.* at 927. The court stated:

> The logical reciprocal of the parallel proceeding rule proves that there must be circumstances in which an antisuit injunction is necessary to conserve the court's ability to reach a judgment. Just as the parallel proceeding rule counsels against interference with a foreign court's exercise of concurrent jurisdiction, it authorizes the domestic court to resist the attempts of a foreign court to interfere with an *in personam* action before the domestic court. When the availability of an action in the domestic courts is necessary to a full and fair adjudication of the plaintiff's claims, a court should preserve that forum. Thus, where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction. This would be particularly true if the foreign forum did not offer the remedy sought in the domestic forum.

*Id.* at 929–30. "Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." *Id.* at 927. The court held that the United States court properly issued an injunction restraining the parties before it from pursuing litigation in the courts of the U.K. Although both courts had overlapping jurisdiction, "the British and American actions [were] *not* parallel proceedings in the sense the term is normally used. This was not a situation where two courts are proceeding to separate judgments simultaneously under one cause of action." *Id.* at 930. Rather, the effect and purpose of the English proceeding was to terminate the American action and not to litigate abroad the same claim that was being litigated in the United States. *Id.* The British action threatened to "virtually eliminat[e] the [United States] court's effective jurisdiction over [plaintiff's] facially valid claim." *Id.* at 931.

In this case as well, the continued prosecution of the U.K. and Greek actions before this Court is able to reach a conclusion on Levona's petition to vacate the Award would permit Intervenors "to avoid potential liability under the United States laws" to which they are subject, *Laker Airways*, 731 F.2d at 915, and would prevent the Court from providing "full justice" to the litigants before it, *id.* at 927.  As in *Laker*, the foreign fora here do "not offer the remedy sought in the domestic forum."  *Id.* at 930.  Their jurisdiction is strictly limited.  They have no power to consider Levona's argument that the Award was procured by fraud.  In these circumstances, the Court cannot rely upon the principles of *res judicata* to ensure that the parties each receive "full justice" under United States law.  While as a formal matter the courts in the U.K. and Greece cannot prevent Levona from litigating its claim of fraud here, they can make that right and any relief Levona might obtain virtually meaningless.  A conclusion that Levona did not have a full and fair opportunity in the U.K. or Greece to challenge the Award as fraudulent would do nothing.  If confirmed, the Award would be reduced to judgment and, under the New York Convention, Intervenors would be free to execute upon it regardless whether  Levona prevailed on its claim in this Court that the Award was fraudulent.

Intervenors respond that the foreign proceedings pose no threat to the Court's jurisdiction because at the moment they seek only confirmation and not enforcement and the Intervenors, in their capacity as Preferred Shareholders, have committed to provide notice to this Court and to the bankruptcy court before any enforcement activity.  *See supra*, Findings of Fact, Section VI.  But tellingly, Intervenors make no commitment not to enforce, only that they will give notice of enforcement, with no commitment to await this Court's approval before proceeding to enforcement.  *See* May 30, 2025 Hearing Tr. 48:23–49:6.  That is no answer at all.  With a judgment, Intervenors would be free to execute in Greece and the U.K.  Moreover, Intervenors

do not identify how, if a judgment is entered abroad and this Court has not yet entered judgment,

the Court could reach any result but to give that judgment recognition. An award, once

confirmed, is a judgment. Under United States law, a judgment, unless vacated, is entitled to

recognition in any location in which the judgment debtor has assets, except under very limited

circumstances; registration is ministerial. *See Cargill Fin. Servs. Int'l, Inc. v. Barshchovskiy*,

2025 WL 522108, at *4–5 (S.D.N.Y. Feb. 18, 2025); *Lenchyshyn v. Pelko Elec., Inc.*, 723

N.Y.S.2d 285, 291 (1st Dep't 2001) ("In proceeding under article 53, the judgment creditor does

not seek any new relief against the judgment debtor, but instead merely asks the court to perform

its ministerial function of recognizing the foreign country money judgment and converting it into

a New York judgment."). And the same essential framework appears to guide international

judgment enforcement in other countries. *See* U.S. Department of State, Bureau of Consular

Affairs, *Enforcement of Judgments*, https://travel.state.gov/content/travel/en/legal/travel-legal-

considerations/internl-judicial-asst/Enforcement-of-Judgements.html (last accessed June 1, 2025)

("The general principle of international law applicable in such cases is that a foreign state

exercises the right to examine foreign judgments for four causes: (1) to determine if the court

that issued the judgment had jurisdiction; (2) to determine whether the defendant was properly

notified of the action; (3) to determine if the proceedings were vitiated by fraud; and (4) to

establish that the judgment is not contrary to the public policy of the foreign country. While

procedures and documentary requirements vary widely from country to country, judgments

which do not involve multiple damages or punitive damages generally may be enforced, in

whole or in part, upon recognition as authoritative and final, subject to the particulars cited

above, unless internal law mandates a treaty obligation."); Violeta I. Balan, *Recognition and*

*Enforcement of Foreign Judgments in the United States: The Need for Federal Legislation*, 37 J.

