**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELETSON HOLDINGS, INC. and ELETSON
CORP.,

               Petitioners/Cross-Respondents,

    v.

LEVONA HOLDINGS, LTD.,

               Respondent/Cross-Petitioner,

    and

APARGO LIMITED, FENTALON
LIMITED, and DESIMUSCO TRADING
LIMITED,

               Intervenors.

Case No. 1:23-cv-07331-LJL

**REED SMITH'S MEMORANDUM OF LAW IN OPPOSITION TO
LEVONA'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS
PURSUANT TO THE CRIME-FRAUD EXCEPTION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.  Eletson Gas and Murchinson's Bribery of Peter Kanelos ................................ 2

    B.  Discovery Conducted During the Arbitration ................................................... 4

    C.  Production of the At-Issue Documents .............................................................. 6

    D.  The At-Issue Documents on Their Face Don't Show or Imply Fraud............... 7

    E.  Levona's Additional "Evidence" of Purported Fraud...................................... 13

ARGUMENT ..................................................................................................................... 14

I.      Legal Standard ..................................................................................................... 14

II.    The Motion Improperly Asks the Court to Prejudge the Merits of The Vacatur
       Petition ................................................................................................................. 16

III.   Levona Fails to Demonstrate Probable Cause That a Fraud Has Been Committed ........ 18

    A.  Levona Fails to Set Forth Adequate and Reliable Evidence That Failure to Produce
        the At-Issue Documents Amounted to Fraud................................................... 18

    B.  Levona Fails to Establish Probable Cause of any Other Fraud ....................... 20

IV.   Levona Has Not Demonstrated Probable Cause That Any Communications or Work
       Product Were in Furtherance of a Fraud .............................................................. 23

V.    The Court Should Exercise its Discretion to Require Levona to Identify a Limited
       Set of Communications for *In Camera* Review ................................................... 27

VI.   In all Events, the Circuit Stay Precludes the Grant of Levona's Motion........................ 27

CONCLUSION .................................................................................................................. 28

CERTIFICATE OF COMPLIANCE ................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave.*,
2013 WL 3863866 (S.D.N.Y. July 25, 2013) .................................................................16, 25

*Amusement Indus. Inc. v. Stern*,
293 F.R.D. 420 (S.D.N.Y. 2013) .........................................................................................15

*Barba v. Shire US, Inc.*,
2015 WL 7015324 (S.D. Fla. Nov. 12, 2015) ......................................................................17

*Bauer v. Carty & Co.*,
246 F. App'x 375 (6th Cir. 2007) ........................................................................................17

*Boss Mfg. Co. v. Hugo Boss AG*,
1999 WL 47324 (S.D.N.Y. Feb. 1, 1999) ............................................................................18

*Commonwealth Ins. Co. v. Beneficial Corp.*,
1987 WL 17951 (S.D.N.Y. Sep. 29, 1987) ..........................................................................20

*Conopco, Inc. v. Wein*,
2007 WL 1859757 (S.D.N.Y. June 28, 2007) ......................................................................18

*Danisco A/S v. Novozymes A/S*,
427 F. Supp. 2d 443 (S.D.N.Y. 2006) ............................................................................15, 21

*In re Gen. Motors LLC Ignition Switch Litig.*,
2015 WL 7574460 (S.D.N.Y. Nov. 25, 2015) .....................................................................16

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) ..............................................................................................................20

*In re Grand Jury Subpoenas Duces Tecum*,
798 F.2d 32 (2d Cir. 1986) ..................................................................................................24

*In re In-Store Advertising Secs. Litig.*,
163 F.R.D. 452 (S.D.N.Y. 1995) .........................................................................................27

*Kiobel v. Royal Dutch Petroleum Co.*,
2005 WL 1925656 (S.D.N.Y. Aug. 3, 2005) .......................................................................25

*Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*,
2016 WL 4154274 (S.D.N.Y. July 21, 2016) .................................................................15, 24

*Levy v. Young Adult Inst.*,
2015 WL 10891654 (S.D.N.Y. Dec. 14, 2015) ............................................................23

*Lively v. Wayfarer Studios LLC*,
2025 WL 1591282 (S.D.N.Y. June 5, 2025) (Liman, J.) (Dkt. 453-3)....................................15

*Lynch v. City of N.Y.*,
2021 WL 5140728 (S.D.N.Y. Nov. 4, 2021) ........................................................15

*In re MetLife Demutualization*,
2007 WL 1017603 (E.D.N.Y. Mar. 30, 2007)........................................................24

*NFL Mgmt. Council v. NFL Players Ass'n*,
820 F.3d 527 (2d Cir. 2016)........................................................19, 20

*NXIVM Corp. v. O'Hara*,
241 F.R.D. 109 (N.D.N.Y. 2007) ........................................................26

*In re Omnicom Grp., Inc. Sec. Litig.*,
2007 WL 2376170 (S.D.N.Y. Aug. 10, 2007)........................................14, 15, 16, 24

*In re Omnicom Grp. Inc., Sec. Litig.*,
233 F.R.D. 400 (S.D.N.Y. 2006) ........................................................18

*P&G v. Allianz Ins. Co.*,
2003 U.S. Dist. LEXIS 26025 (S.D.N.Y. Dec. 2, 2003) ..............................................20

*In re Richard Roe, Inc.*,
68 F.3d 38 (2d Cir. 1995)........................................................15, 26, 27

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
192 F. Supp. 3d 400 (S.D.N.Y. 2016)........................................................22

*SLS Props. Three, Ltd. Liab. Co. v. Arevalo*,
2017 WL 11681023 (S.D. Fla. Feb. 24, 2017) ........................................................17

*Sobel v. Yeshiva Univ.*,
1977 WL 24794 (S.D.N.Y. Mar. 1, 1977) ........................................................16

*Spectrum Dynamics Med. Ltd. v. GE*,
2023 WL 5035143 (S.D.N.Y. Aug. 8, 2023)........................................................17, 18

*United States v. Jacobs*,
117 F.3d 82 (2d Cir. 1997)........................................................ *passim*

*United States v. Levin*,
2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) ........................................................26

*United States v. Sabbeth*,
   34 F. Supp. 2d 144 (E.D.N.Y. 1999) .......................................................................26

*United States v. Sealed Appellant* (*In re Grand Jury Subpoenas Dated September
   13, 2023*),
   128 F.4th 127 (2d Cir. 2025) ..................................................................................27

*United States v. Zolin*,
   491 U.S. 554 (1989)....................................................................................18, 24, 26, 27

**Statutes**

9 U.S.C. § 10(a)(1)...........................................................................................................22

9 U.S.C. § 10(a)(3)...........................................................................................................22

## PRELIMINARY STATEMENT

In the midst of multi-forum litigation, Levona's motion seeks the extraordinary remedy of piercing the attorney-client privilege and work-product protection in an effort to gain discovery advantages and circumvent the Second Circuit's explicit directive to "tailor [these] proceedings to protect the privileged property at issue" (Dkt. 450).  And one need look no further for evidence of this misconduct than Levona's moving-target assertions of fraud, which have now metastasized well beyond its theory that Eletson failed to turn over ostensibly relevant documents during the arbitration.  That is the purported fraud that formed the basis of Levona's amended petition to vacate, and remains an issue still to be determined by this Court.  Levona now seeks not only to rely on that unresolved issue to strip away the attorney client privilege and work product protection, but also to expand its theory of fraud to include that the *arbitration itself was a fraudulent endeavor* by Eletson and that Eletson used Reed Smith to perpetrate that fraud.  Levona has no leave to assert that broader fraud (or any other) in this proceeding.  Doing so would require this Court to revisit some of the very same arguments that were raised and rejected in the arbitration, and would cast as fraudulent good-faith legal arguments made post-arbitration.

