**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELETSON HOLDINGS, INC. and ELETSON
CORP.,

        Cross-Respondents,

    v.

LEVONA HOLDINGS, LTD.,

        Cross-Petitioner,

    and

APARGO LIMITED, FENTALON
LIMITED, and DESIMUSCO TRADING
LIMITED,

        Intervenors.

Civ. No. 23-cv-07331 (LJL)

**ORAL ARGUMENT REQUESTED**

---

**LEVONA'S MEMORANDUM OF LAW IN SUPPORT OF**
**AMENDED CROSS-PETITION TO VACATE ARBITRAL AWARD**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

A. The Pre-Arbitration Period .................................................................................... 2

    1. The Eletson Family Business ..................................................................... 2

    2. Eletson's Failure To Exercise The Buyout Option (Jan.-Mar. 2022) .......... 4

    3. Eletson's Admissions That The Buyout Option Had Lapsed, And Its Efforts Toward A New Buyout Proposal (Mar.-July 13, 2022) .................. 5

    4. Eletson's Ongoing Admissions That The Buyout Option Had Lapsed, And Its Opposition To The Unigas Transaction (July 15-25, 2022) .......... 8

B. The Arbitration ..................................................................................................... 11

    1. Eletson's Arbitration Demand, Which Continued To Hedge About Whether Eletson Exercised The Buyout Option (July 29, 2022) .............. 11

    2. Eletson's Ongoing Admissions That The Buyout Option Had Lapsed (Aug.-Oct. 2022) .................................................................................... 11

    3. Eletson's New Position That The Buyout Option Was Exercised By And For Gas—Not For Intervenors (Oct. 2022-Feb. 2023) ..................... 14

    4. Eletson's Failure To Produce Documents In Arbitral Discovery (Sept. 2022-Mar. 2023) ..................................................................................... 17

    5. Eletson's Latest Position That The Option Was Exercised For Intervenors (Apr.-May 2023) ..................................................................... 22

    6. Eletson's Perjured Testimony In The Arbitration (May 2023) ................. 25

C. The Cover-Up ....................................................................................................... 27

    1. Eletson's Refusal To Produce The First-Discovered Document Voluntarily (July 7-9, 2023) ..................................................................... 27

    2. Eletson's Obstruction To Avoid Producing The First-Discovered Document By Lying To The Arbitrator (July 11-28, 2023) ..................... 29

    3. The Arbitration Award, Which Accepted Eletson's Representations (July-Sept. 2023) ..................................................................................... 33

    4. Eletson's Obstructionism Here And In The Bankruptcy Court (Oct. 2023-July 2024) ..................................................................................... 34

    5. Levona's Amended Vacatur Petition And Discovery (July 2024-Present) ................................................................................................... 36

ARGUMENT ......................................................................................................................... 37

I.      THE AWARD SHOULD BE VACATED BECAUSE IT WAS PROCURED BY
        FRAUD OR UNDUE MEANS .................................................................................. 37

        A.      Eletson Engaged In Fraudulent Activity Or Used Undue Means .............................. 37

                1.      Eletson Lied About The Exercise Of The Buyout Option .......................... 39

                2.      Eletson Lied About The Purported Nomination............................................ 40

                3.      Eletson Lied About The Withheld July 25 Email ...................................... 41

                4.      Eletson Knowingly Concealed Evidence It Should Have Produced.......... 42

        B.      Levona Could Not Have Discovered Eletson's Fraud Prior To The Award ........... 45

        C.      The Fraud Materially Related To The Central Issue In The Arbitration ................. 46

II.     EQUITABLE TOLLING APPLIES ...................................................................... 48

CONCLUSION..................................................................................................................... 50

CERTIFICATE PURSUANT TO LOCAL RULE 7.1(C)............................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Biotronik Mess-Und Therapiegeraete GmbH & Co. v.*
  *Medford Med. Instrument Co.*,
  415 F. Supp. 133 (D.N.J. 1976) ............................................................. 38

*Bonar v. Dean Witter Reynolds, Inc.*,
  835 F.2d 1378 (11th Cir. 1988) ............................................................. 48

*Bright-Asante v. Saks & Co.*,
  855 F. App'x 40 (2d Cir. 2021) ............................................................. 37

*Dogherra v. Safeway Stores, Inc.*,
  679 F.2d 1293 (9th Cir. 1982) ............................................................. 38

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ............................................................. 38

*France v. Bernstein*,
  43 F.4th 367 (3d Cir. 2022) ............................................................. 38, 44, 47

*Harper v. Ercole*,
  648 F.3d 132 (2d Cir. 2011) ............................................................. 49

*Holland v. Florida*,
  560 U.S. 631 (2010) ............................................................. 49

*Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*,
  335 F.3d 497 (6th Cir. 2003) ............................................................. 47

*MidAmerican Energy Co. v. Int'l Bhd. of Elec. Workers Local 499*,
  345 F.3d 616 (8th Cir. 2003) ............................................................. 48

*Nat'l Cas. Co. v. First State Ins. Grp.*,
  430 F.3d 492 (1st Cir. 2005) ............................................................. 37

*Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*,
  164 F. Supp. 3d 457 (S.D.N.Y. 2016) ............................................................. 37

*NuVasive, Inc. v. Absolute Med., LLC*,
  71 F.4th 861 (11th Cir. 2023) ............................................................. 48

*Odeon Cap. Grp. LLC v. Ackerman*,
  864 F.3d 191 (2d Cir. 2017) ............................................................. 37, 48

**Statutes**

9 U.S.C. § 10(a)(1) ................................................................................................ 2, 37, 50

**Other Authorities**

Fed. R. Civ. P. 15 ................................................................................................................49

JAMS Rule 17(a) ........................................................................................... 17, 18, 42

## INTRODUCTION

After a two-year effort, Levona Holdings, Inc. ("Levona") has unearthed dozens of documents that Eletson Holdings, Inc. ("Holdings") and its subsidiary Eletson Corp. ("Corp." and, collectively, "Eletson") failed to disclose in the parties' arbitration and that show Eletson's case was a sham. Although Eletson convinced the arbitrator that Eletson Gas ("Gas") had exercised an option to buy out its preferred shares for the benefit of Apargo Limited, Fentalon Limited, and Desimusco Trading Limited (collectively, "Intervenors"), thirty-six documents withheld from Levona and the Arbitrator reveal—unequivocally—that neither the buyout nor the nomination ever happened.

A year ago, the Court permitted Levona to file an amended vacatur petition asserting fraud based on the few withheld documents that Levona had been able to obtain despite Eletson's extraordinary obstruction. But that was "just the tip of the iceberg" (ECF 162, at 47), as discovery has uncovered multitudes of concealed documents and lies material to the central issue in the arbitration: whether Gas exercised the buyout option for the Intervenors' benefit.

Whereas Eletson's senior-most officers testified in the arbitration to their supposedly "strong[] belie[f]" that Gas had exercised the option on March 11, 2022, the newly uncovered documents show that those same officers continued to discuss a *future "buyout"* with *a payment specifically "in exchange of the preferred shares"* long after that date. *E.g.*, Ex. 30, at 2, 4-5.[1] Similarly, whereas Eletson witnesses testified in the arbitration that, after March 11, Eletson always held itself out consistent with Levona's supposed divestiture, newly uncovered documents show that Eletson continued conveying to potential investors that Levona owned Gas's preferred

---

[1]    Throughout this brief, all emphasis is added unless otherwise indicated. References to the docket in the Eletson Holdings bankruptcy case, No. 23-bk-10322 (Bankr. S.D.N.Y), are cited as "Bankr. ECF ##." Exhibits to the accompanying declaration of Isaac Nesser are cited as "Ex."

shares—including an April 2022 email identifying the four Levona-appointed directors as "directors/officers of Eletson Gas." Ex. 17, at -646, -650-52. And whereas Eletson witnesses testified in the arbitration that the Intervenors held the preferred shares after March 11, that testimony is contradicted by, among other things, *four formally signed, stamped, and certified organizational charts* of Gas dated between April and December 2022. *Infra,* at 6-7, 14-15.

Despite being so obviously crucial to the central issue in the arbitration and responsive to Levona's discovery requests, Eletson never produced those or other documents. Instead, when Levona learned about and asked for one such document—later identified as a July 25, 2022 email describing a future "Buyout" including a $15 million payment for Levona's "partnership share" (Ex. 23)—Eletson doubled down on its deception by falsely telling the arbitrator that the document was not "important" or "called for" in discovery (ECF 485-19, at 2).

The award shoud be vacated as procured by fraud or undue means. 9 U.S.C. § 10(a)(1).

## FACTUAL BACKGROUND

### A.    The Pre-Arbitration Period

#### 1.    The Eletson Family Business

Eletson was "a privately-held family [shipping] business" that operated informally and without corporate formalities. ECF 131 ¶ 6; *see* ECF 67-58, at 31-32; Bankr. ECF 591-1, at 13-15; Ex. 1 (Kertsikoff Tr.), at 380:15-382:6; *id.* at 390:19-393:11. It was and to some extent still is controlled by three first cousins (Ex. 1 (Kertsikoff Tr.), at 20:3-13):

*Vassilis Kertsikoff* was among other things chairman, president, treasurer, and a director of Gas; vice president and a director of Holdings, Corp., and EMC Investment Corp.; a director of Family Unity Trust Co., a former majority shareholder of Holdings; and an owner, with two siblings, of Apargo, until its recent acquisition by David Seas, Ltd., which he and the same two siblings also own. *See* ECF 67-13; Bankr. ECF 1020, at 1-2; Ex. 2, at -988, -1039; Ex. 3; Bankr.

ECF 1021, at 4, 6; Ex. 1 (Kertsikoff Tr.), at 374:22-375:15, 376:19-377:5. **Vasilis Hadjieleftheriadis** was among other things vice president, treasurer, and a director of Holdings, Corp., EMC Investment Corp., and vessel charterer SMEs; a director at Glafkos Trust Co., a former majority shareholder of Holdings; and an owner of Intervenor Desimusco. *See* Bankr. ECF 1021, at 1, 4, 6; Ex. 4, at -031-32, 44; Ex. 3; Bankr. ECF 591-2, at 35; Ex. 5; Ex. 6; Ex. 7; Ex. 8. **Laskarina Karastamati**, a lawyer, was among other things secretary and a director of Gas; president and a director of Holdings and Corp.; secretary and a director of EMC Investment Corp.; vice president and a director of vessel charterer SMEs; a director of Lassia Investment Co., a former majority shareholder of Holdings; and a prior owner with her sibling of Intervenor Fentalon. *See* Bankr. ECF 581, at 1; Ex. 9, at -958, -981; Ex. 3; Bankr. ECF 591-2, at 35; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Bankr. ECF 1021, at 4, 6.

Eletson had three in-house lawyers during the relevant period: Karastamati, Manoulis Andreoulakis (another first cousin of the principals), and "trusted," "long time employee" Elena Vandorou. Ex. 1 (Kertsikoff Tr.), at 20:18-20, 48:15-49:16, 51:21-23; 308:13-23. It also employed Marina Orfanoudaki (Corp.'s corporate controller, responsible for "books and records" and "financial statements," *id.* at 86:14-87:5; Ex. 10 (Orfanoudaki Tr.), at 17:2-17; 18:12-19:17); Elena Tzarouchi (Corp.'s treasury and corporate finance manager, responsible for "financial analysis," Ex. 1 (Kertsikoff Tr.), at 86:23-25); Dmitri Stamos (Eletson's chief accountant, *id.* at 294:6-13); Michalis Kantartzoglou (Eletson's IT lead, *id.* at 420:10-19); and Peter Kanelos (Corp.'s CFO, *see id.* at 215:2-7).

Intervenors are continuing to improperly exercise day-to-day control over Gas in defiance of multiple court orders. *See* Bankr. ECF 1759 (finding Intervenors in contempt and imposing monetary sanctions); ECF 340-1, at 2 (filing in S.D. Tex. in which Intervenors and their affiliates

asserted that Intervenors "control Eletson Gas"); ECF 340-2, at 10 (similar); ECF 340-3, at 3 (similar); Ex. 11 (Section 32 Order); *see also* ECF 413, at 7-8 (collecting control evidence).

### 2.    Eletson's Failure To Exercise The Buyout Option (Jan.-Mar. 2022)

As of January 2022, Gas was a liquefied petroleum gas shipping company governed by its Third Amended and Restated Limited Liability Company Agreement ("LLCA").  ECF 67-2; *see* Ex. 91 (further amending the LLCA to increase the number of board seats).  Its common shares were owned by Holdings; its preferred shares were owned by Levona (an entity owned by two offshore investment funds sub-advised by Murchinson Ltd.); and its ships were managed by Corp. ECF 67-58, at 5.  The preferred shares control a majority of Gas's board seats (LLCA 3.3) and as such control the company except for certain "Fundamental Actions" that require a supermajority vote (*see* LLCA 3.2 & Schedule VII).  The LLCA expressly recognizes that the preferred shares can be retired.  LLCA 1.9.

By February 2022, Gas was in default on hundreds of millions of dollars of debt and several of its vessels had been arrested.  ECF 67-11; ECF 67-58, at 55; ECF 127-1, at 4 (Kertsikoff:  "[I]t was a bad situation.").  To address Gas's financial distress, Levona, Gas, and Eletson subsidiary EMC Gas entered into a Binding Offer Letter ("BOL"), governed by U.K. law, on February 22. ECF 67-10.  Under the BOL, Levona would make a working capital loan to Gas of up to $10 million (increased to $14 million in April 2022, of which at least $12.85 million was drawn (*see* Ex. 2, at -034) (the "W/C Loan")) and give Gas a thirty-day option, exercisable by written notice, to buy the preferred shares from Levona for $23,000,001 (the "Buyout Option").  ECF 67-10 § 2. Gas could exercise the Buyout Option only if the W/C Loan had been fully repaid or "adequate security and/or collateral [was] provided … (the adequacy of such security being at the sole discretion of Levona)."  *Id.* § 2.2.  Gas could extend the thirty-day deadline by repaying portions of the W/C Loan.  *See id.* §§ 2.3, 2.4, 2.5.

