**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELETSON HOLDINGS INC. and
ELETSON CORPORATION,

        Cross-Respondents,

           v.

LEVONA HOLDINGS, LTD.,

        Cross-Petitioner,

          and

APARGO LIMITED, DESIMUSCO
TRADING LIMITED, and FENTALON
LIMITED,

        Intervenors.

Civ. No. 23-cv-07331 (LJL)

ORAL ARGUMENT REQUESTED

---

**CROSS-RESPONDENTS' JOINDER AND MEMORANDUM OF
LAW IN SUPPORT OF LEVONA HOLDINGS, LTD.'S PENDING
AMENDED CROSS-PETITION TO VACATE THE ARBITRATION AWARD**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.    SUMMARY OF KEY FACTS ................................................................ 1

    A.    The Former Directors' Role in Holdings ................................................ 1

    B.    Levona Acquired the Preferred Shares and Subsequently Granted Eletson Gas a Purchase Option ........................................................................ 3

    C.    The Purported Exercise of the Option and Transfer of the Preferred Shares ........ 3

    D.    The District Court Proceeding to Confirm or Vacate the Award .......................... 4

    E.    The Bankruptcy Case ...................................................................... 5

    F.    Documents on Eletson Server Confirm that the Option Lapsed and No Transfer to the Intervenors Occurred ........................................................ 6

    G.    Documents Withheld from the Arbitration Also Confirm that the Option Lapsed and No Transfer of Preferred Shares Occurred .................................... 13

III.    ARGUMENT ........................................................................ 17

    A.    Standard for Vacatur on the Basis of Fraud .......................................... 17

    B.    The Court Should Vacate the Arbitration Award Because it was Procured Through Fraud ........................................................................ 19

        i.    The Former Directors Committed Fraud .................................. 20

        ii.    Eletson Acted Diligently in Seeking to Discover the Former Directors' Fraud ........................................................ 23

        iii.    The Fraud "Materially Related to an Issue in the Arbitration" ........................................................ 24

IV.    CONCLUSION ...................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Arrowood Indem. Co. v. Trustmark Ins. Co.*,
  938 F. Supp. 2d 267 (D. Conn. 2013), aff'd, 560 F. App'x 75 (2d Cir. 2014) .......................... 17

Bonar v. Dean Witter Reynolds, Inc.,
  835 F.2d 1378 (11th Cir. 1988) ........................................................................................ 23

*Connaughton v. Chipotle Mexican Grill, Inc.*,
  29 N.Y.3d 137 (N.Y. 2017) ............................................................................................. 18

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015) ............................................................................................ 18

*France v. Bernstein*,
  43 F.4th 367 (3d Cir. 2022) ........................................................................... 18, 19, 21, 23

*NuVasive, Inc. v. Absolute Med., LLC*,
  71 F.4th 861 (11th Cir. 2023) ......................................................................................... 18

*Odeon Capital Grp. LLC v. Ackerman*,
  864 F.3d 191 (2d Cir. 2017) ........................................................................................... 18

*Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC*,
  497 F.3d 133 (2d Cir. 2007) ........................................................................................... 17

*Veal v. Geraci*,
  23 F.3d 722 (2d Cir. 1994) ............................................................................................. 18

**Other Authorities**

9 U.S.C. § 1 et seq. ........................................................................................................... 17

9 U.S.C. § 10(a)(1) ........................................................................................................... 17

## I.      PRELIMINARY STATEMENT

Cross-Respondents Eletson Holdings Inc. ("Holdings") and Eletson Corporation ("Eletson Corp." and together with Holdings, "Eletson") hereby submit this Joinder and Memorandum of Law in support of Levona Holdings, Ltd.'s ("Levona") pending Amended Cross-Petition to Vacate.  Eletson adopts and incorporates each of the legal arguments and authorities set forth in Levona's Amended Cross-Petition to Vacate.

As this Court is aware, the claimed interest in the Award of Apargo Limited, Desimusco Trading Limited and Fentalon Limited (collectively, the "Intervenors") is based entirely on the purported transfer of the preferred units of Eletson Gas LLC ("Eletson Gas") (the "Preferred Shares") to the Intervenors as "nominees" as of March 11, 2022 through their timely exercise of a purchase option from Levona.  However, documents adduced in discovery in this case and the related bankruptcy matter, and documents on the Eletson server, make it abundantly clear that the purchase option had lapsed and the nomination never occurred.  Eletson's former directors—*i.e.*, Laskarina Karastamati ("Karastamati" or "LK"), Vassilis Kertsikoff ("Kertsikoff" or "VK") and Vassilis Hadjieleftheriadis ("Hadjieleftheriadis" or "VH") (collectively, the "Former Directors")—and their counsel, Reed Smith LLP ("Reed Smith"), contrived this fiction and perpetuated it throughout the arbitration through perjurious testimony and the concealment of highly relevant documents contradicting such testimony.  Accordingly, Eletson joins Levona's pending Cross-Petition to Vacate.

## II.     SUMMARY OF KEY FACTS

### A.      The Former Directors' Role in Holdings

Prior to November 2024, Holdings was part of a corporate structure that had been closely held, managed, and controlled by three Greek families: the Kertsikoff, Hadjieleftheriadis, and

Karastamati families (the "Greek Families").  Bkr. Dkt. 849, at 15.[1]  The Greek Families each held 30.7% of the equity in Holdings through separate Liberian trust companies: (1) Family Unity Trust Company for the benefit of the Kertsikoff Family, (2) Glafkos Trust Company for the benefit of the Hadjieleftheriadis Family, and (3) Lassia Investment Company for the benefit of the Karastamati family.  *Id.*; Bkr. Dkt. 1402, at 1, n.3.  The Greek Families controlled a combined 92.16% supermajority interest in Holdings.  Elafonissos Shipping Corporation and Keros Shipping Corporation owned the remaining 7.84% minority stake.  *See* Bkr. Dkt. 1402, at 1, n.3.

