**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELETSON HOLDINGS, INC. and ELETSON CORP.,<br><br>       Cross-Respondents,<br><br>       v.<br><br>LEVONA HOLDINGS, LTD.,<br><br>       Cross-Petitioner,<br><br>       and<br><br>APARGO LIMITED, FENTALON LIMITED, and DESIMUSCO TRADING LIMITED,<br><br>       Intervenors. | Civ. No. 23-cv-07331 (LJL) |

**LEVONA'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF AMENDED CROSS-PETITION TO VACATE ARBITRAL AWARD**

## TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................................... 1

I. THE CRIME-FRAUD DOCUMENTS CONFIRM THAT ELETSON LIED ABOUT THE EXERCISE OF THE BUYOUT OPTION AND THE PURPORTED NOMINATION ................................................................................................................ 1

II. THE CRIME-FRAUD DOCUMENTS CONFIRM THAT ELETSON LIED ABOUT THE WITHHELD JULY 25 EMAIL AND KNOWINGLY CONCEALED EVIDENCE IT SHOULD HAVE PRODUCED ................................................................ 6

CONCLUSION ......................................................................................................................... 10

## TABLE OF AUTHORITIES

Page

### Cases

*Charette v. Town of Oyster Bay*,
   159 F.3d 749 (2d Cir. 1998) ............................................................................................. 9

*D.H. Blair & Co. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006) ............................................................................................... 9

*Filetech S.A. v. France Telecom S.A.*,
   304 F.3d 180 (2d Cir. 2002) ............................................................................................. 9

*Funk v. Belneftkhim*,
   739 F. App'x 674 (2d Cir. 2018) ...................................................................................... 9

*Kosher Sports, Inc. v. Queens Ballpark Co., LLC*,
   2011 WL 3471508 (E.D.N.Y. Aug. 5, 2011) ................................................................... 8

*In re Lightfoot*,
   217 F.3d 914 (7th Cir. 2000) ............................................................................................ 8

*Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*,
   23 F.3d 41 (2d Cir. 1994) ................................................................................................. 9

*In re Reyes*,
   651 B.R. 99 (Bankr. S.D.N.Y. 2023) ................................................................................ 8

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*,
   328 F.R.D. 100 (S.D.N.Y. 2018) ...................................................................................... 8

*Travel Sentry, Inc. v. Tropp*,
   669 F. Supp. 2d 279 (E.D.N.Y. 2009) .............................................................................. 8

### Other Authorities

F.R.C.P. 43(c) ........................................................................................................................ 9

8 Moore's Federal Practice – Civil § 43.05 (2025) ............................................................... 9

N.Y. R. Prof. Cond. 3.3(a)(1) ................................................................................................ 8

N.Y. R. Prof. Cond. 3.4(a)(5) ................................................................................................ 4

Rule 801(d)(2)(E) .................................................................................................................. 7

Pursuant to the Court's direction during the December 9, 2025 hearing in this matter, Levona submits this supplemental memorandum in support of its amended vacatur petition. Although the existing record is sufficient to support vacatur, Reed Smith recently produced documents, as required by this Court's rulings on Levona's crime-fraud motion (ECFs 606, 652, 657), which further confirm that conclusion. Several of those documents (the "Crime-Fraud Documents"), which were unavailable to Levona at the time of its prior briefing, are discussed below.

## ARGUMENT

**I.   THE CRIME-FRAUD DOCUMENTS CONFIRM THAT ELETSON LIED ABOUT THE EXERCISE OF THE BUYOUT OPTION AND THE PURPORTED NOMINATION**

The award by its terms is based on facts and evidence proffered by Eletson. ***First***, in finding it "more likely than not" that Eletson had "effectively" exercised the Buyout Option, the arbitrator (i) relied on Eletson principals' testimony that they had believed, on March 11, 2022, that they had exercised the Buyout Option, ECF 67-58 at 43-44, and (ii) rejected Levona's argument that the July 13, 2022 "Murchinson Buyout Steps" email was a "smoking gun," *id.* at 45-46 n.6. Indeed, contrary to the text of the July 13 email, the arbitrator credited Eletson's testimony that the email had "created fury and confusion" at Eletson, that it "can be viewed as an attempt to 'move forward' with the original transaction after Levona refused to follow-through with the exercise of the BOL," and that it was "at most, [] an inaccurate checklist of items needed to complete Levona's exit … pursuant to the terms of the BOL." *Id.*

