UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/12/2026
```

------------------------------------------------------------------------X
                                                         :

ELETSON HOLDINGS, INC. and ELETSON CORP.,       :

                       Cross-Respondents,       :

                                         :            23-cv-7331 (LJL)

     v.                               :

                                       :        OPINION AND ORDER

LEVONA HOLDINGS, LTD.                   :

                       Cross Petitioner,       :

                                       :

     and                             :

APARGO LIMITED, FENTALON LIMITED, and    :
DESIMUSCO TRADING LIMITED,          :

                       Intervenors.         :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Respondent Levona Holdings Ltd., joined by Eletson Holdings, Inc., has moved to vacate the arbitral award granted in favor of Eletson Holdings in 2023. The motion to vacate is opposed by Apargo Ltd., Desimusco Ltd., and Fentalon Ltd., Intervenors and beneficiaries of the award. Levona moves also for sanctions against Intervenors for discovery violations committed with respect to the present action. For the following reasons, the motion for sanctions is granted and the motion to vacate the award is granted.

## BACKGROUND

The history of this dispute is lengthy and complex. Much of it is detailed in this Court's opinion in *Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, 731 F. Supp. 3d 531 (S.D.N.Y. 2024) (hereinafter, *Eletson I*). The Court will again lay out the relevant background for the purposes of the motion to vacate the arbitral award.

## I.     A Brief History of the Relevant Parties and Agreements

This long-running dispute revolves around the corporate control of non-party Eletson Gas LLC ("Eletson Gas").  Eletson Gas was formed in 2013 under the laws of the Republic of the Marshall Islands as a limited liability company specializing in the transport of liquified petroleum gas ("LPG").  Dkt. No. 67-58 at 5 (the "Final Award").[1]  Eletson Gas was formed in part by Eletson Holdings ("Holdings"), a corporation formed under the laws of Liberia. Together with Eletson Corporation ("Eletson Corp"), which provides management services for the vessels owned by Eletson Gas, the companies make up the business known as "Eletson."  *Id.* Eletson was "a privately-held family business" in the field of "international shipping," "specifically the financing, leasing, chartering, operation, and management of oil and gas tanker vessels."  Dkt. No. 131 ¶ 6.

Three cousins stand at the center of the disputes involving Eletson: Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, and Laskarina Karastamati.  Kertsikoff served as the chairman, president, and director of Eletson Gas, and as the director of Family Unity Trust Co. ("Family Unity").  Hadjieleftheriadis was the vice president, treasurer, and a director of Holdings and Eletson Corp., and a director at Glafkos Trust Co. ("Glafkos").  And Karastamati was a director of Eletson Gas, president and a director of Holdings and Eletson Corp., and director of Lassia Investment Company ("Lassia").  *See In re Eletson Holdings Inc., et al.*, No. 23-10322 (Bankr. S.D.N.Y. filed March 7, 2023), Bankr. Dkt. No. 1021 ¶¶ 17, 25–26.  Family Unity, Glafkos, and Lassia (the "Former Majority Shareholders") were the controlling shareholders of Holdings, with each owning 30.7% of the common shares of Holdings.  Dkt. No. 556-13 at 8; *see* Bankr. Dkt.

---

[1] Unless otherwise indicated, pagination refers to ECF pagination.  The Final Award and any briefing is paginated using the documents internal pagination.

No. 1603 at 160.[2]  The remainder of Holdings' shares were held by Elafonissos Shipping Corp.

and Keros Shipping Corp.  Dkt. No. 556-13 at 8.

In addition, the three cousins and each of their immediate family members served as part

owners of the Intervenor Cypriot corporations: Desimusco Trading Ltd. ("Desimusco"), Fentalon

Ltd. ("Fentalon"), and Pargo Ltd. ("Apargo").  Desimusco was at the relevant time equally

owned by three individuals: Hadjieleftheriadis, his brother Konstantinos Hadjieleftheriadis, and

his sister Elani Hadjieleftheriadis.  Fentalon was owned by Karastamati and Elani Karastamati.

Apargo was owned by Kertsikoff, Konstantinos Kertsikoff, and Irini Kertsikoff.  Bankr. Dkt. No.

1021 ¶ 29.

In 2013, Holdings partnered with several funds managed by a hedge fund, Blackstone

Tactical Opportunities, to create Eletson Gas as a joint venture.  Dkt. No. 551 ¶ 17.  Holdings

contributed five medium-sized LPG vessels to the enterprise and received the common stock of

Eletson Gas.  The Blackstone funds contributed the capital for the venture and was awarded the

preferred interests ("Preferred Interests").  Dkt. No. 67-50 ¶¶ 91–93.

Several years later, Eletson and Blackstone entered the Third Amended Restated Limited

Liability Company Agreement, dated August 16, 2019.  Dkt. No. 67-2 § 12.14(a) (the "LLCA").

That agreement had several very important provisions.  As this Court has previously explained,

> The LLCA confers on the parties certain rights and obligations.  As relevant to this
> dispute, the LLCA gave the holder of the Preferred Interests the power to designate
> three of five members of the Company's Board of Directors.  Dkt. No. 67-2 § 3.3.
> Because the Board of Directors had "the sole right to manage and control the
> business, operations and affairs of the Company and to do any and all acts on behalf
> of the Company that are necessary, advisable or convenient to the discharge of its
> duties," *id.* § 3.1, the LLCA affords the holder of the Preferred Interests managerial

---

[2] *See also* Final Award at 5 ("Eletson is owned by three principal families, which are the families
of Laskarina Karastamati ('Karastamati'), Vassilis Kertsikoff ('Kertsikoff'), and Vasilis
Hadjieleftheriadis ('Hadjieleftheriadis'), each of whom hold various officer positions in the
Eletson entities.")

control over the Company.  Even so, ownership of the Preferred Interests did not guarantee total control over the Company; the LLCA requires the approval of four Directors—one more Director than the holder of the Preferred Interests has the power to select—to undertake any "Fundamental Action," including the acquisition or disposition of any vessels or any assets worth more than $1,000,000.  *Id.* § 3.2; *id.* Schedule VI.  The LLCA also gives the holder of the Preferred Interests the right to the vast majority of the profits of the Company.

*Eletson I*, 731 F. Supp. 3d at 546.  The LLCA also contained a mandatory arbitration provision.

Section 12.14(a) of the LLCA provides as follows:

Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (including the determination of the scope or applicability of this agreement to arbitrate) shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator. . . The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures.  The Federal Arbitration Act shall govern the interpretation and enforcement of such arbitration proceeding.  The arbitrator shall apply the Law of the State of Delaware and the Republic of the Marshall Islands, as the case may be, in accordance with Section 12.13.2

Arbitration was designated as the "exclusive and binding method" for resolving any such dispute between the parties.  LLCA § 12.14(b).

In November 2021, Blackstone sold its interest in Eletson Gas for three million dollars to a special purpose vehicle created by Canadian hedge fund Murchinson Ltd. ("Murchinson") named Levona Holdings Ltd. ("Levona").  Final Award at 7.[3]  Levona thus succeeded to Blackstone's rights under the LLCA.  *Id.*

By early 2022, five Eletson Gas ships—over a third of its fleet—had been arrested by various creditors for non-payment of its liabilities.  Multiple arrested ships were scheduled to be sold at auction to compensate creditors.  Final Award at 54.  Just before the auction was to take place, and only months after Levona acquired Blackstone's interest in Eletson Gas, Levona and

---

[3] Levona is a subsidiary of two hedge funds, Nomis Bay and BPY, that have both engaged Murchinson as an alternative management company.  Dkt. No. 50 at 7 n.2.

Holdings, Eletson Corp, Eletson Gas and a wholly-owned subsidiary of Eletson Gas entered into a second agreement relevant to this dispute—the Binding Offer Letter.  Dkt. No. 67-10 (the "BOL").  Through that agreement, Levona lent up to $10,000,000 to Eletson Gas, enabling Eletson Gas to avoid losing its fleet to various creditors for non-payment of liabilities.  *Id.*  As part of the transaction that resulted in the cash infusion, Eletson Gas agreed to transfer to Levona the shares Eletson Gas held in the companies that owned two of its ships, the Symi and the Telendos.  Eletson Gas was also offered a limited option to buy Levona out of the Preferred Interests that Levona owned, which would have the effect of terminating Levona's ownership and control of the company.  Because the rights and obligations contained within the BOL are critical in this motion to vacate, the Court explains the terms of that agreement in some detail.

The BOL set forth the terms and conditions pursuant to which Levona was "willing to (A) buy the shares and/or membership interests of" the Symi and Telendos, two of Eletson Gas's vessels (thereby taking ownership), "from Eletson Gas in consideration of advancing a purchase option to Eletson Gas and Eletson Holdings . . . ; [and] (B) advance a US$10,000,000 senior loan to Eletson Gas . . . "  With respect to the Symi and the Telendos, the BOL states that "Levona shall buy all of the Shares in the Companies held by Eletson Gas . . . in consideration of the grant to Eletson Gas and Eletson Corporation of the purchase option set out in Clause 2" of the BOL. BOL § 1.1.  "Simultaneously with the Transfer," it continued, "all claims of any type whatsoever that Eletson Gas, Eletson Corporation, Eletson Holdings . . . and each of their affiliates may have in relation to the Companies [that own the shares in the vessels] or the vessels owned by the Companies . . . shall be automatically and irrevocably waived and released in full by the claimants."  *Id.* § 1.3.

Clause Two of the BOL addresses the Purchase Option and outlines the parameters under

which Eletson Gas could buy out the Preferred Interests and regain control of the company.  It states that, "[s]ubject to and in consideration of the Transfer [of shares in the Symi and the Telendos] occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to Eletson Gas . . . the option, exercisable by written notice to Levona . . . , for either Eletson Gas or its nominee to purchase all of the membership interests held by Levona in Eletson Gas . . . for a consideration equal to the Purchase Option Consideration."  *Id.* § 2.1.  The BOL next clarifies that Eletson Gas "shall only be entitled to serve an Option Notice after either: (a) the Loan and any Interest accrued thereon is fully repaid; or (b) adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona)."  *Id.* § 2.2.  Clause 2.3 noted further that "an Option Notice may only be served within 30 days from the date of [the BOL] ('the Purchase Option Period')."  *Id.* § 2.3.  That put the deadline to exercise the Purchase Option on March 24, 2022.  Under that same clause, "[i]f no Option Notice is validly served by the expiry of such Purchase Option Period, . . . the purchase option shall lapse."  *Id.* § 2.3.  The Purchase Option Period could be extended, but only if the Loan was at least partially repaid.  *Id.* §§ 2.4, 2.5.

As the BOL made clear, the Option granted in Clause 2 could be exercised only where Purchase Option Consideration was provided by Eletson Gas to Levona.  In Clause 3, the BOL defines the Purchase Option Consideration as an amount equal to "$1 plus an amount equal to US$23,000,000 less the Net Value," where the "Net Value" is equivalent to the value of the Symi and the Telendos as determined by an independent valuation.  *Id.* §§ 3.2, 3.3.  In essence, if the value of the two vessels was less than $23,000,000, Eletson Gas—to exercise the option to buy out Levona's Preferred Interests—was required to true up the difference to Levona so that the total value of consideration paid to Levona (including the value of the vessels) equaled

$23,000,000.  If the "Net Value" exceeded $23,000,000 (i.e., if the value of the vessels is greater than $23,000,000), then the excess benefitted Eletson Gas and was to be applied to reduce the amount outstanding on Levona's Loan to the Company.  And if the Net Value was "equal to US$23,000,000, the Purchase Option Consideration shall be US$1." *Id.* § 3.2.  The BOL clarifies also that "[t]he parties agree to work in good faith to determine and agree the Net Value promptly and no later than 5 days after service of the Option Notice," but that "[i]n the event of failure," "the Option Notice shall remain valid but the transfer of the Option Membership Interests shall be suspended pending agreement or determination of the Net Value." *Id.* § 3.4.

Clause Four, which addresses the Loan and Assignment, provides that "[c]oncurrently with the Transfer [of Eletson Gas's interests in the Symi and the Telendos to Levona], Levona shall enter into a loan agreement . . . for the advance of a loan facility to Eletson Gas of an amount of US$10,000,000" to be "used as mutually agreed upon between Levona and Eletson Gas for various refinancing and sources and uses." *Id.* § 4.1.  The Loan, the BOL provided, was senior to all liabilities of Eletson Gas "save for such secured debts of Eletson Gas as Levona may agree in their sole discretion may remain senior to the loan." *Id.*  In other words, Levona was to be repaid its Loan before any other creditors of Eletson Gas were repaid.  The BOL also conditioned the Loan on an agreement by Eletson Gas, Eletson Corp, and Holdings that from the last date of the period during which the Purchase Option could be exercised, "so long as the Loan and any interest accrued thereon remains outstanding unless adequate security and/or collateral has been provided and accepted," they would cooperate and vote in favor of any Fundamental Action (as that term was defined in the LLCA) proposed by Levona. *Id.* § 4.2(d).  And, concurrent with the transfer of the interests in the vessels and entry into the Loan agreement, the parties agreed that Eletson Corp and the Eletson Gas subsidiary would assign any claims they

had against Eletson Gas to Levona until the full amount of the Loan was repaid. *Id.* §§ 4.3, 4.4.

The BOL also contained a new arbitration provision, which provided that "any disputes and claims arising out of or in connection with" the BOL "shall be governed by and construed in accordance with English law and shall finally be resolved by arbitration in accordance with the rules of arbitration of the London International Centre for Arbitration." *Id.* § 10.

Put in plain English, the BOL accomplished multiple objectives. Most importantly, in order to stave off Eletson Gas's creditors Levona granted Eletson Gas a $10,000,000 Loan subject to 10% interest and a 2-year maturity date. Second, and separately, through the agreement Levona bought the shares of the Symi and Telendos from Eletson Gas in consideration of advancing a Purchase Option. The Purchase Option itself could only be exercised, however, upon repayment of the Loan or the provision of satisfactory security for the repayment of the Loan. If Eletson Gas repaid the Loan (and interest) in full, or otherwise provided "adequate security and/or collateral" for the Loan, it could give Levona written notice that it intended to exercise the Purchase Option and could then buy the Preferred Shares back from Levona, subject only to truing up the value of the ships (the Symi and Telendos) to $23,000,000. The option could be exercised by written notice and only within a short time window that ended March 24, 2022. *See Eletson I*, 731 F. Supp. 3d at 549–50. In effect, if Eletson Gas timely repaid the Loan or provided security or collateral to replace the repayment, Eletson would be able to obtain Levona's Preferred Interests through a payment of $23 million in the form either of cash or of the Symi and Telendos. The expiration of the option provided an incentive for Eletson Gas to timely repay the Loan. The time within which the option could be exercised could be extended but only if a portion of the Loan was actually repaid. *See infra* at 15 n.3. But, if the Loan was not repaid or security or collateral not provided within the requisite

time period, Eletson would lose the Symi and Telendos and the right to obtain the Preferred

Interests.  Levona would remain both a creditor of Eletson Gas and, in part to protect its interests

as creditor, Eletson Gas's controller through its ownership of the Preferred Interests and the

related agreements.

Pursuant to the terms of the BOL, on March 11, 2022, Eletson Gas transferred its interest

in the Symi and Telendos to Levona in the Share Transfer Agreement ("STA").  Dkt. No. 67-12.

The STA provided that Eletson Gas would sell its interests in the Symi and the Telendos vessels

and that "[t]he consideration for the sale and purchase of the Shares [in the vessels] shall be as

set out in the [BOL]."  *Id.* § 3.1.  It contained an integration clause providing that the STA

"together with the [BOL] constitutes the entire agreement between the Parties regarding the sale

and purchase of the Shares [in the vessels] and related matters."  *Id.* § 7.1.  Also on March 11,

the parties entered into an Intra-Group Loan Agreement, pursuant to which Levona provided to

Eletson Gas a loan facility of up to $10,000,000 for a term of up to two years.  Final Award at 8.

The parties agreed, through a Fundamental Action Letter, that while the Loan was outstanding,

Eletson would "[c]o-operate with any Fundamental Action . . . proposed by Levona."  Dkt. No.

55-4 at 15.  "By providing that Eletson would cooperate with 'Fundamental Actions' that Levona

wanted to take, the Fundamental Action Letter transferred virtually unfettered control over the

[Eletson Gas's] affairs to Levona."  *Eletson I*, 731 F. Supp. 3d at 550; *see* Dkt. No. 67-2 at 95–99

(defining all fundamental actions).  The parties also entered into an Assignment of Claims

agreement, pursuant to which Eletson Corp assigned to Levona all its claims against Eletson Gas

and any of its vessels as contemplated in § 1.3 of the BOL.  Dkt. No. 67-58 at 9.  Relatedly, the

parties entered into a Deed of Waiver and Release, pursuant to which specified outstanding

claims against the Symi and Telendos were released by certain Eletson entities.  The Board of

Directors of Eletson Gas approved those various documents in a written memorandum. Dkt. No. 67-13.

March 24, 2022—the deadline for Eletson Gas to exercise the Purchase Option—came and went.

About four months later, on July 15, 2022, Levona—purporting to act on behalf of Eletson Gas—signed a non-binding Letter of Intent with Unigas (the "Unigas LOI"), Eletson Gas's primary competitor, to sell Unigas nine of the Eletson Gas's twelve remaining vessels for $262,000,000. Final Award at 9. The two Eletson representatives on Eletson Gas's Board of Directors were not consulted before the Unigas LOI was signed and were only informed of the agreement when a Levona representative sent the Unigas LOI to the Company's Board of Directors via email and directed them to accept its terms. Dkt. No. 67-24 ¶ 45. A Levona-appointed representative circulated a notice for a meeting of the Board of Directors of the Company to be held on July 28, 2022, including a statement of the purpose of the meeting, which included certain actions to be taken in furtherance of the Unigas LOI. *Id.* ¶ 51. After the Eletson Directors responded that the notice was deficient and that they would not attend the meeting, the Levona directors stated that the meeting would nevertheless proceed and ultimately held the meeting. *Id.* ¶¶ 52–54.

## II.    The Arbitration Proceedings

The day after the proposed board meeting, on July 29, 2022, Eletson Holdings and Eletson Corp commenced JAMS arbitration proceedings against Levona pursuant to the mandatory arbitration provision of the LLCA. Dkt. No. 67-16; Dkt. No. 65 ¶ 40; Dkt. No. 66 ¶ 40. JAMS appointed retired Justice Ariel Belen to act as the sole arbitrator of the dispute. Dkt. No. 62 ¶ 12. The Petitioners in the arbitration (the Eletson entities) argued that Levona had granted Eletson Gas the Purchase Option, that it had exercised the Option (in their own name) on

or about March 11, 2022, and that it had therefore effectuated the buy-out of the Preferred

Interests and regained control of the company.  Dkt. No. 67-16.  Accordingly, they argued that

Levona had no authority to sell vessels to Unigas, because Eletson "fully complied with the

terms of the buyout purchase option (to the extent that Claimant's compliance was not excused

by Levona's conduct)."  *Id.* ¶ 31(b).

Levona filed a counterclaim and argued in response that the dispute was controlled by the

BOL rather than the LLCA, and that regardless it was Eletson, both Eletson Holdings and

Eletson Corp, that had breached the LLCA by not agreeing to fundamental actions while the

Loan was outstanding, and by interfering with the sale of the vessels.  Dkt. No. 67-17 ¶¶ 1–2,

24–41.

Briefing of those issues in the arbitration proceeded, and on October 10, 2022, Justice

Belen issued a temporary restraining order requiring the parties to maintain the status quo during

its pendency.  Final Award at 13–14.  Justice Belen later extended that prohibition until further

notice.  *Id.*

The parties were required to exchange documents in the arbitration pursuant to JAMS

Rule 17(a), which mandates the "voluntary and informal exchange of all non-privileged

documents and other information . . . relevant to the dispute or claim."  Dkt. No. 67-3 (the JAMS

Comprehensive Arbitration Rules and Procedures).  The parties additionally engaged in formal

discovery, taking the form of documents requests and motions to compel.  For example, Eletson

agreed to produce "information sufficient to show its efforts to find any outside investor to

purchase the preferred shares, provide new capital to [Gas], and/or provide the $23 million

originally contemplated to fund Levona's exit," Dkt. No. 551-66 at 3, and "[a]ny

communications and/or documents related to Eletson's preparation of, negotiations to, and/or related to the final offer of the 'Murchinson Buyout Steps,'" Dkt. No. 551-65 at 17.

The arbitration hearing was scheduled to begin on May 15, 2023.  Just over a week before the arbitration hearing was set to begin and nearly a year after the arbitration claim was filed, on May 5, 2023, Eletson claimed for the first time that, upon its exercise of the Purchase Option, the Preferred Interests were transferred to three "Cypriot entities by the names of Fentalon, Apargo, and Desimusco" (the "Preferred Nominees," or "Nominees").  Dkt. No. 55-13 ¶ 103.  Eletson stated that "[b]y agreement among all relevant transferors and transferees, valid, legal and binding under Greek law, the preferred interests were transferred to the Preferred Nominees effective upon the transfer of the preferred interests from Levona, which occurred on or about March 11, 2022.  The price committed to be paid by the Preferred Nominees was 3 million Euro, though subsequent to that agreement the Preferred Nominees further agreed to be contingently liable to pay legal expenses in connection with his arbitration."  *Id.* ¶ 104.

On May 10, 2023, shortly after Eletson introduced its claim that it had nominated the Cypriot entities to receive the Preferred Interests and just five days before the arbitration hearing was set to begin, Levona moved to strike Eletson's allegations that the Preferred Interests had been transferred to the Nominees or, in the alternative, to dismiss Eletson's claims in chief.  Dkt. No. 67-40.  Levona argued that Eletson had improperly alleged that the Preferred Interests had been transferred to the Nominees for the first time on the eve of the hearing, with only specious supporting evidence and in contradiction of its own prior assertions.  *Id.*  Levona suggested that the nomination was a mere contrivance done to ensure that the Preferred Interests would be remote from the bankruptcy estate of Holdings in a parallel bankruptcy proceeding that had been commenced by an involuntary petition against Holdings filed by several creditors including a

Levona affiliate. *Id.* at 4. Put differently, on Levona's account, Eletson suggested that the Preferred Interests had been transferred to the Nominees only after it became clear that, as a result of the bankruptcy proceeding, Eletson might win the battle at the arbitration only to lose the war with respect to the control of Eletson Gas. By virtue of the bankruptcy proceeding and the affiliate's interests as creditor of Holdings, Levona or the affiliate might retain control of Eletson Gas through the bankruptcy estate even if Levona was to lose the arbitration. *Id.* Levona also argued that, if the Cypriot entities were the Nominees, they would be the real parties in interest and would be required to be made parties to the arbitration and that Eletson would not have standing. The Arbitrator did not rule on Levona's motion until after the arbitration when he issued the Interim Award on July 28, 2023 (later confirmed in the September 29, 2023 final award). Final Award at 30.

The arbitration hearing commenced on May 15, 2023, and concluded on May 24, 2023. Final Award at 19. At the hearing, both sides presented evidence and further briefing in support of their respective positions. *See Eletson I*, 731 F. Supp. 3d at 557–58.

Ultimately, on September 29, 2023, Justice Belen issued a final award in Eletson's favor, accepting its claims and rejecting Levona's counterclaims. He determined that Eletson Gas had exercised the Purchase Option before March 24, 2022, and therefore obtained the Preferred Interests. To reach that conclusion, he determined that Eletson had paid Levona the Purchase Option Consideration, provided adequate security and/or collateral for the Loan, and provided constructive notice of its intent to exercise the Option. Final Award at 34–42. As this Court previously summarized,

> [Justice Belen] concluded that [Eletson Gas] paid Levona the Purchase Option
> Consideration when, pursuant to the Share Transfer Agreement, on March 11, 2022,
> it transferred the ownership shares of the Symi and Telendos to Levona. [Final
> Award at 34–42]. Levona had argued that the transfer of vessels was the

consideration for the Purchase Option itself, rather than the Purchase Option Consideration payable upon the exercise of Purchase Option. Justice Belen rejected that argument. *Id.* He reasoned that because Section 2.1 of the BOL provided that "consideration equal to the Purchase Option Consideration" would be paid "on completion of the transfer of the Membership Interests," the BOL contemplated that the Purchase Option Consideration would be paid in exchange for the Preferred Interests and not in exchange for the option to purchase the Preferred Interests. *Id.* In his view, that conclusion was consistent with the terms of the LLCA, which prohibits Members (including Levona as the holder of the Preferred Interests) from acquiring or owning any vessels such as the Symi and Telendos. *Id.* at 35. It was only if the Purchase Option was exercised and Levona was no longer a member of the Company that Levona could, consistent with the LLCA, acquire the two vessels. Justice Belen further concluded that the transfer of the Symi and Telendos was adequate consideration because the Net Value of those ships was in excess of $23,000,000, and thus more than the Purchase Option Consideration amount contemplated in the BOL of $23,000,000 less the value of the two ships. *Id.* at 37.

*Eletson I*, 731 F. Supp. 3d at 561.

Justice Belen rejected Levona's argument that the option could not be exercised because Eletson had neither repaid the Loan nor provided adequate security or collateral because Eletson Corp had assigned its claims against Eletson Gas to Levona under the Assignment of Claims agreement. Final Award at 38–40. He determined first that security and collateral were distinct, and that the BOL provided Levona sole discretion to approve only security, not collateral. *Id.* at 39. He also found that the claims assigned were worth more than $10 million dollars and were therefore adequate to compensate for the loaned value. *Id.* at 40. In so finding, he rejected too Levona's argument that the Assignment of Claims was not collateral but was instead a protective measure to prevent Eletson from repaying itself before Eletson Gas repaid the loan. *Id.* at 39. The Arbitrator never explained how claims against Eletson Gas could serve as an asset that would secure Eletson Gas's obligations to Levona. Nor did he explain why, if the assignment of claims was a term of the March 11, 2022 BOL and if the assignment of claims was sufficient to satisfy the requirement that Eletson Gas provide collateral for the Loan before the option

14

could be exercised, the parties would have provided a deadline of March 24, 2022 for the exercise of the option.[4]

As noted, the BOL provided that to exercise the option Eletson Gas was required to provide "written notice" to Levona of its intent to exercise the option prior to March 24, 2022. *Id.* at 42. The Arbitrator found that Eletson had provided such notice, and rejected Levona's argument that no notice was provided. The Arbitrator "agree[d] with Levona that there does not seem to be a separate formal written notice provided to Levona by Eletson exercising the option." *Id.* at 42. But he found the written notice requirement satisfied because the agenda for a board meeting on March 10, 2022, "one day before the execution of the Transaction Documents," included an item that stated: "Update on Eletson's intention to exercise the purchase option." *Id.* From that reference, the Arbitrator concluded "the parties acknowledged that Eletson was exercising the option." *Id.* The Arbitrator stated that Karastamati testified that Eletson understood that intention to be actual notice. *Id.* For the conclusion that the notice requirement was satisfied, the Arbitrator relied too on his finding that Eletson "continued to manage the day-to-day affairs of the Company, board meetings essentially stopped," and "dealings between Eletson and Levona concerning [Eletson Gas] then revolved around Eletson's repayment of its loan obligations to Levona." *Id.* "Eletson held itself out, as the family at large, as the sole shareholder of [Eletson Gas] and the sole beneficial owners of

---

[4] The BOL also provides that the Purchase Option Period could be extended to 60 days from the March 11, 2022 date of the BOL if Eletson Gas repaid at least $1 million from the Loan and could be extended to 90 days from the March 11, 2022 date of the BOL if Eletson Gas repaid at least $2 million from the Loan. BOL ¶¶ 2.4, 2.5. Neither of those provisions would have been necessary if the very security that was necessary to exercise the option Eletson purchased through the BOL was provided by the BOL itself.

[Eletson Gas's] remaining 12 vessels." *Id.* He premised that finding on Kertsikoff's testimony that he "repeatedly represented to potential investors that Levona was out of the Company," citing documents in which Kertsikoff referred to its "previous shareholders." *Id.* at 45. Therefore, Justice Belen concluded, "the absence of a written notice and payment of $1 dollar are formalities that the parties failed to observe." *Id.*

Justice Belen also denied Levona's motion to strike Eletson's claims regarding the Nominees, and accepted Eletson's argument that upon exercise of the Purchase Option, the Preferred Interests were transferred to the Nominees rather than to Eletson Gas. *Id.* at 30. In reaching that conclusion, he cited to the language in the BOL providing that the Purchase Option could be exercised by Eletson or "its nominee." *Id.* at 27. As evidence of the transfer, the Arbitrator credited an unauthenticated note from January 2022 allegedly drafted by Kertsikoff's sister to her mother stating that "our Cypriot company is about to acquire a new asset," and unauthenticated handwritten notes of an October 2022 meeting in which the former owners allegedly discussed that they had nominated the Cypriot companies to acquire the Preferred Interests. *Id.* at 28–29. The Arbitrator rejected Levona's argument that Eletson's own witnesses and counsel made statements contradicting their current stance as to the Nominees. Justice Belen instead credited testimony from Karastamati and Kertsikoff that "Eletson" means "Eletson family," and "Eletson affiliates." *Id.* at 30. Although he acknowledged that "the lack of earlier notice by Claimants to Levona of the contingent transfer of any preferred shares to the Preferred Nominees initially raised concern to me, the Eletson witnesses' testimony was both wholly credible and sincere." *Id.* Further, he found that Levona "was not prejudiced by the late reference." *Id.*

16

From the conclusion that Eletson Gas had validly exercised the Purchase Option on March 10, 2022 and that Levona no longer had an interest in the company, certain conclusions followed. Levona was unjustly enriched by the transfer of the two vessels without the reciprocal transfer of the Preferred Interests. *Id.* at 63–64.[5]  In addition, Eletson was damaged by Levona's other misconduct related to the vessels. *Id.* at 64–65. Levona's counterclaims, which depended on the proposition the Eletson Gas had not exercised the option, necessarily failed. *Id.* at 62. The Arbitrator further addressed Eletson's arguments that Levona and its affiliates had engaged in improper conduct executing a "Services Agreement" with Eletson's CFO Peter Kanelos in December 2021. *Id.* at 51. The Arbitrator determined that by executing that "clandestine" agreement with Kanelos, Levona induced Kanelos to breach his fiduciary duties and breached the covenant of good faith and fair dealing. *Id.*.  He also found that Murchinson, the parent of Levona, breached its nondisclosure agreement with Blackstone by communicating directly with financers and lenders of Eletson Gas. *Id.* at 53–54. He did not explain how the breach of a duty purportedly owed to Levona's predecessor could give rise to rights to relief on behalf of Eletson. The Arbitrator found too that Levona "breached the covenant of good faith and fair dealing by causing [Eletson Gas's] lenders to arrest five vessels and failing to disclose this conduct after it became a member of the Company." *Id.* at 54.

---

[5] *See also id.* at 9 ("The resolution of the majority of the claims and counterclaims asserted in this arbitration rests upon the interpretation of the Transaction documents.  Did Eletson exercise the purchase option pursuant to the Transaction Documents?  If the answer is 'yes,' then at some point in time, Levona was no longer a member of the Company and did not have any rights under the LLCA to enter into the Unigas LOI, or otherwise act on behalf of the Company. Conversely, if Eletson did not fulfill the requirements under the Transaction Documents to exercise the purchase option, Levona's interest were not bought out and Eletson may have violated its obligations under the LLCA by refusing to, *inter alia*, engage in due diligence relating to the Unigas LOI.").

