UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ELETSON HOLDINGS, INC. and ELETSON CORP.,  :
:
              Cross-Respondents,  :  Civ. No. 23-cv-07331 (LJL)
:
  -v.-  :
:
LEVONA HOLDINGS, LTD.,  :
:
              Cross-Petitioners,  :
:
and  :
:
APARGO LIMITED, FENTALON LIMITED, and  :
DESIMUSCO TRADING LIMITED,  :
:
              Intervenors.  :
------------------------------------------------------------------------X

## DECLARATION OF HAL S. SHAFTEL

I, HAL. S. SHAFTEL, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am an attorney duly admitted to practice before this Court and am a shareholder of Greenberg Traurig, LLP ("GT," which I also use herein to refer to the firm and myself collectively). I am counsel of record for Apargo Ltd., Fentalon Ltd., and Desimusco Trading Ltd. (collectively, the "Intervenors") in this action.

2.    I submit this declaration in opposition to the motion for sanctions that cross-petitioner Levona Holdings, Ltd. ("Levona") filed against GT. I have personal knowledge of the matters set forth herein.

3.    I graduated Yale College in 1986, *magna cum laude*, and earned my law degree, also at Yale, in 1989. Since graduating from law school, I continuously have been licensed to practice law in New York, where I have focused on complex commercial litigation in private practice, including for the last 10 years at GT.

4. Over the years, I, or teams I have been a part of, have received numerous awards and accolades for the work we have performed on behalf of our clients. Among other such awards and accolades, I have been named a "Stand-Out Lawyer" by Thomson-Reuters and a "Star Lawyer" by Acritas Stars. I have also been listed in The Legal 500 United States for International Litigation – Securities Litigation, and I was part of teams that received the "Law Firm of the Year" award for Banking & Finance and Real Estate Litigation by *U.S. News – Best Lawyers*. For the past several years, I also have been an Adjunct Professor at Fordham Law School teaching Professional Responsibility.

5. In my 37-year legal career, I have never come close to being reprimanded, censured, or sanctioned by a court or other tribunal in any jurisdiction. Indeed, until this action, no one had ever sought sanctions against me.

6. In a transparent but unfounded attempt to sully my reputation, Levona cites *Syntel Sterling Best Hores Mauritius Ltd. v. TriZetto Group*, 328 F.R.D. 100 (S.D.N.Y. 2018), with a parenthetical stating that "Mr. Solomon['s] and Mr. Shaftel's client" was sanctioned under Fed. R. Civ. P. 37 "for making 'misleading' statements." Levona Br. at 9. While the decision is dated September 19, 2018, GT (and I) filed a notice of withdrawal in that action on July 29, 2016 (Case No. 15 Civ. 0211, ECF 186-1). Thereafter, GT ceased all activity on the case, and I understand that another firm handled it, although my name remained listed on the docket.

7. It further bears note that even when involved, I had only a limited role in that case as local counsel (first, at Cadwalader, Wickersham & Taft LLP, and later, briefly at GT after I moved to GT). And neither I nor GT had any involvement whatsoever with the alleged conduct giving rise to party sanctions in *Syntel*. For many months prior to even the earliest activities relating to the sanctions, GT had no connection to the discovery disputes at issue and neither signed

any implicated court filings nor attended the court conferences—a fact readily apparent from the lack of any mention of GT or my name at all in connection with any of the underlying conduct.

**A.    GT's Limited Role in This Action.**

8.      GT was retained by Apargo in March 2025 and, thereafter, by Fentalon and Desimusco in April 2025.

9.      After the Court granted limited intervention to oppose vacatur on May 9, 2025, our team, consisting of myself and primarily two other attorneys at GT, had an enormously steep learning curve. That was particularly so given what the Court has recognized is the "lengthy and complex" history of this case. ECF 678 at 1. We also faced an extremely tight discovery schedule (with discovery already having progressed significantly among the original parties). In fact, we had only weeks to issue discovery demands (by May 23, 2025), and were required to complete discovery in roughly two months (by July 30, 2025).

