UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                 :

ELETSON HOLDINGS INC.,                  :

                                 :

                   Plaintiff,      :

                                 :        23-cv-7331 (LJL)

     -v-                        :

                                 :      OPINION AND ORDER

LEVONA HOLDINGS LTD.,         :

                                 :

                   Defendant.    :

                                 :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On January 12, 2026, the Court issued an opinion and order granting Levona Holdings Ltd.'s ("Levona") motion to vacate the arbitral award granted in favor of Eletson Holdings in 2023. Dkt. No. 678. In that opinion, the Court noted that the parties "did not brief the form that the proceedings should take" following vacatur. *Id.* at 138. The parties subsequently submitted briefs with respect to the form of future proceedings. Levona, joined by Eletson Holdings ("Holdings") and Eletson Corporation ("Corp"), has moved for permanent injunctive relief. Dkt. Nos. 699, 701. Intervenors Apargo Limited, Fentalon Limited, and Desimusco Trading Limited, three Cypriot companies that were the beneficiaries of the prior arbitral award (the "Intervenors"), oppose a permanent injunction and propose final judgment in the form of an order that the arbitral award is vacated. Dkt. Nos. 721–22, 725.

In addition, Levona seeks a judgment that quantifies the discovery sanctions that the Court entered against the Intervenors in its order vacating the arbitral award. Dkt. No. 701. Intervenors oppose Levona's quantification of those sanctions. Dkt. No. 722.

For the following reasons, Levona's motion for a permanent injunction is denied, and Levona's proposed judgment with respect to discovery sanctions is granted in part and denied in part.

## BACKGROUND AND PROCEDURAL HISTORY

Familiarity with the prior proceedings in this case is presumed. This Opinion and Order should be read in tandem with the Court's opinion and order vacating the arbitral award and granting discovery sanctions against the Intervenors. Dkt. No. 678; *see Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 2026 WL 84510 (S.D.N.Y. Jan. 12, 2026) (hereinafter, *Eletson III*); *see also Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, 731 F. Supp. 3d 531 (S.D.N.Y. 2024) (hereinafter, *Eletson I*).

As detailed in the Court's prior opinions, "[t]his long-running dispute" between Levona, a Canadian hedge fund, and Eletson, a Greek shipping company, revolves around the corporate control of non-party Eletson Gas LLC ("Eletson Gas"). *Eletson III*, 2026 WL 84510, at *1. In 2022, Holdings and Corp (collectively, "Eletson") initiated arbitration against Levona pursuant to an agreement between the parties (the "Binding Offer Letter," or "BOL"). Levona counterclaimed against Holdings. Ultimately, Justice Belen of JAMS entered an arbitration award in favor of Eletson on September 29, 2023 (the "Final Award"). Dkt. No. 67-58. The arbitral award granted declaratory relief that Eletson had exercised a buy-out option contained in the BOL on March 11, 2022, thereby acquiring the preferred shares of Eletson Gas previously held by Levona. Justice Belen continued that, as a consequence, Levona ceased to have any membership in Eletson Gas as of the buy-out date. *Id.* at 95. Furthermore, Justice Belen determined that Eletson had exercised its rights under the BOL to nominate three entities affiliated with the principals of the company to receive the preferred shares. *Id.* at 95–96. Those three nominees are the Intervenors here. The arbitrator also found that Levona had breached a

2

prior agreement between the two entities and the status quo injunction issued by the arbitrator during the arbitration.  *Id.* at 99–101.  Justice Belen did not award any monetary relief to Holdings or Corp, the parties to the arbitration.  Rather, he awarded monetary relief to Eletson Gas and to Intervenors.  *See id.*  He also dismissed Levona's counterclaims that the purchase option had not been exercised following his "finding that Eletson exercised the option to buyout Levona's membership interests as of March 11, 2022."  *Id.* at 62.

After initially issuing an opinion that the award was confirmable in part and vacating the award in part, this Court vacated the Final Award rendered in favor of Holdings and Corp on January 12, 2026, on the basis that Levona had shown by "clear and convincing" evidence that "Eletson committed fraud in the arbitration and on the arbitrator that was material to the result and that Levona could not have discovered even with due diligence."  *Eletson III*, 2026 WL 84510, at *62.[1]  In the course of its opinion, the Court observed that "[t]he evidence demonstrates that the Purchase Option was not exercised because no timely notice was given of its exercise and the consideration necessary to exercise the option was not provided," and that in addition, the evidence "demonstrates too that the 'transfer' to the Nominees was an after-the-fact contrivance designed to keep control of Eletson Gas from Holdings and, in turn, from Holdings'

---

[1] In 2023, three creditors of Holdings commenced an involuntary bankruptcy proceeding against Holdings and two affiliates.  As a result of those proceeding, the bankruptcy court ultimately confirmed the reorganization plan submitted by Pach Shemen, an entity in common ownership with Levona, and other petitioning creditors.  The petitioning creditors' plan vested control of Holdings in the petitioning creditors rather than in the three Greek families that had previously controlled the company.  *Eletson III*, 2026 WL 84510, at *10.  As the Court previously explained, "[i]mportantly, the result of the voluntary bankruptcy proceeding is that Pach Shemen and the other petitioning creditors gained control of Eletson Holdings."  *Id.*  Following confirmation of creditor's plan, Eletson's prior counsel was displaced and new counsel appeared for Holdings.  *Id.*  Levona and Eletson then jointly moved to dismiss the prior petition to confirm the arbitral award.  *Id.* at *15; *see* Dkt. No. 350.  The Court permitted Intervenors to intervene to oppose vacatur of the arbitration award.  *Eletson III*, 2026 WL 84510, at *10.

creditors, after Holdings had been put in involuntary bankruptcy proceedings." *Id.* at *16.  In that same order, the Court also granted Levona's motion for discovery sanctions as against the Intervenors.  *Id.*