Marshall L. Rev. 229, 237 (2003) ("As for foreign-country money judgments, in 1962 the

National Conference of Commissioners on Uniform State Laws approved the Uniform Foreign

Money-Judgments Recognition Act . . . While there are differences in detail, as a whole, the

rules for recognition of foreign judgments under the Brussels and Lugano Conventions are

similar to the provisions of the Recognition Act, the Enforcement Act, and the rules of the

Restatement (Third) of Foreign Relations Law.").

To be sure, under United States law, one of the circumstances in which a judgment need

not be recognized is when that judgment "conflicts with another final and conclusive

judgment."  CPLR 5304(b)(4); Uniform Foreign Money-Judgments Recognition Act of 1962 §

4(b)(4) ("A foreign judgment need not be recognized if . . . the judgment conflicts with another

final and conclusive judgment"); Restatement (Third) of the Foreign Relations Law of the U.S. §

482(2)(e) (1987) ("A court in the United States need not recognize a judgment of the court of a

foreign state if . . . the judgment conflicts with another final judgment that is entitled to

recognition.").  But that does not prevent enforcement in Greece and the U.K.  Moreover, that is

only a permissive, rather than mandatory, ground for non-recognition in the United States.

While a judgment may not be entitled to recognition when there is fraud in the proceeding giving

rise to the judgment, in this instance the relevant fraud would not be in the UK or Greek

proceedings themselves but in the underlying arbitration.  That scenario is not recognized as

either a mandatory or even a permissive basis for non-recognition.

The judgment debtor can ask that the judgment be vacated.  But that too is no answer.

Such answer could be given in any case where an anti-foreign-suit injunction is sought.  The

Second Circuit has held that, under the New York Convention, vacatur of a judgment based on a

fraudulent award is governed by the domestic procedural rules of the forum in which the

judgment was entered.  *See Thai-Lao Lignite*, 864 F.3d at 185.  Thus, vacatur does not follow as

a matter of course.  And there is no reason to believe that the courts in the U.K. or Greece or

anywhere else in the world would vacate a judgment rendered on a fraudulent award any more

readily.  Tellingly, Intervenors offered no evidence and provided no answer to whether a

judgment, once obtained in Greece or the U.K., could be vacated if this Court later determined

that the Award that provided the basis for that judgment is vacated.  Moreover, when pressed by

the Court to stipulate that they would move to vacate an order of the Greek court reducing the

Award to judgment in the event that this Court vacates the Award, Intervenors demurred.  *See*

May 30, 2025 Hearing Tr. 37:6–12.

Although Intervenors were at great pains to suggest that confirmation and enforcement

are two separate proceedings in Greece, *see* Dkt. No. 393 ¶¶ 4–5 ("For the avoidance of doubt,

the request for the award to 'be declared enforceable' is separate from the act of enforcing it.

Judicial recognition/confirmation of an arbitral award is distinct from enforcement under Greek

law."), Intervenors did not dispute that, as in the United States, enforcement in Greece is

essentially a ministerial process after an award is recognized, *see* May 30, 2025 Hearing Tr.

9:18–10:4 ("[M]y understanding, from Greek counsel, is that the enforcement proceeding

literally consists of walking down the hallway to the clerk and having the clerk, on an *ex parte*

basis, put a seal on the confirmed award. And then you get that seal from the clerk. There's no

judge involved. You get that seal from the clerk, and you can call the bailiff and start arresting

assets.").  Against that context, Intervenors' commitment to give the Court "notice" prior to

enforcement proceedings is hardly reassuring.