Levona has failed to meet its burden on this motion under any theory.  Indeed, after searching the 11,400 documents produced by Reed Smith, the only evidence Levona musters of **specific communications** purportedly made in furtherance of any supposed fraud amounts to the five At-Issue Documents provided to this Court a year ago (Dkt. 125), and six additional exhibits (Nesser Decl., Ex. 1 – 6, Dkts. 448-1-6, the "Additional Six").  Five of the Additional Six do not involve Reed Smith at all, and the sixth relates to good-faith legal arguments regarding the relevance of the documents.  Moreover, four of the Additional Six were created at the direction of the very person the arbitrator found that Levona had bribed, and one was created after the

arbitration had been initiated—when both Eletson and Levona were seeking a path towards settlement. None amounts to probable cause of fraud.

Reed Smith recognizes that, in the context of Levona's motion to amend—where all *inferences* were drawn in Levona's favor—this Court found that Levona had *alleged* sufficient facts of fraud to pursue its claim. But this Court also observed, "[Levona is] going to have to establish for [the Court] ... whether the documents do support what [Levona has] asserted that they support. I've found that there's enough for [Levona] to go forward with discovery, but I made clear in my opinion that that was just sustaining the complaint; it was not finding that [Levona has] proven [its] claim" (Dkt. 168 at 15:8-14). In the context of the crime-fraud allegations on this motion in particular, the Court made clear that neither Reed Smith (nor Levona for that matter) should presume "that this Court will order the production of documents that Reed Smith claims are privileged ... that is the very issue before the Court" (Dkt. 462). Levona's motion lacks any basis and should be denied.

## BACKGROUND

### A.    Eletson Gas and Murchinson's Bribery of Peter Kanelos

From the outset, Murchinson's Ltd.'s ("Murchinson") strategy to dismantle Eletson Gas LLC ("Gas") for a "quick return" on investment required an insider who commanded both the confidence of Eletson's principals and unrestricted access to the Gas' most sensitive information. Thus, in early 2021, Murchinson recruited and bribed Eletson Corporation's Chief Financial Officer Peter Kanelos ("Kanelos") (along with turning Eletson's own lawyers, then Watson Farley & Williams) (Dkt. 67-58 ("Final Award") at 67, 73). Kanelos arranged calls between Murchinson's representatives and Gas' lead lenders, while cautioning recipients to maintain secrecy (*see* Solomon Decl., Exs. 3, 7). And Murchinson surreptitiously communicated with Kanelos exclusively through Kanelos's gmail account (*see* Final Award at 24). Kanelos opened

a data room for Murchinson, uploaded confidential management accounts, fleet-valuation models, employee salary schedules, and draft refinancing presentations, and then brokered meetings between Murchinson and major creditor groups. (*see, e.g.,* Solomon Decl., Exs. 4-8). All unbeknownst to and unauthorized by Eletson.

Under Murchinson's bribe, Kanelos completely identified with Murchinson's goals, using "we" and "us" to refer to Murchinson and himself (*see, e.g.,* Solomon Decl., Ex. 9). Murchinson/Levona also promised Kanelos that, if and when Murchinson/Levona took over the Gas, Kanelos could take over the management of Gas' vessels from Eletson Corporation. Indeed, correspondence with lenders shows that Kanelos's management company was referred to as "PKT Gas" (Solomon Decl., Exs. 10-11). And pursuant to their "Services Agreement," Levona/Murchinson paid Kanelos a $100,000 advance transaction bonus (Final Award at 24). He was also eligible for a Base Service Provider Return of $1,000,000, 10% of the proceeds generated by the Preferred Shares after the Base Service Provider return was received and "'an amount equal to five percent (5%) of any proceeds generated as a return of the Capital Expenditures'" (Dkt. 67-50 ¶ 155; Solomon Decl., Ex. 12 at §§ 1.3, 2.1).

Murchinson/Levona lied about its dealings with Kanelos. For example, Levona director Mark Lichtenstein—who was found by Justice Belen to have lied under oath and manufactured evidence (*see* Final Award at 70-72)—after having communicated with Kanelos for at least two months, acted as if he had never met Kanelos immediately after Levona's acquisition of the Gas preferred shares (*see* Final Award at 23-24; Solomon Decl., Ex. 13 at 6; *id.*, Ex. 26-29). As Justice Belen found, it was all a game to Murchinson (Final Award at 73).

The bribery of Kanelos was not peripheral misconduct; it was the engine of Murchinson's and Levona's aggressive, unlawful effort to seize control of Gas and monetize its assets at fire-

sale prices, knowingly and improperly purport to fire management, and interfere with Eletson's

banking relationships, causing massive damage by causing the unlawful arrests of Gas vessels,

among other things (*id.* at 54-59). Thus, in considering the volume of evidence showing

Kanelos's duplicity, Justice Belen discredited the "Murchinson Buyout Steps" document that

Levona had deemed its "smoking gun" evidence (*id.* at 44-45 n.6; Dkt. 67-14) (the "'Smoking

Gun' Email"). To the extent "[t]he disposition of this motion for vacatur will turn, in part, upon

whether the At-Issue Documents reflect ... ***a corrupt arrangement between Kanelos and Levona***

***and/or Murchinson to defraud Eletson***" (Dkt. 435 at 8) (emphasis added), the Court must rely

on Justice Belen's credibility findings about documents prepared by Kanelos or at his direction.

### B.    Discovery Conducted During the Arbitration

Levona claims "Eletson attempted to perpetrate a fraud on the arbitrator by failing to

produce documents" (Dkt. 447 at 2 ("Lev. Br.")) in the arbitration. Levona points to no

evidence—because there is none—that Eletson or its counsel intentionally (or fraudulently)

withheld any of the documents at issue. In the arbitration, the parties engaged in discovery

appropriate to an informal and expedited proceeding. Both parties stipulated to the fairness of

the process (*see* Final Award at 16-17). During discovery, the parties engaged in motion

practice, due in part to Levona's repeated refusal to produce relevant documents. And that

motion practice clarified Eletson's discovery obligations (*see* Solomon Decl., Exs. 14; Dkt. 67-

34). Over the course of the arbitration, Eletson was forced to seek assistance from the tribunal a

number of times regarding Levona's and Murchinson's discovery deficiencies (*see, e.g.,*

Solomon Decl., Exs. 15-16; Final Award at 15), including their failure to produce documents as

ordered by the arbitrator (*see* Solomon Decl., Ex. 14; Final Award at 68 ("To this day, I am

convinced that all relevant documents have not been produced by Murchinson/Levona.")).