"[I]n consideration of the grant of ... [the] option," Gas on March 11 transferred to Levona the shares in two companies that held the vessels *Symi* and *Telendos*. *Id.* § 1. Levona funded the W/C Loan the same day. A "unanimous written consent" adopted by Gas's board that day stated "the sale of the [*Symi* and *Telendos*] to Levona" was "in consideration of the grant of a purchase option to [Gas]." ECF 67-13, at 2. At Levona's request and as required by the operative management agreements, Eletson thereafter assisted Levona in attempting to sell the *Symi* and *Telendos*. ECF 67-58, at 45.

In the thirty days after the BOL's execution, Gas did not exercise the Buyout Option; repay the W/C Loan or provide security or collateral for the loan (and still has not) (ECF 67-58, at 35); provide written notice exercising the Buyout Option (*id.* at 43, 46); or extend the Buyout Option period by repaying portions of the W/C Loan. *See id.* at 43-44. Levona thus concluded that the Buyout Option had lapsed and that its ongoing relationship with Eletson involved three primary matters: (i) efforts to sell the *Symi* and *Telendos*, (ii) the $12.85 million W/C Loan, and (iii) the preferred shares, which Levona still owned.

### 3. Eletson's Admissions That The Buyout Option Had Lapsed, And Its Efforts Toward A New Buyout Proposal (Mar.-July 13, 2022)

In the months after the March 24, 2022 Buyout Option deadline, Eletson repeatedly confirmed that the option had lapsed and Levona still owned the preferred shares:

In March and April 2022, Eletson was in discussions with a company called Swissmarine (aka Swisschem) to fund a ***non-BOL buyout*** of Levona. The first record of that effort available to Levona is a March 21 email from Hadjieleftheriadis to Kertsikoff and Karastamati, which notes that "schedules are becoming tighter"—the Buyout Option would lapse in only three days—and asks whether they should "make some sort of approach" to "swissmarine group ... in case there is any room for collaboration [on] [G]as." Ex. 14, at 17 (Withheld Document 1 (certified

translation)).[2]  It further notes that George Dermatis, Eletson's broker, had "recommended" Swissmarine.  *Id.*; Ex. 1 (Kertsikoff Tr.), at 35:16-22.  Ten days later, Hadjieleftheriadis sent Dermatis a "confidential" presentation "prepared by [Holdings] … for the purpose of considering a transaction."  The proposed transaction was an investment in Gas "consist[ing] of [a] **shareholder buy-out**"—*i.e.*, a buyout of Levona's shares—as well as "asset based refinancing and working capital."  Ex. 15, at -068, -071 (Withheld Document 2); *see* Ex. 1 (Kertsikoff Tr.), at 40:10-15, 42:10-15 (testifying that Holdings and Intervenors, the only other conceivable "shareholder[s]," had not considered selling Gas shares).  The presentation also recited the preferred shares' history **without mentioning a prior buyout of Levona**, stating that "[i]n 2013, Blackstone … partnered with Eletson to form joint venture Eletson Gas," and "[i]n 2021, [Levona] acquired Blackstone's shares."  Ex. 15, at -072.  Days later, Hadjieleftheriadis confirmed to Dermatis that Levona was "in the final stages of disinvesting."  Ex. 16, at 2-3 (Withheld Document 3).

In an unrelated exchange beginning a day later on April 8, Eletson informed its primary financier (Oaktree Capital) that Levona owned the preferred shares.  Oaktree had asked for Vandorou's help "preparing [a] legal opinion" concerning Gas's "corporate authorities," and asked why Levona was listed as a member of Gas in the "officer's certificate" but not the LLCA.  Ex. 17, at 646-47 (Withheld Document 4); Ex. 1 (Kertsikoff Tr.), at 53:9-54:19, 80:17-25.  Vandorou (a lawyer) replied with (i) "documents [showing] the transfer of units of [Gas] … to Levona," with **no mention of a further transfer of those units** away from Levona, and (ii) a "written consent signed by all the directors/officers of [Gas]," which listed the four **Levona-appointed directors** as

---

[2]  "Withheld Document [#]" denotes a document not produced in the arbitration.  *See* Nesser Decl. ¶¶ 2-4.

current board members.  Ex. 17 at -646, -650.  Five days later, on April 13, replying to a Know Your Customer ("KYC") request from Oaktree, Vandorou sent a one-page organizational chart that **shows Levona as the owner of Gas's preferred shares**.  Ex. 18, at 2, 4 (Withheld Document 5).  Vandorou had **signed and formally stamped** the chart as "attorney-at-law," specifically indicating it was "**certified in its content**."  *Id.* at 4.

Eletson's effort to develop a non-BOL buyout proposal continued into June.  On June 17, Tzarouchi sent Kanelos a model that discusses a *future* "Murchinson buyout" of $53 million.  Ex. 83, at 2, 4 (Withheld Document 6).  Consistent with the three primary components of the parties' relationship, the document contemplates a $23 million "1st Payment" for the *Symi* and *Telendos* sale followed by a $30 million "2nd Payment," comprised of $12.85 million to repay the W/C Loan and $17.15 million for the apparent purpose of buying Levona's preferred shares.  There was no controversy between Eletson and Levona at the time or for nearly a month thereafter.  *See* ECF 125-1, at 4 (Kertsikoff admitting Eletson considered Levona to be "good partners" until July 15, 2022); *see also* ECF 67-38, at 79.

Internal Eletson buyout discussions continued into July.  On July 11, Kanelos emailed Kertsikoff (at his Eletson and Hotmail accounts) and Tzarouchi, attaching a document titled "Murchinson Buyout Steps."  Ex. 19.  The document states "Murchinson transfers all membership interest to Eletson Gas LLC after: Receipt of $23 million Exit Proceeds, Repayment of $12.85 million Levona W/C [Loan] and any interest outstanding."  *Id.* at -714.  Unlike the June 17 proposal discussed above, which included a payment for the preferred shares but was not produced in the arbitration, this document does not include such a payment and was produced.  Kertsikoff forwarded the document to himself, Ex. 20 (Withheld Document 7), and received another version by morning, Ex. 21.

The next day, July 13, Kanelos sent a buyout proposal to Levona representative Adam Spears, copying Kertsikoff and Tzarouchi. The cover email referred to "a buyout proposal which [Kertsikoff] would like to discuss." ECF 67-14, at 2. The document was a further update to the models Kertsikoff had been sending and receiving for the prior two days, involving a future "Murchinson exit" in which "Murchinson transfers all membership interests" after receiving $23 million and repayment of the W/C Loan. *Id.* at 3. Karastamati received a copy of the email and forwarded it to Hadjieleftheriadis shortly after. *See* ECF 67-15.

### 4. Eletson's Ongoing Admissions That The Buyout Option Had Lapsed, And Its Opposition To The Unigas Transaction (July 15-25, 2022)

On Friday, July 15, 2022, Spears scheduled a call with Kertsikoff to inform him that Levona, as holder of Gas's preferred shares, had entered into a non-binding letter of intent to sell Gas's ships to a company called Unigas. The call was recorded. ECF 67-58, at 10; ECF 125-1 (transcript); ECF 125-2 (recording). In response to the news, Kertsikoff did not deny that Levona owned Gas's preferred shares. To the contrary, he volunteered that the Buyout Option had lapsed: "*I mean, okay, yeah, the agreement lapsed a couple months ago.*" ECF 125-1, at 3; *compare, e.g.* ECF 127-12 ¶ 15 ("Mr. Spears' assertion that I stated on a call that I 'understood and stated the Option had lapsed' … is unequivocally false. At no point did I make any such statement."). Kertsikoff's primary complaint was instead that Levona had "blindsided" Eletson and "pull[ed] the rug under [its] feet," by purportedly "shopping the fleet around while [Eletson was] in good faith, *try[ing] to figure the way out*"—presumably, a reference to Eletson's effort to generate a new buyout agreement as reflected in its July 13 proposal. ECF 125-1, at 3-5. Spears replied by emphasizing that the option had lapsed; that he had previously warned Eletson that "it was going to be very hard for [Levona] to be lenient on the [contract] deadline"; that he had told Kertsikoff during negotiations "that [the] exit wasn't going to be there forever"; that "*the option … expired*

in … March, and now it's the middle of July"; and that "[Levona's] rights from a contractual perspective allow us to do this." *Id.*; *see* Ex. 22 (Spears Tr.), at 64:3-67:5 (describing prior discussion about non-leniency on deadlines). Again, Kertsikoff did not disagree with Spears's assertion that the Buyout Option had lapsed. Instead—in an unapologetic forewarning of his, Eletson's, and Intervenors' later defiance of court orders requiring them to turn over control of Eletson—Kertsikoff declared "[t]here's no way that I'm going to let the fleet go like this, no way. I mean, that's not happening," "I'm not going to give you the fleet …. I'm not going to give you the fleet. So that's it. I'm not going to give you the fleet." ECF 125-1 at 4-5.

The following Tuesday, July 19, in-house counsel Karastamati sent an email to Spears, copying Kertsikoff and Kanelos, in which she called Spears a "fellow board member[]" and "fellow director" of Gas. ECF 125-35, at 2-3. Karastamati's email questioned whether the Unigas transaction was in Gas's best interests and stated that Eletson would be seeking "independent legal advice," but ***did not say Levona had been bought out of Gas***. To the contrary, she requested Levona's "reply" to Eletson's July 13 buyout proposal. *Id.* at 3. In response, Spears stated that Levona had the right as owner of the preferred shares to enter into the Unigas letter of intent. *Id.* at 2. He also asserted that Eletson's July 13 "proposal" had been "based around a buyout option that has long since lapsed." *Id.* No one at Eletson sent an email disagreeing.

Eletson consulted Reed Smith beginning on Wednesday and Thursday, July 20 and 21, during which time Reed Smith received dozens of background documents (including the July 13 email) and discussed the issues with Eletson at length. Ex. 1 (Kertsikoff Tr.), at 182:16-204:24; Ex. 57, at 2-3 (rows 6-41); *id.* at 4-5 (rows 74-109). Armed with that information, and having had days to consider the issues, Reed Smith sent Levona a cease-and-desist letter on Sunday, July 24. ECF 148-3. Consistent with Eletson's July 13 buyout proposal, the July 15 Spears-Kertsikoff call,

and the July 19 Karastamati email, that letter (i) *did not assert that the Buyout Option had been exercised* and instead (ii) focused primarily on the Unigas transaction.  Specifically, it stated that Levona "ha[d] not been acting in the best interests of" Gas; directed Levona to cease and desist from holding itself out as Gas's representative or selling Gas's assets; and stated that "Eletson has *either* satisfied the conditions for exercising the purchase option … *or* at least that Levona by its conduct has waived or is estopped to assert the conditions, *or* has extended the time to exercise that option."  *Id.* at 2-4.

The next day, July 25, Eletson prepared a revised buyout proposal that—like the withheld internal June 17 model but unlike the produced July 13 proposal sent to Levona—contemplated a payment for Levona's preferred shares.  Ex. 23 (Withheld Document 8).  In particular, Orfanoudaki emailed Kanelos with procedures for a *future* "Buyout of Murchinson," including payments to Levona of $21.2 million from *Symi*/*Telendos* sales, $12.9 million for "repayment of [W/C Loan]," and $15 million for *"Murchinson partnership share*."  She attached cashflow modelling (bearing the file name "EG Model (Tufton & 2 LEG Refi & Overdraft 25.07.2022.xlsx").  *Id.* at 3.  She also stated that the model had been saved to Eletson's "Y Drive," in an "EG Model" subfolder within a "Murchinson" folder.  Ex. 24 (Withheld Document 9).  Kanelos soon replied with "v2" (Ex. 25 (Withheld Document 10)), Orfanoudaki responded with "v3" within an hour (Ex. 26 (Withheld Document 11)), following which Kanelos—*copying Kertsikoff*—sent "v4" to Eletson's principal financier (Oaktree) in support of a "request for … additional credit facility" (Ex. 27 (Withheld Document 12), at -449; Ex. 1 (Kertsikoff Tr.), at 250:15-251:10 (recipient "works for Oaktree")).  The last version contemplated $10 million for the preferred shares.  Ex. 27, at 3.

### B.    The Arbitration

#### 1.    Eletson's Arbitration Demand, Which Continued To Hedge About Whether Eletson Exercised The Buyout Option (July 29, 2022)

Eletson filed an arbitration demand on July 29.  ECF 67-16.  Because its primary concern was that Levona was seeking "to sell [Gas's ships] without regard to [Gas's] best interests," Eletson invoked the LLCA's arbitration clause, which governs LLCA disputes, (ECF 67-2 § 12.14), and not the BOL's arbitration clause, which governs disputes related to the Buyout Option (ECF 67-10 § 10).  ECF 67-16, at 2-4.  Nonetheless, Eletson's demand asserted that the Buyout Option had been exercised on March 11, 2022, and that Levona thus had no interest in Gas through which it could sell Gas's assets.  ECF 67-16, at 8-9.  According to the demand, the transfer of the *Symi* and *Telendos* to Levona was the *exercise* of the option, not "in consideration of the *grant* of … [the] option," as the BOL had provided, *see* ECF 67-10 § 1.1, and as Gas's board had stated on the sale date, *see* ECF 67-13, at 2.  Similar to its July 24 cease-and-desist letter and prior communications, however, Eletson's demand hedged somewhat on whether the Buyout Option had been exercised.  It said "[t]he Company paid the consideration for the buyout – that is, the Purchase Option Consideration – on March 11, 2022.  ***Alternatively, the parties have agreed that the Purchase Option Consideration may still be paid,*** and the buyout will be complete."  ECF 67-16, at 5.