Each of the Former Directors—*i.e.*, Karastamati, Kertsikoff and Hadjieleftheriadis— served on the Board of Directors and as executive officers of Holdings.  Bkr. Dkt. 849, at 15.  The Former Directors also served as officers of certain Eletson subsidiaries, including Eletson Gas.  *Id.*

Eletson Gas is a limited liability gas shipping company formed under the laws of the Republic of the Marshall Islands (Dkt. No. 162, at 2) as a joint venture between Holdings and funds managed by Blackstone Tactical Opportunities (collectively, "Blackstone").  Dkt. No. 104, at 3.  Eletson Gas' ownership consists of common and preferred membership interests.  Dkt. No. 162, at 2.  Holders of preferred interests of Eletson Gas (*i.e.*, the Preferred Shares) are entitled to, *inter alia*, board control over Eletson Gas.  Dkt. No. 104, at 4.

---

[1] References to "**Bkr. Dkt. __**" refer to filings made in the bankruptcy proceeding under Case No. 23-10322 before the Honorable John P. Mastando, III in the United States Bankruptcy Court for the Southern District of New York.  References to "**Dkt. No. __**" refer to filings made in this action (Case No. 23-cv-07331 (LJL)).  Page citations to docket filings refer to the stamped ECF page numbers on the top of each page, except that, for transcripts, citations are made to the relevant page/line of the transcript.  References to "**Furey Decl. Ex. __**" refer to exhibits to the Declaration of Jennifer B. Furey, dated August 20, 2025 ("Furey Decl.").  Page citations to Furey Decl. exhibits refer to PDF page numbers, except that, for transcripts, citations are made to the page/line of the transcript.  To aid the Court, pagination has been added to the bottom center of the Furey Decl. exhibits (in the format of "Ex. __, Page __") reflecting the PDF page numbers.

### B.    Levona Acquired the Preferred Shares and Subsequently Granted Eletson Gas a Purchase Option

In or about November 2021, Levona acquired the Preferred Shares from Blackstone. *Id.* at 3. Thereafter, Eletson and Levona were parties to a Third Amended and Restated LLC Agreement, effective on August 16, 2019, (as amended, the "LLCA") which governs the relationship among the holders of the membership interests in Eletson Gas. Dkt. No. 162, at 2. Under the LLCA, Holdings owned the common stock in the Company while Levona held the Preferred Shares. *Id.*

By early 2022, five of Eletson Gas' ships—over a third of its fleet—had been arrested by creditors for non-payment of financing liabilities, and arrested ships were scheduled to be sold at auction to compensate creditors. *Id.* at 3. Before an auction occurred, on or about February 22, 2022, Eletson and Levona entered into a Binding Offer Letter (the "BOL") and related agreements through which Levona provided cash in the form of a loan. *Id.* The BOL is governed by English Law. Dkt. No. 67-10, at Section 10. The BOL, among other things, gave Eletson Gas the option (the "Option"), upon the satisfaction of certain conditions, to purchase the Preferred Shares from Levona for specified consideration. Dkt. No. 104, at 6-9; Dkt. No. 162, at 4. The Option lapsed if not exercised or extended (through repayment of portions of a loan) within 30 days (*i.e.*, March 24, 2022), Dkt. No. 162, at 4.

### C.    The Purported Exercise of the Option and Transfer of the Preferred Shares

On or about July 29, 2022, Eletson (then controlled by the Former Directors and represented by Reed Smith) commenced JAMS arbitration proceedings between Holdings, Eletson Corp., and Levona (the "Arbitration") before Justice Ariel E. Belen (the "Arbitrator") which concerned, among other things, ownership of the Preferred Shares. *Id.* at 3-4, 12.

3

Initially, Eletson claimed that it exercised the Option on or about March 11, 2022 (*Id.* at 4), and that, as result, *Holdings* became the sole shareholder of Eletson Gas.[2]

However, after commencement of the Bankruptcy Case in March 2023, the Former Directors changed their story. Only then, in a filing dated May 5, 2023, did Eletson assert—*for the first time*—that it did not retain the Preferred Shares for itself, but that it had transferred the Preferred Shares to the Intervenors (entities wholly owned by the Greek Families and controlled by the Former Directors). Dkt. No. 55-13, at ¶¶ 100-06 (Eletson's Arbitration Pre-Hearing Statement of Position dated May 5, 2023). Following that filing, the Former Directors provided sworn testimony in the Arbitration claiming that Eletson Gas had nominated the Intervenors to receive the Preferred Shares effective immediately upon exercise of the Option.[3]

### D.    The District Court Proceeding to Confirm or Vacate the Award

On September 29, 2023, the Arbitrator entered the final award (the "Award"). Dkt. No. 104, at 25. The Arbitrator found, *inter alia*, that Eletson exercised the Option and transferred the Preferred Shares to the Intervenors as of March 11, 2022. *Id.* at 25, 28-31. The Arbitrator awarded

---

[2] *See, e.g.*, Dkt. No. 67-40, at 3-4 (collecting statements made during the Arbitration); *id.* at 4 (referencing action in New York state court in April 2023 where Holdings alleged that Eletson Gas was "a wholly-owned subsidiary of Eletson Holdings."); Furey Decl. Ex. 1, at ¶¶ 9, 28(e) ("Prior to March 11, 2022, Eletson Holdings was a common unit holder (sometimes for convenience referred to as shares) of the Company. As of March 11, 2022, Eletson Holdings became the sole unit holder of the Company"; "Eletson held itself out as the sole shareholder of the Company and sole beneficial owners of the Company's remaining 12 vessels."); Dkt. No. 67-21, at 17 ("At all times, Eletson held itself out as the sole shareholders [sic] of the Company and sole beneficial owners of the Company's remaining 12 Vessels"); Dkt. No. 67-22, at 13 ("Eletson held itself out as the sole shareholder of the Company and sole beneficial owner of the Company's remaining 12 vessels."); Dkt. No. 67-23, at 16 ("The undisputed record establishes that Eletson continued to manage the Company without Levona on the scene and even held itself out to potential financiers as the sole shareholder of the Company").