***Second***, as to the nomination, the arbitrator relied on Eletson principals' testimony that "from January 2022," at the latest, "the three principal families … discussed and later agreed to nominate [Intervenors] … to acquire Levona's shares in the Company following the buyout for consideration." ECF 551-4 ¶ 104 (Hadjieleftheriadis statement); *see also* ECF 551-2 ¶ 194

(similar Kertsikoff testimony); ECF 67-58 at 28-31 (discussing the three principals' arbitration testimony on the purported transfer).

Several Crime-Fraud Documents illustrate Eletson and Reed Smith's real-time invention of the foregoing "facts":

**Ex. 1 (REED SMITH (23-7331) 0160591).** The first Crime-Fraud Document is a March 22, 2023 email from Louis Solomon to various individuals, including the three Eletson principals and several lawyers at the Timagenis law firm. In that email, sent just fifteen days after the bankruptcy petition was filed, Solomon emailed Eletson explaining that an exercise of the Buyout Option in favor of Holdings—as Eletson had until then consistently argued had occurred—would trigger the cancellation of the preferred shares and leave Holdings (and hence its creditors), as the sole owner of Gas. Such an outcome ought to have been acceptable to Reed Smith, which was counsel to Holdings in the arbitration and the bankruptcy. However, reflecting Reed Smith's actual loyalties to Eletson's principals, Solomon noted that a "'nominee' argument" (internal quotation mark in original) would evade the consequences of Holdings' bankruptcy. *See id.* at 3 (explaining "any argument that redemption should not lead to cancellation is likely weak" but that "we do not need to win that argument if the 'nominee' argument wins"); *see id.* at 2 (telling colleague a nomination is "our very best option at this point"). Although Solomon's later statements and testimony indicate that he was unaware of facts supporting the existence of a nomination when writing that message, *see* ECF 51-33, at 6 (Solomon explaining that he asked clients "why don't we just transfer it to the nominees," who replied they "have already done it"); ECF 551-62 (Solomon Tr.), at 397:19-22 (testifying same conversation took place in April 2023), he told his clients that they would discuss the issue further and "need[ed] to make sure our testimony is consistent with the facts." Ex. 1 (REED SMITH (23-7331) 0160591), at 2; *see also* Ex. 2 (REED

2

SMITH (23-7331) 0160484) (Solomon to Reed Smith's arbitration team in April 2023: "[T]his [statement in draft witness statement of Eletson expert] is really very wrong and will severely hurt our client…. ***Levona's interests in the Company must be recognized to be extinguished, or were transferred to Eletson pursuant to the BOL.*** Let's not repeat that ever again.") (emphasis in original). That correspondence, which Levona does not seek to admit for its truth, is admissible including as confirmation that the purported nomination was invented by counsel in collaboration with Eletson in an intentional effort to evade the consequences of Holdings' bankruptcy.

**Ex. 3 (REED SMITH (23-7331) 0160456).** The second Crime-Fraud Document is notes of a May 8, 2023 meeting involving lawyers from Reed Smith and the Timagenis Law Firm, as well as the three Eletson principals.

Reed Smith purportedly learned about the "nomination" in April 2023, immediately identified it as an important issue potentially dispositive of Eletson principals' ability to retain control of Gas, discussed the issue with the principals at length, and received handwritten notes on April 10 purportedly evidencing the nomination having occurred more than a year earlier, before disclosing the issue in the arbitration on April 25, 2023. *See* ECF 51-33, at 6; ECF 104, at 20-21; ECF 551-57, at 9 (rows 187-189).[1] If the nomination had actually occurred, Reed Smith and Eletson surely would have discussed and understood its terms in detail by then. Nonetheless, Crime-Fraud Documents show that Reed Smith and Eletson actually had no idea about the terms