Justice Belen also ruled against "Levona-related entities" that were not parties to the arbitration, namely a company with common ownership named Pach Shemen, finding that it had improperly used the bankruptcy proceedings in an effort to obtain the Preferred Interests.  *Id.* at 61.  Pach Shemen was not a signatory to the LLCA or the BOL, was not a party to the arbitration, and did not otherwise participate in the arbitration in any way.  Nor did Eletson seek an order compelling Pach Shemen's participation in the arbitration, or otherwise serve it with notice that it would be bound by any order of the Arbitrator.  Pach Shemen therefore was not, by its own terms, bound by the status quo injunction issued by the Arbitrator earlier in the proceedings.  Not only that, but Pach Shemen also "was not transferring the assets of Gas or assets in dispute in this arbitration" as was prohibited by the Arbitrator's status quo injunction. *Id.*  Justice Belen nevertheless imposed relief against Pach Shemen.  He did so on the basis of a finding that "the overall strategy" of the initiation of the involuntary bankruptcy (which was valid and converted into voluntary bankruptcy), "was intended to disrupt the status quo and find another path to obtain the assets of Gas or as assets in dispute in this arbitration."  *Id.*  The Status Quo Injunction had not prohibited that conduct.  Put differently, he concluded that because the "Levona-related entities were looking to either strip this arbitration of jurisdiction or hedge against a potential loss," and because they "mistakenly" believed that any award would go to Holdings (rather than to the Nominees), they were not "maintaining the status quo."  *Id.* at 61–62.  That strategy was ultimately "for naught," Justice Belen continued, because the interests were transferred to the Cypriot nominees.  *Id.* at 62.  As a result, the Arbitrator ordered compensatory damages for all fees and costs associated with the bankruptcy litigation against Pach Shemen for initiating that action.  *Id.* at 67.

So too with Murchinson.  Murchinson was not a party to the LLCA nor a participant in the Arbitration.  Eletson made no motion to compel its participation.  Justice Belen nevertheless granted punitive damages against Murchinson stating that "[i]f there was a case warranting punitive damages, I believe this is the one."  *Id.* at 68.  Murchinson, he concluded, "engaged in an intentionally hostile, corrupt, wanton, and deceitful campaign to the great detriment of the [Eletson Gas]."  *Id.* at 68.  Because "without some punitive deterrence, Murchison's agents will continue to believe they are not accountable for their actions," Justice Belen found that punitive damages of $43,455,122.21 (equal to the compensatory damages) were warranted "to be paid to the same entities that are to receive the underlying compensatory damages."  *Id.* at 73.

Thus, the Arbitrator awarded relief against persons who were not parties to the arbitration in favor also of persons who were not parties to the arbitration.

## III.    This Court's Prior Decision Confirming the Award

On August 18, 2023, Holdings filed a Petition before this Court to confirm the Final Award (followed by the filing of a Supplemental Amended Petition with the Final Award).  *See* Dkt. Nos. 1, 11, 14, 46–47.  Levona moved to dismiss the Petition and vacate the award (followed by an amended response).  Dkt. Nos. 28–31, 48–51.  The parties submitted Federal Rule of Civil Procedure 56.1 Statements of Undisputed Fact, and the Court held oral argument.

The Court found for Holdings in part and for Levona in part.  The Court first rejected Levona's argument that Holdings lacked standing because the financial award flowed to the Nominees and to Eletson Gas and not to Holdings, because Holdings—as a party to the contract pursuant to which the arbitration took place—had standing to enforce the contractual rights of third-party beneficiaries.  *Eletson I*, 731 F. Supp. 3d at 568–77.  The Court also rejected Levona's argument that the Arbitrator exceeded his powers by adjudicating claims arising from the BOL under the arbitration provision of the LLCA, because the parties "clearly and

19

unmistakably delegated to the arbitrators the authority to decide the scope and application or the agreement to arbitrate." *Id.* at 580. That delegated authority was determinative, as the "Court need not conclude that it would have reached the same decision as the arbitrator to conclude that he acted within the authority granted him by the parties to determine his own jurisdiction." *Id.* at 582. "As the arbitrator reasoned, because Eletson asserted breaches of the LLCA, the parties were not required to 'arbitrate their disputes in two steps: first, go to London to adjudicate performance under the Transaction Documents and then second, come to JAMS to determine breaches under the [LLCA].'" *Id.* at 583–84 (quoting the Final Award at 14).

The Court also rejected Levona's argument that the Arbitrator exceeded his authority by issuing an award in favor of Eletson Gas and the Nominees who were neither parties to the arbitration nor signatories to the arbitration agreement in the LLCA, concluding that "[t]he award to the Nominees and [Eletson Gas] here fell within the broad authority the parties delegated to the arbitrator." *Id.* at 585. The Court rejected Levona's argument that the Award violated the automatic stay that went into effect upon the commencement of the bankruptcy proceedings against Holdings (detailed *infra*) because "the arbitrator adjudicated claims only as between Eletson and Levona and only under the BOL and LLCA," and "by confirming the arbitral award, the Court also will not intrude on the bankruptcy court's exclusive authority to decide what is property of the estate." *Id.* at 594–95. The Court also held that the Arbitrator "did not manifestly disregard any law in determining that Petitioners were the prevailing parties under the LLCA and entitled to an award of fees," and held that just because the Nominees will receive the direct monetary benefit, Eletson is no less of a prevailing party. *Id.* at 610, 612.

Finally, the Court rejected Levona's argument that the Arbitrator had manifestly disregarded the law in concluding that an option that a contract stated could be exercised only

with written notice had been exercised in the absence of written notice.  The Court highlighted the difficult burden a party would have in overturning an arbitrator's ruling based on an error of law.  It was not enough that the Arbitrator erred.  "A party who agrees for an arbitrator to determine its disputes does not contract for those disputes to be determined in accordance with law, but only not in manifest disregard of the law."  *Id.* at 614.  The Arbitrator concluded that Levona received actual notice and "the evidence established that 'the parties acknowledged that Eletson was exercising the option.'"  *Id.* at 612 (quoting the Final Award at 42).  The Arbitrator did not manifestly err in applying Delaware law and under Delaware law there was authority that substantial compliance with a written notice requirement could suffice "when the circumstances so justified."  *Id.* at 615 (quoting *Vintage Rodeo Parent, LLC v. Rent-A-Center, Inc.*, 2019 WL 1223026, at *15 (Del. Ch. Ct. Mar. 14, 2019)).

The Court accepted several of Levona's arguments and vacated portions of the Final Award.  The Arbitrator awarded relief against Murchinson and Pach Shemen even though neither was a party to the arbitration or to the arbitration agreement.  Though Eletson might be able in a separate proceeding to recover against either or both of them on the theory that they were alter egos of Levona, it could not hold them to an arbitral award when they were not given notice of the arbitration proceedings and an opportunity to defend or participate.  *Eletson I*, 731 F. Supp. 3d at 587–92.  The Court held also that the Arbitrator exceeded his authority in awarding relief on the basis of Pach Shemen's decision to commence a separate involuntary bankruptcy against Holdings on the theory that such action violated the status quo injunction.  "The arbitrator lacked the power to enjoin Pach Shemen from filing the involuntary bankruptcy petition and the bondholder litigation or Levona from assisting in filing those actions," and so "his award of

damages for those actions exceeded his authority under the LLCA and under the law." *Id.* at 597.

In sum, the Court granted the application to confirm in part and denied it in part (and thus granted the motion to vacate in part and denied it in part). *Id.* at 616. The Court accepted Eletson's arguments that the portions of the Award that granted compensatory and punitive damages and attorneys' fees costs, expenses, and pre-judgment interest against Levona and in favor of Eletson, Eletson Gas, and the Nominees could be confirmed. *Id.* It rejected the argument that relief could be granted against Murchinson and Pach Shemen or for the filing of the involuntary bankruptcy petition or the bondholder litigation. The Court directed the parties to submit proposed judgment consistent with the opinion. Eletson and Levona both submitted proposed judgments. Dkt. Nos. 94, 96.

## IV.    The Bankruptcy Proceeding

A parallel proceeding in the Bankruptcy Court for the Southern District of New York is also implicated in the present proceeding. In March of 2023, after Eletson's arbitration claim had been filed and two months before the arbitration hearing was to commence, three creditors of Eletson Holdings commenced an involuntary bankruptcy proceeding against Holdings and two affiliates (Eletson Finance (US) LLC and Agathononissos Finance LLC) (collectively, the "Debtors"). *See In re Eletson Holdings Inc. et al.*, No. 23-10322 (Bankr. S.D.N.Y.). One of those creditors was Pach Shemen, which, in 2023, had purchased $183,851,546 of Holdings bonds for $2,000,000. *See Eletson I*, 731 F. Supp. 3d at 554. Pach Shemen is a distinct corporate entity but is under common ownership with Levona. Dkt. No. 67-31. On September 25, 2023, on motion of the Debtors, the proceeding was converted to a voluntary bankruptcy under Chapter 11. Bankr. Dkt. No. 215. This Court has previously explained the bankruptcy proceeding in detail. *See In re Eletson Holdings Inc.*, 2025 WL 2710411, at *1–8 (S.D.N.Y.

22

Sept. 22, 2025). The bankruptcy proceeding presented the risk to Eletson that Pach Shemen, as a creditor and through the bankruptcy court, might be able to gain control of Eletson Gas if Holdings gained control of the entity through the arbitration proceeding. The fears of Eletson's former owners were realized when the bankruptcy court ultimately confirmed the reorganization plan submitted by Pach Shemen and the creditors over a plan submitted by Eletson's former owners, which "vested control of Holdings in the Petitioning Creditors rather than in the three Greek families that had previously controlled the company." *Id.* at *3 (citing Bankr. Dkt. No. 1132, the "Confirmation Plan").

> As this Court summarized:
>
> On the date the Plan was to become effective, "all property in each estate" vested "in Reorganized Holdings, free and clear of all liens, claims, charges or other encumbrances." Confirmation Plan § 5.2(c). Section 5.4 of the Plan provided that all notes and stock and other documents evidencing or giving rise to claims against an interest in debtors were canceled and the obligations of the debtors thereunder or in any way related thereto were released, terminated, extinguished and discharged. *Id.* § 5.4. Section 5.8 gives Reorganized Holdings the authority "to issue or cause to be issued the reorganized equity in accordance with the terms of this plan." *Id.* § 5.8. *See also* 11 U.S.C. § 1141 (effects of confirmation of bankruptcy plan). The members of the governing body of each Debtor prior to the date the Plan went into effect were "deemed to have resigned or otherwise ceased to be a director or manager of the applicable Debtor," Confirmation Plan § 5.10(c), Eletson Holdings was deemed to be Reorganized Holdings, *id.* § 1.126, and the equity of the old Eletson Holdings was vested in its new owners, *id.* § 1.125. Reorganized Holdings was to be managed by a new board consisting of three directors: (i) one director selected by the Plan Proponents, (ii) one selected by the Plan Proponents but subject to the consent of the Creditors' Committee, and (iii) an independent director selected by the Creditors Committee. *Id.* § 5.10(a), (c). Retention of all professionals by Debtors terminated on the Effective Date. *Id.* § 2.5(a).

*Id.* That Confirmation Plan became effective, as described, fourteen days after it was entered.

*Id.* Proceedings in the Bankruptcy Court to effectuate the Confirmation Plan remain ongoing.

Importantly, the result of the voluntary bankruptcy proceeding is that Pach Shemen and the other petitioning creditors gained control of Eletson Holdings. As contemplated by the

Confirmation Plan, Eletson's prior counsel, Reed Smith, was displaced. Dkt. No. 270 at 106:10–115:8. This Court accordingly ordered that Reed Smith turn over its client files to Reorganized Eletson Holdings, now represented by new counsel Goulston and Storrs. *Id.*

## V.    Subsequent Proceedings

With that history in mind, a new phase of the dispute between Levona and Eletson began with Levona's discovery of a document produced in bankruptcy court that had not been produced in the arbitration. After the close of the arbitration and the issuance of the interim award, in July of 2023, counsel for Pach Shemen informed counsel for Levona that a document had been produced in the bankruptcy proceedings that was seemingly "highly responsive and critical to this Arbitration." Dkt. No. 67-52 at 2. The document was covered by a protective order issued by the bankruptcy court. Levona asked Justice Belen to reopen the arbitration hearing to consider the document, which was identified to Levona by only its BATES number, and represented that it had "been told that the subject email chain is responsive, material, and important to be presented." *Id.* Eletson opposed the request, arguing that the communication between Pach Shemen and Levona "violate[d] the protective order in the Bankruptcy Court," and that the request was untimely. Dkt. No. 485-19 at 2. Reed Smith, counsel for Eletson, represented that it had "never seen" the document, and that it was "outside the scope of discovery materials." *Id.* Justice Belen rejected Levona's request to reopen the arbitration to view the document as "procedurally and substantively flawed." Dkt. No. 67-52 at 2.

Levona continued to pursue the relevant evidence notwithstanding that the arbitration had concluded with the issuance of the Final Award on September 29, 2023. In October of 2023, one month after Eletson filed its petition to confirm the Award, Levona requested that this Court refer the entire proceeding to the bankruptcy court for the stated reason of "consistent and efficient adjudication," although the effect would have been the ability to view and use the

withheld document.  Dkt. No. 34.  Eletson opposed that request, Dkt. No. 35, and the Court

denied it, Dkt. Nos. 36, 39.  On October 19, 2023, Levona moved the bankruptcy court to modify

the protective order to exempt the relevant document.  Dkt. No. 127-14 at 8.[6]  Eletson opposed

that request and represented that there was no "cognizable argument as to why the Documents

can or should have any relevance whatsoever to the issue whether that Award should be

confirmed."  Dkt. No. 127-30 at 3.  Eletson submitted an affidavit from Kertsikoff which

declared that Levona's limited understanding of the documents was incorrect.  *Id.* at 10.  He

stated that the documents were simply "later documents concerning the same subject matter as

the document that Justice Belen reviewed and rejected."  Dkt. No. 127-31 ¶ 7.  On November 8,

2023, the Bankruptcy Court denied the motion to modify the protective order.  Dkt. No. 127-16

at 51.

Levona was eventually permitted to sign the protective order in the bankruptcy

proceedings, but Eletson still refused to let Levona see the document.  On February 15, 2024,

Levona wrote to the Bankruptcy Court "regarding [Eletson's] baseless effort to obstruct Levona

from viewing documents" that had already been produced in the bankruptcy proceeding

notwithstanding the fact that Levona had now signed the protective order.  Dkt. No. 127-21.  On

March 12, 2024, the bankruptcy court ruled in Levona's favor over Eletson's objection, and

Levona was able to view some documents previously under seal (but that remained subject to the

protective order).  Dkt. No. 127-22 at 12–13.  Eventually, on June 18, 2024, the bankruptcy court

modified its protective order for the limited purpose of allowing Levona to use the documents in

---

[6] On December 18, 2023, Levona filed a proof of claim against Eletson Holdings in the
bankruptcy proceeding, giving it the right to participate.  Dkt. No. 378 at 8.

this Court, finding that "extraordinary circumstances" and "compelling need" existed to justify the modification.  Bankr. Dkt. No. 779 ¶ 4.

With the document in hand, Levona filed a motion before this Court on July 3, 3024 to file an amended petition to vacate and for discovery, integrating evidence from the documents to which it had recently gained access.  Dkt. No. 123.  It later supplemented that motion with another document obtained after a London-based arbitrator presiding over a separate arbitration between the parties permitted Levona to disclose a different email both to this Court and in the bankruptcy court.  Dkt. Nos. 138–39.  This Court granted Levona's motion on September 6, 2024.  *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 2024 WL 4100555 (S.D.N.Y. Sept. 6, 2024) (hereinafter *Eletson II*).  In that opinion, the Court summarized the newly-produced documents as follows:

> The newly-produced documents include a July 25, 2022 email from Marina Orfanoudaki, [Eletson] Corp's Group Financial Controller, to Kanelos concerning the "Buyout of Murchinson."  Dkt. No. 127-4.  The communication addresses the financing necessary to fund the repayment of the loan and to purchase the Murchinson partnership share [the Preferred Interest].  *Id.*  The email reflects that Eletson was considering purchasing the Preferred Interests of Levona for $36.2 million—far in excess of the amount under the BOL if the Purchase Option had been exercised in March 2022.  *Id.*  The documents also include (1) a second July 25, 2022 email also from the Group Financial Controller describing the procedures for a Murchinson buyout and containing an updated cashflow model, Dkt. No. 127-5; (2) an August 12, 2022 email from Kanelos to Kertsikoff with the subject line "Investor Model for Murchinson Buyout" that contemplated an additional $12.5 million to be used "in negotiations with Murchinson for acquisition of preferred shares," in addition to $23 million net sale proceeds from the sale of the vessels "to be applied towards Murchinson," Dkt. No. 127-8; (3) an August 18, 2022 email from Corp's Treasury and Corporate Finance Manager to Kanelos containing a "revised model" that contemplated that Eletson would repay the working capital facility and provide $23 million from the sale of the two vessels and a residual $2.2 million from other funding for the Murchinson's Exit Payment, Dkt. No. 127-9; and (4) a detailed model sent by Eletson's CFO [Kanelos], and copying Kertsikoff, to financial advisory firm Castalia Partners and to an individual at private equity firm Austen Grove Capital, for a minority investment in Eletson Gas that contains an entry for "Murchinson's Exit Payment" that contemplates repayment of the working capital, $23 million from the sale of the vessels and a residual amount of

> $2.2 million, Dkt. No. 137-1 at 7.  The documents also refer to an August 13
> engagement letter between Kertsikoff and Castalia Partners "in regards to capital
> raising for Eletson Gas."  Dkt. No. 137-1 at 5.

*Eletson II*, 2024 WL 4100555 at *8.

Importantly, the newly produced documents were inconsistent with both the narrative

presented by Eletson to Justice Belen, and his ultimate determination based on those

representations.  As this Court explained,

> The story that Eletson told, which was accepted by the arbitrator, was that by March
> 2022, Eletson had already bought out Murchinson's Preferred Interests and all that
> remained was the repayment of the working capital.  In that version of events, there
> would have been no need after March 2022 for Eletson to raise money for the
> purchase of the Preferred Interests or for Eletson to have sold the vessels.  Eletson
> already had the Preferred Interests and Levona had the right to the vessels, which
> it obtained in exchange for the Preferred Interests.
>
> According to the documents which Eletson was compelled to produce during the
> bankruptcy proceeding, the story told by Eletson to the arbitrator was untrue.  As
> late as August 2022, after Eletson had filed the arbitration, Eletson was trying to
> raise funds in order to purchase the Preferred Interests and was contemplating that
> it would have to pay more for those interests than contemplated under the Purchase
> Option.  And unlike the email the arbitrator considered during the arbitration, not
> all of these emails were written by the bribed Kanelos.  It is easy to imagine that an
> arbitrator, confronted with these documents, would have reached a contrary
> decision to that reached by the arbitrator here and would have ruled for Levona on
> its counterclaims rather than for Eletson on its claims.

*Id.*  Accordingly, the Court granted Levona's motion to file an amended petition to vacate the

arbitral award, because it had "presented evidence that, if credited, would show that Eletson

engaged in fraudulent activity that Levona could not have discovered and that went to a pivotal

issue in the arbitration."  *Id.* at *22.  Further, the Court permitted discovery on facts relevant to

"whether the award was procured by fraud or undue means."  *Id.*

## VI.    Discovery in the Instant Proceeding

The parties engaged in discovery pursuant to the Court's order, resulting in the

production of many relevant documents that were not produced during the arbitration itself.  The

key persons implicated in the new documents are the three former principals of Eletson (who are also principals of Intervenors)—Kertsikoff, Karastamati, and Hadjieleftheriadis, in addition to several other Eletson employees and outside financers.  During the time at issue in the arbitral proceedings, there were several lawyers working at Eletson, including Karastamati, Manoulis Andreoulakis, and Elena Vandorou.  Andreoulakis is also a first cousin of the three former owners, who at that time received emails sent to legal.contracts@eletson.com, Dkt. No. 551-1 at 62:4–8.  Vandorou was a "trusted" "long time employee" in the legal department, *id.* at 21:18–20, 49:15–50:16.  She had "different reporting lines," and sometimes would report to Karastamati, other times to Kertsikoff or Hadjieleftheriadis.  *Id.* at 51:16–23.  During this time, Kanelos was Eletson's CFO.  *Id.* at 216:2–7.  The financial team working with Kanelos included corporate controller Marina Orfanoudaki, who worked with "books and records" and "financial statements," *id.* at 87:14–88:5, and Elena Tzarouchi, who worked on "financial analysis," *id.* at 87:23–25.  Kanelos was terminated in December of 2022, *id.* at 263:24–264:4, and Tzarouchi in fall of 2022, *id.* at 241:6–9.  After Kanelos and Tzarouchi left the company, Orfanoudaki reported "primarily" to Kertsikoff.  *Id.* at 264:22–25.

The documents produced in connection with the present motion to vacate the award demonstrate that long after March 11, 2022 (the purported date the Purchase Option was exercised), and both before and after March 24, 2022 (the date the Purchase Option expired), the former directors and representatives of Eletson acted with the understanding that notice had not been provided and the option had not been exercised and that Levona, and not Eletson or the nominees of Eletson Gas, held the Preferred Interests.  The new documents also reveal that even after the arbitration was well along (and at a time when Eletson had changed its story to conform to the narrative presented to the Arbitrator), Eletson did not understand the Purchase Option to

have been exercised on behalf of the Nominees or that the Nominees owned the Preferred Interests.

## VII.    Additional Documents Discovered on the Eletson Server

On June 11, 2025, Bankruptcy Judge Mastando issued an order authorizing and directing Microsoft to suspend existing user accounts belonging to the Debtors' former management and to provide administrator-level access for Eletson Holdings and its designees in the bankruptcy case.  Bankr. Dkt. No. 1691 (the "Microsoft Order").  Judge Mastando recognized that "this information should have been exchanged pursuant to multiple orders of this Court" following the change in Eletson's ownership.  Bankr. Dkt. No. 1695.  The Microsoft Order was issued over the objection of Reed Smith, purporting to represent an entity it referred to as "Provisional Eletson Holdings," which both submitted a letter to the Bankruptcy Court in advance of the hearing and attended the hearing.  Bankr. Dkt. Nos. 1678, 1695.  The "board" of what has been denominated "Provisional Eletson Holdings" in Greece post-restructuring includes the individuals whom Reed Smith had represented in their prior capacity as owners of Eletson, including Hadjieleftheriadis and Andreoulakis.  *See In re Eletson Holdings*, 2025 WL 2710411, at *4.[7]  Reed Smith responded to the Order by filing a letter with the Bankruptcy Court threatening anyone who viewed or used documents they believed to be privileged from the Eletson server with sanctions and disqualification.  Bankr. Dkt. No. 1707 at 2.

On the same day that Microsoft Order was issued, Reed Smith moved before the Second Circuit for a "stay of any further proceedings . . . relating to any privileged documents of Eletson" in this Court in the arbitration action and before the bankruptcy court.  *Eletson Holdings*

---

[7] The Court has previously recounted Reed Smith's use of Provisional Eletson Holdings to file papers in this Court following Reed Smith's displacement as counsel for Eletson.  *See In re Eletson Holdings*, 2025 WL 2710411, at *10–13.  No such entity currently exists.

*Inc. v. Levona Holdings Ltd.*, Case No. 25-445 (2d Cir. Filed Feb. 25, 2025), Dkt. No. 62.2 at 1. In that motion, Reed Smith referenced the Microsoft Order and objected that Holdings would be entitled to access and review those computer systems "without the obvious carveout for privileged documents." *Id.* at 9. On June 25, 2025, the Second Circuit "decline[d] to grant Appellant's request to stay the district court or bankruptcy court proceedings." Case No. 25-445, Dkt. No. 66. The Circuit added, without further elaboration, that the panel "trust[s] that both courts will tailor their proceedings to protect the privileged property at issue." *Id.*

Not content with that ruling, Reed Smith tried again and moved before the Second Circuit on July 14, 2025 for an emergency stay enjoining Eletson as restructured and Levona from "from reviewing, transferring, disclosing, or using in any way documents obtained from Eletson Holdings' computer systems, including specifically any documents as to which [Holdings as reorganized] has any claim of privilege" and "requir[ing] those parties to sequester the Eletson Documents in their possession." Case No. 25-445 Dkt. No. 74.1 at 1. On July 18, 2025, the Circuit denied the request for an emergency stay, referring the pending appeal to a three-judge panel. Case No. 25-445 Dkt. No. 88.

Following the order of the Second Circuit, Eletson first marked certain documents obtained from the Microsoft server at the deposition of Reed Smith lawyer Louis Solomon on July 24, 2025. Dkt. No. 610-1. It did so again at the deposition of Kertsikoff on July 30, 2025. Dkt. No. 556-4 (collection of server documents presented at Kertsikoff deposition).

Due to Reed Smith's threats regarding use of the server documents in the bankruptcy court, Eletson did not produce the documents to Levona in formal discovery with respect to the motion to vacate. *See Eletson Holdings Inc. v. Levona Holdings Ltd.*, 2025 WL 2452351, at *1 (S.D.N.Y. Aug. 26, 2025) (*Eletson III*). On June 30, 2025, Levona moved, before this Court, to

compel Eletson to produce the responsive documents it obtained from review of the Microsoft

Order. Dkt. No. 457 at 2. Eletson did not oppose the motion. Dkt. No. 471 at 3. Reed Smith,

joined by Intervenors, opposed the motion. Dkt. Nos. 468, 470. On August 26, 2025, the Court

granted Levona's motion to compel in part. The Court ruled:

> Eletson shall produce the documents responsive to the RFPs, including from the
> Microsoft Server and, to the extent it asserts a privilege, shall produce a privilege
> log. Eletson and Levona are directed to meet and confer on the appropriate means
> for such review and production to occur within the timeframe of this proceeding.
> Eletson further seeks an order that it will not be subject to sanctions of
> disqualification for complying with this Court's order. Eletson has no choice but
> to comply with the Court's order. Accordingly, it will not be subject to sanctions
> from this Court; the Court further assumes it will not be subject to sanctions or
> disqualification from any other court for the actions that it is required to take by
> order of this Court.

*Eletson III*, 2025 WL 2452351 at *5. Following this Court's ruling, Eletson began production of

the server documents on August 28, 2025. Reed Smith again moved for emergency relief before

the Second Circuit, which denied the application on September 17, 2025. Case No. 25-176, Dkt.

No. 77.[8]

Eletson has now produced additional contemporaneous documents found on the

Microsoft Server regarding both the exercise of the Purchase Option and the nomination of the

Cypriot entities. Those documents further establish that Eletson did not understand itself to have

exercised the Purchase Option and that it did not understand, at any relevant time, the Nominees

to have rights in the Preferred Interests.

---

[8] This Court also ordered Reed Smith to hand over the files maintained by Reed Smith with
respect to its representation of Eletson Corp or Eletson Holdings after new ownership terminated
Reed Smith as counsel on February 14, 2025. This included the client file from the arbitration,
excepting files created on or after November 19, 2024. Dkt. No. 270 at 107:19–23. Reed Smith
did not do so and appealed the Court's order. On April 16, 2025, the Second Circuit issued a
temporary stay of the order pending review by a three-judge panel. Dkt. No. 316. A three-judge
panel further stayed the proceedings in June. Case No. 25-445 Dkt. No. 66.

## VIII.    Intervenors Join the Lawsuit

On April 7, 2025, Apargo, Fentalon, and Desimusco—the Cypriot nominees—filed a motion to intervene in this proceeding following the change of control in Holdings precipitated by the Bankruptcy Proceedings.  Dkt. No. 301.  The Intervenors are each incorporated under the law of Cyprus and were formed between 2012 and 2014.  Dkt. Nos. 595-59, 595-60, 595-61.  Eletson and Levona opposed the motion for intervention.  Dkt. Nos. 318–20.  In their motion, Intervenors argued that under the plan as confirmed by the Bankruptcy Court, there is a "lack of genuine adversity between Eletson as presently reconstituted and Levona [that] jeopardizes the fair development of the record, the full presentation of arguments, and the integrity of the process."  Dkt. No. 302 at 2.  On May 9, 2025, this Court held that the proposed Intervenors had standing to oppose vacatur of the arbitration award and were entitled to intervene as of right under Federal Rule of Civil Procedure 24(a)(2).  *See Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, 2025 WL 1369730, at *8–9 (S.D.N.Y. May 9, 2025) (*Eletson IV*).  It held, however, that Intervenors had no standing to support confirmation of the award.  *Id.*  On May 14, 2025, the Court granted Levona and Eletson's joint stipulation to dismiss the Petition to Confirm.  Dkt. No. 350.

## IX.    Discovery Pursuant to the Crime-Fraud Exception

On June 24, 2025, Levona submitted a motion to compel production of documents from Reed Smith pursuant to the crime-fraud exception to attorney-client and work product privileges, along with a memorandum of law and a declaration with six exhibits.  Dkt. Nos. 446–48.  Levona attached too an appendix drawn from Eletson's privilege log containing numerous documents it alleged were withheld on an "erroneous assertion of privilege," "because they relate to matters that the court has ruled constitute substantial evidence of fraud by Eletson, and concerning which Eletson, through its principals and its then-counsel, made specious

representations to Justice Belen, Judge Mastando, and the Court in an ongoing effort to conceal that wrongdoing." Dkt. No. 447 at 4. Reed Smith filed a memorandum of law in opposition to the motion on July 8, 2025, along with its own declaration with thirty-one exhibits. Dkt. Nos. 484–85. Levona replied on July 14. Dkt. No. 498.

On August 27, the Court ordered that Levona identify a subset of thirty documents that it propose the Court review *in camera*. Dkt. No. 572. Levona did so on August 30. Dkt. No. 581. The Court ordered that Reed Smith produce twenty-eight of the identified documents for *in camera* review, because Levona presented "evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability." Dkt. No. 588 at 1 (quoting *United States v. Zolin*, 491 U.S. 554, 574–75 (1989)). On August 19, 2025, the Court granted Levona's motion to compel as to twelve of the identified documents that the Court reviewed *in camera*. Dkt. No. 606 at 7. The Court held a conference with the parties to discuss review of the remaining documents. The parties submitted competing proposals for review in advance of the conference. Dkt. Nos. 612–13. Following the conference, the Court ordered that Levona provide the Court and Reed Smith with a list of 150 documents for which it sought *in camera* review. Dkt. No. 606 at 2. The Court later held that *in camera* review was appropriate for a subset of those documents. Dkt. No. 635 at 2. The Court granted Reed Smith's request to submit an *ex parte* document opposing disclosure pursuant to the crime-fraud exception. Dkt. No. 637. The Court later ordered that the *ex parte* document be filed on the docket, with approved redactions. Dkt. Nos. 652–53.

On December 3, 2025, the Court ordered that Reed Smith produce to Levona seventeen of the identified documents on the basis that they were "related to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." Dkt. No. 653 at 2

(quoting *U.S. v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997)).  On December 10, 2025, the Court

ordered that Reed Smith produce an additional six documents on the same basis.  Dkt. No. 657 at

2.  Levona submitted a supplemental memorandum of law and accompanying declaration with

eight exhibits incorporating the crime-fraud documents on December 15, 2025.  Dkt. No. 658–

59.