10.     Levona and cross-respondents Eletson Holdings, Inc. and Eletson Corp. (Holdings and Corp., together, "Reorganized Eletson") filed motions for summary judgment and for joinder, respectively, on August 20, 2025, replete with 122 total exhibits and 75 total pages of briefing. Reorganized Eletson attached to its motion previously unproduced documents. While certain of those documents were disclosed for the first time and marked at the July 30, 2025 deposition of Vassilis Kertsikoff, they had not been produced at the time and, due to a dispute involving competing claims of privilege in which Intervenors were not involved, GT did not retain copies.

11.     Our response to the large vacatur filings was due 20 days later, on September 10, 2025—even though Reorganized Eletson (after the general July 30, 2025 discovery deadline) produced 77 documents, which we understand were obtained from the Microsoft-server discovery, on August 28, 2025, and a massive quantity of another 110,000 documents (roughly 675,000

pages), also from the Microsoft-server discovery, on September 2, 2025. GT (including myself) had no knowledge of the contents of the Microsoft-server discovery before Reorganized Eletson produced it.

12. After the Court granted Levona's motion to compel Reed Smith, LLP ("Reed Smith") to produce documents pursuant to the crime-fraud exception, Reed Smith made several productions in September and December 2025. Again, neither GT nor I had any knowledge of the contents of those documents until Reed Smith produced them (which, again, was after the general July 30, 2025 discovery deadline). I further note that GT and its clients did not seek to participate in the extensive crime-fraud motion practice, as we were unaware of the contents of the documents, did not claim any privilege with regard to the documents, and thus did not believe we had a constructive role to play. Once the crime-fraud discovery was produced, supplemental briefing as to those documents followed, with Levona filing its brief on December 15, 2025, and GT responding on behalf of Intervenors on December 29, 2025.

13. In short, we were seeing and reacting in real-time to an evolving universe of "at issue" documents on which Levona/Reorganized Eletson relied in this action to allege vacatur-warranting fraud in the arbitration (the "Subject Documents"). We had no involvement whatsoever in the alleged withholding of those materials.

14. During our participation in this case, the Subject Documents also grew over time from the original 5 documents (annexed to Levona's papers in support of leave to file an amended vacatur petition, ECF 125, 137), to an additional 4 documents in June 2025 (annexed to Levona's motion to compel, ECF 448), to an additional 35 documents in August 2025 (annexed to Levona's and Reorganized Eletson's motion papers, ECF 551, 556), followed by an additional 8 documents in December 2025 (annexed to Levona's supplemental brief in further support of a vacatur, ECF

4

659). And, again, GT was reacting to each of these documents in real-time, never having seen *any* of them before their disclosure in this action. Not only had we never seen any of the Subject Documents before they were disclosed, we never stood in the way of their production.

15. As a result of these circumstances, GT was required to review, analyze, and draw inferences from the Subject Documents as they were disclosed. We did precisely what we believe competent defense counsel should do: draw reasonable inferences and advance the strongest good-faith arguments available on behalf of our clients. The Subject Documents are nuanced and complex. Indeed, they cover an extensive time period, pertain to a variety of separate issues, and involve a multitude of authors and recipients. Some are in Greek and required translations. We in good faith believed that the Subject Documents are susceptible to competing inferences that are both fair and reasonable.

16. Because of the nature of the vacatur question and the very high bar to overturn the arbitration award, "we saw the task as addressing the arbitration that was arbitrated in 2022, 2023, not relitigating the underlying merits," as I stated at the February 9, 2026 hearing. ECF 705 at 25:10-12.[1] Accordingly, our focus was on establishing the sufficiency of the evidence that was previously presented to the arbitrator to support his findings—and, as warranted, arguing the immateriality and cumulative nature of the Subject Documents in light of both the arbitrator's overall reasoning and the extent of other probative evidence in the arbitral record.

17. We also sought to establish the general propriety of the arbitral process. In doing so, we understood that our task was to evaluate the quality of the arbitral record, as it was

---

[1] The Court likewise noted at the February 9 hearing that "[it] actually didn't say [] in [its] opinion" that "Levona[] are the owners of the preferred shares," and "Mr. Shaftel did not particularly have notice that I was going to be deciding the questions of whether the nominees were properly selected. He had notice that I would be deciding the question of whether there was evidence that his clients lied with respect to that. The two things are different." ECF 705 at 6:15-17, 8:6-10.