In its opinion vacating the arbitral award, the Court noted that the parties "did not brief the form that the proceedings should take if the award was vacated," and ordered that the parties submit proposals for future proceedings.  Dkt. No. 678 at 138.  On February 2, 2026, each side submitted its respective preliminary proposals.  Levona noted that it "expects that it will ask the Court to enter judgment reflecting the Court's findings and rulings in its vacatur decision, including that the Purchase Option was not exercised, no nomination occurred, and Levona retains ownership of the preferred shares."  Dkt. No. 690 at 1.  Levona noted also that it "anticipate[d] asking the Court to convert the June 2, 2025 anti-foreign-suit preliminary injunction forbidding Intervenors from pursuing foreign actions to confirm or enforce the Award into a permanent injunction," and for the costs and fees associated with the Court's grant of discovery sanctions.  *Id.* at 2.  Eletson submitted that the Court should grant the relief requested by Levona and enter a permanent injunction "against the Intervenors and those acting in concert with them," and to "retain jurisdiction for post-judgment enforcement proceedings."  Dkt. No. 691 at 1.  Intervenors stated their position that the Court "should remand the matter to the original arbitrator . . . to address Intervenors' participation in a further arbitration."  Dkt. No. 692 at 1.

The Court held a hearing following the parties' submissions on February 9, 2026.  At the hearing, the Court ordered the parties to meet and confer with respect to a schedule for further briefing on their requests for post-vacatur relief.  Dkt. No. 705 at 40.  The parties submitted a joint briefing schedule.  Dkt. No. 697.  Levona and Eletson submitted their motions for a

4

permanent injunction and accompanying memoranda of law on February 24, 2026.  Dkt. Nos. 699, 701–02.  Eletson additionally submitted a Declaration of Nathaniel Koslof in support of its motion with six exhibits, Dkt. No. 700, and Levona submitted a Declaration of Isaac Nesser along with four exhibits, Dkt. No. 703.  Levona filed a proposed judgment.  Dkt. No. 704.  Intervenors opposed both motions by memoranda of law on March 17, 2026.  Dkt. Nos. 721–23.  They filed their own proposed judgment the same day, along with an Affidavit of Adrianos Psomadakis-Karastamatis.  Dkt. Nos. 724–25.  Levona and Eletson replied to the opposition on March 30, 2026.  Dkt. Nos. 735–36.

## DISCUSSION

I.      **Final Judgment**

    A.      **Levona's Proposed Factual Findings**

Levona seeks a judgment that "memorializes the determinations in the Vacatur Decision," including that "the Purchase Option was not exercised" and that "the 'transfer' to the Nominees was an after-the-fact contrivance" that did not occur.  Dkt. No. 702 at 1.  In support, Levona argues that the "Court's vacatur determinations could not exist without, and indeed is inseparable from, the fact findings upon which it is based."  *Id.* at 2; *see* Dkt. No. 704 (proposed judgment).  Intervenors, on the other hand, seek a judgment merely noting that "Judgment is ENTERED in favor of Levona on its cross-petition to vacate, and the final award is VACATED."  Dkt. No. 725.[2]

Under Section 9 of the Federal Arbitration Act ("FAA"), a reviewing court's role is limited to "confirming the award . . . unless the award is vacated, modified, or corrected as

---

[2] Although Intervenors previously indicated that they would seek a judgment remanding the matter to the original arbitrator, Dkt. No. 692 at 1, they have abandoned that request in this application and omitted that language from the proposed judgment attached to their opposition to Levona and Eletson's proposed judgment.  Dkt. No. 725.

prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Section 10(a) states in turn that a district court may "make an order vacating the award upon application of any party to the arbitration . . . where the award was procured by corruption, fraud, or undue means." *Id.* § 10(a). It continues that "[i]f an award is vacated and the time within which the agreement required the award to be made has not yet expired, the court may, in its discretion, direct a hearing by the arbitrators." *Id.* § 10(b).

After the Court granted leave to do so, Levona filed an amended answer and counterclaims in this proceeding and sought vacatur of the Final Award "as procured by fraud or undue means" under Section 10(a). Dkt. No. 549 at 2. Pursuant to the Federal Rules of Civil Procedure, a final judgment "should grant the relief to which each party is entitled." Fed. R. Civ. P. 54(c). In its prior opinion, the Court determined that Levona is entitled to a judgment vacating the arbitral award as permitted under Section 10(a) of the FAA. It did so based on findings that: (1) Eletson had engaged in fraudulent activity with respect to the arbitration, including by offering false testimony to the arbitrator regarding whether it had given notice and exercised the purchase option and regarding the nomination of the Cypriot entities; (2) the testimony was knowingly untrue and material and given with intent to mislead; (3) Levona had exercised due diligence in discovering the fraud; and (4) the fraud materially related to an issue in the arbitration. *Eletson III*, 2026 WL 84510, at *33–52, *58–59. The Court also concluded that Eletson had committed fraud in connection with its document production and in connection with a material email that was not disclosed through the discovery process. *Id.* at *52–58. The resulting judgment should not reflect more than the Court's ultimate determination that the award is vacated.

Levona argues that the Court's judgment should contain the secondary findings that the Court reached in coming to the conclusion that fraud was committed upon the arbitrator, including its observations regarding whether notice was given and the purchase option was properly exercised.  However, the Second Circuit has held clearly that "issue preclusion and claim preclusion are enforced by awaiting a second action in which they are pleaded and proved by the party asserting them.  The first court does not get to dictate to other courts the preclusion consequences of its own judgment[.]"  *Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 398 (2d Cir. 2003) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4405, at 82 (2d ed. 2002)).  The Court's opinion speaks for itself in laying out the facts that the Court necessarily found in determining that a fraud was committed.  It is not the Court's prerogative to arrogate for itself in this proceeding the preclusive findings that may be reached in other proceedings.  At this stage, in this case, the Court's role is to enter a judgment that resolves the dispute before it, not to "enter judgments so that a party may later invoke res judicata," or to "predict how its decision might affect some hypothetical, subsequent lawsuit."  *Scottsdale Ins. Co. v. Cabbad Fam. Ltd. Liab. Co.*, 2023 WL 12061717, at *1 (E.D.N.Y. Aug. 8, 2023); *see also Alterra Am. Ins. Co. v. Hertz Glob. Holdings, Inc.*, 2022 WL 16838332, at *1 (S.D.N.Y. Nov. 9, 2022) ("The preclusive effect of a judgment is ordinarily decided in a subsequent action where preclusion is raised; the first court does not dictate the preclusive effect of its own judgment.").