Finally, this Court's jurisdiction is not adequately protected by the orders already issued

by the bankruptcy court, including the Lift Stay Order, *Bankruptcy Proceeding*, Dkt. No. 48 ¶¶

3–4, and the Sanctions Order, *Bankruptcy Proceeding*, Dkt. No. 1537, as Intervenors insist that

they are subject to neither, *see* May 30, 2025 Hearing Tr. 33:9–12 ("We're not parties to the lift-

stay order."); *id.* 34:3–4 ("[T]here's no bankruptcy order that has precluded the preferred

shareholders from proceeding in Greece[.]"); *id.* 48:12–13 ("[My clients [are] not subject to any

sanctions[.]"); Dkt. No. 392 at 7.[12]

### D.    Prejudice and Other Equitable Considerations

As set forth below, Intervenors have not been able to identify any prejudice to them.

Each of the foreign proceedings is in a nascent stage.  In Greece, Intervenors have simply filed

an application for the Award to be declared enforceable in Greece, Dkt. No. 393 ¶ 4, and have

begun the process of effecting service on Levona and its affiliates, *id.* ¶ 11. Levona has not yet

been served and Greek counsel indicates that he intends to request an adjournment which will

likely last six to eight months.  Dkt. No. 393 ¶ 11.[13]  Given the inevitable delay necessitated by

this adjournment and service process, the functional difference for Intervenors in awaiting this

Court's final decision on vacatur and proceeding with the Greek action now appears trivial.

Proceedings in the U.K. are even more embryonic.  *See* Dkt. No. 363 ¶ 4.

Intervenors have not shown that they will be disadvantaged by any incremental delay

between the time that the Greek or English courts in the ordinary course would hold a hearing

---

[12] The Court does not hereby opine on the validity of Intervenors' positions with respect to the bankruptcy court's orders.

[13] Effectuating service will require first "constructive service" of the relevant documents, then "actual service" of the documents. Constructive service is  accomplished by a judicial officer serving the officially translated documents on the local prosecutor.  Once the document is provided to the prosecutor and constructive service is completed, the next required step is actual service.  To accomplish actual service, the local prosecutor serves the documents on the Greek Ministry of Foreign Affairs, and then the Greek Ministry of Foreign Affairs serves the documents via diplomatic channels on the Ministry of Foreign Affairs of the foreign country where the respondent resides.  The respondent is then served pursuant to local service rules.  Actual service is completed when an official receipt of service on the respondent is returned to the Greek court with the officially translated documents.  Dkt. No. 393 ¶ 8.

and the time this Court renders a decision.  Not only are the foreign proceedings not far progressed, but Intervenors have made no showing that they will be difficult to restart.  By contrast, it is Levona who may be deprived of a full and fair hearing on its claim of fraud and would suffer prejudice if an injunction is not granted.  Intervenors argue that Levona delayed in seeking an anti-suit injunction.  Dkt. No. 392 at 22.  But it was not until Intervenors moved for intervention and the Court granted intervention that the Court would have had the power to enter an anti-suit injunction.  Indeed, when Intervenors first approached Levona on March 26, 2025, requesting a stipulation to permit intervention, Levona asked that Intervenors withdraw the foreign confirmation actions, which Intervenors declined.  Dkt. No. 303-2.  Later, in opposing Intervenors' motion to intervene, Levona asked the Court, in the alternative, to grant intervention only on the condition of ceasing the foreign actions.  Dkt. No. 318 at 22.  The Court declined that invitation in the order granting intervention on May 9, 2025, Dkt. No. 343 at 24, noting instead that "[t]o the extent that the Greek proceeding or a proceeding in any other country interferes with or undermines the integrity of the proceedings before this Court, Levona (or Eletson) may bring a motion for an anti-suit injunction or other such relief and may do so on an expedited basis.  Such relief, if granted, would be binding on the Proposed Intervenors, now before this Court," *id.* at 25.[14]  Levona then moved expeditiously in seeking injunctive relief just ten days later, on May 19, 2025.  Dkt. No. 361.

---

[14] Consistent with the discussion of Rule 65, *supra*, Conclusions of Law, Section I.A., the Court has limited power to enjoin a party until they are before the Court.  *See* Fed. R. Civ. P. 65.  Prior to the change in management and ownership resulting from the Bankruptcy Proceedings, Eletson itself was not pursuing the foreign actions, and there was therefore nothing to enjoin.  Once Eletson changed hands, the parties pursuing the foreign proceedings were no longer parties to this proceeding.

E.    **Delay, Inconvenience, Expense, Inconsistency, or Race to Judgment.**

Intervenors have identified no prejudice they would suffer from an injunction in this case. They do not identify any urgency to their foreign actions. They commenced those actions long after the award was rendered and only after the Court raised questions whether it was fraudulently obtained. Indeed, they have not even served Levona. The only "prejudice" they risk is the harm they will suffer if deprived of the ability to confirm an award to which they were never entitled.