Critically, Eletson produced nearly 5,000 documents (approximately 36,000 pages) in the arbitration located in the files of the principal custodians, Vassilis Kertsikoff, Lascarina Karastamati, and Vasilis Hadjieleftheriadis, and from company records.  At no point during the arbitration did Levona make any demand, or discovery motion, or probe during depositions Eletson's document collection and production efforts, including the use of search terms or custodians.  Relevant here, Levona sought "all" documents "concerning actions taken by Eletson to obtain independent investors" after March 11, 2022 (Dkt. 125-11 at RFP 5) or "any attempt to refinance any debt" or "secure new debt/credit" from January 1, 2022 (*id.* at RFP 10).  Justice Belen, however, 1) limited the scope of both of these (and related) requests to documents "sufficient to show" "the requests made to investors or financiers by Eletson to either refinance a debt or raise capital for the company," "the reasons those investors or financiers chose not to work with Eletson," and "how Eletson represented its ongoing relationship with Levona," and 2) with an end date of "***July 29, 2022***" (Dkt. 67-34 at 4 of 8).  Eletson complied.  Similar narrowing was done for Levona.

 Significantly, Levona had multiple opportunities to cross-examine the witnesses with what it purports to now be critical discovery deficiencies or material that (it now claims) establishes fraud by Eletson that *Levona had, itself, withheld.*  Indeed, throughout the Arbitration, Levona was in possession of the Recording, a July 15, 2022, telephone conversation between Kertsikoff and Adam Spears (Dkt. 125-2) in which Levona now claims (incorrectly) that Eletson "admitted ... that the Buyout Option had 'lapsed a couple months ago'" (Dkt. 124 at 3).  Levona admits that "Levona had the recording previously but did not produce it in the arbitration" (*id.* n.2), despite that it was (according to Levona's current view) *directly responsive* to Eletson's document request to produce documents related to Levona's allegation that

"Eletson, through the actions and discussions of its agents, stated their belief that the option had lapsed" (Dkt. 55-3 ¶ 91) and that Levona had previously fraudulently claimed that "any responsive documents that may exist **will be produced or have already been produced**" (Dkt. 148-2 at RFP 8 & Response).

On its motion here, Levona is also attempting to obtain documents (*see, e.g.,* Lev. Br., Appendix A at 10-12, 30, 51) that were already submitted to Justice Belen *in camera* and ruled upon as privileged (Final Award at 44-45 n. 6 ("Levona also insists that additional emails surrounding this document that Eletson withheld as privileged demonstrate that the memo was sent on the advice of counsel and was not privileged. I already denied Levona's motion to compel after reviewing those emails in camera. The emails were privileged **and do not support Levona's position**.") (emphasis added)).

### C.    Production of the At-Issue Documents

Following the commencement of the involuntary bankruptcy proceedings, the Debtors worked with Petitioning Creditors' counsel to identify documents responsive to their discovery requests, using a voluminous set of search terms provided by Petitioning Creditors, and agreed to search the custodial files of eight custodians, including Kanelos (Solomon Decl., Ex. 18). As the accompanying metadata logs reflect, the At-Issue Documents (pejoratively defined by Levona as the "Withheld Documents") were received by Reed Smith's subsidiary, Gravity Stack, on June 22, 2023 (after the record closed in the Arbitration) and were not reviewed before June 24-25, 2023—and even then by a team located in the United Kingdom that had no role in the arbitration (Solomon Decl., ¶ 6; *id.*, Ex. 1, Ex. 2). Reed Smith's arbitration team first became aware of one At-Issue Document on July 7, 2023, when *Levona's counsel* notified Reed Smith of the production of one of the documents in the bankruptcy proceedings (Dkt. 182-5). Following that communication, Reed Smith reviewed the document (an email solely between Kanelos and

Marina Orfanoudaki ("Orfanoudaki") and accurately represented to Justice Belen that Eletson's counsel in the arbitration "had never seen it" prior to Levona's communication, "it was not part of any document collection in the search for responsive documents," and Eletson's principal witnesses in the arbitration "had never seen the document" (Solomon Decl., Ex. 19). Reed Smith's arbitration team became aware of four additional At-Issue Documents in October 2023, when Levona filed its second motion in the bankruptcy court (*see* Bk. Dkt. 230).

Finally, Exhibits 1-5 of the Additional Six (from the custodial files of Elena Tzarouchi and/or Kanelos) were only first received by Gravity Stack on July 10, 2024 in connection with discovery in the LCIA proceedings (Solomon Decl. ¶ 8). Exhibit 6 is an email chain with Justice Belen in which Levona was a participant. This refutes any implication that the documents were collected, reviewed, and/or—most importantly for purposes of asserting fraud—intentionally withheld in the arbitration.

### D.    The At-Issue Documents on Their Face Don't Show or Imply Fraud

Through its motion, Levona seeks to bootstrap statements originally made by the Court in the context of "draw[ing] inferences in favor of Levona" (Dkt. 162 at 1 n.1) into factual findings that are strong enough to support its burden of proof of showing both probable cause (i) that a fraud was committed, and (ii) that the documents it now seeks were prepared in furtherance of that fraud. In that decision, the Court made clear that it "was just sustaining the complaint" and "not finding that [Levona] ha[s] proven [its] claim" (Dkt. 168 at 15:8-14; *see also* Dkt. 162 at 16 ("Crediting the inferences for which Levona argues…"); *id.* at 47 ("Levona has presented evidence that, *if credited*…"); Dkt. 270 at 112:11-13 ("Levona will have to convince the Court that there is sufficient evidence to support a conclusion that there was fraud in the arbitration.").

At no time before or since that ruling has the Court had the benefit of any evidence concerning the meaning or import of the documents upon which Levona relies, or of the state of

mind of any of Eletson's witnesses (or counsel) before, during or after the arbitration. Those inferences previously drawn in Levona's favor for purposes of judging a pleading are not sufficient to support conclusions that would permit Levona to invade the privilege here.

A fair and unbiased examination of the documents that Levona claims were withheld from the arbitrator demonstrates that, regardless of Levona's claims, there is no basis upon which the Court can or should find probable cause that there was any fraud at all. None of the At-Issue Documents was identified by Eletson or its counsel during discovery in the arbitration, and there was no intent to withhold any of them at any time. What is clear is that the documents, on their face, do not support Levona's argument that the *only* explanation for their non-production is an intentional effort to conceal them from the arbitrator. Rather, the documents are, both individually and collectively, at best ambiguous indications concerning analyses performed by some of Eletson's financial personnel at a time when they were attempting to stave off an existential threat from Levona.

The arbitration record makes clear that by mid-2022, months after Eletson had transferred the stock in the entities that owned two vessels valued at over $23 million to Levona, the individuals at Eletson were not clear—even though they believed that transfer represented the exercise of the buyout option—whether they needed to perform any *additional* steps to complete the transaction (Final Award at 44-46). In particular, the Eletson witnesses were still working with Levona to reflag and resell the transferred vessels, finalize a valuation of the vessels so as to finalize the payment for buy-out, and were trying to obtain funds to pay off the loan that had been extended by Levona (*id.*). Under the governing documents, none of these steps was required in order to exercise the buyout, which occurred with the transfer of the two ships (*id.*). In July 2022, when Eletson first learned that Levona was negotiating with Unigas to sell off the

entire fleet of tankers owned by Gas, one of its reactions was to see if it could negotiate an additional payment (beyond the value of the vessels that had already been transferred) to resolve (*see* Final Award at 44-45 n.6) the fabricated dispute raised with the guiding hand of Kanelos, assisted by Eletson's own outside counsel, WFW, who had been acting surreptitiously for Murchinson (*see* Final Award at 25-27; Solomon Decl., Exs. 20, 25).