#### 2.    Eletson's Ongoing Admissions That The Buyout Option Had Lapsed (Aug.-Oct. 2022)

Even after it initiated the arbitration, Eletson continued its efforts to buy out Levona.  For instance, on August 10, Tzarouchi sent Kanelos an "***Exit of Murchinson***" model contemplating a $43 million "Total Murchinson buyout," comprised of a $23 million "1st Payment," a $12.9 million "repayment of W/C [Loan]," and a $7.2 million "2nd Payment."  Ex. 28, at 2, 4 (Withheld Document 13).  The next day, Tzarouchi sent Kanelos another "Murchinson buyout" model,

contemplating a $35.9 million "Total Murchinson buyout," including $23 million for the ships and $12.9 million for the W/C Loan.  Ex. 29, at -194 (Withheld Document 14).  Later that day, Tzarouchi sent Kanelos another revised "Murchinson buyout" model, contemplating a $48 million "Total Murchinson buyout," including a $12.15 million "[a]dditional payment to Murchinson *in exchange of the preferred (negotiable)*."  Ex. 30, at 2, 4 (Withheld Document 15).  The email attached a document called "Strategy *(Exit of Murchinson)*" with the same "$12.15 million additional payment to Murchison [sic] (negotiable) – *in exchange of the preferred shares*."  *Id.* at 5.  Kanelos emailed it to Kertsikoff on August 12 with the subject line, "Investor Model for Murchison [sic] Buyout."  Ex. 31 (Withheld Document 16).  It states that a "New Investor [would] fund[] *buyout of Murchinson*," including repayment of the W/C Loan, "$12.15 million [] *to use in negotiations with Murchison [sic] for acquisition of preferred shares*" and "$23 million … to be applied towards Murchinson [*sic*]."  *Id.*  A spreadsheet with "*Murchinson exit*" in the filename was attached.  *Id.*

A day later, on August 13, Kertsikoff emailed Jay Goodgal of the financial advisory firm Castalia Partners a signed engagement letter with Holdings "in regards to capital raising for Eletson Gas."  Ex. 32, at 3-5 (Withheld Document 17); Ex. 33 (Withheld Document 18).  Goodgal is an old friend of Kertsikoff and a trustee for certain of Kertsikoff's property.  He testified that no decisions were or would have been taken in the engagement without Kertsikoff's input.  Ex. 34 (Goodgal Tr.), at 25:3-30:14, 59:19-62: 15, 113:8-13.  On August 16, Kanelos sent Tzarouchi a model titled "EG Model (Tufton Refi & Murchinson exit)- EQ40M WITH NOTES vF *VEK changes*.xlsx," which contemplated a $48 million "Total Murchinson buyout" with a $23 million "1st Payment," $12.9 million "W/C facility repayment," and $12.2 million "2nd Payment."  Ex. 35 (Withheld Document 19).  Kanelos asked Tzarouchi to "speak after she receive[s] this."  *Id.*

The file name indicates that it reflected changes that had been ***made or directed by Kertsikoff.*** *Id.*; *see, e.g.*, Bankr. ECF 1020.  That same day, Kanelos and Tzarouchi emailed themselves and Kertsikoff the "latest version" of the "***Murchinson's Exit Plan***" model, reflecting $23 million from the ships, $12.85 million for the W/C Loan, and a "$5-$7 residual amount."  Ex. 36 (Withheld Document 20).  Tzarouchi emailed Kanelos a "revised model" two days later with "***Murchinson exit***" in the filename; the first transaction was "***Murchinson's Exit Payment***," comprised of $23 million for the ships, $12.85 million for the W/C Loan, and a "$2.2 million residual amount."  Ex. 37 (Withheld Document 21).  Kertsikoff instructed them to make certain adjustments and "[o]therwise send to Jay" Goodgal.  Ex. 38 (Withheld Document 22).  Kanelos did so, copying Kertsikoff and an individual at a private equity firm.  Ex. 32, at 3, 7 (providing for "***Murchinson's Exit Payment***," $23 million for the ships, $12.85 million for the W/C Loans, and a $2.2 million "residual amount").

On September 21, Orfanoudaki sent Kanelos and Tzarouchi materials for a Gas board meeting, including a document titled "Schedule II- Ownership Percentages up to June 30, 2022," which ***identified Levona as owner of the preferred shares*** as of that date.  Ex. 39, at 2, 4 (Withheld Document 23).  That language had been added at some point after May 17, 2022.  *See* Ex. 40, at -639 (Withheld Document 24) (May 17, 2022 version of same schedule showing Blackstone as owner of the preferred shares and referencing the "takeover of [Blackstone] from Murchinson").  The board materials also included a timeline of Gas's "[s]ignificant events," which stated that "[i]n March 2022[,] *Symi* and *Telendos* were transferred to Murchinson ***in order to enable Murchinson's exit*** with net proceeds of $23 million (Binding Offer Letter)," and "Eletson Gas has engaged in multiple undertakings (since 2020) to ***raise funds to buyout*** Blackstone and then

*Murchinson*."  Ex. 39, at -004.  There is no mention of any purported transfer of the preferred shares to Intervenors or a retirement of the preferred shares by Gas.  *Id.*

None of the foregoing documents indicate that they or the buyout models therein were being developed for settlement purposes.  None was prepared by or appear to have been sent to Eletson's in-house counsel.  And none (other than the July 13 proposal) was sent to Levona.

### 3.  Eletson's New Position That The Buyout Option Was Exercised By And For Gas—Not For Intervenors (Oct. 2022-Feb. 2023)

By October 2022, at which time Reed Smith had been involved for several months, Eletson had stopped hedging and had developed the position that Gas had exercised the Buyout Option. In doing so, it conceded there had been no written notice exercising the option.  As to the BOL's requirement that it repay the W/C Loan or provide adequate security/collateral as a prerequisite to exercising the Buyout Option, Eletson argued it had satisfied that obligation by assigning to Levona long-outstanding amounts that Gas purportedly owed Corp.—*i.e.*, Levona's loan to Gas was supposedly secured by ***Gas's own subordinated debt to others***.  Ex. 42 ¶ 41; *cf.* BOL 4.3, 4.4 (providing for that assignment).

Eletson took the foregoing position in multiple filings in the arbitration.  In an October 25 affidavit, Kertsikoff testified that "[p]rior to March 11, 2022, Eletson Holdings was a common unit holder (sometimes referred to as shares) of the Company.  As of March 11, 2022, Eletson Holdings became the ***sole unit holder*** of the Company."  ECF 67-20 ¶ 9; *see id.* ¶ 28(e) ("Eletson held itself out as the ***sole shareholder of the Company*** …").  Eletson repeated this new position in three briefs filed in the arbitration over the next three weeks.  ECF 67-21, at 17 ("Eletson [Holdings] held itself out as the sole shareholders of the Company …"); ECF 67-22, at 13 (same); ECF 67-23, at 16 (similar).  And Eletson's arbitration filings sought relief only for and on behalf of

Holdings and Gas.  Ex. 42, at 9 (seeking "[damages for all the harm caused to the Company and/or Claimants"); Ex. 43, at 22 (similar).

Eletson took the same position with third parties.  For example, on November 7, as part of formal KYC diligence, Eletson in-house counsel Vandorou, copying Eletson chief accountant Dmitri Stamos and others, sent an organizational chart to ABN AMRO Bank NV.  Ex. 44 (Withheld Document 25); *see* Ex. 1 (Kertsikoff Tr.), at 294:6-13.  The chart had been formally signed, stamped, and certified as "complete valid and up to date" that same day by another Eletson in-house counsel, Andreoulakis, Ex. 44, at 8, who is not only a first cousin of Eletson's then-principals but also was the note taker at the supposed meeting nominating Intervenors.  Ex. 1 (Kertsikoff Tr.), at 292:7-294:2; *see* Ex. 57, at 9-10 (rows 187-189, 193-200) (Andreoulakis sending purported nomination evidence to Reed Smith in April 2023).  Unlike the organizational chart that Vandorou had sent to Oaktree in April 2022 (Ex. 18, *see supra*, at 6-7), which had shown Levona as owner of Gas's preferred shares, the November version makes no reference to the preferred shares, consistent with the position that the option was exercised **by and for Gas**, *i.e.*, resulting in retirement of the preferred shares.  Ex. 44.  When asked about the November chart during his deposition here, Kertsikoff's only response was that it was "clearly erroneous" because, in his view, "Holdings [was] not the sole shareholder of Gas."  Ex. 1 (Kertsikoff Tr.), at 299:4-301:9; *but see* ECF 67-20 ¶ 9 (Kertsikoff October 25 declaration that "Holdings [was] the sole unit holder of [Gas].").  Kertsikoff further testified that, had he been asked to sign the chart in 2022, he would "totally" have "not signed it" because it was "obviously erroneous" in its failure to reflect Intervenors' purported ownership of the preferred shares.  Ex. 1 (Kertsikoff Tr.), at 303:19-304:2.

But Kertsikoff **did** sign such an organizational chart—**twice**.  On December 5, also as part of formal KYC diligence, Vandorou sent Berenberg Bank an "up to date chart of [Gas]" identical

to the "obviously erroneous" one she had sent to ABN Amro a month earlier.  Ex. 46, at -021, -030 (Withheld Document 26).  The chart had been *formally signed and certified by both Kertsikoff and Karastamati* (a lawyer) on December 2, as "complete, valid and up to date."  *Id.* at -030 (also bearing Karastamati's stamp).  Although Kertsikoff and *all three Eletson in-house lawyers* had formally signed, stamped, and/or sent such documents, Kertsikoff during his deposition insisted that it, too, had been "[c]learly erroneous."  Ex. 1 (Kertsikoff Tr.), at 308:6-23.  Kertsikoff and Karastamati signed a similar chart *again* on December 13, which Vandorou then sent to Berenberg Bank as an "update."  Ex. 47, at -192, -210 (Withheld Document 27).

By this point, although Eletson's in-house counsel had updated Eletson's organizational charts to reflect the position Reed Smith had developed in the arbitration (*i.e.*, that Gas had exercised the Buyout Option for its own benefit), Eletson's businesspeople continued to slip up. On December 19, for example, Kertsikoff sent Oaktree a signed financing "term sheet" after Oaktree had stated it was "aware that [Eletson] may use excess cash … to *buy out Levona*, [and] also raised in principle the potential for [Oaktree] to finance the buyout."  Ex. 48 (Withheld Document 28).  The same day, Orfanoudaki sent Kertsikoff a financing model, similar to previous ones, contemplating $23 million for the ships, $12.9 million for the W/C Loan, and a $2.2 million "Murchinson 'extra' payment."  Ex. 49, at -485-486 (Withheld Document 29).  She sent another such email and model on December 23.  Ex. 50 (Withheld Document 30).

Oaktree discussions continued after the new year, when Kertsikoff sent Karastamati and Hadjieleftheriadis an Oaktree proposal to "repay" the W/C Loan and "*redeem preferred capital held by Levona*."  Ex. 51, at -876, -878 (Withheld Document 31).  Hadjieleftheriadis sent Orfanoudaki a model with a Murchinson "'1st Payment' Day 1 -23.0 [million,] '2nd Payment' Two years later (1Q24) -10.0 [million,] … [and a] Total Murchinson buyout [of] -33.0 [million]."

Ex. 52, at -167, -168 (Withheld Document 32).  Orfanoudaki, Kertsikoff, and Hadjieleftheriadis circulated other such models into February 2023.  Ex. 53 (Withheld Document 33) (Feb. 13, 2023); Ex. 54 (Withheld Document 34) (Feb. 15, 2023); Ex. 55 (Withheld Document 35) (Feb. 16, 2023).

Also in February 2023, a finance broker sent Kertsikoff an "updated slide deck" for himself and "VK [*i.e.,* Kertsikoff] … to review again."  Ex. 56 (Withheld Document 36); Ex. 1 (Kertsikoff Tr.), at 318:17-20 (admitting "review again" meant he had reviewed it previously).  The slides state that Levona's equity had been transferred "back to ***the Company [i.e., Gas]***," such that "Eletson ***Holdings is [currently] the sole shareholder of Eletson Gas***."  Ex. 56, at 8.  During his deposition, Kertsikoff variously testified, over just two transcript pages, that that statement was (i) not false, (ii) false but not material, and (iii) true if interpreted as a reference to Holdings' affiliates (which he conceded are not mentioned in the document).  Ex. 1 (Kertsikoff Tr.), at 319:4-321:3.

### 4. Eletson's Failure To Produce Documents In Arbitral Discovery (Sept. 2022-Mar. 2023)

While Eletson was struggling to get its story straight, Levona and Eletson exchanged discovery in the arbitration.  Eletson's obligation to produce documents primarily arose from two sources.  ***First***, JAMS Rule 17(a) required the "voluntary and informal exchange of all non-privileged documents and other information … relevant to the dispute or claim …."  As Eletson's counsel repeatedly insisted to the arbitrator, Rule 17(a) imposed "clear obligations" with real force to disclose "*all* relevant, nonprivileged documents."  Ex. 58, at 1; *see* Ex. 59, at 25-26 (Reed Smith describing Rule 17(a)'s requirement of a "meaningful production").  Indeed, Eletson often touted the nearly 7,000 pages of documents it had produced pursuant to Rule 17(a) and complained about Levona's smaller initial disclosure.  *Id.*; *see* Ex. 60 ¶ 3 (Solomon affirming that "[p]ursuant to JAMS Rule 17(a), after the parties discussed ***the very importance of the initial exchange*** with the Arbitrator, Eletson produced approximately 1,356 documents (6,827 pages in total).").  And the

arbitrator reiterated the parties' Rule 17(a) obligations in all seven of his procedural orders. *See, e.g.*, Ex. 61 ¶ 7; Ex. 62 (Solomon Tr.), at 122:9-124:6 ("at the beginning of the arbitration, there was … an agreement to exchange what everybody thought was relevant").