[3] Furey Decl. Ex. 2, at ¶ 54 ("On March 10, 2022, Eletson confirmed to Levona that it had exercised the option – and it did so in the transaction that occurred on March 11, 2022"); *id.* at ¶¶ 194, 198 ("From January 2022, at the latest, the three principal families owning or controlling Eletson holdings in the Company determined to nominate three entities…" and "the preferred interests were transferred to the Preferred Nominees effective…on or about March 11, 2022"); *see* Furey Decl. Ex. 3, at 159:9-23 (confirming that he swore on the record during the Arbitration hearing that his witness statement was true and correct); *see also id.* at 215:25-216:11 (maintaining position that Eletson had satisfied the conditions for exercising the Option).

the Intervenors the Preferred Shares and money damages.  Dkt. No. 67-58, at 96-101.  Eletson petitioned this Court for an order confirming the Award. (Dkt. Nos. 1 and 14).  On February 9, 2024, the Court issued an Opinion and Order granting in part and denying in part Eletson's motion to confirm and granting in part and denying in part Levona's motion to vacate the Award, which order the Court amended on April 19, 2024.  Dkt. Nos. 83, 104.

On September 6, 2024, the Court issued an Opinion and Order granting Levona's motion for leave to file an amended answer and an amended cross-petition to vacate the Award.  Dkt. No. 162.  In so doing, the Court determined that Eletson (under former management and represented by former counsel) withheld from the Arbitration "highly relevant" documents that "tend to show fraud in the [A]rbitration proceeding."  *Id.* at 16.

### E.    The Bankruptcy Case

On March 7, 2023, certain creditors (the "Petitioning Creditors") filed involuntary petitions against Holdings, Eletson Finance (US) LLC, and Agathonissos Finance LLC (collectively, the "Debtors") under chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  Bkr. Dkt. 1 (Involuntary Petition).  On September 25, 2023, the Debtors' cases were voluntarily converted, at the Debtors' request, to cases under chapter 11 of the Bankruptcy Code.  Bkr. Dkt. 215.  On October 25, 2024, the Bankruptcy Court entered an opinion and order (the "Confirmation Opinion") confirming the chapter 11 plan (the "Plan") of the Petitioning Creditors.  Bkr. Dkt. 1212.  On November 4, 2024, the Bankruptcy Court entered an order (the "Confirmation Order") with its findings of fact and conclusions of law confirming the Plan and overruling the objections of the Debtors' and its former shareholders.  Bkr. Dkt. 1223 (Confirmation Order); Bkr. Dkt. 1132, Ex. 1 (Plan).  On November 7, 2024, the Debtors appealed the Confirmation Opinion (Bkr. Dkt. 1233) but *never* appealed or sought a stay of the Confirmation Order (Dkt. No. 270, at 52:6-14).

On November 19, 2024 (the "Effective Date"), the Plan went effective.  Bkr. Dkt. 1258, at 2.  On the Effective Date, (1) existing ownership's equity interests were extinguished, new equity was issued to applicable creditors under the Plan and the remaining creditors were paid in cash (Bkr. Dkt. 1132, Ex. 1 (Plan) §§ 3.3(i), 5.4); (2) the Plan replaced existing management and governance documents with new agreements (*id.* §§ 5.10(c), 5.20, 9.1(i)); and (3) the Plan terminated retention of Holdings' professionals (*id.* §§ 2.5(a), 10.6).

### F.    Documents on Eletson Server Confirm that the Option Lapsed and No Transfer to the Intervenors Occurred

After the Effective Date, Eletson's new management assumed control over this litigation and retained Goulston & Storrs ("Goulston") to replace Reed Smith as counsel.  Dkt. No. 216; Dkt. No. 270, at 106:10-115:8, 119:2-120:19.  New management and Goulston immediately commenced working to obtain all property belonging to the estate, while the Former Directors and Reed Smith obstructed those efforts by proclaiming to customers, lenders and business partners that the bankruptcy reorganization was a nullity and that the Former Directors remained in control of company operations.  In this case, Reed Smith refused to recognize Goulston as new counsel or turn over its client file to Eletson.  After Eletson secured access to its email server through an order of the Bankruptcy Court (Bkr. Dkt. 1691 (Microsoft Order), at 2-3), it then understood the motives behind Reed Smith's obstinacy.  The documents in the email server reveal that the Former Directors and Reed Smith manufactured a case theory in the Arbitration that they knew was false and perpetuated a fraud by withholding from production documents that contradict their perjured testimony.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ ██████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

Despite knowing that the Option had lapsed, the Former Directors testified in depositions and through affidavits and written arbitration testimony that the Option was timely exercised on March 11, 2022.  This, however, was not true.