---

[1] When asked by the Court on January 2, 2024, whether "there [was] an interest in getting the preferred away from Gas" with the ongoing bankruptcy, Solomon stated that "[t]he idea that this [nomination] was somehow a late add, it was not a late add. That has been the case from the beginning." ECF 77, at 115:4-116:4. Crime-Fraud Documents demonstrate that statement to be false. In a client meeting between Reed Smith, Timagenis, and Eletson on May 3, 2023, Solomon stated, "We don't need [the nominees] as claimants, we just need the [arbitrator] to declare that the interests were transferred to them…. We are trying to sneak in the information but we can't join them as parties, it[ is] too direct." Ex. 4 (REED SMITH (23-7331) 0160492), at 8

3

of the supposed nomination as late as May 8, 2023, just a week before the arbitration hearing was set to begin.

Specifically, notes of a May 8 meeting show Reed Smith and Eletson's principals flailing to invent details about the supposed nomination, including terms as basic as who would receive the €3 million in consideration that the nominees had supposedly agreed to pay for the shares. Indeed, a lawyer present at the meeting recognized that deciding who was to receive that money was not a detail but rather "**necessary for this [nomination] to be a full valid binding agreement.**" Ex. 3, at 3 (emphasis added). Rather than ask the supposed witnesses (who were present in the meeting) to explain what had actually happened, Eletson and its lawyers instead determined what would be most advantageous to Eletson's principals in the bankruptcy and arbitration and worked backward from there. Solomon explained what he "need[ed] [his] witnesses to know": "that a nominee of Gas will get the preferred and there was negotiation with 3 companies. They must accept it as the nominee, there must be consideration." *Id.* Indeed, when asked what witnesses should say if cross-examined on this issue, Solomon did not counsel them to tell the truth but rather suggested they defer to lawyers with more knowledge about what might be necessary to make the story stick, explaining that another lawyer involved in Eletson's bankruptcy "need[ed] time to think about this." *Id.* Solomon also told his clients that all of them needed to testify "that we thought we did what we needed to" on March 11, 2022, and they "need an answer for why [Eletson] didn't act that way after March 11." *Id.* at 5; *see also* N.Y. R. Prof. Cond. 3.4(a)(5). Underscoring the bad faith of this effort, the meeting notes reflect Solomon's explanation that it was necessary to develop and present the arbitrator with a *factual* story specifically to distract from the actual contract documents. Ex. 3 (REED SMITH (23-7331) 0160456), at 6-7 (explaining that Levona would "win on the documents" and "[t]here's a reason we keep asking the judge to look at the

4

broader context…. When you look at just the documents, [Levona] ha[s] a stronger case"). This evidence is admissible including because it is probative of the truth of embedded factual assertions.

***Ex. 5 (REED SMITH (23-7331) 0160577)***.  The third Crime-Fraud document is an email exchange between several Reed Smith attorneys, including Solomon as well as partner Colin Underwood.

The effort to invent facts also infected Eletson and Reed Smith's treatment of the July 13 "Murchinson Buyout" email.  That email had been front-and-center in the arbitration from the outset, having been addressed specifically and explicitly in pleadings, in document requests, in at least one motion to compel, in depositions, in pre-hearing briefs, in witness statements, and during cross-examination during the arbitration hearing.  *See, e.g.*, ECF 67-58, at 45-46 n.6.  By that point, any true and material facts concerning the email would have been well known to Reed Smith. Nonetheless, Crime-Fraud Documents show that on June 11, 2023—***AFTER*** the close of hearing testimony and just days before closing statements—Reed Smith was still workshopping hypothetical explanations of the documents and drafts thereof.  Specifically, comparing a July 11, 2022 draft to the final July 13 email, one Reed Smith lawyer proposed certain aspects to emphasize; Solomon complained that doing so would hurt Eletson's position; and Underwood replied with an alternative approach that Solomon then said was "[a]s good a[] color of lipstick as ever there was." Ex. 5 (REED SMITH (23-7331) 0160577), at 2.  There is no suggestion that any of them actually asked the relevant witnesses to explain the truth about what the documents actually meant.  Those communications are admissible including because they show the state of mind and conduct of counsel in fabricating the story presented to the arbitrator.