The documents produced to Levona pursuant to this Court's orders, and introduced by

Levona into the litigation, demonstrate further that Eletson and its counsel understood the

Purchase Option had not been exercised and that the Eletson had not nominated Intervenors to

receive the Preferred Interests, and that Intervenors purposefully presented false testimony at the

arbitration and withheld from Levona and the Arbitrator the documents necessary to show that

such testimony was false and to reveal the truth.  The evidence demonstrates that the Purchase

Option was not exercised because no timely notice was given of its exercise and the

consideration necessary to exercise the option was not provided.  It demonstrates too that the

"transfer" to the Nominees was an after-the-fact contrivance designed to keep control of Eletson

Gas from Holdings and, in turn, from Holdings' creditors, after Holdings had been put in

involuntary bankruptcy proceedings.

## PROCEDURAL HISTORY

This Court issued an order that confirmed in part and vacated in part the arbitration award

on April 19, 2024.  Dkt. No. 104.  On July 3, 2024, Levona filed a motion for leave to file an

amended answer to the operative petition, along with a memorandum of law and declaration,

seeking vacatur on the basis of fraud in the arbitration.  Dkt. Nos. 123–25.  Eletson submitted a

memorandum of law in opposition and an attached declaration on July 23.  Dkt. Nos. 147–48.

Levona filed its reply on July 30.  Dkt. No. 149.  This Court granted Levona's motion on

September 6, 2024.  Dkt. No. 162.  Accordingly, the parties set a case management plan for discovery and briefing related to the new motion.  Dkt. No. 166.

Following entry of the Confirmation Plan in the bankruptcy proceeding, Goulston and Storrs appeared for Eletson on November 26, 2024.  Dkt. Nos. 222–23.  By operation of the Confirmation Order, Reed Smith was terminated as counsel for Holdings

On April 7, 2025, the Cypriot nominees submitted their motion to intervene in the proceeding.  Dkt. No. 301.  Levona opposed the motion, Dkt. No. 318, to which the Intervenors replied, Dkt. No. 329.  This Court granted the Intervenors' motion to intervene for the limited purpose of opposing vacatur of the arbitration award on May 9, 2025.  Dkt. No. 343.

On May 14, 2025, the Court approved Eletson and Levona's stipulation of dismissal without prejudice of Holdings' petition to confirm the arbitration award.  Dkt. No. 350.

On August 20, 2025, Levona submitted its memorandum of law in support of its motion to vacate the arbitral award.  Dkt. No. 549.  It submitted also a Rule 56.1 statement of undisputed facts, and a declaration with 91 attached exhibits.  Dkt. Nos. 551–51.  Eletson submitted its own memorandum of law in support of the motion the same day and included a Rule 56.1 statement and a declaration with 31 exhibits.  Dkt. Nos. 555–57.  Intervenors submitted their opposition to each on September 10, 2025, and attached a declaration with 97 exhibits and their own Rule 56.1 statement.  Dkt. Nos. 589–92, 595.  Levona and Eletson submitted their reply memoranda of law on August 22, 2025.  Dkt. Nos. 608–09.

Additionally, Levona submitted a motion seeking sanctions against Intervenors for discovery violations in connection with this proceeding, along with a memorandum of law, on August 22, 2025.  Dkt. Nos. 564–65.  Intervenors responded on September 4, Dkt. No. 584, to which Levona replied on September 11, Dkt. No. 598.

The Court held oral argument on December 9, 2025.  Dkt. No. 660 (Transcript of Oral Argument).

Following oral argument, with leave of the Court, Levona submitted a supplemental memorandum of law and accompanying declaration with exhibits incorporating documents that the Court had ordered produced pursuant to the crime-fraud exception to work product and attorney client privilege.  Dkt. No. 658.  Intervenors replied to that memorandum of law on December 29, 2025, submitting also four five declarations and accompanying exhibits.  Dkt. Nos. 662–67.  Levona sought leave of the Court to submit a reply, Dkt. No. 668, which was granted, Dkt. No. 669.  Intervenors then submitted an opposition to that reply, Dkt. No. 672, to which Levona responded, Dkt. No. 673.

## DISCUSSION

### I.    Sanctions Against Intervenors

Before reaching the merits of the vacatur motion, the Court first addresses Levona's motion for sanctions against Intervenors for their conduct with respect to discovery in connection with this litigation.  Dkt. No. 565.  The disposition of that motion informs the evidence that the Court may consider in connection with the motion to vacate the arbitral award.

In late 2024, Levona served subpoenas on Intervenors seeking material "from and after January 1, 2022, concerning the Withheld Documents and related assertions; ownership of the preferred shares of Eletson Gas; Eletson's purported exercise of the BOL Purchase Option; actual or potential financing for Eletson Gas; the reasons the Withheld Documents were not produced in the arbitration or after Levona requested them; related material withheld as privileged in the arbitration; and the collection, review, and production of documents in the arbitration, bankruptcy case, and related cases."  Dkt. No. 325.  Following the Court's order permitting the Cypriot Nominees to intervene in opposition to vacatur, the Court also granted

Levona's motion to compel Intervenors to produce documents responsive to those subpoenas (that converted to party discovery requests post intervention). Dkt. No. 342. The Court rejected Intervenors' arguments that the requests were overbroad or burdensome, and warned that "[i]f Intervenors' compliance with Levona's discovery requests is deficient, Levona may move for sanctions against Intervenors pursuant to Rule 37 of the Federal Rules of Civil Procedure," provided Levona could show that "the documents sought are actually within Intervenors' control." *Id.* at 7.

On July 3, 2025, Levona served a Rule 30(b)(6) deposition notice for the deposition of each Intervenor, Dkt. Nos. 501-4, 501-5, 501-6, and a 30(b)(1) personal deposition notice for Kertsikoff, Karastamati, and Hadjieleftheriadis. Dkt. Nos. 501-1, 501-2, 501-3. The parties agreed that the 30(b)(6) and personal depositions would be combined, with each of Hadjieleftheriadis, Kertsikoff, and Karastamati designated for the deposition for their respective Cypriot entity/Intervenor as well. Dkt. No. 501 at 1.

Levona requested that the Court compel the designees to appear in person in New York for their depositions. *Id.* Intervenors resisted that motion and requested instead an order from the Court permitting the depositions to take place remotely, asserting that the deponents resided abroad and there would be no prejudice to Levona. Dkt. No. 502. The Court rejected Intervenors' argument and granted Levona's motion on July 16, 2025, explaining that "Levona has offered compelling reasons why the depositions should be taken in person in New York, and Intervenors have offered no good cause for why they should be taken remotely from Greece." Dkt. No. 505 at 3. The Court continued that the three principals are "critical witnesses" for the case, and that "[a] remote deposition is no substitute for an in-person deposition in this case." *Id.* A New York deposition was appropriate particularly because Intervenors availed themselves of

New York by initiating the arbitration in New York, testifying in New York for that arbitration, and intervening in a proceeding in New York to defend the Award. *Id.* at 5.

Intervenors did not produce Karastamati and Hadjieleftheriadis as noticed in the United States for depositions on July 29, 2025. Rather, on July 19, Intervenors filed a letter stating that Kertsikoff would "appear on the date as noticed," but asking that, contrary to the Court's ruling, Karastamati not be deposed until August 4, 2025, and that Hadjieleftheriadis be deposed remotely. Dkt. No. 508 at 2–3. Intervenors also sought a protective order "expressly precluding Reorganized Holdings, Levona and/or any other affiliated persons or entities from serving warrants or any other legal papers on Intervenor witnesses when travelling to/from the U.S., or present here, for purposes of appearing for their respective depositions, or otherwise using their visits to New York for purposes other than obtaining testimony for this case." *Id.* at 2.

Intervenors' apparent concern was that the bankruptcy court had found Karastamati and Hadjieleftheriadis (as well as the three former majority shareholders run by each of the former principals) in contempt of court for violating its orders, *see e.g.* Bankr. Dkt. No. 1721 at 74–76, and that opposing counsel in the bankruptcy proceedings was "exploring whether warrants may be able to be issued," Dkt. No. 508 at 1 (quoting Bankr. Dkt. No. 1709). Karastamati and Hadjieleftheriadis had not taken action to purge themselves of the contempt or to pay the contempt sanctions, and seemingly feared that if they appeared in the United States they might have to answer for their contempt. (By contrast, Kertsikoff had resigned from Eletson upon the effective date of the Confirmation Plan and, by July 2025, had not been found to be in violation of the Confirmation Order.[9]) Levona responded to Intervenors' argument on July 23, 2025, and

---

[9] Kertsikoff was later found in contempt of the Bankruptcy Court in November 2025. Bankr. Dkt. No. 1885.

stated that although Levona would not itself serve the deponents with legal papers, "[i]f any other entity or person attempts to take those steps, Intervenors and their witnesses could seek appropriate relief." Dkt. No. 522. at 1. It continued also that neither Karastamati nor Hadjieleftheriadis had provided a sufficient basis for the Court to grant their remote deposition request. *Id.* at 2.

The Court construed Intervenors' requests as a motion for reconsideration and denied it because Intervenors had not met the high standard for the Court to reconsider its prior order. Dkt. No. 525. It explained that "[e]ven if Intervenors were entitled to a second bite at the apple, the Court would not reach a different conclusion," because neither Karastamati nor Hadjieleftheriadis offered a "persuasive reason why they cannot rearrange their schedules to attend a one-day deposition" in New York, the "same city" where they admit having travelled to for the JAMS arbitration hearings. *Id.* at 3–4. The Court also denied the Intervenors' request for immunity from process for attending a deposition in New York, noting that the argument should be addressed to the court from which process would issue and not the court in which the discovery was being sought. *Id.* at 6. Neither Karastamati nor Hadjieleftheriadis appeared for their depositions. Dkt. Nos. 551-88, 551-89.

Federal Rule of Civil Procedure 37(b)(2)(A) states that "[i]f a party or party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." The permitted orders include the Court directing that certain facts be taken as established for the purposes of the action, prohibiting introducing designated matters in evidence, striking pleadings, staying the proceeding, dismissing the action in whole or in part, rendering default judgment, or treating the failure to obey an order as contempt of court. Fed. R. Civ. P.

37(b)(2)(A).  In "addition to" or "instead of" a further order, the court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make the award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  The Court may also "order sanctions" where "a party or party's officer, director, or managing agent . . . fails, after being served with proper notice, to appear for that person's deposition."  Fed. R. Civ. P. 37(d)(1)(A)(i).

### A.    The Failure of Karastamati and Hadjieleftheriadis to Appear

Levona argues that Intervenors should be sanctioned under Rule 37 for their failure to produce Hadjieleftheriadis and Karastamati for their personal and corporate depositions in violation of the Court's Orders.  Dkt. No. 565.  Intervenors do not defend Hadjieleftheriadis' and Karastamati's contempt.  They argue instead that because the individuals are not directors or employees of Desimusco or Fentalon respectively, the Cypriot companies could not have compelled their appearance and should therefore not be sanctioned for their failure to appear. Dkt. No. 584.  The argument is facetious.  Having offered Karastamati and Hadjieleftheriadis to testify respectively and having sought on their behalf to delay or move their depositions, Fentalon and Desimusco cannot now turn around and disclaim responsibility for their failure to appear as ordered.  Intervenors clearly believed that they were in control of Kertsikoff, Karastamati and Hadjieleftheriadis, when, on July 19, 2025, they offered Kertsikoff to testify in person, Karastamati to testify in August 2025, and Hadjieleftheriadis to testify only outside the United States.  The evidence is clear that Intervenors as a group were no less in control of the three witnesses when Karastamati and Hadjieleftheriadis failed to appear as ordered on July 29, 2025.  Moreover, at a minimum, those individuals are "managing agent[s]" of their respective

companies such that the party can be sanctioned by their misconduct.  Fentalon and Desimusco cannot hide behind the fiction that they are ostensibly separate legal persons.

Under Rule 37(b)(2)(C), a party may be sanctioned where its "managing agent" fails to appear for their properly noticed deposition.  "The test of whether an individual is a 'managing agent' is functional rather than formal."  *Grain D'OR LLC v. Wizman*, 2023 WL 2162499, at *3 (S.D.N.Y. Feb. 22, 2023).  "It is sufficient that the deponent be, in some respects, an agent of the corporate defendant and have some actual or potential managerial authority."  *Id.*; *see Schindler Elevator Corp. v. Otis Elevator Co.*, 2007 WL 1771509, at *3 (S.D.N.Y. June 18, 2007) (holding that independent contractors can be managing agents and that the focus of analysis is on the agency relationship, the scope of the agent's authority, and the nature of his role in the matters at stake in the litigation); *Tomingas v. Douglas Aircraft Co.*, 45 F.R.D. 94, 96 (S.D.N.Y.1968) ("The term 'managing agent' should not be given too literal an interpretation.").  "[C]ourts in this district have generally considered five factors in determining whether an individual is a managing agent: '1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; 4) the general responsibilities of the individual respecting the matters involved in the litigation; and 5) whether the individual can be expected to identify with the interests of the corporation.'"  *Dubai Islamic Bank v. Citibank, N.A.*, 2002 WL 1159699, at *2 (S.D.N.Y. May 31, 2002) (quoting *Sugarhill Records Ltd. v. Motown Record Corp.*, 105 F.R.D. 166, 170 (S.D.N.Y. 1985)).

It is abundantly clear that the Cypriot entities and their principals are one and the same, such that it is beyond dispute that the individuals who did not appear are at least managing agents of Intervenors. The record is replete with evidence of Hadjieleftheriadis' and Karastamati's control over Desimusco and Fentalon, and that they are the principals of those companies and exercise judgment and discretion in corporate matters. Dkt. No. 551-1 at 539:18–540:7. Kertsikoff testified that Hadjieleftheriadis and Karastamati are the ultimate beneficial owners of the companies. *Id.* at 559:5–560:6. An October 24, 2023 contract between Eletson and an advisory firm they hired explains that the "holders of the preferred membership Interests in Eletson Gas" are "Fentalon Limited (controlled by the family of Laskarina Karastamati), Desimusco Trading Limited Liberia (controlled by the family of Vasilis Hadjieleftheriadis) and Apargo Limited (controlled by the family of Vassilis Kertsikoff)." Dkt. No. 599-1 at 3. This legal document is an admission. It was signed by Karastamati, Hadjieleftheriadis, and Kertsikoff and sent by Karastamati (at her Naftilos Maritime email address)[10] to the Papaphilippou law firm that represents Intervenors in Cyprus, with instructions to that firm that it ask the "respective directors of the 3 companies to countersign and return the copy back to this address." *Id.* at 2.

Furthermore, there is no person "employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination." *Dubai Islamic Bank*, 2002 WL 1159699, at *2. Hadjieleftheriadis is not nominally a director or officer of Desimusco and Karastamati is not nominally the director or officer of Fentalon, but the persons who hold those positions do so in name only. The director of Desimusco is Marios Lazarou who is an attorney at the Papaphilipou law firm that represents

---

[10] In his deposition, Kertsikoff testified that he would "[o]ccasionally" conduct Apargo business using a "nafitilosmaritime.com e-mail address." Dkt. No. 551-1 at 391:5–9.

Intervenors in Cyprus, *see* Dkt. No. 599-1 at 15; and the director of Fentalon is Savvas

Polydorou, *see* Dkt. No. 599-1 at 15, another partner at Papaphilipou law firm, Dkt. No. 566-3 at

3. Furthermore, Hadjieleftheriadis explains in his declaration that he, not that director, has the

power to instruct U.S. counsel for Desimusco, including by instructing that they make a filing as

to the necessity of appearing remotely for his deposition. Dkt. No. 585 ¶ 6. As with

Hadjieleftheriadis, in her declaration Karastamati clarifies that she was capable of giving

instruction to U.S. counsel for Fentalon, including the instruction that counsel "file legal papers

opposing a motion to compel my appearance in New York," and "file[] papers seeking

reconsideration and/or a protective order." Dkt. No. 586 ¶ 7. Hadjieleftheriadis and

Karastamati, not the formal directors, were designated as the 30(b)(6) witnesses to testify on

behalf of Desimusco and Fentalon, and they in turn designated their cousin Kertsikoff to testify

on their behalf instead of the two lawyer-"directors." Their actions are consistent with an

individual at the apex of the company's control structure. *See United States v. M/Y Amadea*,

2025 WL 754124, at *16 (S.D.N.Y. Mar. 10, 2025) (a "shell company" with "no employees" and

a "single director" owned by an individual can be sanctioned for his failure to appear at a

deposition).

There is also no other individual who is better situated to testify about Intervenors'

actions in connection with this litigation. In a declaration submitted in opposition to the motion

for sanctions, Hadjieleftheriadis, states that he has "never been a director or officer of Blige[11] or

---

[11] Kertsikoff explained in his deposition that Fentalon and Desimusco are owned by a company
called "Blige," whose owners in turn are the principals of Fentalon and Desimusco. Dkt. No.
551-1 at 557:8–11. The corporate reorganization was accomplished purportedly for tax and
estate tax reasons. *See, e.g., id.* at 376:5–12 (Kertsikoff explaining that the acquisition of his
company, Apargo, by a new entity Davit Seas was done for "estate and tax planning.") Counsel
for Intervenors itself cannot keep the entities straight. Upon intervention, on April 7, 2025,
Desimusco submitted its corporate disclosure statement stating that Desimusco has "no parent

Desimusco," "[n]or have I been an employee of these companies." Dkt. No. 585 ¶ 2. He states that he acted as the representative for Desimusco "[o]n a purely voluntary basis." *Id.* ¶ 3. However, whether he was paid salary for his service as a witness for Desimusco, he is the ultimate owner of the company. He designated Kertsikoff to appear for Desimusco on his behalf, and he had the requisite knowledge to "refresh[] [Kertsikoff] regarding certain corporate structure and governance details relating to Desimusco." *Id.* ¶ 10. He was aware too of the details of the litigation hold that Desimusco initiated, and that the company "only has minimal documents given the nature of its business." *Id.* ¶ 11. Previously, in the arbitration, when it suited him, he stated that "[m]y family's company is Desimusco," and that "I have authority to speak on behalf of Desimusco and any order entered in this Arbitration will bind my entity." Dkt. No. 551-4 ¶ 104. Hadjieleftheriadis described Desimusco as "my Cypriot company." *Id.* ¶ 108. Hadjieleftheriadis' present declaration borders on the sanctionable.

Karastamati, for her part, noted in her declaration in opposition to sanctions that she is an owner of "units in Ascella Limited," although she has only a "minor stake," and that in turn Ascella "is the sole owner of Fentalon Limited." Dkt. No. 586 ¶ 1.[12] (The other owner apparently is Karastamati's sister. Dkt. No. 551-9 ¶ 103.) Like Hadjieleftheriadis, she declares that she has "never been a director, officer or employee of Fentalon," and that she has acted as its representative in the instant proceedings "[o]n a voluntary basis." Dkt. No. 586 ¶¶ 2–3. But the same points apply to her as to Hadjieleftheriadis. The ostensible separation is a fiction. She

---

company." Dkt. No. 304. It had to correct the statement two days later, when Desimusco submitted an amended Corporate Disclosure Statement disclosing that Desimusco's parent is Blige Corporation. Dkt. No. 306.

[12] This contradicts Kertsikoff's testimony that Fentalon is owned by Blige. Kertsikoff did not mention Ascella in his deposition testimony. As with Desimusco, Fentalon originally submitted a Corporate Disclosure Statement stating that it had no parent company, Dkt. No. 305, only to update it two days later identifying Ascella as the parent, Dkt. No. 307.

does not need to be paid a salary for her appearance in this case; she is an ultimate owner of Fentalon who will receive her compensation in that capacity. Like Hadjieleftheriadis, she had enough information about the company to instruct Kertsikoff, who would testify on her behalf, as to "various details relating to the structure and activities of Fentalon." *Id.* ¶ 10. And she knew that Fentalon "only has minimal documents at all pertinent to these matters." *Id.* ¶ 11. In her witness statement before the arbitration, she too admitted that "my family's company is Fentalon, which I own with my sister," and that "[a]s a result, I have authority to speak for this nominee," and "[a]ny conclusion by the Tribunal in this Arbitration will bind Fentalon." Dkt. No. 551-9 ¶ 103.

Collectively, this evidence establishes both Karastamati and Hadjieleftheriadis as managing agents of Fentalon and Desimusco respectively. It was on the basis of their representation to the Arbitrator that those companies would be bound by the arbitration that they received the Arbitral award in the first instance. Dkt. No. 551-4 ¶ 104; Dkt. No. 551-9 ¶ 103; Final Award at 31 (explaining that "representatives from each of the Preferred Nominees have testified that they are bound by any award in this arbitration."). Intervenors have presented no evidence in connection with the motion for sanctions demonstrating that another individual has actual control over the three shell entities or would be better positioned to testify about their actions with respect to the Preferred Interests. The Intervenors may therefore be sanctioned for the failure of the individual deponents to appear under Rule 37(d).

Levona argues that any sanctions should run against Apargo as well. The Court agrees. In this litigation, the Intervenors have operated as an indivisible unit, and the individual companies are indistinguishable. Any argument that they possess distinct interest in the outcome of this litigation is an artifice created to avoid the consequences of their collective actions. They

have appeared collectively, through counsel, as to each motion they have submitted. They have presented no distinct arguments, nor any indication that they possess unique legal strategies or interests. The Final Award determined that the three companies were nominated collectively and resulted in them receiving the Preferred Interests as a whole, not on an individual basis. Final Award at 95–96.[13] The three Cypriot companies were awarded damages collectively in the Arbitration. *Id.* at 99. Also, the evidence reveals that the companies are functionally indistinguishable—they share the same counsel (both in this litigation and in Cyprus), the same physical address (which is the same address as Eletson in Piraeus, Greece), Dkt. No. 599-1 at 10, and the same accountant, Dkt. No. 555-1 at 361:5–14. Apargo does not have its own phone number. *Id.* at 38-:23–25. Apargo has no existence other than as a vehicle to hold the Preferred Interests— interests that according to the Award are held in common with the other two Intervenors. *See* Dkt. No. 551-1 at 347:16–348:10. Karastamati also instructed Cypriot counsel for Intervenors to have all three of the Cypriot companies sign an engagement letter, without copying Kertsikoff or Hadjieleftheriadis, further evidencing common control over the three entities. Dkt. No. 599-1 at 2. This is confirmed in this litigation by the fact that the three Intervenors have acted in lockstep and coordinated with one another in the discovery violation leading to the instant sanctions. *See* Dkt. No. 585 ¶ 6; Dkt. No. 586 ¶ 7 (explaining that Kertsikoff, the Apargo representative, was requested to represent Desimusco and Fentalon at his deposition); Dkt. No. 551-1 at 540:22–541:24 (Kertsikoff explaining that it was not until within a week of the deposition date that Karastamati and Hadjieleftheriadis decided not to appear, of which they informed him by phone).

---

[13] Indeed, it is telling that to this day the Intervenors have not identified the interests each of them purportedly has in the Preferred Interests.

The decision of Karastamati and Hadjieleftheriadis to flout this Court's orders was made with the involvement of Kertsikoff, and Kertsikoff and his company, Apargo, are complicit in that wrongdoing. It is appropriate and proper therefore that Kertsikoff and his company be held accountable for the decision made by Karastamati and Hadjieleftheriadis. *See Flaks v. Koegel*, 504 F.2d 702, 710 n.6 (2d Cir. 1974) (where there exists a "virtual identity of interests" between two entities, the failure of one to appear at a deposition "could be properly considered to be the failure" of the other for the purposes of Rule 37 sanctions); *see also United States v. M/Y Amadea*, 2025 WL 754124, at *16 (S.D.N.Y. Mar. 10, 2025) (similar). The Intervenors who apparently hold the Preferred Interests in common cannot avoid the effect of their contempt by proffering only one of the critical witnesses the Court ordered appear in New York and withholding the others. It would undermine the purpose of the discovery sanctions to exempt Apargo on the basis that Kertsikoff appeared on its behalf.[14]

## B.    Failure to Produce Documents

Levona argues too that sanctions should be imposed on Intervenors for their failure to produce documents belonging to Eletson Gas that are within their control. In May 2025, the Court granted Levona's motion for an order compelling Intervenors to produce Eletson Gas documents. Dkt. No. 342. As relevant here, the Court held that "as to the issue of Intervenors' possession, custody, or control of relevant documents, the Court does not now prejudge the question of whether Intervenors' eventual compliance with this Order will be deficient if it does not include documents ostensibly belonging to third parties such as Eletson Gas." *Id.* at 4. The Court continued that

---

[14] Even if the sanctions did not run against Apargo, that would not change the outcome of the motion to vacate because in any event, Apargo has failed to present admissible evidence that would create a genuine issue of material fact that the award was procured by the fraud of each of the three principals, any one of which would be sufficient to support the Court's conclusion.

> Under Rule 34(a)(1), a party is obligated to produce requested documents "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). "The concept of control has been construed broadly." *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 334 F.R.D. 68, 72 (S.D.N.Y. 2020) (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006)). "[D]ocuments are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Smith v. Pergola 36 LLC*, 2022 WL 17832506, at *4 (S.D.N.Y. Dec. 21, 2022) (quoting *Bank of N.Y. v. Meridien BIAQ Bank Tanzania Ltd.*, 171 F.R.D. 135, 146–47 (S.D.N.Y. 1997)); *Mirlis v. Greer*, 80 F.4th 377, 382 (2d Cir. 2023) (control includes "the right, authority, or practical ability to obtain the documents"). "A party is deemed to 'control' documents that it has the legal right or the practical ability to obtain—even where those documents are in the physical possession of non-parties." *Waite v. UMG Recordings, Inc.*, 2020 WL 3959185, at *2 (S.D.N.Y. July 13, 2020) (quoting *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 190 (S.D.N.Y. 2013)). A parent corporation with a "sufficient degree of ownership and control . . . must be deemed to have control over documents located with [its] subsidiary." *Dietrich v. Bauer*, 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000). "The . . . application of the concept [of 'control'] is often highly fact-specific." 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2210 (3d ed. 2025). "Particular concerns can arise when a corporate party is related to another corporation, and this nonparty corporation actually possesses the materials in question." *Id.* "Rather than adopting an overarching rule for such situations, the courts have tended to focus on the facts shown in a particular case." *Id.*

*Id.* at 5–6. In granting the motion to compel, the Court concluded that if Intervenors' compliance was deficient, Levona could move for sanctions—at which point it would bear the burden of "showing that the documents sought are actually within Intervenors' control." *Id.* at 7.

Reed Smith produced a subset of the Eletson Gas documents that Levona sought. Dkt. No. 565 at 23 ("To be sure, Reed Smith in response to Levona's subpoena produced certain Eletson documents that were in Reed Smith's possession."). Levona argues, however, that Intervenors failed to produce several categories of documents to which they retain access, and which are directly responsive to the document request and the questions presented by the motion to vacate. For example, Eletson maintained a "buyout" file on the "Danaos ERP System" or "Y drive," *see* Dkt. No. 551-24 at 2 (Orfanoudaki emailing Kanelos and noting that a buyout file is "located at Y:\MURCHINSON\EG Model."). Eletson also maintained an internal "FINANCE"

48

folder, a "LEGAL AND CONTRACTS" folder, a "VESSELS" folder, and a "MARKETING"

folder. Dkt. No. 566-1 at 3–4.  Reed Smith on behalf of Eletson noted that responsive

information might be found in those files.  *Id.*  There is no evidence that those files were

searched for responsive documents in connection with this litigation.  Another source of relevant

discovery is the physical Eletson office (the office of Eletson as it existed in Greece, pre-

bankruptcy); Reed Smith previously indicated that there could be relevant materials in "hard

copy" at Eletson's office, 118 Kolokotroni Street, in Piraeus, Greece.  *Id.* at 4.  That same

address is the location of Intervenors' office.  Dkt. No. 599-1 at 10.  If there is a document from

either the drive or the physical office that was produced (or if there is any other evidence that

those locations were searched), Intervenors have not pointed to it.

Levona has demonstrated that Intervenors failed in their obligations under Rule 34 of the

Federal Rules of Civil Procedure.  Intervenors had an obligation to conduct a reasonable search

for documents in all locations over which they had custody, control or possession.  *See*

*Gardner-Alfred v. Fed. Res. Bank of N.Y.*, 2023 WL 3495091, at *15 (S.D.N.Y. May 17, 2023)

("Under Rules 26 and 24, 'parties [must] conduct a reasonable search for documents that are

relevant to the claims and defenses' and parties 'have an affirmative obligation to search for

documents which they may use to support their claims or defenses, unless the use would be

solely for impeachment.'" (quoting *Raine Grp. LLC v. Reign Cap., LLC*, 2022 WL 538336, at *1

(S.D.N.Y. Feb. 22, 2022))).  Rule 34 does not give the producing party permission to ignore

locations where responsive documents might reside.  *Id.*; *see also In re Ski Train Fire of Nov. 11,*

*2000 Kaprun Austria*, 2006 WL 1328259, at *5 (S.D.N.Y. May 16, 2006) ("It is axiomatic that a

party is obliged to produce in response to document requests responsive documents that are in its

'possession, custody, or control.'" (quoting Fed. R. Civ. P. 34(a))).

The evidence demonstrates that Intervenors had control over the drives and the physical office where Levona has demonstrated responsive documents should be located.  Intervenors' "practical ability to obtain" those documents is evident from the fact that they control the entity that possesses them.  The Court could go further.  Kertsikoff testified that to conduct Apargo business, he "predominantly" used his eletson.com email address.  Dkt. No. 551-1 at 394:4–11.  He testified too that if Apargo wanted to get ahold of Eletson emails, it would be able to.  *Id.* at 412:9–19.  Additionally, the Cypriot entities all share the same physical office, which is also the same physical office of Eletson Gas.  Dkt. No. 599-1 at 10.  There is no evidence that the Cypriot companies have any actual presence in Cyprus, as their address there is the same as that for the Papaphilippou law firm that represents them.  *See also* Dkt. No. 566-3 at 4.  Furthermore, in his declaration supporting his non-appearance at his deposition, Hadjieleftheriadis stated that he "frequently require[s] access" to "on-site files" at the joint office of Eletson and Intervenors.  Dkt. No. 510 ¶ 6.  The principals of Intervenors also continue to exercise day to day control over Eletson Gas (notwithstanding the provisions of the Confirmation Plan and the bankruptcy court's directives that deprive them of the right to that control).  Dkt. No. 413 at 8.[15]  Intervenors could have conducted a search of the physical documents and drive documents stored at Eletson.

Intervenors' arguments to the contrary are without merit.  Intervenors suggest that Levona agreed that the documents did not need to be produced, or that Reed Smith would alone be responsible for the production of Eletson documents.  But that argument flies in the face of Levona's motion to compel directed to Intervenors which the Court granted.  Levona had a right to seek documents from all persons who might have responsive information.  *Alexander*

---

[15] The Court does not rest on the question whether a pre-reorganization "Eletson Holdings" continues to enjoy a corporate existence, an issue that is before the Second Circuit.