5

presented, and not to develop new evidence outside of that record to disprove the alleged fraud (which was not our burden to disprove in any event). Nor, in the limited window for discovery in this case, were we in a position to develop new evidence concerning the merits of the issues that the arbitrator evaluated and determined in a 102-page final award—which unequivocally found in favor of Eletson (and Intervenors)—after a seven-day hearing with several hundred exhibits, testimony from 14 witnesses, and post-hearing briefs exceeding 320 pages.

**B.    GT's Pre-Filing Inquiry in This Action.**

18.    At all relevant times, my colleagues and I conducted a reasonable inquiry under the circumstances—and concluded that a reasonable basis existed in the record—before making and filing what Levona now contends are sanctionable statements. (I note that Levona never raised the prospect of sanctions until the eleventh hour, when they served their original notice of motion for sanctions on December 31, 2025—after all substantial filings in the action, and on the eve of the Court's vacatur decision. Levona served an amended notice of motion for sanctions on January 7, 2026.)

19.    Prior to filing the now-challenged submissions, we reviewed in detail, among other things and to the extent then available, the following:

- The pleadings and the evidence in the arbitration record, including the exhibits and transcripts of the witness testimony, as well as the post-hearing briefing;

- The arbitrator's interim and final arbitration awards;

- The material filings, Court orders and decisions (including the order partially confirming the award in *Eletson I*), and Court transcripts in this case; and

- The documents produced in discovery in this action, including an evolving universe of the Subject Documents, as they became available to GT (which, again, was, for

6

the crime-fraud documents, no earlier than when they were available to the other side, and, for the Microsoft-server documents, even after).

20.    In addition, we conferred regularly with the representatives from our overseas clients as the case proceeded. And before filing, we diligently checked with our clients on the facts set forth in submissions made on their behalf.

21.    For example, with respect to the modeling documents, we reacted to those documents as they were disclosed, drew reasonable inferences based on our own assessment of the documents and the information we received from our clients, and raised the inference that they reflected calculations of what Eletson could pay, as opposed to what Eletson owed, for a global resolution (i.e., a settlement) of the parties' disputes.

**C.    Intervenors' Adjudicated Discovery Defaults.**

22.    The Court has sanctioned Intervenors for the failure of Vasilis Hadjieleftheriadis and Laskarina Karastamati to appear in their individual and representative capacities (as representatives of Desimusco and Fentalon, respectively) at their depositions noticed in New York.

23.    Without waiving or intending to waive any attorney-client privileges, I can state that GT was in no way responsible for the representatives' decisions to not appear for their noticed depositions. On July 27, 2025, I communicated with counsel for Levona and reiterated that Mr. Hadjieleftheriadis and Ms. Karastamati had personal fears about traveling to New York under the circumstances. I explained that "we have been communicating with them throughout the weekend trying to address these concerns," but that "they now advise, in consultation with Greek counsel," that they will not appear. ECF 587-4.

24.    Mr. Hadjieleftheriadis and Ms. Karastamati themselves explained as much in filings before this Court. As they attested in their respective declarations, (i) "[i]n conjunction with

advice from personal counsel"—i.e., not GT—they decided "after deep consideration not to travel to New York given the personal risks." ECF 585 ¶ 8; *see also* ECF 586 ¶ 9 ("Having made my decision after obtaining advice from personal counsel"—i.e., not GT—"I then informed U.S. litigation counsel"—i.e., GT—"of my decision."); ECF 585 ¶ 5, 586 ¶ 6. And (ii) there was "nothing anyone . . . could do" to change their decisions. ECF 586 ¶ 9; *see also* ECF 585 ¶ 8, 666 ¶ 2, 667 ¶ 2. Indeed, GT began its brief addressing the issue of deposition sanctions "[w]ithout downplaying, let alone condoning, non-compliance." ECF 584 at 7.

25. As for the alleged failure to produce documents of Eletson Gas—a separate entity—based on information provided to us by our clients, GT believed that Intervenors lacked control over those documents and, in fact, could not access them without implicating privilege concerns. Apart from any access the Court believes the *three representatives* of Intervenors might have had to Eletson Gas documents, *GT* undeniably never represented, or agreed to represent, Eletson Gas as a client, and thus was not in a position to review Eletson Gas documents with non-client privileged and commercially confidential information.