None of the cases cited by Levona compels a contrary conclusion.  In *NuVasive, Inc. v. Absolute Medical, LLC*, 71 F.4th 861, 880 (11th Cir. 2023), the court held that it was not an abuse of discretion for the district court to have continued to exercise jurisdiction to resolve a dispute on the merits after it vacated an arbitral award addressing that dispute.  In this case,

however, Levona and Eletson ask not that the Court exercise jurisdiction to resolve the dispute between them and Intervenors but to issue a judgment stating that it has resolved the dispute. Levona points also to the Ninth Circuit's decision in *Dogherra v. Safeway Stores, Inc.*, where that circuit held that "we need not decide whether ordinarily remand should be required upon the district court's finding that fraud vitiated the arbitral ruling." 679 F.2d 1293, 1297 (9th Cir. 1982). It continued that in the context of that case, "[r]emand would serve no purpose," because the "finding of fraud by [the respondent] would necessarily imply that [the petitioner] was wrongfully discharged, for both questions turn on the same issue of fact." *Id.* at 1297–98. The decision in *Dogherra*, however, was only that remand was not required. The Court's dicta did not purport to establish a rule of law that a court can establish the collateral estoppel effect in another court of its own prior rulings.[3]

Accordingly, the Court declines to enter judgment other than that the arbitral award has been vacated.[4]

---

[3] The view that a court may continue with proceedings in an FAA case post-vacatur is also not universal among the circuits. The Tenth Circuit has held to the contrary that if a "district court determines by clear and convincing evidence that" one party to an arbitral award committed fraud on the arbitrator, "section 10 of the Arbitration Act authorizes the court to enter an order vacating the arbitration award," but does not "authorize[]" the Court to "decide the merits of an issue committed by the parties to arbitration." *Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986).

[4] Eletson also argues that this Court has the authority to enter the requested judgment under Rule 56(g) of the Federal Rules of Civil Procedure. That rule is applicable to summary judgment and states that "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). The court's order did grant the relief requested by Levona's motion for vacatur: it vacated the underlying arbitral award. There is therefore no authority under Rule 56(g) for the Court to enter further findings of fact. *See Cortes v. City of New York*, 2019 WL 5592853, at *4 (E.D.N.Y. Oct. 30, 2019) (declining to enter relief under Rule 56(g) where "Defendants' motion was granted in its entirety").

### B.        Injunctive Relief

Levona and Eletson seek also a judgment that enjoins "Intervenors and their officers, agents, servants, employees, and attorneys and other persons who are in active concert or participation with them from purporting to exercise control over Gas, interfering with Levona's rights as owner of the Preferred Interests, or profiting at Gas's expense." Dkt. No. 702 at 22; *see also* Dkt. No. 704 at 2. That relief would go far beyond that which Levona requested in its Answer and Counterclaim. The Court thus declines to grant this relief for the same reasons the Court will not enter Levona and Eletson's proposed factual findings.

## II.        Permanent Anti-Foreign-Suit Injunction

Levona also seeks conversion of its preliminary anti-foreign-suit injunction into a permanent injunction "prohibiting Intervenors and all those acting in concert with them from seeking to enforce or confirm the now-vacated Award in foreign jurisdictions." Dkt. No. 701 at 3. The Court previously entered a preliminary anti-foreign-suit injunction on June 2, 2025. Dkt. No. 413; *Eletson Holdings Inc. v. Levona Holdings Ltd.*, 2025 WL 1558380, at *8 (S.D.N.Y. June 2, 2025) (hereinafter, *Eletson II*). At that stage in the litigation, Levona made, and the Court granted, a request for an injunction directing Intervenors "and any of their agents . . . to take all steps necessary to dismiss or stay proceedings filed in Greece or the United Kingdom . . . to enforce the underlying arbitral award . . . which was entered in favor of [Holdings, Corp, and the Intervenors] until the resolution of this action." *Id.* at *1. Levona sought to have the Court enjoin the proceedings in the United Kingdom and Greece that sought "to reduce the Award to a money judgment" during the vacatur proceedings in this Court. *Eletson II*, 2025 WL 1558380, at *10. The preliminary anti-foreign-suit injunction was in direct response to a proceeding in Greece in which the Intervenors sought "to confirm and enforce the entire award," including portions that, at that point, "the Court ha[d] vacated," *Eletson II*, 2025 WL 1558380, at *4, and a

9

proceeding in the High Court of Justice in the United Kingdom seeking an order permitting Eletson Gas as it then existed to enforce the final arbitration award, *id.*  The Court concluded that actions in those jurisdiction would threaten this Court's "authority to vacate, set aside, or suspend the award." *Id.* at \*11. Those vacatur proceedings have now concluded, and the Court's role as the primary jurisdiction under the New York Convention vacating the award is complete. *See id.* at \*12.  Absent conversion to a permanent injunction, the preliminary injunction expires at the end of the proceeding.  *See Madison Square Garden Boxing, Inc. v. Shavers*, 562 F.2d 141, 144 (2d Cir. 1977) ("With the entry of the final judgment, the life of the preliminary injunction came to an end.").

Whether a court may enter a permanent anti-foreign-suit injunction is governed by the factors set forth in *China Trade & Development Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987).  "Under the *China Trade* test, an anti-suit injunction against foreign litigation may be imposed only if two threshold requirements are met: '(A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined.'"  *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007) (quoting *Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Tech.*, 369 F.3d 645, 652 (2d Cir. 2004)).  If these two threshold requirements are satisfied, "courts are directed to consider a number of additional factors," *Paramedics*, 369 F.3d at 652, including whether the parallel litigation would:

> (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment.