Finally, it is apparent that in the absence of an anti-foreign suit injunction, there will be a race to judgment as this Court rushes to determine whether there has been fraud in the arbitration and whether the Award should be vacated or modified before the foreign courts determine whether the award should be reduced to judgment. By withholding injunctive relief, the Court would provide an incentive to every party whose award is called into question on any of the grounds set forth in the FAA to race to another court to obtain a judgment that would vitiate those proceedings. Eletson, under its former management, agreed to arbitrate in the United States. *See* Third Amended and Restated LLC Agreement (the "LLCA"), Dkt. No. 51-1 § 12.14. There is no unfairness to Intervenors in ensuring that the Award that Eletson obtained in the U.S. be subject to review by a U.S. court under U.S. standards before it is enforced elsewhere.

III.    **Preliminary Injunction Factors**

Courts have held that a party seeking an anti-suit injunction also must satisfy the ordinary test for a preliminary injunction. *Keep on Kicking Music, Ltd. v. Hibbert*, 268 F. Supp.3d 585, 591 (S.D.N.Y. 2017). The movant must show irreparable harm absent injunctive relief, likelihood of success on the merits, that the public interest favors an injunction, and that the balance of equities tips in the movant's favor. Those conditions are readily satisfied here, for largely the same reasons elaborated above.

Levona has demonstrated irreparable harm.  If denied the requested anti-foreign-suit injunction, it may never have the opportunity granted it by United States law to challenge the Award.  That harm is not reparable by money damages.  Intervenors have not identified how, if the Court were to vacate the Award, a judgment in their favor in the U.K. and in Greece confirming that same award and reducing it to an enforceable judgment could be undone, nor have they stipulated to cooperating with the Court to seek vacatur of a foreign judgment in the event that it conflicted with the Court's ultimate judgment regarding the Award.  And even if they so stipulated, there would be no assurance that a foreign court would grant that relief.  Moreover, the possibility of "inconsistent holdings . . . constitutes irreparable harm." *Jolen*, 2019 WL 1559173, at *5.

Levona also has shown a likelihood of success.  As this Court has already found, "Levona has presented substantial evidence that a fraud was committed by Eletson Corp. and Eletson Holdings, including by withholding the Withheld Documents and critical evidence on a pivotal issue and by presenting perjured testimony."  Dkt. No. 342, at 3 (citing Dkt. No. 162).  Intervenors have offered no evidence to the contrary.  While Intervenors challenge the Court's decisions permitting Levona to assert fraud in the arbitration, Dkt. No. 392 at 24, those rulings are law of the case.  Intervenors offer no reason for the Court to reconsider them.  Levona will have its day in court, as will Intervenors.

The public interest favors an injunction for the reasons set out above, *supra*, Conclusions of Law, Section II.A., concerning the policy considerations animating the New York Convention.

The balance of equities favors Levona where, for all of the reasons set out above, the potential prejudice to Intervenors is only negligible months of delay, while the prejudice to

43

Levona consists of potentially incalculable losses globally from Intervenors' and affiliates'
actions to seize assets under the color of a dubious Award.

## IV.    Levona's Request for Notice of Foreign Action

In addition to the anti-foreign-suit injunction, Levona requests an injunction "requiring
Intervenors to inform Levona of any foreign proceedings seeking to confirm and/or enforce the
award so that Levona may seek relief as appropriate." Dkt. No. 361 at 2. Levona seeks this
relief in recognition of the fact that an antisuit injunction granted by this Court against the
proceedings in Greece and the U.K. could quickly be rendered illusory by Intervenors or their
agents and affiliates filing a new lawsuit in another country. Levona notes that Intervenors
proceeded in Greece *ex parte*. There is no assurance that, if Intervenors were barred from
pursuing the Greek and U.K. proceedings, they would not launch another foreign proceeding
intended to achieve precisely the same result. Intervenors do not object to entry of such an order
and are not prejudiced by it. It is intended to give Levona the opportunity to determine whether
such a proceeding would effectively strip this Court of its jurisdiction and, if Levona makes that
determination, for this Court to decide a motion for an additional anti-foreign-suit injunction.
The Court grants the requested relief.

SO ORDERED.

Dated: June 2, 2025
      New York, New York                          _____
                                                  LEWIS J. LIMAN
                                                  United States District Judge

44