On July 13, 2022, Kanelos created and emailed to Levona the "Smoking Gun" Email (Final Award at 44-45 n.6), which Levona claimed showed that Eletson did not believe that it had exercised the Buyout Option. This email was the subject of extensive testimony and argument during the arbitration hearing (*id.*). Justice Belen disagreed with Levona's reading, concluding that the "Smoking Gun" Email—to the extent it was not totally tainted by Kanelos—related to the process of exiting Murchinson from Gas entirely and not to the Buyout Option itself, referring it to as "at most ... an inaccurate checklist" *(id.).*

Around the same time as the "Smoking Gun" Email, Eletson retained counsel—including Reed Smith—in the event it could not resolve the issue. On July 24, 2022, Reed Smith sent a cease-and-desist letter to Levona and on July 29, 2022, filed the Statement of Claim in the arbitration asserting that the Buyout Option had properly been exercised (Dkt. 148-3; Final Award at 3).

There are five At-Issue Documents that Levona argues support its claims of fraud. In the absence of any evidence from any author or recipient, no conclusion can be drawn concerning the purpose of any of the documents or the state of mind of anyone at Eletson concerning them, thus completely eliminating any predicate for destroying the privilege. None furthers any inference not already offered by the "Smoking Gun" Email (Final Award at 44-45 n.6) that was

sent to Levona and that was used again and again before Justice Belen, or the inference that

Levona (now) seeks to draw from the call transcript Levona fraudulently withheld.

**Document 1 (Dkt. 127-4)**

This is an email dated July 25, 2022, from Orfanoudaki to her superior Kanelos.  It

postdates the Reed Smith cease and desist letter (*see* Dkt. 148-3).  It contains a further

refinement of the analysis contained in the "Smoking Gun" Email.  There is no basis on the face

of the document to infer that the author had any involvement with the Binding Offer Letter or

any details concerning the Buyout Option, or had the expertise or authority even to express an

opinion as to whether Eletson had or had not exercised that option.  To the extent that the email

refers at all to "the binding agreement with Murchinson/Levona" there is no indication as to what

specific agreement that phrase refers to, where that language came from, or the basis for it.  To

the extent the email identifies "Net Proceeds from MGCs sale" or repayment of the "Murchinson

W/C Facility" (*i.e.*, the loan from Levona), it cannot be read as referring to any buyout

obligations arising under the Binding Offer Letter.  On the contrary, the reference to the

"Murchinson 1st Payment" is directly inconsistent with Levona's position throughout the

arbitration that the transfer of the vessels from Gas to Levona was ***not*** payment for the buyout

(*see* Final Award at 34).

On the face of the document, it is clear it was prepared for Kanelos. When and if the

Court ultimately entertains evidence concerning this document, the Court may assess testimony

from Orfanoudaki, including specific directions, instructions, or information she was provided by

Kanelos concerning any transactions between Gas and Levona.

At most, the document reflects consideration of whether ***Gas*** could refinance some of its

fleet (the "Libera vsls") and draw on its overdraft facility to enable ***Gas*** to (1) pay off the Levona

loan, and (2) make an additional "2nd Payment" to Levona in order to resolve Levona's claim that it still had rights in Gas.  To the extent that this calculation offers any indication as to who controlled Gas, it proposes increasing the indebtedness of ***Gas*** in order to pay off the loan and make an additional payment to ***Levona***.  The document is accordingly facially inconsistent with the idea that anyone involved in creating it could have believed that Levona still owned or controlled Gas.

### Document 2 (Dkt. 127-5)

Document 2 is another email dated July 25, 2022, from Orfanoudaki to Kanelos, forwarding Document 1.  There is no further information that would permit the Court to draw any inferences about its meaning or significance.

### Document 3 (Dkt. 127-8)

Document 3 is an email dated August 12, 2022, from Kanelos to Kertsikoff and Hadjieleftheriadis.  The email was created two weeks *after* Eletson had commenced the arbitration against Levona and accordingly represents *at most* internal discussion of a possible offer to settle the pending arbitration.  On its face, the email discussed the possibility of locating a "New Investor" to obtain funds (1) "for the repayment of the Murchison [*sic*] [Working Capital] Facility," and (2) "to ***use in negotiations*** with Murchison for acquisition of preferred shares."  There is nothing on the face of the document to indicate the basis for Kanelos' analysis or how the recipients reacted to this proposal.  As with the documents discussed above, any consideration of a plan to bring in a new investor and to use Gas' assets and credit in order "to conclude negotiations with Murchison" is facially inconsistent with the idea that Levona was at that time still the owner of the preferred shares of Gas.

**Document 4 (Dkt. 127-9)**

Document 4 is an email dated August 18, 2022, from Elena Tzarouchi to her superior Kanelos, describing further revision to the financial analysis of a possible resolution of the ongoing dispute with Levona.  There is nothing to indicate that Ms. Tzarouchi had any involvement with the Binding Offer Letter or any details concerning the Buyout Option, or had the expertise or authority even to express an opinion as to whether Eletson had or had not exercised that option.  As with Orfanoudaki's documents above, the analysis in this email, on its face, appears to have been created in response to specific instructions from Kanelos, and this Court, too, will need to assess evidence related to his involvement, including all information about the details or requirements of any transactions between Gas and Levona provided by him.  Additionally, this email is inconsistent with Levona's claim that the "$23 million from Symi/Telendos sale" was never intended to be credited against the buyout of the preferred shares.  Finally, as with all the earlier documents, any discussion of leveraging or otherwise encumbering Gas's assets to fund a further payment to Levona is not consistent with Levona's claim that it still owned the preferred shares.

**Document 5 (Dkt. 137-1)**

This document is an email dated August 18, 2022, from Kanelos to Jay Goodgal of Castalia Partners attaching the analysis prepared by Ms. Tzarouchi (Document 4, discussed above).  On its face, it appears to represent a proposal from Eletson to Castalia for Castalia to become the outside investor contemplated by the analysis, to help fund an additional payment to Levona to resolve the then-pending arbitration.  Nowhere does the document suggest or imply that Eletson did not in fact transfer the two vessels to Levona, nor does it suggest that that transfer was not for the purpose of securing Levona's exit.  It also does not mention or refer to

the Binding Offer Letter or the Buyout Option and therefore should not be seen as evidence of anyone's state of mind as of the date of the email concerning that issue.

>    **E.**    **Levona's Additional "Evidence" of Purported Fraud**

Levona now points to the Additional Six as "additional evidence" purporting to "corroborat[e]" its theory of fraud (Lev. Br. at 4; Nesser Decl. Ex. 1-6).  Not a single document states, as Levona implies, that the purchase option lapsed, that the buyout of the preferred shares was not effectuated, nor do any of them implicate any conduct of Reed Smith.