**Second**, the parties engaged in a formal discovery process involving dozens of document requests and objections and multiple motions to compel. *See, e.g.*, Ex. 63 (Eletson motion with 16 citations regarding metadata production and reliance on litigation procedure as indicative of how arbitration should be conducted, including reference to Sedona principles); Ex. 64 (Eletson motion to compel); Ex. 65 (Levona motion to compel). Eletson agreed to produce documents concerning numerous topics, including whether the Buyout Option had been exercised. For example, Eletson agreed to produce "information sufficient to show its efforts to find any outside investor to purchase the preferred shares, provide new capital to [Gas], and/or provide the $23 million originally contemplated to fund Levona's exit" from July 1, 2021 through March 31, 2022. Ex. 66, at 2 ("December 2022 Agreed RFP"). Eletson also agreed to produce documents from November 2, 2021, to July 29, 2022, "sufficient to show the requests made to investors or financiers by Eletson to either refinance a debt or raise capital for" Gas and "how Eletson represented its ongoing relationship with Levona." ECF 148-4, at 3 ("Agreed RFP 5/10"). Crucially, Eletson further agreed to produce, *id.*—without a date filter, Ex. 62 (Solomon Tr.), at 81:19-82:4—"[a]ny communications and/or documents related to Eletson's preparation of, negotiations to, and/or related to the final offer of the 'Murchison Buyout Steps,'" Ex. 65, at 17 ("RFP 11").

In addition to those fully agreed-upon obligations, Eletson agreed, subject to its general objections, to produce communications after July 10, 2022, "that discusse[d] Levona's position within the Company in any way." Ex. 65, at 17-18 ("RFP 12"). It likewise agreed to produce

communications from March 11, 2022, to November 4, 2022, that "related to the repayment of the principal and interest accrued on the [W/C] Loan." *Id.* at 25-26 ("RFP 25"). Those are just examples.[3] None was narrowed other than as already stated. Ex. 67 (Klein Decl.) ¶¶ 7-16.

It is impossible to speak definitively about Eletson's document collection process, which appears to have been run primarily by in-house counsel Karastamati and IT lead Michalis Kantartzoglou, neither of whom appeared for their noticed deposition (Karastamati willfully violated two Court orders directing her to appear and Kantartzoglou was not made available on the purported basis that Intervenors do not control him). ECF 505, 525; Ex. 68; Ex. 69; Ex. 62 (Solomon Tr.), at 128:2-130:16 ("Karastamati … would identify search for this, search for [that]"); *id.* at 135:12-137:20 ("Karastamati … might have been said to have taken some lead"). Nor have Kantartzoglou's emails been produced. Ex. 68; Ex. 69. The testimony of the two relevant witnesses who did appear—Kertsikoff and Solomon, both as Rule 30(b)(6) designees on topics including document collection (ECF 501-6; Ex. 85)—was incomplete, contradictory, and limited by privilege objections.

For example, it appears to be common ground that Kantartzoglou "or someone under his direction" conducted "word searches in the e-mails of Karastamati, Kertsikoff and

---

[3] Eletson agreed, subject to its general objections, to produce documents responsive to many other requests. Ex. 65, at 14-15 ("Any and all communications and documents … related to the negotiations and other efforts to sell the Vessels.") ("RFP 6"); *id.* at 15 ("Any documents … as to the determinations of the value of the Vessels in 2022.") ("RFP 7"); *id.* at 16 ("Any documents and/or communications, related to the Transaction, Transaction Documents, or negotiations leading to the Transaction.") ("RFP 9"); *id.* at 23 ("All documents and/or communications evidencing the current fair market value for each of the nine vessels [at issue in the] Unigas Transaction.") ("RFP 21"); *id.* at 24 ("All documents and/or communications evidencing that Eletson executed the [Buyout] Option.") ("RFP 22"); *id.* at 24-25 ("All documents and/or communications evidencing that the [Levona] board members … resigned ….") ("RFP 23"); *id.* at 27 ("All documents and/or communications evidencing that Claimants fully complied with the terms of the buyout option.") ("RFP 27"); *id.* at 27-28 ("All documents and/or communications, evidencing the [Buyout] Option was extended … [or] may still be paid to date.") ("RFP 28/29").

Hadjieleftheriadis"; that Kanelos's emails and laptop were reviewed; and that Kertsikoff, Hadjieleftheriadis, and Karastamati were responsible for collecting certain electronic and paper documents *on their own*.  Ex. 62 (Solomon Tr.), at 126:23-143:23; Ex. 1 (Kertsikoff Tr.), at 121:2-122:2 (besides the principals, "the IT team was, specifically, charged with … going through and searching ….").  Reed Smith had little to no involvement.  *See* Ex. 1 (Kertsikoff Tr.), at 428:8-13 ("*Q.  Did Reed Smith supervise the document collection at all? … A.  No, as I said before, they were not involved* in the collection."); Ex. 62 (Solomon Tr.), at 121:22-124:17 (Reed Smith has "only … some secondary knowledge" of Eletson's process); *id.* at 135:9-136:5 ("… the witnesses or the principals were tasked with finding documents …").

Beyond that, little is known about what was searched, how, or by whom.  For example, Solomon testified on behalf of Reed Smith that some search terms were developed by Karastamati and others by Kantartzoglou "on his own"; that *Reed Smith has "[n]ever see[n] the word searches that [Eletson] ran*," does not know what "the complete set of word searches" was, does not know whether there is a record of them, and does not know whether they were run across "sent" and "deleted items" folders, but does know that Eletson's "ability to do … word searches … was challenged" because it lacked "modern technology."  *Id.* at 131:6-136:5, 141:12-23, 156:13-158:3, 160:9-21.  He also testified that Eletson's principals and/or their respective "agents or associates or secretaries" may have been tasked with some document collection, and that Reed Smith does not know whether Eletson culled the hits for responsiveness or privilege before sending them to Reed Smith.  *Id.* at 141:12-23, 166:3-175:2; *id.* at 92:8-121:21 (invoking privilege to refuse to testify about date filters Eletson used).  Reed Smith nonetheless "believes that the searches were done appropriately to the requests that were asked."  *Id.* at 132:17-133:12.  As for Intervenors, Kertsikoff testified for Apargo that he is "not aware" of the search terms, custodians, or date

limitations that were used, but believes they were "agreed between the lawyers and the Judge and" then "handed to" Eletson. Ex. 1 (Kertsikoff Tr.), at 416:19-422:3.

Whatever the reason, ***Eletson did not produce any of the 36 Withheld Documents identified above***[4]—not the pre-arbitration communications with investors seeking funding to buy out Levona, not the communications amongst Eletson's highest-ranking officers just before and just after the arbitration began discussing Levona and how to buy it out, not the communications with investors after the start of the arbitration looking for money to buy out Levona, and not the post-March 11 organizational charts, schedules, and presentations showing that the preferred shares remained held by Levona or had been retired. Nesser Decl. ¶¶ 2-4; Ex. 67 (Klein Decl.) ¶¶ 19-21.

Moreover, Eletson withheld those documents even though Reed Smith had at least one of them in its possession ***for months*** during the discovery period and discussed it internally. In particular, Reed Smith's privilege log in this action contains three entries—two in November 2022 and one in February 2023—in which an email with the same sender, recipient, and subject line as the April 2022 Swisschem emails, Ex. 16 (Withheld Document 3), was sent from Reed Smith's discovery vendor to Reed Smith's arbitration team and then from an associate on that team to Mr. Solomon. Ex. 70; Ex. 57, at 6 (rows 112, 114, 116); Ex. 62 (Solomon Tr.), at 348:14-358:15 (admitting Reed Smith received this document during the arbitration and deliberately withheld it from production). And although Eletson and Reed Smith did not produce the Swisschem emails, they *did* produce a document attached to the same chain that they argued supports Eletson's position. Ex. 70; Ex. 57, at 6 (rows 112, 114, 116).

---

[4]  The 36 Withheld Documents are a de-duplicated subset of documents Eletson should have produced, and are themselves members of document families with 101 total files.

### 5. Eletson's Latest Position That The Option Was Exercised For Intervenors (Apr.-May 2023)

In March 2023, as arbitral discovery (or lack thereof) proceeded, several of Holdings' creditors commenced an involuntary bankruptcy case because Holdings had been in default on hundreds of millions of dollars in corporate bonds since at least 2019. ECF 67-26, 67-27, 67-28, 67-29, 67-30. One of those creditors was Pach Shemen, an entity under common ownership with Levona. *See* ECF 67-31.

On April 20, in a publicly-filed complaint, Eletson reiterated the position it had been taking for months, *i.e.*, that "Eletson Gas" was "a wholly-owned subsidiary of Eletson Holdings." Compl. ¶ 33, Dkt. 1, *Eletson Holdings Inc. v. Murchinson Ltd.*, No. 23-01132 (JPM) (Bankr. S.D.N.Y.).

However, on April 25, thirteen days before the arbitration hearing was scheduled to begin, Eletson radically altered its position by asserting in the arbitration, for the first time and at the very end of an unrelated pre-hearing submission, *see* ECF 104, at 20-21, that Intervenors had been secretly nominated to receive the preferred shares "effect[ive] immediately upon Eletson's exercise of the option." Ex. 71 ¶ 47. Eletson contends the transfer occurred March 11, 2022. ECF 67-50 ¶ 419; *see* ECF 67-58, at 18. Kertsikoff and Reed Smith have both admitted that Eletson's sudden disclosure of the purported nomination was an effort to evade the bankruptcy. *See* Ex. 1 (Kertsikoff Tr.), at 327:14-331:17 ("it was … becoming clear to us that even if … the claim was awarded, the … bankruptcy strategy … of Lenova [sic] would have that award actually go to Holdings from Gas. So it was very important for us to establish that the party that … stood to lose was … the [Intervenors], who … were allowed and had become the owners of the preferreds."); Ex. 62 (Solomon Tr.), at 399:23-400:10 (testifying that a potential nomination was raised when assessing "what are the options that Gas has at this point given the … statements that Lenova/Murchinson [sic] had just begun making in the bankruptcy").

Eletson's "evidence" of the nomination was roughly six pages of largely handwritten notes in Greek, purportedly memorializing discussions between the families and bearing dates between January (before the option even *existed*) and October 2022.  ECF 67-5, 67-6, 67-7, 67-8, 67-9; *see* Ex. 1 (Kertsikoff Tr.), at 286:8-10 (testifying he does not recall documents evidencing the nomination other than those produced in the arbitration).  In the bankruptcy, Karastamati testified that there had been no corporate formalities associated with the transfer—merely "a family meeting" during which she, Kertsikoff, and Hadjieleftheriadis sat around a table and represented both sides of the transaction (*i.e., Gas and Intervenors*).  Bankr. ECF 591-1, at 31, 34-35.  The purported nomination, if it occurred, conferred a windfall on Intervenors at Holdings' and Gas's expense.  Ex. 1 (Kertsikoff Tr.), at 337:6-21 (testifying no consideration has been paid for purported transfer); *see* ECF 104, at 85 ("Eletson's claims included 'factual allegations' regarding the election of the Nominees that might overlap in any fraudulent conveyance action ....");

Until April 2023, only the Eletson family knew about the supposed transfer to Intervenors:

***Eletson's own employees did not know***—including employees responsible for administering Gas's finances, legal files, and governance processes, in a context where Gas's finances, legal files, and governance processes would change based on whether Gas's preferred shares had been retired versus transferred to the Intervenors.  *See* Ex. 1 (Kertsikoff Tr.), at 286:11-288:3 ("as of November 2022 … the only people who knew about the nomination in favor of the Intervenors were … family members"); *id.* at 327:14-331:17 ("we didn't have to say anything to anybody").[5]  At least one of Eletson's in-house attorneys responsible for responding to financial

---

[5]    Orfanoudaki asserts that Hadjieleftheriadis told her in April 2022 that "there were [nominees]" but "didn't specify the names," and that "based [on] what [she] reviewed from [a] Meerbaum [leasing] agreement [around that time], [she] assumed that these nominees were the three principal families."  Ex. 10 (M. Orfanoudaki Tr.), at 109:10-110:17, 115:18-120:8.  The "Meerbaum agreement" has not been identified or located, but two related "proposal[s] of [] lease

diligence inquiries was also unaware.  *Id.* at 291:2-292:6 (Vandorou was unaware of the purported nomination).

 ***Eletson's outside counsel did not know***—even though ownership of the preferred shares was the core issue in the arbitration.  *See id.* at 286:11-287:4 (agreeing "no lawyer was notified" and "[c]ertainly, not Reed Smith"); *id.* at 322:2-8 ("Q.  [U]ntil [April 2023] Reed Smith knew nothing at all about this supposed nomination, right? ... A.  I don't believe they knew and they didn't have to know.").  To the contrary, Solomon came up with the idea on his own, in the course of assessing "what are the options that Gas has at this point given the … statements that Lenova/Murchinson [sic] had just begun making in the bankruptcy."  Ex. 62 (Solomon Tr.), at 399:23-400:10.  As he has explained it: "I went back to my client and [the BOL] says 'these nominees,' why don't we just transfer it to the nominees and they said, 'we don't have to, we have already done it.'  Not something that we knew about."  ECF 51-33, at 6; Ex. 62 (Solomon Tr.), at 397:19-22 (testifying conversation took place in April 2023);[6] *see, e.g.*, Ex. 57, at 9-10 (rows 187-189, 193-200).