And, after the filing of the bankruptcy petition, a new challenge arose.  As the Former Directors and Reed Smith were well aware, upon any exercise of the Option, Eletson Gas would obtain the Preferred Shares and, as a result, the Preferred Shares would be either redeemed or canceled ████████████████████████████████████████████

████████████████████████████████████████████████████

████████.  Louis Solomon of Reed Smith ("Solomon") recognized that cancellation of the Preferred Shares would be harmful to the Former Directors, as cancellation of the Preferred Shares would result in Holdings owning 100% of Eletson Gas, and Solomon foresaw that the Former Directors were likely to lose control of Holdings upon its chapter 11 reorganization.[5]

---

[4] ████████████████████████████████████████████
████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██
[5] ███████████████████████████████████████
██████████████████████████
███████████████████████████████████
████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

To attempt to address the defects in Eletson's position vis-à-vis the Option exercise in light of the bankruptcy filing, Reed Smith fabricated a new theory to move the Preferred Shares out of the Eletson estate. Reed Smith perverted a single word in the BOL—"nominee"—into a blanket right to move the Preferred Shares out of the bankruptcy estate and into the hands of its real clients—the Former Directors—all of whom owed duties to Holdings, Gas and the creditors.[6]

Accordingly, Reed Smith asked its clients to "[find] the documents" that support this novel theory; conveniently, Reed Smith then claimed that the Former Directors already "transferred [the

_____

████████████████████████████████████████████████████████

██████████████████████████████████████████████

[6] Moreover, this theory is inconsistent with the typical meaning of "nominee" under English law (which governs the BOL). *See, e.g.*, Thomson Reuters, Practical Law UK, Glossary, Nominee, https://uk.practicallaw.thomsonreuters.com/4-382-5718 (last visited Aug. 14, 2025) (defining nominee as "[a] person in whose name assets (for example, a nominee shareholder of company shares) are held, but who does not have any beneficial entitlement to those assets."); *id.* ("A nominee is a mere agent of the person who appoints them.").

Preferred Shares] to the nominees."  Furey Decl. Ex. 14, at 153:11-19 ("*[T]hat's when we said,*

*well, wait a minute, I went back to my client and it [i.e., the BOL] says these nominees, why*

*don't we just transfer it to the nominees* and they said, we don't have to, we have already done it.

Not something we knew about.  *We then went and found the documents*.") (emphasis added); *see*

*also* Furey Decl. Ex. 6, at 397:19-22 ("Q. … And the first time you learned that there had been

this nomination was in April of 2023?  A. On or about April of 2023.").  Shortly thereafter, at

Solomon's request, handwritten documents showing a transfer suddenly appear.

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

    At his deposition, VK could not speak to the origin of any of the Five Nomination

Documents.  Furey Decl. Ex. 3, at 519:12-530:14.  When asked specifically about another one of

the Five Nomination Documents—a typed letter (in Greek) purportedly from VK's sister, Irina, to

their mother (the "Mum Letter")—VK could not recall how or when he first saw the document,

*Id.* at 530:3-10, nor could he think of a single typed letter like this that his sister ever sent to his

mother, to him, or to anyone.  *Id.* at 536:5-25; Furey Decl. Ex. 9 (Mum Letter with translation,

Arb. Ex. C-00789).[7]

---

[7] Moreover, the metadata produced for the Mum Letter (or its English translation) does not identify Irina as the "author" of the document.  *See* Furey Decl. Ex. 10 (showing no author for Mum Letter and "Argyro Iliopoulou" as

The Intervenors also "found" handwritten notes of family meetings in August and October of 2022, written by Andreoulakis, a former in-house Eletson lawyer and shareholder of Keros Shipping Corporation (a former minority shareholder), which purportedly support their nomination argument and were two of the Five Nomination Documents.  Furey Decl. Ex. 11 (August 2022 meeting notes, Arb. Ex. C-00786); Furey Decl. Ex. 12 (October 2022 meeting notes, Arb. Ex. C-00790); Dkt. No. 67-50, at ¶¶ 425-26 (Eletson's Arbitration Post-Hearing Brief discussing the August and October 2022 meeting notes).[8]  Yet a few months *after* the alleged family meeting in October 2022, when asked to provide corporate ownership information as part of a regulatory KYC exercise, that same in-house lawyer certified that *Holdings* owned 100% of Eletson Gas.  Furey Decl. Ex. 13, at 2-3, 8.  The certification—which makes no mention of the Intervenors—was not produced in the Arbitration.

Furthermore, the Former Directors *never* stated to *anyone* outside the family that the Intervenors held the Preferred Shares.[9]  Even Eletson's CFO (Peter Kanelos) and in-house counsel (Andreoulakis) were not aware of this purported nomination (notwithstanding that Andreoulakis was the purported note-taker at the August and October 2022 "family meetings").  Marina

---

[8] author of English translation).  When VK was asked about this metadata at his deposition, VK could not identify or explain the mystery "author" of the Mum Letter translation.  Furey Decl. Ex. 3, at 533:17-534:3.

[8] This self-serving approach was consistent with Eletson's entire collection process.  ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████

[9] At his deposition, VK testified that, at least as of November 2022, the only people who knew about the nomination in favor of the Intervenors were his family members (Furey Decl. Ex. 3, at 286:11-287:25) and, moreover, that the nominees still "hadn't been disclosed to the outside world" as of February 7, 2023 (*id.* at 319:22-320:11).  He also testified that the family did not even inform Reed Smith of the purported nomination until April 2023 (*id.* at 321:11-322:8), right before making the argument for the first time in the Arbitration in May 2023.  Solomon confirmed the same at his deposition.  Furey Decl. Ex. 6, at 397:19-22 ("Q. … And the first time you learned that there had been this nomination was in April of 2023?  A. On or about April of 2023.").