## II. THE CRIME-FRAUD DOCUMENTS CONFIRM THAT ELETSON LIED ABOUT THE WITHHELD JULY 25 EMAIL AND KNOWINGLY CONCEALED EVIDENCE IT SHOULD HAVE PRODUCED

Crime-Fraud Documents also reveal the extent to which Eletson, through Reed Smith, lied about the Withheld Documents in its presentation to the arbitrator. *See* ECF 549, at 32-38. After Levona learned of the existence (but not the content) of the first withheld document, the July 25, 2022 email (ECF 551-23), and requested that it be disclosed, Solomon made multiple misrepresentations about the document to prevent that from happening. On July 13, Solomon told the arbitrator, among other things, that there was nothing "important about the document," that "[t]he document was not called for by any document request," that "it was not part of any document collection in the search for responsive documents," and that it "post-dated [Eletson's] cease and desist letter … and therefore was in general outside of the scope of discovery materials produced by either party." ECF 485-19, at 2. On July 28, Solomon doubled down, telling the arbitrator that the document was not "pertinent or material to the controversy"; that it "post-dated the initiation of this adversary process [and] was not called for by any document request"; and that Eletson had "complied fully with [its] obligations to produce responsive documents." ECF 551-84, at 3-4. The arbitrator, relying on those representations, refused to permit Levona to access the document and never ruled on Levona's reconsideration request, thereby preventing the first indication of Eletson's extensive fraud from coming to light. *See* ECF 67-52; ECF 549, at 34-38.

Crime-Fraud Documents confirm that the foregoing statements were knowingly false and/or misleading, crossing well over the line separating advocacy from misconduct:

***Ex. 6 (REED SMITH (23-7331) 0160466)***. The final Crime-Fraud Document is an email exchange involving several Reed Smith attorneys, including Solomon.

On July 9, 2023, in response to an email from Levona's counsel requesting that the July 25, 2022 email be disclosed, Solomon asked his team at Reed Smith several questions about that

6

document, including whether "[it was] called for in any doc[ument] request" in the arbitration and any "directives ending the production period at the commencement of the arbitration." Ex. 6 (REED SMITH (23-7331) 0160466), at 8-9. A Reed Smith associate responded that the document was "arguably called for" by RFP 11, "could also be covered by" RFPs 6, 9, 10, and noted the disclosure requirements under JAMS Rule 17(a) and the arbitrator's seven Procedural Orders citing the rule. *Id.* at 4-8. In an email to fellow Reed Smith counsel on July 10, a Reed Smith associate wrote, "I'm not seeing anything in Belen's orders that sets the discovery cut off as the commencement of the arbitration." Ex. 7 (REED SMITH (23-7331) 0160505), at 2.[2] And on July 11, a Reed Smith associate quoted RFPs 6, 9, 10 in an otherwise-blank email to partner Colin Underwood in the same chain with Solomon's July 9 questions. Ex. 6 (REED SMITH (23-7331) 0160466), at 2. Those statements are admissible without regard to their truth, including as relevant to Levona's claim of fraud, and for their truth as non-hearsay admissions by an agent of a party-opponent under Rule 801(d)(2)(E).

When Solomon told the arbitrator, among other things, that the document "was not called for by any document request," ECF 485-19, at 2, that it was not "important," *id.*, and that it was not "pertinent or material to the controversy," ECF 551-84, at 3, he had just been told otherwise by his own colleagues—in response to questions that he had posed to them. And Solomon also knew that the document related to a "buyout" of Levona, which was the central issue of the arbitration, as Kertsikoff later admitted in his deposition. ECF 551-1 (Kertsikoff Tr.) at 238:19-239:2. Those statements therefore fell well outside the bounds of zealous advocacy.

---

[2] That same day, in reference to the failure to produce the July 25 email, a Reed Smith restructuring and insolvency associate wrote, "My guess [regarding the first withheld document is] it's because the client search of files was – shall we say? – shaky at best …." Ex. 8 (REED SMITH (23-7331) 0160509).