*Interactive Inc. v. Adorama, Inc.*, 2014 WL 61472, at *2 (S.D.N.Y. Jan. 6, 2014). Neither Levona nor the Court relieved Intervenors of their obligation to produce responsive documents in their possession, custody or control. The fact that the principals who control the locations where documents reside are not the same as the persons who are directors of Intervenors, *see* Dkt. No. 566-3 at 3, does not mean that Intervenors lack control over those locations, particularly where the directors are lawyers who represent the principals. This is not a case where the moving party has made only a "mere showing of a corporate relationship" between Intervenors and Eletson. Dkt. No. 584 at 20. Levona has shown that Intervenors cannot be distinguished from their principals, and that together those entities exercise control over Eletson Gas's documents such that they could have produced them in connection with this litigation. Finally, it is no defense that Eletson Gas documents may be commingled with those of Holdings and Eletson Corp—Intervenors still had the obligation to search for and produce responsive documents.[16]

### C.    The Nature of the Sanctions

The Second Circuit has explained that:

> Disciplinary sanctions under Rule 37 are intended to serve three purposes. First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.

*S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)). The Court has significant

---

[16] In a tit-for-tat argument, Intervenors claim that they should not be required to produce documents nominally in the possession of Eletson Gas because Levona was not required to produce documents of its parent. The argument is neither here nor there. The Court did not require Levona to produce Murchinson documents because there was no evidence of an alter ego relationship between Murchinson and Levona, and Intervenors "had the opportunity to take issue with the specific search terms used by Levona," but "have not done so." Dkt. No. 495 at 2.

discretion in imposing sanctions, subject to the "basic limitations" that the sanction be "just" and "relate to the particular claim to which the discovery order was addressed." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991). "Sanctions available under Rule 37(b) include a grant of an adverse inference instruction for the non-production of evidence and precluding the party from supporting its claims or introducing certain matters into evidence." *Trepeta v. Poll Rest. Grp.*, 2022 WL 16822965, at *2 (E.D.N.Y. Oct. 5, 2022); *see also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 119 (S.D.N.Y. 2018). Reasonable expenses as contemplated under Fed. R. Civ. P. 37(b)(2)(C) are "mandatory." *In re Kwok*, 2025 WL 783645, at *3 (2d Cir. 2025) (summary order).

Levona argues that "Intervenors should be precluded from introducing evidence or argument concerning statements or actions of Hadjieleftheriadis or Karastamati," and that the Court should "draw an adverse inference as to their failure to testify and presume their testimony would have favored Levona." Dkt. No. 565 at 14. Levona also seeks to preclude Intervenors "from offering evidence or argument concerning the meaning or implications of Eletson's documents" that they failed to produce. *Id.* at 23. In this case, the sanction of preclusion is the least restrictive and harsh sanction the Court could impose to address the serious discovery violations by Intervenors "to achieve the purpose of Rule 37 as a credible deterrent 'rather than a paper tiger," *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (quoting *Cine-Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979)). Preclusion is necessary both to "ensure that [Intervenors] will not be able to profit from [their] own failure to comply," *JSC Foreign Econ. Ass'n Technostroyexnort v. Int'l Dev. & Trade Servs., Inc.*, 2005 WL 1958361, at *10 (S.D.N.Y. Aug. 16, 2005) (quoting *Cine Forty*, 602 F.2d at 1066), and it is "the least harsh sanction that will remedy the discovery violation and

deter such conduct in the future." *Farmer v. Hyde Your Eyes Optical, Inc.*, 2015 WL 2250592, at *8 (S.D.N.Y. May 13, 2015).

Intervenors engaged in "culpable [mis]conduct." *Savor Health, LLC v. Day*, 2022 WL 1912881, at *4 (S.D.N.Y. May 17, 2022) (quoting *Scantibodies Lab., Inc. v. Church & Dwight Co., Inc.*, 2016 WL 11271874, at *33 (S.D.N.Y. Nov. 4, 2016)).  The decisions of Intervenors not to produce Hadjieleftheriadis and Karastamati and to violate the Court's orders was considered and willful.  They knew that the Court had ordered Hadjieleftheriadis and Karastamati to be present in New York for their depositions, just as they had done for the arbitration itself.  Hadjieleftheriadis and Karastamati were two of the three most critical witnesses in the case, the only ones able to speak to whether they committed perjury, and the ones with the greatest stake in the outcome of the case.  Intervenors tried twice to avoid having to appear in New York, including going to the length of asking for reconsideration.  And Intervenors made the deliberate decision to take the law into their own hands and to disregard the Court orders and their obligations under United States law.  Dkt. No. 585 ¶ 8 (Hadjieleftheriadis stating "it was my decision after deep consideration not to travel to New York given the personal risks"); Dkt. No. 586 ¶ 8 (Karastamati stating that "I made a determination myself—that did not come easily—to not travel to New York").  Intervenors' conduct with respect to document production was barely less contemptuous.  The Court granted Levona's motion to compel.  Intervenors' failure to search for and produce the requested documents was willful; Intervenors could have accessed the digital and physical documents located in files with titles that could not be more relevant to the case but simply chose not to abide by the Court's order.

It is appropriate to preclude Intervenors from offering argument or evidence regarding the statements and actions of Hadjieleftheriadis or Karastamati from any source because those

individuals were best positioned to testify as to their own statements or actions and their intent behind them, and they simply chose not to appear. If Intervenors had wanted to offer evidence regarding Hadjieleftheriadis' or Karastamati's statements or actions, they could have presented those two witnesses for testimony. By arguing that Intervenors should not be foreclosed from offering evidence regarding the statements and actions of those individuals anyway, Intervenors seek to obtain from their own willful misconduct even more than the Court denied them when it rejected their motion for reconsideration and required the appearance of those two individuals for testimony in the United States. For the same reasons, it is appropriate to "draw an adverse inference as to their failure to testify and presume their testimony would have favored Levona." Dkt. No. 565 at 14. Few other inferences are available given the conduct of the two principals. *See Bouzo v. Citibank, N.A.*, 1993 WL 525114, at *1 (S.D.N.Y. Dec. 13, 1993) ("Such adverse inferences are appropriate as a consequence for failure to make discovery.").[17]

Levona also is entitled to an order precluding Intervenors "from offering evidence or argument concerning the meaning or implications of Eletson's documents" that they failed to produce. Dkt. No. 565 at 23. If Intervenors wanted to offer evidence or argument regarding a document, they should have produced it—as ordered by the Court. The Court will not allow them to benefit from their misconduct by withholding a document and then offering evidence or argument regarding it. *See Daval Steel Prods.*, 951 F.2d at 1365 ("When a party seeks to frustrate [the purpose of the discovery provisions of the Federal Rules of Civil Procedure] by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate") (citation omitted).

---

[17] Monetary sanctions alone would clearly be ineffective, as the same individuals have refused to pay the more than $1.3 million for which they are liable in their personal capacities in the Bankruptcy Proceeding. See Bankr. Dkt. No. 1716.

The Court does not rest upon, but also cannot ignore, the contemptuous conduct of all three principals of Intervenors in the parallel bankruptcy proceedings. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022) (taking into account the fact that the defense's strategy "had a dilatory effect and, indeed, strongly suggest[s] that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him" in denying leave to amend); *Williams v. Nat'l R.R. Passenger Corp.*, 2019 WL 3423267, at *4 (S.D.N.Y. July 30, 2019) (taking course of litigation misconduct into account in imposing sanctions under Rule 37); *Heendeniya v. St. Joseph's Hosp. Health Ctr.*, 830 F. App'x 354, 358 (2d Cir. 2020) (summary order) (same); *Nat'l Hockey League v. Met. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976). In the bankruptcy proceeding, Intervenors are subject to sanctions for failure to comply with the orders of that Court. The bankruptcy court has repeatedly found that the former owners and directors of Eletson, including Hadjieleftheriadis, Kertsikoff, Karastamati, and Intervenors, having submitted to the jurisdiction of the Bankruptcy Court, disregarded and violated the orders of that court that they simply did not like. *See* Bankr. Dkt. No. 1721 at 74–76. Specifically, on July 8, 2025, the bankruptcy court found that the "violating parties," which there included the former majority shareholders (Glafkos, Family Unity, and Lassia), the purported provisional board of Eletson Holdings in Greece (which includes Hadjieleftheriadis individually), and Karastamati, should be sanctioned for contesting judicial recognition of the Bankruptcy Plan abroad. *Id.* On August 1, 2025, the bankruptcy court separately sanctioned the Cypriot entities for seeking to register the preferred shares in their name and change the composition of the Board in violation of that court's stay relief order. Bankr. Dkt. No. 1759. In November 2025 the Bankruptcy Court also sanctioned Kertsikoff and Karastamati for their involvement in the violations detailed as to the Cypriot entities. Bankr. Dkt. No. 1885 at 16–17. Hadjieleftheriadis, Kertsikoff, and Karastamati

have shown through their conduct that they have no regard for the orders of United States courts.

Their pattern of conduct is no less egregious in this proceeding. The principals of Intervenors delayed resolution of the case by withholding the document produced in the Bankruptcy Proceeding that should have been turned over in discovery and threatening Levona with sanctions if they were to rely on that document that this Court has since compelled production of. Additionally, at each turn, their dilatory discovery has forced Levona to move to compel the production of basic and responsive documents. Intervenors have then nevertheless disregarded this Court's grant of various motions to compel.

Intervenors' arguments against the imposition of discovery sanctions are unconvincing. They argue that they "proposed various means to mitigate" the failure to appear, in that they offered that the depositions could be conducted remotely. Dkt. No. 584 at 11. In other words, when the Court rejected their arguments that they appear outside the United States, they went ahead and offered that alternative anyway. That Intervenors repeated to Levona what they had earlier offered and the Court rejected does not excuse or mitigate Intervenors' misconduct. *See Kitevski v. City of New York*, 2006 WL 680527, at *5 (S.D.N.Y. Mar. 16, 2006) ("A party does not have the option to disregard an order because it believes it has a good excuse for doing so."). Intervenors go so far as to argue that Levona should be blamed for Intervenors' failure to appear because Levona would not stipulate that the individuals would not be served with process from any entity from this proceeding or the bankruptcy proceeding when in New York. That argument barely merits a response. In the first instance, it was not for Levona to stipulate that Intervenors would not be served with process when they came to the United States. Levona represented that it would not "serve any warrants or legal papers on Intervenor witnesses when those witnesses are travelling to/from the U.S., or present here, for purposes of appearing at their

respective depositions, or otherwise using those visits to New York for purposes other than obtaining testimony for this case." Dkt. No. 508 at 2. It is apparently Holdings and the bankruptcy court that Intervenors fear. But it is Levona that noticed the depositions and that is seeking relief here and it was not for Levona to make a representation on behalf of Holdings.

More important, Intervenors were not entitled to use their own contempt of the bankruptcy court as an excuse to deprive Levona of the discovery to which it was entitled. The principals of Intervenors have engaged in flagrant misconduct. They are subject to contempt sanctions from the Bankruptcy Court because, having placed Eletson in voluntary bankruptcy, they have simply ignored and disregarded numerous orders of the Bankruptcy Court when those orders have not gone their way. Bankr. Dkt. No. 1716. As a result of that contempt, the Bankruptcy Court has continued to impose increasing monetary sanctions on an increasingly wide scope of implicated parties, now encompassing each of the principals and their Cypriot companies. Bankr. Dkt. Nos. 1495, 1537, 1716, 1721, 1759, 1885. If the individuals feared the consequence of the Bankruptcy Court orders, they had the means to address it. They could have not violated those orders in the first instance or, once they violated the orders, they could have taken action to purge their contempt—they "carr[y] the keys of [their] prison in [their] own pocket." *CBS Broad. Inc. v. FilmOn.com*, 814 F.3d 91, 101 (2d Cir. 2016) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994)). They cannot use their contempt first to deprive the persons who funded Eletson and its creditors in a valid bankruptcy proceeding of the right to control the entity for which they paid and then to deprive Levona of the discovery to which it is and was entitled.

The fact that Intervenors offered Kertsikoff as a 30(b)(6) witness is not an excuse for their failure to produce Karastamati or Hadjieleftheriadis. Intervenors asked for an order that

Kertsikoff, Karastamati, and Hadjieleftheriadis be permitted to testify remotely. Dkt. No. 502. When the Court denied that motion, they then offered that Kertsikoff would testify in person, but that Karastamati would not testify until a week later, and that Hadjieleftheriadis would appear remotely. Dkt. No. 508. The Court denied that motion as well. Having asked for and been denied that relief, Intervenors did not have the prerogative to grant it to themselves. Karastamati and Hadjieleftheriadis were noticed as 30(b)(1) witnesses in their individual capacity—a role that cannot be designated to another. They were each individually critical witnesses. Karastamati was principal of Fentalon, and Hadjieleftheriadis the same as to Desimusco. They testified at the arbitration in order to obtain control of Eletson Gas. It is their testimony that is alleged to be perjurious. Second, even as the 30(b)(6) designee, Kertsikoff was unable or unwilling to testify meaningfully on questions relevant to his cousins; he struggled to answer even simple questions about the operations of Fentalon and Desimusco. *See* Dkt. No. 551-1 at 545:25–546:9 (Kertsikoff spoke to Hadjieleftheriadis for "something like" ten minutes "for the purpose of educating [himself] to testify on behalf of his company"); *id.* at 547:3–20 (Kertsikoff spoke to Karastamati for "approximate[ly]" "[t]en minutes on Friday and ten minutes on Saturday" to prepare); *id.* at 566:14–22 (Kertsikoff did not review "any financial statements of Desimusco or Fentalon"). He himself recognized that it was only his cousins and not he himself who should speak to their intent and understanding with respect to the actions they took and the statements that they made.

The award of expenses necessarily follows from the finding of sanctions following violation of a motion to compel. Fed. R. Civ. P. 37(b)(2)(C). The Court will accordingly award Levona costs and fees associated with the preparation of the motion to compel Hadjieleftheriadis' and Karastamati's depositions, opposing Intervenors' motion for

reconsideration, preparing for the no-show depositions,[18] and the motion for sanctions. *See Burks v. Stickney*, 837 F. App'x 829, 832–33 (2d Cir. 2020) (summary order).[19]

### D. Intervenors' Post-Briefing Evidence

Despite not submitting any declaration in connection with the vacatur briefing in this case, Intervenors offered declarations from Karastamati and Hadjieleftheriadis following Levona's introduction of the crime-fraud documents that addressed the Sever Documents. Dkt. Nos. 664, 666. The Court will not consider those declarations and grants Levona's request that the Court disregard them for several reasons. First, it is improper for Intervenors to now introduce such evidence. Intervenors could have, in the course of their briefing, submitted declarations from Kertsikoff, Karastamati, and Hadjieleftheriadis or the other persons who are generally in their control if there was any innocuous explanation for the server documents. They chose not to do so until the eleventh hour. The documents submitted by Levona were not a surprise—leaving aside that they are Intervenors' own documents (wearing their hat as the former owners and directors of Eletson and Eletson Gas), the server documents were marked by Eletson in front of Intervenors at Kertsikoff's deposition. In their declarations, Karastamati and Hadjieleftheriadis acknowledge that they "did not submit a declaration in connection with the

---

[18] Excepting any preparation done after July 27, 2025, the date on which counsel for Intervenors informed Levona that Karastamati and Hadjieleftheriadis would not be attending their depositions. Dkt. No. 587-4 at 2. *See Animon Inc. v. Shenzhen Hollyland Tech Co. Ltd.*, 2025 WL 66633, at *24 (S.D.N.Y. Jan 10, 2025) (in the Rule 45 context, finding that the non-movant "should not bear the costs for that preparation given that it had unequivocally conveyed" that the proposed deponent "would not appear.")

[19] Although in their opening brief Levona also seeks sanctions on the basis that Intervenors did not implement a litigation hold until they were granted intervention into this action, Levona drops that argument in their reply brief. Dkt. No. 598. The argument is therefore deemed abandoned. *See Doe v. Indyke*, 465 F. Supp. 3d 452, 466–67 (S.D.N.Y. 2020) ("defendants do not respond to this argument in reply, and the Court deems them to have abandoned the argument) (citing *Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.*, 176 F.3d 601, 609 (2d Cir. 1999)).

Intervenors' original opposition to Levona's Amended Cross-Petition to Vacate Arbitral Award," but chose to submit a declaration now because Levona "greatly mischaracterizes the meaning and purpose of the Subject Documents and attempts to draw unfounded inferences from them." Dkt. No. 667 ¶ 3 (Karastamati); Dkt. No. 666 ¶ 3 (Hadjieleftheriadis).  The declarations come too late.  They are both beyond the scope that the Court permitted for Intervenor's response to Levona's introduction of the crime-fraud documents, *see* Dkt. No. 660 at 78, and will not be considered by the Court in light of the discovery sanction of preclusion awarded Levona against the two individuals.  As to Kertsikoff, his last-ditch attempt to address the server documents goes far beyond the permitted response to the crime-fraud documents.  *Id.* (Intervenors are "permitted to put in materials that respond to those documents.").

Second, even today Karastamati and Hadjieleftheriadis seek to have the best of both worlds—purportedly injecting evidence into this case without giving Levona the opportunity the Court has decided that it should have to challenge that evidence.  In their declarations, neither offer to appear for a deposition in the United States as the Court previously ordered, instead reiterating their prior (rejected) offer to be deposed in Greece, remotely, or in New York "if the other parties would agree not to abuse my travel to attempt to serve me, with new legal process, which I believe would be improper."  Dkt. No. 666 ¶ 2; Dkt. No. 667 ¶ 2.  The Court previously has determined that Karastamati or Hadjieleftheriadis have no right to impose those conditions on Levona.  Karastamati and Hadjieleftheriadis do not have the prerogative to determine whether process would be proper or not; the process they apparently fear is that issuing from a court (not this one) whose orders they have consistently violated.  If they wanted relief, they should have gone to the Bankruptcy Court—a course that they knowingly eschewed.  This Court has no

power to issue an injunction against process issuing from that court and that court has the prerogative to take action to ensure that its orders are followed.

Likewise, the Court also will not consider any additional documents Intervenors have attempted to introduce as exhibits to the declarations accompanying their memorandum of law opposing the relevance of the crime-fraud documents, or any further explanation from either Kertsikoff or Solomon with regard to those newly introduced documents. *See* Dkt. Nos. 663-1, 663-3, 663-9, 663-10, 663-11, 663-13, 664-1. Primarily, the Court has concluded that Intervenors are precluded from offering evidence or argument concerning the meaning or implications of Eletson's documents that they failed to produce (or file). In any event, Intervenors could have (and should have) introduced these documents, to which they clearly maintain access, at an earlier point in the litigation if they hoped for the Court to consider them. Their response to Levona's introduction of crime-fraud documents is not the procedurally proper avenue for Intervenors to offer additional Microsoft server documents.

Finally, as the Court will elaborate later in this Opinion and Order, even if the Court were to consider the additional material submitted by Intervenors, that material only strengthens and does not weaken the Court's conclusions. It is ultimately irrelevant whether the additional material is considered; it does not create a genuine issue of fact.

## II.    The Server Documents

Additionally, before reaching the merits of the motion to vacate, the Court must also address Intervenors' argument that Levona may not rely on the documents found on the Microsoft server. The documents are attached to Eletson's response in support of Levona's motion but are relied upon by Levona. Intervenors argue that the use of those documents is barred both under the Federal Rules of Civil Procedure and as inadmissible hearsay. Intervenors' arguments are without merit.

61

### A.    The Federal Rules of Civil Procedure

Intervenors first argue that Levona should not be permitted to rely upon documents discovered on the Eletson server because it did not provide notice of such documents in conformance with the initial disclosure requirements of Federal Rule of Civil Procedure 26.

Federal Rule of Civil Procedure 26(e)(1)(A) requires a party to supplement any Rule 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing." And if "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  A party seeking sanctions for a discovery violation under Rule 37(c) is required to show "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is relevant to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense." *Feltenstein v. City of New Rochelle*, 2018 WL 3752874, at *6 (S.D.N.Y. Aug. 8, 2018) (quoting *Doug's Word Clocks.com Pty Ltd. v. Princess Int'l Inc.*, 323 F.R.D. 167, 172 (S.D.N.Y. 2017)).  "A Defendant possesses a culpable state of mind when Defendant breaches a discovery obligation through bad faith, gross or ordinary negligence." *Id.* at *7.

Levona has not violated Rule 26.  Levona did not know of the documents on the Microsoft server when it prepared and served its original initial disclosures and, when it learned of those documents, it need not have made any supplemental disclosure because the additional documents and discovery on the Microsoft server were "made known" to Intervenors. *See* 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010)

(supplemental disclosure is "only necessary when the omitted or after-acquired information has not otherwise been made known to the other parties during the discovery process."); *Koral v. Saunders*, 2025 WL 1332017, at *3 (E.D.N.Y. May 7, 2025) (a party has otherwise been made known of documents where they produced documents themselves in discovery that "included information" about the same persons or issues); *Howard Univ. v. Borders*, 2022 WL 3568477, at *2 (S.D.N.Y. Aug. 17, 2022) (no Rule 26 violation where the counterparty "knew throughout discovery" of the non-produced evidence).

It is farcical for Intervenors to claim that the server documents were not made known to them. The Intervenors, their principals, or the principals' agents authored the documents. Intervenors generated them and Intervenors were in control of them. They resided on a server that was owned by Eletson but over which Intervenors—through their retention of the Microsoft licensing—had control exclusive from Eletson or Levona in advance of the bankruptcy court's Microsoft Order. The relevance and incriminating nature of the documents was inescapable. And their relevance and nature did not escape Intervenors' attention. Intervenors or their principals, through Reed Smith, fought tooth and mail to prevent disclosure of the documents.[20] Furthermore, Levona made clear its intent to use the documents from the server multiple times in writing, including at least as early as June 30, 2025. *See* Dkt. No. 457 at 2. Thus, Intervenors (and Reed Smith) have long been aware that Eletson (and Levona) intended to use the documents on the Microsoft server.

---

[20] Reed Smith recently submitted a motion to intervene in the instant proceeding on behalf of what it calls "Unreorganized Holdings." Dkt. No. 627. In support of that motion, Reed Smith submitted a declaration of Hadjieleftheriadis, in which he stated that Eletson Holdings and Eletson Corp continue to operate with a principal place of business in Greece. Dkt. No. 629 ¶¶ 3–4. He continued that he had the "authority to act on behalf of Corp," and "instructed" Reed Smith to seek intervention on that entity's behalf. *Id.* ¶ 5.

To the extent that Intervenors were not aware earlier of the intended use of the documents by Eletson and Levona, that is a problem of their own manufacture. At every step in the way, Intervenors frustrated Eletson's access to the documents and its ability to produce them to Levona. Any failure to disclose also is substantially justified because it was made in the face of threats by Reed Smith of consequences to Eletson and their counsel of sanctions if Eletson did make the disclosure, combined with the fact that Reed Smith (and Intervenors) knew precisely the documents that they were hoping to prevent Eletson from using. *See* Bankr. Dkt. No. 1695 (noting that Eletson's access to the server documents "should have been exchanged pursuant to multiple orders of this court."). It is harmless because Intervenors' directors were aware of (and in control of) the same documents that are now being presented—they had control of all documents on the Microsoft server until the Bankruptcy Court's order on June 11, 2025. *See Chavez v. Finney*, 2022 WL 874716, at *4 (S.D.N.Y. Mar. 23, 2022) ("even assuming that these documents were not disclosed in a timely manner consistent with Rule 26, any such violation is harmless because it is undisputed that Plaintiff had knowledge of the information contained in both documents such that he cannot have been unfairly surprised by them.")

Intervenors complain that they were unable to conduct meaningful review because 675,000 pages of documents were produced by Eletson before their responsive briefing was due. Dkt. No. 591 at 8.[21] However, Levona relies on only a handful of documents from the server, and the documents generally are those regarding Kertsikoff, Karastamati and Hadjieleftheriadis. Several were marked at the Kertsikoff deposition. Dkt. No. 556-4. He could then have testified

---

[21] The Court already entertained an argument from Intervenors for an extended briefing timeline in response to the server discovery at a conference on August 19, 2025. The Court found that counsel for Intervenors had sufficient "resources at your firm," and declined to extend the briefing timeline. Dkt. No. 593-2 at 34:3–4. Intervenors responded extensively to Eletson's introduction of the server documents in their responsive brief to its memorandum. Dkt. No. 551.

about them but chose not to do so; it was a strategic choice by Kertsikoff to decline to testify regarding those documents. Intervenors could also have had Karastamati and Hadjieleftheriadis testify. Intervenors were in control of those individuals, and those individuals knew of the documents, and simply chose not to engage with them.

Intervenors further argue that the Court should either deny Levona's Rule 56 motion or, in the alternative defer ruling on it so that Intervenors can take further discovery.

Federal Rule of Civil Procedure 56(d) provides that where "a non-movant shows by affidavit or declaration . . . it cannot present facts essential . . . to its opposition," "the court may (1) defer considering the motion or deny it: (2) allow time to . . . take discovery; or (3) issue any other appropriate order." The argument fails at the threshold. A party cannot stave off a well-founded motion to vacate by a bare protestation in an opposition brief that it wants and could use more time or information. "Rule 56(d) expressly requires the nonmoving party who seeks further discovery in these circumstances to make a showing by affidavit or declaration of the reasons for needing the relief." *Mattel, Inc. v. AnimeFun Store*, 2021 WL 765766, at *2 (S.D.N.Y. Feb. 26, 2021) (quoting *Kazolias v. IBEW*, 806 F.3d 45, 54 (2d Cir. 2015)); *see* Fed. R. Civ. P. 56(d). That affidavit must show "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (internal quotation marks omitted). Intervenors have not submitted such an affidavit here or demonstrated what evidence they would offer if they had more time. That failure alone "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."

*1077 Madison St., LLC v. Daniels*, 954 F.3d 460, 464 (2d Cir. 2020) (citing *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)).

It is apparent too that the decision not to submit a Rule 56(d) affidavit was considered. The handful of documents Eletson relies on were generated by the principals of Intervenors themselves, their employees at that time, or Intervenors' (current or former) counsel. If the documents needed clarification or explanation, Intervenors could have submitted a declaration or affidavit from one of the authors of the documents with their opposition to the motion to vacate. Their failure to do so is telling. Even now, Intervenors do not identify any information they could expect to obtain from discovery of their own documents which they do not already have.

### B.    Hearsay

Intervenors next argue that the server documents cannot be considered by the Court at the summary judgment stage because they are inadmissible hearsay statements. "Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). The argument is frivolous.

Many of the documents are party admissions and therefore not hearsay at all. An out of court statement offered for the truth of the matter asserted is not hearsay, if "the statement is offered against the opposing party, and (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed it to be true; (C) was made by a person whom the party authorized to make a statement on that subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2).

Levona relies on a series of emails produced by Eletson from the company's server from July of 2022 between Kertsikoff, Karastamati, Hadjieleftheriadis, their then-Greek counsel at

Timagenis law firm, and lawyers at Reed Smith.  Dkt. No. 556-4 at 3–24.  Those emails attach

two versions of a document labeled "Instructions to Reed Smith," which contain the principals'

understanding of the relevant factual background of the dispute between Eletson and Levona.

*See id.*  The email, along with the attached instructions, was sent by Yiannis Timagenis of the

Timagenis law firm to Karastamati; Karastamati later forwarded it to Hadjieleftheriadis and

Kertsikoff; Kertsikoff then emailed it to himself from his work email to his personal email.  *Id.* at

3.  In the body of the email attaching the document, Timagenis requested that the Eletson

representatives "check the facts to ensure they describe accurately the position."  *Id.*  There is no

evidence that any of the principals disputed the facts set forth in the document.

The statements by Kertsikoff, Karastamati and Hadjieleftheriadis are party admissions.

They are statements by those individuals offered by a party opponent.[22]  The statements by the

lawyers are admissible both as agency admissions by the lawyers and as adoptive admissions of

Kertsikoff, Karastamati and Hadjieleftheriadis.  "Statements made by a party's agent 'do not

implicate the rule against hearsay, and are admissible subject to generally applicable rules

involving, e.g., relevance and potential for unfair prejudice or confusion.'"  *Pugh v. Casimir*,

2021 WL 4463103, at *10 (E.D.N.Y. Sept. 29, 2021) (quoting *United States v. Demizio*, 2009

WL 2163099, at *3 (E.D.N.Y. July 20, 2009)).  "The Second Circuit has held that 'statements

made by an attorney concerning a matter within his employment may be admissible against the

---

[22] The statements by Karastamati and Hadjieleftheriadis are also admissible as statements against
their interest, since they were unavailable and would be precluded from offering further
testimony.  Fed. R. Evid. 804(b)(3) (permitting admission from an unavailable witness where a
statement is one that a reasonable person in the declarant's position would have made only if the
person believed it to be true because, when made, it was so contrary to the declarant's
proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or
criminal liability"); *see also Vista Foods Exchange Inc. v. Comercial De Alimentos Sanchez S de
R L de C.V.*, 627 F. Supp. 3d 408, 419 (S.D.N.Y. 2022).

party retaining the attorney.'" *Wechsler v. Hunt Health Sys., Ltd.*, 2003 WL 227664545, at *2 (S.D.N.Y. Nov. 21, 2003) (quoting *United States v. Margiotta*, 662 F.2d 131, 142–43 (2d Cir. 1981)). "[C]ourts in this Circuit have reasoned that an attorney's statements or documents discussing legal strategy may be admissible as party admissions if: (1) the attorney is shown to be the party's agent with regard to the making of the statement; (2) the statements concern a matter within the attorney's employment; or (3) the statements are adopted by the party." *Id.* (quoting *Bensen v. American Ultramar Ltd.*, 1996 WL 422262, at *9 (S.D.N.Y. July 29, 1996)); *see Pappas*, 963 F.2d at 537; *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). Timagenis was an attorney for the principals, acting in his capacity as such, and the subject of the statements go directly both to the reason for which the attorney was hired, and the subject matter of the arbitration and this proceeding. *See Bensen v. American Ultramar Ltd.*, 1996 WL 422262, at *11 (S.D.N.Y. July 29, 1996) (a law firm's statements that concerned the litigation "were made within the scope of employment and agency," and "could readily be understood as those of the [client] not merely those of its lawyers," especially where it illustrated the client's position on "various legal and financial issues."). The communications are not a "statement of legal strategy." *Wechsler*, 2003 WL 22764545, at *2. By its own terms, the Instructions to Reed Smith purport to set out the factual progression of events leading to the dispute with Levona.

The documents are admissible too as statements that the principals of Intervenors (and therefore Intervenors for whom they acted as agents) "manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2). "A person or entity can adopt another's statement 'by any appropriate means, such as language, conduct, or silence,'" and a party "may adopt a written statement by using it or taking action in response to or in compliance with it." *In re Mirena IUD Prods. Liability Litig.*, 202 F. Supp. 3d 304, 321 (S.D.N.Y. 2016) (quoting *Penguin Books*

*U.S.A., Inc., v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003)).  As described, Timagenis sent the document to Karastamati then forwarded the document in an email to both Kertsikoff and Hadjieleftheriadis; the former then forwarded the email to himself at his personal email.  At no point did any of the three individuals manifest any objection to that document—to the contrary, it is clear from context that they assisted Timagenis in compiling it.  In his email, Timagenis requested that the three individuals "Check the facts to ensure they accurately describe the position."  Dkt. No. 556-4 at 3.  He later sent the email to Reed Smith with no substantive changes.  *Id.* at 14.  The silence and acquiescence of Intervenors is particularly powerful evidence of adoption here, in the context of setting out the critical facts for new counsel, as "a person ordinarily [would] respond" to such a false statement "with a denial, or at least some indication that he objects to the statement as untrue," if it in fact were untrue.  *King v. Wang*, 2021 WL 5232454, at *11 (S.D.N.Y. Nov. 9, 2021) (quoting *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980)).[23]

For similar reasons, the other documents submitted by Eletson and relied upon Levona in this litigation are admissible as party opponent statements, or statements that Intervenors adopted.  The emails sent by Kertsikoff, Karastamati and Hadjieleftheriadis are admissible as party statements (or statements of an agent of a party) offered against them in this litigation.  *See, e.g.*, Dkt. No. 556-4 at 30–60 (email and attachment from Hadjieleftheriadis to Kertsikoff on October 31, 2022); Dkt. No. 556-4 at 62–67 (email and attachments from Hadjieleftheriadis to Reed Smith, copying Karastamati, Kertsikoff, and Andreoulakis, on April 22, 2023); Dkt. No. 556-4 at 69–73 (email from Karastamati to Reed Smith, copying Timagenis and Andreoulakis,

---

[23] In addition, as noted, these documents are admissible as statements against the interests of the unavailable parties.