26. In its May 7, 2025 order, this Court was persuaded by Levona's argument that "in multiple recent filings in other courts, Intervenors and their affiliates have asserted that Intervenors 'control Eletson Gas,'" and cited those filings to positively suggest Intervenors' control over Eletson Gas. ECF 342 at 6-7. Setting aside that I do not read those filings as establishing Intervenors' day-to-day managerial control over Eletson Gas, those filings were not made by GT. In fact, I was not aware of those filings prior to Levona attaching them to its motion. ECF 340. The Court also relied on a few other filings to suggest Intervenors' control over Eletson Gas, but those filings were all made prior to GT's entry into the case. ECF 342 at 7 (discussing filings by Reed Smith in this Court, ECF 248, and in the bankruptcy proceeding).

27. Importantly, all document repositories that GT was aware of based on conversations with its clients were discussed openly, and repeatedly, with Levona's counsel. We concealed nothing and clearly and consistently explained on multiple occasions, as is well documented, what GT was searching and what it was not (specifically including Eletson Gas's files).

28. Dating back at least to May 19, 2025, Intervenors and Levona exchanged multiple communications in which Intervenors stated that they did not have access to Eletson documents, and in which Levona recognized as much. ECF 587-1 at 3 (Levona counsel on May 19: "Intervenors' position is that they don't have possession, custody, or control of Eletson Gas's documents, and suggested that such documents might be available from Reed Smith."). On the next day, May 20, 2025, GT wrote:

> As previously stated, the documents the Preferred Shareholders are producing . . . do not include the documents of Eletson Gas . . . . We have asked counsel for Eletson Gas (Reed Smith) if they intend to review Eletson Gas documents . . . and understand they plan to . . . . As both a legal and a practical matter, we are aware of no other means for a timely, efficient production of Eletson Gas documents.

ECF 587-2 at 2.

29. In this way, GT—to the extent of any standing its clients had—made clear that Intervenors affirmatively asked for Eletson Gas documents to be produced by the law firm it understood had access to them (i.e., Reed Smith). Likewise, on May 23, 2025, GT again wrote to Levona's counsel: "I nonetheless conferred with Reed Smith (RS) . . . and RS is/will be making the production(s)" from Eletson Gas. ECF 587-3 at 3. Not hearing of any dispute thereafter, we understood that that request was being addressed in direct discussions between Levona and Reed Smith.

30. In short, as the record shows, when GT made its position—and workaround proposal to facilitate discovery—clear to Levona during our meet-and-confers, Levona did not register any objection. To the contrary, in follow-up communications with counsel, Levona restated our position and proposal, reflecting that they were both well aware, and seemingly accepting, of it. It frankly was a surprise to GT when, on August 22, 2025, Levona sought discovery sanctions relating to Eletson Gas documents, given that the matter had appeared satisfactorily resolved almost three months earlier.

31. In addition, the Court in its vacatur decision referred to certain Eletson electronic files and a location of potential hard-copy documents where Eletson's information might also be found. ECF 678 at 48-49. The Court cited Reed Smith as the source that relayed that responsive information might be found there. *Id*. at 49. I have no knowledge from Intervenors (or otherwise) of additional responsive documents that they have.

32. This is not a case where discovery was delayed. There were no missed deadlines or unusual extension requests. And, critically—in the very antithesis of any effort to conceal or delay—GT did not even oppose Levona's motion to compel Reed Smith to produce the crime-fraud documents.

33. GT did not present any of the filings now being challenged for any improper purpose, such as to harass or cause unnecessary delay, much less to needlessly increase the cost of litigation. Instead, we filed them for the purpose of protecting our clients' rights and to respond to the arguments being raised by Levona in support of its efforts to vacate the arbitration award. That was, after all, the role that this Court—in granting our clients' motion to intervene for the limited purpose of opposing vacatur—authorized us to fulfill.

34. I declare under penalties of perjury that the foregoing is true and correct.

Dated: March 5, 2026
      New York, New York

                                                                                                                           */s/ Hal S. Shaftel*
                                                                                                                                Hal S. Shaftel