*Ibeto Petrochemical Industries Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007) (cleaned up) (quoting *China Trade*, 837 F.2d at 35).  "*China Trade* instructed that two of these [discretionary]

10

factors should be accorded 'greater significance': whether the foreign action threatens the enjoining forum's jurisdiction or its 'strong public policies.'" *Karaha Bodas*, 500 F.3d at 119 (quoting *China Trade*, 837 F.2d at 36).  The Second Circuit has "reiterated that all of the additional factors should be considered when determining whether an anti-suit injunction is warranted." *Id.* (citing *Ibeto Petrochemical*, 475 F.3d at 64).  *China Trade* also states that "principles of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.'" *Paramedics*, 369 F.3d at 652 (quoting *China Trade*, 837 F.2d at 36).

Levona and Eletson are not entitled to a permanent anti-foreign-suit injunction because they cannot meet the second threshold condition that "resolution of the case before the enjoining court is dispositive of the action to be enjoined," and because the additional factors do not weigh in favor of injunctive relief.  *Paramedics*, 369 F.3d at 652.

In the first instance, the Court's resolution of Levona's motion to vacate is not *ipso facto* dispositive of an action to confirm or enforce in a court of secondary jurisdiction.  The New York Convention "mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997).  This Court is one of primary jurisdiction; it is the court in which, or under the law of which, the award was made, and which has "supervisory authority over an arbitral award." *Id.* at 22; *see also CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 71 (2d Cir. 2017).  The Court thus had the authority under the Federal Arbitration Act—the United States domestic law—to set aside or modify the award. *Yusuf Ahmed*, 126 F.3d at 23. Levona and Eletson seek to enjoin Intervenors from attempting to confirm or enforce the Final

11

Award in jurisdictions other than in the United States.  All those other states that are signatories to the New York Convention are considered to have "secondary jurisdiction." *CBF Industria de Gusa S/A*, 850 F.3d at 71.  Under the New York Convention, they enjoy competence to recognize and enforce an award or, in the alternative, to "refuse to enforce the award," which they may do "only on the grounds explicitly set forth in Article V of the Convention." *Yusuf Ahmed*, 126 F.3d at 23.  Those grounds are "limited." *Karaha Bodas*, 500 F.3d at 115 n.1.[5]  As relevant here, a court in a secondary jurisdiction may decline to enforce an award if the award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  N.Y. Convention art. V(1)(e).

It is true, as Levona and Eletson argue, that where the award has been "lawfully set aside by a 'competent authority' in the primary contracting state" under the New York Convention, the second state "normally may not enforce an arbitration award." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (quoting N.Y. Convention art. V(1)(e)).  The

---

[5] Under Article V(1) of the Convention, the grounds for refusing to recognize or enforce an arbitral award are:

> a) The parties to the agreement . . . were . . . under some incapacity, or the said agreement is not valid under the law . . .; or
>
> b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings . . .; or
>
> c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . .; or
>
> d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . .; or
>
> e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

circumstances under which the second state may decline to recognize an order of the court in a

primary jurisdiction vacating an award are limited.  At least as the Convention is understood and

applied in the United States, courts apply principles of international comity to the question of

whether to honor the decision of the court in the primary jurisdiction to vacate an award.  *See*

*Thai-Lao Lignite (Thai.) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172,

176 (2d Cir. 2017); *Corporacion Mexicana de Mantenimiento Integral, S. de R.L.de C.V. v.*

*Pemex-Exploracion y Produccion*, 832 F.3d 92, 106 (2d Cir. 2016); *TermoRio*, 487 F.3d at 937.

Under those principles, the decision by a court with primary jurisdiction to vacate an arbitral

award "is generally conclusive unless enforcement of the judgment would offend the public

policy of the state in which enforcement is sought."  *Pemex*, 832 F.3d at 106 (quoting

*Ackermann v. Levine*, 788 F.2d 830, 837 (2d Cir. 1986)).  "The standard is high, and infrequently

met," *Ackermann*, 788 F.2d at 841, and it is the "rare case[]" that "present[s] 'extraordinary

circumstances' that are repugnant to notions of justice in the United States."  *Esso Expl. & Prod.*

*Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 63 (2d Cir. 2022) (quoting *Pemex*,

832 F.3d at 106).[6]  "It takes much more than a mere assertion that the judgment of the primary

State 'offends the public policy' of the secondary State to overcome a defense raised under

Article V(1)(e)."  *TermoRio*, 487 F.3d at 937.  But it is up to the court in the secondary

jurisdiction to determine whether the order vacating an award offends the public policy of that

state.  *Cf. Karaha Bodas*, 500 F.3d at 124 ( "Federal courts in which enforcement of a foreign

arbitral award is sought cannot dictate to other 'secondary' jurisdictions under the New York

---

[6] Under principles of comity, a court may also disregard a judgment entered in a foreign court if the foreign court "lacked jurisdiction over the subject matter or the person of the defendant" or "the judgment was fraudulently obtained." *Ackermann*, 788 F.2d at 837.  Intervenors have not suggested that the Court lacked subject matter or personal jurisdiction or that the judgment vacating the Final Award was fraudulently obtained.

Convention whether the award should be confirmed or enforced in those jurisdictions."); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("[N]o nation can expect its laws to reach further than its jurisdiction to prescribe, adjudicate, and enforce.  Every nation must often rely on other countries to help it achieve its regulatory expectations.").  If the vacatur order under review does in fact violate the public policy of the secondary jurisdiction, then the order may be disregarded and the award confirmed and enforced in that jurisdiction over the vacatur in the primary jurisdiction.  *Thai-Lao Lignite*, 864 F.3d at 184; *Esso*, 40 F.4th at 73.  If it does not, then the award may not be confirmed or enforced.