The first of the Additional Six (Nesser Decl. Ex. 1) is a spreadsheet prepared for Kanelos on September 21, 2022.  Levona's suggestion that this document shows anything new (Lev. Br. at 4) is frivolous:  the fact that the Gas corporate records were not updated during the pendency of the arbitration was argued by Levona in the arbitration, and expressly rejected by Justice Belen (Final Award at 45).  Further, in an obvious attempt to manufacture fraud where none exists, Levona fails to include the attachments to that document, one of which states:  "In March 2022 Symi and Telendos were transferred to Murchinson in order to enable Murchinson's exit with net proceeds of $23 million (Binding Offer Letter)" (*see* Solomon Decl., Ex. 21).

Three other documents of the Additional Six (Nesser Decl. Exs. 2-4), all prepared for Kanelos, are simply different iterations of the At-Issue Documents 1-4 discussed above.  They bear no "assurance of reliability," having been drafted by or at the direction of Kanelos.  They are of a piece with the "Smoking Gun" Email, which "Levona spent considerable energy and time focused on" in the arbitration (Final Award at 44-45 n.6), and which Justice Belen rejected (*id.* ("As for the substance of the July 13th document, I do not view this as the 'smoking' gun Levona does.").

Exhibit 5, on its face, makes no reference whatsoever to Levona, Murchinson or any buyout (*see* Nesser Decl., Ex. 5).  This benign communication seeking investments for Gas does

not support any purported claims of fraud.  Rather, it is *consistent with* communications sent by Kertsikoff, to at least two investors in May 2022—two months after the buyout—seeking "$30m from a financial/strategic partner to refinance working capital facility ***provided by its previous shareholders*** and to refinance part of its fleet" (Solomon Decl., Exs. 22-23, 30-31; *see also* Final Award at 45).  The reference to "previous shareholders" is explicit evidence that Eletson understood and believed, and disclosed to potential investors, that the buy-out had occurred, even if there were additional steps to be taken to finalize it.  Respectfully, nowhere in this Court's September 6, 2024 (Dkt. 162) decision did it even consider or give any weight, as it must at this time, to this evidence.

Finally, Exhibit 6 merely demonstrates that Reed Smith made good-faith arguments to the arbitrator, based on its review of the document and the posture of the case (*see* Nesser Decl., Ex. 6).

## ARGUMENT

### I.    Legal Standard

The attorney-client privilege is a foundational protection in our adversary system, designed to foster candid communications between clients and counsel.  Exceptions to this privilege are limited and exacting.  *See In re Omnicom Grp., Inc. Sec. Litig.,* 2007 WL 2376170, at *11-12 (S.D.N.Y. Aug. 10, 2007).  The party seeking to invoke the crime-fraud exception bears the burden of showing for ***each challenged communication*** probable cause to believe (1) that a crime or fraud was committed, and (2) that the specific communication was made in furtherance of that misconduct.  *United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir. 1997), abrogated on other grounds by *Loughrin v. United States,* 573 U.S. 351 (2014).; *Amusement Indus. Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013); *Lively v. Wayfarer Studios LLC*, 2025 WL 1591282, at *1 (S.D.N.Y. June 5, 2025) (Liman, J.) (Dkt. 453-3) ("As the Second Circuit

has stressed, to properly override the privilege, a court must determine whether **each**

communication at issue was made in furtherance of a crime or fraud.") (emphasis added)

(quoting *Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443, 444-45 (S.D.N.Y. 2006)).  The

Second Circuit has not addressed whether the probable cause standard applies in civil cases.  *See*

*In re Omnicom Grp.,* 2007 WL 2376170, at \*10-11 (noting "importance of the attorney-client

privilege, which justifies demanding more than a simple, if reasonable, suspicion of fraud" and

stating standard for assessing such a motion is "robust"); *Cf. Lynch v. City of N.Y.*, 2021 WL

5140728, at \*8 (S.D.N.Y. Nov. 4, 2021) (noting a "high threshold of particularized probable

cause" to warrant application of crime-fraud exception).

   "[T]he crime-fraud exception does not apply simply because privileged communications

would provide an adversary with evidence of a crime or fraud," for "[i]f it did, the privilege

would be virtually worthless because a client could not freely give, or an attorney request,

evidence that might support a finding of culpability."  *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d

Cir. 1995).  "Instead, the exception applies only when the court determines that the client

communication or attorney work product in question was *itself* in furtherance of the crime or

fraud."  *Id.* (emphasis in original).  And this means that the "exception only applies 'where there

is probable cause to believe that the ***particular communication*** … was intended in some way to

facilitate or to conceal the criminal activity."  *Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*, 2016

WL 4154274, at \*4 (S.D.N.Y. July 21, 2016) (quoting *In re Richard Roe*, *Inc.*, 68 F.3d at 40);

*see also In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 7574460, at \*4 (S.D.N.Y. Nov.

25, 2015) (same); *In re 650 Fifth Ave.*, 2013 WL 3863866, at \*2 (S.D.N.Y. July 25, 2013 ("[T]he

Government must provide particularized evidence that *each challenged communication* was

made in furtherance of the crime or fraud.") (emphasis added).  Courts, therefore, place a "***strong***

*emphasis on intent*," requiring that a movant "show that the wrong-doer had set upon a criminal course before consulting counsel." *Jacobs*, 117 F.3d at 88 (emphasis added).

Once a movant has met its initial burden of probable cause, the opposing party may provide an explanation of the evidence offered by the movant to rebut it. *In re Omnicom Grp.,* 2007 WL 2376170, at *11. Then, in assessing the record, the court must exercise its discretion to determine whether, "in light of all of the evidence, [the movant has] demonstrated *substantial reason to believe* that [the nonmovant has] committed a fraud *with the aid of attorney-client communications*." *Id.* at *12 (emphasis added).

Levona's invocation of the crime-fraud exception fails to meet any of the requirements for the exception—including the existence of a fraud or a particularized nexus between the communications at issue and the purported fraud. Nor has Levona otherwise challenged Reed Smith's privileges with its clients on any other grounds. Accordingly, the Court should uphold that privilege and deny Levona's motion.

## II. The Motion Improperly Asks the Court to Prejudge the Merits of The Vacatur Petition

As a threshold matter, Levona's motion should be denied because it improperly asks the Court to decide the merits of Levona's amended vacatur petition in the context of a discovery dispute. "It is essential to judicial procedures that important substantive issues not be determined on routine discovery motions, particularly when the proponent of discovery argues that it is essential in order to lay a basis for the decision of the substantive issues." *Sobel v. Yeshiva Univ.*, 1977 WL 24794, at *1 (S.D.N.Y. Mar. 1, 1977); *see also Spectrum Dynamics Med. Ltd. v. GE*, 2023 WL 5035143, at *2 (S.D.N.Y. Aug. 8, 2023) (cautioning against transforming ordinary discovery disputes on a fraud claim into "a motion aimed at the merits disguised as a motion to compel privileged documents."); *SLS Props. Three, Ltd. Liab. Co. v. Arevalo,* 2017 WL

11681023, at *3 (S.D. Fla. Feb. 24, 2017) (declining to apply crime-fraud exception where "Plaintiff is attempting to establish in discovery the very abuse that must be shown to the satisfaction of the judge.") (citations omitted); *Barba v. Shire US, Inc.*, 2015 WL 7015324, at *2 (S.D. Fla. Nov. 12, 2015) (declining to apply exception where "the ultimate determination as to whether the crime-fraud exception should apply seemingly requires the resolution of some of the very same factual and legal issues that have not yet been decided by a jury and/or the presiding District Court Judge.") .