---

financing" contradict her testimony by referencing "[p]urpose[s]" of "repay[ing] a working capital loan provided by shareholders [*i.e.*, Levona]" and "redeem[ing] preferred capital held by Levona."  *See* Ex. 72, at -151; Ex. 73, at -988.  Hadjieleftheriadis could not be examined about the issue because he did not appear.

 [6]  Although Solomon asked Eletson "why don't we just ***transfer*** it to the nominees," he could not explain who that transfer would be ***from,*** instead testifying "I don't believe I had any understanding at all," because "the question of who owned the shares was not relevant" in the arbitration.  Solomon went so far as to swear that he may have envisioned Intervenors transferring the preferred shares ***to themselves***.  Ex. 62 (Solomon Tr.), at 399:23-405:19; *see* 403:24-404:23 ("Q.  [Y]ou knew that … the preferreds were not held by the nominees, because you're talking about transferring it to the nominees.  A.  No, I didn't know one way or the other.  Q. …[W]hen you told your clients 'why don't we just transfer it to the nominees,' your view is that the nominees at that point had already gotten it?  A.  I didn't know the answer to that question.  Q…. But the one thing we know … is that they were held by someone other than the nominees [be]cause otherwise you wouldn't be transferring it to the nominees, the nominees already had it?  A.  I did not know that.  I did not know that.").

24

*Intervenors' accountants and other advisors did not know*.  There are no communications between Intervenors and their accountants and advisors concerning the purported acquisition of the preferred shares, notwithstanding that Intervenors apparently have no *other* significant assets. *See* Ex. 1 (Kertsikoff Tr.), at 286:17-22 (agreeing "no accountant had been notified"); *id.* at 345:12-348:22 (as to Intervenors' other assets, he "think[s] there is some investment" but does not "recall the amount"); ECF 479, at 2 ("Intervenors are not aware of any" "'documents provided' to accountants"); Ex. 74 (confirming Intervenors have no documents responsive to accounting-related requests Levona successfully moved to compel); Ex. 90 (showing that Apargo had only a few thousand dollars in 2021);[7] *see also* ECF 488, at 3 (The Court: "It would be relevant whether Intervenors reported to an accountant or advisor that they had obtained or would obtain the Preferred Shares.  It likewise would be relevant if Intervenors did not consult with an accountant regarding such a large acquisition.").

Hadjieleftheriadis, however, had testified in the arbitration that he "reminded everyone [during an October 2022 family meeting] that the accountants had submitted for our approval 2018/2019 financial statements for the [Intervenors] and that when we discussed with the accountants the 2022 financial year in a few months from now, we need to provide them with the necessary information for the contingent transfer of the preferred units."  Ex. 4 ¶ 107.  Indeed, Apargo just recently filed its 2021 financial statements but did not discuss the transfer or nomination with its accountants.  Ex. 1 (Kertsikoff Tr.), at 361:23-368:13.

### 6.    Eletson's Perjured Testimony In The Arbitration (May 2023)

The arbitration hearing began in May 2023.  ECF 67-58, at 5.  During the hearing and in their witness statements, Eletson's three key witnesses—Karastamati, Kertsikoff, and

---

[7]    Intervenors concealed the absence of relevant discussions with their accountants and advisors—disclosing it only *after* the Court granted Levona's motion to compel (ECF 488).

Hadjieleftheriadis—did not disclose the existence of the above-described Withheld Documents, did not discuss their contents, and instead repeatedly contradicted them. To start, all three witnesses testified, contrary to the statements in the Withheld Documents, that they "strongly believe[d]" Eletson had "exercised the option" to buy out Levona on March 11, 2022. Ex. 75 (Arb. Hr'g 5/16 Tr.) (Karastamati), at 86:22-87:13; *id.* at 97:10-21; *id.* at 143:22-25; Ex. 9 ¶ 57 (similar); Ex. 76 ¶ 63 (Kertsikoff similar); Ex. 75 (Arb. Hr'g 5/16 Tr.), at 259:24-260:2; *id.* at 290:12-16 (similar); Ex. 4 ¶ 46 (Kertsikoff similar); *see* Ex. 77 (Arb. Hr'g 5/18 Tr.), at 128:21-130:7 (similar).

In support of their testimony but again in contradiction of the Withheld Documents, they added that Eletson "held itself out … as the sole shareholder of" Gas when it "met with potential investors and financiers in order to obtain refinancing for the early repayment of the loan provided by Levona." Ex. 9 ¶ 67; Ex. 76 ¶ 71. Moreover, to rebut Levona's argument that the "July 13, 2022 Murchinson Buyout Steps" email from Kanelos to Levona showed the buyout was not exercised in March 2022, Karastamati testified that the "Buyout Steps" document "was an incorrect account of the state of affairs at that time." Ex. 9 ¶ 78-79. Karastamati also stated that "[n]othing coming from the hands of Mr. Kanelos can be trusted" and she "never approved" the "Buyout Steps" document. *Id.* ¶¶ 78, 80; *see id.* ¶¶ 74-75 (similar). Indeed, despite receiving a draft buyout proposal on July 11 at both his Eletson and Hotmail accounts (Ex. 19), forwarding it to himself from his Eletson account to his Hotmail account that same day (Ex. 20 ), and again receiving a draft buyout proposal on July 12 at his Hotmail account (Ex. 21), Kertsikoff went so far as to testify at his deposition here that he "***did not authorize***" the July 13 email, that he could "call [Kanelos] up and scream to him" because the email "was crazy," and that he "probably did" and "believe[s] so," but that he could not "remember, exactly" and could not "recall the exact circumstances." Ex. 1 (Kertsikoff Tr.), at 97:5-98:21. When asked whether he screamed at

Kanelos around the time of these emails, Kertsikoff further testified, "No, I don't recall if I – this is theoretical, right.  I would just call him and scream to him.  I don't recall if I did."  *Id.* at 108:20-109:12; *see id.* at 116:10-117:9, 146:2-23.

Finally, all three witnesses testified in the arbitration contrary to a wealth of evidence, including statements in the Withheld Documents themselves, that "the preferred interests were transferred to [Intervenors] effective upon the transfer of the preferred interests from Levona on or about March 11, 2022."  Ex. 9 ¶ 108; Ex. 75 (Arb. Hr'g 5/16 Tr.), at 71:24-73:12 (Karastamati); *id.* at 287:23-291:13 (Kertsikoff"); Ex. 76 ¶¶ 194, 198 (Kertsikoff); Ex. 77 (Arb. Hr'g 5/18 Tr.) 94:7-25 (Hadjieleftheriadis); Ex. 4 ¶¶ 104, 109 (Hadjieleftheriadis).

The arbitration hearing closed on June 13.  ECF 67-58, at 5.

### C.    The Cover-Up

#### 1.    Eletson's Refusal To Produce The First-Discovered Document Voluntarily (July 7-9, 2023)

On June 28, 2023, less than three weeks after filing its post-hearing brief in the arbitration, Eletson produced the withheld July 25 email to Pach Shemen and the other creditors in Eletson's bankruptcy case—*i.e.,* the July 25, 2022 email describing a *future* "Buyout of Murchinson," including a $15 million payment for the "Murchinson partnership share."  Ex. 23; *see supra*, at 10.  Because the document was subject to the bankruptcy court's protective order, Pach Shemen did not disclose it to Levona (Ex. 22 (Spears Tr.), at 113:13-20, 119:16-120:16; Ex. 78 (Lichtenstein Tr.), at 136:17-24, 138:14-25), and Levona could not have used it in the arbitration.  *See* ECF 67-52, at 2-3.  But its Bates number was disclosed to Levona's counsel.

In an email to Reed Smith on Friday afternoon, July 7, Levona's arbitration counsel, Mayer Klein, identified the newly-produced bankruptcy document by Bates number and asked Reed Smith to produce it in the arbitration together with "subsequent documents/communications

relating to [it]." ECF 148-6, at 5-6. In doing so, Klein emphasized that he had "not seen the documents, nor know their contents." *Id.* The reaction inside Reed Smith was swift and intense. Reed Smith attorneys exchanged no fewer than 20 emails *just that night,* each with the same distinctive subject line as Klein's email ("ELETON/LEVONA"), including seven that attached the document Klein had inquired about. Solomon himself sent seven emails regarding the issue between 7:41pm and 10:15pm ET that Friday night—including emails to Eletson's arbitration and bankruptcy teams at Reed Smith as well as Kertsikoff, Hadjieleftheriadis, Karastamati, and Eletson's Greek counsel. Ex. 57, at 10-12 (rows 201-233).[8]

Reed Smith's internal and external discussions continued all day Sunday, including in response to a follow-up email from Klein. Finally, at 10:20pm ET, after having considered the issue all weekend, Solomon responded to Klein. The email first accused Klein, Levona, and other "complicitors" of having engaged in "unlawful" and "doubly unpardonable" "violations" of the protective order. ECF 148-6, at 4. It then acted as if Reed Smith had not reviewed the document at issue: "[w]e do not consent to your reviewing *whatever document you identified*." *Id.* And it concluded by threatening "to seek all available remedies" and telling Klein "it is time for you to tell your client that you want no more part in its illegal schemes." *Id.* The email does ***not*** say that the document was irrelevant or nonresponsive to agreed discovery, and Solomon testified "I don't

---

[8] Solomon would not agree that the foregoing log entries relate to Klein's July 7 email or forwarded the document Klein had requested—even though the emails, many of which had been sent to or from Solomon himself, (i) were sent just hours after Klein's email; (ii) have the same distinctive subject line as Klein's email; and (iii) are variously described on Reed Smith's log as involving "Doc. Referenced in Klein's letter," "withheld document in JAMS arbitration," and "bankruptcy production in JAMS arbitration," and in some instances include the relevant Bates number. Ex. 62 (Solomon Tr.), at 234:3-240:9; *see id.* ("I don't know that"; "I don't know if it's a forward of the email"; "There's not enough information on here for me to answer the question"; "I just don't know"; "I did not prepare an analysis of the privilege logs"; "I'm not able to tell you what of the e-mail it is a forward of").

know that Reed Smith had a view [as to those issues] at that time."  Ex. 62 (Solomon Tr.), at 211:20-212:14; *id.* 244:15-21 ("I looked at that before and I … didn't see that I had explicitly discussed that [in the email].").

### 2.    Eletson's Obstruction To Avoid Producing The First-Discovered Document By Lying To The Arbitrator (July 11-28, 2023)

On Tuesday, July 11, Levona asked the arbitrator to order Eletson to produce the withheld document.  *See* ECF 67-52, at 2.  Eletson, through Reed Smith, opposed that request in a letter to the arbitrator that Thursday, July 13.  ECF 485-19.  The letter had been carefully drafted—the result of more than 80 emails between and among Reed Smith, Eletson, and Eletson's Greek lawyers as reflected on Reed Smith's privilege log in the days following Klein's original July 7 request for the withheld document.  Ex. 57, at 10-21 (rows 201-336).  The product of all that work was a series of misrepresentations and lies.

Eletson's July 13 letter began by accusing Levona of having "violate[d] the protective order in the Bankruptcy Court."  ECF 485-19, at 2.  The letter then asserted that Levona's request for the document should be denied because discovery was "long over," *id.* at 2—a position impossible to square with Reed Smith's request, *at the end of the same letter*, to reopen discovery for Eletson's benefit.  *See id.* at 3.

Eletson's letter then proceeded to misrepresent and mislead as to the substance and relevance of the document.  ***First,*** although the document describes a *future* "Buyout of Murchinson" and a $15 million payment for the "Murchinson partnership share" (Ex. 23)—issues at the heart of the arbitration—Eletson took advantage of the fact that the arbitrator (and Levona) had never seen the document by representing, astonishingly, that "***there is [not] anything important about the document***" and "***[t]he document was not called for by any document request in the arbitration***."  ECF 485-19, at 2; *see* Ex. 79 , at 1 ("the document … was not called for").

Those statements were not true. Kertsikoff, during his deposition here, conceded that the document *was* important: "Q. [T]his discussion [in the withheld July 25 email] of the buyout with Murchinson … was an ***important issue*** in the arbitration, right? A. ***[Y]eah, it was their main issue***." Ex. 1 (Kertsikoff Tr.), at 238:19-239:2. Indeed, the representations in Eletson's letter were so farfetched that even Solomon was unwilling to call them true at his deposition here: "Q. Sitting here today do you believe that the statements in this letter are all true? A. ***I do not know what the … word 'true' means*** when you're not talking about a factual statement." Ex. 62 (Solomon Tr.), at 255:3-8; *see id.* at 267:24-268:24 ("Q. [Y]ou say [in the July 13 letter] 'there is [not] anything important about the document.' … [Y]ou're not willing to tell me that it's true…? … A. I'm telling you that arguments with lawyers don't fall into the true and false category…."); *id.* at 281:14-21 (similar).[9]

**Second**, Eletson's letter represented that the document and hence the attached model ***had not been "seen"*** by Eletson's witnesses "before this week." ECF 485-19, at 2. Yet Kertsikoff saw a near-identical version of the relevant model ***less than two hours*** after the document at issue was sent. *Compare* Ex. 23 (1:52pm UTC), *with* Ex. 27 (3:36pm UTC). More generally, as shown above, Eletson's witnesses had seen and engaged with multiple versions of the same model, with the same file name,[10] and were fully familiar with its contents and context. *See* Ex. 1 (Kertsikoff

---

[9]   Notwithstanding his refusal to characterize his own letter as "true," Solomon had no trouble making sweeping factual assertions in other circumstances. *See, e.g.*, Ex. 62 (Solomon Tr.), at 270:7-20, 277:25-278:11 ("there's nothing of interest in that document" and it "has ***nothing to do with whether [Levona] still owned its partnership share***").