Orfanoudaki, corporate controller of Eletson Corp., testified at her deposition that she had a conversation with VH in or about April 2022 in which VH allegedly told her of the nominees, but that VH refused to identify the names of the nominees.  Furey Decl. Ex. 21, at 118:4-119-4. Orfanoudaki testified that, despite serving as corporate controller of Eletson Corp., she did not need to know what entities owned the Preferred Shares of Eletson Gas.  *Id.* at 119:14-24.

Moreover, there is reason to doubt Orfanoudaki's credibility.  Although she testified at her deposition that (i) she resigned from Eletson Corp. in October 2024, (ii) she has no ongoing responsibilities for Eletson Corp. or for any Eletson entity after October 2024, and (iii) she has not used and no longer has access to her Eletson.com email account since October 2024, *id.* at 195:14-202:15, documents located on Eletson's server contradict these claims.  Since January 1, 2025, Orfanoudaki's name and Eletson.com email address (marina.orfanoudaki@eletson.com) appears in ***over 150 emails*** as a sender or recipient, including emails to/from third parties.  Furey Decl. ¶ 36; *see also* Furey Decl. Ex. 22, at 2 (email dated January 10, 2025 from Orfanoudaki to P. Sathiskumar at Zodiac-Maritime); Furey Decl. Ex. 23, at 2 (email dated March 20, 2025 from Orfanoudaki to VK); Furey Decl. Ex. 24, at 2 (email dated April 4, 2025 from Orfanoudaki to the Eletson Human Resources Department and others with the NAK Insurance company); Furey Decl. Ex. 25, at 2 (email dated May 22, 2025 from Orfanoudaki to VH, VK and LK).  Incredibly, Orfanoudaki claimed that she did not send *any* of these emails or authorize anyone to send them under her name.  Furey Decl. Ex. 21, at 205:16-206:2.  These emails, however, suggest that Orfanoudaki continues to work for the Former Directors (which may disqualify her from certain leave benefits that she is receiving from the Greek government) and was not truthful in her deposition.

In sum, the nominee argument cannot be seen as anything other than an eleventh hour end-around the Bankruptcy Case at Holdings' and Eletson Gas' expense.  Reed Smith admitted as much during the Arbitration.  At the Arbitration hearing on May 16, 2023, Solomon expressed concern that the outcome of the bankruptcy reorganization could render the Award "nugatory." *See, e.g.*, Furey Decl. Ex. 14, at 6:24-7:6 (advocating for "how we might structure the relief here so that it's effective so that we don't wind up going through all this … and then Levona and its affiliates will render it nugatory"); *id.* at 153:3-10 ("[E]ven if we win in this proceeding, they're going to take that asset and … it goes back into Holdings and so, lo and behold, the bankruptcy allows them to take it.").  At his deposition in this action, VK confirmed the same sentiment.  *See* Furey Decl. Ex. 3, at 330:5-23 (testifying that "the bankruptcy side of [Murchinson's] litigation strategy" became "very clear" and "so it was…becoming clear to us that even if…the claim was awarded…the bankruptcy strategy…would have that award actually go to Holdings from Gas" and "[s]o it was very important for us to establish that the party that…stood to lose was …the owners of the preferreds").

As a result, Reed Smith sought to structure the Award such that the Preferred Shares and damages would be awarded to the Intervenors instead of Eletson, apparently without any consideration to Eletson.  Furey Decl. Ex. 3, at 337:6-21 (███████████████████████ ███████████████████████████████████████████).

### G.    Documents Withheld from the Arbitration Also Confirm that the Option Lapsed and No Transfer of Preferred Shares Occurred

In addition to the emails on Eletson's server, documents obtained in discovery in the Bankruptcy Case and in this case (but *not* produced in the Arbitration) also evidence that the Option was not exercised for the Intervenors.

13

First, several documents dated from March through at least August 2022 reveal that long after March 11, 2022 (the purported exercise date), the Former Directors and/or their counsel repeatedly and publicly proclaimed to third parties—including banks and potential investors—that *Levona* still held the Preferred Shares.  *See, e.g.*, Furey Decl. Ex. 15, at 2, 7 (email dated March 31, 2022 from VH to George Dermatis, a broker at Intermodal Group, attaching a slide deck seeking investment for a "shareholder buy-out"); Furey Decl. Ex. 16, at 3-4 (email dated April 7, 2022 from VH to Dermatis indicating "Murchinson's preferred stake of 40.5%" in responding to a request to "list all stakeholders involved" in Eletson Gas); Furey Decl. Ex. 17, at 2, 6 (email dated April 8, 2022 from Elena Vandorou, in house counsel at Eletson, to Robin Parry of Ince & Co., counsel to Oaktree Capital, a financier of Gas, attaching a "Unanimous Written Consent" of the Eletson Gas board listing six Eletson Gas board members, four of which were Mark Lichtenstein, Adam Spears, Johsua Fenttiman, and Eliyahu Hassett, who were the Levona designees on the Eletson Gas board); Furey Decl. Ex. 18, at 3, 5 (email dated April 13, 2025 from Vandorou to Jon Baker of Oaktree Capital, attaching an updated organizational chart "certified" by Vandorou on April 13, 2022, showing that as of April 13, 2022, Levona still owned 40.40% of Eletson Gas); Furey Decl. Ex. 19, at 2, 4 (email dated July 25, 2022 from Peter Kanelos, Eletson's CFO, to Martin Hugger of Meerbaum solutions, an advisor to Oaktree, copying VK, with the subject "Oaktree/Meerbaum $10m Credit Facility," and attaching an "EG model" which discusses a prospective "Murchinson buyout"); Dkt. No. 137-1, at 2-3, 5 (email dated August 18, 2022 from Kanelos to Jay Goodgal of Castalia Partners, copying VK and Anselm Gehling of Austen Grove Capital, describing a transaction for which Eletson was seeking to obtain financing, particularly "capital raising for Eletson Gas LLC," and mentioning, *inter alia*, "Murchinson's Exit Payment"); Furey Decl. Ex. 20, at 2-4 (email dated January 15, 2023 from Martin Hugger to VK with subject

"take out proposal" attaching "indicative proposal of a lease financing" for stated "purpose" of "redeem[ing] preferred capital held by Levona," which VK then forwarded to LK and VH).