New York Rule of Professional Conduct 3.3(a)(1) provides that "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal." That obligation carries special weight in discovery because "[a]s officers of the court, all attorneys conducting discovery owe the court a heightened duty of candor." *Travel Sentry, Inc. v. Tropp*, 669 F. Supp. 2d 279, 286 (E.D.N.Y. 2009). "Candor is not the state of simply not lying; candor is the quality of being open and honest in expression. An attorney cannot excuse her lack of candor by pointing out that she did not technically lie." *In re Reyes*, 651 B.R. 99, 143 (Bankr. S.D.N.Y. 2023), *aff'd*, 2023 WL 8184933 (S.D.N.Y. Nov. 25, 2023). As the Seventh Circuit has explained, "it is one thing for a lawyer to advocate an unreasonable position to a court; usually the court can prevent any serious harm to anyone just by rejecting the position. It is another thing for a lawyer to defeat an opposing party's claims by misleading the Court." *In re Lightfoot*, 217 F.3d 914, 917 (7th Cir. 2000).

But the arbitrator could not merely "reject" Reed Smith's argument about the document because neither he, nor Levona, had access to it. In a context where the tribunal necessarily had to rely on Solomon's characterization of the document, his statements that the document was not responsive, unimportant, and immaterial—despite having just been told otherwise by his colleagues—were not just materially misleading, active they are affirmative misrepresentations. "That is misconduct." *Lightfoot*, 217 F.3d at 917; *see Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 121-24 (S.D.N.Y. 2018) (holding party and counsel jointly and severally liable for sanctions based on "repeated representations to the Court" that all responsive documents were produced, which "were, at best, misleading," and observing that "failure to produce certain documents appears to have been a deliberate choice to limit the scope of discovery"); *Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, 2011 WL 3471508, at *9-10 (E.D.N.Y. Aug. 5, 2011) (sanctioning attorney who certified "misleading responses to defendant's

8

discovery demands" that "suggested complete production, provided false reassurance and effectively hid the existence of the [relevant] recording").

\* \* \*

The documentary record is clear on its face, but to the extent the Court concludes otherwise, it can resolve any disputes about their meaning by making factual findings on the present record. Although the Second Circuit has stated that courts should apply a standard "akin to [] summary judgment" when approaching vacatur petitions, *see, e.g.*, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 (2d Cir. 2006), it has never held an evidentiary hearing is required if factual disputes are identified, and Federal Rule of Civil Procedure 43(c) expressly provides that a court may resolve factual disputes needed to decide a motion without hearing testimony.  *See* 8 Moore's Federal Practice – Civil § 43.05 (2025) (non-exclusive list of fifteen types of motions in which courts resolve factual disputes without a hearing); *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46 (2d Cir. 1994) (court properly decided merits of vacatur petition "based solely on the papers submitted by the parties in support of their motions"); *see also Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (district court could resolve factual disputes relating to sovereign immunity on the papers); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (no evidentiary hearing required on preliminary injunction "when the disputed facts are amenable to complete resolution on the paper record").  Further, in resolving any disputes it may identify, the Court may consider the preclusive and adverse inference sanctions that Levona has requested be imposed for Intervenors' willful discovery misconduct, ECF 565. *See Funk v. Belneftkhim*, 739 F. App'x 674, 678-79 (2d Cir. 2018) (district court was permitted to impose preclusive and adverse inference sanctions to resolve factual disputes relating to assertion of qualified immunity).

## CONCLUSION

The Award should be vacated pursuant to Levona's proposed judgment (ECF 562).

DATED: December 15, 2025    QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Isaac Nesser*
Isaac Nesser
William B. Adams
Daniel M. Kelly
Michael A. Wittmann
295 Fifth Avenue
New York, NY 10016
Tel: 212-849-7253
isaacnesser@quinnemanuel.com
williamadams@quinnemanuel.com
danielkelly@quinnemanuel.com
michaelwittmann@quinnemanuel.com

Matthew Scheck
Matthew Roznovak (admitted *pro hac vice*)
Alexander Van Dyke (admitted *pro hac vice*)
300 W. 6th Street
Austin, TX 78701
Tel: 737-667-6100
matthewscheck@quinnemanuel.com
matthewroznovak@quinnemanuel.com
alexvandyke@quinnemanuel.com

*Attorneys for Cross-Petitioner Levona Holdings, Ltd.*