on May 19, 2024); Dkt. No. 556-4 at 75–79 (email and attachment from Karastamati to

Kertsikoff and Kanelos on July 29, 2022).

And as with Timagenis, documents sent by Reed Smith as the agent of Eletson as

controlled by the former owners going to the core issues of the arbitration are party admissions,

not hearsay.  *See, e.g.*, Dkt. No. 556-4 at 84–85 (email from Reed Smith to Karastamati,

Kertsikoff, Hadjieleftheriadis, etc. on March 22, 2023); *id.* at 87–93 (email from Solomon to

Timagenis, Karastamati, Kertsikoff, and Hadjieleftheriadis on August 28, 2023); *id.* at 95–99

(email from Solomon to Timagenis, Hadjieleftheriadis, Kertsikoff, Karastamati, etc. on October

28, 2022).  The same goes too for an email produced from Eletson's former counsel at Watson

Farley & Williams LLP ("WFW"), Dkt. No. 557 ¶ 46.  *See, e.g.*, Dkt. No. 556-5 (email from

WFW to Kertsikoff on January 7, 2022).  And documents sent by other Eletson agents like

financial advisors employed by Eletson at that time are similarly not hearsay.  *See* Dkt. No.

556-28 (email from David Herman at SSY Finance to Kertsikoff on February 7, 2023).

Moreover, many of the documents introduced by Eletson are offered by Levona not for

their truth but rather to demonstrate that at a certain point in time, Eletson was aware of a fact, or

thought something about the current state of affairs, in contradiction of sworn testimony that they

believed or knew the opposite to be true.  Where evidence is offered for something other than the

truth of the subject represented therein, it is not hearsay.  Fed. R. Evid. 801(c).  Also, "[a]

statement of the declarant's then-existing state of mind (such as motive, intent, or plan)" is "not

excluded by the rule against hearsay."  Fed. R. Evid. 803(3).  For the purposes of the vacatur

motion, what is important is what they said, not whether what they said was true.  *See United

States v. Ray*, 2022 WL 558146, at *4 (S.D.N.Y. Feb. 24, 2022) (evidence that was "offered not

for the truth of anything [the party] is stating but as evidence that he made the statement," is not

hearsay and "[t]o the extent it is offered for the truth of anything in his statements, the statements would be admissible as party admissions.").

To be considered at the summary judgment stage, the evidence submitted must also be authenticated. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "Pursuant to Federal Rule of Evidence 901, authentication is satisfied where the proponent produces 'evidence to support a finding that the item is what the proponent claims it is.'" *Delman v. Gatto*, 2025 WL 1826388, at *4 (E.D.N.Y. July 2, 2025) (quoting Fed. R. Evid. 901(a)). "The bar for authentication of evidence 'is not particularly high' and depends on a 'context-specific determination whether the proof advanced is sufficient.'" *Id.* (quoting *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014)); *see United States v. Moayad*, 545 F.3d 139, 162 (2d Cir. 2008) ("Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." (internal quotation marks & citation omitted)). Eletson has offered evidence, in the form of a declaration from counsel, "based on . . . personal knowledge," that the server documents are "from the Eletson email server." Dkt. No. 556 ¶¶ 3, 8. This is in addition to a surfeit of evidence that the server does belong to Eletson and includes Eletson documents. That is sufficient.[24]

---

[24] After Eletson sought access to the Microsoft server documents in bankruptcy court from the former owners, Microsoft entered an appearance to contest the motion. Bankr. Dkt. No. 1682. In its brief, Microsoft explained that the former owners provided their Microsoft Tenant ID and a Domain to help identify the accounts. *Id.* at 5. Upon granting Eletson's motion, the bankruptcy court further ordered that Microsoft was required to "designate" an Eletson representative as "the global administrator for the Microsoft account related to customer number 10865635-c27a-44cf-9cb9-a0684d08bcb6, domain '@eletson.com,' and the associated secondary domains." Bankr. Dkt. No. 1691. Intervenors do not set forth any reason for the Court to doubt that the order to turn over that file was carried out, and that the documents are authentic.

### III.    Eletson's Fraudulent Conduct at the Arbitration

Turning to the merits of Levona's motion, "[a] party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by the statute and case law." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003).  Under the FAA, an arbitral award "must stand unless it is made abundantly clear that it was obtained through corruption, fraud, or undue means." *Karppinen v. Karl Kiefer Mach. Co.*, 187 F.2d 32, 34 (2d Cir. 1951) (citing 9 U.S.C. § 10(a)(1)).  A losing party cannot "bypass the FAA's statutory text" by the expedient of "cry[ing] fraud—and seeking vacatur under §10(a)(1)—whenever the winning party had advocated for itself during the arbitration." *Metro. Mun. of Lima v. Rutas de Lima S.A.C.*, 2024 WL 1071119, at *11 (D.D.C. Mar. 12, 2024), *aff'd*, 141 F.4th 209 (D.C. Cir. 2025).  To make the requisite demonstration of fraud, the party moving for vacatur must "show (1) the existence of 'fraudulent activity'; (2) that, 'even with the exercise of due diligence,' he 'could not have discovered the fraud prior to the award issuing'; and (3) that 'the fraud materially related to an issue in the arbitration.'" *Bright-Asante v. Saks & Co.*, 855 F. App'x 40, 42–43 (2d Cir. 2021) (summary order) (quoting *Odeon Cap. Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017)); *see also Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988); *Metro. Mun. of Lima*, 2024 WL 1071119, at *12.  The moving party must establish the required elements "by clear and convincing evidence." *Mitchell v. Ainbinder*, 214 F. App'x 565, 568 (6th Cir. 2007).

Fraud under the FAA exists only where the moving party proves that there was "intentional malfeasance." *Guardian Flight, L.L.C. v. Med. Evaluators of Texas ASO, L.L.C.*, 140 F.4th 613, 621 (5th Cir. 2025) (quoting *Nat'l Cas. Co. v. First State Ins. Grp.*, 430 F.3d 492, 499 (1st Cir. 2005)); *see Mitchell*, 214 F. App'x at 568.  "Under the FAA, 'fraud requires a

showing of bad faith during the arbitration proceedings, such as bribery, undisclosed bias of an arbitrator, or willfully destroying or withholding evidence.'" *Guardian Flight,* 140 F.4th at 621 (quoting *Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 304 (S.D. Tex. 1997)).  "[O]btaining an award by perjured testimony constitutes fraud." *France v. Bernstein*, 43 F.4th 367, 378 (3d Cir. 2022); *see Karppinen v. Karl Kiefer Mach Co.*, 187 F.2d 32, 34 (2d Cir. 1951) ("an arbitration award must stand unless it is abundantly clear that it was obtained through the perjury.").  And "at least for the purposes of the FAA, 'knowingly concealing evidence' is 'analogous to perjured testimony.'"  *France*, 43 F.4th at 378 (quoting *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 (D.N.J. 1976)).  In sum, "[o]rdinary conduct will not suffice; the alleged fraudulent acts must have been so prejudicial that they effectively denied the opposing party a fundamentally fair hearing." *ARMA, S.R.O. v. BAE Systems Overseas, Inc.*, 961 F. Supp. 2d 245, 254 (D.D.C. Aug. 21, 2013).  Inconsistencies that resulted from "uncertainty or confusion" as opposed to "intent to mislead" are not sufficient.  *EB Safe, LLC v. Hurley*, 832 F. App'x 705, 709 (2d Cir. 2020) (summary order).

The Second Circuit has analogized the standard necessary to overturn an arbitration award to that necessary to reopen a final judgment.  *See Karppinen*, 187 F.2d at 34–35; *Odeon Cap.*, 864 F.3d at 196.  Under Federal Rule of Civil Procedure 60, vacatur is available where the offending party "interfered with the judicial system's ability to adjudicate impartially," and the "acts of the defendant must have been of such a nature as to have prevented the plaintiff from fully and fairly presenting a claim or defense." *Mazzei v. The Money Store*, 62 F.4th 88, 93–94 (2d Cir. 2023).  Even more so than with respect to litigation, parties to an arbitration "have a significant stake in assuming that final judgments remain final;" the "adversarial process relies

on the parties to keep one another in check," and the availability of vacatur is not a second chance for parties to relitigate issues that they lost in the arbitration.  *Id.* at 94–95.

As to materiality of the fraud, "[f]or fraud to be material within the meaning of Section 10(a)(1) of the FAA, petitioner must demonstrate a nexus between the alleged fraud and the decision made by the arbitrators." *Odeon Cap. Grp.*, 864 F.3d at 196.  However, the "petitioner need not demonstrate that the arbitrators would have reached a different result."  *Id.*  If it is clear that "the arbitrator's fact-finding task would have looked much different had [the movant] possessed the concealed evidence," "that is enough for us to see a 'nexus between [the] fraud and the basis for the arbitrator's decision.'"  *France*, 43 F.4th at 382 (quoting *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503 (6th Cir. 2003)).

District courts "treat a petitioner's application to confirm or vacate an arbitral award as akin to a motion for summary judgment."  *Chicago Bridge & Iron Co. N.V. v. Refineria de Cartagena S.A.S.*, 2025 WL 71658, at *12 (S.D.N.Y. Jan. 10, 2025) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 (2d Cir. 2011)).  Therefore, "the 'party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high.'"  *Id.* (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden to "demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and to oppose summary judgment, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation," *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing

74

that there is a genuine issue for trial," *id.* at 587 (quoting Fed. R. Civ. P. 56(e)), including its own

"affirmative evidence" supporting its theory of the case, *Island Software and Comp. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 262 (2d Cir. 2005).  It is appropriate for the Court to decide

vacatur petitions "based solely on the papers submitted by the parties in support of their

motions."  *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46 (2d

Cir. 1994).

 While the Court draws reasonable inferences in favor of the non-moving party, the Court

can draw an inference only from evidence.  *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d

Cir. 1987).  The Court cannot draw an inference from what Karastamati and Hadjieleftheriadis

"might" say.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86

(1986). (the non-moving party cannot point to only "metaphysical doubt as to the material

facts.").  Intervenors have not submitted evidence from Karastamati and Hadjieleftheriadis as to

the principal issues in the case.  Even if the declarations that they now submit created a genuine

issue, the Court would not consider the declarations in the face of the contemptuous conduct of

Intervenors in denying Levona the ability to depose them.

 Levona argues that Eletson committed fraud in the Arbitration by submitting false

testimony that Eletson had given notice and the Purchase Option had been exercised, later

submitting false testimony that Eletson Gas had nominated the Cypriot companies after it

became evident that the exercise of the option without a nomination would provide no economic

benefit to the then-owners of Eletson, knowingly concealing the Withheld Documents[25] that

---

[25] The Court adopts Levona's proposed label of "Withheld Documents" to reference the non-produced discovery.  *See* Dkt. Nos. 551-14, 551-15, 551-16, 551-17, 551-18, 551-83, 551-20, 551-23, 551-24, 551-25, 551-26, 551-27, 551-28, 551-29, 551-30, 551-31, 551-32, 551-33, 551-35, 551-36, 551-37, 551-38, 551-39, 551-40, 551-44, 551-46, 551-47, 551-48, 551-49, 551-50, 551-51, 551-52, 551-53, 551-54, 551-55, 551-56.

would have refuted the false testimony given with relation to the Purchase Option and the alleged Nominees, and submitting false statements regarding the July 25 email to the Arbitrator and Levona after it was produced in the bankruptcy proceeding. Dkt. No. 549 at 37. The Court reviews the evidence offered by the parties, drawing the reasonable inferences that can be drawn from that evidence to determine whether the evidence creates a genuine issue of fact regarding whether Eletson committed fraud and whether that fraud deprived Levona of a full and fair opportunity to arbitrate its case.

### A. The Perjurious Testimony Regarding Eletson's Exercise of the Purchase Option

Levona has established by clear and convincing evidence that Eletson committed fraud by offering false testimony to the Arbitrator that it had given notice and had exercised the Purchase Option on March 11, 2022. Before Eletson could exercise the Purchase Option, it was contractually required to provide written notice to Levona. It was undisputed that no written notice was provided. To fill the gap, Eletson argued that the notice requirement was satisfied because Eletson had decided in early March that it could and would exercise the Purchase Option and notified Levona at a board meeting on March 10, 2022 that it was doing so. That testimony and evidence was false. Eletson was of the belief that it could not exercise the option and therefore it did not provide notice that it was exercising the option. For the proposition that notice was given and Eletson had timely exercised the Purchase Option, at the arbitration Eletson relied on testimony from the three key individuals—Karastamati, Kertsikoff, and Hadjieleftheriadis—the same individuals who are the beneficial owners of Intervenors here. The Arbitrator heavily cited that testimony in reaching his conclusion on the critical question whether Eletson had timely given notice as required by the BOL. The Arbitrator agreed with Levona that Eletson never gave "formal written notice" that it was exercising the Purchase Option as

required, but he nevertheless concluded that "the evidence reflects that the parties acknowledged that Eletson was exercising the option." Final Award at 42. For this, he relied upon the agenda for the March 10, 2022 Board meeting and the testimony of Karastamati. *Id.* at 42–43. The agenda stated "Update on Eletson's intention to exercise the purchase option." *Id.* at 42. And Karastamati testified that "for us, the intention means the actual fact." *Id.* at 42–43. The combination of those facts led to the inference that notice was given.

The Arbitrator rejected Levona's argument that a July 13, 2022 email from Kanelos with an attachment entitled "Murchinson Buyout Steps" demonstrated that the option was not exercised. In it, Kanelos contemplated that Eletson would have to repay the Loan before exercising the Purchase Option, and so had not done so as of July 2022. The Arbitrator credited instead "the testimony of Eletson's witnesses, [that] the Kanelos email created fury and confusion," that Kanelos "had every incentive to muddy the waters," and that the email should be "viewed as an attempt to 'move forward' with the original transaction after Levona refused to follow-through [sic] with the exercise of the BOL." *Id.* at 44–45 n.6. Based on that testimony, he concluded that the July 13 was "at most, … an inaccurate checklist of items needed to complete Levona's exist from the Company pursuant to the terms of the BOL." *Id.* The Arbitrator rested the finding that notice was given and the option was exercised on March 11 also on the testimony that "Kertsikoff repeatedly represented to potential investors that Levona was out of the company." *Id.* at 45. The Arbitrator added also that "it would be economically irrational to find that Eletson never bothered to exercise the option that would have cost $1 when the consequences of not doing so would be: Levona obtained two liquified natural gas vessels valued at more than $23 million, more than $10 million in assigned claims, and a Fundamental

Action Letter that gives Levona more rights to control the actions of [Eletson Gas] than those spelled out in the LLCA while Levona still retains the Company's preferred interests." *Id.*

It is now clear from the documents that were not produced but should have been produced during the arbitration and from the evidence produced in discovery here that Eletson's story and the testimony it offered in support of that story was an invention. Karastamati, Kertsikoff, and Hadjieleftheriadis had the understanding that to exercise the option in the BOL Eletson Gas would not only have to transfer the two vessels but also would have to repay the Loan or provide adequate security or collateral. They also understood that Eletson Gas had neither repaid the Loan nor offered adequate security or collateral at the time the Purchase Option expired. And, as a result of that understanding, they also knew that Eletson Gas had not exercised—and could not exercise—the option in March 2022 and had not provided notice of the exercise of the option. The Kanelos email did not create "fury and confusion;" it was consistent with emails and analyses conducted by and with the principals of the Intervenors/Nominees contemporaneously. The only Eletson witness to testify during these proceedings was on vacation at the relevant time and could not recall any interaction with Kanelos regarding the document. Dkt. No. 551-1 at 111:22–114:2. Nor did Eletson represent to outsiders that Levona was out of the company as of March 2022—in fact, it attempted to raise money to take Levona out of the company long after the Purchase Option supposedly was exercised.

Revealingly, Intervenors had the chance to depose Kanelos and could have attempted to offer evidence that he was acting without approval when he worked with Karastamati, Kertsikoff, and Hadjieleftheriadis on the models that would permit Eletson Gas to repay the Loan and attempt to purchase the Preferred Interests. On May 23, 2025, Intervenors submitted a motion for permission to serve a subpoena on Kanelos pursuant to the Walsh Act, 28 U.S.C. §

1783, which permits the issuance of a subpoena to a United States citizen outside the United States where the testimony and documents are "necessary in the interest of justice" and "it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in the matter." Dkt. Nos. 388–89. The Court rejected the importance of that testimony. The disposition of the motion to vacate would turn, in part, upon whether the Withheld Documents reflected an effort by Eletson to purchase the Preferred Interests of Gas that it did not own "or rather, to the contrary, a corrupt arrangement between Kanelos and Levona and/or Murchinson to defraud Eletson." Dkt. No. 435 at 8. The Court denied the motion only because the Intervenors had not established "that it is not possible to obtain Kanelos' testimony in admissible form without the Court taking the step of subpoenaing him to travel from a foreign country to appear in the United States to give testimony," and even so did that only without prejudice. Dkt. No. 435 at 9. Intervenors renewed their motion with evidence that Kanelos had refused to commit to a date for a deposition and that serving him via the Hague Convention would be extremely time-consuming. Dkt. Nos. 458–59. The Court granted that motion again noting that Kanelos was "not a minor or peripheral witness." Dkt. No. 493 at 1 (quoting Dkt. No. 435 at 8). When Intervenors requested it, the Court later granted Intervenors an extension with regard to the Walsh Act deposition of Kanelos. Dkt. No. 421 at 2. Still, knowing that they had not been able to obtain any testimony from Levona or Murchinson that Kanelos was a rogue employee acting for their benefit instead of for Eletson's benefit, Intervenors voluntarily chose not to take Kanelos' deposition. Dkt. No. 619 at 8:23–9:18. Whether Intervenors based that decision on knowledge that Kanelos would harm rather than help their case or for some other reason, the result is the same. There is no evidence to counter the plain meaning of the Withheld Documents.

The falsity of the testimony from Kertsikoff, Hadjieleftheriadis and Karastamati that Eletson had exercised the Purchase Option is established through words of the principals themselves and their employees in the documents not produced in the arbitration, spanning from before purported exercise of the Purchase Option through the filing of the Arbitration.

### 1. Internal and External Communications regarding the Purchase Option

On March 21, 2022, with just three days remaining before the Purchase Option expired on March 24, 2022, and ten days after notice was purportedly given of the exercise of the Option, Hadjieleftheriadis sent an email to Kertsikoff and Karastamati regarding a potential investment from the Swissmarine Group recommended to him by an outside broker "[b]ecause schedules are becoming tighter." Dkt. No. 551-14 at 18. Hadjieleftheriadis told his cousins and partners at Eletson that the group had a "long-term approach" and was "financially sound" and asked whether they should "make some sort of approach in case there is any room for collaboration in gas." *Id.* at 18. Swissmarine Group makes investments in LNG/LPG gas carriers and other ships. *Id.* at 7. The "schedules" that were becoming "tighter" could have referred to nothing other than the timetable to exercise the Purchase Option, which was due to expire in three days.[26] And the obvious and inescapable inference is that the investment was necessary because without an investment Eletson would neither be able to pay off the Loan nor offer adequate security or collateral—without which it could not exercise the Purchase Option. Were it sufficient that Eletson had sold Levona the Symi and Telendos in order to exercise the option, without any need

---

[26] At argument, counsel for Intervenors speculated that read in context, it was clear that the "schedules" referred to "shipping schedules." Transcript of Oral Argument at 47:13–17. Tellingly, Intervenors offer no evidence from Hadjielftheriadis or from Swissmarine to support that argument. To the contrary, the email from Hadjieleftheriadis is clearly in reference to a potential investment, or "collaboration," with Eletson Gas. Dkt. No. 551-14 at 18. The only inference, given the timeframe and that context, is an investment to assist with removing Levona as a shareholder.

to take further action on the Loan, there would have been no need for an investment. Intervenors do not proffer evidence that creates a genuine issue of fact. In his deposition, Kertsikoff declined to answer questions regarding this exchange as he "didn't write the e-mail" and "could not recall" what Hadjieleftheriadis was referring to. Dkt. No. 551-1 at 30:1–11. He stated too that Hadjieleftheriadis was "most in contact" with Dermatis, who had proposed the investment, *id.* at 63:22–24, and that he did not know what Karastamati was thinking regarding that proposed investment either, *id.* at 68:22–69:9. Intervenors cannot now contend that the document does not support what the reasonable inference demonstrates that it does support.

Ten days later, on March 31, 2022 (approximately a week after the Purchase Option had lapsed), Hadjieleftheriadis emailed Dermatis, the broker for Swissmarine, attaching a copy of a presentation on Eletson Gas prepared by Holdings "for the purpose of considering a transaction" with it and its affiliates. Dkt. No. 551-15 at 4. The presentation offered an "Opportunistic LPG Investment," involving an "Investment across the capital structure consisting of shareholder buy-out, asset based refinancing and working capital." *Id.* at 7. The presentation touted Eletson as a "Best-in-Class Operator with Strong Track-Record," and offered a joint venture with a "[s]easoned management team." *Id.* at 7. The presentation referenced that Murchinson had acquired Blackstone's shares in 2021. *Id.* at 7. Kertsikoff confirmed at deposition in this case that Eletson was never seeking to sell its shares. The only reasonable inference that can be drawn, then, is that the "shareholder buy-out" for which an investment was being suggested referred to the buy-out of Levona whose shares had not yet been acquired by Eletson Gas. When asked about this document, Kertsikoff testified simply that he had "no recollection." Dkt. No. 551-1 at 45:5–11. On May 4, 2022, Dermatis asked Hadjieleftheriadis for a number of items on behalf of an entity called Swisschemgas (which is the same company as Swissmarine) including

financial statements and "all stakeholders involved." Dkt. No. 551-16 at 5. Hadjieleftheriadis responded (copying Kertsikoff and Karastamati) that "Murchinson is in the final stages of disinvesting from the Company," and that "Murchinson's preferred stake of 40.5% is being exchanged for 2 vessels, M/T Symi and M/T Telendos." *Id.* at 3. In other words, even as of May, he acknowledged that Murchinson had not been bought out of the company.

On April 8, 2022, Eletson's Greek counsel wrote to in-house lawyer Elena Vandorou for documents in connection with a legal opinion that the Marshall Islands' counsel was preparing on Eletson Gas in relation to their guarantees. Dkt. No. 551-17 at 2. The letter asked for corporate and constitutional documents including clarification regarding who the current members were of the board of directors. *Id.* at 3. Vandorou responded with a copy of the "Unanimous Written Consent of the Board of Directors of Eletson Gas LLC," listing the four Levona nominees as members of the board. Dkt. No. 551-17 at 6. In her email, Vandorou clarified that the attachment was "signed by all the directors/officers of Eletson Gas LLC." *Id.* at 2.[27] On April 11, 2022, Jon Baker of Oak Tree Capital emailed Vandorou seeking information for its know-your-client obligations. Dkt. No. 551-18 at 3. Baker asked whether a chart which listed Levona as an owner of Eletson Gas was still valid. On April 13, Vandorou responded with "updated charts." That chart lists Levona as still owning 40.40% of Eletson Gas and is "certified in its content" by Vandorou's signature. *Id.* at 4. Intervenors offered no evidence to rebut the plain and inescapable inference from this document.[28]

---

[27] Intervenors argue that it is "disingenuous" for Levona to rely on this document in their briefing because the Director listing is dated February 9, 2022. Dkt. No. 589 at 26 n.17. What is relevant, however, is that the document was sent and confirmed as accurate by Vandorou on April 8, 2022. Dkt. No. 551-17 at 2.

[28] Intervenors presented no evidence from Vandorou in connection with this litigation to counter the implication of this document.

Eletson continued to discuss and analyze the terms under which it might be able to purchase the Preferred Interests from Levona both before and after it commenced the arbitration, in which it contended from the outset that the interests already had been acquired. The discussions continue to reflect that the Preferred Interests would be transferred only after repayment of the Loan (and some additional consideration). On June 17, 2022, *i.e.*, three months after the March 2022 purported exercise of the Purchase Option and approximately five weeks before it commenced the arbitration, Eletson finance employee Tzarouchi and Kanelos exchanged a financial model for the purchase of the Preferred Interests. The document titled "ELETSON/MURCHINSON TRANSACTION" outlined a potential "Total Murchinson buyout." Dkt. No. 551-83 at 4. Under the proposed plan, Eletson would make a "1st payment" of $23 million resulting from the sale of the Symi and Telendos, and an additional "2nd payment" of $30 million to be paid "on the closing" which would "include[]" but not be limited to the "repayment of the W/C facility."

Kanelos was not alone in modelling the terms under which the Preferred Interests might be purchased; he was not acting as a turncoat in a manner unsanctioned by his bosses, as portrayed by the Eletson witnesses during the arbitration. The principals also participated in those discussions. On July 11, 2022, a week and a half before Eletson commenced the arbitration and four months after notice was supposedly given and the Purchase Option supposedly was exercised, Kanelos emailed Kertsikoff and attached a document titled "Murchinson Buyout Steps" that, under a subsection labeled "Murchinson exits from Eletson Gas" explained that "[a]s per the agreement dated February 22, 2022," such exit could be accomplished only after the $23 million dollar payment from the sale of the vessels and full Loan repayment. Dkt. No. 551-19. Kertsikoff emailed the document to himself at his personal email

the same day.  Dkt. No. 551-20.  And Kanelos sent him the same document again on July 12th.

Dkt. No. 551-21.  In his deposition, Kertsikoff testified that he could not recall if he discussed

the Murchinson buyout steps document with Kanelos in July, or why he emailed it to himself.

Dkt. No. 551-1 at 116:14–17, 118:20–119:4.  His testimony confirms the reasonable inferences

the Court draws from the document.  He stated that the document reflected that "starting

immediately . . . after March 11 . . . that we were trying to find money . . . to recap the company

and refinance the loan," and that it was Kanelos who was "pushing us to believe that it was part

of the . . . Buyout Steps when, in fact, it was not."  *Id.* at 119:22–121:4.  In short, he corroborated

that at the relevant time he believed that the refinancing of the loan was part of the "Buyout

Steps," and that it was only later—during the course of the arbitration and no doubt informed by

counsel's legal strategy—that he came to a different view.

Kertsikoff, Karastamati, and Hadjieleftheriadis revealed their true understanding of the

state of affairs regarding the exercise of the Purchase Option in their unvarnished

communications to counsel.  On July 20, 2022, Yiannis Timagenis, Greek counsel for Eletson,

sent an email to Karastamati and Andreoulakis (who in turn forwarded it to Hadjieleftheriadis

and Kertsikoff) regarding "instructions to be sent to [Reed Smith]" with regards to resolving the

dispute with Levona.  Dkt. No. 556-4 at 3.  The Eletson owners were requested to "check the

facts to make sure they describe accurately the position."  *Id.*  The instructions attached to the

email unambiguously state that "[t]he terms of the BOL have not been entirely complied with

and in particular the obligations set out in clauses 2.2–2.5 of the BOL relating to the 'Purchase

Option Period' and Eletson Gas defaulted on the Loan Agreement."  *Id.* at 7.  The three

principals who later testified to the contrary in the arbitration recognized that the Purchase

Option Period had expired without it being exercised.  The instructions continued that "all parties

behaved as if BOL was still valid and effective (despite the lapse of the Purchase Option Period)." *Id.* It stated that although Eletson "appreciates that certain dates of the original BOL has lapsed," "they believe that the objective may be achieved with some adjustments like sale of a third ship or increasing Levona's return, etc.," *i.e.*, exactly what was reflected in the spreadsheets. *Id.* at 10. A few hours later on the same day, Timagenis sent the instructions document to Reed Smith after it had been checked by Eletson with no changes to the quoted portions. *Id.* at 14.

Days later, on July 25, 2022, just four days before the arbitration was commenced, Karastamati sent further responses upon request of Reed Smith, and again reiterated that "there was no explicit written or verbal indication that the option period would be extended nor any action from Levona to inhibit our ability to exercise the purchase option." Dkt. No. 556-4 at 81. During the summer of 2022, Eletson continued to discuss internally the terms under which it could acquire the Preferred Interests, communications that would be nonsensical if those interests already had been acquired. On July 25, Kanelos and Orfanoudaki exchanged another model for the "buyout of Murchinson" that contemplated a first payment of $21.2 million to Murchinson for the sale of the ships, repayment of the Loan facility for an additional $12.9 million, and a second payment to Murchinson of $15 million for the "partnership share." Dkt. No. 551-23; *see also* Dkt. Nos. 551-24, 551-25, 551-26. This is the email that was produced in the bankruptcy proceedings but not in the arbitration. There was no partnership share other than the Preferred Interests.

Eletson did not just talk internally about what would be necessary to purchase the Preferred Option. The limited evidence that Levona has been able to uncover demonstrates that Eletson acted on the understanding that it would need to obtain financing to purchase the

Preferred Interests.  On July 25, the same day Kanelos and Orfanoudaki exchanged the financial model contemplating repayment of the Loan and additional consideration for the acquisition of the partnership share, Eletson requested "an additional credit facility" from a financier at Meerbaum Solutions, sending that institution a financial model with that same structure (although with the second Murchinson payment for the Partnership Share decreased to $10 million), with the note that the "detailed model" was to "support[] our request for this additional credit facility."  Dkt. No. 551-27.  The request was not a clandestine communication from a rogue employee, as the email attaching the request and the model was copied to Kertsikoff.

Eletson employees continued to seek external financing into the late summer and fall of 2022 as the arbitration progressed.  Tzarouchi and Kanelos exchanged an updated financial model with topic line "Strategy: leverage the investor to remove Murchinson on Day 1" on August 11, 2022.  Dkt. No. 551-30 at 4.  It explained that after the "investor gives $40 million, we buyout Murchinson on Day 1," with that $40 million being used to fund the $12.9 million loan repayment, $12.2 million "[a]dditional payment to Murchinson in exchange of the preferred (negotiable)," and repayment of a distinct $15 million loan from Tufton.  *Id.*

On August 12, 2022, Kertsikoff communicated with Kanelos about an "initial investor proposal" that sought financing to "fund[] buyout of Murchinson," and which would use the proceeds to pay (1) "$12.85 million for the repayment of Murchinson W/C facility," and (2) "$12.15 million available to use in negotiations with Murchinson for acquisition of preferred shares."  Dkt. No. 551-31 at 2.  And on August 16, 2022, Tzarouchi and Kanelos exchanged a model with edits from "VEK" which again contemplated payment in the form of a "1st payment," "W/C facility repayment," and "2nd payment."  Dkt. No. 551-35 at 6.  The inference is unmistakable that VEK refers to Vassilis E. Kertsikoff.  A new version was emailed to

Kertsikoff the same day, with the only change being the "2nd payment" relabeled as a "Murchinson 'additional' exit payment," or "residual payment," and the value of that payment decreased from $12.2 million to $5 million. Dkt. No. 551-36 at 5. After the document was edited again (and the residual payment changed to $2.2 million), Kertsikoff instructed Kanelos to send it to external financers. Dkt. No. 551-38.