This Court has no reason to believe that a foreign court will disregard its order and confirm and enforce an award that this Court has determined is unenforceable.  The Court had personal jurisdiction over all of the parties to the arbitration and then, when Holdings emerged from bankruptcy under common ownership with Levona, it permitted Intervenors to enter the action and to defend the Final Award.  It thus also had jurisdiction over Intervenors.  The Court gave all parties a full and fair hearing.  It permitted each side to take discovery.  And, after discovery and fulsome briefing of the merits on motions for summary judgment, it issued a 138-page opinion exhaustively examining the evidence and determining that there was no triable issue and that Eletson had procured the Final Award by fraud.  *Eletson III*, 2026 WL 84510, at *33.  That judgment was in accordance with United States domestic arbitration law, which permits vacatur in circumstances where an award was procured by fraud.  9 U.S.C. § 10(a).  It would not offend public policy in any country either party has identified for an award procured by fraud to be vacated.  "Under principles of comity, [the] decision by this Court that the award should be vacated [sh]ould be preclusive of any decision by the courts in the U.K. and in Greece to recognize and/or enforce the award."  *Eletson II*, 2025 WL 1558380, at *10.  However,

14

ultimately, under the New York Convention, it is the court in the secondary jurisdiction that must make the judgment whether by vacating the Final Award for fraud, this Court has violated principles of public policy applicable in that secondary jurisdiction. Under the New York Convention, the decision of a court in a primary jurisdiction to vacate an award does not necessarily and as a matter of law foreclose a decision by a court in a secondary jurisdiction to enforce or confirm the same award.

Levona and Eletson's application thus fails the first threshold factor under *China Trade.* The threshold factors ask whether the parties are the same and resolution of the case before the enjoining court is dispositive of the action to be enjoined. *Paramedics*, 369 F.3d at 652. "Under the *China Trade* test, an anti-suit injunction may be imposed only if [these] two threshold requirements are met." *Karaha Bodas*, 500 F.3d at 119. Otherwise, "[w]hen two sovereigns have concurrent *in personam* jurisdiction one court will ordinarily not interfere with or try to restrain proceedings before the other." *China Trade*, 837 F.2d at 36. The Court's decision vacating the Final Award is not as a matter of United States law dispositive of an action in a secondary jurisdiction to enforce the Final Award.

Even if the threshold requirements had been met, the discretionary factors cut against entry of a permanent anti-foreign-suit injunction. As a signatory to the New York Convention, the United States has a policy interest in "protecting the regime established by the Convention for enforcement of international arbitral awards." *Karaha Bodas*, 500 F.3d at 126. That regime is one that recognizes the authority of the Court with primary jurisdiction to supervise the Final Award and, if the domestic law applicable to the Final Award requires it, to modify or vacate the Final Award. That is what this Court did in vacating the Final Award. But the New York Convention also recognizes that there is a role for a court in a secondary jurisdiction to determine

whether to honor the order in the court of primary jurisdiction and to decide, if the order is not to be honored, whether to recognize and enforce the Final Award.  The United States courts, as courts of secondary jurisdiction, exercised such prerogatives in *Pemex* in recognizing an award even though the award had been vacated in the court of primary jurisdiction.  832 F.3d at 111.  The Second Circuit has considered whether to exercise such prerogatives in numerous other cases (without the parties having been subject to an anti-suit injunction in the court of primary jurisdiction), and has decided not to enforce an award that has been vacated.  *See Thai-Tao Lignite*, 864 F.3d at 188; *Esso*, 40 F.4th at 78–79.  To begrudge a foreign court the same right to consider whether to extend comity to this Court's order would be antithetical to the regime established by the New York Convention and thus antithetical to United States policy.

Second, there is not strong evidence of vexatiousness at this juncture.  "[V]exatiousness is 'likely to be present whenever parallel actions are proceeding concurrently.'"  *Karaha Bodas*, 500 F.3d at 126 (quoting *China Trade*, 837 F.2d at 36).  Of course, "vexatiousness" in this sense is insufficient alone to permit a court to order an injunction.  *See Laker Airways*, 731 F.2d at 226; *China Trade*, 837 F.2d at 36 ("[S]ince these two factors [of vexatiousness and race to judgment] are likely to be present whenever parallel actions are proceeding concurrently, an anti-suit injunction grounded on these additional factors alone would tend to undermine the policy that allows parallel proceedings to continue and disfavors anti-suit injunctions.").  Neither Levona nor Eletson has identified any parallel proceeding to be enjoined at this juncture; the vexatiousness is hypothetical.  Nor is there a threat of a race to the courthouse.  As the court of primary jurisdiction, this Court has already vacated the arbitral award, such that there is no longer a "race to another court to obtain a judgment that would vitiate" the proceeding with respect to confirmation and vacatur.  *Eletson II*, 2025 WL 1558380, at *19.

16

Considering the Circuit's instruction that an anti-foreign-suit injunction be issued only "sparingly" and "with care and great restraint," *China Trade*, 837 F.2d at 36, one should not be issued here.[7]

## III.    Discovery Sanctions

In the order vacating the Final Award and awarding discovery sanctions, the Court held that it would "award Levona costs and fees associated with the preparation of the motion to compel Hadjieleftheriadis' and Karastamati's depositions, opposing Intervenors' motion for reconsideration, preparing for the no-show depositions, and the motion for sanctions." *Eletson III*, 2026 WL 84510, at *27 (citing *Burks v. Stickney*, 837 F. App'x 829, 832–33 (2d Cir. 2020) (summary order)).[8]  For that work, Levona seeks quantification of discovery sanctions in the amount of $536,598.65.  Dkt. No. 701 at 3.  Levona has detailed these costs in exhibits to the Declaration of Isaac Nesser in the form of counsel's time entries related to the discovery sanctions, the associated expenses, and relevant attorneys' biographies.  Dkt. Nos. 703-1, 703-2, 703-3.  Intervenors do not contest that discovery sanctions are due but argue that there is "no basis for the magnitude of discovery sanctions Levona requests."  Dkt. No. 722 at 20.

### A.    The Reasonable Hourly Rate

The "starting point" and "lodestar" in analyzing whether claimed attorneys' fees are appropriate is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Milea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also*

---

[7] Although the Second Circuit has not yet determined whether a court needs to evaluate the traditional injunction factors in addition to the *China Trade* factors in entering a permanent foreign anti-suit injunction, the Court need not address that here where the standards have not been met under *China Trade*.

[8] The Court expressly noted that the award as to preparing for the no-show depositions did not include "any preparation done after July 27, 2025, the date on which counsel for Intervenors informed Levona that Karastamati and Hadjieleftheriadis would not be attending their depositions." *Eletson III*, 2026 WL 84510, at *27 n.18.