The merits of the Motion are indisputably bound up in the precise questions underlying Levona's claim pursuant to Section 10(a)(1) of the FAA. Indeed, they overlap completely, each turning on the critical question of whether "a fraud was committed by Eletson Corp. and Eletson Holdings, including by withholding the [At-Issue Documents] and critical evidence on a pivotal issue and by presenting perjured testimony" (Lev. Br. at 2 (quoting Dkt. 342 at 3)). Underlying that question are sensitive issues of law and fact, including whether the complained of actions, which can be construed as "differences in interpretation" over discovery requests, fall within the purview of Section 10(a)(1). *Bauer v. Carty & Co.*, 246 F. App'x 375, 378-79 (6th Cir. 2007) (failure to produce documents "is not clear and convincing evidence of bad faith").

Of course, Levona and Reorganized Eletson (both commonly controlled) and the Intervenors share differing views on these subjects. Ultimately, after the close of discovery, the Court will decide that question. It should not improperly do so now, and in the process, forever chill the attorney-client privilege. *E.g., Spectrum Dynamics Med. Ltd.,* 2023 WL 5035143, at *2 (declining to grant motion to compel based on crime-fraud where motion was "disguised" to litigate the merits).

- 17 -

**III.    Levona Fails to Demonstrate Probable Cause That a Fraud Has Been Committed**

Levona has failed to satisfy its burden to demonstrate probable cause of a fraud here.  To begin with, Levona has failed to set forth adequate and reliable evidence that failure to produce the At-Issue Documents amounted to fraud, instead merely relying on conclusory allegations and the Court's prior order under a different standard.  Second, and importantly, Levona has failed to put forward any additional evidence of any other purported fraud.

**A.    Levona Fails to Set Forth Adequate and Reliable Evidence That Failure to Produce the At-Issue Documents Amounted to Fraud**

When, as here, a motion to compel based on the crime-fraud exception overlaps with the allegations of fraud in the underlying case, courts apply heightened scrutiny:  the exception's application requires "an adequate record ***and bear some assurance of reliability.***"  *In re Omnicom Grp. Inc., Sec. Litig.*, 233 F.R.D. 400, 405 (S.D.N.Y. 2006) (emphasis added).  After all, "any findings by the court that would suggest a strong enough basis to infer the perpetration of a fraud when such fraud is an essential element of the plaintiffs' underlying claims … would … potentially tilt the playing field of [the] lawsuit at a relatively early stage in the litigation." *Id.* Accordingly, a complaint's allegations of fraud "cannot suffice to establish probable cause to believe a fraud was perpetrated."  *Conopco, Inc. v. Wein*, 2007 WL 1859757, at *8 (S.D.N.Y. June 28, 2007).  Rather, probable cause requires "sufficient ***independent evidence*** to suggest that the disputed document will contain evidence" of fraud.  *Boss Mfg. Co. v. Hugo Boss AG*, 1999 WL 47324, at *2 (S.D.N.Y. Feb. 1, 1999) (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

Levona fails to adduce such evidence.  Levona stresses the Court's prior statements about the plausibility of Levona's vacatur petition (*see* Lev. Br. at 2), but the September 6, 2024 Opinion merely drew "inferences in favor of Levona" and "sustain[ed] the ***complaint***" (Dkt. 168

at 15:13-14 (The Court: "I made clear in my opinion that that was just sustaining the complaint; it was not finding that you have proven your claim.")).  This Court expressly did ***"not engage in ultimate factfinding***" (Dkt. 162 at 1 n.1) (emphasis added), as Levona misleadingly suggests.

Levona's reliance on the Additional Six is likewise misplaced.  Most importantly, *none* demonstrates any intent to withhold documents from either Levona or from the arbitrator. Indeed, Reed Smith UK did not even have the documents until June 2023 (Solomon Decl. ¶ 7), and the arbitration team was made aware of the first document *by Levona* in July 2023—*after* the record had closed (*see* Nesser Decl., Ex. 6 (noting June 13, 2023 closure of the record)).

As set forth in Section E, *supra*, none of those documents demonstrates that the purchase option lapsed or that the buyout of the preferred shares was not effectuated, or that anyone at Eletson believed that.  The financial analyses of potential additional payments to resolve Levona's specious claim are no more significant than the "Smoking Gun" Email that Justice Belen considered and rejected.  This Court has no authority to question that determination or undermine the FAA and Convention.  *NFL Mgmt. Council v. NFL Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016); Dkt. 77 at 76:20-23 (explaining that the Final Award can be confirmed even if the Court "disagree[s] with the arbitrator's legal rulings and think they were crazy" or "disagree[s] with the factual findings and say they don't have much support in the record.")). Significantly, Justice Belen considered, and Eletson relied upon, a series of documents, sent to investors in May 2022, that referred to Levona as the "previous shareholder."  In the end, Justice Belen deemed *all documents* post-dating the buyout irrelevant, finding that "[t]he language in the BOL is unambiguous," "the evidence reflects that the parties acknowledged that Eletson was exercising the option," and "the record establishe[d] that Eletson satisfied both of the[] conditions" for the buyout, *i.e.*, the payment of the "Purchase Option Consideration and [the]

provi[sion] [of] adequate security and/or collateral for the Loan" (Final Award at 33, 34, 42). Exhibit 5 of the Additional Six is irrelevant.  Exhibit 6 relates to good-faith legal arguments made by counsel.

What Levona really complains of is not fraud, but instead the informalities of arbitration discovery, which it accepted when it became a party to the Eletson Gas Limited Liability Company Agreement.  It is indisputable that "arbitration, by its nature, is a process less formal than actual litigation," including that it frequently does not entail "full scale discovery."  *P&G v. Allianz Ins. Co.*, 2003 U.S. Dist. LEXIS 26025, at *6 (S.D.N.Y. Dec. 2, 2003) (Solomon Decl., Ex. 24).  By agreeing to arbitrate, Levona "trade[d] the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991); *see also Commonwealth Ins. Co. v. Beneficial Corp.*, 1987 WL 17951, *4-5 (S.D.N.Y. Sep. 29, 1987) ("Full scale discovery is not automatically available in arbitration, as it is in litigation").  This includes the "well-settled" principle that "procedural questions that arise during arbitration…are left to the sound discretion of the arbitrator."  *NFL Mgmt. Council,* 820 F.3d at 545.  Indeed, Justice Belen made procedural rulings regarding the relevant document requests, including limiting the timeframe and scope.

In essence, not one thing has changed in the posture of the case to support Levona's remarkable and premature conclusion that this Court has all but decided its petition to vacate under a lower and different standard.