[10]   Solomon first testified that the July 25 Withheld Document 9 was ***not*** "a further refinement of the analysis in the [July 13 proposal]." Ex. 62 (Solomon Tr.), at 198:11-21 (Reed Smith "completely disagree[s]" with that assertion). When confronted with Reed Smith's brief, filed sixteen days earlier, which had stated that the July 25 proposal "contains a further refinement of the analysis in the [July 13 proposal]" (ECF 484, at 15), Solomon testified that his testimony and the statement in the brief "have nothing to do with each other." Ex. 62 (Solomon Tr.), at 204:19-205:14; *see id.* at 196:9-18 ("Q. [D]oes this [July 25 model], in your view, relate to the final offer

Tr.), at 236:11-237:24 (testifying that the various models were "one continuum" and "just …
further refinements of the same analysis"); ECF 484, at 15 (Reed Smith contending that the
withheld July 25 email "contains a further refinement of" the July 13 proposal); Ex. 27 (email with
Kertsikoff and attached "EG Model (Tufton & 2 LEG Refi & Overdraft) 25.07.2022 v4.xlsx").

**Third,** Eletson's letter stated that Kertsikoff, Hadjieleftheriadis, and Karastamati "***could
have had nothing meaningful to say about***" the July 25 withheld document had they been asked
about it during the arbitration. ECF 485-19, at 2. Yet Kertsikoff during his deposition expounded
upon it—meaningfully—for 15 transcript pages. Ex. 1 (Kertsikoff Tr.), at 223-238.
Hadjieleftheriadis and Karastamati plainly would have done the same had they appeared for their
depositions. *See* Ex. 54 (Hadjieleftheriadis and Karastamati viewing a later model).

**Fourth,** Eletson's letter to the arbitrator stated that because the withheld July 25 email
"post-dated Claimant's cease and desist letter to Levona in July 2022," it "therefore was in general
outside the scope of discovery materials produced by either party in the arbitration except for post-
arbitration conduct." ECF 485-19, at 2. There was no agreement to limit discovery in that way.
*See* Ex. 62 (Solomon Tr.), at 343:11-344:7; *see also* Ex. 67 (Klein Decl.) ¶ 10; *supra*, at 18-19
(describing relevant and agreed-to document requests); Ex. 80 , at 2 (Levona arguing "[i]n no
universe does a document request conclude simply because a party sends a cease-and-desist
letter"). Beyond that, there was no general understanding that discovery obligations cut off at
either the July 24 cease-and-desist letter or July 29 arbitration demand, as evidenced by the
thousands of documents produced by both sides that post-dated those events. *Cf.* Ex. 62 (Solomon
Tr.), at 341:11-342:18; Ex. 67 (Klein Decl.) ¶ 10; Nesser Decl. ¶¶ 2-4. Or perhaps Eletson was

---

of the Murchinson Buyout Steps? A. No. Q. Even though it talks about 'buyout of Murchinson'
three times? A. … [T]his document has nothing to do with the final buyout").

suggesting that few discovery documents "post-dated" the July 24 cease-and-desist letter yet predated the July 29 arbitration demand such that they did not involve "post-arbitration conduct"—a point so frivolous as to be misleading.

All told, a reasonable person reading Reed Smith's July 13 letter would conclude that the withheld July 25 email lacked even an *arguable* connection to *any issue* in the arbitration—perhaps it was a shopping list, or a newspaper article. Apparently reading it that way, the arbitrator denied Levona's motion including on the basis that Levona had made only "conclusory assertions" about the document's relevance. ECF 67-52. Levona requested reconsideration, among other things citing caselaw for the proposition that "if the documents are as described, they must be turned over or the ultimate award could be later vacated." ECF 67-54.

In response to Levona's reconsideration motion, Eletson deepened its misrepresentations in a lengthy opposition it filed on July 28. Ex. 84. There, Eletson argued that the arbitrator should make a credibility assessment favoring Eletson's (untested and at the time untestable) representations about the irrelevance of the documents over the arguments of Levona's "incredible representatives." *Id.* at 2; *id.* at 4 (opposing discovery that "*Levona's representatives (supposedly) believe is relevant*") (emphasis in original). Eletson also tripled-down on its misrepresentations that the withheld July 25 email "was not called for by any document request," was "not part of any document collection," was not "pertinent or material to the controversy," and that "Claimants' witnesses had never seen it," and then added another one: that the document "post-dated the initiation of this adversary process" when, in fact, it is dated a week before the arbitration commenced. *Id.* at 3. Eletson's letter also distinguished Levona's caselaw as involving "an arbitration award *procured by fraud*," where the "plaintiff both lied under oath and intentionally

withheld information." *Id.* at 3 (emphasis in original).  The arbitrator appears never to have ruled on Levona's reconsideration motion.

### 3.    The Arbitration Award, Which Accepted Eletson's Representations (July-Sept. 2023)

On July 28—the same day Eletson had filed its opposition to reconsideration—the arbitrator issued an interim award in which, "after weighing the evidence," he found "that it is more likely than not that the conditions for the buyout were met" and that "Eletson Gas transferred the[] interests to" Intervenors such that "as of March 11, 2022, Levona was no longer the preferred holder" of Gas.  Ex. 81, at 45.  That decision was based on several factual determinations.  As relevant here, the arbitrator first found, based on "[t]he evidence presented," "that the Eletson families agreed to the contingent transfer" of Gas's preferred shares to Intervenors.  *Id.* at 27-30 (relying on Hadjieleftheriadis's witness statement).

The arbitrator next determined that "any alleged precondition to the exercise of th[e] option was either satisfied or waived."  *Id.* at 74.  Specifically, "the lack of an express written Option Notice" as the BOL required, was excused because "the evidence reflects that the parties acknowledged that Eletson was exercising the option."  *Id.* at 41.  That evidence included Karastamati's testimony that Eletson "strongly believe[d]" it exercised the option, and Kertsikoff's testimony and selective documents showing that "Eletson held itself out, as the family at large, as the sole shareholder of [Gas]."  *Id.* at 41-44.  The arbitrator also rejected Levona's argument regarding the July 13 "Murchinson Buyout Steps" email because it had purportedly "created fury and confusion" at Eletson.  *Id.* at 43-44 n.6 (citing Kertsikoff testimony).  A final award followed on September 29, 2023, which included the above findings (the "Award").  ECF 67-58, at 5-6, 43-46, 96-97, 103.

###### 4.    Eletson's Obstructionism Here And In The Bankruptcy Court (Oct. 2023-July 2024).

In October 2023, days after the Award had issued and while confirmation/vacatur briefing was ongoing here (ECF 46, 48-49), Levona learned that Eletson had produced additional potentially-relevant documents subject to the protective order in the bankruptcy case. Levona thus sought an order referring this action to the bankruptcy court, where access and use of confidential documents would have been permitted. ECF 34. Eletson opposed. ECF 35. The Court denied that request and a request for reconsideration. ECF 36, 39.

Levona next moved to modify the protective order. ECF 127-14, at 8; ECF 127-15, at 7. Eletson opposed the motion, asserting that "there was no 'cognizable argument as to why the Documents can or should have any relevance whatsoever.'" ECF 535, at 7 (quoting ECF 127-30, at 3). Eletson also submitted an affidavit from Kertsikoff "stating that Levona's understanding of the documents was incorrect." *Id.* at 7-8. At a November 8 hearing, Eletson asserted that Levona's motion was a "fishing expedition" and the document "was not responsive to any arbitration discovery." *Id.* at 8. The bankruptcy court denied Levona's motion. ECF 127-16, at 51:5-8.

"Levona persisted in its efforts and Eletson persisted in its steadfast opposition." ECF 535, at 9. Levona filed a proof of claim in December (ECF 127-17), opening the door to discovery on the withheld documents. Eletson objected, arguing that the claim should be "stay[ed] … until the Award was confirmed." ECF 585, at 9 (citing ECF 127-17, at 10-12). Levona nonetheless requested documents concerning, *inter alia*, the preferred shares and Buyout Option. ECF 136, at 14. Eletson objected, and Levona moved to compel (Bankr. ECF 699), following which the bankruptcy court stayed discovery on Levona's claim. Bankr. ECF 811, at 8:7-9.

On March 11, 2024, the petitioning creditors filed four of the Withheld Documents as sealed attachments to an unrelated motion. Bankr. ECF 468, 478. Eletson objected to Levona's

request to access the documents in its capacity as a creditor, but the bankruptcy court on March 18 permitted Levona to do so.  *See* ECF 127-22, at 11:12-12:5.  Shortly after receiving the documents, Levona sought leave of the bankruptcy court to use them here.  ECF 136, at 14-15.

In April 2024, Levona twice requested a discovery conference regarding Eletson's refusal to produce any discovery.  ECF 127-23, 127-24.  On May 8, the bankruptcy court granted Levona permission to move to compel, which Levona did.  ECF 136, at 15.  But "Eletson again sought delay," arguing that Levona "was impermissibly seeking to collaterally attack the Award 'as subsequently confirmed by Judge Liman.'"  ECF 535, at 10 (quoting ECF 127-27, at 2).  At a June 18 hearing, the bankruptcy court considered whether it should "modify [its] protective order to allow [this Court] to see [the withheld] documents."  ECF 136, at 15.  "Eletson again resisted production" (ECF 535, at 11), arguing that Levona had "been blustering about these Documents for nearly a full year, repeatedly claiming they show fraud in the Arbitration" (Bankr. ECF 779 ¶ 3).  Eletson also "took issue with the fact that Levona was seeking to modify the Protective Order when it had never raised its fraud claim with [this Court], all the while taking the position that Levona was not entitled to the documents necessary to raise the issue of fraud with this Court."  ECF 535, at 11.  The bankruptcy court modified the protective order, finding "extraordinary circumstances and compelling need."  Bankr. ECF 865, at 243:5-9.[11]

---

[11]    On March 13, 2025, the bankruptcy court held Intervenors' principals in contempt for pursuing foreign proceedings to confirm or enforce the Award and imposed monetary sanctions of $5,000 per party per day until they dismissed them. Bankr. ECF 1537. On August 1, 2025, the bankruptcy court found the Intervenors in contempt of court for violating the Lift Stay Order (Bankr. ECF 48) by purporting to remove Levona-appointed directors from the Eletson Gas's board and replacing them with family and affiliates of Intervenors' principals.  Bankr. ECF 1759.

### 5.    Levona's Amended Vacatur Petition And Discovery (July 2024-Present)

On July 3, after obtaining a few of the Withheld Documents and permission to use them, Levona sought leave to file an amended petition to vacate and for discovery.  ECF 123.[12]  Levona supplemented the motion with another document it had obtained via a separate London-based arbitration.  ECF 138-139.  The Court granted the motion and permitted discovery.  ECF 162.

In October, Eletson agreed to custodians and search terms for use in its document collection, but stopped the collection when the bankruptcy court confirmed a plan of reorganization on November 4.  Bankr. ECF 1223.  Eletson's previous owners, in their various roles, then (i) refused to relinquish control of Eletson's documents and personnel (resulting in large and growing monetary sanctions), while (ii) arguing here that they **lack control** over the **same documents and personnel**.  *See* ECF 343, 488.  Levona was thus denied discovery that Eletson had agreed to turn over, including emails of IT lead Kantartzoglou (he and Karastamati coordinated Eletson's document production in the arbitration), but that Reed Smith had not collected by the time of its displacement.  Intervenors also disclaimed the ability to make Kantartzoglou or Tzarouchi available for depositions.  *See* Ex. 69; Ex 41.  Karastamati and Hadjieleftheriadis each then flouted two Court orders requiring them to appear for their depositions.  ECF 505, 525.[13]

---

[12]    Earlier, the Court had ruled on Eletson and Levona's petitions (ECF 83, 104, 268) without entering final judgment.  Eletson later voluntarily dismissed its confirmation petition.  ECF 321.

[13]    To be sure, Reed Smith had collected some Eletson documents by the time of its displacement, and produced some of them on its own behalf in response to Levona's subpoena.  *See* Ex. 62 (Solomon Tr.), at 178:6-12; Ex. 68, at 3-5.  But Reed Smith unilaterally imposed a narrower set of search terms when responding to the subpoena relative to those to which it had agreed when acting for Eletson.  For example, Withheld Document 3 (the Swisschem email) was responsive to Eletson's agreed search terms but not Reed Smith's narrower terms, and turned up only because Eletson's new counsel produced it.

**ARGUMENT**

## I.    THE AWARD SHOULD BE VACATED BECAUSE IT WAS PROCURED BY FRAUD OR UNDUE MEANS

The Federal Arbitration Act permits vacatur "where the award was procured by corruption, fraud, or undue means."  9 U.S.C. § 10(a)(1).  This requires a party "to show (1) the existence of 'fraudulent activity'; (2) that, 'even with the exercise of due diligence,' he 'could not have discovered the fraud prior to the award issuing'; and (3) that 'the fraud materially related to an issue in the arbitration.'"  *Bright-Asante v. Saks & Co.*, 855 F. App'x 40, 42-43 (2d Cir. 2021) (summary order) (quoting *Odeon Cap. Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017)). "Undue means" are "underhanded or conniving ways of procuring an award."  *Nat'l Cas. Co. v. First State Ins. Grp.*, 430 F.3d 492, 499 (1st Cir. 2005); *accord Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 484-85 (S.D.N.Y. 2016) (citing *Nat'l Cas. Co.*).