The Former Directors sent at least several of these documents[10] to Reed Smith but, for whatever reason, the documents were not produced in the Arbitration despite their obvious relevance to the proceeding.  *See* Furey Decl. Ex. 4, Tab C, at 26, 28, 30-33, 35-60; *see also* Furey Decl. Ex. 30, at 2, 13; Furey Decl. Ex. 31, at 2, 4.

Then, well into the Arbitration when the Former Directors had cemented their case theory that the Option was timely exercised, the Former Directors began representing to the outside world that *Eletson* held the Preferred Shares.  The Former Directors and/or their counsel still made no mention of the Intervenors (either by name or description as "nominees") in any of these communications.

For instance, on November 7, 2022, Elena Vandorou (in-house counsel at Eletson) emailed Margarita Lagarou (an employee of ABN AMRO Bank), copying Kanelos, Dimitris Stamos, and Elena Tzarouchi of Eletson, apparently seeking to open a bank account for Eletson.  Furey Decl. Ex. 13, at 2.  In response to a request from Lagarou for "[i]nformation/documentation about Levona Holdings Ltd.," Vandorou attached a "revised chart of Eletson Gas LLC where Levona is not a shareholder."  *Id.* at 2-3.  The attached organizational chart—dated, signed, and certified as being "complete, valid and up to date" by Emmanouil Andreoulakis, Eletson in-house counsel, on November 7, 2022—shows Holdings as the sole owner of Eletson Gas as of that date.  *Id.* at 8.

When asked at his deposition about this November organizational chart, VK testified that it was "clearly erroneous…[b]ecause Holdings [was] not the…sole shareholder of Gas."  Furey

---

[10] Upon gaining access to the Eletson server, Eletson discovered that the unified audit logging feature was turned off, making it impossible to assess what documents the Former Directors had already deleted from the system.  *See* Furey Decl. at ¶ 8.  As a result, Eletson cannot determine whether it has access to all relevant documents.

Decl. Ex. 3, at 300:2-9; *but see* Furey Decl. Ex. 1, at ¶ 9 (VK October 25, 2022 affidavit from the Arbitration stating that "[a]s of March 11, 2022, Eletson Holdings became the sole unit holder of [Gas].").  When asked whether he would have signed this organizational chart, VK said he would have "[n]ot signed it" "[be]cause it's erroneous" and claimed that "if [he] had seen it, [he] would have corrected it."  Furey Decl. Ex. 3, at 303:19-24, 305:6-9.  Yet just one month later, VK signed an organizational chart containing the same information (omitting any mention of the Intervenors).  Specifically, on December 5, 2022, Vandorou emailed Marcel Hansemann of Berenberg Bank attaching an updated organizational chart of Eletson Gas.  Furey Decl. Ex. 26, at 3.  The chart, dated December 2, 2022, reflected Holdings as the sole owner of Eletson Gas as of December 2, 2022, signed by VK and LK underneath a sentence reading "[w]e hereby confirm that the above is complete, valid and up to date."  *Id*. at 12.  VK testified at his deposition that he "shouldn't have signed" this document and referred to it as "[c]learly erroneous."  Furey Decl. Ex. 3, at 308:6-11.  Notably, VK and LK again signed another similar chart on December 13, 2022, which also showed Holdings as the sole owner of Eletson Gas as of that date.  Furey Decl. Ex. 27, at 20.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.  At his deposition, VK confirmed that he "had reviewed this [slide deck] before."  Furey Decl. Ex. 3, at 318:9-20.  When asked about the bullet, VK testified that "Holdings…includes affiliates" and "the nominees at that point…which hadn't been disclosed to the outside world were affiliates."  *Id.* at 319:22-320:11.  VK went on to concede that that the slide deck "doesn't say affiliates anywhere."  *Id.* at 320:12-17.

Despite their obvious relevance to a central issue in the Arbitration (*i.e.*, whether Eletson Gas or its nominee timely exercised the Option in accordance with the BOL), Eletson did not produce these undisputedly nonprivileged documents. When Levona raised the issue of withheld documents in the Arbitration and before this Court, the Former Directors and Reed Smith adamantly rebuffed their relevance. It was not until the Bankruptcy Court allowed Levona to move to compel the documents that Reed Smith took note, ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ Reed Smith had previously characterized to the Arbitrator as "[not] anything important" and a mere "tactic designed to distract." Dkt. No. 485-19, at 2.

## III.    ARGUMENT

### A.    Standard for Vacatur on the Basis of Fraud

The Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), "provides the exclusive, and limited, authority for federal court review of an arbitral award." *Arrowood Indem. Co. v. Trustmark Ins. Co.*, 938 F. Supp. 2d 267, 272 (D. Conn. 2013), *aff'd*, 560 F. App'x 75 (2d Cir. 2014). Despite the deference generally afforded to arbitration awards, decisions made by arbitrators are "not totally impervious to judicial review." *Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007). The FAA provides that a District Court may vacate an arbitration award for four reasons, including "where the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). A petitioner seeking to vacate an award on the basis of fraud must show that: "(1) respondent engaged in fraudulent activity; (2) even with the exercise of due

17

diligence, petitioner could not have discovered the fraud prior to the award issuing; and (3) the fraud materially related to an issue in the arbitration." *See Odeon Capital Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017); *see also NuVasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 878-80 (11th Cir. 2023) (applying same three-factor test to vacate arbitration award procured by fraud); *France v. Bernstein*, 43 F.4th 367, 377-78 (3d Cir. 2022) (same).