Also in mid-August, 2022, Kertsikoff communicated with Jay Goodgal of Castalia Partners regarding a potential transaction with Austen Grove Capital. Dkt. No. 551-32. The attached engagement agreement was between Castalia Partners and Eletson Holdings "in relation to the fund raising for up to $25 million to $30 million to recapitalize its subsidiary Eletson Gas LLC." Dkt. No. 551-33 (agreement signed by Kertsikoff and Goodgal). Goodgal testified in connection with this proceeding that he introduced Kertsikoff to an investor at Austen Grove because it is a "capital raiser" that was "very knowledgeable about availability of capital in the German market." Dkt. No. 551-34 at 49:3–12. Kertsikoff and Kanelos communicated about a financial model to send to Goodgal in connection with the transaction, which Kertsikoff approved with minor edits. Dkt. No. 551-38. Kanelos then followed up with Goodgal detailing potential transactions, one of which was "Murchinson's Exit Payment." Dkt. No. 551-32 at 3. That required the money from the Symi/Telendos sale, repayment of the loan, and a "$2.2 million residual amount" remaining from another transaction. *Id.*

In an email to Karastamati, Kertsikoff, and Hadjieleftheriadis on September 1, 2022, Greek counsel for Eletson noted that the primary disadvantage of litigation as opposed to settlement was "that we did not exercised [sic] the option on the basis of the formalities of the BOL." Dkt. No. 610-7 at 3. The principals did not disabuse counsel of the notion that the option had not been exercised. And on September 12, 2022, Andreoulakis confirmed to Timagenis that

87

"[y]our understanding is correct that Eletson Holdings Inc. has all common units (100%) and Levona has all the preferred units (100%)."  Dkt. No. 610-9 at 2.

In December 2022, consistent with his acceptance of the view that the Purchase Option had not been exercised, Kertsikoff continued to communicate with Meerbaum Solutions seeking external financing for the acquisition of the Preferred Interests.  Martin Hugger of Meerbaum informed Kertsikoff that Oak Tree Capital was "aware that you may use excess cash from MRs to buy out Levona."  Dkt. No. 551-48.  Following up on January 17, 2023, Kertsikoff emailed Karastamati and Hadjieleftheriadis with a proposal from Meerbaum Solutions with the purpose to "repay a working capital loan provided by Levona" and "redeem preferred capital held by Levona."  Dkt. No. 551-51.

Indeed, Eletson's understanding of the BOL to require a multi-step buyout including repayment of the Loan and that the Purchase Option was not exercised is confirmed by emails stretching into early 2023—on February 13, 2023, Kertsikoff emailed Hadjieleftheriadis a financial model prepared by Orfanoudaki for the "Eletson/Murchinson Transaction." The model contemplated that Eletson would repay the Loan and make an additional payment to Levona of $23 million for a "Total Murchinson buyout."  Dkt. No. 551-53.

### 2.    Eletson's Testimony at Arbitration

The evidence clearly and convincingly demonstrates that Kertsikoff, Karastamati, and Hadjieleftheriadis committed perjury in their testimony during the arbitration.  On May 16, 2022, Kertsikoff answered positively "[w]e did" when posed the question by Eletson's counsel in the arbitration "[i]s it your belief that Eletson exercised the option on March the 11th?"  *Id.* at 260:24–261:2.  Further, he stated that Eletson "intend[ed]" to do so at that time.  *Id.* at 261:7–10. In his written testimony, he stated "as of March 11, 2022, the Company paid the consideration for the buyout—that is, the Purchase Option Consideration—by transferring the shares of the

Greek SMEs that were the bareboat charterers (lessees) of the Symi and Telendos." Dkt. No. 551-76 ¶ 46. He also swore that from the Spring of 2022 and onwards, "Eletson held itself out, as the family at large, as the sole shareholder of [Eletson Gas] and the sole beneficial owners of the company's remaining 12 vessels. I was clearly communicating that, as between any person or entity on the Eletson side and any person or entity on the Levona side, it was Eletson who effectively owned the company. We would never have done or said that if there was any question about the efficacy of the buy-out of Levona." *Id.* ¶ 71.

That testimony was knowingly untrue. Kertsikoff did not believe that Eletson exercised the option on March 11, 2022 and he knew on May 16, 2023 when he gave that testimony that he had not had such belief. Both before and after the March 11, 2022 date of the purported exercise of the Purchase Option, he sought to raise money to satisfy the conditions pursuant to which Eletson could exercise the Purchase Option, including the repayment of the Loan and additional consideration for the fact that the option exercise period had expired. Dkt. Nos. 551-19, 551-20. After the date passed, he was the key Eletson principal working with the company's finance team to raise money to compensate Levona for the Preferred Interests considering the fact that the Purchase Option Period had passed. Dkt. Nos. 551-27, 551-31, 551-35, 551-36, 551-38, 551-51, 551-53. He was the face of at least some of the company's external communications and fundraising efforts. Dkt. Nos. 551-32, 551-33, 551-48, 551-51. He also acknowledged to his lawyers in July 2022 that the Purchase Option had not been exercised. Dkt. No. 556-4 at 14.

On May 16, 2023, Karastamati gave live testimony that "we strongly believe that we gave notice to Levona that we were exercising the option and gave this notice on March 10 and March 11, we exercised that option." Dkt. No. 551-75 at 88:4–13. She continued that "as soon as the transfer of the sales of the Symi and Telendos, we exercised the purchase option." *Id.* at

98:17–19.  In her written testimony, Karastamati further affirmed under penalty of perjury that "[o]n March 10, 2022, Eletson confirmed to Levona that it was indeed exercising the option." Dkt. No. 551-9 ¶ 57.  She swore also that "[a]fter March 11, 2022, Eletson understood that the preferred shares were transferred," and that it "held itself out, as the family at large, as the sole shareholder of the company," and that "Kertsikoff clearly communicated that, as between any person or entity on the Eletson side and any person or entity on the Levona side, it was Eletson who effectively owned the company.  [Eletson] would never have made such representations if there were any question about the efficacy of the buy-out of Levona."  *Id.* ¶ 67.

That testimony too was knowingly untrue.  Karastamati was privy to efforts at Eletson to source outside financing to buy-out Murchinson after the deadline for exercise of the Purchase Option had passed.  Dkt. Nos. 551-16, 551-51.  She similarly acknowledged to her lawyers that the Purchase Option had not been exercised, Dkt. No. 556-4 at 14, and that there was no indication from any party that the Option could be extended, *id.* at 81.  The Court can draw no inference from the evidence other than that Karastamati lied in her arbitration testimony.

Hadjieleftheriadis gave the written testimony in the arbitration that "[t]he values of these vessels was more than was necessary under the BOL to effectuate the buyout."  Dkt. No. 551-4 ¶ 43.  He testified also that "[a]t no point did Levona object to" the Assignment of Claims "failing to constitute sufficient collateral."  *Id.* ¶ 51.  Hadjieleftheriadis also testified in the arbitration that after Eletson exercised the Purchase Option, "Levona made false representations to third parties that it has complete control over the company and unrestricted authority to sell its assets," whereas in reality "Levona had no interest in the company following March 11, 2022."  *Id.* ¶¶ 96–97.  Again, that testimony was knowingly untrue; the documents produced in this litigation demonstrate that Hadjieleftheriadis did not believe either on March 11, 2022 or on May 17, 2023

at the time of his written testimony that the Purchase Option had been exercised.  He initiated

contact regarding a potential investment from an outside company in March of 2022 with the

purpose of using the investment to exercise the Purchase Option.  Dkt. Nos. 551-14, 551-15,

551-16.  He was cognizant too of Eletson's efforts to secure external financing after the option

lapsed.  Dkt. Nos. 551-51, 551-53.  And he also acknowledged to his lawyers that the Purchase

Option had not been exercised.  Dkt. No. 556-4 at 14.

Some of the more egregious misstatements by the three principals of Eletson/Intervenors

occurred with respect to the July 13 email sent by Kanelos to Spears of Levona, which was

produced during the arbitration.  Dkt. No. 67-14.  The Arbitrator relied on the testimony of the

principals in rejecting the probative value of that document.  The email attached a proposal

outlining a plan by which Eletson could purchase the Preferred Interests from Levona.  It was

sent shortly before the call from Levona to Eletson about the plan to sell the nine vessels to

Unigas that triggered this arbitration, *i.e.*, before there was any litigation or dispute to settle.

Dkt. No. 125-1.  Levona argued that the document was the "smoking gun" demonstrating that

notice could not have been given and the Purchase Option could not have been exercised.

Eletson responded that such characterization was untrue.  It asserted that Kanelos was a

compromised witness because he had previously been offered compensation from Levona,[29] that

---

[29] In December of 2021, after Levona's acquisition of the Preferred Interests from Blackstone and long before the conduct at issue in the Arbitration, Kanelos and Levona entered a "Services Agreement."  *See* Dkt. No. 180-1.  Under that agreement, Kanelos could receive a percentage of any return that Levona earned through its investment in Eletson, and he received an advance of $100,000 dollars.  *Id.*  The agreement recites that the consideration was provided as remuneration for Kanelos's services in connection with the acquisition of the Preferred Interests.  The Arbitrator found that Kanelos owed fiduciary duties to the Group Companies, that his agreement with Levona was contrary to his obligations as an officer of Gas and Eletson and that he used confidential information to lower the price that Levona would have to pay Blackstone for its shares, to talk to financiers about how to finance Gas's debt, and to discuss what to do with Gas's assets after Levona became a preferred shareholder.  Final Award at 22–23, 51.

he was acting alone, that the email created fury and storm at Eletson, and that it merely and incorrectly captured a checklist for consummating an option that had already been exercised.

That argument and the testimony offered to support it was false. The conduct of Kanelos was not that of a rogue actor. Kanelos communicated extensively about a proposed Murchinson buyout and external investment with Eletson principals and other finance team members. The newly produced documents include communications similar to that July 13 email, which are exchanged between Kanelos and: Kertsikoff (Dkt. Nos. 551-20, 551-31, 551-36), Orfanoudaki (Dkt. No. 551-25), Tzarouchi (Dkt. No. 551-35), outside investors at Meerbaum Solutions (Dkt. No. 551-27, cc'ing Kertsikoff), and outside investors at Catalia Partners (Dkt. No. 551-32, cc'ing Kertsikoff and a party at Austen Grove Capital). Others are sent to Kanelos from Kertsikoff (Dkt. No. 551-38), Orfanoudaki (Dkt. Nos. 551-23, 551-39), and Tzarouchi (Dkt. Nos. 551-28, 551-29, 551-30, 551-37, 551-83). Further, Kertsikoff's deposition testimony in this proceeding that the financial models that were circulated throughout this time period were all a part of "one continuum" similarly contradicts any inference that the July 13 document was a one off or that Kanelos was a rogue actor. Dkt. No. 551-1 at 237:11–19.

There was also no fury and storm at Eletson after Kanelos sent that email on July 13, 2022. When called upon during the course of this case to support that characterization and to refute the plain inference from the documents that Kanelos was authorized to send the buyout proposal, Eletson offered not a scintilla of evidence from a percipient witness. Kertsikoff

---

Neither Intervenors nor the Arbitrator explained how any of that conduct injured, or was to the detriment of, Eletson. If anyone would have had a complaint about the agreement, it would have been Blackstone (which apparently never complained). None of the renumeration paid to Kanelos was from Eletson's share of any Eletson Gas proceeds. Levona and Eletson would have had a common interest in financing Gas's debt, and Eletson would have no interest in how much Levona had to pay for Blackstone's interest.

testified he did not recall whether he reacted at all to the email, offering only the speculation that he "probably did" scream at Kanelos. *Id.* at 99:6–17; *see also id.* at 110:4–12 ("I don't recall if I did"). In fact, as Kertsikoff elsewhere admitted at the deposition, he was on vacation at the time the email was sent, *id.* at 113:15–24, and only read the email at issue "after the fact," *id.* at 109:4–6. The document was not a checklist for consummating an option that had already been exercised. As previously and exhaustively discussed, Eletson's witnesses knew the option had not been exercised.

Importantly, the false testimony as to the exercise of the Purchase Option was clearly material. The question of whether notice was given, and correspondingly whether the option was exercised, was one of the dispositive, critical issues at the arbitration. If no notice had been given, not only would Eletson's claims have necessarily failed, but also Levona's counterclaims likely would have succeeded. And that question was supposedly answered in Eletson's favor by the notion that Eletson gave informal notice to Levona at the March 10 board meeting. But Levona has demonstrated that all of the facts that supported that claim were untrue and known to be untrue. Eletson did not believe that it had exercised the Purchase Option because it knew it could not have. It did not intend to exercise the Purchase Option on March 10 or 11, because it knew the conditions for such exercise had not been satisfied. It did not act consistently with the claim that the option had been exercised—as its witnesses falsely testified. It acted inconsistently with that claim. And the decision not to exercise the option was not economically irrational; Eletson understood that the cost of exercising the option was not $1 but repaying the Loan or providing adequate collateral or security which it had not done.

### 3.    Intervenors' Arguments and Belated Submissions

Intervenors have offered no evidence that would create a genuine issue of fact as to the existence of fraud with respect to the testimony at arbitration from the former owners that the

Purchase Option had been exercised.  Through counsel, Intervenors argue that the modeling documents reflect a potential settlement offer—but this argument gravely mischaracterizes the record.  Dkt. No. 589 at 34.  After Eletson commenced arbitration on July 29, 2022, Levona offered a global settlement proposal on August 9.  Dkt. No. 595-26.  In it, Levona stated its position that: "There was no loan repayment.  There was no exercise of an option.  Those ships have sailed."  Dkt. No. 595-26 at 2.  Levona's offer was in several parts.  (1) Levona would sell the Symi and Telendos, and if the net proceeds were less than $23 million, Eletson would pay Levona the difference (and if the net proceeds were more, Levona would apply them toward the outstanding Loan); (2) Eletson would have to repay the $12.85 million dollar Loan within 30-days of the letter; (3) Eletson would pay their "best offer" for the purchase of Levona's preferred and common shares.  Dkt. No. 595-26 at 2–3.  In response, Eletson did not challenge Levona's position that there was no exercise of an option because the Loan had not been repaid or that that ship had "sailed."  Instead, it made a counteroffer predicated on the notion that the repayment of the Loan was critical to the exercise of the option and thus that the option had not been exercised.  Dkt. No. 595-27.  Eletson offered that: (1) the excess value from the sale of the two ships (at least $3,263,300 based on the value at the time they were conveyed to Levona) would count against the Loan total; (2) Eletson would facilitate the sale of the ships; (3) Eletson would pay the outstanding trade debt of the ships; (4) the remaining balance of the Loan will be repaid by November 30, 2022.  Dkt. No. 595-27 at 3–4.  There is no evidence that these conversations continued.

The key problem with Intervenors' argument that the Withheld Documents are merely a continuation of those settlement efforts rather than a reflection of the effort to raise the money to acquire Preferred Interests that Eletson had not previously acquired is that there is no evidence

that supports it.  The best that Intervenors offer is the general testimony of Kertsikoff that

Eletson was trying to "pay ransom money to Levona/Murchinson to get them out," Dkt. No. 551-

1 at 225:3–9, and his speculation when confronted with the financial models from July 2022 that

contained a three-payment buyout structure, that "I guess that would be in the context" of some

"early settlement discussions," *id.* at 233:7–13.  But that Eletson was trying to pay to get Levona

out of the management of Eletson Gas or that Eletson thought that any money it would have to

pay was "ransom" does not create a genuine issue of material fact.  Eletson Gas and Eletson had

been trying to obtain the Preferred Interests at the time of the BOL—that is why there was an

option to purchase those interests.  And Levona had extended a loan that was accompanied by an

option that could be exercised only if the loan was repaid or adequate security or collateral

provided by March 24, 2022.  The testimony thus does not speak to the central question here of

whether the Eletson principals believed that the Purchase Option had been exercised in March

2022.  Whether Levona's demand that its loan be repaid or it receive security or collateral before

the option could be exercised is characterized as an act of extortion or simply an exercise of

contractual rights, the models all reflect that the principals of Eletson understood that the option

had not been exercised and the buyout did not occur and that the option would not be exercised

until Levona was satisfied.  Intervenors have not proffered evidence that would create a genuine

issue of fact.  *See Island Software and Comp. Serv., Inc.*, 413 F.3d at 262; *Presbyterian Church

of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).  They cannot withstand

summary judgment on the basis of some "metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 585.

In any event, the argument that the models reflected a proposal for a settlement offer

cannot explain away the surfeit of other evidence indicating that Eletson had not and did not

believe it had exercised the Purchase Option on March 11, 2022.  That includes its representations to external parties that Murchinson/Levona remained a part of the company past that date.  *See* Dkt. Nos. 551-16, 551-17, 551-18, 551-38, 551-32.  For example, as late as December of 2022, Eletson was communicating with Oak Tree Capital about a potential investment, which the financer was "aware" would be used "to buy out Levona."  Dkt. No. 551-48.  Nor can the argument that the financial models were settlement proposals explain away Eletson's admission to its own counsel that the Purchase Option had not been exercised, Dkt. No. 556-4 at 10, 81, or the statement by Eletson's Greek counsel that it had not been formally exercised, Dkt. No. 610-7.

Moreover, while several of the Withheld Documents containing buyout models were created in the period following Levona's initial settlement offer on August 9, 2022,[30]  those documents, which contemplate a three-step buyout including repayment of the Loan, are consistent with earlier financial models sent between Eletson employees, models that pre-date the dispute between the parties which started on July 11, 2022, but post-date the expiration of the Purchase Option Period.  As early as June 17, 2022, Tzarouchi and Kanelos exchanged financial models that contemplated both first and second Murchinson payments including repayment of the Loan in order to buy out Levona.  Dkt. No. 551-83.

Intervenors also argue that "Levona fails to provide evidence that anyone acted with any intent to deceive," and that because Levona "puts forward no evidence of anyone's state of mind," it had not met its burden to show fraud.  Dkt. No. 589 at 40–41.  However, as juries are

---

[30] *See* Dkt. No. 551-28 (August 10, 2022); Dkt. No. 551-29 (August 11, 2022); Dkt. No. 551-30 (August 11, 2022); Dkt. No. 551-31 (August 12, 2022); Dkt. No. 551-35 (August 16, 2022); Dkt. No. 551-36 (August 16, 2022); Dkt. No. 551-32 (August 18, 2022); Dkt. No. 551-37 (August 18, 2022); Dkt. No. 551-38 (August 18, 2022)

instructed every day in every courthouse of the United States, fraudulent intent may be inferred from the circumstantial evidence.  *See* 4 Leonard B. Sand. Et al., Modern Federal Jury Instructions, Instruction 74–2 (2025) ("You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact. Circumstantial evidence is of no less value than direct evidence; for, it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence but simply requires that your verdict must be based on (e.g., a preponderance of) all the evidence presented."); *see also United States v. Coutu*, 383 F. App'x 30, 33 (2d Cir. 2010) (summary order) ("We have repeatedly emphasized . . . that 'intent to defraud can be established by circumstantial evidence.'" (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999))); *United States v. Denkberg*, 139 F.4th 147, 155 (2d Cir. 2024) ("Indeed, 'a defendant's intent may be proven entirely through circumstantial evidence.'" (quoting *Williamson v. United States*, 207 U.S. 425, 453 (1908))).  The law is no different at the summary judgment stage. Summary judgment may be granted when intent is an issue if there is no genuine dispute as to the circumstantial evidence and what that evidence shows.  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 40 (2d Cir. 1994) ("Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available [in such cases] lacking genuine issues of material fact."); *see also Laro, Inc. v. Chase Manhattan Bank (Nat. Ass'n)*, 866 F. Supp. 132, 137 (S.D.N.Y. 1994) ("a plaintiff 'is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind.'" (quoting *Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988))).

The circumstantial evidence here is overwhelming and undisputed that the false testimony was given with the intent to mislead the Arbitrator as to the former owner's own

beliefs regarding the exercise of the Purchase Option—and "obtaining an award by perjured testimony constitutes fraud." *France*, 43 F.4th at 378 (quoting *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982)). The extent of the evidence before this Court clarifies too that the misstatements were not the result of "confusion, mistake, or faulty memory," but rather are proof of a "willful intent to provide false testimony." *EB Safe,* 832 F. App'x at 709. The former owners themselves, their employees, and their legal counsel continuously understood, over the time period stretching from March 2022 to early 2023, that the Purchase Option had not been exercised. They revealed as much in their communications with external financers and banks.

Intervenors have also attempted to enter evidence they claim creates an issue of material fact late in this proceeding. During oral argument on this motion, Levona made reference to six crime-fraud documents filed at Dkt. No. 655, which the Court had previously ordered Reed Smith to produce and which Levona had submitted as exhibits to a memorandum of law challenging Reed Smith's assertion of privilege over other crime-fraud documents. Each of the documents was one with which Intervenors would have been familiar prior to the briefing on the motion to vacate—they included communications between Reed Smith and Eletson's principals in the lead up to the arbitration, and internal Reed Smith communications in July of 2023. Nonetheless, the Court gave Intervenors leave to respond to those six documents and any other crime-fraud documents that Levona would submit (by December 15, 2025); in other words, it gave Intervenors limited leave to respond to the newly offered documents despite the completion of briefing on the motion to vacate. Dkt. No. 660 at 63, 77. Levona eventually submitted a total of eight documents produced under the crime-fraud exception (which included the six previously-referenced documents). Dkt. No. 659. In their response to Levona's submission of

the eight crime-fraud documents, Intervenors submitted 94 pages of declarations including the declarations of Louis Solmon, Robert J. Cleary, Kertsikoff, Karastamati and Hadjieleftheriadis. Although the Court gave Intervenors leave to respond to the new documents offered by Levona (*i.e.* the crime-fraud documents that were late-produced and not included in Levona's original motion to vacate submission), Intervenors took the opportunity as license to submit argument and statements regarding the server documents (*i.e.*, documents that were part of Eletson's original motion to vacate briefing and adopted by Levona, and as to which the Court did not give Intervenors' leave). They spend little time on the eight documents to which leave to respond was granted.

To the extent that the submissions address documents (and facts reflected in those documents) other than the new material submitted by Levona, Intervenors' submissions exceed the scope of the leave permitted by the Court and are properly disregarded. In addition, the Court will disregard the declarations of Karastamati and Hadjieleftheriadis and the declarations of any other declarants to the extent that they purport to speak to the intent or actions of Karastamati and Hadjieleftheriadis. Intervenors forfeited the rights to rely on declarations from those two individuals or other evidence regarding their actions or intent when they knowingly deprived Levona of the opportunity to take their testimony in violation of Court order. The Court also disregards any document relied upon now by Intervenors that Intervenors failed to produce in discovery.

Further, the Court disregards the testimony of Mr. Cleary. His declaration exceeds the scope of what was permitted by the Court's order, improperly raises expert testimony when such testimony was not permitted by the Case Management Plan in this case, and is speculative and unhelpful. Mr. Cleary purports to opine on matters of law on the basis of a cherry-picked set of

documents. *See B&R Supermarket, Inc. v. Visa, Inc.*, 2024 WL 4252031, at *13 (E.D.N.Y. Sept. 20, 2024) (explaining that "an expert's testimony on issues of law is inadmissible" and citing cases); *Hamrit v. Citigroup Global Markets, Inc.*, 2024 WL 4891889, at *6 (S.D.N.Y. Nov. 26, 2024) ("Rule 702(b) requires that an expert's testimony be 'based on sufficient facts or data.'" (quoting Fed. R. Evid. 702(b))); *Daniels-Feasel v. Forest Pharmaceuticals, Inc.*, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021) ("[a]n expert must not cherry-pick . . . and present the court with what he believes the final picture looks like." (internal quotations omitted)). It therefore is inadmissible under Federal Rule of Evidence 702. Additionally, his expert declaration is noncompliant with Rule 26, which requires disclosure of "publications authored in the previous 10 years" and "other cases in which . . . [he] testified," or a "statement of [his] compensation" or who is paying it. Fed. R. Civ. P. 26(a)(2)(B)(iv)–(vi). The Court grants Levona's motion to strike his declaration.

Even if the Court were to consider Intervenors arguments and evidence in their entirety, however, they would create not create a genuine issue of fact as to notice with respect to the Purchase Option and the exercise of the Purchase Option. (The Court addresses the relevance of the supplemental submission to the issue of the nomination later in this Opinion and Order.) The gravamen of Levona's claim is that the principals of Eletson (and now representatives of Intervenors) misled the Arbitrator when they expressed the view that on March 10, 2022, they intended to exercise the option and conveyed that intent to Levona shortly thereafter. In their supplemental briefing, Intervenors argue that the Instructions to Reed Smith are not probative of fraud, as "[a]t the time prior to receiving appropriate legal advice, Eletson was misled by its key but disloyal advisors, CFO Kanelos and WFW attorneys aligned with Levona, as well as Levona itself, as to full loan repayment being a condition." Dkt. No. 662 at 11; *see also* Dkt. No. 664 ¶ 8

(Kertsikoff declaration stating that although the Instructions document was sent after the principals were to "check the facts to make sure they describe accurately the position," "we wanted to act urgently to involve RS," and so had not developed a "firm position on legal issues"); Dkt. No. 667 ¶ 17 (Karastamati stating that the Instructions to Reed Smith and responses thereto were "misunderstandings and erroneous assumptions regarding the BOL requirements"); Dkt. No. 666 ¶ 7 (Hadjieleftheriadis stating the same). In other words, they argue that the principals had an incorrect understanding through July of 2022 that they had not exercised the Purchase Option, and that the understanding was only corrected upon retention of unbiased counsel, i.e. Reed Smith.

This argument only proves Levona's point: regardless of the reason *why*, Eletson did not believe it had exercised the Purchase Option as late as July 2022. It would have been critical for the Arbitrator to know that they were operating on an understanding that the option could not be exercised without repayment of the Loan—and with that information, he may not have determined that appropriate notice was given and the option was exercised.[31]

In his declaration, Kertsikoff also addressed the Server Document from Eletson's Greek Counsel to the principals on September 1, 2022, which stated "that we did not exercised [sic] the option on the basis of the formalities of the BOL." Dkt. No. 610-7 at 3. Again, that testimony is outside of the scope of the permitted response. And again, his declaration creates no issue of fact. He stated that "after analysis and guidance from appropriate counsel, rather than from conflicted and disloyal advisors, Eletson came to realize that even the legal formalities were

---

[31] The Court similarly need not address Karastamati's contention that her response on July 25 that there was "no explicit written or verbal indication" that the Purchase Option could be extended was actually drafted by Kanelos. Dkt. No. 667 ¶ 15. Regardless, the email was sent from her email and is a party admission.

satisfied." Dkt. No. 664 ¶ 17. In short, Kertsikoff admits that prior to the analysis and guidance he later received from counsel (*i.e.* after March 2022), he was on the understanding that what he characterizes as "legal formalities" were not satisfied and the option could not be exercised. It is irrelevant whether the repayment of a $10 million loan is properly characterized as a "legal formality." The undisputed point is that contrary to what he conveyed to the Arbitrator, Kertsikoff understood in March 2022 that the Purchase Option could not be exercised.

Intervenors also argue that even if the false testimony was fraudulent, it was not material to the Arbitrator's ultimate decision. Their primary argument is that because the Arbitrator determined that the "language in the BOL is unambiguous," Dkt. No. 41-1 at 34, no extrinsic documents could have influenced or changed the results of the arbitration. The arbitrator concluded that the language of the BOL was unambiguous in that the transfer of the Symi and Telendos was the consideration for the exercise of the Purchase Option and that Levona only had the right to approve "security" but not collateral. Final Award at 40. However, it does not follow that the Arbitrator's conclusions would have looked no different had Kertsikoff, Hadjieleftheriadis, and Karastamati testified truthfully.

There is no genuine issue of material fact on this record that the false testimony and the Withheld Documents were critical to the factual question the Arbitrator was required to and did resolve of whether Eletson timely provided notice that it was exercising the Purchase Option. To reiterate, the BOL required written notice of the intent to exercise the Purchase Option and there was no such written notice. Eletson relied instead on the notion that there was substantial compliance with the notice provision because Eletson intended to exercise the option and it informed Levona that it was exercising the option on March 10, 2022. The Arbitrator found that "[a]t best, the absence of a written notice and payment of $1 dollar are formalities that the parties

failed to observe." *Id.* at 45.  But for Eletson to have intended to exercise the option in March

2022 it would have had to understand in March 2022 that it had satisfied the conditions to

exercise the option then.  The same is true with respect to whether Eletson informed Levona of

the exercise of the option—the intent to exercise the option supported the proposition that it

would have informed Levona of that intent.  Fed. R. Evid. 803(3); *see Shepard v. United States*,

290 U.S. 96, 98 (1933).  The testimony was the critical linchpin that could support that Eletson

intended to exercise the Purchase Option.  And, as discussed extensively, that testimony was

false.

Intervenors also argue that Levona's evidence in connection with this motion for vacatur

was already comprehensively submitted to the Arbitrator.  In essence, Intervenors appear to

argue that it is irrelevant whether they testified falsely; they assert that documents that would

demonstrate their false testimony were already subject to adversarial testing in the arbitration.

The failure to disclose evidence is not fraudulent and cannot give rise to a motion to vacate an

arbitral award when the Arbitrator is "already aware of the essential facts" contained in the

withheld evidence.  *Int'l Bhd. of Teamsters v. CBF Trucking, Inc.*, 440 F. App'x 76, 78 (3d Cir.

2011). The Intervenors rely primarily, and mistakenly, on the July 13, 2022, email from Kanelos

to Spears with an attachment entitled "Murchinson Buyout Steps" that Levona presented in its

argument during the arbitration.  Dkt. No. 41-1 at 44 n.6 (referencing Dkt. No. 125-32).  As

already discussed, however, Eletson convinced the Arbitrator to disregard that sole document on

the false narrative that it was a checklist for an option that had already been exercised.  That

narrative was untrue.

Intervenors argue too that Orfanoudaki has provided evidence that Eletson shared

privileged documents with Spears, and that because Spears had access to those documents during

the arbitration Levona cannot now claim fraud on the basis that they were not introduced.  But the testimony to which Intervenors point establishes no such thing.  Orfanoudaki testified at deposition that while Kanelos was speaking with Spears, Kanelos asked Orfanoudaki "how much is the outstanding loan."  Dkt. No. 551-10 at 213:13–24.  The testimony does not establish that Spears had any of the Withheld Documents.  Indeed, Intervenors had the opportunity to take the deposition of Spears himself and he testified that the only Withheld Documents he obtained were in connection with the bankruptcy which he did not share with Levona.  Dkt. No. 551-22 at 113:3–114:20.  Intervenors point to no evidence to refute that testimony. Orfanoudaki's testimony thus does not establish a genuine issue of fact.  *See Celotex*, 477 U.S. at 324.