*Lilly v. City of New York*, 934 F.3d 222, 227–34 (2d Cir. 2019) (discussing calculation of reasonable hourly rates and reasonable number of hours expended).  "That fees are being awarded as part of a sanction as opposed to under a statute does not change that analysis. *Barbera v. Grailed, LLC*, 2025 WL 12374413, at *1 (S.D.N.Y. Apr. 29, 2025) (citing *Laba v. JBO Worldwide Supply Pty Ltd.*, 2023 WL 4985290, at *13 (S.D.N.Y. July 19, 2023).  "The party seeking the fees bears the burden of establishing that its requested rates are reasonable." *Id.*

The Second Circuit has instructed district courts to "calculate a 'presumptively reasonable fee' by determining the appropriate billable hours expended and 'setting a reasonable hourly rate, taking account of all case-specific variables.'" *Lilly*, 934 F.3d at 229–30 (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Bd. of Elections*, 522 F.3d 182, 188–90 (2d Cir. 2008)).  "An attorney's hourly rate is considered reasonable when it is in line with those rates prevailing" in the district in which the court sits "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. M&B Builders Grp. Inc.*, 2018 WL 6067229, at *5 (S.D.N.Y. Nov. 19, 2018) (cleaned up and citation omitted); *accord McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006).

In considering a reasonable hourly rate, the Second Circuit has instructed courts to consider:

> factors including, but not limited to the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing

18

> demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

*Suarez v. Liquid Blue, Inc.*, 2024 WL 2978311 (S.D.N.Y. June 12, 2024) (quoting *Arbor Hill*, 522 F.3d at 189). Courts may also consider the following twelve factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Lilly*, 934 F.3d at 228 (citation omitted).

"The actual billing arrangement certainly provides a strong indication of what private parties believe is the 'reasonable' fee to be awarded." *Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001). "Courts in this District have recognized that an 'attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of' a reasonable hourly rate." *Doe 1 v. E. Side Club, LLC.*, 2023 WL 4174141, at *6 (S.D.N.Y. June 23, 2023) (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, 2006 WL 3498590, at *9 (S.D.N.Y. Dec. 4, 2006)), *aff'd sub nom. Derek Smith L. Grp., PLLC v. E. Side Club, LLC*, 2024 WL 1756106 (2d Cir. Apr. 24, 2024) (summary order), *cert. denied sub nom. Cohen v. Derek Smith L. Grp., PLLC*, 145 S. Ct. 439 (2024). However, the fee arrangement is not dispositive. *See Charles v. Seinfeld*, 2022 WL 889162, at *4 (S.D.N.Y. Mar. 25, 2022) (Nathan, J.). "[W]hile plaintiff may enter into any fee arrangement it wishes with counsel, it should not be permitted to manipulate the actual damage incurred by burdening the defendant with an exorbitant fee arrangement." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263

(2d Cir. 1987) (quoting *Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 344 N.E.2d 391, 397 (N.Y. 1976)).

In this proceeding, counsel for Levona seeks fees for a number of different lawyers. For Isaac Nesser and William Adams, two partners, Levona seeks fees at a rate of $1,629 per hour. For various associates, it seeks fees ranging from $1,015 per hour to $1,364 per hour. Dkt. No. 703-1. For a clerk, it seeks a rate of $558, and for a paralegal, a rate of $536. Dkt. No. 703 ¶ 3. Those rates are "net of a 10% discount accorded to Levona." *Id.*

Intervenors take issue primarily with the rates charged for the associates.[9] Levona requests reimbursement at an hourly rate of: $1,174.50 for two junior associates, JL and MW, who graduated in 2022; $1,075.50 for AG (2023 graduate); and $1,363.50 for DK (2017 graduate) and $1,255.50 for AVD (class of 2019). With respect to these associates, the provided attorney biographies explain only that their practice "focuses on complex commercial litigation." Dkt. No. 703-3 at 6 (AG), 7 (DK), 8 (JL), 12 (AD), 13 (MW). Except for listed clerkships, the biographies do not provide any additional information about particular expertise.

Even for a "senior or mid-level associate, an hourly rate above $1,000 . . . exceeds the range of hourly rates typically approved by courts in this District." *China AI Cap. Ltd. v. DLA Piper LLP (US)*, 2025 WL 2466633, at *6 (S.D.N.Y. May 22, 2025) (collecting cases). Instead, courts have determined that rates around $875 are appropriate for a senior associate with nearly a

---

[9] Courts have found rates for partners at large law firms similar to those requested here to be reasonable; "[i]n this district, partner billing rates in excess of $1,000 are not uncommon in the context of complex commercial litigation." *China AI Cap. Ltd. v. DLA Piper LLP (US)*, 2025 WL 2466633, at *4 (S.D.N.Y. May 22, 2025) (quoting *Adstra, LLC v. Kinesso, LLC*, 2025 WL 1070034, at *7 (S.D.N.Y. Apr. 9, 2025)); *see also Fearnley Secs., Inc. v. Iwatani Corp. of Am.*, 2026 WL 1080331, at *8 (S.D.N.Y. Apr. 6, 2026) (collecting cases finding partner rates around $1,350 to be reasonable); *An v. Despins*, 2024 WL 1157281, at *2–4 (S.D.N.Y. Mar. 18, 2024) (approving partner rate of up to $1,990). Nor do Intervenors challenge the $1,364 rate for an associate who graduated law school in 2006.

decade of experience, and $700 per hour appropriate for a mid-level associate. *Id.*; *see also Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 2022 WL 413229, at *14 (S.D.N.Y. Feb. 9, 2022) (finding that an hourly rate of $405 to $660 for associates was "within the spectrum for hourly rates approved in this district for attorneys at large New York City law firms involved in complex commercial litigation"); *An*, 2024 WL 1157281, at *2–4 (finding requested hourly rates of $796 to $895 reasonable for Davis Polk associates in awarding fees incurred in moving to dismiss and moving for sanctions); *Wells Fargo Tr. Co. v. Fast Colombia S.A.S.*, 2023 WL 8591953, at *8 (S.D.N.Y. Oct. 16, 2023), *report and recommendation adopted*, 2023 WL 8433128 (S.D.N.Y. Dec. 5, 2023) (awarding $800 hourly rate to senior associate); *Sagax Dev. Corp. v. ITrust S.A.*, 2022 WL 2663488, at *2 (S.D.N.Y. July 11, 2022) (approving hourly rate of $675 for associate with five years of experience in case with complex issues of foreign law). The Court thus finds that an hourly rate of 70% of the charged rate as to the identified associates here to be reasonable.