B.       **Levona Fails to Establish Probable Cause of any Other Fraud**

Levona's motion further makes vague and unsubstantiated assertions that Eletson "made every effort to conceal its fraud," through attorney arguments made following the production of the documents in the bankruptcy proceedings (Lev. Br. at 3, 6), and arguments *made to this Court when it had the At-Issue Documents before it* (Dkt. 147 at 13, 25) to defend against

- 20 -

Levona's allegations.  But even were that unproven and irresponsible falsehood accurate, the statements are insufficient to justify an exception to the attorney-client privilege because they do not demonstrate "that the litigation or an aspect thereof had little or no legal or factual basis and was carried on substantially for the purpose of furthering the crime or fraud."  *In re Richard Roe, Inc.*, 168 F.3d at 71.  Instead, they constitute the "very act of litigating" *id.*, even if the arguments were rejected by this Court.  *See Danisco*, 427 F. Supp. 2d at 450 n.8 ("taking adversary positions about legal standards and hotly-disputed facts relevant to the issues of materiality and the duty to disclose" do not amount to "fraud or bad faith).  Levona points to no evidence to support any such conclusion—the facts demonstrate the opposite.

  Two weeks after the bankruptcy production, Levona sought to reopen the arbitration record and compel production by referring to one or more of the At-Issue Documents (Dkt. 148-6).  Justice Belen rejected Levona's application on July 18, 2023, finding *Levona* failed to establish "good cause" to re-open the record (Dkt. 148-7).  Justice Belen did not rely on any statement made by Eletson or Reed Smith about the document.  Levona then moved in the Bankruptcy Court for access to the At-Issue Documents on July 26, 2023 (Bankr. ECF 144), while requesting that Justice Belen reconsider his decision and hold the arbitration in abeyance pending the Bankruptcy Court's decision on the matter (Dkt. 148-8).  Justice Belen issued the Interim Final Award on July 28, 2023 (Final Award at 4).

  Levona then delayed pursuing its July 26 Bankruptcy motion until October 19, 2023, and has never offered any explanation for the tactical delay (Bankr. Dkt. 231).  It then filed its Motion to Modify the Protective Order ("Motion to Modify") (Dkt. 125-14).  Levona argued the Documents "are relevant to the dispositive issue in a parallel district court action" (*id.* ¶ 1), stating that the Documents "undermine, if not outright conflict with, Eletson['s] position … that

[Gas] had exercised [the] purchase option" (*id*. ¶ 7).  At that time (over twenty months ago),

Levona expressly referenced 9 U.S.C. §§ 10(a)(1) and 10(a)(3), noting that it "may be able to use

the Documents to show that the award was procured by fraud to the extent that they contradict

Eletson Holdings' position" (*id*. ¶ 21).

Levona assured the Bankruptcy Court that the issues surrounding the At-Issue

Documents "***are being raised with the District Court***" (Dkt. 125-16 at 34:21-35:22; 38:16-

39:10).  This exceptionally important representation was made to the Bankruptcy Court and to

Eletson.  Both were entitled to rely on it to conclude that nothing in the litigation in the

Bankruptcy Court was delaying Levona's efforts in this Court.  Levona then further represented

to the Bankruptcy Court in November 2023 that Levona could seek the documents here without

violating the Protective Order (*id*. at 46:7-11 ("if it turns out that pursuant to a protective order,

documents are being produced in one case but withheld in another case, I think that is of

sufficiently important information that it can be communicated without violating the protective

order")).  The Bankruptcy Court's and Eletson conclusions were furthered by the fact that,

repeatedly, Levona cited and relied on *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co*.,

192 F. Supp. 3d 400, 405 (S.D.N.Y. 2016), which held that a "court order barring the 'use' of

discovery documents in other cases" "does not" prohibit counsel "from using their knowledge of

what has been produced here to advocate for the production of the same documents, if otherwise

discoverable, in a parallel case."

Although this Court has commented that Eletson "constructed extraordinary obstacles to

prevent Levona from uncovering the fraud" (Dkt. 413 at 4), Reed Smith respectfully disagrees.

That has no bearing on the current motion.  The record evidence shows that Eletson *voluntarily*

produced the documents in the bankruptcy (to which Levona's principals had access), relied on

counsel's multiple representations to the Bankruptcy Court that it could and would address the

issue with this Court without more from the Bankruptcy Court and irrespective of any efforts by

Eletson to prevent misuse of the protective order elsewhere, and defended its position that the

documents were cumulative given the nature of discovery in arbitration and the parties'

expectations.  These actions were not motivated by any fraudulent intent, but were strategic

decisions given Levona's penchant for expending its substantial resources across the world to

railroad a company in distress (*see* Dkt. 168 at 26:10-19).  These were clear legal arguments and

advocacy—it was certainly not a fraudulent scheme.

    With these good-faith assertions of legal arguments in a complex civil dispute in mind,

all that Levona seeks to compel are the "kind[s] of documents that one would typically expect to

find generated in the course of a legitimate defense of this particular kind of litigation."  *In re*

*Richard Roe, Inc*., 168 F.3d at 72.  Further, Levona has "not advanced sufficient evidence to

demonstrate that the claims 'had little or no legal or factual basis' or that they were brought

solely for the purpose of furthering a crime [or fraud]."  *Levy v. Young Adult Inst*., 2015 WL

10891654, at *3 (S.D.N.Y. Dec. 14, 2015).  That is because it cannot.  Levona has failed to meet

its burden.

## IV.    Levona Has Not Demonstrated Probable Cause That Any Communications or Work Product Were in Furtherance of a Fraud

    Levona has also failed to meet its burden on the second prong—that the *specific*

*communications* it seeks were made in furtherance of misconduct.  Levona's motion seeks 1,767

documents, which it lists in its Appendix A under four categories: (1) material related to

Eletson's document collection in the arbitration ("**Category 1**"); (2) material regarding the

meaning or import of the so-called "At-Issue Documents" ("**Category 2**"); (3) material relating

to submissions made by Eletson's principals regarding the content of the documents ("**Category**

- 23 -

**3**"); and (4) material regarding the purported exercise of the purchase option ("**Category 4**"). But Levona makes no showing—let alone a particularized showing—that any specific privileged communications were in "furtherance" of, i.e., a "purposeful nexus" to any "fraud." *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986). Instead, Levona merely points broadly to *1,767 documents* and speculates in conclusory fashion that all somehow possess the requisite nexus. Levona's failure to engage in a particularized analysis of each document's "purposeful nexus" to the supposed fraud is "fatal." *Omnicom*, 2007 WL 2376170, at *1; *see also Lazare*, 2016 WL 4154274, at *4 (S.D.N.Y. July 25, 2013).

Rather, Levona's attempt to bootstrap over 1,700 communications—including countless internal firm communications—under the crime-fraud exception illustrates the "wholesale, broad brush" approach that is "contrary to the Second Circuit's admonition that the 'crime-fraud exception has a narrow and precise application.'" *In re MetLife Demutualization*, 2007 WL 1017603 (E.D.N.Y. Mar. 30, 2007), at *17 (quoting *Jacobs*, 117 F.3d at 88) (exception did "not apply to the over 1,400 documents" because plaintiffs did "not demonstrate[] that the advice of counsel was sought in furtherance of a crime or fraud with respect to each of the documents in question"). Levona's approach would provide an impermissible basis for crime-fraud motions whenever a party accuses a counterparty of making—yet to be proven—untruthful or fraudulent statements. *See, e.g., Zolin*, 491 U.S. at 571 ("There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents.").