Those elements are satisfied here.  *First*, Eletson engaged in at least four independent fraudulent activities: (1) lying about the exercise of the Buyout Option; (2) lying about the nomination of Intervenors; (3) lying about the substance of the withheld July 25 email; and (4) knowingly concealing the Withheld Documents.  *Second*, Levona could not have discovered that fraudulent activity before the Award issued because of Eletson's concealment and obstruction. *Third*, Eletson's fraudulent activities concerned the key arbitration issues—whether the Buyout Option was exercised in favor of Intervenors—and the Award relied on Eletson's lies.  At minimum, Eletson's failure to produce documents and its false and misleading statements and testimony were deceitful and devious tactics that constitute undue means.

### A.    Eletson Engaged In Fraudulent Activity Or Used Undue Means

Fraudulent activity occurs for purposes of Section 10(a)(1) where a party does one of at least two things.  *First*, fraud occurs when a party "knowingly conceal[s] evidence."  *France v.*

*Bernstein*, 43 F.4th 367, 378 (3d Cir. 2022) (quoting *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 (D.N.J. 1976)).  *Second*, fraud occurs when a party offers an arbitrator "perjured testimony" or other lies.  *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982); *accord France*, 43 F.4th at 378-79 (prevailing party "committed fraud" by "l[ying] under oath"); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1381-84 (11th Cir. 1988) (vacating arbitration award in relevant part because purported expert had asserted "credentials … as a basis for his testimony … [that] were completely false").

For example, in *France*, the Third Circuit held that fraudulent activity had occurred where the prevailing party in the arbitration "both lied under oath and withheld important information demanded in discovery."  43 F.4th at 378.  Specifically, "in response to [the losing party]'s document requests," the prevailing party had said "he was going to produce responsive documents in his possession" but then did not do so.  *Id.*  Moreover, as to a key issue in the arbitration— whether the prevailing party had set up an autograph-signing event—the prevailing party had denied "in his pre-hearing deposition and at the hearing that he had any knowledge of or involvement in the signing event," which turned out to be false "as revealed by … evidence uncovered in [the losing party]'s Parallel Action."  *Id.* at 378-79.  Thus "[t]he easiest conclusion in th[e] case" was that the prevailing party had "committed fraud."  *Id.*  And that was so even though the prevailing party had maintained his innocence in the face of the circumstantial evidence against him because his explanation—that other people were "sending and receiving emails in his name"—was not credible.  *Id.* at 379 & n.12 (quoting *Bonar*, 835 F.2d at 1384 ("concluding that movant 'submitted to the district court clear and convincing evidence of [an expert witness's] perjury' by providing letters and an affidavit contradicting the expert's claimed background"); *cf. Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 122 (2d Cir. 2017) ("Actual

knowledge may be proven or disproven by direct evidence, circumstantial evidence, or a combination of the two."). Like the prevailing party in *France*, Eletson committed fraud—or at minimum relied on underhanded, undue means—by repeatedly lying to the arbitrator and knowingly withholding evidence.

### 1. Eletson Lied About The Exercise Of The Buyout Option

The Withheld Documents first show that Eletson and its three main witnesses—Karastamati, Kertsikoff, and Hadjieleftheriadis—lied when they testified at the arbitration that they "strongly believe[d]" Eletson had "exercised the option" to buy out Levona on March 11, 2022. Ex. 75 (Arb. Hr'g 5/16 Tr.), at 86:22-87:13; *supra*, at 25-26. Rather than hold that belief, Eletson and those senior officers had in fact spent nearly a year *after* March 11, and perhaps longer, *still trying* to find a way to buy out Levona's stake in Gas. Indeed, eighteen Withheld Documents include various models for a *future* "Murchinson Buyout" or *future* "Murchinson Exit"—six of which included a payment to Levona *specifically for the preferred shares of Gas*, and another seven of which included an unspecified payment to Levona *above* the $23 million for the two vessels and the $12.9 million for the W/C Loan. *E.g.*, Ex. 83, at 2, 4 (June "Total Murchinson [Levona] buyout" model of $53 million); Ex. 23, at 3-4 (July 25 "Buyout of Murchinson" including "*$15 million for "Murchinson partnership share*"); Ex. 30, at 2, 4-5 (August "Total Murchinson buyout" model of $48 million, including "$12.15 million additional payment to Murchison [sic] (negotiable) — *in exchange of the preferred shares*."); Ex. 31, at 3 (August "Investor Model for Murchinson [sic] Buyout" including $12.15 million available *to use in negotiations with Murchinson [sic] for acquisition of preferred shares*"); *supra*, at 5-10, 11-14. Likewise, the disclosed July 13 email and its "Murchinson Buyout Steps" document was *not* "an incorrect account" as Eletson claimed to the arbitrator, Ex. 9, at ¶ 78, *supra*, at 26—it was in accord with a host of similar documents showing that the Buyout Option had not been exercised and Eletson was

still trying to buy out Levona after March 11. *E.g.*, Ex. 20 (July 11 Kertsikoff forwarded the Murchinson Buyout Steps to himself); Ex. 53 (Kertsikoff and Hadjieleftheriadis circulate similar model in February 2023).

Beyond those attempts to buy out Levona after March 11, in eight of the remaining Withheld Documents, Eletson *acknowledged outright* that Levona owned the preferred shares of Gas after March 11 and thus did not, as Eletson's witnesses falsely testified, "h[o]ld itself out … as the sole shareholder of" Gas, especially when it "met with potential investors and financiers." Ex. 9, at ¶ 67(d); *supra*, at 26; *see e.g.*, Ex. 18 (April certified organizational chart sent to finance broker showing Levona holding Gas's preferred shares); Ex. 16, at 2-4 (April email to financier stating Levona is "disinvesting from" Gas); Ex. 17, at -646, -650-652 (April email to financier identifying "the directors/officers of Eletson Gas" as including the four Levona-appointed directors); Ex. 32, at 2-3 (August 13 email to two financiers explaining "***Murchinson's Exit Payment***"); Ex. 38 (August 18 email of Kertsikoff authorizing a "***Murchinson's Exit Payment***" model be sent to a financier); Ex. 51 (Kertsikoff sending Karastamati and Hadjieleftheriadis a financier's proposal for "[p]urpose" of "redeem[ing] preferred capital held by Levona"); *supra*, at 7-16.

Putting together all those Withheld Documents, which show Eletson and its senior-most officers consistently recognizing Levona as the owner of Gas's preferred shares *after* March 2022, it is clear that they did *not* believe the Buyout Option had been exercised in March 2022.

## 2.    Eletson Lied About The Purported Nomination

The Withheld Documents also show that Eletson's witnesses lied when testifying that Intervenors had been nominated as of March 11, 2022, to receive Gas's preferred shares. *Supra*, at 27. In contrast to the unverifiable Greek notes on which Eletson relied in the arbitration, no fewer than three formally-certified organizational charts from well after March 11—a November

7, 2022 chart certified by Eletson's counsel (Ex. 44, at 2-3, 8) and December 2 and 13, 2022 charts signed and certified by Karastamati and Kertsikoff (Ex. 46, at -021, -030; Ex. 42, at -192, -210)—show that the shares had been redeemed.  These charts were followed by a February 7, 2023 "updated slide deck" for Kertsikoff to "review again" that likewise stated "Eletson Holdings is the sole shareholder of Eletson Gas."  Ex. 56.  At his deposition here, Kertsikoff had no explanation for this evidence other than to insist everything up to his arbitral testimony had been "[c]learly erroneous," and that his unverified testimony was the lone accurate statement as to who owned Gas's shares.  Ex. 1 (Kertsikoff Tr.), at 297:23-298:1, 299:23-300:4, 306:25-307:10, 308:6-10.  The concealed evidence permits only one conclusion:  the nomination was a lie.

### 3.    Eletson Lied About The Withheld July 25 Email

The Withheld Documents also show that Eletson, through its former counsel Reed Smith, lied to and misled the arbitrator about the substance of the withheld July 25 email describing a *future* "Buyout of Murchinson" that included a payment specifically for the "Murchison [sic] partnership share ($36.2 million)."  Ex. 23, at 3.  When Levona learned of the existence—but not substance—of that withheld document and asked the arbitrator to require Eletson to produce it, Eletson did not show the arbitrator the document and instead made multiple plainly false statements about it, including that (i) there was not "***anything important about the document***," and (ii) "***[t]he document was not called for by any document request in the arbitration***."  ECF 485-19, at 2.  The July 25 email, however, is indisputably "important."  In it, Eletson explains a framework for a ***future "Buyout of Murchinson,"*** including "repayment of Murchinson loan ($12.9 million)" ***and payment for the "Murchison [sic] partnership share ($36.2 million)***."  Ex. 23, at 3.  This email, as the Court has put it, "reflects that Eletson was considering purchasing the Preferred Interests of Levona for $36.2 million—far in excess of the amount under the BOL if the Purchase Option had been exercised in March 2022."  ECF 162, at 16.  Likewise, production of

the July 25 email was directly "call[ed] for" by , at minimum, Levona's RFP 11 because it explicitly bore on the "Murchinson Buyout" as well as JAMS Rule 17(a) because it was "relevant" to the main dispute.  Ex. 65, at 17.

Eletson also made deceptive and misleading statements regarding the withheld July 25 email to avoid being ordered to produce it.  *See supra*, at 27-33.  Most notably, Eletson asserted the email was not "seen" by Eletson's witnesses "before this week," even though Eletson's witnesses had received an updated version of the same buyout model—"EG Model (Tufton & 2 LEG Refi & Overdraft) 25.07.2022.xlsx," Ex. 23, at 3—*less than two hours later*.  Ex. 27 (Kertsikoff receiving "EG Model (Tufton & 2 LEG Refi & Overdraft) 25.07.2022 v4.xlsx").

### 4.    Eletson Knowingly Concealed Evidence It Should Have Produced

Apart from its various lies, Eletson engaged in fraudulent activity or undue means by failing to produce the trove of Withheld Documents it had to disclose pursuant to two independent obligations.  *First*, Eletson had to disclose the Withheld Documents under JAMS Rule 17(a), which as Eletson's own counsel argued, "clear[ly]" required the disclosure of "*all* relevant, non-privileged documents … in their possession or control."  Ex. 58, at 1; *see supra*, at 17-18.  The Withheld Documents fell squarely within Eletson's disclosure obligations under Rule 17(a) because for all the reasons just stated they were "highly relevant" to the key issue in the arbitration—whether the Buyout Option was exercised in favor of Intervenors.  ECF 162, at 16.  According to the Withheld Documents, it was not.  *Supra*, at 39-40.

*Second,* the Withheld Documents were responsive to document requests with which Eletson had agreed to comply, including at minimum the following:

| RFP # | Excerpts from RFP | Withheld Documents Exhibit No. |
|---|---|---|
| 6 | "Any and all communications and documents … related to the negotiations and other efforts to sell the Vessels …." | Exs. 14, 20, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 35, 36, 37, 38, 49, 50, 52, 53, 54, 55, 83 |
| 4 | "Any documents … as to the determinations of the value of the Vessels in 2022." | Exs. 15, 20, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 35, 36, 37, 38, 49, 50, 83 |
| 9 | "Any documents and/or communications, related to the Transaction, Transaction Documents, or negotiations leading to the Transaction." | Exs. 39, 40, 83 |
| 5/10 (as limited)[14] | "[F]or the time period November 2, 2021 to July 29, 2022, documents and communications sufficient to show the requests made to investors or financiers by Eletson to either refinance a debt or raise capital for the company[;] documents sufficient to show the reasons those investors or financiers chose not to work with Eletson; and documents sufficient to show how Eletson represented its ongoing relationship with Levona …" | Exs. 14, 15, 16, 17, 18, 20, 23, 24, 25, 26, 27, 40, 83 |
| 11 | "Any communications and/or documents related to Eletson's preparation of, negotiations to, and/or related to the final offer of the 'Murchison Buyout Steps' …." | Exs. 20, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35, 36, 37, 38, 48, 49, 50, 53, 54, 55, 83 |
| 12 | "Any and all non-privileged … communications sent to any party by Eletson, their agents, counsel, representatives, or otherwise after July 10, 2022 indicating the Levona is not able to negotiate or speak on behalf of the Company or that discusses Levona's position within the Company in any way …." | Exs. 15, 20, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 35, 36, 37, 38, 39, 44, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56 |
| 21 | "All documents and/or communications evidencing the current fair market value for each of the nine vessels Levona contemplated for transfer as part of the Unigas Transaction." | Exs. 15, 23, 24, 25, 26, 27, 29, 31, 32, 35, 36, 37, 49, 51, 52, 53, 54, 55 |
| 22 | "All documents and/or communications evidencing that Eletson executed the Option laid out in the BOL." | Exs. 44, 46, 47, 56 |
| 23 | "All documents and/or communications evidencing that the four board members who joined the Company board on or about November 10, 2022 resigned their position from the board of the Company." | Ex. 40 |

---

[14]    *See* ECF 148-5.

| RFP # | Excerpts from RFP | Withheld Documents Exhibit No. |
|-------|-------------------|-------------------------------|
| 25 | "All communications and/or documents related to the repayment of the principal and interest accrued on the Loan as established by the BOL." | Exs. 20, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35, 36, 37, 38, 39, 49, 50, 51, 52, 53, 54, 55, 83 |
| 27 | "All documents and/or communications evidencing that Claimants fully complied with the terms of the buyout option." | Exs. 44, 46, 47, 56 |

By way of example, in RFP 5/10, Eletson agreed to produce for "November 2, 2021 to July 29, 2022, … documents sufficient to show how Eletson represented its ongoing relationship with Levona." ECF 148-4, at 3.  That request covered, among other things, the April 2022 Swisschem email chain stating that "Murchinson is in the ***final stages of disinvesting*** from [Gas]," Ex. 16 , at 2-4; the April 8 email listing the four Levona-appointed directors as current directors of Gas, Ex. 17, at -646, -650-652; and the April 13 organizational chart showing Levona as the holder of Gas's preferred shares, Ex. 18 .  And, in RFP 11, Eletson agreed to produce "[a]ny communications and/or documents related to Eletson's preparation of, negotiations to, and/or related to the final offer of the 'Murchison Buyout Steps,'" without any date limitation.  Ex. 65, at 17.  That request called for, among other things, the June 17, 2022 model detailing a *future* "Total Murchinson buyout" of $53 million, Ex. 83, at 2, 4; the July 25 email describing a *future* "Buyout of Murchinson," including payment for the "Murchison [sic] partnership share ($36.2 million)," Ex. 23, at 3; and the August 11 "Murchinson buyout" model with a "Total Murchinson buyout" of $48 million, including a "$12.15 million additional payment to Murchison [sic] (negotiable) — ***in exchange of the preferred shares***," Ex. 30, at 2, 4-5; *see supra*, at 6-12, 17-21.  Eletson, however, did not produce *any* of the 36 Withheld Documents as it was required to do.