As to the first requirement—that the petitioner show the respondent engaged in fraudulent activity—fraud requires "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 142 (N.Y. 2017) (citation omitted); *see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015). "[U]nder traditional principles of agency the attorney's knowledge must be imputed to" the client. *See, e.g.*, *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994).

As to the second requirement—that the petitioner show due diligence could not have revealed the fraud—the Second Circuit has held that the petitioner must show that, "even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing." *Odeon*, 864 F.3d at 196.

As to the third requirement—the materiality requirement—the Second Circuit has held that, "[f]or fraud to be material within the meaning of Section 10(a)(1) of the FAA, [a] petitioner must demonstrate a nexus between the alleged fraud and the decision made by the arbitrators, although [the] petitioner need not demonstrate that the arbitrators would have reached a different result." *Id.*

**B.**    **The Court Should Vacate the Arbitration Award Because it was Procured Through Fraud**

Here, the undisputed facts clearly establish that the standard for vacatur has been met. The Former Directors "engaged in fraudulent activity" by putting forth a case theory based on facts (and sworn testimony) that they knew was false and then concealing key documents in the Arbitration that demonstrate that this theory and their testimony was false.

Specifically, the Former Directors and Reed Smith knew that the option had lapsed and that the "nomination" was a complete fiction contrived at eleventh hour of the Arbitration in a deliberate effort by the Former Directors to deceive the Arbitrator and avoid the consequences of the chapter 11 bankruptcy reorganization. Not until Eletson obtained new management and counsel after the Chapter 11 reorganization did it discover the fraud perpetuated by the Former Directors and their former counsel. And there can be no doubt that the fraud the Former Directors committed in the Arbitration concerning the purported nomination of the Preferred Shares "materially related to an issue in the arbitration." Accordingly, this Court should vacate the Arbitration Award.

Indeed, this case does not merely present an issue of ordinary nondisclosure but instead presents a party's wholesale fabrication of theories—the "nomination" theory aimed at evading bankruptcy law and "the option exercise theory" asserted despite knowing that the Option had lapsed. This is not a case where an arbitrator simply heard conflicting testimony and made a credibility determination. This is a case where the Arbitrator was deceived, never having the chance to weigh the truth, because the Former Directors and Reed Smith concealed critical documents and presented perjurious testimony. *See e.g., France,* 43 F.4th at 378-80.

*i.    The Former Directors Committed Fraud*

Documents not produced in the Arbitration and documents found on the Eletson server show that (i) the Option had lapsed and, (ii) even if it were exercised (which it was not), it was not exercised for the benefit of the Intervenors.  As described in Section II above, the documents reveal at least nine instances over the course of March 31, 2022 to February 7, 2023—all *after* the date on which the Former Directors purport the exercise and transfer occurred—in which the Former Directors identified either Murchinson/Levona or Holdings as the holder of the Preferred Shares in communications with third parties, with no mention of the Intervenors at all.

For example, these documents show that the Former Directors sent organizational charts to banks and financial advisors involved in the Eletson Gas transaction in April 2022 (prior to the dispute) evidencing that Levona held the Preferred Shares.  Furey Decl. Ex. 18, at 5.  Other documents from the Spring and Summer of 2022 show the Former Directors referring to Murchinson or Levona as still holding the Preferred Shares and exchanging information concerning a prospective buyout.  *See e.g.,* Furey Decl. Ex. 15, at 2, 4, 6; Furey Decl. Ex. 16, at 3-4; Furey Decl. Ex. 18, at 3-5; Dkt. No. 137-1, at 3-4.  Then, after November 2022 while the arbitration was underway, newly discovered documents show Holdings as the sole owner of Eletson Gas.  Furey Decl. Ex. 13, at 2-3, 8; Furey Decl. Ex. 26, at 3, 12; Furey Decl. Ex. 27, at 20; Furey Decl. Ex. 28, at 2, 4-5, 8.

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



Evidence of this nature, which demonstrates a fraudulent case theory and the withholding of contradictory documents to perpetuate that theory, amounts to fraud and has been found sufficient to support vacatur.  *See e.g., France,* 43 F.4th at 367 (granting vacatur where party "withheld important information demanded in discovery" and noting that "false representations that [the party] did not possess th[e] emails" at issue "amount[ed] to clear and convincing evidence that fraud occurred").

The Former Directors also provided perjurious arbitration testimony in support of their fabricated theory.  Indeed, the Former Directors provided written and verbal testimony under oath in the Arbitration that the Option had been timely exercised on March 11, 2022—testimony that, as described in Section II above, is contradicted by documentary evidence withheld from the Arbitrator.  *Compare, e.g.*, Furey Decl. Ex. 2, at ¶ 54 ("On March 10, 2022, Eletson confirmed to Levona that it had exercised the option – and it did so in the transaction that occurred on March 11, 2022") *and* Furey Decl. Ex. 29, at 86:22-87:13, 259:24-260:2 (LK testifying at Arbitration hearing that she "strongly believe[d]" Eletson had "exercised th[e] option" on March 11, and VK testifying the same) *with* Furey Decl. Ex. 4, Tab A, at 7, ¶ 5 (███████████ ███████████████████████████████████████████████████████████████); *id.* at 10, ¶ 6(b) (███████████ ███████████████████████████); Furey Decl. Ex. 4, Tab B, at 19, ¶¶ 7 and 8 (███████████ ██████████████████████████████████████████████████).