## B.    Nomination of the Cypriot Entities

The testimony of Karastamati, Kertsikoff, and Hadjieleftheriadis regarding the exercise of the Purchase Option was not the only false testimony offered by Eletson at the arbitration hearing.  Levona argues that Eletson committed fraud in the arbitration in connection with the testimony it proffered regarding the nomination of the three Cypriot companies that it claimed acquired the Preferred Interests upon the exercise of the Purchase Option.  At the arbitration hearing, Karastamati, Kertsikoff, and Hadjieleftheriadis all testified that the Preferred Interests had been transferred to the three Cypriot nominees on March 11, 2022.

On May 14, 2023, Karastamati testified under oath at the arbitration that:

On August 2, 2022, I attended a call with the Eletson families.  In this meeting, among other things, the families reiterated that the preferred interests were transferred to the Preferred Nominees effective upon the transfer of the preferred interest from Levona on or about March 11, 2022.

Dkt. No. 551-9 ¶ 108; *see* Dkt. No. 551-75 at 73:25–74:12 (same).  Kertsikoff testified to the same, that "the Company determined to nominate three entities related to the principal owners of Holdings," and that the "three entities are Cypriot entities by the names of Fentalon, Apargo, and

Desimusco." Dkt. No. 551-76 ¶ 194. He explained that the discussions "are corroborated by several written communications," including a note written on January 10, 2022 from his sister to his mother stating that "our Cypriot company is about to acquire a new asset." *Id.* ¶ 197. He continued also that "[b]y agreement among all relevant transferors and transferees, valid, legal, and binding under Greek law, the preferred interests were transferred to the Preferred Nominees effective upon the transfer of the preferred interests from Levona, which occurred on or about March 11, 2022. The price committed to be paid by the Preferred Nominees was 3 million Euro, though subsequent to that agreement the Preferred Nominees further agreed to be contingently liable to pay legal expenses in connection with this arbitration. That further agreement occurred on August 2, 2022, after Levona tried to interfere with Claimant's ability to pay legal expenses in connection with this arbitration." *Id.* ¶ 198. Hadjieleftheriadis testified to the same, stating that "[f]rom approximately January 2022 the three principal families owning or controlling Eletson holdings in [Eletson Gas] discussed and later agreed to nominate three Cypriot entities . . . to acquire Levona's shares in the company following the buyout for consideration." Dkt. No. 551-4 ¶ 104.

The Arbitrator expressly relied on the testimony of the former principals in reaching his conclusion as to the purported nomination. He found that the "[t]estimony and evidence reflect that on August 2, 2022, the three principal families owning or controlling the Eletson holdings in the Company had a meeting," in which "the families discussed the contingent transfer of the preferred shares to the Preferred Nominees." Final Award at 29. In rejecting Levona's argument that Eletson's own witnesses and counsel made statements contradicting their current stance as to the Nominees, Justice Belen instead credited testimony from the Karastamati and Kertsikoff that "Eletson" means "Eletson family," and "Eletson affiliates," and so it did not matter what was

represented to outside parties.  *Id.* at 30.  Although he acknowledged that "the lack of earlier notice by Claimants to Levona of the contingent transfer of any preferred shares to the Preferred Nominees initially raised concern to me, the Eletson witnesses' testimony was both wholly credible and sincere."  *Id.*  Thus, on July 28, 2023, the Arbitrator ruled that the Preferred Interests had been transferred to the nominees on March 11, 2022.  *Id.* at 96.

There is no genuine issue of material fact that such evidence and testimony was false. The Intervenors were not designated as nominees either in March 2022 or in August 2022.  The identification of the nominees as the recipients of the Preferred Interests was a ruse intended to avoid the impact of the bankruptcy and the likely transfer of the economic value represented by the Preferred Interests to the creditors of Eletson, including Levona's affiliate Pach Shemen, through the bankruptcy proceeding.

The undisputed evidence on this motion is that after March 22, 2022, when the nomination allegedly occurred, and prior to May 5, 2023, when Eletson first argued that the Preferred Interests had been exercised in the interest of the Cypriot nominees, Eletson's former owners had consistently stated that the Preferred Interests were held by Holdings and not by the Nominees.  In April 2022, Vandorou represented to Oaktree Capital by verified signature that Levona still owned 40.40% of Eletson Gas.  Dkt. No. 551-18 at 4.  She was a trusted Eletson employee and was communicating with one of Eletson's financers.  Even after Eletson initiated the Arbitration and began representing to outsiders that it had exercised the Purchase Option, Eletson maintained that it was Eletson Holdings, not the Intervenors, that fully owned the Preferred Interests, and therefore owned Eletson Gas.  On November 7, 2022, for example, Andreoulakis signed a certified organizational chart in know-your-customer communications with ABN AMRO bank that clearly shows Eletson Holdings as the sole owner of Eletson Gas.

Dkt. No. 551-44 at 8.  On December 2, both Karastamati and Kertsikoff signed and certified identical charts listing Holdings, not Intervenors, as the sole owner of Eletson Gas, and sent the chart to Berenberg Bank.  Dkt. Nos. 551-46 at 12.  Karastamati and Kertsikoff did the same on December 13, 2022, 551-47 at 20.  On February 7, 2023, Kertsikoff was sent a slide deck to "review again" by a financer at SSY Finance, which stated clearly that "Today, Eletson Holdings is the sole shareholder of Eletson Gas."  Dkt. No. 551-56 at 8.  He was sent the deck to "review again" because, as he acknowledged in deposition, he had previously reviewed the slide deck. Dkt. No. 551-1 at 319:17–20.  There is no evidence that Kertsikoff did anything to correct the "error," for there was no error.

All of that changed after March 2023, when Holdings' creditors, including Pach Shemen, initiated an involuntary bankruptcy proceeding against Holdings.  Dkt. No. 67-26.  The bankruptcy proceeding presented a grave threat to the strategy of Holdings' former owners. Even if Holdings prevailed in the arbitration and the Arbitrator concluded that it had exercised the Purchase Option and Eletson Gas (and therefore Eletson as the common shareholder) owned the Preferred Interests, the economic value of those interests would pass to Holdings' creditors through the bankruptcy, including to Levona's affiliate, Pach Shemen.  After the bankruptcy petition was filed, the former owners (Intervenors here) had a conversation with Reed Smith about their options "given the statements that Levona/Murchinson had just begun making in the bankruptcy."  Dkt. No. 551-62 at 401:5–10.  Kertsikoff testified at deposition here that "it was becoming clear to us that even if . . . the claim was awarded, the . . . bankruptcy strategy, as I said of Levona, would have that award actually go to Holdings from Gas.  So it was very important for us to establish that the party that . . . stood to lose was, you know, the preferreds." Dkt. No. 556-3 at 50:9–20.

On March 22, 2023, fifteen days after the involuntary petition was filed, Reed Smith emailed Hadjieleftheriadis, Kertsikoff and Karastamati, and Greek counsel Timagenis to explain that if the Preferred Interests were awarded to Eletson Gas in the arbitration they would be "subject to cancellation by operation of law." Dkt. No. 556-4 at 84–85. In other words, the only equity interests that would remain in Eletson Gas would be the common shares held by Holdings, which would then be available for distribution to Eletson's creditors. However, Reed Smith advised that the problem could be averted if the Preferred Interests had been transferred to nominees—if the "nominee argument wins" that problem would be avoided. *Id.*; *see also* Dkt. No. 551-62 at 401:16–23. In response, the former owners told Reed Smith lawyer Louis Solomon "it was already done," meaning that coincidentally they had already done the exact thing that Solomon was suggesting. *Id.* at 397:10–16. On April 19, 2023, Reed Smith again reiterated in an internal email that "Levona's interests in the Company must be recognized to be extinguished, or were transferred to Eletson pursuant to the BOL." Dkt. No. 569-2. On April 22, following the conversation with Reed Smith, Hadjieleftheriadis sent an email to Reed Smith with "a couple of docs which may be helpful for discovery" supporting that new theory of nomination. Dkt. No. 556-4 at 62.

It was only after that internal April discussion that Eletson for the first time introduced in the arbitration that the Preferred Interests had been transferred to the Cypriot nominees, Intervenors here, on May 5, 2025. Dkt. No. 55-13 ¶ 100–06.

Eletson knew that the last minute submission regarding the Nominees was underhanded. In a May 3, 2023 meeting at Reed Smith just days before the nominees were introduced to the Arbitrator, Solomon himself was reported by a notetaker as stating that "[w]e are trying to sneak in the information" about the transfer of the interest "but we can't join them as parties, its too

direct." Dkt. No. 659-4 at 8. He continued that doing so was necessary "to avoid the risk that you win the arbitration," but that then "the preferred goes back to Gas . . . so there's only common stock, Holdings owns common stock, Levona or creditor take over common stock in the bankruptcy." *Id.* He concluded that "[t]he reason we're trying to get [Justice Belen] to do it, is more favorable than doing it in the bankruptcy." *Id.* Just a few days later, on May 8, at a different meeting between Reed Smith and the former owners, Solomon clarified that "[w]e have to know who it will be transferred to," and that "there must be consideration" for any such transfer. Dkt. No. 659-3 at 3. The meeting did not reflect that the clients were already aware of the essential details of the nomination, as they would have been if the nomination had occurred. To be safe, Solomon informed the participants that "[e]veryone needs to testify that we thought we did what we needed to," and that "I need my witnesses to know that a nominee of gas will get the preferred." *Id.*[32]

In his declaration submitted in response to Levona's invocation of the crime-fraud documents, Solomon stated that these notes did not reflect any untoward action on behalf of his law firm. He states that as of March 22, 2023, Reed Smith had "not yet clarified with our clients whether or not a nomination under the BOL had occurred," Dkt. No. 663 ¶ 9, and that in fact he "pressed the client representative to provide Reed Smith with evidence of the nomination," *id.* ¶ 11. According to Solomon, Reed Smith "determined that they supported the facts relayed to

---

[32] In a declaration submitted in response to Levona's introduction of the crime-fraud documents, Solomon argues that because Eletson submitted its pre-hearing statement explaining (for the first time) that the nomination had occurred on May 5, it cannot be true that the May 8 meeting notes reflect a post-hoc attempt to invent that story. That is obviously not true of the May 3 meeting notes, cited above. And as to the May 8 meeting notes, the fact that Eletson's lawyers submitted arguments days earlier does not answer why they needed to, a few days later, re-explain the details of that purported nomination to the persons who allegedly executed the transfer much earlier.

Reed Smith concerning the nomination of the Preferred Nominees," and so the firm "made a timely supplemental document production in the Arbitration."  *Id.* ¶ 20.

The Court need not decide here whether Reed Smith was complicit in its clients' perjury either directly or through a wink and a nod or instead was incredulous and was its clients' innocent dupe.  Reed Smith did not have percipient knowledge of the facts regarding the nomination.  At a minimum, it was the vehicle through which a fraud was committed. The documents make the inference plain that, at the time that the former owners gave their testimony at the arbitration hearing, they knew that the Preferred Interests had not been transferred as of March 2022.  The three concocted a story to avoid a consequence where the Preferred Interests would pass to Eletson and through Eletson to Eletson's creditors.

The inference is also unrebutted on this record.  Intervenors have submitted no evidence from Karastamati or Hadjieleftheriadis supporting their version of events or explaining why from October 2022 to February 2023 they took the position that Holdings—not any nominees—held the Preferred Interests in Eletson Gas.  Although Eletson relied on handwritten notes and a letter from Kertsikoff's sister at the arbitration for the proposition that the Preferred Interests had been transferred as a result of a family understanding reached as early as January 2022, Intervenors have offered no evidence to support that such a meeting ever took place.  Instead, the Intervenors point only back to the testimony of Hadjieleftheriadis at the arbitration that "[o]n April 2, 2022, the three principal families owning or controlling the Eletson holdings in the Company had a meeting in Piraeus," during which they discussed "the contingent transfer of the preferred shares to the Preferred nominees."  Dkt. No. 67-45 ¶ 106.  But that is the very evidence that is alleged to be perjurious.  Hadjieleftheriadis himself avoided having to affirm under oath the truth of that testimony by failing to appear for his deposition.  And no other witness can or has testified for

Hadjieleftheriadis.  Tellingly, Intervenors have offered no evidence or testimony from Kertsikoff's sister, from the author of the handwritten notes, or from any other percipient witness who attended the meeting or who would support that such a meeting ever occurred.

Kertsikoff himself did not testify to being present at a meeting or being aware of any document reflecting the initial nomination of the Cypriot entities, only that he "believe[d]" he was present at a meeting in October 2022 in which Hadjieleftheriadis "reminded everyone that these shares had been transferred."  Dkt. No. 551-1 at 358:6–359:8.  That is, he had no percipient knowledge that there was a nomination of the Cypriot entities.  All he could relay was hearsay from Hadjieleftheriadis.  Kertsikoff also testified that he did not recall if Eletson had ever told anyone as of November 2022 if the Preferred Interests had been transferred.  Dkt. No. 551-1 at 285:19–21.  He said that he had not informed anyone—not any accountant, lawyer, potential investor, or even Eletson staff—of the March nomination; it was "a family matter."  Dkt. No. 551-1 at 287:11–288:25.  He could not recall when the three million euro payment that he testified was the consideration was paid.  *Id.* at 341:14–19.  He also could not recall how the Greek language meeting notes were found or searched for, and answered only that they "existed," and "were all around," that they "weren't just created."  Dkt. No. 551-1 at 525:12–16. Furthermore, as to the letter presented to the Arbitrator from his sister noting that their Cypriot company was going to acquire a new asset, Kertsikoff could not recall if his sister had ever sent a typed note like that before.  *Id.* at 533:17–535:2.  And although he testified that he must have spoken with his sister about the letter at the time it was written, he could not remember what they said to each other.  *Id.* at 526:7–19.  Nor is it clear why, in January of 2022, his sister would have been under the impression that a new asset in the form of the Preferred Interests was forthcoming; at that point, the parties had not agreed to the BOL.

With respect to the documents at issue in the litigation, Kertsikoff testified only that

Eletson was understood to "include[] affiliates." *Id.* at 321:8–20. But he offered no testimony to

explain why he signed himself an organizational chart of Eletson sent to Berenberg Bank that

clearly illustrated Holdings, not Intervenors, as the shareholders of Eletson Gas, Dkt. No.

551-46, stating only that he should not have done so because the chart was erroneous, Dkt. No.

551-1 at 309:7–11. When asked about the email sent to SSY finance stating that "[t]oday,

Eletson Holdings is the sole shareholder of Eletson Gas," Dkt. No. 551-56 at 8, he could answer

only that the only thing that mattered was if Eletson represented that Eletson Gas was owned by

the "broader Eletson," Dkt. No. 551-1 at 317:21–318:9. He similarly could not recall a statement

in an externally circulated presentation created by Eletson explaining that "[i]n 2021,

Murchinson Partners acquired Blackstone's shares" but had no mention of Intervenors later

doing so. Dkt. No. 551-1 at 46:4–10. Nor could he account for the statements of his lawyers

that clarify details of the purported nomination that had not been worked out until the strategy

was created following the instigation of the Bankruptcy Proceeding. Dkt. Nos. 659-2, 659-3,

659-4. His self-serving conclusory testimony thus does not create a genuine issue of material

fact. *See Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (summary order).

Further, Intervenors have not "square[d] that testimony with 'the hard evidence adduced during

discovery.'" *Pfunk v. Cohere Comms., LLC*, 73 F. Supp. 3d 175, 187 (S.D.N.Y. 2014) (quoting

*Deebs*, 346 F. App'x at 656); *see AMVS, Inc. v. Mt. Hawley Ins. Co.*, 2025 WL 278438, at *6

(S.D.N.Y. Jan. 23, 2025) (noting that "[c]ourts in this District have held that 'a non-moving

party's self-serving statement, without direct or circumstantial evidence to support the charge, is

insufficient to defeat a motion for summary judgment.'" (quoting *Adler v. Penn Credit Corp.*,

2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022))).

The inference is overwhelming and undisputed on this record that the false testimony was given with the intent to mislead the Arbitrator regarding the nomination of the Cypriot entities.  Eletson never told any external party that the Preferred Interests were owned by Intervenors upon exercise of the option.  When Eletson did make external representations, Eletson made it clear that either Levona or Holdings owned the Preferred Shares, not Intervenors.  And most tellingly, Eletson told its own lawyers that there had been no nomination, and instead worked with or through them post-Bankruptcy filing to create the fabricated backstory they then told to the Arbitrator.  It is now clear that their statements were knowingly false, and "obtaining an award by perjured testimony constitutes fraud."  *France*, 43 F.4th at 378 (quoting *Dogherra*, 679 F.2d at 1297).  The extent of the evidence before this Court clarifies too that the misstatements were not the result of "confusion, mistake, or faulty memory," but rather are proof of a "willful intent to provide false testimony."  *EB Safe,* 832 F. App'x at 709.

In its response to Levona's introduction of the crime-fraud documents, Intervenors introduce for the first time several documents from the Eletson server that they argue create an issue of fact with respect to the fraudulent testimony regarding nomination.  They are primarily emails sent by Andreoulakis, which Intervenors attempt to offer for the truth of the matter asserted therein (i.e., that nomination occurred and that Eletson could produce documents to verify as much).  *See* Dkt. Nos. 663-9, 663-10, 663-11, 663-13.  As previously discussed, the introduction of those documents is precluded by this Court's imposition of discovery sanctions and was additionally procedurally improper at this stage in the litigation.  Intervenors have had knowledge and possession of the server documents since the inception of the litigation, and any response to Levona's use of those documents would have been proper only in their responsive motion to vacate briefing.  In addition, the documents are hearsay and thus not properly

considered on this motion.  *See Porter*, 722 F.3d at 97.  They constitute self-serving out-of-court statements of a person, Andreoulakis, who has not offered a declaration or submitted to a deposition and which were made after a motive to fabricate arose.  Fed. R. Evid. 801(c).  At most, they speak to the knowledge and intent of Reed Smith—but whether Reed Smith itself knew of the fraud is not at issue in this motion.

More telling is both what Intervenors do not say and what the documents do say.  While Intervenors see fit to go beyond what the Court permitted in the supplemental submissions, they still offer no evidence that a meeting occurred in March 2022 or at any time in which an agreement was reached for the Preferred Interests to go to the nominees rather than to Eletson Gas.  Kertsikoff, Karastamati and Hadjieleftheriadis offer no firsthand evidence on this issue.  They are silent.  Intervenors offer no evidence from any percipient witness.  Intervenors primarily rely on an email from Solomon to the principals and their Greek lawyers summarizing a call that Solomon had with Karastamati.  The statements from Karastamati are hearsay and therefore are not properly considered.  But in the email Solomon (reporting the outcome of that call) states that there were "2-3-4" meetings or calls in the summer or fall of 2022 that discussed the transfer of the preferred shares "in the event Eletson succeeded in getting Levona to comply with its agreement."  Dkt. No. 663-6 at 1.  The timing is notable—even if it is credited (and it cannot be), it suggests that there was no understanding in March 2022 as conveyed to the arbitrator.  Second, the email indicates that "there were people outside the three largest-stake holding families at these meetings/calls."  *Id.*  But the Arbitrator was told that no one else was told about the nomination because it was a family matter.  Another email produced is from Andreoulakis to Solomon in response to a request for further information regarding the purported nomination.  In providing Solomon with the dates of shareholder meetings that occurred in in

2022, Andreoulakis suggests that the documents can simply be altered: "[i]f the caption EHI shareholder formal meeting is misleading we can call it families meeting."  Dkt. No. 663-11. There is no evidence that the caption was, in fact, altered, but the fact that the possibility was considered hardly supports that there exists a genuine issue of fact in this case that would foreclose vacatur.

### C. Fraud as to Document Production

Levona argues that Eletson's scheme to commit fraud had a third part: that Eletson withheld and concealed the documents that would have permitted Levona and the Arbitrator to challenge the former owners' subjective view of the critical events.  There is no genuine issue of material fact that Eletson withheld documents that were required to be produced in the arbitration and that there exists a "nexus between the alleged fraud and the decision made by the arbitrators," even if Levona could "not demonstrate that the arbitrators would have reached a different result."  *Odeon*, 864 F.3d at 196.  Through its fraudulent document production, Eletson prevented Levona from challenging the testimony of the three principals, deceived the Arbitrator, and denied Levona a full and fair arbitration.

The parties agreed that the JAMS Comprehensive Arbitration Rules and Procedures would govern the Arbitration.  Dkt. No. 67-3 (JAMS Comprehensive Arbitration Rules and Procedures).  "JAMS Rule 17(a) … requires that parties to the arbitration engage in good faith, voluntary exchange of relevant, nonprivileged evidence, which presumably would include" documents going to the basis for the arbitration.  *Stinger v. Ft. Lincoln Cemetery LLC*, 2022 WL 2702424, at *2 (4th Cir. 2022) (citing Rule 17(a)).  The rule directs that parties are required to "cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information (including electronically stored information ('ESI')) relevant to the dispute or claim immediately after commencement of the Arbitration."  Dkt. No. 67-3 at 12.  In his very

first procedural order in September of 2022, Justice Belen "reminded" the parties that "pursuant

to JAMS Comprehensive Rule 17(a) they are obligated to cooperate in good faith in the

voluntary and informal exchange of all non-privileged documents . . . relevant to the dispute or

claim immediately after commencement of the arbitration."  Dkt. No. 551-61 ¶ 7.  Eletson

understood those rules, repeatedly referring to them throughout the course of the arbitration.  *See*

Dkt. No. 551-58 at 1; Dkt. No. 551-59 (Eletson stating again that JAMS Rule 17(a) requires a

"meaningful production"); Dkt. No. 551-60.[33]

There is no way to read the Withheld Documents referenced throughout this opinion

other than that they were "relevant" under JAMS Rule 17(a).  The documents speak to the

primary issues in the arbitration—whether the Purchase Option was exercised, and whether the

Preferred Shares passed to the Nominees upon its exercise.  The Court has already described as

"incredible" Intervenors' argument that "the documents were not relevant to the arbitration

proceedings."  *Eletson II*, 2024 WL 4100555, at *21.

Levona has established through circumstantial evidence that these discovery failures were

intentional, and therefore fraudulent.  In the usual case, "a lawyer's 'failure to disclose an

instrument which he could have supposed reasonably—although, as it now appears,

erroneously—to have been known to his adversary' is not fraud."  *USM Corp. v. SPS*

*Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir. 1982) (quoting *Kupferman v. Consolidated*

*Research & Mfg. Corp.*, 459 F.2d 1072, 1081 (2d Cir. 1972)); *see Pontiac Trail Medical Clinic,*

---

[33] In addition, Eletson agreed to comply with various requests for production of documents relevant to certain specific topics.  Eletson agreed, for example, to produce "information sufficient to show its efforts to find any outside investor to purchase the preferred shares, provide new capital to the Company, and/or provide the 23 million originally contemplated to fund Levona's exit—including documents sufficient to show why those investors turned Eletson down."  Dkt. No. 66 at 3; *see* Dkt. No. 549 at 43–44 (chart provided by Levona detailing which of the Withheld Documents fell within which of the requests for production).

*P.C. v. PaineWebber, Inc.*, 1 F.3d 1241, 1241 (6th Cir. 1993) (table decision).  Thus, Intervenors are correct that "[t]he narrow interpretation of a document request and withholding of a document based upon a potentially meritorious objection do not constitute clear and convincing evidence of bad faith or immoral conduct required for fraud or undue means." *Bauer v. Carty & Co.*, 246 F. App'x 375, 378 (6th Cir. 2007).  And in the context of the Federal Rules of Civil Procedure, courts do not require "perfection," and have articulated the commonsense proposition that it is "unsurprising that some relevant documents may have fallen through the cracks." *Freedman v. Weatherford Intern. Ltd.*, 2014 WL 4547039, at *3 (S.D.N.Y. Sept. 12, 2014).

But Levona has not argued that Eletson committed fraud on the basis of a few pertinent documents slipping through the cracks, or a contested but legitimate understanding of what was relevant.  Rather, Levona argues that fraud was committed because Eletson purposefully withheld a trove of documents directly responsive to required discovery, that went to the key issues in the arbitration, and that directly refuted the narrative of events presented in the arbitration.  With access only to the Microsoft Server, the emails produced here by Intervenors, and a smattering of documents produced pursuant to the crime-fraud exception, Levona has presented to the Court dozens of documents that directly refute the story Eletson told at the arbitration.  These documents, which go to the core of the dispute in the arbitration, frequently were sent or received by the former principals of the company themselves and thus demonstrate the knowing falsity of their testimony.  At the very least, they are of such an importance that Kertsikoff, Hadjieleftheriadis, and Karastamati would have recognized their relevance when producing documents in the arbitration.  That is particularly so given that at least one of the Withheld Documents was produced in the bankruptcy proceeding before the conclusion of the

arbitration, and that the former owners were made aware of the document in the arbitration after that had happened.

Intervenors have not "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" with regard to the discovery of the fraud. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so light,' summary judgment must be granted.'" *Id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)). Primarily, Intervenors failed to produce Karastamati, who "might have been said to have taken some lead" on document collection for Eletson. Dkt. No. 551-62 at 136:16–137:5.[34] Nor did Intervenors collect files from Michalis Kantarzoglou, the IT lead at Eletson, who did searches of the company's computer systems during the arbitration. *Id.* at 129:7–17; Dkt. No. 551-68.

Eletson's counsel, Solomon, testified to his opinion that the searches were done "appropriately to the requests that were asked." Dkt. No. 551-62 at 134:22–135:2. He added that Eletson's "technology . . . shouldn't be thought of like a US corporation with highly modern technology. The ability to do even word searches is—was challenged." *Id.* at 158:15–24. His testimony does not create a genuine issue of fact. Solomon is not a percipient witness. He and his firm did not conduct the document collection. He did not "ever see the word searches that [Eletson] ran," *id.* at 133:10–12, and it is undisputed that Reed Smith was "not involved in the collection." Dkt. No. 551-1 at 429:8–13. Kertsikoff testified that he and his cousins were tasked with finding certain documents. *Id.* at 426:16–25.

---

[34] Even in her untimely declaration, she does not speak to the discovery process.

Intervenors next argue that because Eletson produced 5,000 documents in the Arbitration, it is implausible that "supposed evidence about one file demonstrates the requisite intent that all 36 at-issue documents were intentionally withheld." Dkt. No. 589 at 44. They get it directly backwards. Eletson produced a large number of documents including an undated document seeking external financing that referenced a "working capital facility provided by its previous shareholders," because the word "previous" supported their argument. Dkt. No. 595-20 at 2. It just did not produce documents showing that it was seeking funds to repay the working capital facility in order to acquire the Preferred Interests and make its creditor and shareholder into a former shareholder. *See* Dkt. No. 551-15 at 8. Similarly, Eletson produced a July 13, 2022, financial model which was sent to Spears (and thus was "ice in winter"), but it did not produce a July 25, 2022, financial model that did expressly contemplate payment for the Preferred Interests that Levona did not already have. *Compare* Dkt. No. 67-14 *with* Dkt. No. 551-23. A comparison of what was produced against what was not produced further supports the inference of scienter.

Additionally, Intervenors argue that even if their production was deficient, it was not due to any intent to defraud but due instead to the informal nature of arbitration. Dkt. No. 589 at 45–46. To be certain "there are material differences between an arbitration and a judicial proceeding." *Prudential Equity Grp., LLC v. Ajamie*, 538 F. Supp. 2d 605, 607–08 (S.D.N.Y. 2008). "An arbitral tribunal is not a court of record; its rules of evidence and procedures differ from those of courts of records; its fact finding process is not equivalent to judicial fact finding. " *Williamson v. John D. Quinn Constr. Corp.*, 537 F. Supp. 613, 616 (S.D.N.Y. 1982) (Weinfeld, J.). However, the informality of the arbitration process should not be confused with the license to willfully violate the disclosure obligations of the arbitral tribunal. Intervenors did

not enjoy the liberty to withhold the numerous documents that are most centrally relevant to this case on the pretext that because discovery was informal it was meaningless.

That argument is confounded as well by the very position that Eletson took in the arbitration and that Intervenors again have taken in this Court with respect to the discovery obligations pursuant to the rules of the arbitration. There, Eletson argued when it came to Levona's obligations that discovery was intended to be complete and robust. *See* Dkt. No. 589 at 46 n.40 (noting that compared to Eletson, Levona only produced 199 pages of documents under JAMS Rule 17(a), which the Arbitrator determined was not comprehensive). As Solomon stated in his declaration in the Arbitration, "Pursuant to JAMS Rule 17(a), after the parties discussed the very importance of the initial exchange with the Arbitrator, Eletson made a good faith initial exchange of documents on Friday, September 30, 2022. Eletson produced approximately 1,356 documents (6,827 pages in total) including, but not limited to, communications between the parties. In contrast, Levona produced only the agreements between the parties—a handful of documents totaling 199 pages." Dkt. No. 551-60 at 2. The Arbitrator in the Final Award stated his conclusion that "[t]o this day, I am convinced that all relevant documents have not been produced by Murchinson/Levona." Final Award at 68. As it turns out, it was Eletson who failed to produce all relevant documents.

Nor does Intervenors' argument that the documents were not improperly withheld because many post-date the July 29 filing of the arbitration demand have merit. JAMS Rule 17(c) direct that parties, "[a]s they become aware of new documents or information," shall "continue to be obligated" to provide them. Consistent with that rule, Eletson produced many documents that postdated July 29 throughout the discovery process. Eletson knew there was no cut-off date. Counsel for Reed Smith itself privately admitted that there was no "written order or

ruling from Judge Belen regarding the discovery cut off date." Dkt. No. 659-6 at 5.[35]  In several

of its RFPs, it specifically agreed to produce documents post-dating the filing of the arbitration.

For example, Eletson agreed to produce communications through November 4, 2022, Dkt. No.

551-65 at 27, and to produce documents concerning "efforts to sell the [Symi and Telendos]"

that post-dated the arbitration, Dkt. No. 596 ¶ 56.  Eletson just omitted some of the documents

that were most central to the arbitration and that undermined its position in the arbitration.

Intervenors argue that any fraud as to document production cannot be material because

the produced documents are cumulative of documents already presented at the Arbitration.  In

the arbitration, Justice Belen addressed evidence presented by Levona showing that after March

11, 2022, "Eletson held itself out as the sole shareholders of the Company," and so the

Nomination had not occurred.  Final Award at 30 (citing Dkt. No. 31-37).  That evidence

included (1) an affidavit from Kertsikoff on October 25, 2022 in which he stated that "[a]s of

March 11, 2022, Eletson Holdings became the sole unit holder of the Company," and that

"Eletson held itself out as the sole shareholder of the Company and sole beneficial owner of the

Company's remaining 12 vessels," (2) Eletson's memorandum of law from November 8, 2022 in

which it reiterated the same, (3) Eletson's reply brief from November 11, 2022 in which it stated

that the "undisputed record establishes that Eletson continued to manage the company without

Levona on the scene and even held itself out to potential financiers as the sole shareholder of the

Company," and (4) Eletson's October 25, 2022 memorandum of law stating that "[a]t all times,

Eletson held itself out as the sole shareholder of the Company."  Dkt. No. 31-37 at 2–4.  As

---

[35] In his declaration submitted in response to the introduction of the crime-fraud documents, Solomon states that this statement reflects only that they could not find an order "at the time" reflecting as much.  Dkt. No. 663 ¶ 54.  However, despite having ample time, he does not now identify in his declaration which order they had "remembered" which cut off discovery at that time.  *Id.*

noted, Justice Belen did not agree with Levona.  Final Award at 31.  Intervenors argue that because Justice Belen already considered the same argument that Levona has now offered this Court, no additional evidence presented about whether or not nomination occurred could have impacted the Arbitrator's conclusion.