Levona has not demonstrated that the rates charged for the clerk and paralegal are reasonable. No information is provided as to either's seniority or experience. "With respect to the hourly rate for paralegals in commercial litigation, courts in this District generally award between $150 to $250." *Dakus v. Koniklijke Luchtvaart Maatschappij, N.V.*, 2025 WL 1183676, at *5 (S.D.N.Y. Apr. 4, 2025) (citation omitted). Law clerks are generally treated similarly. *See Holiday Park Drive, LLC v. Newist Corp.*, 2025 WL 990165, at *2 (E.D.N.Y. Apr. 2, 2025); *see also K2M Design, Inc. v. Schmidt*, 2023 WL 10674525, at *12 (S.D.N.Y. Nov. 30, 2023) (finding paralegal rates of $150 to $200 per hour to be reasonable), *report and recommendation adopted*, 2024 WL 1208910 (S.D.N.Y. March 21, 2024); *Top Jet Enters., Ltd. v. Kulowiec*, 2022 WL 1184245 (S.D.N.Y. Apr. 21, 2022) ("With respect to the time sought for non-attorney staff,

21

courts in this District generally find that reasonable hourly rates for paralegal and litigation support staff range from $150 to $250") (citing *Tatintsian v. Vorotyntsev*, 2020 WL 2836718, at *5 (S.D.N.Y. June 1, 2020) ("$150 per hour is reasonable for a paralegal in a complex commercial litigation matter")). Accordingly, the Court finds that a rate of $250 per hour is reasonable for the law clerk and paralegal's time.

### B.      The Number of Hours Expended

Once a reasonable rate of pay has been calculated, it is multiplied by a reasonable number of hours expended to determine the award amount. *Ruradan*, 2024 WL 3567276, at *4. The Court has discretion to disregard hours viewed as "excessive, redundant, or otherwise unnecessary." *Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). However, the Supreme Court has emphasized that "determination of fees 'should not result in a second major litigation.'" *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley*, 461 U.S. at 437). The Court's role is not to act as a "green-eyeshade" accountant but "to do rough justice." *Id.* "[T]rial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Williams v. Epic Sec. Corp.*, 368 F. Supp. 3d 651, 655 (S.D.N.Y. 2019) (quoting *Errant Gene Therapeutic, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, 286 F. Supp. 3d 585, 588 (S.D.N.Y. 2018), *aff'd*, 2018 WL 3094913 (S.D.N.Y. June 21, 2018)); *see also Cruz v. Space NY 50th St LLC*, 2019 WL 4061492, at *5 (S.D.N.Y. Aug. 28, 2019). The Court need not individually assess each time entry but has "discretion to simply apply a reasonable percentage reduction as a practical means of trimming fat from a fee application." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). "Courts apply a percentage reduction to the hours requested where, for example, the hours expended were excessive, the time entries reflect block billing, the entries include time spent on unrelated work, the time entries are redundant or vague, and/or the time entries reflect

22

that work should have been delegated to more junior attorneys or paralegal staff." *StoneX Grp., Inc. v .Shipman*, 2025 WL 1212165, at *6 (S.D.N.Y. Apr. 25, 2025) (collecting cases).

First, Intervenors argue that Levona should not be permitted to recover attorneys' fees for work performed after the sanctions reply brief was filed on September 11, 2025. Dkt. No. 722 at 21. The work that post-dates the filing of the brief includes preparation for oral argument with respect to the sanctions motion and internal conferences with respect to the same in November and December 2025, and work reviewing and summarizing billing records with respect to the discovery sanctions in January and February 2026. Dkt. No. 703-1. It also includes the writing, research, and preparation of the motion to quantify the fees and associated declaration and exhibits. *Id.* "Fees on fees are available only where permitted by the unmistakably clear terms of the applicable statute or contractual provision." *Ruradan*, 2024 WL 3567276, at *5 (citing *Novick v. AXA Network, LLC*, 714 F. App'x 22, 26 (2d Cir. 2017) (summary order)).

The Court entered monetary sanctions pursuant to Rule 37(b) of the Federal Rules of Civil Procedure. *See Eletson III*, 2026 WL 84510, at *26. That rule states that a court "must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by" the conduct for which discovery sanctions were entered. Fed. R. Civ. P. 37(b)(2)(C). The need to move for fees is, along with the motion in the first instance, "caused by" the violating conduct. *See LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 2016 WL 5812105, at *7 (S.D.N.Y. Sept. 22, 2016) ("Since Rule 37(b)(2)(C) mandates payment of reasonable attorney's fees 'caused by the failure' to obey the Court's order, it follows that attorney's fees incurred in preparing the fee application to determine the appropriate amount of the sanctions award are necessarily 'caused by the failure' to obey the Court's order, where the sanctions motion has been granted, such as here."); *Romspen Investment LP v. Dibert*, 2025 WL 3297849, at *6 n.2

23

(S.D. Fla. Oct. 7, 2025) (contrasting the use of "caused by the failure" in Rule 37(b)(2)(C) with the language "incurred in making the motion" in Rule 37(a)(5)(A)).

However, the amount of time expended on the post-award tasks is unreasonable.  Levona seeks reimbursement for 80.8 hours of work performed after the motion for sanctions was completed.  Those include 11.6 hours of preparation for oral argument in December.  Dkt. No. 703-1.  Sanctions specifically were discussed at oral argument over the course of a single exchange.  Dkt. No. 606 at 31:16–32:16.  Levona's request also includes at least 54.6 hours billed by a single associate, MR, for tasks including "review, collate, and summarize billing records re Karastamati and Hadjieleftheriadis depositions, motion to compel in-person briefing, discovery sanctions, briefing, and related tasks," and "update latest quantification based on the same; gather and review relevant attorney bios for discovery sanctions award," and "draft declarations and exhibit re discovery sanctions award."  Dkt. No. 703-1.  This amount of time is grossly disproportionate to the difficulty of those tasks; the substantive briefing of sanctions had already been granted, and all that remained was to collate the records of time spent on the tasks for which the Court specified.