For example, Levona asserts that Category 1 applies to 1,676 of the documents in its Appendix A, but makes no attempt whatsoever to establish that each communication was—or could have been—intended to facilitate a scheme to allegedly (and intentionally) withhold

documents from production in the arbitration.  Levona relies on the erroneous assumption that the alleged fraud *must* have been perpetrated through counsel (Lev. Br. at 3), but that is woefully insufficient to establish probable cause.  *See In re 650 Fifth Ave.*, *supra,* 2013 WL 3863866, at *2 (requiring particularized evidence that each challenged communication was in furtherance of the crime or fraud).  Levona also seeks to apply the exception to documents concerning the "meaning and import" of the At-Issue Documents (1,283 in total), a substantial number of which *pre-date their production* (*see, generally,* Lev. Br., Appendix A at 1-17; 25-40, 51-62; 77-86).  Again, Levona cannot show how each communication—pre-dating knowledge of the At-Issue Documents—could possibly give rise to probable cause to believe they were *intended* to conceal a fraud.

Further, in a scattershot approach to invoke the exception without satisfying its burden, Levona seeks a substantial number of documents *post-dating* the close of discovery and the arbitration, as well as documents relating to discovery in unrelated proceedings, including the bankruptcy and LCIA proceedings.  As a matter of law, however, those documents cannot have been made *in furtherance* of the alleged fraud on the arbitrator.  It "is well settled that the crime-fraud exception to the attorney-client privilege applies only to *present or future* crimes; it has no application to disclosures concerning prior, completed crimes."  *Kiobel v. Royal Dutch Petroleum Co.*, 2005 WL 1925656, at *6 (S.D.N.Y. Aug. 3, 2005) (emphasis added) (where "communications relate[] to past…conduct… the validity of the privilege is unaffected.").  "Stated another way, the exception concerns 'not prior wrong doing but future wrong doing.'"  *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 134 (N.D.N.Y. 2007) (quoting *Zolin*, 491 U.S. at 563).  That is because the "furtherance" requirement turns on whether the alleged "wrong-doer had set upon a criminal course ***before*** consulting counsel."  *In re Richard Roe, Inc.*, 68 F.3d at

- 25 -

40; *Jacobs*, 117 F.3d at 88.  There is no conceivable basis—and certainly none that Levona

articulates—on which documents post-dating the alleged fraud could somehow reflect any

intent—there was none—to withhold documents *in the arbitration*.  And significant here,

defending *allegations* that a fraud occurred does not—and cannot—amount to a fraud itself.

*United States v. Sabbeth*, 34 F. Supp. 2d 144, 151 (E.D.N.Y. 1999) (crime-fraud exception "has

no bearing on communications between attorney and client which pertain to the defense" of

alleged fraud).

 As to Category 4, Levona's attaching of additional documents does not move the needle.

Those documents (aside from being duplicative of the At-Issue Documents underlying the

merits, *see supra* at 16-18) fail to demonstrate Eletson's intent to further any fraudulent act.

*Jacobs*, 117 F.3d at 88.  Nothing in the documents suggest that any of the communications in

Appendix A were "made with an ***intent*** to ***further*** an unlawful act."  *Id*.

 At best Levona identifies ***only 68 documents and communications*** in Categories 2 & 3

(approximately ***4% of the documents*** in Appendix A) that Levona speculates (without any

particularized showing) relate to legal arguments made by Eletson following Eletson's voluntary

production of the documents in the bankruptcy (Lev. Br. at 5-6).  But, as explained in

Section III.B. *supra*, making legal arguments does not constitute fraud.  Further,

"communications that are merely relevant to the fraudulent scheme will not trigger the crime-

fraud exception."  *United States v. Levin*, 2015 WL 5838579, at *3 (S.D.N.Y. Oct. 5, 2015).

"[T]he crime-fraud exception does not apply simply because privileged communications would

provide an adversary with evidence of a crime or fraud."  *In re Richard Roe, Inc*., 68 F.3d at 40.

Rather, "they must actually have been made with an intent to further an unlawful act."  *Jacobs*,

117 F.3d at 87.  Levona's references to emails with the subject line "Team i need help" (Lev. Br.

at 6) also offer no support, as Eletson's lead counsel frequently uses such nomenclature during litigation, especially when he is unavailable (Solomon Decl. ¶ 9). By not offering any evidence that the documents it seeks were specifically intended to further a fraud, the Motion must be dismissed as to all documents and communications.

## V.    The Court Should Exercise its Discretion to Require Levona to Identify a Limited Set of Communications for *In Camera* Review

Because Levona has not demonstrated probable cause, the Court should deny the motion and decline *in camera* review. Indeed, *in camera* "'review is not … to be routinely undertaken … as a substitute for a party's submission of an adequate record' in support or in opposition to privilege claims." *In re In-Store Advertising Secs. Litig.*, 163 F.R.D. 452, 459 (S.D.N.Y. 1995) (citation omitted). However, to the extent the Court concludes Levona has met its burden of proof (it has not), the Court should exercise its discretion, *Zolin*, 491 U.S. at 562-65, and conduct an *in camera* review of a limited set of documents prior to ordering the production of any privileged documents. Good cause exists for the exercise of such discretion, including the Second Circuit's recent Order directing that this Court "tailor [its] proceedings to protect the privileged property at issue" (Dkt. 450).

## VI.    In all Events, the Circuit Stay Precludes the Grant of Levona's Motion

The Circuit Stay Order precludes the relief sought by Levona on two independent grounds: the turnover of any documents and the protection of privileged documents (*see* Dkt. 453, incorporated herein by reference). Levona's motion asks this Court to apply the crime-fraud exception to strip the protection from otherwise privileged documents. *United States v. Sealed Appellant* (*In re Grand Jury Subpoenas Dated September 13, 2023*), 128 F.4th 127, 141 (2d Cir. 2025). That result would contravene the Circuit's directives to stay the turnover of all documents and "to protect the privileged property at issue" (Dkt. 450). It also would interfere

with the Circuit's jurisdiction to consider whether, as a matter of privilege or property rights,

Reed Smith can be compelled to turn over those documents—a determination the Circuit will

now make on the merits.  Any such attempt to order the disclosure or turnover of the documents

is beyond this Court's jurisdiction until the Circuit rules on the turnover appeal.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Levona's motion.

DATED:    New York, New York
              July 8, 2025

<div style="margin-left:40%">

**REED SMITH LLP**

*/s/ Louis M. Solomon*
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail: lsolomon@reedsmith.com

*Reed Smith LLP*

</div>

## **CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of S.D.N.Y. Local Rule 7.1(c), because, excluding the parts of the document exempted by that rule, and relying on the word count of the word-processing program used to prepare this document, this document contains 8,742 words.

Dated:  July 8, 2025

<div style="text-align:center">

*/s/ Louis M. Solomon*
Louis M. Solomon

</div>