The failure to abide by basic discovery obligations is sufficient to show that Eletson knowingly concealed evidence.  *See, e.g.*, *France*, 43 F.4th at 378-79.  The record, however,

44

further demonstrates Eletson's deliberate effort to withhold unfavorable information: the Withheld Documents were known to and often created by Eletson's senior-most management, involved massive transactions that implicated Eletson's viability, were created just months before *or within* the arbitral discovery period, and were withheld notwithstanding that other documents on the same subject were disclosed.   As a concrete example of Eletson's intentionality in withholding documents, Reed Smith had the April 2022 Swisschem email chain, Ex. 16, for months during the discovery period, discussed it internally, and produced at least one attachment from the chain that it apparently viewed favorably.  *Supra*, at 21.  Moreover, the two Eletson witnesses who were most knowledgeable about Eletson's document collection efforts—Karastamati, who Reed Smith identified as the "lead" of Eletson's document collection, and Kantartzoglou, who was in charge of actually gathering documents from Eletson's databases, Ex. 62 (Solomon Tr.), at 128:2-129:3, 135:9-136:5, 138:20-139:6; Ex. 1 (Kertsikoff Tr.), at 121:2-18—did not appear for their noticed depositions.  Karastamati failed to appear in violation of two Court orders, and Kantartzoglou failed to appear (or produce documents) after Intervenors speciously claimed to lack control over him.  As Levona will set out in its forthcoming sanctions motion, the Court should, *inter alia*, draw adverse inferences as to those witnesses' testimony, the meaning of documents identified in Levona's amended petition to vacate, the existence of additional evidence of fraud in the arbitration, and the nature of Eletson's document collection during the arbitration.   But even without those inferences, the intentionality of Eletson's conduct is inescapable.

### B.    Levona Could Not Have Discovered Eletson's Fraud Prior To The Award

Eletson's "non-production of responsive documents and false testimony" was, by its very nature, "not discoverable through reasonable diligence" before the issuance of the Award because Eletson concealed the Withheld Documents, and thus the evidence of its lies, until after the Award. *France*, 43 F.4th at 379.  Levona diligently sought the production of all documents concerning the

45

purported exercise of the Buyout Option during the arbitration, yet it did not receive the on-point Withheld Documents.  And in the one pre-Award instance in which Levona learned there *might* be a relevant document that Eletson had withheld, Levona immediately asked the arbitrator—twice—to reopen the arbitration hearing so that it could order the production of the undisclosed document and consider it, but the arbitrator denied Levona's requests after Eletson doubled down on its fraud by lying about the document and baselessly asserting a protective order violation.  ECF 67-52, at 2-3; ECF 67-54, at 2, 5.

The same goes for Eletson's lies.  Because Levona did not have and could not have obtained the Withheld Documents before issuance of the Award, it lacked evidence it could present to the arbitrator to show Eletson lied about the exercise of the Buyout Option or the purported nomination of Intervenors.  And perhaps most clearly, Levona could not have known that Eletson's statements regarding the substance of the July 25 email were false until after the Award issued because Levona did not get to see and use that document until a year later.  Thus "Eletson engaged in fraudulent activity that Levona could not have discovered."  ECF 162, at 46-47.

## C.    The Fraud Materially Related To The Central Issue In The Arbitration

The Withheld Documents and Eletson's lies "materially relate[] to an issue in [the] arbitration" because there is "a nexus between the alleged fraud and the decision made by the arbitrator[]."  *Odeon*, 864 F.3d at 194.  The Award makes clear, and Eletson's former counsel Reed Smith agrees (Ex. 62 (Solomon Tr.), at 272:22-275:16), that the arbitrator's finding that Gas more likely than not had exercised the Buyout Option was the central issue in the arbitration, ECF 67-58, at 10, and it directly led to Eletson prevailing on its claims, *see id.* at 47-48, 63, and the dismissal of Levona's counterclaims, *see id.* at 63.  *See* ECF 162, at 4 (the Court stating, in granting leave to amend, that "[a] pivotal question in the arbitration was whether Eletson had properly exercised the right granted it in the BOL to purchase Levona's Preferred Interests in the

Company").  Likewise, the arbitrator's determination that Intervenors had been nominated as owners of the preferred shares of Gas resolved another critical issue in the arbitration, affecting both who owns and controls Gas and who is the beneficiary of the nearly $100 million damages award.  *See* ECF 67-58, at 28-33, 88-90.

Moreover, as discussed above, the Withheld Documents are "material, and obviously so" to that pivotal issue of whether Gas exercised the Buyout Option in favor of Intervenors, including because that "concealed evidence proved important facts supporting [Levona's] theory of the case," *France*, 43 F.4th at 381   The Withheld Documents contradict Eletson's position in the arbitration that the Buyout Option was exercised on March 11, 2022, because they show that long *after* that date, Eletson's senior-most officers still viewed Levona as owning the preferred shares of Gas and acted consistent with that view, including by continuing to try to buy out Levona's stake in Gas.  *See supra*, at 5-14, 39-40.  Kertsikoff has admitted that certain Withheld Evidence is within "the same subject matter" as issues central to the arbitration.  ECF 127-30, at 10; ECF 127-31 ¶ 7.  And, as Eletson's story began to change, other Withheld Documents reflect that Holdings was the sole shareholder of Gas—with no indication, contrary to Eletson's later position—that Intervenors owned the preferred shares of Gas.  *See supra*, at 14-17, 40-41.

Plainly, "the arbitrator's fact-finding task would have looked much different had [Levona] possessed the concealed evidence to support [its] core allegation," which is "enough … to see a 'nexus between [the] fraud and the basis for the [arbitrator's] decision.'"  *France*, 43 F.4th at 382; *accord Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503-04 (6th Cir. 2003) (alleged fraud was "material to the arbitration" because it "may have impacted not only on the arbitrator's ultimate decision to grant or deny relief …, but also may have directly affected the arbitrator's factual findings").  And "it is easy to imagine that an arbitrator, confronted with

these documents, would have reached a contrary decision to that reached by the arbitrator here and would have ruled for Levona on its counterclaims rather than for Eletson on its claims," ECF 162, at 18—though Levona "need not demonstrate that the arbitrator[] would have reached a different result" absent the alleged fraud to obtain vacatur, *Odeon*, 864 F.3d at 194.

Similarly, Eletson's lies were material because the relevant "testimony 'related directly' to issues" subject to the arbitration. *NuVasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 879 (11th Cir. 2023); *see, e.g.*, *Bonar*, 835 F.2d at 1384-85 (expert's perjury about his qualifications was "material" because his opinion concerned central factual issue underlying punitive damages determination); *MidAmerican Energy Co. v. Int'l Bhd. of Elec. Workers Local 499*, 345 F.3d 616, 622-23 (8th Cir. 2003) (witness's perjured testimony on key disputed issues was "material" where award stressed witness's honesty and truthfulness). In determining that the Buyout Option had been exercised, the arbitrator explicitly relied on testimony that Eletson "strongly believe[d]" it "exercised the option," testimony that "Eletson held itself out, as the family at large, as the sole shareholder of [Gas]," and testimony that the July 13 email "created fury and confusion" within Eletson. ECF 67-58, at 43-46. Eletson's lies about the nomination were also highly material, as the arbitrator relied on testimony and evidence "that the Eletson families agreed to the contingent transfer" of Gas's preferred shares to Intervenors. *Id.* at 29-31. And Eletson's lies regarding the content of the July 25 email were highly material too, as the arbitrator apparently accepted Eletson's representation that the document lacked even an arguable connection to any issue in the arbitration and thus declined to order its production. ECF 67-52.

## II.    EQUITABLE TOLLING APPLIES

As this Court has ruled, the three-month limitations period for seeking to vacate an arbitral award is equitably tolled when a party "has been pursuing its rights diligently and some extraordinary circumstance stood in his way to prevent timely filing." ECF 162, at 30 (citing

*Holland v. Florida*, 560 U.S. 631, 653 (2010)); *see* ECF 535, at 20-21 (discussing equitable tolling). "Extraordinary" refers "not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." ECF 162, at 30 (quoting *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011)). "The diligence required for equitable tolling purposes is reasonable diligence not maximum feasible diligence." *Holland*, 560 U.S. at 653 (cleaned up).[15]

The record here, in the arbitration, and in the bankruptcy case shows that Levona diligently sought the Withheld Evidence so that it could petition to vacate the Award as procured by fraud, but Eletson erected extraordinary obstacles that prevented Levona from doing so. *Supra*, at 27-35. From even before the issuance of the Award when Levona's claim for vacatur based on fraud could have accrued, Levona moved in both the arbitration and the bankruptcy court to gain access to and use a document (the withheld July 25 email, Ex. 23 (ECF 127-4)) that it just days earlier learned Eletson may have concealed. ECF 182-5, at 5-6; ECF 148-8; Bankr. ECF 144. Then one week after issuance of the Award, Levona sought to have this action referred to the bankruptcy court, which would have permitted Levona to access and use certain withheld documents under the protective order there. ECF 34. When that failed, *see* ECF 36, ECF 39, still less than one month after the Award had issued, Levona again moved to modify the bankruptcy court's protective order, ECF 127-14, which again failed over Eletson's opposition, ECF 127-16, at 34:15-51:8; ECF 127-30. Levona next attempted to obtain and use the withheld documents through a proof of claim it filed in Eletson's bankruptcy in December 2023 and associated discovery it served (over Eletson's opposition (Bankr. ECF 378; Bankr. ECF 461, at 92:15-94:20) concerning the Withheld Documents and related issues. ECF 535, at 9. After that eventually led to Levona obtaining the

---

[15] The Court previously ruled that Levona could not rely on a "relation back" theory because Rule 15 does not apply to vacatur petitions. ECF 162, at 38. Levona adheres to and preserves its position that Rule 15 is available but does not press that argument here given the Court's ruling.

documents on March 18, 2024, Levona moved in the bankruptcy court for leave to use the documents here, which was granted on June 2024—just two weeks before Levona moved this Court for leave to seek vacatur on the basis of fraud. *Id.* at 10-12.

It is, moreover, undisputed that Levona and its counsel did not obtain any of the Withheld Documents until March 2024—and then only 4 of the 36 documents that Levona has now determined Eletson wrongfully failed to disclose. ECF 136, at 14-15. It is likewise undisputed that, to the extent any withheld documents were in the possession of Levona's affiliates before then, those documents could not have been shared with or used by Levona in light of the bankruptcy court's protective order. ECF 535, at 9-10.

As the Court stated in granting Levona leave to amend, "Levona was reasonably diligent" in seeking the Withheld Documents; it could not assert its fraud claim before it had obtained sufficient factual support and the ability to present that evidence to the Court; and "Eletson fought tooth and nail to prevent Levona" from obtaining the relevant evidence and the right to use it here. ECF 162, at 34-36. "Levona did not [initially] bring a claim for fraud because based on Eletson's actions it was prevented from doing so." ECF 162, at 34-35. Levona's claim for vacatur under Section 10(a)(1) is thus timely under the doctrine of equitable tolling.

## CONCLUSION

The Court should (1) find that Eletson knowingly concealed documents regarding the Buyout Option; (2) find that Eletson lied when it testified that the Buyout Option had been exercised; (3) find that Eletson lied when it testified that the purported nomination had occurred; (4) find that Eletson, through Reed Smith, lied about the substance of the withheld July 25 email; and (5) vacate the Award in its entirety.

DATED: August 20, 2025          QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Isaac Nesser
_____

Isaac Nesser
William B. Adams
Daniel M. Kelly
Michael A. Wittmann
295 Fifth Avenue
New York, NY 10016
Tel: 212-849-7253
isaacnesser@quinnemanuel.com
williamadams@quinnemanuel.com
danielkelly@quinnemanuel.com
michaelwittmann@quinnemanuel.com

Matthew Scheck
Matthew Roznovak (admitted *pro hac vice*)
Alexander Van Dyke (admitted *pro hac vice)*
300 W. 6th Street
Austin, TX 78701
Tel: 737-667-6100
matthewscheck@quinnemanuel.com
matthewroznovak@quinnemanuel.com
alexvandyke@quinnemanuel.com

*Attorneys for Cross-Petitioner Levona Holdings, Ltd.*

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(c)

I, Isaac Nesser, certify that according to the word processing program used to prepare this opposition, the foregoing memorandum of law in relevant part contains 16,910 words, which is less than the 17,500 words permitted by this Court's order granting Levona permission to file a 50-page brief and Local Rule 7.1(c).

*/s/ Isaac Nesser*
Isaac Nesser