Moreover, beginning in May 2023, the Former Directors presented sworn statements in the Arbitration in support of their "nominee argument"—statements that, as described in Section II above, are contradicted not only by documentary evidence but also by the Former Directors' own statements and filings made earlier in the Arbitration prior to May 2023.  *Compare e.g.,* Furey Decl. Ex. 2, at ¶ 198 (VK May 15, 2023 Arbitration witness statement, stating that "the preferred interests were transferred to the Preferred Nominees effective…on or about March 11, 2022") *with* Furey Decl. Ex. 26, at 12 (organizational chart signed by VK showing Eletson Holdings Inc. as the sole owner of Eletson Gas as of December 2, 2022) *and* Furey Decl. Ex. 1, at ¶ 9 (VK October 25, 2022 Arbitration affidavit stating that "[a]s of March 11, 2022, Eletson Holdings [was] the sole unit holder of [Gas]"); *see also* Dkt. No. 67-40, at 3-4 (collecting examples of statements made during the course of the Arbitration); *id.* at 5 (mentioning that Eletson had filed an action in New York state court in April 2023 where they alleged that Gas was "a wholly-owned subsidiary of Eletson Holdings.").

In this case, the Intervenors continue to lie about the exercise of the Option and purported nomination.  *Compare e.g.,* Furey Decl. Ex. 3, at 215:25-216:11 (testifying that as of July 24, 2022, VK believed that Eletson had satisfied the conditions for exercising the Option) *with* Furey Decl. Ex. 4, Tab B, at 18, ¶ 5 (███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████); *compare* Furey Decl. Ex. 3, at 300:2-9 (testifying that a November 2022 organizational chart was "clearly erroneous…[b]ecause Holdings [was] not the…sole shareholder of Gas") *with* Furey Decl. Ex. 1, at ¶ 9 (VK October 25, 2022 affidavit from the Arbitration stating that "[a]s of March 11, 2022, Eletson Holdings [was] the sole unit holder of [Gas]").

The submission of perjurious testimony alone has been found sufficient to support vacatur on the basis of fraud. *See, e.g.*, *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (vacating arbitration award because claimant's expert committed perjury in arbitration hearing); *see also France,* 43 F.4th at 378-79 (granting vacatur where party, *inter alia*, "lied under oath"). Accordingly, the evidence in this case makes it "abundantly clear" that the Former Directors procured the Award through fraud in the Arbitration.

### ii.    *Eletson Acted Diligently in Seeking to Discover the Former Directors' Fraud*

Since the Effective Date, Eletson has worked diligently to obtain its property, including the client files held by former counsel. Eletson's new counsel immediately sought turnover of the Eletson client file from Reed Smith, including by filing a motion to compel turnover of said documents from Reed Smith. Dkt. Nos. 242-43. This Court granted that motion on February 14, 2025, ordering the prompt production of the client file and logging of any documents withheld on the basis of any purported privilege. Dkt. No. 270, at 106:10-115:8, 119:2-120:19. Rather than comply with this Court's order, Reed Smith appealed the turnover order (Dkt. No. 272) and has, to date, failed to produce anything from the client file outside of the documents produced in response to Levona's subpoena.[11] In sum, the Former Directors and their counsel have obstructed Eletson's efforts to obtain Eletson's own property, including its client files. The persistent obstruction must not be rewarded.

---

[11] Documents produced by Reed Smith do not include any internal correspondence between Reed Smith attorneys, any billing statements, any internal Reed Smith work product prepared in connection with the Arbitration, or any relevant documents that do not "hit" on certain search terms.

### iii.    The Fraud *"Materially Related to an Issue in the Arbitration"*

Finally, it is beyond dispute that the fraud committed by the Former Directors "materially related to an issue in the [A]rbitration."  As detailed above, their fraud tainted the entirety of the Arbitration proceeding, and certainly "related" to the key issue in the case (*i.e.*, whether the Option was exercised for the benefit of the Intervenors).  As a direct result of this fraud, the Award was issued in the Intervenors' favor at the eleventh hour, resulting in an improper award to the Intervenors of both the Preferred Shares and money damages.  Dkt. No. 67-58, at 96-97, 100-01.

## IV.    <u>CONCLUSION</u>

Accordingly, the Court should (i) vacate the Award, (ii) enter a factual finding that the purported nomination of Intervenors to receive the Preferred Shares was fraudulent and never occurred, and (iii) enter such other and further relief as is just.


Dated: August 20, 2025

*/s/ Jennifer B. Furey*
Jennifer B. Furey (admitted *pro hac vice*)
Nathaniel R.B. Koslof (admitted *pro hac vice*)
GOULSTON & STORRS PC
One Post Office Square
Boston, MA 02109
jfurey@goulstonstorrs.com
nkoslof@goulstonstorrs.com
Tel: (617) 574-3575

Nicholas Cutaia
Jaclyn Grodin
GOULSTON & STORRS PC
730 Third Avenue, 12th Floor
New York, New York 10022
ncutaia@goulstonstorrs.com
jgrodin@goulstonstorrs.com
Tel: (212) 878-5065

*Attorneys for Eletson Holdings Inc.*
*and Eletson Corporation*

## <u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1(c)</u>

I, Jennifer B. Furey, certify that the foregoing Memorandum contains fewer than 8,750 words.  According to the word processing program used to prepare this Memorandum, it contains 8,253 words.

*/s/ Jennifer B. Furey*
Jennifer B. Furey

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer B. Furey, certify that on August 20, 2025, I caused the foregoing Memorandum to be filed with the Clerk of the Court and served on all counsel of record by electronic delivery via the ECF system.

*/s/ Jennifer B. Furey*

Jennifer B. Furey