That argument is unconvincing.  The newly produced evidence reveals that the principals of Eletson themselves in sworn documents provided to accountants stated that Eletson Holdings—and not the nominees—was the sole owners of Eletson Gas.  These documents post-date the filing of the arbitration (and Eletson's development of the position that it had exercised the Purchase Option) and reflect significantly more than the statements by the lawyers in filings that were presented to the Arbitrator.  *See* Dkt. No. 551-46 at 2; Dkt. No. 551-47 at 8 (December 2, 2022 chart signed and dated by Kertsikoff and Karastamati and clarifying that Eletson Holding is owned by Lassia, Glafkos, and Family Unity Trust, without any mention of the Cypriot nominees); Dkt. No. 551-56 at 8.  More tellingly, the documents produced pursuant to the crime-fraud exception clearly demonstrate the perjurious nature of the principals' testimony at the arbitration.  These documents show the nomination ruse being created in real time.  There is no serious argument that, understanding that the very persons who testimony he relied so heavily on did not believe there to have been a nomination, the Arbitrator may have reached a different determination as to the nomination of the Cypriot entities.  It would have had "some bearing on the arbitrator's final decision."  *ARMA*, 961 F. Supp. 2d at 255; *see France*, 43 F.4th at 382.

Levona has established intent as to Eletson's campaign to fraudulently withhold relevant evidence that (i) was necessary to expose the false statements of its witnesses; and (ii) would have been damaging to the case they presented to the Arbitrator.

### D.    Fraud as to Withholding of the July 25 Document

The fourth part of the fraud relates to Eletson's response when, after the hearing had concluded but before the Award issued, information came to light that Eletson was withholding relevant evidence.  As noted, through the bankruptcy proceeding, Levona learned of the existence but not the content of the July 25 email.  After the document was produced in the bankruptcy proceeding, a representative of Pach Shemen informed Levona that "certain documents produced by Eletson Holdings in the Bankruptcy proceedings were required to be produced in the Arbitration."  Dkt. No. 148-6. at 6.  Levona immediately contacted Eletson, through Reed Smith, on July 7, 2023, requesting production of the document on the basis that it was "responsive to both requests for production and Motions to Compel."  *Id.* at 5–6.

Levona's email elicited a flurry of internal emails at Reed Smith, which resulted in Reed Smith speaking with the former owners "about the document that Klein referred us to on Friday." Dkt. No. 659-6 at 8.  After speaking with the former owners, Solomon of Reed Smith sent an update to the legal team at Reed Smith with several questions, explaining that the matter "needs our urgent focus."  *Id.*  In response to the question "was the document called for in any doc requests," another attorney answered that "[t]his is arguably called for by Levona's RFP No. 11: 'Any communications and/or documents related to Eletson's preparation of, negotiation to, and/or related to the final offer of the Murchinson Buyout steps,' attached to Counterclaim as Exhibit E."  *Id.* at 7.  He noted that it could also be covered by three other RFPs, and that to the extent it was subject to one of those RFPs it "was covered by Levona's Motion to Compel."  *Id.* In a follow-up email, the same attorney referenced also that "Belen's directive regarding relevant material . . . laid out in the Procedural Orders" included that the parties would cooperate on discovery through JAMS Comprehensive Rule 17(a).  *Id.* at 5.  Another attorney on the same e-mail chain commented that they could not find "anything in Belen's orders that sets the

discovery cut off as the commencement of the arbitration." Dkt. No. 659-7 at 2. Another lawyer commented that his guess as to why the document was not produced is because "the client search of files was—shall we say?—shaky at best." Dkt. No. 659-8 at 2.[36]

Eletson eventually responded aggressively to Levona through Reed Smith two days later on July 9, 2023. It threatened that Levona had been "violating the Protective Order," and that the "unlawful conduct should cease immediately." Dkt. No. 148-6 at 4. Eletson continued that "we do not consent to your reviewing whatever document you identified," and that they wanted "no more part" in Levona's "illegal schemes." *Id.*

Two days later, on July 11, 2023, Levona asked Justice Belen to compel Eletson to produce the document. *Id.* at 2. Eletson's response to Justice Belen was aggressive, and misleading. It accused Pach Shemen of having violated the protective order in the bankruptcy case. Dkt. No. 485-19 at 2. It asserted that the request for the document was a "tactic designed to distract Claimants" and to run up their costs for "no reason," *id.*, when, in fact, there would have been a very good reason for the document to have been produced. It misleadingly argued that because the document post-dated Eletson's July 2022 cease and desist letter it was "in general outside the scope of discovery materials produced by either party in the arbitration exception for post-arbitration conduct," *id.* at 1, when the author of the letter had been reminded just three days earlier that there was no such cut-off for document discovery in the case. It

---

[36] In his declaration submitted in response to Levona's offer of the crime-fraud documents, Kertsikoff states that although Eletson did not run a search for "Murchinson Buy Out," it ran a "diligent and good faith approach to discovery." Dkt. No. 664 ¶ 29. As explained as to fraud in document production, that statement is suspect in light of the fact that Eletson did not produce any of the Withheld Documents now at issue. Kertsikoff's self-serving statement does not a genuine issue of material fact make. But as to the July 25, 2022, email, Kertsikoff's explanation does not address Eletson's representations to the Arbitrator, through counsel, about that email after Levona was made aware of it.

suggested that the only reason Levona raised the issue was so that it could continue interfering

with Eletson's business relationships.  *Id.* at 2–3.

  But then Eletson's counsel went further.  Having seen the document and spoken to its

clients about it, and knowing that neither the Arbitrator nor Levona could disclaim its assertion

because they had not and could not see the document, Eletson's counsel stated:

> So why does Levona disclose its Protective Order violation and make this obviously
> untimely request?  *It can't be because there is anything important about the*
> *document.*  Taking time away from the bankruptcy defense, we checked on the
> document when Mr. Klein wrote to us.  The document was not called for by any
> document request in the arbitration.  We had never seen it … *Nor had any of*
> *Eletson's witnesses ever seen the document before this week, so they could have*
> *had nothing meaningful to say about it.*

*Id.* at 2 (emphasis added).[37]

  Eletson's representation that there was nothing important about the document was

patently untrue.  Even a cursory glance at the document would have demonstrated its importance.

The document was a July 25, 2022, email, already been described in this opinion, sent from

Orfanoudaki to Kanelos, and was on the subject of the "Buyout of Murchinson."  Dkt. No.

551-23.  The email clarified that the Eletson Gas, in part through sale of the Symi and Telendos,

would raise $49.1 million dollars "which will be used for the repayment of Murchinson loan

($12.9 million) and Murchinson partnership share ($36.2 million)."  *Id.* at 2.  It is explicit that the

---

[37] Intervenors argue that Reed Smith was not, in the cited paragraph, "commenting on the
document's substance," but rather was "making the point (by rhetorical question) that if Levona
had not seen the document as claimed, it could not plausibly comment on its materiality or
importance."  Dkt. No. 662 at 13.  They do not offer any evidence to that effect.  The argument,
made in response to Levona's submission of the crime-fraud documents, is beyond the scope
permitted by the Court and thus is disregarded.  It also is irrelevant.  The letter responded to
Levona's request that Eletson be required to produce the July 25, 2022 email.  It is nonsensical to
presume that the statement that the document was not "important" was not about its substance
but rather reflected a veiled accusation that Levona must have seen it in violation of the court
order.  The entire thrust of the letter's argument was that the document need not have been
produced because based on its contents it was not important, *i.e.*, it had no significance for the
issues in the arbitration.  That was false.

"Murchinson buyout will took [sic] place in 3 steps," which include a "1st Payment" of $21.2 million (from the sale of the two ships), a "W/C facility repayment" of $12.9 million, and a "2nd payment" of $15 million for the Preferred Shares. *Id.* at 3, 7.  The central issues in the arbitration was whether Eletson had given notice that it was exercising the Purchase Options in March 2022 and whether it had exercised the Purchase Option in March 2022, before the March 24, 2022 deadline.  The document could not have been more relevant to those questions.  It demonstrated that in July 2022, well after the March 2022 deadline, Eletson believed that it had not exercised the option, that it had therefore lapsed, and that Eletson would have to pay millions to obtain the Preferred Interests from Levona.  Indeed, Kertsikoff testified at deposition in this proceeding that the discussion of the buyout with Murchinson was "their main issue" in the arbitration.  Dkt. No. 551-1 at 239:19–240:2.

Having been drafted nearly two weeks after the July 13 email produced in the Arbitration, the July 25 email also would have also demonstrated to the Arbitrator the fraudulent nature of Eletson's testimony that the July 13 email had elicited fury and storm at Eletson and was a mistaken checklist for the consummation of an option that had already been exercised.  It also added additional information absent from the July 13 email.  The July 13 email proposed a Murchinson exit, but mentioned only the $23 million for the two ships and repayment of the Loan.  Dkt. No. 67-14 at 3.  The July 25 document, on the other hand, proposes a buyout of Murchinson with a first payment from the sale of the vessels, repayment of the Loan, and a second payment of $15 million for the "partnership share."  Dkt. No. 551-23 at 2.  Alone, the admission that in July of 2022 Eletson still believed it needed to buyout Murchinson through repayment of the Loan and the sale of the ships is evidence that they had not exercised the Purchase Option.  The addition a few weeks later of a third payment is evidence that Eletson

126

acknowledged the lapse of the deal entirely, and the necessity of proposing a new deal with additional funds to purchase the preferred shares.

It also was untrue that Eletson's witnesses would have "nothing meaningful to say" about the document. It may be literally true that Hadjieleftheriadis, Karastamati, and Kertsikoff themselves had not seen the specific July 25, 2022 email; they are not copied on it and Levona has adduced no evidence that they were shown the specific email on or about July 25, 2022. But it is manifestly untrue that they were unfamiliar with its contents. Orfanoudaki was an employee of the former owners' in Eletson's finance department, and the principals had seen other versions of the same document at precisely the same time. The email produced in the bankruptcy to which the Reed Smith letter was directed was sent at 1:52 p.m. on July 25, 2022. Dkt. No. 551-23. At 3:36 p.m., Kanelos sent a nearly identical email attaching a similar financial model to Kertsikoff. The two emails both included an attachment titled "ELETSON/MURCHINSON TRANSACTION EXECUTIVE SUMMARY," both of which contemplate a first payment equal to the value of the Symi and the Telendos, a full loan repayment, and a second payment to "be paid on the closing." Dkt. No. 551-23 at 7; Dkt. No. 551-27 at 4. The only difference between the documents is that in the email about which Reed Smith wrote the 2nd payment was fifteen million and in the email sent to Kertsikoff the 2nd payment reduced to $10 million. Dkt. No. 551-27.[38]

_____

[38] Eletson argues that just because Kertsikoff received a copy of the document, it does not mean that he had actually seen it. It is telling, however, that Kertsifkoff himself did not testify that he had not seen the document; he stated that it was "correct" that as far as he knew, he received that email at "both [of his] e-mail accounts." Dkt. No. 551-1 at 253:10–14. To the contrary, Kertsikoff testified that he was aware of the various financial models that were being sent, noting that they were part of "one continuum" and were "further refinements of the same analysis." Dkt. No. 551-1 at 237:11–25. In the absence of any credible evidence that he had not seen that email, the mere "metaphysical possibility" that Kertsikoff did not see such an important document that he was copied on does not create a genuine issue of material fact. *Matsushita*,

At his deposition for this proceeding, Solomon attempted to defend the letter discounting the importance of the July 25 email as an argument to the Arbitrator, going so far as to state that "arguments with lawyers don't fall into the true and false category." Dkt. No. 551-62 at 269:8–17. Intervenors channel that argument, asserting the letter was "proper legal advocacy." Dkt. No. 589 at 50. The Court rejects that argument.

There is an important line between aggressive advocacy and false statements. The letter crossed that line. Although an attorney has a duty to "zealously represent his client," that does not include the presentation of "false evidence." *Torres v. Donnelly*, 554 F.3d 322, 326 (2d Cir. 2009). That is true especially where the other party cannot contest the misrepresentation. "[I]t is one thing for a lawyer to advocate an unreasonable position to a court . . . [i]t is another thing for a lawyer to defeat an opposing party's claims by misleading the Court." *In re Lightfoot*, 217 F.3d 914, 917 (7th Cir. 2000); *see also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 328 F.R.D. 100, 121–24 (S.D.N.Y. 2018) (imposing sanctions for "repeated representation" that was "at best, misleading"); *Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, 2011 WL 3471508, at *9–10 (E.D.N.Y. Aug. 5, 2011) (sanctions for "misleading responses" to discovery demands that "suggested complete production, provided false reassurance and effectively hid the existence of the [relevant] recording.")

As the Court has discussed, the representations regarding the July 25, 2022 email were false. Counsel did not just characterize a document. Knowing that it alone had access to the document, it made representations regarding the contents of the document and the knowledge of counsel's clients regarding the document and its contents. The statements that the July 25, 2022 email was unimportant and that Eletson's witnesses would have nothing meaningful to say about

---

475 U.S. at 584.

the document would have been false representations to the Arbitrator if made directly by the Eletson witnesses. That the representations were conveyed through counsel does not make them any less false. Nor does it protect the Award from attack as being fraudulently procured. From the email itself, it is apparent that it was sent only after Reed Smith had spoken to each of the Eletson witnesses, and it contained the statements of those witnesses. As Eletson's lawyer, Reed Smith was Eletson's agent. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994). The actions of the attorney within the scope of the representation are imputed to the client. *See Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010).[39] Eletson itself is thus held accountable for the statements.

Eletson's fraudulent statements as to the July 25 email were intentional. As discussed, intent may be established through circumstantial evidence. The circumstantial evidence here is prodigious, and more than establishes for the purposes of summary judgment that Eletson committed fraud in the Arbitration and thereby prevented Levona from receiving a fair hearing.[40]

## IV.    Due Diligence in Discovering the Fraud

In evaluating a petition to vacate an arbitral award, courts must also ascertain whether "even with the exercise of due diligence, petitioner could not have discovered the fraud prior to the award issuing." *Odeon Cap. Grp.*, 864 F.3d at 196. If with due diligence, a movant could

---

[39] Eletson has not taken the position that it was "coerced or deceived," by its lawyer's conduct, and it has not relied on any kind of advice-of-counsel defense. Dkt. No. 660 at 56:14–17. Therefore, the misrepresentations of Reed Smith, whether knowing or not, are imputed to Eletson.

[40] In its response to Levona's introduction of the crime-fraud documents, Intervenors argue that because the Arbitrator did not deny Levona's request to re-open the arbitration based on Eletson's representations about that document, its arguments were immaterial. Dkt. No. 662 at 9. That argument misstates the Arbitrator's ruling, which was based in part on the fact that Levona offered only "conclusory assertions by interested agents" that the document was "responsive and critical." Dkt. No. 55-15 at 3. It would evidently have had an impact on the Arbitrator's decisionmaking if Eletson had admitted, as was the truth, that the July 25 email was important and went to the core of the issues to be determined in the arbitration.

have discovered a fraud that occurred before the Arbitrator, the movant is not entitled to a redo. The moving party's effort need have been "reasonable under the specific circumstances of record." *France*, 43 F.4th at 381. Diligence can be "legally adequate even if some stones are left unturned. 'Reasonable' does not mean 'perfect.'" *Id.* The purpose of requiring fraud to be "newly discovered" before vacating an arbitration award on that ground is "to avoid reexamination, by the courts, of credibility matters which either could have been or were in fact called into question during the course of the arbitration proceedings." *A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*, 1989 WL 115941, at *3 (S.D.N.Y. Sept. 27, 1989).

The undisputed factual record clearly establishes that Levona did exercise due diligence in its attempts to procure the Withheld Documents but was nevertheless stymied in their efforts to discover the fraud because, as detailed, Eletson "constructed extraordinary obstacles" in its way. *Eletson II*, 2024 WL 4100555, at *17. As this Court previously explained,

> Levona time and again asked for the documents that might show that Eletson had withheld material evidence from the arbitrator. And Eletson time and again engaged in efforts to frustrate Levona from obtaining that evidence. It initially argued that Levona was not entitled to the documents because it was not a party to the Bankruptcy Proceedings. When Levona submitted a claim in the Bankruptcy Proceeding and signed the Protective Order, which would enable it to receive the documents that had been produced in that matter, Eletson then raised an objection to Levona's right to participate as a creditor. It objected to Levona viewing the documents and objected to the production of additional documents. It objected to Levona presenting the documents to this Court. Throughout the proceedings, it made threats that Levona was in breach of the Protective Order and that it would be in further breach of that order (and subject to sanctions) if it revealed the contents of the documents to this Court. *See* Dkt. No. 67-52; Dkt. No. 127-16 at 41. Throughout, it also made meritless and arguably frivolous arguments that the documents were not relevant to these proceedings. While Eletson was urging this Court to speed its efforts to confirm the arbitral award, it engaged in a process of stalling and delay in the Bankruptcy Court, repeatedly frustrating Levona's attempts to view the additional documents and objecting at every turn both before and after the Award was issued and before and after Levona filed a claim in the Bankruptcy Proceeding.

130

*Id.*  Because Levona did not have access to the Eletson documents, it could not demonstrate to the Arbitrator that Eletson had falsely proclaimed that Eletson understood itself to have exercised the Purchase Option and nominated the Cypriot entities, that they were deficient in their discovery obligations, or that they falsely stated the July 25 document was not relevant or important.

Intervenors argue that as to the nomination of the Intervenors, Levona did not exercise due diligence because at the arbitration it did not ask for documents regarding the nomination issue and did not conduct an aggressive cross-examination of the testifying witnesses on that question.  That argument severely misrepresents the factual record on this motion to vacate the arbitral award.  Levona was not alerted to the existence of the Nominees until Eletson asserted for the first time on May 5, 2023, just ten days before the arbitration hearing was to commence, that "the preferred interests in this arbitration, from the issuance up until the execution of the BOL and even thereafter, were never owned or controlled, directly or indirectly," by Eletson Gas, and that "from January 2022 at latest," the Cypriot entities were nominated to hold the preferred interests.  Dkt. No. 67-38 ¶¶ 100, 103.  Just five days later, Levona moved to strike those new allegations.  Dkt. No. 67-40.  As Levona explained in that motion, there had been no prior mention of the Nominees, and to the contrary Eletson had frequently represented to the Arbitrator that Eletson Gas was owned by Holdings.  *Id.* at 3.  Levona argued too that "there is a substantial question whether the Tribunal has jurisdiction over these claims as the Preferred Nominees have not appeared and have not agreed to be bound by any decision of the Tribunal."  *Id.* at 6.  In sum, Levona had "prepared this case under the assumption that Claimants were asserting they owned the Preferred Shares through their alleged complete ownership of Eletson Gas," *id.* at 7, and therefore requested that the Arbitrator strike those new claims.

The Arbitrator did not rule on the Motion to Strike, and the Arbitration hearing began just five days later. Levona not only had no time to prepare a defense to a claim that they previously did not know existed; they also did not yet know if their motion to strike was successful. The Arbitrator did not address the Motion to Strike until he issued the arbitral award. The Arbitrator dismissed the idea of prejudice in the Final Award by noting that the parties had agreed on May 3 to a stipulation that "each has no challenge or objection to the arbitration on fairness grounds on the basis that it has not been granted enough time to prepare for or present its case," but that agreement pre-dated Eletson's introduction of the nominee claim by two days. Final Award at 32. In sum, the Arbitrator's conclusion that Eletson did not seek additional discovery or depositions does not indicate a lack of diligence on their behalf.

## V.    Equitable Tolling

Intervenors separately argue that the Court cannot consider the arguments for vacatur addressed above because they are time barred, and that Levona is not entitled to equitable tolling. Under the FAA, parties are required to raise claims of alleged fraud in support of vacatur "within three months after the award is filed or delivered." 9 U.S.C. § 12. Levona acknowledges that the three-month deadline had long passed at the time of its motion, but argues that the limitations period must be tolled here as Levona, "the party seeking to avoid" the effects of the statute of limitations, has "show[n] that it has been [1] pursuing its rights diligently and [2] some extraordinary circumstances stood in his way to prevent timely filing." *Eletson II*, 2024 WL 4100555, at *15. "The diligence required for equitable tolling purposes is reasonable diligence not maximum feasible diligence." *Holland v. Florida*, 560 U.S. 631, 653 (2010). The Court is required to ask: "did the petitioner act as diligently as reasonably could have been expected *under the circumstances?*" *Baldayaque v. United States*, 338 F.3d 145, 153 (2d Cir. 2003) (emphasis added). "The term 'extraordinary' refers not to the uniqueness of a party's

circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). As this Court previously explained, such "extraordinary circumstances" must surpass what is required for vacatur under the FAA—otherwise, "the three-month time limit for motions based on Section 10(a)(1) [would be] largely illusory." *Eletson II*, 2024 WL 4100555, at *16. The equitable tolling doctrine is relevant, however, "where the defendant engaged in efforts to conceal its own wrongdoing frustrating its adversary's right to bring a timely claim." *Id.*

In considering whether to grant Levona leave to file an amended answer and an amended cross-petition to vacate the arbitral award in September of 2024, the Court determined that "at this stage," Levona identified "sufficient facts to establish . . . extraordinary circumstances and due diligence." *Id.* On extraordinary circumstances, the Court summarized that:

> Eletson constructed extraordinary obstacles to prevent Levona from uncovering its fraud. Levona time and again asked for the documents that might show that Eletson had withheld material evidence from the arbitrator. And Eletson time and again engaged in efforts to frustrate Levona from obtaining that evidence. It initially argued that Levona was not entitled to the documents because it was not a party to the Bankruptcy Proceedings. When Levona submitted a claim in the Bankruptcy Proceeding and signed the Protective Order, which would enable it to receive the documents that had been produced in that matter, Eletson then raised an objection to Levona's right to participate as a creditor. It objected to Levona viewing the documents and objected to the production of additional documents. It objected to Levona presenting the documents to this Court. Throughout the proceedings, it made threats that Levona was in breach of the Protective Order and that it would be in further breach of that order (and subject to sanctions) if it revealed the contents of the documents to this Court. *See* Dkt. No. 67-52; Dkt. No. 127-16 at 41. Throughout, it also made meritless and arguably frivolous arguments that the documents were not relevant to these proceedings. While Eletson was urging this Court to speed its efforts to confirm the arbitral award, it engaged in a process of stalling and delay in the Bankruptcy Court, repeatedly frustrating Levona's attempts to view the additional documents and objecting at every turn both before and after the Award was issued and before and after Levona filed a claim in the Bankruptcy Proceeding.

*Id.* at *17.  "It was in fact Eletson's efforts to oppose Levona's receipt and use of the documents that prevented Levona from filing any earlier.  The extraordinary circumstances caused Levona's late motion and Levona filed its motion as soon as those circumstances lifted."  *Id.* at *18.

Intervenors had the opportunity during the course of this proceeding to test the proposition that Levona was previously aware of the existence of the Withheld Documents. Equitable tolling would not apply if Levona was dilatory in its conduct during the arbitration and in bringing this action for vacatur.  But Intervenors have offered no evidence arising from documents from Levona, Pach Shemen, and Murchinson, or from the depositions of Mark Lichtenstein (a Murchinson employee), and Spears.  To the contrary, those individuals testified that they only saw the July 25 withheld email after the arbitration was concluded (as Levona explained in its motions seeking to reopen discovery).  *See* Dkt. No. 551-22 at 113:3–114:20 (Spears testimony that the only Withheld Documents he obtained were in connection with the bankruptcy which he did not share with Levona); Dkt. No. 551-78 at 103:3–14 (Lichtenstein testifying that he saw the Withheld Documents only when they were on the bankruptcy court discovery platform).

Intervenors affirmative arguments are unconvincing.  They point to the fact that at the time the original Petitions to confirm and vacate were litigated before this Court, Levona already had a "secret" recording of Kertsikoff in which he stated that "I mean, okay, yeah, the agreement lapsed a couple months ago."  Dkt. No. 127-1 at 3.  Intervenors argue that because Levona had access to that recording before the statute of limitations to seek vacatur lapsed, it should have moved to vacate the award on that basis, and that because it did not, it cannot now seek equitable tolling here.  As the Court already explained in *Eletson II*, "that suggestion is fatuous."  2025 WL 4100555, at *17

> To be sure, Levona was aware as early as July 2023 that evidence might exist that would show that there was a fraud. But the law does not require, and might not even permit, a party to bring a claim for fraud when it has some inkling that there might be a fraud. The allegation must have "evidentiary support" or be one that is likely to have evidentiary support. Fed. R. Civ. P. 11(b)(3). Levona does not merely claim that Eletson concealed information that would have made Levona's case to vacate the arbitral award based on fraud stronger. Levona had no basis to vacate the arbitral award based on fraud until it learned of Eletson's alleged fraud. In this way, Levona is correct to point out that while it may have had a recording that was corroborative of the evidence Levona ultimately uncovered that Eletson allegedly fraudulently withheld during the arbitration, that has no bearing on whether Levona knew that Eletson committed fraud during the arbitration. *See* Dkt. No. 149 at 13.

*Id*.

Next, Intervenors argue that during the arbitration, Levona's counsel wrote two letters to the Arbitrator in which it sought the production of documents produced in the Bankruptcy Case. In the first letter, counsel for Levona noted that the documents in the email chain beginning at EletsonBK017281 were "highly responsive and critical to the arbitration," but explained further that counsel "d[id] not know of its contents" due to the protective order. Dkt. No. 182-5 at 2. Justice Belen denied the request to reopen discovery in the arbitration. The second letter requested reconsideration of that decision, and noted that "[r]espondent's agents who have seen the documents believe that the subject email is pertinent and material and fundamentally undermines Claimants' case; further, the email puts at issue the completeness and integrity of both the discovery process and the factual record in this arbitration. If true, under applicable law, this raises serious issues." Dkt. No. 182-6 at 3. That request, too, was rejected. Although Intervenors argue that at that moment, or anytime thereafter, it was incumbent on Levona to move for vacatur on the basis of fraud, that ignores the key point of the letter to which they cite: counsel for Levona did not know if fraud had occurred because it had not seen the documents at issue. It noted expressly that there would be "serious issues" only "if" what they had been told (in the most general terms) about the document was in fact "true." *Id*. The cases that Intervenors

have gathered for the proposition that courts have found a pleading on "information and belief"

sufficient for fraud therefore are not apposite because, in this case unlike in those, Levona did

not have information sufficient to form a belief that fraud had been committed.  *See* Dkt. No. 589

at 15.[41]  Eletson had prevented Levona from acquiring that information through its persistent

efforts to deny Levona access to them through the bankruptcy proceeding.  Had Eletson moved

then to dismiss a motion to vacate on the basis of fraud, the Court would have speedily granted

the motion without discovery.

      For similar reasons, Levona's inclusion of an affirmative defense of fraud in its Answer

to the Petition and to the Amended Supplemental Petition (Dkt. No. 29 at 13, Dkt. No. 48 at 14)

cannot bear the weight Intervenor's attempt to give it.  The referenced answers contain no factual

development whatsoever, and do not speak to the specific basis upon which Levona later moved

to reopen the proceedings after obtaining access to the withheld documents.  *See* Dkt. No. 29 at

13 (stating only that "[t]he Petition to Confirm should be denied and the Award should not be

confirmed because of fraud," and listing also affirmative defenses of illegality, laches, res

judicata, and waiver); Dkt. No. 48 at 14 (same).  It would have been subject to a motion to strike

had Eletson bothered to make it; it would not have supported a request for discovery.  *Cf.*

*GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 96 (2d Cir. 2019) (*Twombly* standard

applies to motions to strike affirmative defenses).

---

[41] To the contrary, in his deposition for this proceeding Spears testified that he did not discuss the document at that time with Levona anyone from Levona or with Levona's attorneys.  Dkt. No. 551-22 at 113:3–25.  When asked specifically how Levona's attorneys found out about the document, Spears answered that "Pach Shemen representatives or maybe counsel, I'm not sure, would have notified Levona of the existence of the document, but nothing beyond that."  *Id.* at 114:13–20.

Nor is it odd that Levona did not seek discovery as to fraud in its request seeking additional discovery on authority and capacity.  Dkt. No. 75.  In that letter motion, which predated counsel's access to any Withheld Documents, Levona sought discovery as to only authority and capacity because it had affirmatively learned of "certain irregularities related to Petitioner Eletson Holdings' board of directors."  Dkt. No. 75 at 1.  "Post-arbitration discovery in an action to confirm or vacate an arbitration award is available only in very limited circumstances where it is deemed necessary to the determination of an issue raised by the application."  *Schwartz v. Merrill Lynch & Co., Inc.*, 2009 WL 2496028, at *1 (S.D.N.Y. Aug. 5, 2009).  Such a request is rejected where it is a "fishing expedition in an attempt to determine if there is some basis, however farfetched, to prosecute a claim of bias."  *Molecular Dynamics Ltd. v. Spectrum Dynamics Med. Ltd.*, 2022 WL 17418695, at *1 (S.D.N.Y. Nov. 28, 2022) (quoting *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2d Cir. 1991)).  Given that, again, Levona did not have the Withheld Documents, Levona was not in a position to seek discovery on the question of fraud.

Finally, Eletson cannot be heard to argue that Levona should have used information obtained in the bankruptcy court to obtain the same or similar documents in the proceedings before this Court.  In essence, Intervenors would have the Court adopt a rule that diligence can be shown only if a party violates a court order.  Pach Shemen, which had certain of the documents originally, and Levona, which obtained them after much effort, were subject to a protective order.  That protective order prevented the use of the documents in this Court.  Levona would have been in contempt had it sought to use the documents in this Court.  Dkt. No. 127-16 (explaining also Justice Belen rejected use of the document both in light of the protective order

and the fact that Levona did not have a strong enough basis upon which to re-open discovery).[42]

As soon as it obtained relief from the order, Levona sought to amend its motion to use the

documents.  The fact that first Pach Shemen and then later Levona honored the orders of the

court does not demonstrate that they were dilatory in their prosecution of this action.

## CONCLUSION

Levona has demonstrated that no genuine issue of material fact remains as to whether the

arbitral award should be vacated—the evidence is clear and convincing that Eletson committed

fraud in the arbitration and on the Arbitrator that was material to the result and that Levona could

not have discovered even with due diligence.  As a result of the fraud, Levona was denied a fair

hearing.  Levona also has established the basis for equitable tolling.  The motion to vacate the

arbitral award is therefore GRANTED.  Levona's motion for discovery sanctions is also

GRANTED.  The parties did not brief the form that the proceedings should take if the award was

vacated.  The parties shall submit their proposals by February 2, 2026.  The Court will hold a

conference on February 9, 2026, at 2:00 p.m.

The Clerk of Court is respectfully directed to close Dkt. Nos. 557, 561, and 564.


SO ORDERED.

Dated: January 12, 2026
       New York, New York
                                        _____
                                              LEWIS J. LIMAN
                                        United States District Judge


---

[42] Nor is there reason to credit further Intervenors' argument that Levona's hands are "unclean" due to conduct in the arbitration that is not at issue in this proceeding, as they do not speak even tangentially to whether Eletson exercised the Purchase Option or gave notice, nominated the Cypriot companies, withheld the July 25 document, and committed discovery abuses.  Dkt. No. 589 at 19–20.