Intervenors also take issue with counsel for Levona's use of block billing.  Block-billed time entries are permissible where they "contain[] enough information to allow the Court to conduct a meaningful review."  *Oakley v. MSG Networks, Inc.*, 2025 WL 3041936, at *14 (S.D.N.Y. Oct. 31, 2025).  While it is "unnecessary for [fee applicants] to identify with precision the amount of hours allocated to each individual task," *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, 2009 WL 72441, at *7 (S.D.N.Y. Jan. 7, 2009), attorneys seeking reimbursement "must provide enough information for the [c]ourt, and the adversary, to assess the reasonableness of the hours worked on each discrete project," *Themis Cap. v. Dem. Rep. of Congo*, 2014 WL 4379100,

24

at *7 (S.D.N.Y. Sept. 4, 2014), *reconsideration denied*, 2014 WL 4693680 (S.D.N.Y. Sept. 22, 2014).  Though courts disfavor block billing in general, it "is most problematic where large amounts of time (e.g., five hours or more) are block billed," thereby "meaningfully cloud[ing] a reviewer's ability to determine the projects on which significant legal hours were spent." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 53 (S.D.N.Y. 2015) (italics omitted); *see also Abdell v. City of New York*, 2015 WL 898974, at *4 (S.D.N.Y. Mar. 2, 2015) (finding block billing acceptable "for temporally short entries combining related tasks").

Many of the entries included in the time-log are discrete enough that the Court can determine the task for which the time billed corresponds.  On the other hand, there are several entries for which it is not possible to discern what amount of time was spent on which task, and therefore not possible for the Court to ascertain whether the amount of time billed was in fact reasonable.  For example, in one entry, associate MW billed 3.8 hours for:

> QE Team call to discuss sanctions brief; call with A. Van Dyke, A. Goodman, and F. Liu re. sanctions brief; research case law re. sanctions for failing to implement litigation hold, failing to produce documents in control of party, and whether preclusion is available for failing to produce a witness; research case law re. scope of Rule 37 sanctions; corr. with A. Van Dyke and A. Goodman re. outline for sanctions brief and how to approach sanctions re. Michalis K. (Eletson IT); calls with A. Van Dyke re. legal research on sanctions and brief; call with D. Kelly re. case law on Second Circuit opinion that adverse inferences are disallowed on summary judgment even under Rule 37.

Dkt. No. 703-1 at 5.  There is no further breakdown of those tasks.  The same associate block-billed 8.3 hours for a similar range of tasks the next day.  *Id.*; *see also id.* at 7 (MW time entry for 5.7 hours on 8/21/25); *id.* at 8 (MW time entry for 7.7 hours on 8/22/25); *id.* at 10 (MW time entry for 7.3 hours on 9/8/25); *id.* (DK time entry for 11.9 hours on 9/9/25).  "Therefore, in light of the vague nature of certain billing entries, the Court finds an across-the-board reduction to be warranted." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 188 F. Supp. 3d 333, 344 (S.D.N.Y. 2016) (citing cases).

It is also clear, looking at the entries as a whole, that there is "some duplication and excess 'fat' in the billing that merits trimming." *Dakus*, 2025 WL 1183676, at *6. For example, a single associate billed 8.7 hours on "legal research re: sanctions for failure to attend 30(b)(6) deposition in connection with preparing sanctions motion," Dkt. No. 703-1 at 4; one associate billed for a "team call" on August 13, 2025 that is not reflected in any other team members' billing records, *id.* at 6; the same occurred on August 20, 2025, *id.* at 7; and one associate billed 11.7 and 11.9 hours on consecutive days for "prepare and revise sanctions reply," which was in addition to at least another approximately 61.1 hours expended by other associates and partners on the same over the course of that week, *see id.* at 10–12. These are just some examples of excessive billing contained within the time records. When faced with such a situation, courts have discretion "simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (citation omitted).

Considering all of the above factors, the Court will impose a 30% reduction on the total number of hours for which compensation is sought. "It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate." *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005), *reconsideration denied*, 2009 WL 3816976 (S.D.N.Y. Nov. 10, 2009); *see also Beastie Boys*, 112 F. Supp. 3d at 57 ("Fee reductions around 30% are . . . common in this District to reflect considerations of whether work performed was necessary, leanly staffed, or properly billed.").

### C.    Costs

Levona also seeks expenses of $1,913.60 that consist "of relevant vendor charges associated with expenses covered by the Sanctions Order."  Dkt. No. 703 ¶ 8; Dkt. No. 703-2. Intervenors do not object to the award of costs.  The Court finds that these costs are "adequately documented, reasonable, and of the type commonly reimbursed by courts in this district." *Palaguachi v. All City Remodeling, Inc.*, 2018 WL 11226108, at *3 (S.D.N.Y. April 20, 2018).

### D.    Joint and Several Liability

Finally, Levona requests that the award "be made payable jointly by Intervenors and their principals Hadjieleftheriadis, Kertsikoff, and Karastamati."  Dkt. No. 702 at 26 n.2.  Levona moved for sanctions only against Intervenors.  Dkt. No. 564.  The Court's resulting award of sanctions therefore ran only against the Intervenors.  *Eletson III*, 2026 WL 84510, at *27.  That request is therefore denied.[10]

### CONCLUSION

The motion for a permanent injunction is DENIED.  Additionally, Levona shall submit a calculation of reimbursable attorneys' fees in conformance with this Opinion by June 26, 2026. The Clerk of Court is respectfully requested to close Dkt. Nos. 699 and 701.

SO ORDERED.

Dated: June 17, 2026
       New York, New York

                 LEWIS J. LIMAN
              United States District Judge

---

[10] The Court will not consider Holdings' request for sanctions under Rule 56(h), as they have not provided notice and included the request only as a portion of their memorandum of law in support of their motion for a permanent injunction.  *See* Fed. R. Civ. P. 56(h) (explaining that the court may order expenses "after notice and a reasonable time to respond").